AO 241 (Rev. 5/85)

**PETITION UNDER 28 USC § 2254 FOR WRIT OF**
**HABEAS CORPUS BY A PERSON IN STATE CUSTODY**

| United States District Court | District | Eastern District |
|---|---|---|

| Name  Kinson Her | Prisoner No.  F-08643 | Case No.  2:09-cv-0612 JAM KJM |
|---|---|---|

Place of Confinement

Pelican Bay State Prison

| Name of Petitioner (include name under which convicted) | Name of Respondent (authorized person having custody of petitioner) |
|---|---|
| Kinson Her                          v. | Francisco Jacquez |

The Attorney General of the State of:  California

**FILED**

**PETITION**

SEP. 2 2 2009

1. Name and location of court which entered the judgment of conviction under attack

   Sacramento Superior Court of California

CLERK U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY
                    DEPUTY CLERK

2. Date of judgment of conviction  August 15, 2005

3. Length of sentence  Life Without Parole+20 years+Life with parole

4. Nature of offense involved (all counts)  1. Murder 2. Attempted murder 3. Discharged

   a firearm from a motor vehicle/with gun and gang enhancments

   were applied to all counts

5. What was your plea? (Check one)
   (a) Not guilty      ☒
   (b) Guilty          ☐
   (c) Nolo contendere ☐
   If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
   (a) Jury        ☒
   (b) Judge only  ☐

7. Did you testify at the trial?
   Yes ☐   No ☒

8. Did you appeal from the judgment of conviction?
   Yes ☒   No ☐

AO 241   (Rev. 5/85)

9.  If you did appeal, answer the following:

(a) Name of court **THIRD APPELLATE COURT OF APPEALS**

(b) Result **AFFIRM CONVICTION, REDUCED SENTENCE WITH-DRAW LWOP**

(c) Date of result and citation, if known **NOVEMBER 30,2007**

(d) Grounds raised **see opening brief**

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court **CALIFORNIA SUPREME COURT OF SACRAMENTO**

(2) Result **DENIED**

(3) Date of result and citation, if known **MARCH 12,2008**

(4) Grounds raised **see "petition for review"**

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court **N/A**

(2) Result **N/A**

(3) Date of result and citation, if known **N/A**

(4) Grounds raised **N/A**

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒   No ☐

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court **SACRAMENTO SUPERIOR COURT OF CALIFORNIA**

(2) Nature of proceeding **HABEAS CORPUS**

(3) Grounds raised **see attact grounds 1 through 11**

AO 241   (Rev. 5/85)

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐   No  ☒

(5)  Result  **Denied**

(6)  Date of result  **March 2, 2009**

(b)  As to any second petition, application or motion give the same information:

(1)  Name of court  **Court of Appeals, 3d District**

(2)  Name of proceeding  **Writ of Habeas Corpus**

(3)  Grounds raised  **Same as attach brief -See grounds 1 through 11**

(4)  Did you receive an evidentiary hearing on your petition, application or motion?
Yes  ☐   No  ☒
(5)  Result  **Denied**

(6)  Date of result  **April 20, 2009**

(c)  Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1)  First petition, etc.        Yes  ☒   No  ☐
(2)  Second petition, etc.     Yes  ☒   No  ☐
                                              still pending
(d)  If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

**N/A**

12.  State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
       CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

AO 241    (Rev. 5/85)

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(**X**) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A.  Ground one:   **SEE ATTACH BRIEF**

_____

Supporting FACTS (state *briefly* without citing cases or law):    **SEE ATTACH BRIEF**

_____

_____

_____

_____

_____

_____

B.  Ground two:  **SEE ATTACH BRIEF**

_____

Supporting FACTS (state *briefly* without citing cases or law):    **SEE ATTACH BRIEF**

_____

_____

_____

_____

_____

_____

AO 241 (Rev. 5/85)

C. Ground three:  **SEE ATTACT BRIEF**

Supporting FACTS (state *briefly* without citing cases or law):  **PLEASE SEE ATTACH BRIEF**

D. Ground four:  **PLEASE SEE ATTACH BRIEF**

Supporting FACTS (state *briefly* without citing cases or law):  **PLEASE SEE ATTACH BRIEF**

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them:  N/A

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☒  No ☐

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing  Paul Irish

2001 "S" Street, Sacramento, CA. 95814

(b) At arraignment and plea  N/A

AO 241   (Rev. 5/85)

(c) At trial    **Paul Irish 2001 "S" Street, Sacramento, CA 95814**

(d) At sentencing    **Paul Irish 2001"S" Street, Sacramento,CA 95814**

(e) On appeal    **W.L. Osterhoudt 135 Belverdere Street, Sanfrancisco CA 94117**

(f) In any post-conviction proceeding    **W.L. Osterhoudt 135 Belverdere Street Sanfrancisco, CA 94117**

(g) On appeal from any adverse ruling in a post-conviction proceeding _____

16.   Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
      Yes **XX**   No

17.   Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
      Yes ☐   No **XX**
      (a) If so, give name and location of court which imposed sentence to be served in the future: _____

      **N/A**

      (b) Give date and length of the above sentence: _____

      **N/A**

      (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
      Yes ☐   No **XX**

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

__9/9/09__
Date

_____
Signature of Petitioner

(7)

CASE NO. 2:09-cv-612-JAM-KJM

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

_____

KINSON HER,
       PETITIONER,

VS.

FRANCISCO JAQUEZ(Warden),
         RESPONDENT,

_____

Amended Application in Response To Docket No. 10, Case No.2:09-cv-612

_____

KINSON HER CDCR# F-08643
PELICAN BAY STATE PRISON
P.O. BOX 7500
CRESCENT CITY, CA. 95531

1        **Table of Contents**

2    INTRODUCTION.................................................1

3    STATEMENT OF APPEALABILITY..................................2

4    STATEMENT OF CASE..........................................2

5    STATEMENT OF FACTS.........................................5

6    ARGUMENT..................................................11

7    I.   THERE WAS INSUFFICIENT EVIDENCE OF PETITIONER KINSON HER'S

8         GUILT ON ANY OF THE CHARGES AGAINST HIM..............11

9    A.   There Was Insufficient Evidence To Convict Petitioner Her of Murder

10        and Attempted Murder On A Direct Theory of Liability.............11

11   B.   There Was Insufficient Evidence To Convict Petitioner Her of Murder

12        and Attempted Murder As An Aider and Abettor....................12

13   C.   There Was Insufficient Evidence To Convict Petitioner of Murder and

14        Attempted Murder,...............................................14

15   II.  THERE WAS INSUFFICIENT EVIDENCE SUPPORTING THE ENHANCEMENTS......16

16   A.   There Was Insufficient Evidence Supporting Enhancements Applied To

17        Counts One and Two For the Use of A Firearm During An Enumerated

18        Felony..........................................................16

19   B.   There Was Insufficient Evidence Supporting the Gang Enhancement

20        Applied To All Counts...........................................16

21   B·1  The Prosecution Failed To Prove Her's Membership In An Ongoing

22        Association of Three or More Persons............................17

23   B·2  There Was Insufficient Evidence Presented Concerning the Primary

24        Activities of YMS, or Even MOD..................................19

25   B·3  There Was Insufficient Evidence To Show That Her Acted With the

26        Specific Intent to Promote, Further, or Assist In Any Criminal Conduct

27        by Gang Members.................................................22

28   III. THE PETITIONER HAD INEFFECTIVE ASSISTANCE OF COUNSEL.............23

i

1  A.    Petitioner Had Ineffective Assistance of Counsel ···················23

2  B.    The Petitioner Had Ineffective Assistance of Counsel When Counsel

3        Failed To Investigate................................................24

4  C·1   The Petitioner Had the Ineffective Assistance of Counsel For

5        Failing To Object To Prosecution Witness' Inflammatory Characterization..25

6  C·2   The Petitioner Had the Ineffective Assistance of Counsel When Counsel failed

7        To object the Gang Experts Baseless Characterization of Petitioner

8        Her As A "Hard Core Killer"........................................27

9  D.    Ineffective Assistance of Counsel For Giving Ineffective Example

10       In Closing Argument That Defeated the Defenses Theory of Self-

11       Defense............................................................28

12 E.    The Petitioner Had Ineffective Assistance of Counsel When Counsel

13       Failed To Present the Petitioner's Expert Witness At Trial ··········29

14 F.    The Petitioner Had Ineffective Assistance of Counsel When the

15       Petitioner Request For A  Speedy Trial, But Counsel Failed

16       To Notified the Court of Such Request·.............................30

17 G.    Counsel Failed To Request Inquiry Into Prosecution Witness' Detective

18       Stigerts Prohibited Communication With The Jurors...................31

19 IV.   THE COURT ERRED AND ABUSED ITS DISCRETION THAT VIOLATED PETITIONER'S

20       COUNSTITUTIONAL RIGHTS.............................................31

21 A.    The Court Failed To Order A Compentency Hearing Pursuant To

22       Penal Code §1368....................................................31

23 B.    The Trial Court Erred By Not Excepting Letters From Petitioner Her

24       As Motions, As Regards To Personal Conflicts Between Petitioner

25       and Petitioner's Trial Counsel......................................33

26 C.    The Trial Court Erred By Denying Petitioner's Motion For An

27       Interpreter.........................................................33

28 D.    The Trial Court Erred By Denying Petitioner's Motion To Exclude

1        Any Opinion of Bandanna........................................34

2   E.   The Court Erred In Allowing Inflammatory Gang Evidence To

3        Be Presented To the Jury......................................35

4   E·1  The Court Erred In Denying Petitioner's Motion To Bifurcate

5        the Gang enhancement..........................................35

6   E·2  The Trial Court Erred In Allowing Gang Expert To Give Prejudicial

7        Testimony About A Hypothetical Question That Misrepresented

8        the Core of the Facts of the Case.............................36

9   E·3  The Trial Court erred In Allowing the Gang Expert's Baseless

10       Characterization of Petitioner Her As A "Hard Core Killer"....37

11  E·4  The Gang "Expert's" Testimony Violated the Confrontation

12       Clause of the 6th Amendment of the U.S. Constitution..........38

13  E·5  The Court Abused Its Discretion In Considering the Gang Detective

14       As An "Expert"................................................40

15  F.   The Trial Court Erred By Failing To Declare A Mistrial During

16       Voir Dire.....................................................42

17  G.   The Trial Court Erred By Failing To Declare A Mistrial When

18       Witness Detective Stigerts Made An Illegal and Prohibited

19       Communication With the Jurors................................42

20  H.   The Court Erred In Denying Petitioner's '995' Motion During

21       Trial.........................................................43

22  I.   The Court Erred By Admitting Prejudicial and Inflammatory Testimony

23       of A Witness That He (the witness) Believed That Threats and Reprisals

24       He Had Suffered Years Ealier Were Connected To His Testimony Against

25       Kinson Her, When the Witness Admittedly Had No Factual Basis For This

26       Belief........................................................45

27  J.   The Court Erred In Giving the Following Jury Instructions........47

28  J·1  The Trial Court Erred By Instructing the Jury, Over Objection, On the

1       Theory of "Pretexual Sel-Defense" Under CALJIC No. 5.55, When This

2       Instruction Was Unsupported By the Evidence and Undermined Petitioner's

3       Legitimate Self-Defense Argument.................................47

4   J·2   The Trial Court Erred In Instructing the Jury, Over Objection, On

5       the Theory of "Adoptive Admissions" (CALJIC 2.71.5), Involving Her's

6       Post-Arrest Interrogation By Police............................50

7   J·3   The Trial Court Erred In Instructing CALJIC No. 2.03, 2.06, 2.51

8       and 2.52........................................................51

9   J·4   The Trial Court Erred By Denying Petitioner's Motion To Re-write

10      CALJIC No. 2.90..................................................52

11   J·5   The Court Erred In Instructing CALJIC No. 1.00 Which Instructed

12      In Terms of Whether the Defendant Was "More Likely To Be Guilty than

13      Not" Was Confusing By Impermissibly Lessening Guilt Beyond A

14      Reasonable Doubt................................................53

15   J·6   The Trial Court's Instruction On CALJIC No. 5.17 On Imperfect

16      Self-Defense Is Erroneous, Placing An Improper Limitation On the

17      Defense In Circumstances In Which the Defense Should Be Legally

18      Applicable......................................................54

19  **V.**   PROSECTUION MISCONDUCT..........................................55

20  **VI.**  DUE TO PETITIONER'S YOUTH, PETITIONER WAS DEPRIVED TO HAVE

21      THREE POSSIBLE TERMS OF HIGH, MEDIUM, AND LOW PENALTIES...........55

22  **VII.** PETITIONER HER'S STATEMENT TO POLICE WAS OBTAINED IN VIOLTION OF

23      HIS CONSTITUTIONAL RIGHTS.......................................56

24  A.   The Trial Court Abused Its Discretion In Admitting Petitioner's

25      Statement At Trial..............................................56

26  B.   Miranda Warnings Were Not Given Until Interrogation Was Well

27      Underway........................................................57

28  C.   Her's Repeated Invocations of His Rights To Remain Silent Were

1         Ignored By the Detectives..........................................61

2  **VIII.**  UNDER THE CIRCUMSTANCES OF THE CASE, ENHANCED SENTENCED OF 25

3         TO LIFE VIOLATES THE EIGHT AMENDMENT AND ARE CONTRARY TO WIDELY

4         ACCEPTED INTERNATIONAL NORMS FOR THE TREATMENT OF CHILD OFFENDERS...64

5  **IX.**  PETITIONER'S RE-SENTENCE OF "25 YEARS TO LIFE" CONSTITUTES CRUEL

6         AND UNUSUAL PUNISHMENT.......................................72

7  **X.**  THE 3d APPELLATE DISTRICT COURT'S DECISION NOT TO REMAND PETITIONER

8         HER TO THE SUPERIOR COURT FOR RE-SENTENCING VIOLATED PETITIONER'S

9         DUE PROCESS AND WAS PREJUDICIAL..............................73

10  **XI.**  CUMMULATIVE ERRORS ARE CUASED FOR A REVERSAL ...............74

11         CONCLUSION..................................................75

12         PRAYER FOR RELIEF...........................................75

13         APPENDIX

14         APPENDIX I. '995' MOTION

15         APPENDIX II.  DIAGRAM AND PHYSICAL EVIDENCE SHEET

16         APPENDIX III.  PETITIONER'S LETTER TO LAWYER

17         APPENDIX IV.  INTERVIEW OF MICHEAL CAMACHO WITH INVESTIGATOR

18         WALLY DAMERELL

19         APPENDIX V.  LOWER COURT'S DATE OF DENIAL

20         PROOF OF SERVICE

21

22

23

24/ 5

25

26

27

28

1   KINSON HER
    PELICAN BAY STATE PRISON
2   P.O. BOX 7500
    CRESCENT CITY, CA 95531
3   IN PRO PER PETITIONER

4

5

6                    IN THE UNITED STATES DISTRICT COURT

7                FOR THE EASTERN DISTRICT OF CALIFORNIA

8
                                      )
9   KINSON HER,                       )      Case No.  2:09-cv-00612-JAM KJM
                 Petitioner,          )      Docket No. 10
10  VS.                               )
                                      )      Amended Application
11  FRANCISCO JACQUEZ,                )
                      Respondent.     )
12                                    )
                                      )
13  _____  )

14                          -INTRODUCTION-

15       Kinson Her was convicted of murder, attempted murder, and discharge of

16  a firearm from a vehicle, and gang and firearm were applied to the first

17  two of these charges.  The scant physical and circumstantial evidence

18  connecting Her to these crimes was grossly overshadowed by the deeply prejudicial

19  and entirely unscientific and unsupported testimony offered by a gang "expert,"

20  who testified that Kinson Her, who was fifteen years old at the time of

21  the crime, was the worst of the "MOD" gang members, and was a "hardcore killer."

22  Her's trial counsel was deficient for not objecting and allowing this prejudicial

23  statement to be placed before the jury, and the Court abused its discretion

24  in allowing this prejudicial statement to be placed before the jury.

25  Had the "expert testimony" and character assassination not been enough,

26  the Court abused its discretion by allowing one witness to testify at length

27  about supposed death threats, attempts on his life and acts of violence suffered

28  years earlier at the hands of unknown individuals, which he interpreted as

                                      -1-

1  Lao(3CT 795), at the conclusion of which Lao was held to answer on Counts One and
2  Two(1CT 17;3CT 870-71).  Petitioner Her was arrested in June of 2002, after
3  preliminary examination, Her was held to answer all charges(4CT 1147).

4       On December 19, 2002, an Amended Information was filed as to both defendants;
5  in Count One charged murder, Count two charged attempted murder, and Count Three
6  charged,discharged of a firearm from a vehicle, and discharge of a firearm
7  causing great bodily injury, and gang enhancement were applied to all counts.

8       Trial commenced on July 18, 2005(1CT 144).  Jury deliberations began on
9  August 4, 2005(1CT 291).  On August 15, 2005 the jury found both defendants guilty
10  as charged on all three counts of the information, as well as finding each of the
11  special allegations true for the purpose of enhancements.(2CT 406)*  A sentencing
12  hearing was held on December 9, 2005(1RT 1357).  On sentencing petitioner Her was
13  sentenced to:  Count One, Life Without Parole and a consecutive 25-years to Life
14  with parole;  Count Two, Life with the possibility of parole with a consecutive 20
15  years;  Count Three were not being imposed due to the Jurys finding that the
16  shooter was not made.

17       On December 9, 2005, petitioner filed a timely notice of appeal(2CT 408).

18       The appeal was denied, and petitioner's sentence of Life Without Parole was
19  reduced to 25-years to Life with possibility of parole.  Decision was made on Nov.
20  30, 2007, in the Court of Appeals, 3d District-Case No. C051473.

21       Petitioner filed a "Petition For Review" in the California Supreme Court. Denied
22  March 12, 2008- Case No. S159613.

23       Petitioner filed a writ of habeas corpus in the Superior Court of California
24  (Sacramento) on January 27, 2009 and it was denied on March 2, 2009-Case No.0F00819.

25       Petitioner filed a writ of habeas corpus in the United States District Court
26  on April 6, 2009  to extend the AEDPA time limitation until all remedies are
27  fully litigated in the lower courts. Case No. 2:09-cv-0612-JAM KJM

28       Petitioner filed a writ of habeas corpus in the Court of Appeals-3d
_____
* This form of citation refers to the Reporter's Transcript on Appeal, in six
  volumes.

-3-

1  pressure not to testify against Kinson Her.

2      Viewed in its proper context, and without this  emotionally charged
3  testimony, there was insufficient evidence connecting Kinson Her to the crimes
4  alleged. Though the evidence showed that many people witnessed the shooting
5  of Fong Vue, and that some if not all of the alleged victims in this case
6  had fired weapons at the time Vue was shot, no effort was made to collect
7  or analyze this evidence or find these witnesses. No witness testified that
8  they seen Kinson Her as being at the crime scene, or in the stolen vehicle
9  used during its commission, and no finger prints nor ballistics evidence
10 was produced to connect Her to any weapon in the case.

11     Of the scant **evidence presented against Her at trial were** letters found
12 in the home of his friend's father shorty after Her's arrest in Minnesota
13 in July 2002. This evidence was seized as a direct result of an unlawful
14 interrogation of Her by a police detective engaging in deceptive and inherently
15 coercive tactics, and should not have been amitted.

16     In these and other ways to be addressed herein, petitioner was deprived
17 of important constitutional and statutory rights, requiring that the judgement
18 and sentence against him be reversed by this Court.

19              -STATEMENT OF APPEALABILITY-

20     Judgement was pronounced on December 9, 2005 (2CT:361-367).* On December
21 9,2005 appellant filed a timely Notice of Appeal (2CT:408). This appeal
22 is from a final judgement of conviction and is authorized by Penal Code Section 1237.

23              -STATEMENT OF CASE-

24     On or about April 9,2002, the Sacramento County District Attorney filed
25 a complaint against Houa Lao, charging him with murder (count one), and assult .
26 with a firearm (count two), and with enhancements base on gang membership
27 and use of a firearm. (1 CT 15-16).

28     On April 9,2002 a preliminary examination was held in regards to Houa

---

* This form of citation refers to the Clerk's Transcript on Appeal, in four
volumes.

2

1  District on April 20, 2009 and it was denied on April 20, 2009.-Case No.C061573.

2      On June 24, 2009, petitioner filed a writ of habeas corpus in the California

3  Supreme Court-Case No. S174121- and this petition is still pending in the Supreme

4  Court.

5      On August 24, 2009, petitioner filed another habeas corpus in the Court of

6  Appeals-3d District to exhaust two more grounds, and it was denied on August 27,

7  2009.- Case No.C062732.  Petitioner was directed to assert these claims first in

8  the lower court.  (These grounds are grounds IX and X  in the instant petition)

9      On September  3, 2009 petitioner sent out a writ of habeas corpus in the

10 Sacramento California Superior Court to exhaust the two grounds.

11     On August 28, 2009,petitioner file a writ to the California Supreme Court

12 asking that the two grounds be attached to the previous petition still pending in

13 the Supreme Court. Case No. S174121.-The latter filed petition Case No. S175956.

14     Petitioner now filing an Amended Application in response to No. CIV

15 S-09-612 JAM KJM P, in the United States District Court for the Eastern District

16 of California. -Docket No. 10- Case No.2:09-cv-612.  Petitioner previously asked

17 this Honorable court to extend the AEDPA time limitation until petitioner

18 fully exhaust all remedies in the lower courts.  Due to lack of legal training,

19 consistant lock downs and limited access to law library, petitioner finally

20 seek exhaustion in the lower courts in Febuary 17,09.(Before the AEDPA time

21 expires)

22 ///

23 ///

24

25

26

27

28
_____
Grounds IX and X  in the instant petition are grounds that petitioner is
seeking to attach to the previous petition pending in the California Supreme
Court. The previous petition contains all grounds attached here except grounds
IX and X.

1                              STATEMENT OF FACTS

2  Background

3        On the evening of Febuary 3, 2002, a shooting occurred in the driveway
4  area of 3212 Western Avenue, in Sacramento California.  When the police
5  arrived at the scene they found two individuals suffering from gunshot
6  wounds, Yee Xiong and Fong Vue (1 RT 50).  Yee Xiong was only grazed and
7  did not sustain life threatening injuries.  Fong Vue had extensive injuries
8  to his head and upper torso.  Social Worker Marcia Hager at UC. Davis stated
9  that Fong Vue was concious at the scene, but rapidly progressed to comma(see
10 p. 334 Bioethics Committee Consultation).- Officer Burke(badge #474) arrived
11 at the scene to find Vue laying next to a pool of blood.  Vue advised Officer
12 Burke that Vue could not feel his legs when Officer Burke tried to get a
13 statement from Vue.(see Burke interview report).  A third individual, Vue
14 Heu, claimed to have been there with Fong Vue and Yee Xiong when the shooting
15 occurred.  Heu was not injured.  Both Vue and Xiong were transported to UC.
16 Davis Medical Center where Vue stayed commatose.  Xiong was treated and
17 released during the early morning hours after the shooting(1 RT 77).  On
18 Febuary 9, 2002, Vue died after his parent decided to pull out the life
19 support plug.  Officers at the scene were informed by witnesses that shots
20 came from a vehicle, identified as a dark Toyota Camry(1RT 179;236;254)-.

21       Shortly thereafter, Officer Warren Estrada observed a blue Toyota
22 Camry containing three male individuals in the area of West Sacramento
23 making an illegal turn.  Believing that the car maybe stolen, Estrada attempted
24 to pull the Toyota over.  The Toyota came to a stop on 2nd and F street
25 near a landmark called the "pyramid" (the Money Store) at this point the
26 officer noted that the back window had been blown out.  As Estrada approach
27 the driver, however, the Toyota sped away(2RT 397-401).- A car chase ensued
28 for several blocks(2RT 402).- The Toyota eventually slowed down to a near

                                   -5-

1  stop, whereupon three individuals exited the front and back of the car,
2  and ran toward the Sacramento river(2RT 405-406).- Estrada pursued the three
3  on foot, until two pasted the third and fled in different directions.
4  Estrada then chased one of the individual, later identified as Houa Lao.
5  Lao was apprehended by Estrada; the other suspects fled(2RT 406-409-421).-
6  It was later confirmed that the Toyota Camry had been stolen earlier that
7  evening(4RT 918-922).- Officer Estrada could not identify Kinson Her as
8  being one of the individuals who ran from the blue Toyota Camry.

9      A jacket containing a cell phone was found on the passenger-side,
10  backseat of the Toyota Camry. As officers collected evidence from the
11  car, the phone was ringing and the name "Xang" was flashing on the caller
12  I.D.. Officer Duncan answered one of these calls, and the caller either
13  stated that "he would wait on the other side of the river in Old Sacramento,"
14  as testified to by Duncan at trial, or that he made it to the other side"
15  as Duncan's contemoraneous report indicated.

16     At about the same time that Houa Lao was being arrested, officers
17  on the far side of the river in Old Sacramento found a group of five young
18  asian male sitting in a van, A cell phone was confiscated from one member
19  of the group, Xang Thao, which corresponded to the number that was found
20  in the Toyota Camry(2RT 547).- On Febuary 4, 2002, early in the morning
21  a street sweeper found a 32 caliber and a 380 caliber on the "pursuit path."
22  Officer walked the pursuit path in the location where the Toyota had driven
23  while Officer Estrada had given chase, and found a 12-gauge shotgun(1RT 95).-

24     Houa Lao was interrogated by Detective Patrick Keller on Febuary 4,
25  2002(2RT 549-566).- Lao stated that two friends, Jasong and Jack Vang
26  had picked him up in the Toyota Camry at approximately 6-7 pm. that evening,
27  and that the three proceeded to drive around until they were pulled over
28  by Officer Estrada(2RT 554-560).- After encounting the officer, Jasong

-6-

1. told Lao, who was seated in the front passenger seat, to run.

2. Processing of the crime Scene

3. The scene at 3212 Western Ave. was described by investigating officers

4. as chaotic(1RT 78) - with as many as fifteen people assembled outside of

5. the residence while the police processed the crime scene(1RT 71).- The

6. wounds suffered by Vue and Xiong were consistant with shotgun pellets.

7. Two spent shell casings were found between 3212 and 3216 Western Ave.; from

8. two different 45 caliber weapons,and bullets were lodge into the yard of

9. the residence located at 3225 Western Ave., which is across the street from

10. 3212 Western Ave.. At least one of the bullets lodge into the yard across

11. the street from 3212 Western had knocked down a downspout from the rooftop(4RT

12. 1106).- A 38 caliber bullet was retrieved from 3225 Western Ave.. A trail

13. of blood was found, leading from the driveway area of 3212 Western Ave.,

14. ultimately ending at the door to the yard of 3210 Western Ave,, where a

15. great deal of blood was concentrated on the ground and on a blue jacket.

16. What is most notable about the processing of the crime scene is what

17. the officers failed to do. No DNA or ballistics evidence was collected

18. from the blood trail and blue jacket located between 3212 and 3206 Western

19. Ave.(the jacket having been found midway in the blood trail on the gate

20. to the rear yard of 3210 Western·1RT 135)- Detective Marnie Stigerts, who

21. was placed in charge of processing of the crime scene, testified that she

22. nor any other officer ever went into the residence or the backyard area

23. of 3212 Western, and she never returned to the scene during daylight hours

24. (1RT 124-125).- Detective Stigerts testified that she did not look north

25. of 3212 Western, and did not cross the street from this address(1RT 125).-

26. Of the fifteen (15) or so witnesses on the street when officer Micheal Boyd

27. arrived to secure the scene and collect evidence, none were interviewed(1RT

28. 73, 78) -

1    Gun residue tests were not conducted on Vue Heu, and were
2  only done on Fong Vue and Yee Xiong after many hours had elapsed.
3  Though Vue Heu testified that he and his friends never fired
4  any weapon that day(4RT 1083-84)-, gunshot residue was found
5  in the hands of Yee Xiong; the test conducted on Fong Vue
6  indicates the presence of concentrated lead(3RT 846).-  When
7  the versons of the story recounted by Vue Heu and Yee Xiong
8  substantially and materially diverged, no attempt was made
9  to probe these participant witness.  3212 Western Ave. is
10 the home of Vue Heu and Yee Xiong's friend, Vang Vang, but
11 no appearent effort was made to talk to this individual.
12 Though Vue stated that directly after the shooting, Xiong-
13 bleeding from the head-stagger to the nearby home of his
14 girlfriend, no effort was made to identify her or search
15 her residence for secreted weapons.

16    Officer Williams collected the bullets lodge in the property across
17 the street from 3212 Western Ave. only because a neighbor living in that
18 home ran out, called his attention to this evidence, and asked that he
19 do so(2RT 390-392)-  Ballistics testing confirmed that the 38 caliber
20 bullet retrieved from across the street did not emanate from any of the
21 weapons that had been found(3RT 851)-  Likewise, the 45 caliber shell
22 casings collected from the crime scene could not be connected to any
23 weapon in this case(3RT 852)-

24    Officers found expended 12-gauge and 32 caliber casings in the Toyota
25 Camry(3RT 749-813)-  This evidence was consistent with gun having been
26 fired from within the vehicle.

27    Additionally, through ballistic reconstruction, it was established
28 that the car had been fired upon from the outside(3RT 842).-  The evidence

1  of this fact was that there were four (4) 40 caliber bullets lodge in
2  the rear bumber of the Toyota and one of those four 40 caliber bullet
3  landed in the spair tire(3RT 827).- There is a bullet hole in the front
4  windshield, and the back windshield had been blown out, and the passenger
5  rear side window had likewise been blown out, -showing that the vehicle
6  had been attacked by a gunman who was located to the side of the car.
7  Faye Ann Springer is the District Attorney's expert who did the trajectory
8  analysis on the Toyota Camry. The expert testified that she "...saw
9  indication of one hole. Once the window breaks out, you know, you could
10  fire a second round, but it has to go some place. So it would either
11  have to exit some open portal in that vehicle."(3RT 864)-

12      A blue and white community bandanna was found on the floor of the
13  backseat. Testing of this item revealed the DNA of three individuals,
14  one of whom was Kinson Her(3RT 900)- It could not be determind, however,
15  which individual was wearing the community bandanna most recently before
16  it was found(4RT 905).- Fingerprints from the vehicle could not be matched
17  to Kinson Her or Houa Lao(3RT 649).-

18      Kinson Her was arrested in Minnesota on June 21, 2002. Detectives
19  Keller and Stigerts traveled to Minnesota on July 2, 2002, to bring
20  Her to Sacramento. Detective Keller interrogated the fifteen-year
21  old Kinson Her, while still in Minnesota without first explaining to
22  Her what was he being charged with(2RT 643 710)- It is clear from this
23  interview that Her believed that he was being arrested for leaving Sacramento
24  in violation of his probation, and not in connection with any murder(2RT 668).-
25      Before Dectives gave Miranda Warnings, Detectives recieved information
26  from Her of where his belongings might be. After interrogating Her,
27  Detective  Keller went to a residence located at 1514 Irving Way, in
28  Minnesota. During his search Detective Keller found a green duffel bag

1 in the basement, which contains two letters.  On a nearby shelf the Detective
2 found three more letters.  1514 Irving Way is the home of Her's girlfriend's
3 father.

4 Other Trial Evidence

5        Brenda Ly testified that she was Kinson Her's girlfriend for a time.
6 She attended a Super Bowl party with Her on the date of the shooting, Febuary
7 3, 2002.  She testified that Lao was at this party.  After the Super Bowl
8 concluded, she left.  At about 9 or 10 that evening, Kinson Her called her to
9 pick him up in West Sacramento, which she did.  Her stayed at Ly's house that
10 night, and the next day she returned from work he was gone.

11       Rindy Her testified that he was at the Super Bowl party on Febuary 3,
12 2002, but that niether Kinson Her nor Brenda Ly were there.  He was driving his
13 fathers' minivan on that day,  Rindy testified that Kinson Her belonged to the
14 "gang" called YMS.

15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24 //
25 //
26 //
27 //
28 //

1        —ARGUMENT—
         —GROUNDS—

2            -I-
         THERE WAS INSUFFICIENT EVIDENCE OF
3        PETITIONER KINSON HER'S GUILT ON
         ANY OF THE CHARGES AGAINST HIM

4

5    A.  There Was Insufficient Evidence To Convict Petitioner Her of
         Murder and Attempted Murder On A Direct Theory of Liability

6

7        There was no direct nor circumstantial evidence of Her's participation in

8    the shooting of Fong Vue and Yee Xiong. No eye witness testified that Her was

9    at the scene of the crime. There was no confession by Her. Her's fingerprints

10   were not found either in the Toyota Camry, nor on the weapons used in the shooting

11   (or anywhere else connected with this investigation). Her was not seen at or

12   near the Toyota Camry. Houa Lao did not, in any way implicate Her. There is

13   no link between the weapons used and Kinson Her. There is no history of threats

14   by Kinson Her to attact these individuals; indeed, Her had no history of violence.

15       Hence, the governments case rested on the cobbling together of circumstantial

16   evidence. Her's DNA, along with two (2) other person, was found on a community

17   bandanna in the vehicle. Rindy Her, a cousin of Kinson Her, testified that

18   petitioner had borrowed his cell phone, and that cell phone was used to call

19   Xang's cell phone. Her left Sacramento to stay with family in Minnesota, where

20   he remain until his arrest in July 2002.

21       This is the sum total of the evidence implicating Her in these crimes.

22   Though this evidence is weak even to establish that he was in the vehicle, there

23   was abolutely no evidence establishing Her's state of mind or alleged role in

24   the offense. The evidence failed to show the petitioner had committed the

25   shooting. Thus, the evidence was insufficient to find petitioner guilty on

26   a direct theory of liability.  "When there is insufficient evidence to establish

27   guilt beyond a reasonable doubt, the defendant must be found not guilty."

28   Jackson v. Virginia,(1979) 443 U.S. 307.

**11**

1    Therefore, the petitioner's rights to a fair trial, due process, and
2 equal protection were violated and prejudice occurred against the 5th, 6th,
3 and 14th Amendments of the U.S. Constitution.

4

5    **B.  There Was Insufficient Evidence To Convict Petitioner Her of Murder
     and Attempted Murder As An Aider and Abettor**
6

7    Petitioner Her's convictions cannot be sustained on the theory of aiding
8 and abetting. A finding of aiding and abetting requires proof that petitioner,
9 with knowledge of the unlawful purpose of the perpetrator, and with the intent
10 of committing, facilitating or encouraging the commission of the crime, by
11 act or advice, aids, promotes, encourages or instigates the commission of
12 the crime.People v. Cooper(1991)53 Cal.3d.1158;People v. Francisco(1994)22
13 Cal.App.4th 1180.

14    In Francisco, the defendant was found guilty of first degree murder on
15 an aiding and abetting theory, based upon his involvement in a drive by shooting.
16 Francisco argued that he was simply the driver of the vehicle used in the
17 murder, and that the government failed to prove his acts were deliberate or
18 premeditated. The Court rejected this claim, finding evidence that the defendant
19 stated before the crime that he was going to get a gun to shoot someone, and
20 thereafter drove a confederate into rival gang territory, where the passenger
21 shot a rival at closed range, in retaliation for a murder done to a gang member
22 associated with the defendant, and then disposed of the weapon, was sufficient.
23 These facts established that Francisco intended to further the acts of the
24 principle.

25    Her, fifteen years old at the time of the offense and with no history
26 of committing violent acts- did not engage in any such conduct. There was
27 no prior declaration made about intending to shoot someone, nor any retaliatory
28 purpose. Her was not alleged to have taken the active role of driving the

**12**

1  Toyota Camry, and he did not have any interaction with the murder weapon.  Even

2  assuming Her was in the Toyota at the time of the shooting, he may have been

3  cowering in the backseat or otherwise merely present at the time of the shooting.

4  These scenarios are as likely, based on the evidence, as any scenario implicating

5  Her in aiding and abetting a killing with malice aforethought.  When evidence

6  is susceptible to two reasonable conclusions, one consistent with guilt and the

7  other consistent with innocence, the jury is required to acquit the defendant.

8  See CALJIC 2.24;See also People v. Merkouris(1956)46 Cal.2d 540;United States v.

9  Berger, 224 F.3d 107 (2d Cir.2000)(Evidence that is at least as consistent with

10 innocence as with guilt is  insufficient to support a guilty verdict.).

11     The Court has made clear that mere presence cannot give rise to liability

12 under the theory of aiding and abetting:

13     Mere presence at the scene of the crime, coupled with a failure to try to
       prevent the crime, does not justify an instruction on aiding and abetting.
14     (People v. Durham,(1969)70 Cal.2d 171,180-181[74 Cal.Rptr.262,449 P.2d 198]).
       A thorough review of the facts shows no knowledge by either Rose or Rodriguez
15     that the crime was to be committed.  Nor was any encouragement shown.  The
       fact that Rose knew of the first argument and the victim's return to the home
16     and had asked defendant also to return there is totally inadequate to support
       a charge of "accomplice" against her. Her knowledge of the presence of the
17     shotgun in the house is likewise of no aid on this respect.  As to Rodriguez,
       he was merely a percipient witness to the crime.  The assistance after the
18     fact is insufficient to show aiding and abetting; at worst, such assistance
       could lead to prosecution for a different offense, namely, accessory after
19     the murder.(Penal Code,§ 32;People v. Collum,(1898)122 Cal.186,187[54 P.589];
       People v. Duty,(1969)269 Cal.App.2d 97,100-101[74 Cal.Rptr.606].)
20

21     People v. Ruthowsky,(1975)53 Cal.App.3d 1069,1072-73.  Because the evidence

22 in the instant case showed, at most, no more than petitioner's mere presence at

23 the scene of the shooting, his convictions on Counts One and Two must be reverse.

24 No evidence in the instant case showed petitioner was an aider and abettor.

25     Therefore, petitioner's rights to a fair trial, due process and equal protection

26 were violated and prejudice occurred against the 5th, 6th and 14th Amendments

27 of the U.S. Consitution.

28 //

1    **C.  There Was Insufficient Evidence To Convict Petitioner of Murder**
        **and Attempted Murder**
2

3        Even assuming Her was in the Toyota at the time of the shooting, the defense

4   demonstrated that the people at Western Ave. had fired shots first even before

5   the Toyota past 3212 Western(location where "victim" was), and that the people

6   inside the vehicle return shots after passing 3212. see appendix II (drawn

7   diagram I and II)-  This theory of self-defense is supported by the evidence

8   the prosecutor presented at trial:  There were two shots fired first followed

9   by more shots.  There were two empty .45 caliber shell casings found a few

10  feet away from where the "victims" were during the shooting.(2RT 354)-  There

11  were concentrated lead detected on the hands of Fong Vue, and more gunshot

12  residue were detected on the hands of Yee Xiong.(3RT 846)-  The right side

13  of the rear passenger window had been blown out.(1RT 117)-  As indicated by

14  the trajectory analysis, the bullet  would have to exit an open portal in the

15  vehicle(3RT 864); in which, the back windshield had also been blown out.(1RT

16  117)-  This sum up that at least one of the first bullet had enter the right

17  rear passenger window and exit the back window as the Toyota was approaching

18  the "victims."

19       Apparently, there were more than one gun that was used, not including

20  the weapons from the Toyota Camry.  Based on the evidence the Toyota had multiple

21  shots from a .40 caliber.(3RT 827)-  A .38 caliber bullet were lodge into the

22  yard of 3225 Western Ave., which is located across the street, north of 3212

23  Western Ave.(4RT 1106.-  The .45 caliber empty shell  casings collected from

24  the scene could not be connected to any weapons in this case.(3RT 852)-  The

25  .40 caliber bullets that were lodge into the Toyota Camry could not be connected

26  to any weapons found.(3Rt 860)-  The .38 caliber bullet retrieved from across

27  the street of 3212 Western was confirm that it was not emanated from any weapons

28  that had been found.(3RT 861)-  At least three(3) weapons were used by the

**14**

1  people at Western: one, the .45 caliber; two, the .40 caliber; three, the .38

2  caliber, and not one of these weapons were found.

3      There were indications that Xiong and Vue possibly shot a gun that night of

4  the shooting.(3RT 852)- Shortly after the shooting, Social Worker at UC Davis

5  Marvia Hager stated that Vue rapidly progress to coma and only has gag reflexes.

6  (see Bioethics Committee Consultation)- At the scene Officer Burke interviewed

7  Vue and Vue stated that he could not feel his legs.(see Burke interview report)-

8  In which indicates that when Vue was shot in the head, he was paralyzed and

9  he rapidly progressed to coma, and only has gag reflexes; therefore, leaves

10 Vue in a position where Vue should not be capable of firing a gun after he was

11 shot; meaning the only way Vue was to shoot a gun is before he got shot that

12 caused him to be paralyzed and rapidly progressed to coma.

13     The petitioner contends that one of the first bullet the people at Western

14 shot had enter the rear right passenger window and exit the back window as the

15 Toyota was appoaching the people at Western.(see Appendix II-) This clearly indica-

16 tes that prior to the shootout the rear passenger window was up and in no position

17 to do a premeditated drive-by shooting. The petitioner also contends that the

18 conclusion that Vue shot a gun before he got shot is reasonably supported by

19 the evidence.  There is no way the occupants in the vehicle shot Vue first and

20 Vue return shots as he was progressing to coma after being shot in the head.  The

21 evidence presented at trial was insufficient to establish guilt beyond a

22 reasonable doubt, the defendant must be found not guilty." Jackson V. Virginia,

23 (1979) 443 307.

24     Therefore, the petitioner's rights to a fair trial, due process and equal

25 protection were violated and prejudice occured against the 5th, 6th, and 14th

26 Amendments of the U.S. Constitution.

27 ///

28 ///

1                                    -II-

2                        **THERE WAS INSUFFICIENT EVIDENCE**
                         **SUPPORTING THE ENHANCEMENTS**
3

4    A.  **There Was Insufficient Evidence Supporting Enhancements Applied to**
         **Counts One and Two for the Use of A Firearm During An Enumerated**
5        **Felony**

6        The Jury found true an enhancement on Counts One and Two, pursuant to

7    Cal.P.C. 12022.53, for the use of a firearm during the commission of an enumerated

8    felony.  The enhancement under 12022.53 for Count One required a finding by

9    the trier of fact that (1) during the commission of an enumerated felony; (2)

10   a principal personally and intentionally; (3) discharged a firearm; (4) proximately

11   causing death; (5) and that the murder was committed for the benefit of, at

12   the  direction of, or in association with a criminal street gang; (6) with

13   the specific intent to promote, further or assist in any criminal conduct

14   by gang members.

15       The crimes alleged in Counts One and Two, murder and attempted murder, are

16   enumerated felonies.  However, for the reasons stated above in grounds 1(see

17   pages 11-15), the prosection failed to prove that petitioner Her had the requisite

18   mens rea, or that the killing was "unjustified."  Therefore, the first element

19   of these enhancements is not satisfied.  Hence, there is insufficient evidence

20   to establish guilt beyond a reasonable doubt, the defendant must be found not

21   guilty."  Jaskson V. Virginia, (1979) 443 U.S. 307.

22       Thus, the petitioner's rights to a fair trial, due process and equal

23   protection were violated and prejudice occurred against the 5th, 6th, and

24   14th Amendments of the U.S. Constitution.

25   B.  **There Was Insufficient Evidence Supporting The Gang Enhancement Applied**
         **To All Counts**
26

27       The element "that the murder was committed for the benefit of, at the

28   direction of, in association with a criminal street gang" lacks evidentiary

**16**

1  support.   Central to these enhancements is the definition of criminal street

2  gang as:

3      (1) an ongoing association of three or more persons with a common name
    or common identifying sign or symbol; (2) which has as one of its primary

4      activities the commission of one or more of the criminal acts enumerated
    in the statue; and (3) includes members who either individually or collective-

5      ly have engaged in a 'pattern of criminal gang activity' by committing,
    attempting to commit, or soliciting two or more of the enumerated offenses

6      (the so-called "predicate offenses") during the statutorily  defined
    period.

7

8  See People v. Gardeley, (1996) 14 Cal. 4th 605, 617.  The prosecutor failed

9  to prove that petitioner Her was a member of a gang possessing these attributes.

10

11      **B·1  The Prosecution Failed to Prove Her's Membership In An Ongoing
        Association of Three or More Persons**

12

13  *///*

14  *///*

15  *///*

16  *///*

17  *///*

18

20

21

22

23

24

25

26

27

28

**17**

1     An alleged gang expert, Aaron Lee, testified that Her had been validated   as

2  a member of the Young Mafia Society("YMS") in the year 2000(4 RT 972).- Lee

3  testified that at some point two other individuals, Ceng Vang and Laksu Cha

4  had been validated as YMS members(4 RT 971), though both had since moved on

5  to become members of MOD(4 RT 971).- Appellant Lao was not shown to have any

6  affiliation with YMS, and was not a validated member of any gang.  Kinson Her's

7  alleged stint in YMS was not shown to have coincided with that of Vang and Cha.

8  Therefore, the prosecution failed to prove the existence of an **ongoing association**

9  **of three or more persons.**

10     The People attempted to abscure the insubstantial nature of "YMS" by claiming

11  that it was a junior subset of MOD, and that MOD is an "umbrella group." (4

12  RT 949)- Lee explained that each group has its own identity, but they all have

13  the same enemies as MOD- and fall under the heading "MOD."(Id.;4 RT 949;972).-

14  such a claim must failed, however, because whatever "YMS" may have been, the

15  prosecution failed to show that this chimerical "subset" consisted of anyone

16  but Her at the time of the shooting.* Petitioner Her was never validated as

17  a member of MOD, perhaps because his extreme youth precluded such membership.

18     In this respect the present case is similar to **People v. Perez**(2004) 118

19  Cal.App.4th 151.  In Perez, the basis of a criminal street gang enhancement

20  was that the defendant was a member of a group calling itself "Crazy Latin Boys"

21  ("CLB"), which harbored racial animus torward African Americans and Asians.

22  The shooting in question, in which an Asian boy was targeted, was supposedly

23  committed for the purpose of avenging a fallen comrade, who was believed to

24  have been killed by members of an Asian gang.  118 Cal.App.4th at 156-157.

25     On review, the Court reversed the criminal street gang allegation, holding

26  that the evidence failed to establish the necessary element that the gang's

27  primary activities were the commission of enumerated crimes.  Id. 118 Cal.App.4th

28  at 159.  Importantly, the Court looked soley to the documented behavior of CLB,

---

\* Her's former girlfriend thought he was a "MOD", and one of Her's letter bore
numbers supposedly signifying MOD affiliation.  But no one testified to Her's
validation as a MOD, a group apparently consisting of people considerably older
than Her.

1 which at the time of the offense had somewhere between 10 and 20 members, and
2 not its "umbrella organization" the East Side Longos, a gang professing membership
3 of over 300 members. The Court did not even consider actions taken or documented
4 in relation to the East Side Longos, because though there might be affiliation
5 between that gang and Perez' group, the relevant issue was the primary activities
6 of CLB.

7     As in Perez, the relevant question in relation to petitioner Kinson Her
8 is whether there was sufficient evidence that the group of which he was a validated
9 member, the YMS, can meet the definition of a street gang as set forth in the
10 statute. Because the government failed to prove that the necessary criteria
11 existed in this case, the enhancements applied to all Counts must be reversed.
12 There is no way the jury could reasonably find that petitioner Her is a validated
13 gang member, nor that the petitioner was a membership in an ongoing association
14 of three or more persons. "When there is insufficient evidence to establish
15 guilt beyond a reasonable doubt, the defendant must be found not guilty."
16 Jackson V. Virginia,(1979) 443 U.S. 307.

17     Therefore, the petitioner's rights to a fair trial, due process and equal
18 protection were violated and prejudice occurred against the 5th, 6th, and 14th
19 Amendments as guaranteed by the U.S. Constitution.

20

21     **B·2. There Was Insufficient Evidence Presented Concerning the Primary
        Activities of YMS, or Even MOD**
22

23     After stating that Kinson Her was a member of YMS, gang expert Lee never
24 returned to detail the actions, history of crime, avowed purpose or any other
25 relevant data about this so-call gang. Instead, he made a bald statement that
26 YMS consists of the younger brothers and cousins of original MOD members -
27 and then detailed actions taken by MOD members in association with that gang.
28 (4 RT 949; 953). In this regard, Lee stated that the primary activities of

1  of MOD are doing acts of violence. With the prosecutor's prodding, he added

2  robbery and theft offenses. (4 RT 951).- He backed this description of MODs

3  primary activities by describing a number of violent episodes occurring within

4  the preceding decade, which MOD members were suspected of, arrested for, or

5  convicted of.(4 RT 953-957)-

6      This evidence failed to establish the necessary element of the group's

7  "primary activities", and was thus insufficient to support the enhancement

8  applied to Petitioner's sentence. In Perez, supra, the Court explained:

9      "The phrase 'primary activities,' as used in the gang statue, implies
       that the commission of one or more of the statutorily enumerated crimes
10     is one of the group's'chief'or 'principal'occupations.[Citation.] That
       definition would necessarily exclude the occasional commission of those
11     crimes by the group's member."(id. at 323.) "Sufficient proof of the gang's
       members consistently and repeatedly have committed criminal activity listed
12     in the gang statute. Also sufficient might be expert testimony, as occurred
       in People v. Gardenley[(1966)]14 Cal.4th 605.[620][59 Cal.Rptr.2d 356,
13     927 P.2d 713]. There, a police gang expert testified that the gang of
       which defendant Gardeley had for nine narcotics and witness intimidation,
14     both statutorily enumerated felonies.[citation.]"(Sengpadychith, supra,
       at p. 324.)
15

16  18 Cal.App.4th at 159-160 (emphasis in original). Utilizing this standard,

17  the Perez Court found that a rash of shootings over the course of a week, coupled

18  with the beating of an individual six years prior, and the alleged shooting

19  at issue in the case were legally insufficient to establigh that the gang's

20  primary activities, i.e. activities which the gang consistently and repeatedly

21  committed, consisted of murder and attempted murder. Id. Accordingly, the

22  Court ordered that the true finding on the criminal street gang allegation

23  be striken. Id.

24     In this instant case, there was no testimony from which to glean the primary

25  activities of YMS. As for MOD, Officer Lee testified that he believes the

26  group's primary activities to be violence(homicide and drive-by shooting) and

27  theft. Later in his testimony Lee detailed a number of incidents occurring

28  between members of MOD and HNS. Of the offenses claimed to be perpetrated by

1 MOD members, the officer only identifies three incidents resulting in convictions.
2 The first of these occurred in January 1995 - and the person convicted was from
3 a supposed junior subset called TLR(4 RT 954); the second and third incidents
4 occurred in Febuary and July 2001 in which MOD members were convicted of robbing
5 and beating rival gang members.(4RT 956-957). All other crimes discussed by Lee
6 failed to specify who was involved and how the cases were resolved. This evidence
7 was plainly insufficient to show that the primary activities of MOD were violence
8 and theft offenses. See In re Leland D.,(1990)223 Cal.App.3d 251;and In re
9 Nathaniel C.,(1991) 228 Cal.App. 3d 990.

10      In Leland D., a California Court of Appeal reversed the finding on the gang
11 enhancement under Section 186.22, explaining"[a]lthough the statute does not reqire
12 proof of convictions, it does reqire proof that the offenses were committed.
13 Evidence that an individual has been arrested for an offense, without more, is
14 not sufficient to establish either that a crime has been committed or that any
15 particular individual is guilty of its commission." 223 Cal.App.3d at 258.
16 Applying this rule to the facts of Leland D., the Court concluded that "[c]learly
17 Officer Freeman's "expert testimony" based on nonspecific hearsay and arrest
18 information does not constitute substantial evidence that the Fink White Deuces
19 are a criminal street gang as defined by statute." Id., 223 Cal.App.3d at 259.

20      In the present case, Officer Lee's testimony did not reflect who was arrested
21 for the crimes which were alleged to have been committed, nor the outcome of those
22 arrests. The information presented by Lee was based on nonspecific hearsay and
23 did not provide substantial evidence that the MOD is a gang, cognizable under
24 staute. Therefore, there's no way the jury could reasonably find that the petitioner
25 is a validated gang member, nor could the jury reasonably find that YMS or MOD's
26 primary activities are violence, robbery, and theft. Thus, the gang enhancement
27 should be reversed. "When there is insufficient evidence to establish guilt
28 beyond a reasonable doubt, the defendant must be found not guilty." Jackson v.

1  **Virginia**,(1979) 443 U.S. 307.

2      Therefore, petitioner's rights to a fair trial, due process, and equal
3  protection were violated and prejudice occurred against the 5th, 6th, and 14th
4  Amendments as guaranteed by the U.S. Constitution.

5

6   **B·3.  There Was Insufficient Evidence To Show That Her Acted With the**
        **Specific Intent to Promote, Further, or Assist In Any Criminal**
7        **Conduct by Gang Members**

8      There was no evidence from which a rational jury could have concluded that
9  Her acted with the specific intent to promote, further, or assist gang members.
10  see People v. killibrew,(2002) 103 Cal. App. 4th 664; see also People v. Frank
11  S.,(2006) 141 Cal.App.4th 1129.

12      In Killibrew, the defendant was convicted of conspiring to possess a handgun.
13  Though Killibrew did not have a handgun in his possession, a gang expert testified
14  that Killibrew was a member of a criminal street gang, and thereby had the requisite
15  subjective knowledge and intent to possess the gun.  Id., 103 Cal.App.4th at 647;
16  652.  Specifically he testified that "when one gang member in a car possesses
17  a gun, every other gang member in the car knows of the gun and will constructively
18  possess the gun." Id., 103 Cal.App.4th at 652.  The California Court of Appeals
19  reversed this conviction, upon a finding that the testimony about Killibrew's
20  subjective knowledge and intent was inadmissible, and evidence was insufficient
21  to establish Killibrew's guilt. Id.103 Cal. App.4th at 648.

22      Similarly, In re Frank S.,(2006)141 Cal.App.4th 1192, 1196, the Court reversed
23  the lower court's finding on a gang allegation, because there was no substantial
24  evidence that the defendant had the specific intent to promote, further or assist
25  in criminal conduct by gang members, aside from a gang expert's statement that
26  the defendant's possession of the knife would benefit the Nortenos by providing
27  the gang with protection. Id. 141 Cal.App.4th 119.

28      In the present case, there was absolutely no evidence presented that Petitioner

**22**

1  Her had the specific intent to promote, further or assist in the
2  criminal conduct of gang members at the time of the shooting on Western
3  Ave.. The gang expert spoke generally, stating that drive-by shootings promote
4  gangs, such as MOD, by installing fear in rivals.(4 RT 961). This general
5  supposition by the gang expert, however, was plainly insufficient to establish,
6  beyond a reasonable doubt that Kinson Her harbored the necessary specific
7  intent required for the gang enhancement. Accordingly, there was a failure
8  of proof on this element as well. Thus, the gang enhancement applied to petitioner
9  should be reversed. "When there is insufficient evidence to establish guilt
10 beyond a reasonable doubt, the defendant must be found not guilty." Jackson
11 v. Virginia,(1979) 443 U.S. 307.

12      Therefore, petitioner Her's rights to a fair trial, due process, and
13 equal protection were violated and prejudice occurred against the 5th, 6th,
14 and 14th Amendments of the U.S. Constitution.

15

16                          -III-
                THE PETITIONER HAD INEFFECTIVE ASSISTANCE OF
17              COUNSEL

18

19  A.  Petitioner Had Ineffective Assistance of Counsel

20      When the petitioner was arrested, he was a fifteen year-old juvenile
21 minor with a low education level and his mental condition as an adult was
22 not completely full. The petitioner suffered from mental retardation as not
23 being a completely sane adult with minimal education level. The petitioner
24 did not understand, nor was he knowing or intelligent of criminal law, due
25 to his young juvenile age of 15 years. The petitioner had not completed his
26 junior year in high school education. Thus, the petitioner was mentally
27 retarded and incompetent during his arrest.

28      "A defendant's competence to stand trial goes to the fundamental integrity

23

1 of the court's proceedings.  If counsel, despite doubts as to defendant's competence,
2 were... to accede... not to institute proceedings, defendant's due process rights
3 might be violated.  This would place defense counsel and the integrity of the cr-
4 **iminal** justice system in an impossible situation."  People v. Harris,(1993) 14
5 C.A. 4th 984,995.

6        "Conviction of an incompetent defendant violates due process.  Unless a
7 defendant's competent, the state cannot put him on trial.  Competence to stand
8 trial is rudimentary, for upon it depends the main part of those rights deemed
9 essential to a fair trial, including the right to effective assistance of counsel,
10 the right to summon, to confront, and to cross examine witness, and the right
11 to testified on one's own behalf or to remain silent without penalty for doing
12 so."  Riggins v. Neveda,(1992) 504 U.S. **12, at** 140.

13        Therefore, the petitioner's rights to a fair trial, due process, and equal
14 protection were violated and prejudice occurred against the 5th, 6th, and 14th
15 Amendments as guaranteed by the U.S. Constitution.

16

17    **B.  The Petitioner Had Ineffective Assistance of Counsel When Counsel Failed**
     **to Investigate**
18

19        The petitioner's Investigator Wally Demerell investigated and found a witness
20 who can possibly identified petitioner Her in a white vehicle,and not in a dark
21 colored vehicle as alleged in this case.  Investigator Wally Damerell interviewed
22 Micheal Camacho on May 3, 2004.  Camacho stated that he and his cousin Angel
23 Camacho were at the Sacramento County Court-house with someone named Vang.  Vang
24 stated to Angel Camacho that Vang witness the shooting in this instant case.
25 Vang also stated that Vang was at the scene on Western Ave. at the time of the
26 shooting, and Vang identified petitioner Her as being in a white vehicle, not
27 the blue Toyota as alleged in this case. (see  interview-Appendix IV)

28        During Micheal Camacho's interview with Investigator Demerall in May 3,

1  2004, Micheal Camacho stated that witness Vang was the only one with that last
2  name in J-1 juvenile Facility; however, the Defense Counsel nor the investigator
3  Demerell made any attempts to find out what Vang really witness before abandoning
4  this possible defense. -Citing Eugene Rios v. Teresa Rocha, (2002) no.-01-15835
5  D.C. No.-CV-94 00209 U.S. Court of Appeals, 9th Circuit.- This information
6  may have been helpful to the petitioner at trial to demostrate that infact
7  petitioner was not in the Blue Toyota Camry when the shooting occurred, but
8  Counsel and Investigator Demerell fail to investigate. see Wiggins v. Smith,
9  123 S.Ct 2527 (2003)- Although it is not clear what witness Vang witness due
10 to the fact that Counsel and Investigator never investigated Vang for possibly
11 useful information that may help the petitioner. "Supression of favorable
12 evidence violated due process." Brady v. Maryland, (1963) 303 U.S. 83, and
13 "Constitution requires that criminal defendant be given opportunity to present
14 evidence that is relevant, material and favorable." U.S. v. Begay, (1991) 973
15 F.d 515. - also in Taylor v. Singletary,(1997) 123 F.2d 350,"Defendant have
16 5th and 6th Amendment rights to present witness that are both material and favorable."
17 The petitioners' Counsels' representation of the petitioner clearly fail way below
18 an objective standard of reasonableness under prevailing professional norms
19 and a reasonable probability existed that, but for counsel's failings, defendant
20 would have received a more favorable result. see Strickland v. Washington,
21 (1984) 466 U.S. 668,688.

22      Therefore, the petitioners rights to effective assistance of counsel, due
23 process, and equal protection were violated, and prejudice occurred against
24 the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

25

26    **C·1.  The Petitioner Had the Ineffective Assistance of Counsel For Failing
           To Object To Prosecution Witness' Inflammatory Characterization**
27

28  ///

25

1     The petitioner's Counsel failed to lodge an objection to prosecutions

2 hypothetical question, and therefore, allowed gang experts' prejudicial statement

3 to be presented in front of the juries.

4     The prosecution gave gang 'expert' Lee a situation supposedly mirroring

5 that in this case- Herein three people, associated with with MOD gang, were

6 in a car with three weapons, one a sawed off shotgun, the car is stolen, and

7 they go to Western Avenue, approach a house, and fire the weapons. Lee is

8 asked whether that would be for the benefit of MOD.(4 RT 962), and unsuprisingly

9 reponded "definitely- a drive by shooting is a classic gang crime."(Id.)-

10    This hypothtical, however, included crucial "facts" not supported by the

11 evidence. First, for the reason stated in the proceding section, the description

12 of the three vehicle occupants as MOD members was not proven. The government

13 does not even offer a guess as to who the third person might have been, and

14 the prosecution's own witness identified Her as a member of YMS, not MOD, and

15 could not assign Lao to any gang. (4 RT 972)-

16    Second, there was no sawed off shotgun in this case. Defendant Lao objected

17 to the mischaracterization of the gun, and the court simply instructed the prosec-

18 utor to call it a "shorten" shotgun instead. (4 RT 962)- This "fact" should

19 not have been introduce into a case wherein no weapons were sawed off."

20    Third, the evidence does not support the assumption that the occupants

21 in the vehicle went to a nieghborhood and shot weapons without provocation.

22 The undeniable facts are that a gun battle took place between individuals

23 on the street and the individuals in the vehicle, and it could not be assertain

24 that the occupants in the vehicle fired first. Therefore, taken as a whole,

25 the hypothetical question - which served as the basis for the expert to offer ul-

26 timate opinion testimony on the question of the enhancements, grossly misstated

27 the facts of the case, and resulted in undue prejudice.

28    The testimony of the gang 'expert' Lee was flawed because the form of the

1  hypothetical question put to the expert was devoid of factual support and was

2  unduly prejudicial. A valid hypothetical question "must be rooted in the facts

3  shown by the evidence." See People v. Gardeley, (1996) 14 Cal. 4th 605, 619.

4  Thus, the petitioners trial Counsels legal representation fail way below an

5  objective standard of reasonableness, and the petitioner would have been able

6  to strike the prejudicial statements of the presecution witness if petitioners

7  counsel was effective in representing the petitioner.  Strickland v. Washington,

8  (1984) 446 U.S. 668,688.

9      Therefore, petitioner Her's rights to effective assistance of counsel,

10 fair trial, due process,and equal protection were violated  and prejudice occurred

11 against the 5th, 6th and 14 Amendments as guaranteed by the U.S. Constitution.

12

13     **C.2.  The Petitioner Had the Ineffective Assistance of Counsel When**
       **Counsel Failed To Object To the Gang Experts Baseless Characterization**
14     **of Petitioner Her As A"Hard-Core Killer."**

15     The gang expert Lee was asked by the prosecutor for his opinion of Kinson

16 Her's level of participation and activity as a gang member, and he responded:"I

17 put him right up there at the top--- of being a hard core killer."(4 RT 973)-

18 Lee went on,"[Her] had progressed from his previous times he was arrested,

19 from steeling a vehicle to illegal gun possession in a vehicle, now to homicide."(Id.)

20 This"opinion" was not based on training and experience, or on any real expertise,

21 but rather was foundationless, conclusory and completely prejudice.  The expert

22 assumed petitioner Her's guilt in this case at bar, and then argue that his

23 participation in this murder put him at the forefront of homicide gangsters.

24 The opinion could not assist the trier of fact in any way other than giving

25 them a basis to prejudge the defendant, outside of the evidence.  The Killibrew

26 Court explained:

27     Otherwise admissible expert opinion testimony which embraces the ultimate
       issue to be decided by the trier of fact is admissible.(Evid.Code 805)-
28     This rule, however does not permit the expert to express any opinion he

1    or she may have. (Citation). 'Undoubtedly there is a kind of statement by the witness
     which amounts to no more than an expression of his general belief as to
2    how the case should be decided.... There is no necessity for this kind
     of evidence; to receive would tend to suggest that the judge and jury
3    may shift responsibility for decision to the witness; and in any event
     it is wholly without value to the trier of fact in reaching a decision.'
4    Killibrew, 103 Cal.App.4th at 651.

5        The type of opinion offered by Officer Lee is especially  egregious, because

6    it invited the jury to base its complex determination of guilt or innocence

7    on generalized fear and unsupported hypothesis.  He based his characterization

8    of the petitioner as the worst member of the "largest Hmong gang in Sacramento"

9    on his assumption that petitioner was guilty of the crime.  The expert was

10   charged with assisting the jury to decipher, and then attacted petitioner's

11   character in crude, manifestly unscientific terms.  Thus, the petitioners trial

12   counsels legal representation fail below an objective standard by not objecting

13   to this highly prejudicial statement, and thus, allowing this undue prejudicial

14   statement to be presented to the juries.

15       Therefore, this caused prejudice and violated petitioners rights to effective

16   assistance of counsel, fair trial, due process, and equal protection, as

17   guaranteed by the 5th, 6th, and 14th Amendments of the U.S. Constitution.

18

19       **D.  Ineffective Assistance of Counsel For Giving Ineffective Example In**
             **Closing Argument That Defeated The Defenses Theory of Self-Defense**
20

21       Trial Counsel said in closing argument that "We know from the

22   evidence that there was a projectile fired through, as I just

23   went over, the rear passenger window.  That projectile was never

24   fired--"-(paused for a moment then continued) -"-recovered."

25   Petitioner Hers Counsel is referring to the first projectile that

26   the people at Western Ave. had fired.  According to the Reporters

27   Transcript (5 RT 1228) trial counsel let the word "**never fired**"

28   sink in the jury's head, and then corrected himself by saying "recovered".

     This   a    at       R   p  **28**        T    WTTE. W       r

1  This is clearly ineffective assistance of counsel and this simply defeats the

2  petitioner's theory of self-defense, since the defense was relying on the

3  first bullet that penetrated and blew out the right rear passenger window,

4  in which exit the back window.

5  　　Furthermore, it is clear in the record that trial counsel is saying

6  that it is difficult for the defense to prove self-defense; for the defense

7  is in the"negative." In closing argument, trial counsel said,"...if the

8  burden was on lets say, Kinson Her to prove it, which is true in some other

9  countries, that it's very difficult for somebody on the other side to prove

10 a negative, as we all know. The negative being, well, we didn't shoot first.

11  It's very difficult if the burden was on him to prove that."(4RT 1195)

12 The defense Counsel defeated the self-defense argument by giving these

13 prejudicial statements to the Jury. Petitioner's trial counsel fell way

14 below an objective standard.  see Strickland v. Washington, 446 U.S. 668.

15 　　Therefore, it caused prejudice against petitioner and violated petitioners

16 rights to effective assistance of counsel, fair trial, due process and equal

17 protection, as guaranteed by the U.S. Constitution.

18

19 　　**E.  The Petitioner Had Ineffective Assistance of Counsel When Counsel
　　　　Failed To Present the Petitioners Expert Witness At Trial**

20

21 　　The petitioner was told verbally by his trial counsel that

22 there was an expert witness who was willing to testified on the

23 petitioner's behalf; however, when trial began, defense counsel failed

24 to locate and have expert witness attend the trial in order to

25 testify for the defense.  The expert was willing to testify that

26 the people at Western Ave. had shot first based on the evidence.

27 This expert witness would have been helpful to the petitioner had

28 the counsel located the expert.  The expert would have had an

1 influence on the jurors to have a more favorable result to the
2 petitioner.  "Defendant's 5th, and 6th Amendment rights to present
3 witness that are both material and favorable." Taylor v. Singletary,
4 (1997) 123 F. 3d 350.  Therefore, the petitioner's rights to an
5 effective counsel, rights to present witness, rights to a fair trial,
6 and rights to equal protection were violated and prejudice occurred
7 against the 5th, 6th, and 14th Amendments of the U.S. Constitution.
8

9     **F.   The Petitioner Had Ineffective Assistance of Counsel When**
        **the petitioner Request for a Speedy Trial, But Counsel**
10         **Failed to Notified the Court of such Request**

11     On April 7, 2005, the petitioner had written a letter to his
12 trial counsel requesting for a speedy trial.(see appendix III)-
13 However, the defense counsel failed to ask for a speedy trial.

14     The trial had not begun until June 29, 2005(motion of limine),
15 more than sixty days after the defense counsel had received
16 petitioner Her's letter requesting for a speedy trial.

17     Therefore, the petitioner's rights to speedy trial, effective
18 assistance of counsel, due process, and equal protection were
19 violated and thus, the petitioner was deprived of the 5th, 6th,
20 and 14th Amendments of the U.S. Constitution.

21 ///

22 ///

23 ///

24

25

26

27

28

1    **G.  Counsel Failed To Request Inquiry Into Prosecution Witness'Detective**
     **Stigerts Prohibited Communication With the Juror(s)**

2

3

4        On July 20, 2005, at the petitioner's trial, one of the prosecution witness,

5    Detective stigerts made an illegal and prohibited communication with the jurorss

6    by talking to the jurors; however, when this matter was brought to the attention

7    of the petitioner's counsel, petitioner's counsel failed to request inquiry

8    into the prohibited communication that may have infected the jurors and caused

9    prejudice.  (2 RT 510)-  The petitioner's counsel fail below an objective standard

10   of reasonableness under prevailing professional norms and a reasonable probability

11   existed that, but for counsel's failings, defendant would have received a more

12   favorable result.  see Strickland v. Washington,(1984) 446 U.S. 668, 688.

13       This was ineffective assistance of petitioner's counsel and the petitioner's

14   rights to effective assistance of counsel, fair and impartial jury, due process,

15   and equal protection were violated and prejudice occurred against the 5th, 6th,

16   14th Amendments to the U.S. Constitution.

17

18                              -IV-
                     THE COURT ERRED AND ABUSED ITS
19                   DISCRETION THAT VIOLATED PETITIONER'S
                     CONSTITUTIONAL RIGHTS

20

21

22   **A. The Court Failed to Order A Competency Hearing Pursuant to Penal**
     **Code §1368**

23

24       "An accused has a right to a hearing on present sanity."  People v. Szijarto,

25   (1968) 246 C.A. 2d 828.

26       The Court was aware that the **petitioner**,being 15 years of age, had not

27   completed junior high school education and had a low education level which caused him

28   mental retardation and mental incompetency to stand trial as an adult, but the

1 court erroneously overlooked the petitioner's mental incompetency and proceeded
2 with the court proceedings as if the petitioner was a sane and competent adult,
3 while only a minor.

4     "Trial Court is ...required to order hearing on defendant's incompetency
5 to stand trial if there is ...substantial evidence of incompetence." People v.
6 Gallego,(1990) 52 C. 3d 115, 162, 276 CR 679.

7     The petitioner was not allowed to nor was he given the opportunity to show
8 the court that he was incompetent to stand trial or even to proceed with the
9 preliminary hearing, although he should have been allowed to and given the
10 opportunity by the Court to prove his incompetence through mental retardation by
11 his very low education level before any trial proceedings were had.

12     "When accused presents substantial evidence of incompetence, due process requires
13 that Court conduct full competency hearing; evidence is 'substantial' if it raises re-
14 sonable doubt about defendant's competence to stand trial." People v. Jones,
15 (1997) 12 C. 4th 119, 61 2d 386.

16     "When doubt of defendant's sanity at the time of trial, as contemplated
17 by this section, appears on face of record as a matter of law, an abuse of discretion
18 is shown and failure to order a determination of question of sanity results as
19 a miscarriage of justice and a reversal is required." People v. Gomez, (1953)
20 41 C. 150.

21     "...[E]ven if court does not entertain such doubt, competency hearing is
22 mandatory when there is substantial evidence of incompetency." People v. Deere,
23 (1985) 41 C. 3d 353, 222 CR 13.

24     Therefore, the petitioner's rights to a fair trial, due process, and equal
25 protection were violated and prejudice occurred against the 5th, 6th, and 14th
26 Amendments as guaranteed by the U.S. Constitution.

27 ///

28 ///

**32**

1    B.   **The Trial Court Erred By Not Excepting Letters From Petitioner Her**
          **As Motions, As Regards to Personal Conflicts Between Petitioner and**
2         **Petitioner's Trial Counsel**

3

4

5         The petitioner was having a personal conflict with his defense attorney

6    and attempt to notify the Court verbally, but the court stated that the petitioner

7    would have to go through his counsel.(1 RT 19)- The petitoner also wrote two

8    letters to the court asking the court to settle this personal conflict and

9    to place a "995" motion in the court files.(1 RT 25-line 13)- The court held an In

10   Camera proceeding with the petitioner, petitioner's counsel, and the court.

11   Although the petitioner had inform the court by and through the letters that

12   there is a personal conflict and that a healthy relationship between the petitioner

13   and petitioner's counsel could no longer exist. The court would not accept

14   nor construe the petitioner's letters as a motion(1 RT 25-line 27,28)-(1 RT 26

15   line 1)- "When a trial judge is on notice that a potential conflict of interest

16   exists, the judge must make an inquiry into the conflict. If not, the defendants

17   conviction is reversed automatically." Holoway v. Arkansas, (1976) 435 U.S.

18   475.

19        Therefore, the petitioner's rights to effective assistance of counsel,

20   fair trial, due process, and equal protection were violated and prejudice occurred

21   against the 5th, 6th, and 14th Amendments of the U.S. Constitution.

22

23        C.   **The Trial Court Erred By Denying Petitioner's Motion For An Interpreter**

24

25        On July 11, 2005, at the beginning of the petitioner's trial, the petitioner

26   motion for the court to provide an interpreter for the petitioner because

27   the petitioner did not fully understand the english language and was not able

28   to proceed to trial with an understanding of what was being said within his

1  own trial;  however, the court denied the motion and allowed the petitioner
2  to be unaware of what was being said at his trial. (1 RT 5)-

3      The english language is not the petitioner's primary language and speaking
4  english fluently can be quite fast for a person who does not fully understand
5  the english language. Thus, this was a denial of the petitioner's rights to a
6  meaningful access to the court when the petitioner could not fully understand
7  what was being said or done at his own trial.

8      Therefore, the petitioner's rights to freedom of speech, fair trial, due
9  process and equal protection were violated and prejudice occurred against the
10  1st, 5th, 6th, and 14th Amendments  as guaranteed by the U.S. Constitution.
11

12  **D.  The Trial Court Erred By Denying Petitioner's Motion To Exclude**
    **Any Opinion of Bandanna**
13

14      On July 11, 2005, during motion of limine, the petitioner motion to exclude
15  any lay opinion that the community bandanna was used in a fashion to cover someone's
16  face or any nature thereof.  (1 RT 13)-  The Court denied this motion.(1 RT 13)-
17  The trial court abused its discretion in denying this motion and allowing the
18  prosecution to introduce the theory that the community bandanna was used in
19  a fashion to cover one's face or head.

20      Witness Detective Stigerts testified on direct examination that the community
21  bandanna was tied like it would go around your head and made a motion with both
22  of her hands to the back of her head.(1 RT 122)- The prosecution's intention
23  that the community bandanna was to 'cover ones head' was not rooted from the
24  facts or evidence in this case. There was no witness who seen the suspects
25  wearing a blue bandanna on ones face or head. Not a single witness mention
26  the color blue or the community bandanna. "It is abuse of discretion to admit
27  evidence if there is even the modest likelihood of unfair prejudice or small
28  risk of misleading the jury" see U.S. v. Hitt,(1992) 981 F.2d 422

34

1    This is clear error and abuse from the court for allowing the prosecution's

2 witness Detective Stigerts to testify in the manner of how the community bandanna

3 was used to 'cover ones head'; for no eye witness seen the suspect wearing a bandanna

4 or anything to do with the color blue  on ones head.

5    Therefore, the petitioner's rights to a fair trial, due process, and

6 equal protection were violated and prejudice occurred against the 5th, 6th, and

7 14th Amendments as guaranteed by the U.S. Constitution.

8    E.   The Court Erred In Allowing Inflammatory Gang Evidence To Be
         Presented To the Jury
9

10   E·1. The Court Erred In Denying Petitioner's Motion To Bifurcate the
         Gang Enhancement
11

12    The petitioner filed a written motion to bifurcate the gang enhancement

13 during motion of limine, on grounds that the other crime evidence is highly

14. inflammatory and irrelevant to the substantive charges, which will create prejudice

15 and violate the petitioner's rights to receive a fair trial.

16    The court denied the motion and allowed prejudicial evidence to be presented

17 within the trial; therefore, causing prejudice in the petitioner's trial.  The

18 court abused its discretion in allowing this. "Enhancemets can be bifurcated

19 from the substantial charges." People v. Caleron,(1994) 9 Cal. 4th 69; people

20 v. Bracamonte,(1981) 119 Cal. App.3d 664; and People v. Weathington (1991) 231

21 Cal. App.3d 69).-

22    The detrimental impact of gang evidence is further compounded when it involves

23 violent acts of third parties because it imposes upon the accused the impossible

24 task of dissuading a jury from concluding  guilt by association.  A conviction

25 based on guilt by association has long been recognized as a heinous error."

26 People v. Chambers,(1964) 231 Cal. App. 2d 23.

27    Therefore, the petitioner's rights to a fair trial, due process, and equal

28 protection were violated and prejudice occurred against the 5th, 6th, and 14th

**35**

1   Amendments as guaranteed by the U.S. Constitution.

2

3       E·2.   The Trial Court Erred In Allowing Gang Expert To Give Prejudicial
               Testimony About A Hypothetical Question That Misrepresented The Core
4               of the Facts of the Case

5

6       The Trial Court erred in denying petitioner's motion to bifurcate the gang

7   enhancement; therefore,allowing the gang expert to give inflammatory testimony.

8   The testimony of Officer Lee was flawed because the form of the hypothetical question

9   put to the expert was devoid of factual support and was unduly prejudicial.  A

10  valid hypothetical question "must be rooted in the facts shown by the evidence."

11  See People v. Gardeley,(1996) 14 Cal. 4th 605, 618.  ( "Like a house built on sand,

12  the expert's opinion is no better than the facts on which it is based."  Id.,

13  qouting Kennemur v. State of California,(1982) 113 Cal.App.3d 907).  Here, the

14  prosecutor gave Lee a factual situation supposedly mirroring that in this case -

15  wherein three people, associated with the MOD gang, were in a car with three

16  weapons, one a sawed off shotgun, the car is stolen, and they go to Western Ave.,

17  approach a house, and fire the weapons.  Lee was asked to opine whether that

18  would be for the benefit of MOD, (4 RT 962)- and unsupprisingly responded "definitely

19  - a drive by shooting is a classic gang crime."(Id.)-

20      This hypothetical, however, included crucial "facts" not supported by the

21  evidence.  First, the description of the three vehicle occupants as MOD members

22  was not proven.  The government does not even  offer a guess as to who that third

23  person might have been, and the prosecution's own witness could not assign Lao

24  to any gang.  Second, there was no sawed off shotgun in this case.  Defendant Lao

25  objected to the mischaracterization of the gun, and the court simply instructed

26  the prosecutor to call it a "shorten" shotgun instead. (4 RT 961)-  This "fact"

27  should not have been introduced into a case wherein no weapons were "sawed-off."

28  Third, the evidence does not support the assumption that the vehicle's occupants

1 went into a neighborhood and shot weapons without provocation. The undeniable
2 facts are that a gun battle took place between individuals on the street and indivi-
3 dual in the vehicle, and it could not be assertain that the occupants in the
4 vehicle fired shot first, or what event precipitated the battle. Therefore, taken
5 as a whole, the hypothetical question - which served as the basis for the expert
6 to offer ultimate opinion testimony on the question of the enhancement, grossly
7 misstated the facts of the case, and resulted in undue prejudice.

8   Not had the Court abused its discretion in denying the petitioner's motion
9 to bifurcate the gang enhancement, this prejudicial testimony from the gang expert
10 wouldn't been presented so early to the jury on the substantial charges.
11 Therefore, the court erred in allowing inflammatory testimony from the gang
12 expert to be presented on the substantial charges. Thus, the petitioner's rights
13 to a fair trial, due process, and equal protection were violated and prejudice
14 occurred against the fifth, sixth, and 14th Amendments of the U.S. Constitution.
15

16   E·3  **The Trial Court Erred In Allowing the Gang Expert's Baseless
      Characterization of Petitioner Her As A "Hard Core Killer"**
17

18   The trial court erred in denying petitioner's motion to bifurcate the gang
19 enhancement; therefore, allowing the gang expert to give inflammatory testimony.
20 At trial Officer Lee was asked by the prosecutor for his opinion of Kinson Her's
21 level of participation and activity as a gang member, and he responded:"I put him
22 right up there at the top - of being a hard core killer." (4 RT 973)- Lee went
23 on,"[Her] had progressed from his previous times he was arrested, from stealing
24 a vehicle to illegal gun possession in a vehicle, now to homicide."(Id.)  This
25 "opinion" was not based on training and experience, or on any real sort of expertise,
26 but rather was foundationless, conclusory and completely prejudicial. The expert
27 assumed petitioner's guilt in the case at bar, and then argued that his participation
28 in this murder put him at the forefront of homicidal gangsters. Because this

**37**

1  opinion could not assist the trier of fact in any legitimate way, the trial court
2  erred by allowing the testimony to stand.  The decision to do so was at adds
3  with the California law.  In People v. killebrew,(2002) 103 Cal.App.4th 644,
4  the California Court of Appeal explained:

5      Otherwise admissible  expert opinion testimony which embraces the ultimate
       issue to be decided by the trier of fact is admissible(Evid.Code 805)- This
6      rule, however, does not permit the expert to express any opinion he or she
       may have.(citation)-'Undoubtedly there is a kind of statement by the witness
7      which amounts to no more than an expression of his general belief as to
       how the case should be decided....There is no necessity for this kind of
8      evidence; to receive it would tend to suggest that the judge and jury may
       shift responsibility for decision to the witness; and in any event it is
9      wholly without value to the trier of fact in reaching a decision.'

10  Killebrew, 103 Cal.App.4th at 651.(internal citations omitted).  Because
11  there was no evidence of petitioner Her's active participation in this crime,
12  the officer's assessment of Her's guilt, offered pursuant to his designation
13  as an ''expert,'' and with the authority of the State behind him,  was unduly
14  prejudicial.  Officer Lee acted as an adjunct of the prosecution, using the
15  seemingly impenetrable cloak of gang expertise to promote the views of the
16  prosecution.  This is precisely the type of testimony that the Killebrew court
17  cautioned against.  The officer's crude attack on this child, who had absolutely
18  no record of violent behavior, was unprofessional, unscientific, and must be
19  rectified by this court; for this violated the petitioner's rights to fair trial,
20  due process, and equal protection as guaranteed by the U.S. Constitution.

21

22

23      E•4.  The Gang "Expert's" Testimony Violated the Confrontation Clause of
              the 6th Amendment of the U.S. Constitution
24

25      Though petitioner understands that expert opinion, in the abstract, may
26  be based on outside sources, not produced for cross-examination, that principle
27  does not justify what was done here, which was entirely lawless.  While Lee was
28  presented as an "expert"in gang-related matters, there was nothing scientific

1  or analytical about his opinions.  Lee's testimony about specific gangs, their
2  activities and membership was based almost entirely on information imparted to him
3  by others-- police officers, alleged gang affiliates, and informers.  Thus, Lee
4  was simply conveying, in the guise of expert opinion, the out-of-court factual
5  assertions of individuals who were not called to testify and were thus not subject
6  to cross-examination.

7      In Crawford v. Washington, 541 U.S. 36, 124 S.Ct. 1354 (2004), the Supreme
8  Court reinvigorated the historical Sixth Amendment right of confrontation, by
9  holding that out of court statements that are testimonial in nature must be excluded
10 in criminal trials. We acknowledge that the California Court of Appeal, 4th
11 Appellate District, has upheld gang expert testimony in the face of a Crawford cha-
12 lleges in People v. Thomas (2005) 130 Cal.App.4th 1202 and People v. Fulcher
13 (2006) 136 Cal.App.4th 41, 56.  Nevertheless, we respectfully submit that the
14 circumstances of Lee's testimony required that it be excluded on 6th Amendment
15 grounds.

16      Lee's opinion about MOD, YMS, and the defendants below were cobbled
17 together from staements made by people - both in law enforcement and in the criminal
18 underworld - who knew Lee's purpose and were aware of the likely import of these
19 statements,  Thus, these out-of-court, uncross-examined declarations were
20 made by people who knew that their utterances to Lee, a reputed gang "expert,"
21 were "testimonial" in nature, forming the probable basis for testimony to be
22 presented in court. These declaration thus meet the criteria for "testimonial"
23 utterances set forth in Crawford and its progeny.  The Crawford explained:

24     Various formulations of this core class of "testimonial" statements exist:
       "ex parte in-court testimony or its funtional equivalent-- that is, material
25     such as affidavits, custodial examinations, prior testimony that the
       defendant was unable to cross-examine, or similar pretrial statements that
26     declarants would reasonably expect to be used prosecutorially,"Brief for
       Petitioner 23; "extrajudicial statements .....contained in formalized
27     testimonial materials, such as affidavits, depositions, prior testimony,
       or confessions,"White v. illinois, 502 U.S. 346,365,116 L.Ed.2d 848,112
28     S.Ct. 736(1992)(Thomas,J.joined by Scalia,J.,concurring in part and

1   concurring in judgement);"statements that were made under circumstances
    which would lead an objective witness reasonably to believe that the
2   statement would be available for use at a later trial,"Brief for Nation
    Association of Criminal Defense Lawyers et al.as Amici Curiae 3.   These
3   formulations all share a common nucleus and then define the Clause's
    coverage at various levels of abstraction around it.  Regardless of the
4   precise articulation, some statements qualify under definition--for example,
    ex parte testimony at a preliminary hearing.
5

6   541  U.S. at 40-41 [emphasis supplied].  The Court concluded "[w]here testimonial

7   statements are at issue, the only indicium of reliability sufficient to satisfy

8   constitutional demands is the one the Constitution actually prescribes: confrontat-

9   ion." Id.

10      The People cannot overcome this constitutional violation by invoking the

11   canard independently in evidence.  Lee's "opinion" about Her, his gang affiliation

12   and his character as "a hard core killer" are clearly not scientific or analytical

13   conclusions drawn from a careful examination of available data; they are mere

14   expressions of things Lee had been told.  Lee is, in short, a mouth piece for

15   all manner of out-of-court assertions made  under circumstances making it clear

16   to the declarants that their claims would be used testimonially.  The prosecutor

17   should not have been able to avoid the crucial confrontation guaranteed of the

18   Sixth Amendments in this way.

19      Therefore, the petitioner's rights to a fair trial, due process, and equal

20   protection were violated and prejudice occurred against the 5th, 6th, and 14th

21   Amendments to the U.S. Constitution.

22

23      E·5  The Court Abused Its Discretion In Considering the Gang Detective
             As An"Expert"

24

25      As describe in Rule 702 of the state rule of evidence, the trial court

26   must also consider the experts qualifications and the "straight forward connection

27   between the experts knowledge and the basis for the opinion such that no analytical gap

28   exists between the data and the opinion.

1    In the instant case, though its at the courts discretion, the court abused
2 its discretion for not considering the experts qualifications as to the "straight
3 forward connection between the experts knowledge and the basis for the opinion
4 such that no analytical gap exists between the data and the opinion offered."
5 In the instant case, the gang 'expert' Lee's accuracy rate did not show that
6 the  analysis was sufficiently trustworthy to be reliable; for the gang expert
7 was a police detective for a period of time does not necessarily make the
8 detective a qualified expert.

9    The gang expert Lee's opinion that petitioner Her was a "hardcore killer"
10 and the crime was committed for the benefit of the MOD gang was foundationless,
11 unscientific, and an analytical gap existed. The analytical gap existed as argued
12 in ground II section B1, B2, B3, and ground IV section E1, E2, E3, E4.

13    Therefore, the petitioner's rights to a fair trial, due process, and
14 equal protection were violated and prejudice occurred against the 5th, 6th,
15 and the 14th Amendments to the U.S. Constitution.

16 ///

17 ///

18 ///

19 ///

20 ///

21 ///

22 ///

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

1   F.   **The Trial Court Erred By Failing To Declare A Mistrial**
       **During Voir Dire**

2

3    On July 12, 2005 at the petitioner's trial, petitioner's trial counsel

4   motioned for a mistrial (1 RT 38)- based on prejudicial questions posed by

5   the prosecuting attorney within the voir dire of the prosepective **jurors, and**

6   the court erroneously denied the motion and failed to declare a mistrial.

7    The prosecutor's statement that **both the defense counsel are in the job**

8   **of hiding the truth, and that the truth is** not a good thing for the defendant(1 RT 39)

9   is highly prejudice.  It is prejudicial and irrevelent to pose such question

10   during voir dire.  This prejudicial questions were intentionally posed to the

11   prospective jurors.  see Irwin v. Dowd, (1961) 366 U.S. 717.-

12    Therefore, the petitioner's rights to a fair and impartial jury, due process,

13   and equal protection were violated and prejudice occurred against the 5th, 6th,

14   and 14th Amendments as guaranteed by the U.S. Constitution.

15

16   G.   **The Trial Court Erred By Failing To Declare a Mistrial When Witness**
       **Detective Stigerts Made An Illegal and Prohibited Communication**
17       **With the Jurors**

18   On July 20, 2005, at the petitioner's trial, one of the prosecution witness

19   Detective Stigerts made an illegal and prohibited communication with the jurors

20   by talking to the jurors, but when this matter was brought to the attention

21   of the court, the court failed to declare a mistrial.(2 RT 510)-

22    **The petitioner's co-defendants trial counsel** brought the attention up

23   so the record can reflect that the court had to admonish Detective Stigerts,

24   who has been present as the prosecution investigating officer, because she

25   had approached the jury and made some comments to the jurors(2 RT 510).-  Without

26   any questions being asked, the Court **assumes** the conversation between the witness

27   Detective Stigerts and the jury were about a coffee spillage, and the Court

28   found that Detective Stigerts did not in any way intended to ingratiate herself

1 with the jurors or did anything that would amount to a mistrial.  In Caliendo
2 v. Warden of Cal. Men's Conoly-C.A. 9 (2004) 365 F.3d 691.- "Any unathorized
3 communication between [a] juror and a witness or interest party is presumptively
4 prejudice." Thus, the court erred in her foundationless opinion and abused
5 its discrection by presuming communication between witness Detective Stigerts
6 and the jurors harmless and being **not** prejudice.

7 The petitioner has a right to a fair **and impartial** jury, but the illegal
8 and prohibited communications infected the jurors and caused prejudice within
9 the petitioner's trial. **Therefore,** the petitioner's rights to a fair and impartial
10 jury, due process and equal protection were violated and prejudice **occurred**
11 against the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.
12

13 **H.  The Court Erred In Denying Petitioner's '995' Motion** ⌐ ⌐ ⌐ ⌐ ⌐ ⌐
14

15 On August 4, 2005, petitioner filed a '995' motion and the court erred
16 in not accepting the motion; for it was not filed by the petitioner's counsel.
17 According to the '995' motion, as it pertains to the Indeterminate Sentencing
18 Law, the Senate Bill 42 was ratified on July 1, 1977, and it states as follow:
19 "S.B. 42 would repeal the indetermine sentencing statute and would substitute
20 a system of sentences that would allow the court to specify the amount of time
21 the defendant would serve in prison. Each crime would carry three possibilities
22 for the sentence. The Bill specifies the procedures for the judge to select
23 one of the three choices."

24 The S.B. 42 repealed and eliminate all life with the possibility of parole
25 from the California statutes, laws, and codes on July 1, 1977. Under the law
26 of case, there can be no crime without a penalty, and if the penalty is "indeterminate"
27 under the Legislature's declared policy of "punishment" for the crime itself,
28 it **is** "void on its face" as being uncertain, and against the law, because it

43

1   cannot be constitutionally administered.(P.C. §1170(a)(1) Stats 1977 C 165 § 15)-

2   the penalty inflicted must be the same for each offender committing the same

3   offense, therefore, it must be a penalty fixed in a number of years by the

4   Legistrature. Without an expressed re-enactment of the repealed "I.S.L." and

5   its supporting statutes, some of which call for purpose and policy, the penalty

6   cannot be legally enforced. The voters did not confer discretion on any agency

7   to determine any indeterminate sentence after July 1, 1977. Also, the "I.S.L."

8   re-enactment was not a subject that was ever submitted for voters approval.

9   Schnitz v. Younger, 21 Cal. 3d 90, 93, 145 CR 517 (1978): Scott v. Superior

10  Court, 27 Cal. App.3d 292, 295, 103 CR 683(1972) ["... a statute may not be

11  amended by reference to its title. A section of a statute may not me amended

12  unless the section is re-enacted as amended."].

13      On July 1, 1977, California no longer provided for indeterminate sectencing.

14  And under the policy of "punishment" for the crime itself, indeterminate sentencing

15  cannot exist, therefore, the penalty for the crime charged, must be the same

16  in a number of years for each person committing the same offense, or the penalty

17  is "uncertain" and violates, inter alia, both due process and equal protection

18  clauses of the State and Federal Constitution. *(see appendix 1)- The Indeterminate

19  sentencing law violates the equal protection right as guaranteed by the 14th

20  Amendment of the U.S. Constitution since one person serving life can be released

21  before another person serving life when the two committed the same offense.

22  This is clearly unconstitutional and the petitioner's 52 years to life with

23  the possibility of parole must be eliminated and correctly re-sentence.

24      Therefore, the court erred in not accepting the petitioner's motion; for

25  the petitioner's rights to due process and equal protection were violated,against

26  the 5th and 14th Amendments as guaranteed by the U.S. Constitution

27  ///

28  ///

---

* Please notice that appendix 1 is only a copy and the original is still in
  the Sacramento Superior Court----
                                44

1    I.  **The Court Erred By Admitting Prejudicial and Inflammatory Testimony**
2         **of A Witness that He (the witness) Believed that Threats and Reprisals**
           **He Had Suffered Years Earlier Were Connected To His Testimony Against**
3         **Kinson Her, When the Witness Admittedly Had No Factual Basis for this**
           **Belief**

4

5    Midway through the direct examinations of witness Rindy Her, the prosecutor

6 asked for a hearing outside the presence of the jury.(3 RT 673)- Apparently,

7 Rindy Her's demeanor was thought unsatisfactory, and the prosecutor endeavored

8 to prove, by questioning Mr. Her, that his poor performance was a product of

9 intimidation he suffered as a result of testifying- stating that his house had

10 been shot at, he had been physically attacted, and he had received death threats,

11 which he connected to being a witness against Petitioner Her.

12    Her made clear, however, that he did not know who shot at his house three

13 years before, and no warning was issued to him by the shooter; (3 RT 678-681);

14 He stated that he likewise had never seen the people who attacted him on the

15 street three years before, though he thought they could have been friends of

16 persons who were friends of Kinson Her.(3 RT 690-691). Again, the attackers said

17 nothing to Rindy Her about testifying and Her did not report the attacks to police;

18 Finally, Rindy Her stated that unknown persons called his house three years

19 before, on two occasions - and during one of these calls he was told that he

20 would be killed if he testified, (3 RT 681-684)-

21    Petitioner objected to allowing Rindy Her to testify about these events,

22 arguing that, under California Evid. Code §352, any probative value to be gained

23 from the testimony was clearly and substantially outweighed by its prejudicial

24 effect (3 RT 695-696); and that the testimony would violate petitioner's right

25 to due process. The court ultimately allowed this highly prejudicial material

26 to be presented to the jury with following instruction:

27    You are about to hear testimony concerning threats and acts of violence
        directed toward this witness.  This evidence is only to be considered in
28    evaluating Mr. Her's attitude and demeanor torwards testifying.  The evidence

1        is not to be considered against Houa Lao and Kinson Her. there's no
            evidence connecting Houa Lao or Kinson Her to these acts. (3RT 697)-
2

3      The trial court's rulings on evidentiary questions are reviewed for an

4 abuse of discretion. Inflammatory evidence is admissible only where its pro-

5 bative value outweighs its prejudicial effect. People v. Durham(1969) 70

6 Cal. 2d 171.

7      In refining this rule, the California court of Appeal has explained that

8 evidence should be excluded where there is good reason to believe that the real

9 object for presenting the evidence is not that for which it is ostensibly offered,

10 by rather is to affect the jury's determination on issues for which the evidence

11 could not be rightly admitted under the California Rules of Evidence. People

12 v. McGee (2002) 104 Cal. App. 4th 559.

13      There is no question that this testimony, which bore no relevance to the

14 issue of the trial, painted Kinson Her in the minds of the jurors as a gang

15 member and a violent individual with violent associates. The court had

16 strong reason to believe that this was the real purpose for which Rindy

17 Her's testimony was elicited. Clearly the evidence of uncharged threats,

18 violence and witness intimidation was not admissible to establish either

19 Kinson Her's gang connections nor his participation in the charged offenses.

20     Nor was this evidence fairly relevant to Rindy Her's credibility. Rindy

21 Her had not been cross-examined or impeached at the time that the court allowed

22 this testimony about his fear or reprisals from persons associated with

23 Petitioner Her. This violation was magnified by the fact that, as we know,

24 Rindy Her did not know the identity of his attackers, had never seen them before,

25 and could not connect them to Kinson Her - though he thought it was possible that

26 they might know people who Kinson Her also knew. This evidence was irrelevant

27 to the establishment of any material fact in this case, and created a substantial

28 likelihood of undue prejudice and confusion in the jury.

1    Therefore, the court's admission of this evidence deprived petitioner Her

2    of a fair trial, due process, and equal protection.  This violation occurred

3    against the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

4

5    J.  The Court Erred In Giving the Following Jury Instructions

6

7    J·1.  The Trial Court Erred By Instructing the Jury, Over Objection,
          On the Theory of "Pretextual Self Defense" Under CALJIC No. 5.55,
8         When This Instruction Was Unsupported By the Evidence and Undermined
9         Petitioner's Legitimate Self-Defense Argument

10

11   The Court below instructed the Jury, over objection by Her(4 RT 1096),

12   that "the right of self-defense is not available to a person who seeks a quarrel

13   with the intent to create a real or apparent necessity of exercising self defense"

14   pursuant to CALJIC 5.55.(4 RT 1134)-  Because this intruction was not supported

15   by the evdience, its inclusion in the jury's instructions constituted error

16   under state law and federal constitution law. People v. Crandell,(1988)

17   46 Cal.3d 833.

18       The error was exacerbated by the People's reliance on CALJIC 5.55, to undercut

19   the defendant's claim of self-defense, during closing arguments.  In his intial

20   closing argument, the prosecutor told the jury that "[t]hat instruction would

21   eliminate any possibility of self-defense." and stated "This is not a case of

22   self-defense.  And even if it were self-defense, it wouldn't be appropriate

23   for these two defendants, but its not a case of self-defense." (4 RT 1172-1173)-

24   Again in closing, after defense counsel had argued self-defense, the prosecutor

25   quoted the CALJIC 5.55 instruction, and argued that it precluded self-defense.

26   (5 RT 1296)-

27       Use of this erroneous instruction to undermine petitioner's viable claim

28   of self-defense was damaging, because the defense was very strong.  The vehicle

1  allegedly, with Lao and Her, drove past a house where gang members were collected,
2  and gunfire was exchanged.  Forensic evidence established that the rear passenger
3  side window was closed at the time of the shooting, and thus was blown out by
4  the persons who fired upon the vehicle, as it went past.  The fact that the
5  side portion of the Toyota was hit by the assailants gathered in front of 3212
6  Western Ave. and that bullet holes were also found at the residence across the
7  street from 3212 Western Ave. is strong evidence that these individuals were
8  the intial aggressors in the shootout, and that the vehicle occupants return
9  fire, in the belief that self-defense was warranted.

10  The evidence did not show, as claimed by Yee Xiong and Vue Heu, that these
11  individuals were innocently collected at the Western address when they were
12  fired upon.  Rather, it is beyond dispute that notwithstanding the perjury of
13  these key witnesses, a gun battle occurred - with assailants firing weapons
14  at the vehicle, and guns being fired from the vehicle torward the individuals
15  on the street.  Gunshot residue found on the hands of Yee Xiong and the noted
16  concentration of lead on the hands of Fong Vue makes it clear that these individual
17  fired weapons.  Since no weapons were found corresponding to the bullet holes
18  found on the Toyota, individuals associated with the "victims" on Western at
19  the time of this incident clearly took and hid the weapons used to shoot at
20  the vehicle, following the exchange of gunfire.

21  The only persons who admitted to being present, Yee Xiong and Vue Heu,
22  lied about almost every detail of this event on the witness stand, and their
23  testimony was internally inconsistent, inconsistent with each other, and lacked
24  even the most rudimentary credibility.  (1) Vue Heu stated that neither he nor
25  any of his friends had guns.  (1 RT 192)-  He stated that he did not see any
26  of his friends with a weapon(Yee,Fong,Vang,or himself) and he does not know
27  if any of them own weapons.(1 RT 227)-  Yee Xiong,likewise was adamant that
28  he did not shoot at the car, nor handle any weapon on the day of the shooting .

1 (2 RT 311-313)- The results of gun residue tests undeniably show that both
2 Heu and Xiong lied about this fact. (2) Vue Heu testified that he was
3 outside with Yee Xiong and Fong Vue, and that no one else was present (Vang
4 having gone inside prior to Fong's arrival)(1 RT 172-173;187)-

5      Further, Heu stated that Fong had only been there for approximately one
6 minute when he was shot.(1 RT 174;214); Yee Xiong testified, however, that there
7 were at least four people outside, though he doesn't remember who, whether these
8 individuals were male or female, young or old, or any other details.(2 RT 333-
9 335); Xiong further stated that he never saw Vang that night, and was not talking
10 to Vue Heu at all.(2 RT 336). (3) Vue Heu testified that he had been with his
11 friends in the driveway of 3212 Western Ave. for about 1 to 2 hours (though he
12 acknowledged telling police that they were outside for approximately 4 hours.)
13 (1 RT 172;214); Yee Xiong stated, by contrast, that he had just arrived moments
14 before the shooting (rather than being there for a period of hours).(2 RT 313)-
15 (4) Heu said he is not associated with a gang, but that he had hear that Yee Xiong
16 was part of **RBG(Ruthless Boy Gangster)**- (1 RT 182;198).- Yee Xiong confirmed
17 this affiliation. By contrast, the People's gang expert testified that Xiong
18 was a member of the gang "Little Leprechaun Krew"(4 RT 968), and that Heu was
19 associated with HNS.(4 RT 989)-

20      Based on the evidence, the defendant relied heavily on their claims that
21 the people had failed to prove the shootings were not justified by self-defense.
22 There was no evidence that the petitioner went to 3212 Western, looking to court
23 a fight, planning to "create" a spurious claim of self defense. As a review of
24 the evidence shows, such a theory is preposterous under the facts of this case.
25 The giving of CALJIC 5.55 and the prosecutor's argument to the jury that this
26 instruction elimated the possibility of a finding that petitioner acted in self-
27 defense; therefore, the petitioner's rights to a fair trial, due process, and
28 equal protection were violated and prejudice occurred against the 5th, 6th, and

49

1   14th Amendments to the U.S. Constitution.

2

3   **J·2.   The Trial Court Erred In Instructing the Jury, Over Objection, On the**
4   **Theory of "Adoptive Admissions" (CALJIC 2.71.5), Involving Her's
       Post-Arrest Interrogation By Police**

5

6   The court below also intructed the jury on the theory of adoptive admissions,

7   codified in CALJIC 2.71.5, regarding petitioner Her's silience in the face of accusa-

8   tion.  Since petitioner's silence came during a police interrogation, and after

9   petitioner Her had finally been apprised of his constitutional right to remain

10  silent, the Court erred in allowing the ensuing silence to be treated as an

11  admission.  The Court's instruction was as follows:

12      "If you should find from the evidence that there was an occasion when defendant
        Kinson Her(1)under conditions which reasonably afforded him an opportunity
13      to reply;(2) failed to make a denial or made an evasive statement in the face
        of an accusation expressed directly to him or in his presence, tending to
14      connect him with the commission of the crime for which the defendant is now
        on trial; and (3) that he had heard the accusation and understood its nature,
15      then the circumstance of his response on that occasion may be considered
        against him as indicating an admission that the accusation is true..."
16  (4 RT 1122-1123)-

17  A review of California case law discussing "adoptive admissions" makes clear

18  that this instruction is not intended to be used to undermine a criminal defend-

19  ant's constitutional right to silence during custodial interrogation.  See People

20  v. Cockrell(1965)63 Cal. 3d 659, 670-671.  Rather, the jury instruction has been

21  upheld as properly given, only after the threshold inquiry is satisfied that the

22  accused's silence was not the product of an exercise of his rights.  As the Court

23  observed in People v. Edmondson(1976)62 Cal.App.3d 677,"[i]f a person is accused

24  of having committed a crime, under circumstances which fairly afford him an

25  opportunity to hear, understand, and to reply, and which do not lend themselves

26  to an inference that he was relying on the right of silence guaranteed by the

27  Fifth Amendment to the United States Constitution, and he fails to speak...

28  the accusatory statement and the fact of silence may be offered as implied

1  adoptive admission of guilt.

2      Here, because petitioner Her was communicating with a law enforcement
3  agent, following arrest and during custodial interrogation, he had the right to
4  rely on the constitutional right to silence which had been belatedly offered him
5  by Detective Keller.  In light of the lack of evidence presented against petitioner
6  Her in connection with the crimes alleged, the Court committed harmful error by
7  allowing the jury to infer petitioner's culpability from his non-responsiveness
8  during interrogation.

9      Therefore, the petitioner's rights to a fair trial, due process and equal
10 protection were violated and prejudice occurred against the 5th, 6th, and 14th
11 Amendments to the U.S. Constitution.

12

13     **J·3.  The Trial Court Erred In Instructing CALJIC No.2.03,2.06,2.51 and
14          2.52**

15     The Court allowed jury instruction CALJIC No. 2.03,2.06,2.51, and 2.52 to
16 be given to the jury during the petitioner's trial.  These were argumentative, pin-
17 point instructions, that redered the instant case fundamentally unfair in
18 violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution.

19     What redered the instructions fundamentally unfair in this case is that a
20 neutrally formulated version of these instructions had the effect of throwing
21 or appearing to throw, the prestige and weight of the court itself behind the
22 theory of the prosecuting party.  A fair and reliable determination in a criminal
23 case requires of course a fair and impartial trier of fact.  In re Murchison,
24 (1955) 349 U.S. 133, 136;  Marshall v. Jerrico, Inc.,(1980) 446 U.S. 238,242.
25 The instructions at issue here violated **due process** against the Fifth and
26 Fourteenth Amendments, and in a case in which the question of self-defense was
27 close factually, there is at least a reasonable doubt that these instructions
28 affected the outcome of the case, and the petitioner's conviction must be

1 reversed. Chapman v. California, supra, at 23-24.

2     Therefore, the petitioner's rights to a fair trial, due process, and
3 equal protection were violated and prejudice occurred against the 5th,
4 6th, and 14th Amendments to the U.S. Constitution.

5      : ∕,

6     **J·4. The Trial Court Erred By Denying Petitioner's Motion To**
        **Re-write CALJIC No. 2.90**
7

8     On July 11, 2005, at the beginning of the petitioner's trial, the
9 Petitioner motioned to re-write Jury Instruction CALJIC No. 2.90 due to
10 the reduced **requirement** of the burden of proof for the prosecution(1 RT 7);
11 however, the court denied the motion and allowed the instruction to be
12 presented to the jury **with**out re-writing; therefore, causing prejudice.

13     The reasonable doubt instruction's burden of proof to something
14 less than the required "guilt beyond a reasonable doubt standard." The phase
15 "abiding conviction" in that instruction fails to convey to the jury the
16 degree of certainty to establish proof beyond a reasonable doubt. The notion
17 of "abiding conviction" is too easily confused with "clear and convincing"
18 evidentiary standard. "Clear and convincing" evidence can never be the basis
19 of a criminal conviction.

20     CALJIC No.2.90 sanctions application of a constitutionally deficient
21 "degree of proof." (**Cage** v. Louisiana,((1990) 498 U.S. 39,40,41)- Such
22 instructional error is structural and requires automatic, per se reversal.
23 (Sullivan v. Louisiana, supra, 508 U.S. at p.227-280; Jackson v. Virginia,
24 (1979) 443 U.S. 307, 320, fn 14 ["failure to intruct the jury on the necessity
25 of proof beyond a reasonable doubt can never be harmless error"].)

26     Therefore, the petitioner's rights to an impartial jury and fair trial,
27 due process and equal protection were violated and prejudice occurred against
28 the 5th, 6th, and 14th Amendments to the U.S. Constitution.

1    J·5  **THE COURT ERRED IN INSTRUCTING CALJIC NO.1.00 WHICH INSTRUCTED IN**
     **TERMS OF WHETHER THE DEFENDANT WAS "MORE LIKELY TO BE GUILTY THAN**
2    **NOT" WAS CONFUSING BY IMPERMISSIBLY LESSENING GUILT BEYOND A**
     **REASONABLE DOUBT**
3

4        The court allowed Jury Instruction Caljic No. 1.00 to be given to the

5    jury during the petitioner's trial.  Language in the last paragraph of

6    CALJIC No. 1.00 improperly poses the question of whether the defendant is

7    "more likely to be guilty than not guilty" and lessens the proper reasonable

8    doubt standard.  The last paragraph of CALJIC No. 1.00 provides in the

9    pertinent part:

10           You must not be influenced by pity for or prejudice against a defendant.
             You must not be biased against a defendant because he has been arrested
11           for this offense, charged with a crime, or brought to trial.  None
             of these circumstances is evidence of guilt and you must not infer
12           or assume from any or all of them that a defendant is **more likely**
             **to be guilty than not guilty.**
13

14       The questionable language is CALJIC No. 1.00 obviously refers to

15   a standard that is different than reasonable doubt.

16       "Instructions that conflict with erroneous instructions do not cure

17   the conflict."  People v. Orelland, (2000) 79 Cal. App. 4th 179.  Erroneous

18   and omitted instruction on reasonable doubt standard and infringes on

19   a defendant's constitution rights to due process and to a jury trial under

20   the 5th, 6th and 14th Amendments of the Federal Constitution.  People

21   v. Phillips, (1998) 59 Cal. App. 4th 952, 956-958; and Ramirez v. Hatcher,

22   (1998) 136 F. 3d 1209, 1211-1215. see also Cage v. Louisiana,(1990) 498

23   U.S. 39, 40, 41)- Such instructional error is structural and requires automatic,

24   per se reversal. (Sullivan v. Louisiana, supra, 508 U.S. at p.227-280; Jackson v.

25   Virginia,(1979) 443 U.S. 307,320, fn 14["failure to instruct the jury on the

26   necessity of proof beyond a reasonable doubt can never be harmless error."]

27       Therefore, the petitioner's rights to an impartial jury and fair trial, due

28   process and equal protection were violated and prejudice occurred against the

                                      53

1  5th, 6th, and 14th Amendments to the U.S. Constitution.

2       **J•6   THE TRIAL COURT'S INSTRUCTION ON CALJIC NO. 5.17 ON IMPERFECT SELF-
            DEFENSE IS ERRONEOUS, PLACING AN IMPROPER LIMITATION ON THE DEFENSE
3           IN CIRCUMSTANCES IN WHICH THE DEFENSE SHOULD STILL BE LEGALLY APPLICABLE**

4       The court allowed jury instruction CALJIC No. 5.17 to be given to the

5  Jury during the petitioner's trial. The revised language in CALJIC No. 5.17

6  which is cast in objective terms and takes no account of the petitioner's

7  subjective belief as to the situation, purports to disqualify imperfect self-

8  defense for the petitioner who makes a mistake of fact as well as for the petitio-

9   ner who either violates the law knowingly or who makes a mistake of the law

10  unknowingly. The revised language is therefore erroneous.

11      Thus, the limiting language in CALJIC No. 5.17 was erroneous and created

12  a bar to a finding of voluntary manslaughter if petitioner was found to have

13  objectively been the aggressor regardless of his subjective state of mind.

14  Also, if the gang evidence in this case were accepted to one degree or another

15  by the jurors as showing an agression by MOD, this should not have precluded

16  a finding of imperfect self-defense except for the erroneous language of CALJIC

17  No. 5.17. The evidence that clearly established that the Toyota Camry was

18  fired on was also a basis for this finding of lesser culpability, and the case

19  would have resulted more favorably for the petitioner absent the instruction

20  error. People v. Watson, (1956) 46 Cal. 2d 818, 836-837.

21      The improper language in CALJIC No. 5.17 also interferes with and deprived

22  petitioner of his 6th and 14th Amendment rights to present a defense. This

23  caused prejudice and violated petitioner's 6th and 14th Amendments to the U.S.

24  Constitution. Since the respondents cannot show beyond a reasonable doubt

25  that the improper portion of CALJIC No. 5.17 was harmless, petitioner's conviction

26  must be reversed. Chapman v. California, (1967) 386 U.S. 18, 23-24.

27  ///

28  ///

1                        **-V-**
                   **PROSECUTION MISCONDUCT**

2

3

4         The prosecution allowed the prosecution's main witness, who

5 was put in charge to collect evidence at the scene at Western

6 Ave., to talk to the jury during trial.(2RT 510)- The prosecution's

7 witness, Detective Stigerts, illegally communicated with the jurors

8 on July 20, 2005, during trial and may have influenced on the

9 Jury's guilty verdict and caused prejudice. "Any unathorized

10 communication between [a] juror and a witness or interest party

11 is presumptively prejudice." see Caliendo v. Warden of Cali.

12 Mens colony C.A. 9(2004) 365 F3d 691.- The burden to prove harmless

13 rely's heavily on the prosecutor. However, the prosecutor failed

14 to prove the communication was harmless; therefore, the conversation is presume

15 harmful and it caused prejudice that invalids the guilty verdict.

16         Therefore, the petitioner's rights to a fair trial and impartial jury,

17 due process, and equal protection were violated and prejudice occurred against

18 the 5th, 6th, and 14th Amendments to the U.S. Constitution.

19

20

21                        **-VI-**
             **DUE TO PETITIONER'S YOUTH, PETITIONER WAS**

22              **DEPRIVED TO HAVE THREE POSSIBLE TERM OF**
             **HIGH, MEDIUM, AND LOW PENALTIES**

23

24         Petitioner Her was 15 years-old at the time of the offense and thus,

25 was unable to receive Life Without Parole and Death Penalty. see Penal Code 190.-

26 Therefore, leaves petitioner with only one option of life with the possibility

27 of parole. -Anyone sentenced before July 1, 1977 can be an indeterminate

28 term(see Penal Code §1168) and anyone sentenced after July 1, 1977, are setenced

1  to a determinate term (P.C. §1170)(also see appendix 1)- The petitioner's alleged
2  offense was committed in 2002 way after 1977. The petitioner not only has a
3  right to know the certainty of the penalty, but also the right to know the three
4  precise term he could possibly face, if convicted. A crime that does not have
5  three precise term of punishment of high, medium, and low must be striken out
6  of the statute; for every crime has a punishment of three precise term, and
7  without punishment there is no crime. Therefore, petitioner Her should be precluded
8  as to Murder and Attempted Murder since P.C. 187 (murder) and P.C. 664/187 (attempt
9  murder) does not provide three precise term of high, medium, and low for youthful
10 offender such as 15 years old. Thus, petitioner Her should be precluded as
11 to those charges and petitioner's conviction must be vacated for petitioner
12 was 15 years-old during the alleged offense in 2002.

13    For the stated reasons above, petitioner has been deprived of having three
14 precise term of possible punishments and therefore, violated petitioner's rights
15 to a fair trial, due process, and equal protection as guaranteed by the U.S.
16 Constitution.

17

18                              -VII-
                    PETITIONER HER'S STATEMENT TO POLICE
19                  WAS OBTAINED IN VIOLATION OF HIS CONSTITUTIONAL
                    RIGHTS
20

21

22    A.  The Trial Court Abused Its Discretion In Admitting Petitioner's
          Statement At Trial
23

24    Police Detective John Keller and Detective Stigerts interviewed petitioner
25 Her after Her's arrest, and Detective Keller elicited statements from Her.
26 The petitioner was 15 years-old, did not have any adult present during questioning,
27 had minimal contact with the justice system, had not finish his junior year
28 in high school and was of limited education and mental compacity. Petitioner

**56**

1  also asserted that there was "pre-Miranda custodial interrogation" and that
2  Det. Keller engaged in subterfuge and deceit. The Court abused its discretion
3  in denying petitioner Her's motion to **suppress** Her's interrogation statement.
4  (4 RT 1025)- The U.S. Supreme Court has long recognized that"admission and
5  **confession** of juveniles requires special caution," In re Gault, 387 U.S. 145
6  (1987)-

7       The admission of the petitioner's statements to Detective Keller were
8  prejudicial when presented at trial and that the jury's verdict was influenced
9  by the statements. Therefore, the petitioner's rights to a fair trial, due
10 process and equal protection were violated and prejudice occurred against the
11 5th, 6th, and 14th Amendments to the U.S. Constitution.

12

13

14       **B.  Miranda Warnings Were Not Given Until Interrogation Was Well**
             **Underway**
15

16       In Miranda v. Arizona the Supreme Court held that "the Fifth and Fourteenth
17 Amendments' proscription against compelled self-incrimination required that
18 any interrogation of a suspect in custody must be preceded by specific warnings."
19 See Miranda v. Arizona, 384 U.S. 436, 479(1966)- Miranda refers to police
20 interrogation, whether by word or action, which "the police would know is
21 reasonably likely to elicit an incriminating response from the defendant."
22 See Rhodes v. Innis, 446 U.S. 291,301(1980)-

23       Miranda warnings were not offered to Kinson Her until interrogation by
24 Detective Keller was well under way, and only after the youthful petitioner
25 had already committed himself to a course of unprotected discussion with the
26 detective. This, of course, was by design, and not a product of an oversight
27 by the detective. Petitioner Her never explicitly waived his Miranda rights,
28 and any impicit waiver claimed by the government was not the result of a knowing

1  and intelligent decision by the young petitioner. Prior to any Miranda warnings,
2  Det. Keller elicited from Her where he was staying and where his clothing
3  and possession could be found (3 CT 651-658, 659-660); a shooting involving
4  petitioner's aunt(3 CT 661); and other personal details (3 CT 665-557)- Keller
5  mislead Her as to his status, telling Her that he is being arrested on a pro-
6  bation violation, rather than a homicide warrant.(3 CT 668)-

7      Det. Keller questioned Her about being the victim in a shooting - having
8  been in a vehicle which people shot at. (3 CT 661)- Keller asked what communication
9  Her had with his parents since arriving in Minnesota, who Her lives with in
10  Sacramento, and about the ages, names and characteristics of his brothers
11  and sisters. (3 CT 663-664)- Keller asked Her where he was born, in what
12  hospital, and whether he has a Hmong name in addition to his American name.
13  (3 CT 665-667)-

14      After all of this far ranging discussion (comprising fourteen pages of
15  transcript), Detective Keller decided to Mirandize the fifteen year old suspect.
16  (2 CT 669)- By that time the detective and the petitioner had entered into
17  a full course of communication, wherein Detective Keller was able to ascertain
18  who petitioner Her was spending time with in Minnesota, the name of his girlfriends,
19  the location of his clothes and possessions, personal details about the composition
20  of Her's family, about a shooting in which Her was a victim and his family
21  member was shot. All of this time was spent developing a rapport with Her,
22  so that once Miranda warnings were given, they would no longer be effective.
23      Det. Keller convinced Her that they were there to pick him up for probation
24  violation right before the Miranda warnings.(see interview)-  citing Doody v.
25  Arizona, Case No. 06-17161---D.C. No. CV-98-00528-EHC 9th Circuit, U.S. Court
26  of Appeals (2008)-  It held that ...."the excessively casual delivery of Miranda
27  warnings to a juvenile, seemingly designed to ensure that he would ignore
28  the warnings and waive his rights, gives little comfort that Doody commenced the

1  interrogation with an understanding of what was at stake." In Doody, it further
2  states that..."although the state court's conclusion that there was no Miranda
3  violation reasonable, the safety net that proper, serious Miranda warnings
4  provide- that of informing a suspect of his rights and of the gravity of the
5  situation - was quite weak in this case, prone to give way as a protection
6  against an involuntary confession if conditions were otherwise conducive to
7  such a confession." Plus it also states that..."A juvenile was given Miranda
8  warnings in a downplay manner that ensure he would not take them seriously
9  and would waive his rights."

10  In the instant case, Det. Keller convinced Her that he was being arrested
11  for probation violation for going out of state.(see interrogation interview
12  transcript)- Det. Keller used the Miranda warnings in a downplay manner and
13  the way in which, petitioner Her did not take the Miranda seriously.

14  In Missouri v. Seibert, 542 U.S. 600, 124 S.Ct.2601(2004), the United
15  States Supreme Court held that the giving of such mid-stream warnings could
16  neither cure the constitutional violation which had already occurred, nor
17  provide adequate protection of the right against self-incrimination during
18  the remainder of the interrogation.  The Supreme Court explained:

19  The threshold issue when interrogators question first and warn later
    is thus whether it would be reasonable to find that in these circumstances
20  the warnings could function "effectively" as Miranda requires.  Could
    warninings effectively advise the suspect that he had a real choice about
21  giving an admissible statement at that juncture?  Could they reasonably
    convey that he could choose to stop talking even if he had talked ealier?
22  For unless the warnings could place a suspect who has just been interrogated
    in a position to make such an informed warnings as compliance as distinct
23  from the first, unwarned and inadmissible segment.

24                          *  *  *

25  Upon hearing warnings only in the aftermath of interrogation and just
    after making confession, a suspect would hardly think he had a genuine
26  right remain silent, let alone persist in so believing more likely reaction
    on the suspect's part would be perplexity about the reason for discussing
27  rights at that point, bewilderment being an unpromising frame of mind
    for knowledgeable decision.  What is worse, telling a suspect that "anything
28  you say can and will be used against you." Without expressly excepting

59

1      the statement just given, could lead to an entirely reasonable inference
         that what he has just said will be used, with subsequent silence being
2      of no avail. Thus, when Miranda warnings are inserted in the midst of
         coordinated and continuing interrogation, they are likely to mislead
3      and "deprive a defendant of knowledge essential to his ability to understand
         the nature of his rights and the consequences of abandoning them."
4

5 See Seibert, 542 U.S. at 655-656.

6     Although petitioner Her did not make a confession, either in the unwarned
7 or warned segments of the interrogation, he did provide answers to Detective
8 Keller's questions which were used to produce further evidence against him,
9 and used at trial. Of particular note, petitioner Her responded to Detective
10 Keller's investigatory questions about whereabout of his possessions by pointing
11 the officer in the direction of the home of his girlfriend, Lise Vang. He
12 explained to Keller, in fact, where to find Vang's address and phone number,
13 and told that officer her name, age, and that she lived with her parents.
14 These pre-Miranda statements led the detectives to a search of the family
15 home of Lisa Vang, wherein petitioner Her's duffel bag and a series of letters
16 written from and to him were seized and enter into evidence, as proof of gang
17 affiliation, and association with codefendant Lao.

18     The post-Miranda interrogation was put before the jury, and was used
19 by the prosecution to establish that petitioner was untruthful in claiming
20 to not know co-defendant Lao - evidencing his consciousness of guilt. As
21 in Seibert, both the warned and unwarned segments of this interrogation occurred
22 in the station house, far from petitioner's home and family. The 15-year old
23 Her was not offered assistance of any sort as he was held in detention and
24 in isolation, to face the gaunlet of accusations of the two detectives alone.
25 Petitioner Her was arrested and placed in Hennepin County Juvenile Center
26 in a single cell for 12 days before Detectives interrogated petitioner Her,
27 and he certainly did not have any friendly adult present during questioning.
28     Hence, the petitioner's rights to a fair trial, due process,

1  and equal protection were violated and prejudice occurred against the
2  5th, 6th, and 14th Amendments to the U.S. Constitution.

3

4    C. Her's Repeated Invocations of His Right to Remain Silent Were Ignored
         by the Detectives
5

6       In People v. Burton (1971) 6 Cal.3d 357, the California Supreme Court
7  reversed the appellant's convictions for murder and assault, based upon a finding
8  that his statement was obtained in violation of his constitutional rights.
9  Burton, who was sixteen years old at the time of the incidents, confessed
10 during police interrogation to shooting three people. He had been advised
11 of his Miranda rights prior to these confessions. Though he never directly
12 invoked his right to counsel, on several occasions Burton requested to speak
13 with his parents. These requests were rebuffed by his interrogator.

14      The Court held that the defendant's request to see his parents was an
15 invocation of his Fifth Amendment rights under Miranda v. Arizona, 384 U.S.
16 436 (1966)- In so holding, the California Supreme Court explained:"[t]the
17 United States Supreme Court in Miranda, noting that incommunicado interrogation
18 is at odds with an individual's right not to be compelled to incriminate himself
19 stated:"Unless adequate protective devices are employed to dispel the compulsion
20 inherent in custodial surroundings, no statement obtained from the defendant
21 can truly be the product of his free choice"..."To strictly limit the manner
22 in which a suspect may assert the privilege, or to demand that it be invoked
23 with unmistakable clarity (resolving any ambiguity against the defendant)
24 would subvert Miranda's prophylactic intent." 6 Cal.3d at 383.

25      During the course of petitioner Her's interrogation, Her attempted to
26 invoke his right to remain silent on several occasions. First Her states"I
27 don't- okay, so what, I can just be quiet until like uh, court?" Detective
28 Keller did not miss a beat, responding to this request: 'Well, yeah, you could.

1  But Ricky's in jail, right now on a murder, okay? And he's trying to implicate

2  you as being involved." Detective Keller and Her than proceeded to talk

3  about how Her is being implicated in a shooting. *

4      In the second invocation of his right to remain silent petitioner Her

5  states "So I could just wait until my court date to say anything?" the Detective

6  again sidestepped Her's clear intent to find help before proceeding with

7  the interrogation, by stating:

8      "If that's what you choose...Well, you're the one who is gonna be looking
       at getting charged with murder, okay? And if your not a shooter or
9      you not the one that did it, this is the time - **this is gonna be the**
       **only time we talk to you, okay?"** (3 CT 710-711)(emphasis added)
10

11  as the interrogation continued, Her yet again attempted to assert his rights:

12  DET KELLER:  Well, then be honest about what happened down there.  Tell me
                 about it.
13  HER:         What, I can't wait 'til, um, court?
    DET KELLER:  You can.
14  HER:         Well, that's what I want to do.
    DET KELLER:  Okay.  All right.  Well when we get  back we are going to write
15               up a warrant requesting you be charged with murder on a drive-
                 by shooting.
16  HER:         So if ---
    DET KELLER:  Gang related.
17

18  (See 3 CT 711-712)- The detective concludes this threat with an invitation

19  to Her that he can think about it, and if he decides he wants to be honest

20  about this before its too late, then they can talk about it during the plane

21  ride home.

22      These tactics undermined any protection the belated giving of Miranda

23  warnings could have **afforded.  Accordingly, the interrogation violated petitioner**'s

24  Constitutional rights, and the court abused its discretion in admitting it

25  at trial for the jury's consideration.  Petitioner's statement in response

26  to Keller's interrogation should not have been admitted, and all fruits thereof,

27  including items seized for use against Her at trial, should be suppressed.

28      Therefore, the court's admission of this evidence deprived petitioner
    * The statements of the detective were false. Keller well knew that no one had directly
    implicated Her as being involved in the Sacramento shooting.

1  Her of a fair trial, due process, and equal protection that caused prejudice

2  against petitioner and thus, violated petitioner's rights as guaranteed by the

3  5th, 6th, and 14th Amendments to the U.S. Constitution.

4  //

5  //

6  //

7  //

8  //

9  //

10  //

11  //

12  //

13  //

14  //

15  //

16  //

17  //

18  //

19  //

20  //

21  //

See People v. Ahluwalia, 2005 WL 1560465(Cal.App.3Dist.),an **unpublish case decided**
by the Appellate Court on July 5, 2005. In that case, as in this, **Detective Keller**
interrogated the defendant at length before finally giving him Miranda warnings.
Though the Court found in that case that there was no evidence that Detective
Keller's actions undermined the defendant's Constitutional rights, the record in the
instant case shows that the detective's actions were by design and part of a
pattern. The interrogation of Houa Lao in the instant case, likewise displays an
attempt by this same detective to coerce youthful or otherwise vulnerable suspects
into unprotected discussion through subterfuge, badgering and overreaching. We
cite Ahluwalia not as authority for any legal argument, but merely to demonstrate
Keller's pattern of abusive, improper interrogation, which should not be encouraged
or rewarded.

1

-VIII-
UNDER THE CIRCUMSTANCES OF THE CASE, EHANCED
2    SENTENCES OF 25 TO LIFE VIOLATES THE EIGHTH
AMENDMENT AND ARE CONTRARY TO WIDELY ACCEPTED
3    INTERNATIONAL NORMS FOR THE TREATMENT OF CHILD
OFFENDERS

4

5

6       Petitioner urges that his federal and state constitutional rights to be
7 free from cruel and unsual punishment are implicated in this case, because though
8 just fifteen years old at the time of the offense, an offense for which there
9 was little if any evidence that he took any role aside from being present, the
10 Court of Appeal ordered this case for the limited purpose of correcting
11 his sentence from life without the possibility of parole to one of 25 years to
12 life.  This "corrected" sentence, though consistent with the letter of California
13 law is deeply at odds with emerging Supreme Court precedent regarding the treatment
14 of juveniles in the criminal justice system, and is entirely inconsistent with
15 international precepts on the treatment of juveniles.  The appellate court's
16 holding that "[a] life sentence with the possibility of parole for a criminally
17 sophisticated 15 year old convicted of a special-circumstance murder to promote
18 the objectives of a criminal street gang violates neither Eighth Amendment nor
19 article 1, section 17 of the California Constitution," (Exhibit A, p.32), is
20 deeply flawed, for it embraced assumptions about Her, such as his supposed "sophi-
21 stication" and his gang-related mental state, that are unsupported by the evidence.
22 In this same section, the Court of Appeals also explicitly refused to give any
23 consideration to the maxims of international law cited by the Petitioner.

24       The Eighth Amendment to the United States Constitution prohibits the imposition
25 of cruel and unusual punishment on a criminal defendant.  The California Supreme
26 Court has held that "a punishment may violate article I, section 17, of the [Cal-
27 ifornia] Constitution if, although not cruel or unusual in its method, it is so
28 disproportionate to the crime for which it is inflicted that it shocks the conscience

1  and offends fundamental notions of human dignity." In re Lynch, (1972) 8 Cal.

2  3d 410, 424.  In Lynch, the court delineated several "techiques" employed by

3  courtsa to determine proportionality:

4      (1)examination of the nature of the offense and/or the offender, with
       particular regard to the degree of danger present to society,(2)comparison
5      between the challenged penalty with the punishments prescribed in the same
       jurisdiction for different offenses which, by the same test, must be deemed
6      more serious, and(3)comparison between the challenged penalty with the pun-
       ishments for the same offense in other jurisdictions having an identical or
7      similar constitution provision. In re Lynch, 8 Cal.3d 410, 425-29.

8  "the importance of each prong depends on the specific facts of each case and

9  application of the first prong alone may suffice in determining whether a

10  punishment is cruel and unusual.[Citation.]" In re DeBeque,(1989) 212 Cal.App.3d

11  241, 249.

12      Moreover, the U.S. Supreme Court death penalty cases provide an analytical

13  framework from which to approach the issue of whether a punishment runs afoul

14  of the Eighth Amendment prohibition on cruel and unusaul punishment when applied

15  to juvenile offenders. The Court's reliance on international norms on the

16  treatment of child offenders forms the basis of these recent decisions and

17  indicates a trend toward juvenile sentencing that is in line with humanitarian

18  priciples and standards.

19      A. Lynch and its progeny

20      The cases since Lynch demonstrate that a punishment which is not

21  disproprtionate in the abstract is nevertheless constitutionally impermissible

22  if it is disproportionate to the defendant's individual culpability.  See

23  People v. Dillon(1983) 34 Cal.3d 441, 480. These cases compel a finding that

24  petitioner Her's sentence was disproportionate in light of the nature of the

25  offense and his personal characteristics.

26      In Dillon, several boys plotted to rob some marijuana plants from a marijuana

27  farm.  They armed themselves with guns, knowing that the farm was guarded by armed

28  men.  Defendant Dillon, 17 years-old at the time of the offense, shot and killed

1  a guard in the course of the attempted robbery.  Dillon testified that he was
2  acting under the belief that the guard had shot one of his cohorts.  As the armed
3  man approached him, Dillon shot at him, testifying that he was in fear of his
4  life.  That defendant was convicted,  and received a sentence of life in prison.*
5  On review, the California Supreme Court addressed the proportionality of a
6  defendant's sentence, relying on Lynch, by establishing a two-part analysis:

7      "[f]irst, the crime itself must be reviewed, both in the abstract and in
        view of the totality of the circumstances surrounding its commission,
8      'including such factors as its motive, the way it was committed, the extent
        of defendant's involvement, and the consequences of his acts ...,'
9      to determine whether a particular punishment is grossly disproportionate
        to the crime for which it is inflicted.[citations ommitted].  Secondly, the
10     court must consider 'the nature of the offender' and inquire 'whether the
        punishment is grossly disproportionate to the defendant's individual
11     culpability as shown by such factors as his age, prior criminality, personal
        characteristics, and state of mind."
12

13  Applying this framework, the Dillon Court concluded that a sentence of life
14  imprisonment for first-degree murder was grossly disproportionate in relation
15  to the defendant's true culpability, and thus violated the State Constitution.
16  34 Cal. at 448.  By contrast, in Prople v. Demirdjian,(2006) 144 Cal.App. 4th
17  10, the court held that the imposition of two consecutive terms of 25 years to
18  life with possibility of parole for a defendant who was 15 years old at the time
19  of the crime did not violate the state or federal constitutional prohibitions
20  against excessive punishment.  The Court again looked to the unique facts and
21  circumstances underlying the crime and the defendant's role in it.  The court
22  held the circumstances of the crime were so barbarous as to support a finding
23  of premeditation:

24     "[t]he circumstances of this case are particularly horrendous.  The bodies
        of the two boys, aged 13 and 14, were found at the playground of their
25     school... there was a 16-pound rock next to Blaine's head and a 3-pound
        rock a few yards away.  Both boys had head injuries and there was blood
26     all over the school yard - on fences, rails, playground equipment and in
        two outdoor sinks.  There was a broken bottle with a red stain on it.
27     A 60-pound, 12-foot bench was lying across Chris' chest and neck.  A trail

* Noting the youth and immaturity of the defendant,and that the muder at issue appeared
to be completely out of character and a product of the stress of the moment, the court
below, following the lead of the jury, concluded that the defendant should be sentenced to
the youth authority rather than to prison. The People successfully appealed this ruling,
and the court was ultimately force to re-sentence the defendant to life without the

1  of bloody footprints led from the bodies to the sinks...[¶]. Autopsies
2  of the boys showed that they died of multiple blunt force trauma to their
   heads and bodies.  The rocks were identified as potential weapons.  Chris'
3  neck and chest were compressed and his liver was torn apart."

4  144 Cal.App. 4th 10, 15.  Applying the Dillon factors, the court found that the

5  killings were "savage and apparently unprovoked", that appellant "attempted to

6  dispose of the evidence and denied wrongdoing when questioned."  The punishment

7  was not held to be disportionate because of the horrendous nature of the crime,

8  and the relative maturity of the defendant - evidenced by his involvement in

9  narcotics sales and possession of firearms.  The court concluded that the

10 circumstances of the crimes and of defendant himself justified imposition of

11 the 25 year to life sentences.

12  The facts of the instant case can be readily distinguished from Demirdjian.

13 Petitioner Her may have been a passenger in the rear of an automobile that

14 was involved in a shooting but there is no evidence that he was in control

15 of the situation.  Petitioner Her was only fifteen at the time of the incident

16 and had no record of violent crime.  Perhaps most importantly, the instant

17 case involved a shootout between two sets of armed individuals.  There is

18 no proof that Her was a participant in the shooting, or, if a participant,

19 that he did not act in self-defense.  Clearly, under the facts of the instant

20 case Her's punishment is so disproportionate in light of his individual culpability

21 that it violates the prohibitions against cruel and unusual punishment contained

22 in the Eighth Amenendment and should be vacated.

23  B. International Law on the Rights of the Child

24  Article 37 of the Convention on the Rights of the Child ("CRC")prohibits

25 the imposition of the death penalty or life without the possibility of parole

26 on anyone under the age of 18.  UNITED NATIONS CONVENTION ON THE RIGHTS OF

27 THE CHILD, Art.37, Nov. 20 1989, 15577 U.N.T.S. 3, 28 I.L.M. 1448, 1468-70

28 (entered into force Sept. 2, 1990).  The CRC explicitly addresses the contradiction
   possibility of parole.  See Dillon, 34 Cal.3d 441.

1  between the particular rights and needs of children and unduly harsh adult
2  sentencing.  Underlying several of the Treaty's provisions is the fundamental
3  recognition of the child's potential for rehabilitation.

4      Recognizing the unacceptability of sentences that negate the potential
5  of children to make changes for the better over time, the CRC flatly prohibits
6  sentencing children to life sentences without parole or to the death penalty.
7  It is a universal precept of international law, that the child, by reason of
8  his physical and mental immaturity, needs special safeguards and care, including
9  appropriate legal protection.  By this model, Courts are urged to place an
10 emphasis on rehabilitation and reintegration of the child into society, rather
11 than on punishment alone.

12     The Supreme Court has relied heavily on the consensus of the international
13 community in holding that the Eighth and Fourteenth Amendments bar capital
14 punishment for juvenile offenders.  U.S. v. Roper, 543 U.S. 551,561 (2005)
15 citing Thompson v. Oklahoma (1988) 487 U.S. 815, 830.  In Roper, the court
16 stated "it is proper that we acknowledge the overwhelming weight of international
17 opinion against the juvenile death penalty, resting in large part of the
18 understanding that the instability and emotional embalance of young people
19 may often be a factor of the crime."  Indeed, the Supreme Court has repeatedly
20 cited the penacological questions of retribution and deterrence when determining
21 the adequacy of punishment imposed on juveniles.

22     In Thompson v. Oklahoma, the Supreme Court held that to permit the execution
23 of any offender under the age of 16 would offend civilized standards of decency.
24 Thompson, supra, 487 U.S. at 919. The plurality observed that this position
25 was consistent with the views that have been expressed by "other nations that
26 share our Anglo-American heritage and by the leading members of the Western
27 European Community." Id. at 830.  To impose a sentence on a juvenile that

In discounting the imposition of capital punishment upon juvenile offenders, the
Court in Roper cited three general differences between juveniles and adults:(1) a
lack of maturity and an underdeveloped senses of responsibility found in youth
more often than in adults;(2)the susceptibility of juvenile influences and outside
pressures, including peer pressure; and(3)the transitory personality traits

1  effectively forecloses the possibility forever realizing the youths rehabilitation,
2  and which will not serve society's interest in retribution, is contrary the
3  purpose imposing punishment.

4      The logic applied in Thompson and Roper should be applied to prohibit the
5  imposition of enhanced sentences of twenty-five years to life on juvenile offenders.
6  Although the Calilfornia courts have deferred to the legislature in enacting
7  provisions that allow such sentences on juveniles, there is consensus that the
8  punishment is indeed severe.  See People v. Guinn(1994)28 Cal. App. 4th 1130,
9  1147.  The Court is urged to reevaluate the appropriateness of meeting  out
10 such severe punishment, especially, where, as here, the result is a life sentence
11 imposed on a juvenile, with no history of violence, and for whom there is no
12 reason to believe that he cannot be redeemed.

13     Implicit in the imposition of severe statutory sentencing schemes, after
14 all, is the conclusion that the young person cannot be rehabilitated.  Petitioner
15 submits that this position is entirely at odds with widely accepted international
16 norms on the treatment of juvenile offenders.  It is simple untenable that a
17 momentary lapse of judgement can result in a child being incarcerated for the
18 remainder of their natural life.  As the Supreme Court stated in Roper the differe-
19 nces between youths and adults "render suspect any conclusion that a juvenile
20 falls among the worst offenders."  Roper, 543 U.S. 551, 553(2005).  The Court
21 went on to say "the reality that juveniles still struggle to define their indentity
22 means it is less supportable to conclude that even a heinous crime committed
23 by a juvenile is evidence of an irretrievably depraved character."  Id.*

24     Petitioner's trial counsel argued persuasively to the court that:

25     [J]ust from a psychological standpoint a fifteen year old kid is a lot
    different from an adult. Their inability to make judgements, their impulsivity.
26     Their emotions are different.  In fact, there is I think studies about
    their brain development not actually having totally developed at that point.
27     And it does affect their ability to make decisions and, more significantly,
    get involved in - with the wrong type of people and get involved in the
28     wrong type of situations.

of a juvenile when compared to that of an adult. Roper at 569.
*  Petitioner's trial counsel argued these matters to the court at sentencing.(5
RT 1378)

1  (5 RT 1378-1379)- Counsel was correct that studies have shown a marked difference

2  in the brain development of young adolescents as compared to adults.  Among these

3  was a study by the Juvenile Justice Center of the American Bar Association,

4  prepared in January 2004.  While developed to address the subject of the juvenile

5  death penalty, the conclusions of this study are highly relevant to the imposition

6  of adult penalties on juveniles in general:

7      Adolescence is a transitional period during which a child is becoming, but
       is not yet, an adult.  An adolescent is a crossroads of changes where, emotions,
8      hormones, judgement, identity and the physical body are so in flux that
       parents and even experts struggle to fully understand.

9
       As a society, we recognize the limitations of adolescents and, therefore,
10     restrict their privileges to vote, serve on a jury, consume alcohal, marry,
       enter into contracts, and even watch movies with mature content.  Each year
11     the United States spends billion of dollars to promote drug use prevention
       and sex education to protect youth at this vulnerable stage of life.  When
12     it comes to the death penalty, however, we treat them as full functioning
       adults.

13  Cruel and Unusual Punishment: The Juvenile Death Penalty, ABA Juvenile Justice
14  Center, January 2004 edition.

15      This anomalous treatment of children as fully functioning adults holds equally

16  true where life sentences are concerned.  Yet, as researchers have discovered,

17  the human brain undergoes significant structural changes over the period between

18  childhood and adulthood that tends to discredit this treatment.  see Elkhonon

19  Goldberg,  The Executive Brain: Frontal Lobes and the Civilized Mind, Oxford Univer-

20  sity Press (2001).  The behaviors associated with this process of development

21  include self-absorption, a need for privacy, mood swings, unique dress, and escapism,

22  such as video games, music, and talking on the phone as well as riskier behaviors,

23  such as drug use and sexual activity.

24      Of central importance to this process is childhood trauma of various kinds,

25  including social dislocation, poverty, social and emotional disfunction and violence.

26  These factors act upon the biological changes already occurring in the adolescent

27  brain to produce behaviors that can be destructive and dangerous.  As one research

28  had put it, "part of the brain that is helping organization, planning and strategizing

1 is not done being built yet . . . .its sort of unfair to expect [adolescents]
2 to have adult levels of organizational skills or decision making before their
3 brain is finished being built."

4    At Kinson Her's sentencing proceeding, members of petitioner's family testified
5 eloquently about his background and upbringing. His sisters, Mary and Donna,
6 testified about his childhood, his brightness, his promise, and his kindness.(5
7 RT 1367-1373)- As he entered early adolescent, a person of modest means in
8 an immigrant family struggling to understand a new culture ran into trouble.
9 As Donna Her put it: "I know that for a lot of male adolescents there are a lot
10 of negative influences in low income families and low income communities like
11 ours." In a civilized system of justice it is incumbent upon the Court to explore
12 this youth's backround, his capabilities, his rehabilitative potential, his
13 future dangerousness or lack thereof, before effectively throwing the key away
14 and concluding that he must serve his life or the greater portion thereof in
15 an adult prison.

16    In sum, we submit that sentences passed on child offenders such as Kinson
17 Her must reflect not only the gravity of the crimes they have committed, but
18 acknowledge that they do not possess the maturity and judgement necessary to
19 justify a punishment that brands them permanently unredeemable. Because petitioner
20 has been so branded, we respectfully urge that his "corrected" sentence of 25
21 years to life is unlawful, and violates petitioner's 6th, 8th, and 14th
22 Amendments of the U.S. Constitution, thus should be reverse.
23 //
24 //
25 //
26 //
27 //
28 //

1
-IX-
PETITIONER'S RE-SENTENCE OF "25
2
YEARS TO LIFE" CONSTITUTES CRUEL
AND UNSUAL PUNISHMENT
3

4    On November 30, 2007, the California Third Appellate District modified

5    petitioner Her's sentence from "Life Without Parole" to "25-years to Life"

6    on count one(Cal.P.C.187); for the Life Without Parole is forbidden and

7    cannot be imposed on someone who was only 15 years-old at the time of the

8    offense, such as petitioner.(see Cal.P.C. 109.5 and also see 3d Appellate

9    Court decision(transcripts p.28))-

10    California Penal Code prescribes the maximum punishment for juvenile

11    defendants who have been found guilty of special circumstance findings.

12    Subdivision (b) specifies that the maximum punishment for a juvenile who

13    was at least 16 and under 18 at the time of the offense may be sentenced

14    to either Life Without Parole or 25 years to Life, at the court's discretion.

15    However, in the instant case, the Appellate Court applied the Demirdjian

16    case(People v. Demirdjian (2006) 144 Cal.App.4th 10, 17)- "For juveniles

17    under 16 who were 14 or 15 when the crime was committed, a life term without

18    possibility of parole is not permitted, leaving a term of 25 years to life

19    with possibility of parole."  Accordingly, the Appellate Court re-sentenced

20    petitioner to "25 years to Life with possibility of parole" on count one.

21    The re-sentence of 25-years to Life on count one (Cal.P.C. 187), plus 20

22    years and 7 years to Life on count two(Cal.P.C.664/187) totaled to 52-years

23    and two Life sentences with the possibility of parole.  Making the minimum

24    earliest parole date in the year 2057; which is indistinguishable from a

25    sentence of "Life Without Parole" for all intensive purposes in the real world.

26    Thus, there is no difference between "52-years to Life" and "Life Without

27    Parole."  Accordingly, the re-sentence totaling to 52-years to Life is unlawful

28    along with Life Without Parole for someone who was 15-years-old at the time

72

1  of the offense, such as petitioner.

2      Based on the foregoing, it is inhumane and unlawful to sentence petitioner

3  Her to serve the greater portion of his life in prison starting at age (15)

4  fifteen; seeking his very first parole hearing from the parole board at age

5  (70) seventy. Therefore, the petitioner's re-sentence totaling to 52-years

6  to Life constitutes cruel and unusual punishment and such sentence on a 15 year-

7  old minor should be eliminated and/or reduced. This clearly violates petitioner's

8  8th and 14th Amendments as guaranteed by the U.S. Constitution.

9

10                          -X-
                 **THE 3d APPELLATE DISTRICT COURT'S DECISION
11               NOT TO REMAND PETITIONER HER TO THE SUPERIOR
                 COURT FOR RE-SENTENCING VIOLATED PETITIONER'S
12               DUE PROCESS AND WAS PREJUDICIAL**

13      The Appellate Court(3d District) simply modified petitioner Her's Life

14  Without Parole to 25-years to Life with parole without remanding petitioner

15  to the trial court or give petitioner a re-sentencing hearing; which deprived

16  petitioner an opportunity to receive a more reasonable sentence from the trial

17  court. Perhaps petitioner would have been successful at convincing the trial

18  court to stay more of petitioner's counts and/or run both counts concurrent.

19      Therefore, the Appellate Court did not remand petitioner to the trial

20  court or give petitioner a re-sentencing hearing deprived and violated petitioner's

21  Due Process under the 6th and 14th Amendments of the U.S. Constitution.

22  ///

23  ///

24

25

26

27

28

**73**

-XI-
## CUMMULATIVE ERRORS ARE
## CAUSED FOR A REVERSAL

The combined and cummulative errors of incompentency proceedings, insufficient evidence, Miranda violations, Jury Instructional errors, Ineffective Assistance of Counsel, prosecution misconduct, trial court errors, and sentencing errors have compunded the prejudice caused by the other, to petitioner's detriment and are caused for a reversal of the petitioner's case. see Harrington v. California, (1968) 395 U.S. 250, 255; United States v. Frederick (9th Cir. 1996) 78 F. 1370, 1381; People v. Buffum, (1953) 40 Cal. 2d 709 726; People v. Zerillo, (1950) 36 Cal. 2d 222, 133; People v. Cruz, (1978) 83 Cal. App. 3d 308, 334; People v. Ramos, (1982) 30 Cal. 3d 553, 581; Cal. Const. Art. IV, §13.

The petitioner did not forfeit any of these claims. However, the forfeit rule is not automatic. see People v. Allen (1974) 41 Cal. App. 3d 196; also see People v. Norwood (1972) 26 Cal. App. 3d 148; Hale v. Morgan, (1978) 22 Cal. 3d 388.

Therefore, the petitioner's rights to freedom of speech, fair and impartial jury, due process, free from cruel and unusual punishment, effective assistance of counsel, and equal protection were violated and prejudice occurred against the 1st, 5th, 6th, 8th, and 14th Amendments as guaranteed by the U.S. Constitution.

1                              -CONCLUSION-

2        Based on the foregoing, there are numerous,multiple and highly

3  constitutional errors that have occurred in the petitioner's pre-trial, trial,

4  and post-trial proceedings, and the claimed errors are harmful.

5        Wherefore, the petitioner respectfully ask this honorable court to grant

6  his prayer for prayer for relief.-

7

8                        **-Prayer for Relief-**

9        **1.**  Grant petition and issue a writ granting a reversal of the petitioner's

10  conviction, based on the absence of evidence of guilt.

11        2.  In the alternative, petitioner respectectfully ask this Honorable

12  Court to vacate and reverse his conviction and sentence, and to remand the case

13  to the Superior Court with appropriate directions or modify petitioner's

14  conviction and/or sentence.

15        3.  Appoint petitioner counsel to assist in the litigation necessary

16  to remedy the subject or award reasonable attorney fee's.

17        4.  Order an evidentiary hearing and appoint counsel for petitioner;

18  and

19        5.  Grant all other appropriate relief.

20

21

22        Dated: September 8, 2009            Respectfull Submitted,

23

24                                           Kinson Her
                                             In Pro Per Petitioner

25

26                              VERIFICATION

27        I declare under penalty of perjury that the foregoing is true and correct.

28        Dated:  September 8, 2009
                                             Delcarant

                                    **75**

## APPENDIX

**APPENDIX I**

**APPENDIX I**

**APPENDIX I**

**APPENDIX I**

**APPENDIX I**

**APPENDIX I**

CASE NO.  **02F01534**

I N   T H E   S U P E R I O R   C O U R T

O F   T H E   S T A T E   O F   C A L I F O R N I A

IN AND FOR THE

COUNTY OF SACRAMENTO

**Kinson Her**

Defendant,

vs.

THE STATE OF CALIFORNIA

Plaintiffs, et al.

**District Attorney,
Kevin McCormick**

MOTION TO DISMISS
PURSUANT TO PENAL CODE SECTION 995

1

2

3

4

5

6

7                    I N  T H E  S U P E R I O R  C O U R T

8            F O R  T H E  S T A T E  O F  C A L I F O R N I A

9                          IN AND FOR THE

10                       COUNTY OF SACRAMENTO

11

**KINSON HER,**

12                                    CASE NO.  **02F01534**

13            Defendant,                    MOTION

14            vs.                  PURSUANT TO: P.C. § 995

15   The State of California,

16            Plaintiffs, et al.

17   **DISTRICT ATTORNEY**              /

18

19                    NOTICE AND MOTION FOR:

20              MANDATORY AND PROHIBITORY RELIEF

21   TO THE HONORABLE PRESIDING JUDGE OF THE SUPERIOR COURT OF
     THE STATE OF CALIFORNIA IN AND FOR SACRAMENTO COUNTY, AND TO
22   THE HONORABLE ASSOCIATE JUSTICES OF THE COURT.

23   AND TO THE PLAINTIFFS AND ATTORNEY OF RECORD:

24   (1). PLEASE TAKE NOTICE THAT at the time set by the above

25   named Court, or as thereafter set by the Court's clerk for the

26   matter to be heard, Defendant will move for a "MANDATORY" and

27   "PROHIBITORY" order to dismiss the above entitled action pursuant

28   to Section 995 of the California Penal Code.  Said order is

                              -1-

IN THE CALIFORNIA SUPERIOR COURT FOR SACRAMENTO COUNTY

GROUNDS FOR MOTION TO DISMISS (Note: References to "Exhibits" are those obtained from State Archives, except # 3 which was obtained from B.P.T. Chairman Albert Leddy)

(1). That effective July 1, 1977, California repealed its 60-year-old Indeterminate Sentencing Law (I.S.L.) and replaced it with the Determinate Sentencing Law (D.S.L.), so that all those whose crimes were committed after 7/1/77, would know the "certainty" of the penalty to be inflicted see: SB-42, Stats 1976 C 1139 § 273. Effective 7/1/77, AB-476 went into effect. This amendment to SB-42 made the D.S.L. retroactive so that all persons - whether their crime was committed as a felony or a misdemeanor, under the I.S.L. or the D.S.L. - would be vested by the Legislature with the right to know the certainty of the penalty as determined by the Legislature and imposed by a court of law see e.g., P.C. § 1170(a)(1), AB-476, Stats 1977 C 165 § 15.

(2). In repealing the I.S.L., and enacting the D.S.L., - in order to effect the "certainty of the term" - California repealed the statutes necessary for the I.S.L.'s continued existence; this included the Adult Authority's "term fixing" and "parole granting" functions over persons whose crime was committed after 7/1/77. The only discretion retained by this agency, was the power to fix the conditions of performance while released on parole, and the parole of those persons sentenced "FOR LIFE" with the possibility of parole (See: Pen. Code §§ 671, 2920, 2940, 3020-3025, & 5077 (repealed), see now: Pen. Code §§ 1170, 2931, & 3000(f), see also: §§ 3052 & 5076, Stats 1977 C 165). In repealing the I.S.L., the Legislature made the policy decision to repeal Plaintiffs' statutory authorization to fix terms, supra, and replaced the Adult Authority with the Community Release Board (C.R.B.) with specified ministerial duties see Defendant's Exhibits 1 and 4.

(3). In repealing the I.S.L., the Legislature changed from its purpose and policy for imprisonment for crime from: "Mitigation and Rehabilitation", to the certainty of the term, and "punishment" for the crime itself; "as determined by the Legislature, to be imposed by a court of law with specified discretion" (See: AB-476, supra and Pen. Code §§ 12 & 13). In SB-42, the Legislature declared the repeal of the I.S.L., as its "number one priority", and by law and fact acted by repealing the WAYS, MEANS, STANDARDS, SAFEGUARDS, PURPOSE, and POLICY, necessary for the I.S.L.'s existence.

(4). The C.R.B.'s discretion under Pen. Code §§ 3041, and 1170.2 - to fix terms for persons whose crime was committed prior to 7/1/77 - expired on October 1, 1978 prior to the voters ratification of the 1978 Prop. 7 Initiative Statute on November 8, 1978 (See: Pen. Code § 1170.2(b), Stats 1977 C 165 § 18; Stats 1978 C 329 §§ 4, 5, & 6; Stats 1979 C 255 § 9). Accordingly, ipso jure, Plaintiffs, were never given jurisdiction over those whose crime was committed after 7/1/77, and not sentenced "FOR LIFE", which, as a penalty, has always been held as an exception to the I.S.L. Consistent with Art. IV § 9 of California's Constitution, Prop. 7 failed to ask the voters to approve the re-enactment of any part of the repealed I.S.L., or re-vest discretion in any agency (Note: The C.R.B. was replaced by the B.P.T., without term fixing authority or judicial discretion; both which would have been necessary to impose a final judgment and to fix terms under the repealed purpose and policy of the I.S.L. see also: Stats 1979 C 255 p. 568 § 53).

(5). As of July 1, 1977, California law no longer provided for indeterminate sentences, and there was no discretion vested for its administration for persons whose crime was committed after that date. Moreover, under the policy of "punishment" for the crime itself, no state-wide agency can be vested with power to determine the "punishment" any given crime shall bear, absent a constitutional amendment authorizing the legislature to vest its exclusive powers elsewhere.

T A B L E   O F   E X H I B I T S

(1). SENATE BILL NO. 42 (1976): Showing California's repeal o
its 60-year-old Indeterminate Sentencing Law, and creatio
of a seven (7) category classification system, making al]
crimes for which imprisonment in a state prison i
specified - in order to effect the "certainty" of the term,
as "DETERMINATE SENTENCES".

(2). 1978 PROPOSITION 7 INITIATIVE: Obtained from the State
Archives.  Proving that the voters were not asked to: (a)
re-enact the repealed I.S.L.; (b) change the policy for
imprisonment from "punishment" for the crime itself
(emphasis added), back to "rehabilitation" of the
individual offender, as the purpose for release on parole;
(c) vest any agency with the power to determine the term to
be served for each offender committing the same offense.

(3). MORRISSEY 8 MEMORANDUM: Showing how a group of state
officials - hired and paid for by the Attorney General's
Office — changed and enlarged Prop. 7 in order to vest
discretion back   in the same branch agency who just had
its power repealed; for the expressed purpose of vesting
authority to determine "punishment" for crime, without the
approval of the voters, or a constitutional amendment
authorizing the Legislature to vest its discretion
elsewhere.

(4). ASSEMBLY BILL NO. 476 (1977): Making "substantive" changes
to SB-42, including: (a) the making of the Determinate
Sentencing Law retroactive; (b) changing the policy to
include all penalties for crime, whether calling for
imprisonment specified to be served in county jail or state
prison would have a determinate penalty fixed by the
legislature and imposed by a court of law; (c) restatement
of the Legislative declaration that Determinate Sentencing
applies after July 1, 1977, equally to all persons
sentenced under Penal Code Sections 1170, or prior to July
1, 1977, under Penal Code Section 1168, would be entitled
by law, to know the "certainty" of the penalty to be
inflicted; as determined by the Legislature and imposed by
a court of law.

(5). SANTA CLARA LAW REVIEW: The legal history of Indeterminate
Sentencing in California.  Gives the Legislature's reasons
for repealing the I.S.L., and as to why it was deemed a
"failed experiment" - due to administrative abuse - during
over 60 years in operation.

-ii-

1   necessary for restraining, enjoining, and ordering you, your

2   officers, agents, servants, employees, and attorney, and all those

3   in active concert or participation with you or them, from further

4   proceedings in the prosecution of the matter of the charge of

5   murder under Penal Code Section 187 against Defendant.

6                      OPENING STATEMENT

7     (2). PLEASE TAKE NOTICE THAT, ____Kinson Her____, hereinafter

8   Defendant in the above entitled action, respectfully motions this

9   Court to set aside the indictment on the grounds that this Court

10   has no jurisdiction to allow the prosecution of Defendant where

11   the "penalty" for the offense of murder in the 1st or 2nd degree –

12   enacted by the 1978 Proposition 7 Murder Penalty Initiative

13   Statute – is challenged as being either: (A) "VOID ON ITS FACE" in

14   violation of expressed provisions of the State and Federal

15   Constitutions, infra. (B) Where these penalties, supra, cannot be

16   lawfully administered as being repugnant to numerous provisions of

17   the State Constitution as well as the due process and equal

18   protection clauses of both State and Federal Constitutions, infra.

19     (3). PLEASE TAKE NOTICE THAT, in these proceedings, Defendant

20   will prove that the drafter of Prop. 7 adopted the sentencing

21   scheme from a repealed law, and submitted it to the voters under

22   the guise of an existing sentencing structure, in violation of

23   lawful provisions for the making of a law, and expressed

24   Constitutional mandates (See: e.g., Government Code § 9609;

25   California Constitution Article 1 §§ 7(a)&(b), 9, 24, & 26;

26   Article III § 3; and Article IV §§ 9 & 16; and the 1st, 5th, &

27   14th Amendments, & Article 10(1) of the United States

28   Constitution). Additionally, the drafter misused the People's

initiative power to unconstitutionally repeal and re-enact Penal Code Section 190 to change the penalties from "Determinate" penalties fixed by the Legislature, back to "Indeterminate" penalties without approval of the voters, and without the WAYS, MEANS, STANDARDS, SAFEGUARDS, PURPOSE, and POLICY, necessary for the administration of the penalty to be inflicted (See: Exhibit 1 – SB-42 Ways & Means Analysis).   In short, the statutes used to vest discretion in the State's parole agency, as it existed during the time the agency was vested with discretion to fix penalties, were expressly repealed, along with the "I.S.L.'s" purpose – mitigation of the penalty the offender would ordinarily serve for the offense, and the policy of fixing the terms based on the determination of the offender's "rehabilitation" (See: e.g., 18a, 18b, 671, 2920, 2940, 3020-3025, and 5077; see: SB-42, Stats 1976 C 1139; AB-476, Stats 1977 C 165).

(4).  PLEASE TAKE NOTICE THAT, the repeal and re-enactment of Penal Code § 190, to "change" the penalty in the case of 1st degree murder, and to "increase" the penalty in the case of 2nd degree murder, did not contain the subject of changing the sentencing law from "Determinate" terms fixed by the Legislature, to be determined by a jury, and imposed by a court of law, to "Indeterminate" penalties, to be fixed by some agency not mentioned anywhere in the initiative.  This could not be lawfully accomplished by will of Prop. 7's drafter alone, and without the subjects presented within the initiative for approval of the California voters.  This denies Defendant a "final judgment" and from knowing the "certainty" of the penalty to be inflicted the same as all others for which the "Determinate Sentencing Law"

-3-

1  (D.S.L.) was created.   Therefore, unless this Court enters a
2  declaratory judgment to the effect that Prop. 7's penalties are
3  "Determinate" penalties of 25 or 15 year terms, whereby the final
4  judgment as to the "certainty" of the penalty is fixed by the
5  Legislature, determined by a jury, and imposed by a court of law,
6  and not conditioned upon the will of the same branch charged with
7  Defendant's prosecution, Defendant is denied his constitutionally
8  vested rights.

9     (5).  **PLEASE TAKE NOTICE THAT**, pursuant to Penal Code Sections
10 12 & 13, the only way Defendant can be taken to trial under the
11 current sentencing structure, based on the policy of "punishment"
12 for the crime itself, is for the charge of voluntary manslaughter.
13 Under the law of the case, there can be no crime without a
14 penalty, and if the penalty is "indeterminate" - under the
15 Legislature's declared policy of "punishment" for the crime itself
16 - it is "void on it face" as being uncertain, and against the law,
17 because it cannot be constitutionally administered (See: P.C. §
18 1170(a)(1), Stats 1977 C 165 § 15).   As this case indisputably
19 shows, the "Indeterminate Sentencing Law" (I.S.L.) was repealed
20 effective July 1, 1977.   Therefore the penalty to be inflicted
21 must be the same for each offender committing the same offense,
22 ergo, it must be a penalty fixed in a number of years by the
23 Legislature.   Without an expressed re-enactment of the repealed
24 "I.S.L." and its supporting statutes, some of which call for a
25 purpose and policy, the penalty cannot be legally enforced.   The
26 voters did not confer discretion on any agency to determine the
27 amount of time within Prop. 7's sentencing structure.   Without
28 these subjects having been presented within the initiative, by

-4-

1    law, they are expressly excluded, and as shown by the law itself,

2    the "I.S.L.'s" re-enactment, was not a subject submitted for voter

3    approval (See: Exhibits 1, SB-42 supra, and 2 - 1978 Proposition 7

4    Murder Penalty Initiative Statute, obtained from the State's

5    Archives; Cal. Const. Art. 1 §§ 7(a)&(b), 9, 24, & 26; Art. II §§

6    8(d) & 10(c); Art. III § 3, Art. IV §§ 9 & 16; and Art. 1 § 10(1)

7    & the 1st, 5th, & 14th Amendments to the U.S. Const., supra; see

8    also: Schmitz v. Younger, 21 C.3d 90, 93 [145 C.R. 517] (1978);

9    Scott A. v. Superior Court, 27 C.A.3d 292, 295 [103 C.R. 683]

10    (1972) ["...a statute may not be amended by reference to its

11    title.  A section of a statute may not be amended unless the

12    section is re-enacted as amended."]; Clark v. Jordan, 7 C.2d 248,

13    60 P.2d 457 (1936) [short title in initiative measure held

14    misleading]; Ex parte Haskell, 112 C. 412, 421 [44 P. 725] (1896)

15    [former Art. IV § 24, now Art. IV § 9] [Holding: "A statute shall

16    embrace but one subject, which shall be expressed in its title.

17    If a statute embraces a subject not expressed in its title, only

18    the part not expressed is void."]).

19    (6).  PLEASE TAKE NOTICE THAT, the indictment must be set aside

20    because it charges a crime without a constitutionally correct

21    penalty, and was issued without notice to Defendant that "state

22    actors" hereinafter referred to as the "MORRISSEY 8", have

23    "changed" the penalty for the crime charged in order to vest

24    themselves discretion where none was conferred.  By their own

25    admissions, the officials acting as the "MORRISSEY 8" have

26    committed "constructive fraud" upon this Court, and Defendant in

27    the name of the People of the State of California (See: Exhibit 3,

28    "MORRISSEY 8 MEMORANDUM").  This "Memorandum" provides this Court

1  with indisputable evidence that state actors have changed Prop.

2  7's penalties from "25 or 15 year terms, subject to good-time

3  credits", to "straight life" penalties with 25 and 15 year minimum

4  terms, subject to some kind of "suitability hearing" process to

5  determine a person's rights to liberty, that was not in affect for

6  any application of law to persons whose crime was committed after

7  July 1, 1977, and not sentenced to "straight life" (See: Pen. Code

8  §§ 1170 (a)(1); 2931, 3000(f), Stats 1977 C 165 §§ 15, 38, & 42;

9  Defendant's Exhibit 4 - AB-476, obtained from the State Archives).

10  (7). PLEASE TAKE NOTICE THAT, Defendant's direct attack upon

11  the sentencing schemes adopted by the 1978 Prop. 7 Initiative

12  Statute, should in no way be construed as an admission of guilt on

13  the part of Defendant.  The issues presented are a result of a

14  fraud upon the People of California, preventing Defendant from

15  protecting his liberty interests in a matter that could cause this

16  Court to issue an invalid judgment as to the penalty to be

17  inflicted for the crime charged (See: e.g., Witkin & Epstein,

18  Crim. Law 2ed Vol. 1 § 12 & 13; see also: People v. Butterfield 37

19  C.A.2d 140, 143 [99 P.2d 310] [holding: "...motion made 10 months

20  after discovery of fraud; held not barred]; 62 A.L.R.2d 432).  If

21  Defendant were to find himself convicted in a trial by judge,

22  jury, or plea, and failed to attack Prop. 7's unlawful adoption of

23  a repealed laws sentencing structure prior to trial - see Gov.

24  Code § 9609, supra, he will have invited a substantial error to

25  have been committed that could cause him irreparable injury (See:

26  Cal. Const. Art. 1 § 26 and Art. IV §§ 9 & 16).

27  (8). PLEASE TAKE NOTICE THAT, if this Court were to impose any

28  of Prop. 7's penalties upon Defendant, there is no way to know to

-6-

1  a "certainty" the will of the voters the exact amount of penalty
2  to be imposed for the offense charged, based on a verdict by
3  judge, jury, or plea, against Defendant pursuant to Penal Code §
4  187/190. And if Defendant failed to make this attack upon Prop.
5  7's sentencing schemes, the result might be attributable to
6  Defendant's lack of due diligence; regardless of the institutional
7  failures of the D.O.C., B.P.T., and the Court. Thus a "reversible
8  error" would have been committed, and these proceedings would be a
9  meaningless waste of the People's taxes, as well as the fair and
10 impartial administration of justice. In this case, Penal Code §
11 995 allows for a Motion to dismiss and operates at times in a
12 manner similar to that of an extraordinary writ (See: s/n #1:)

13     (9). PLEASE TAKE NOTICE THAT, due to the repeal of the I.S.L.,
14 supra, no discretion was vested in the Executive Branch to
15 determine facts or evidence as to the vested rights of persons
16 whose crime was committed after July 1, 1977. The only function
17 remaining with the C.R.B., was for parole considerations of those
18 persons whose sentence is determined by a jury and imposed by a
19 court "FOR LIFE" (See: Pen. Code § 190; Stats 1977 C 316, Stats
20 1978 C 579; Pen. Code § 5076 et seq.).

21     (10). PLEASE TAKE NOTICE THAT, under the laws of this case,

22 s/n #1: For example see: People v. Superior Court 33 C.3d 754, 762 [191 C.R. 1] (1983); Domino v.
   Superior Court, 129 C.A.3d 1000, 1006, 1012 [181 C.R. 486] (1982) [given the state of evidence, the
23 superior court should have granted the motion to dismiss]; People v. Swinney, 46 C.A.3d 332, 340,
   344 [120 C.R. 148] (1975) ["discovery" refers to discovery of criminal agency, not merely discovery
24 of loss, and requires exercise of "reasonable diligence"]; People v. Witt, 53 C.A.3rd 154, 162 [125
   C.R. 653] (1975) [when information shows on its face that prosecution is barred by statute of
25 limitations, defense may be raised at any time before or after judgment — crime or penalty];
   Anderson v. Superior Court, 66 C.2d 863, 866–67 [59 C.R. 426] (1967) [995 motion dismissing murder
26 charge granted]; In re Henderson, 61 C.2d 541, 544 [39 C.R. 373] (1964); In re Razutis, 35 C2d 532,
   534 [219 P.2d 15] [legality of commitment at preliminary examination; waiver of objections unless
27 raised by motion under P.C. 995]; see also: In re Sandel, 64 C.2d 412, 415–19 [50 C.R. 462] (1966);
   Gray v. Hall, 203 Cal. 306, 316, 322 [265 P.246] (1928); Norton v. Shelby County, 118 U.S. 425, 6
28 S.Ct. 1121, 1125, 30 L.Ed. 178, 186 (1886)).

1  Defendant does not claim a statute of limitations defense to the
2  prosecution for the crime of murder, but he is claiming, inter
3  alia, that those acting on the part of Plaintiffs knew, or should
4  have known that California repealed its "I.S.L.", along with the
5  Executive Branch's discretion to fix terms of imprisonment between
6  a minimum and maximum penalty structure (See: e.g., Exhibits: 1,
7  3, & 4, supra; see also: 3 Cal. Proc., 3d Actions § 544; 1 Cal.
8  Crimes, § 35; Planned Parenthood Affiliates v. Swoap, 173 C.A.3d
9  1187, 1201 [219 C.R. 664] (1985); cf. Association for Retarded
10  Citizens v. Department of Developmental Services, 38 C.3d 384, 394
11  [211 C.R. 758] (1985) cf. Morris v. Williams, 67 C.2d 733, 748 [63
12  C.R. 689] (1967); Drummey v. State Bd. of Funeral Directors, 13
13  C.2d 75, 84-85 [87 P.2d 848] (1939); Cal. Const. Art. III § 3).

14          **EVIDENCE IN SUPPORT OF MOTION TO DISMISS**

15  Supporting Statement:

16      (11). **PLEASE TAKE NOTICE THAT,** having presented a case in
17  controversy, and a showing of indisputable evidence that
18  regardless of the circumstances, and/or opposition offered by
19  Plaintiffs, under the law of the case, Defendant cannot be taken
20  to trial where the penalty for the offense is in violation of
21  expressed provisions to both State and Federal Constitutions.
22  Furthermore, if Defendant where to be found guilty of the crime of
23  murder in the 1st or 2nd degree, the State's Constitution mandates
24  that Defendant is entitled to have the penalty fixed to a
25  "certainty" by the Legislature in a number of years, and that the
26  penalty be a "final judgment", imposed by a court of law; not
27  conditioned upon the will of any other branch or agency (See e.g.,
28  Art. 1 §§ 7(a)&(b), 26; Art III § 3 of Cal. Const.; and the 1st,

                            -8-

1  5th, and 14th Amend. to the U.S. Const.).

2      (12). PLEASE  TAKE  NOTICE  THAT,  according  to  California

3  Constitution Article II § 10(c), Defendant is entitled by law to

4  have a penalty determined according to the expressed language used

5  in the Title of Prop. 7, and administrated by the laws adopted for

6  the  implementation  of  the  penalty - Penal  Code  §  2931  et  seq.,

7  Stats 1977 C 165 § 38 - as these laws, supra, stood in effect as

8  of November 8, 1978, based on the following:

9      (13). Effective November 8, 1978, the voters ratified the 1978

10  Prop.  7  Initiative  Statute  into  law.   The  language  used  in  Prop.

11  7's Title by its Drafter stated, inter alia, that:

12      "Changes minimum sentence for first degree murder from
       life to 25 years to life.  Increases penalty for second
13      degree murder.  Prohibits parole of convicted murderers
       before  service  of  25  or  15  year  terms,  subject  to
14      good-time credits".  (See: Exhibit 2, supra).

15      (14). The 1978 Prop. 7 Initiative Statute did not contain the

16  following subjects, nor did it ask the voters permission to:

17      (A). Change Prop. 7's penalties of 25 or 15 years, to penalties

18          "FOR LIFE" with mimimums of 25 or 15 years, subject to some

19          kind  of  "suitability  hearing  process"  whereby  a  person's

20          liberty  would  be  conditioned  upon  the  will  of  the  same

21          branch  charged  with  Defendant's  prosecution.   The  voters

22          were  not  asked  to  vest  discretion  in  the  "MORRISSEY 8"  or

23          any other agency granting them the power to amend Prop. 7,

24          or that could be construed as "notice" other than what was

25          specified  by  the  expressed  language  used  in  Prop.  7's

26          Title, supra;

27      (B). re-enact  the  I.S.L.,  under  the  Legislature's  declared

28          policy of "punishment" for 1st and 2nd degree murder

-9-

offenses;

(C). change the purpose for imprisonment from "punishment" for the crime itself, back to "mitigation" of the penalty, based on "rehabilitation" of the individual offender;

(D). repeal the authority to reduce Defendant's penalty, "subject to good-time credits", and re-vest it back with the same agency who just had its powers to fix terms and administer earned credits - under the repealed I.S.L. Pen. Code § 2920, Stats 1977 C 165 § 36 - taken away less than 16 months earlier for abuse;

(E). create a separate and "special class" of prisoner to be excluded from the D.S.L.; granting the Community Release Board (C.R.B.) - now known as the Board of Prison Terms (B.P.T.) - the power to deny those who stand within the same relationship to the law, the same rights and privileges as all others for the D.S.L. was created, the "certainty" of the penalty to be inflicted, sine qua non, there can be no penalty;

(F). repeal or amend the law vesting the rights created, as decreed by the Legislature, so that all those who commit a crime, as well as the victims and the offender's family members - would know the "certainty" of the penalty to be inflicted as declared by the law itself;

(G). ask the voters to amend Penal Code Sections 1170, 2931, and 3000, et seq., adopted as the means for implementing the D.S.L., as well as Prop. 7's sentencing structure;

(H). nor did Prop. 7 ask the voters to amend the D.S.L., or to amend the State Constitution in order to permit the

1         vesting of legislative discretion in Plaintiffs to

2         determine Defendant's fundamental rights under the newly

3         declared policy of "punishment" for Prop. 7's penalties;

4 (I). Prop. 7 did not repeal the D.S.L. nor create a "special

5         class" within the D.S.L. for category four and five crimes

6         (See: Exhibit 1, supra, id at p. 3).

7 INDISPUTABLE ISSUES OF FACT AND LAW

8 Indisputable Material Facts:       Supporting Evidence:

9 1-(A) During its 1976 session, California's Legislature made the
10 policy decision to repeal the sentencing law with no fixed
11 penalties as its purpose for imprisonment for crime. In repealing
12 the I.S.L., California changed from the policy for imprisonment from
13 mitigation and rehabilitation to the "punishment" for the crime itself.
14 The purpose for the new Determinate Sentencing Law was so that all those
15 convicted of crime, would know the "certainty" of the penalty to be
16 imposed by a court of law. This law took effect on July 1, 1977. Prop. 7
17 did not contain notice of the "MORRISSEY 8 MEMORANDUM" where they
18 changed Prop. 7's penalties of 25 and 15 year terms to penalties "FOR LIFE"
19 with 25 and 15 year minimum terms, subject to a so-called "suitability
20 hearing process".

As shown, Prop. 7's Title asked the voter to "CHANGE" the penalty for 1st degree murder from life. In the case of 2nd degree murder, the subject of "LIFE" was specifically omitted (See: Cal. Const. Art. 1 § 26; Art. II § 8(d); Art. IV §§ 9 & 16). When Plaintiffs made the decision to treat Prop. 7's terms the same as all other penalties "FOR LIFE", they violated expressed provisions of both State and Federal Constitutions (See: e.g., Witkin Const. Law 9ed Vol. 7 §§ 101-105; 444-47; 481; 497; and 500 (1988); Cal. Const. Art. 1 §§ 1, 3, 7(a)&(b), 15, 24, & 26, Art. II § 10(c); & the 1st, 5th, 6th, and 14th U.S. Const. Amend.'s; Exhibit 3, supra).

21 2-(B). Prop. 7 did not re-enact the I.S.L., which cannot exist under the
22 policy of "punishment" for these offenses. In the case of Prop. 7's
23 1st and 2nd degree murder penalties, neither the C.R.B., or any other
24 agency was delegated with legislative discretion to determine the penalties
25 of Prop. 7's adopted sentencing schemes. According to Prop. 7's
26 Title, the voters were told the offenders would be paroled from the
27 25 or 15 year terms "subject to good-time credits", and nothing more.

Under California law, no state-wide agency can be vested with this exclusively Legislative power, and any attempt to so construe Prop. 7's penalties would violate State & Federal Constitutions (See: Cal. Const. Art. 1 § 26; Art. II § 8(d); Art. III § 3; & Art. IV §§ 9 & 16; see also: Witkin & Epstein Crim. Law Vol. 1 § 12; Vol. 3 § 1447; & Witkin Const. Law 9ed Vol. 7 §§ 93, 101-05, 107-11, 113-14, 120, 129, 481-87, 497, 556-57, & 591 et seq; and the 1st, 5th, 6th, & 14th Amend.'s to the U.S. Const.; see

28

3-(C). Prop. 7 did not change the purpose for imprisonment from: "punishment" for the crime itself, back to "mitigation" of the penalty, based on "rehabilitation" of the offender as these were not subjects contained in the 1978 Prop. 7 Initiative Statute. The Legislature did not state its purpose for retaining indeterminate sentencing, which cannot exist under the policy of "punishment" for the crime itself. Note: Prop. 7's Title did not contained the subject of 15 years to life.

4-(D). Prop. 7 did not ask the voters to take the power to fix terms and grant parole away from the D.O.C. - pursuant to Pen. Code §§ 2930 thru 2932 & 3000(f) - and re-vest it back with the C.R.B. so that those effected by Prop. 7 would be subjected to some kind of "suitability hearing process" not contained within the bill. By law, offenders are entitled to four months off their sentences for each eight months served. The B.P.T.'s so-called "suitability hearings", interfere with this vested right.

5-(E). Prop. 7's sentencing structure is a pure question of law where fundamental rights are at stake. There is no question that the D.S.L. was created so that all those within the "SB-42 class" would be entitled to know the "certainty" of the penalty to be inflicted as determined by the Legislature and imposed by a court of law. The charge against Defendant were part of the "class" for which the D.S.L. was created. Prop. 7 did not ask the voters to create a "special class" of offender. Nor did it ask the voters to grant

Exhibits 2, 3, & 4, supra).

At the time Prop. 7 was submitted to the voters, the Adult Authority had already had its term fixing authority repealed. The C.R.B. succeeded the Adult Authority with only specified duties (See Exhibit 1 SB-42, supra). State law prohibits any state-wide agency from possessing the power to determine the penalty any given crime shall bear, absent an amendment to the Constitution authorizing it (See: Cal. Const., Art. 1 §§ 7(a)&(b), 9, & 26; Art. III § 3; Art. IV §§ 1, 9 & 16; & the 14th Amend. to the U.S. Const., supra; see Exhibit 3, supra).

Under California law, once the Legislature vested the power to administer penalties for crimes committed after 7/1/77, with the D.O.C., this function became a matter of public trust, and could not be given away, or usurped by another agency - acting outside the law - who just had its discretion repealed. The voters ratified Prop. 7's sentencing provisions according to what they were told by its title, and according to the laws in existence at the time of its enactment (See: Cal. Const., Art. 1 § 26; Art. II § 10(c); Art. IV §§ 9 & 16; and U.S. Const.'s 1st, 5th, 6th, & 14th Amend.'s, supra).

California's Constitution prohibits discrimination in the application of the law in any form. It also prohibits "class" discrimination, whenever a general law can be made applicable. If the Author of Prop. 7 intended to create a "special class", and disadvantage Prop. 7 prisoners by reviving "uncertainty" in their penalties, he failed to mention it to the voters. Any attempt to deny those within Prop. 7, the same rights and privileges as those for which the D.S.L. was created, violates the due process

-12-

ask them to amend the State Constitution to allow the legislative body to vest arbitrary discretion in Plaintiffs to allow for disparate penalties to be determined by the same branch charged with the prosecution. The voters did not approve of different penalties to be imposed on individual offenders committing the same offense; as opposed to the expressed language contained in Pen. Code §§ 1170(a)(1), 2931, & 3000, as these law's stood on November 1978.

9-(I). As previously stated, Prop. 7 did not ask the voters to repeal any part of the D.S.L., or create a "special class" for category four and five crimes; this was done by "constructive fraud" in violation of both State and Federal Constitutions. The terms of 25 or 15 years, are exactly what the voters of Prop. 7 said they were, subject only to "good-time credits". The only way a person can be subjected to having to spend a longer term - up to "LIFE", in the case of 1st degree murder, would be if the person violated the provisions of Pen. Code § 2931, or refused to perform according to its provisions.

it to the voters under the guise of an existing law, thus, making it void on its face as being repugnant to expressed provisions of the State and Federal Constitutions (See: Cal. Const. Art. 1 § 26; Art. III § 3; Art. IV §§ 9 & 16; as well as Gov. Code § 9609 see Witkin Const. Law 9ed Vol. 7 §§ 87-89, 93-94, 101-05, 109, 111, 120, 129, 497, 500, 519, & 556-57).

Prop. 7's penalties are now being implemented as penalties with no fixed terms. Under the policy of "punishment" for the crime itself; this makes Prop. 7's sentencing schemes incomplete as legislation. Furthermore, as administratively appointed officials, Plaintiffs have abused their discretion, because under State law, no Legislative agency can be vested with the power to determine a person's fundamental rights. Plaintiffs' actions violate both State and Federal Constitutions (See: e.g., Cal. Const., Art. 1 §§ 7(a)&(b); 26; Art. III § 3; Art. IV §§ 9 & 16; and U.S. Const. Art. 1 § 10(1) and the 1st, 5th, 6th, & 14th Amend.'s, supra; Exhibits 1, 2, 3, & 4, surpa.

## CONCLUSIONS

(15). As of July 1, 1977, California law no longer provided for indeterminate sentencing. And under the policy of "punishment" for the crime itself, indeterminate sentencing cannot exist, ergo, the penalty for the crime charged, must be the same - in a number of years - for each person committing the same offense, or the penalty is "uncertain" and violates, inter alia, both due process and equal protection clauses of the State and Federal Constitutions (See also: e.g., Witkin & Epstein, Crim. Law 2ed

-14-

1 | Vol. 1 § 12, supra, Vol. 3 § 1447, supra; 13 Cal. Jur.3d §§
2 | 104-107; Cal. Const. Art. 1 § 26; Art. II § 10(c); Art. III § 3;
3 | Art. IV. §§ 9 & 16; and the 1st, 5th, 6th, & 14th Amend.'s to the
4 | U.S. Const.; see also: Exhibit 5 - Santa Clara Law Review).   It
5 | has always been the law in this State that only the Legislature
6 | has the exclusive authority to define a crime and fix the penalty
7 | for its offense.   And, absent a constitutional amendment
8 | authorizing the vesting of this exclusively legislative function
9 | elsewhere, the "legislature cannot delegate this power to any
10 | administrative agency of its own creation", ibid.   Therefore,
11 | Prop. 7's penalties must be fixed to a "certainty" by the law
12 | itself, and be so complete in all its terms and provisions, that
13 | nothing is left to be decided by those who are empowered to
14 | administer the law.   Whatever the outcome of these proceedings,
15 | Defendant cannot be taken to trial under a suspect sentencing
16 | structure, and the penalty to be imposed may not be conditioned
17 | upon the will of the same branch charged with his prosecution - to
18 | be determined by some political appointee - where the actual term
19 | of confinement is based on the will of whomever is in power at the
20 | time (emphasis added).

21 | REQUEST FOR RELIEF

22 | (16). Defendant, having acted with due diligence in trying to
23 | resolve this matter prior to trial, request both "Declaratory and
24 | Injunctive Relief".   Furthermore, Defendant requests this Court
25 | grant his "Motion to Dismiss" the defective charges on the basis
26 | that - under California law there can be no crime without a
27 | penalty - the penalty is either "void on its face" as being in
28 | direct conflict with both State and Federal Constitutions, or

-15-

1  "void" because the sentence cannot be constitutionally
2  administered under the Legislature's declaration contained in
3  Penal Code § 1170(a)(1), supra.

4     (17) Or, that this court declare the penalties for a
5  conviction of 1st or 2nd degree murder pursuant to Penal Code
6  Sections 187/190 are 25 or 15 year fixed terms, where defendant is
7  mandatorily paroled by the Dept. of Corrections subject to earned
8  credits, as it is expressly stated in the Title of Prop. 7, and
9  not subject to any agency's "suitability" hearing.

10                              Respectfully submitted,

11                  V E R I F I C A T I O N

12                        FORM NO. 2

13      Verification of Pleading (CCP § 446) - Declaration Under Penalty
                          of Perjury (CCP § 446, 2015.5)
14
15                         BY PARTY

16  Case Title:        MOTION TO DISMISS - P.C. § 995

17  Case Number:        02F01534

18     As the Defendant in this matter, I declare I have read the
19  foregoing GROUNDS FOR FILING THE ATTACHED PENAL CODE SECTION 995
20  MOTION TO DISMISS THE ABOVE ENTITLED CASE (Pleading - Complaint)
21  and know the contents thereof. The same is true of my own knowledge
22  except as to those matters which I believe to be true.

23     Executed on  Febuary  (Month) 28  (Day), 2009, in the City
24  of Sacramento, County of Sacramento, California.

25     I declare (or certify) under penalty of perjury that the fore-
26  going is true and correct.

27
28                    Kinson Her            2/28/09
                   Name of Defendant          Date

                         -16-

1          P R O O F   O F   S E R V I C E   B Y   M A I L

2    Case Name:          **KINSON HER**

3                            Defendant,

4                               vs.

5                        State of California

6                           Plaintiffs.

7    Case Number:          **02F01534**

8        I **Sanbeira** Thlang_____, declare and state as follows:   I am 18
     years or older and not a party to this action.   My address is:
9    P.O. BOX 7500, Crescent City, CA. 95532          Pelican Bay State Prison

10       On   March____ (Month) __23__ (Day), 2009   I   served   the
     attached MOTION AND PLEADING FOR: NOTICE OF MOTION AND MOTION TO
11   DISMISS BASED ON A DEFECTIVE INDICTMENT GROUNDED ON CONSTRUCTIVE
     FRAUD by placing a true copy enclosed in a sealed envelope with
12   postage   fully   paid   thereon,   in   the   United   States   Mail   at
          **Crescent City** (City), California, addressed as follows:

13

14                          PARTIES SERVED

15   NAME                   ADDRESS

16   JOHNNY JOHNSON         720 9th Street, Dep. 10
     Superior Court-Clerk   Sacramento, CA. 95814
17

18   Bill Lockyer, et al.,  Post Office Box No. 944255
     Attorney General       1300 I Street Suite 125
19                          Sacramento, CA      95814

20   _____  _____
     District Attorney
21

22   Jeanne Woodford,       P.O. Box 942883
     Dir. of Corrections    Sacramento, CA  94283-0001
23

24       I declare under penalty of perjury under the laws of the United
     States of America, that the foregoing is true and correct.
25

26       Executed  on   March_____ (Month) __23__ (Day), 2009,  at
         **Crescent City**_____ (City), California.
27

     Sanbeira Thlang
28   _____                           _____
       PRINT NAME                                       SIGNATURE

                              -17-

# EXHIBIT 1

ASSEMBLY COMM^^^ ^EE ON                    ^ll Number ___SB 42_____

   CRIMINAL JUSTICE                         As Amended April 22, 1976**

Alan Sieroty, Chairman                      Author __Nejedly_____ __

                                            Rev. & Tax ___NO___ :

                                            Ways & Means ___YES____

                                            Staff Member __MU_____

## BILL ANALYSIS

**(as amended by Leg. Counsel Request #12986) as reflected in
the mock-ups distributed on July 28, 1976)

SUBJECT:          Imprisonment: Determinate Sentencing

NOTE:             There have been significant changes in SB 42 since
it was last heard by the Criminal Justice Committee in August of
1975.  This analysis will generally describe the bill as amended by
Legislative Counsel Request #12986 (or mock-ups dated July 28, 1976)
(hereinafter referred to as the current version of the bill), des-
cribe the significant changes to the bill since it was last heard
by the Committee (the form of the bill at the last hearing shall
hereinafter be referred to as the 1975 version of the bill), and
then will offer comments.

## BILL DESCRIPTION:

     Under our current system of prison sentencing, the trial judge
would commit a defendant to prison for the indeterminate period
expressed in the statute and the respective parole board (the
Adult Authority or the Women's Board of Terms and Paroles) would
determine the actual term to be served and the amount of incarcer-
ation prior to being paroled.  The law does not specify when these
decisions must be made.  Historically, these decisions were not
made until long into the prison sentence.  Currently, both Boards
attempt to make these decisions early in the term.

     SB 42 would repeal the indeterminate sentence statute (as for
all crimes that do not call for life imprisonment or death) and
would substitute a system of sentences that would allow the court
to specify the amount of time the defendant would serve in prison.
Each crime would carry three possibilities for the sentence.  The
bill specifies the procedure for the judge to select one of the
three choices.  To this base term, there are many enhancements
that may be charged and proved that will add more time to the
sentence.

(continued on next page)

SB 42 provides for credits from the sentence for good behavior and participating in programs within the prison. These credits total one-third off of the sentence. There is a specified procedure in the bill that would cover the loss of these time credits.

After the term is completed, the bill would allow for a parole period of one year for most crimes (three years for others). A violation of parole would provide for six months of further incarceration.

The bill abolishes the current parole boards and sets up a new board called the Community Release Board (CRB).

SB 42 expands the current role of the Judicial Council as the overseer of the sentencing system.

SB 42 is retroactive and a procedure is detailed as to how this new structure will apply to those sentenced to prison prior to the effective date of the Act.

Sentencing Structure:

The purpose of the sentencing structure in SB 42 is summarized by the statement of legislative purpose that appears in Section 1170 (a)(1) of this bill: The Legislature finds and declares that the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances. The Legislature further finds and declares that the elimination of disparity and the provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the trial court with specified discretion.

SB 42 has a three-tiered approach for all felonies that can be sentenced determinately. The bill places all of the crimes that currently carry prison sentences into the following categories: 16 months, 2, 3 years; 2, 3, 4 years; 3, 4, 5 years; 5, 6, 7 years; life imprisonment (indeterminate sentence with parole eligibility after seven years); life imprisonment without the possibility of parole; death.

(1) 16 months, 2, 3 years - this classification is to cover the least serious felonies. It contains all felonies that currently carry a maximum of two years and a maximum of three years, all felonies that carry a maximum of five years (with one exception, Penal Code Section 243, battery with serious bodily injury), all wobblers (with three exceptions: P.C. 243, battery with bodily injury; P.C. 245a, assault with a deadly weapon or force likely to commit great bodily injury; P.C. 4532a, escape with force), some crimes with 10 year maxima, some crimes with 14 year maxima, and some others that have higher maxima such as statutory rape

(continued on next page)

and offenses involving prisoners. This category includes most non-violent property offenses (grand theft, forgery, receiving stolen property, joy-riding, credit card offenses, second degree burglary), possession of all controlled substances (that are currently felonies), possession for sale of dangerous drugs and marijuana, and some felonious assaults (simple assault on a peace officer, assault with intent to commit a felony, shooting into a dwelling).

    (2)  2, 3, 4 years - this classification is to cover more seriou offenses. It contains only one felony that currently has a maximum of less than seven years (P.C. 243, battery with injury). Most other crimes with 10 and 14 year maxima are in this classification. It contains all wobblers that were not in the previous classification. It contains some crimes that currently carry a maximum of life imprisonment (sale of marijuana, first degree burglary, assault with a deadly weapon). Some of the felonies in this classification are: mayhem, assault with intent to commit murder, assault with a deadly weapon, voluntary manslaughter, involuntary manslaughter, bribery, perjury, possession for sale of opiates, sale of dangerous drugs and marijuana, second degree robbery, first degree burglary, arson, forceable oral copulation, forceable sodomy, oral copulation on a child under 14, sodomy on a child under 14, pimping, pandering, and assaults with intent to rape or rob.

    (3)  3, 4, 5 years - this classification covers the second most serious felonies that are to be determinately sentenced. All crimes in this group currently carry maxima of life imprisonment or a very high term. The minima currently range from six months to ten years for these crimes. Included in this classification are the following crimes: sale of opiates, kidnap, unarmed robbery of a taxi or bus driver, assault with a deadly weapon on a peace officer, forceable rape, gang sodomy and oral* copulation, child molestation, and burglary with explosives.

    (4)  5, 6, 7 years - this classification covers the most serious crimes that are to be punished with something less than life imprisonment or death. SB 42 places the following five crimes into this category: second degree murder; attempted murder; explosives with bodily injury; gang rape, and conspiracy to commit a crime on certain elected officials. All these crimes currently carry maxima of from 20 years to life imprisonment and minima ranging from five to fifteen years.

    (5)  Life imprisonment - this covers murder in the first degree, explosives with great bodily injury, kidnap for ransom, trainwrecking.

    (6)  Life with no parole - included in this classification is trainwrecking with injury, and kidnap for ransom with injury.

(continued on next page)

(7) <u>Death</u> - this covers special circumstance murders and kidnap with death.

Attempts are to be punished as ½ of the term selected, plus enhancements, consecutive sentences, etc. Attempt of a crime punishable by life imprisonment is to be punished 5, 6, 7 years. Attempt of the lowest class felony can be punished with state prison (current law only allows one year in the county jail for such attempts).

Enhancement to Sentence:

SB 42 provides for a series of factors that can cause the sentence to be enhanced if these factors are charged and proved. Some of these enhancements are applications of existing statutes; some are new concepts incorporated into the bill. The following is a summary of these enhancements:

(1) Armed with a deadly weapon (P.C. 12022) - This factor would cause one year to be imposed in addition to the base term. The "armed" allegation applies in the case of all felonies and is codification of existing law.

(2) Use of a firearm (P.C. 12022.5) - This factor would cause two years to be added to the sentence. Current law recognizes that "use of a firearm" should enhance the sentence in the following specified felonies: murder, assault with attempt to commit murder, assault with a deadly weapon, robbery, rape, burglary, kidnapping. SB 42 would expand the operation of this concept to all felonies.

(3) Great bodily injury (P.C. 12022.7) - This factor would cause three years to be added to the sentence. Current law recognizes that greater sentences are to be imposed when the defendant, during the commission of rape, burglary, and robbery, with the intent to inflict such injury, inflicted great bodily injury on the victim. SB 42 expands this concept to cover all felonies and to cover acts committed by a person other than the defendant. Great bodily injury is specifically defined in the bill.

(4) Excessive taking or damage (P.C. 12022.6) - If the victim suffers a property loss of between $100,000 and $500,000, then 50% of the term may be added to the sentence. If the loss is over $500,000, then the enhancement may be 100% of the base term. This enhancement would apply in theft and arson cases. There is no corresponding concept in the statutes currently.

(5) Prior prison terms (P.C. 667.5b) - One year may be added for each prior term spent in prison, provided that the defendant has not remained free of prison custody for five years immediately preceding the filing of an accusatory pleading that results in a felony conviction.

(continued on next page)

(6)   Prior prison terms for specified felonies (P.C. 667.5a) -
Three years may be added for each prior prison term served if
the term was for a "violent felony" that includes the following:
murder or voluntary manslaughter, mayhem, forceable rape, sodomy
or oral copulation, kidnapping as defined by Section 209, lewd
acts on a child (P.C. 288), and any other felony in which great
bodily injury on a person other than the defendant or his
accomplices has been alleged and proved.   This enhancement will
apply in cases where the defendant has not remained free of prison
custody and free of felony conviction for 10 years preceding the
filing of an accusatory pleading that results in a felony
conviction.

(7)   Consecutive sentences - Under current law, the court
may impose sentences consecutively which would in effect raise
the minimum time in prison before parole eligibility.   SB 42
would allow consecutive sentences to be imposed that would add
one-third of the middle base term to the sentence, for each
consecutive sentence.   Any consecutive sentence must be free
of enhancements.

(8)   Limits on enhancements - SB 42 has three sections dealing
with a limit on the amount of time that can be added to a sentence
because of enhancements and consecutive sentences:

P.C. 1170.1a(d) - Only one enhancement for arming, use,
or GBI may apply.   These enhancements cannot be utilized in cases
where they are elements of the crime.

P.C. 1170.1a(e) - Prior terms that are not specified
as violent felonies and consecutive sentences cannot exceed five
years of enhancement.

P.C. 1170.1a(f) - Enhancements cannot more than double
the base term unless the defendant is convicted of a violent felony
as enumerated in Section 667.5c, or allegations of arming, use,
or GBI are found to be true.

Sentencing Procedure:

If the court decides that punishment in prison is appropriate,
it shall select the middle term from the choice of three terms
unless a motion is made to select the higher or lower based on
circumstances in aggravation or mitigation of the crime.   The
court shall impose the additional sentences for enhancements
charged and proved unless the court determines that there are
circumstances in mitigation of the punishment prescribed.   Reasons

(continued on next page)

for deviating from the middle term and for not imposing the
additional sentence for enhancements must be stated on the
record.  The court shall follow the rules established by the
Judicial Council in exercising its decisions in sentencing
matters.

## Judicial Council:

To promote uniformity in sentencing, the Judicial Council
shall adopt rules to provide criteria to sentencing judges in
their decisions concerning sentencing.  It shall quarterly
distribute information to trial judges relating to sentencing
in this state and in others.  It shall conduct sentencing
institutes.  It shall provide criteria to the Community Release
Board regarding parole and term setting decisions (for indeterminate
life sentences).  It shall annually meet in public session to
review the sentencing structure and specific statutes.  It shall
report to the Legislature regarding proposed legislation in this
area.  The review will consider the nature of the offense (in
the proposed legislation) with the degree of danger it presents to
society; compare its penalty to more serious crimes, compare
its penalty to penalties in other jurisdictions and to recommenda-
tions by national commissions and other learned bodies.

## Community Release Board:

The Community Release Board will replace the existing
Adult Authority and Women's Board of Terms and Parole.  It will
succeed to their same functions in indeterminate sentence cases;
it will set up parole guidelines for individual cases; and it
will be the ultimate body of review for decisions of the Depart-
ment of Corrections in the loss of good time credit.  The Board
will be comprised of nine members and "shall reflect as nearly
as possible a cross-section of the racial, sexual, economic,
and geographic features of the population of the state."  In
reality, the bill grandfather's in all of the existing Adult
Authority members.  The Women's Board members will not be part
of this new board unless by appointment to fill a vacancy.

The Board must review all cases sentenced determinately
to see that the sentence is not disparate.  If the sentence is
disparate, the Board is to move the sentencing court to recall
and resentence.  This is to promote uniformity in sentencing.

## Credits for Good Behavior and Participation:

SB 42 allows for credits to be deducted from the term of
imprisonment.  Three months a year are to be deducted for the fore-
bearance of specified acts (such as escape, assaultive behavior,
possession of drugs, possession of a weapon, etc.)  These acts
are placed into three categories:  acts which will allow the loss

(continued on next page)

of 15 days; acts which will allow the loss of 30 days; acts
which will allow the loss of 45 days. The bill provides for
some procedural safeguards for the loss of good time.

One month a year is to be deducted for participation in
work, educational, vocational, therapeutic, or other prison
programs and activities.

All prisoners will serve eight months of each one year
of the term unless good time or participation time credits are
lost. If the inmate is prosecuted by the local district attorney
for an act for which good time could be lost, then good time can
only be lost by a conviction. An acquittal is binding as a factual
determination.

Prisoners sentenced prior to the effective date of SB 42
will receive credits on their terms only after the effective
date of the Act.

Parole:

SB 42 prescribes rules and procedures for parole of persons
sentenced under this bill, including an automatic parole of no
longer than one year, or three years for "lifers", at the
expiration of the term, unless CRB for good cause waives parole
and discharges the inmate.

The bill prescribes rules and procedures for parole of
persons receiving an indeterminate (life) sentence, including
the following:

(1) Meetings between the inmate and CRB, at which a
majority of a 3 member panel of CRB will decide whether to
set or decline to set a release date. The first is within
one year of his incarceration. If no release date is set
prior to his minimum eligible parole release date, or if the
date is more than 3 years after the minimum, he can have a
re-hearing with counsel.

(2) The right of the inmate to the undivided attention
of panel members, to a transcript and to receive notice of the
panel's decision, with an explanation whenever a release date
has been denied, postponed, or rescinded.

SB 42 limits parole revocation in the following respects:

(1) Reconfinement shall not exceed 6 months.

(2) In no event shall reconfinement and re-parole extend
beyond the original one-year, or three-year maximum.

(continued on next page)

SB 42
Nejedly                                                                      Page 8

## Retroactivity:

For those prisoners already in prison but who would have
been determinately sentenced under SB 42 (had it been law at
the time of the sentence), the following guidelines are set up
for the Community Release Board:

(a)  Figure the middle term of the crime for which
the prisoner has been convicted and aggregate it by any additional
terms which were imposed by the trial court.

(b)  The CRB should use this figure as the prisoner's
term unless he already has a parole date from the Adult Authority
(or Women's Board) that will let the prisoner out earlier; then
the earlier date shall be selected.  There shall be no good time
credit for time served prior to the effective date of the Act.

(c)  However, if the CRB feels that the prisoner merits
more time because of the number of convictions or priors, or due
to the fact that a deadly weapon was involved or that an attempt
to inflict great bodily injury was involved, the Board may set a
later date for release (upon a hearing with counsel for the inmate).

In fixing a term in these cases, the board "shall be guided
by the term which reasonably could be imposed on a person con-
victed after the effective date of this act of a similar crime
under similar circumstances."

## Other Incidental Changes from Current Law:

(1)  Special penalties for prior convictions in narcotic
cases is repealed.  Only prior prison terms will enhance the
sentence in the case of prior convictions.

(2)  1202b, the Youthful Offender provision is repealed.

(3)  The habitual criminal statute is repealed.  The enhance-
ment for prior prison terms and for violent priors that result in
prison terms is substituted for this concept.

## CHANGES IN THE BILL SINCE LAST HEARD BY THE COMMITTEE

SB 42 has had many amendments since the Committee heard the
bill in August of 1975.  Many of the amendments are technical
and many of the ambiguities have been resolved.  The following
is a chart with some of the substantial changes in the bill since
the printed version dated August 14, 1975.

(continued on next page)

*CR 42*
*Noperdly*

| Subject | 1975 Version | 1976 Version |
|---|---|---|
| Life without possibility of parole | not in bill | is provided for in P.C. Sections 209, 218, 219 (trainwreck, kidnap for ransom) |
| 5 year washout for prior prison terms | not in bill | in bill |
| 3 years for "violent felony" prior term | not in bill | in bill |
| Power to recall sentence by judge | at any time | limited to 120 days after the sentence |
| Consecutive sentences | add one year | add 1/3 of middle term |
| CRB review of sentence for disparity; remand to court | for sentences of more than 10 years | for all sentences |
| Limit on enhancements | 5 years for prior terms and consecutives | 5 years for prior terms for non-"violent felonies" and consecutive; 100% limit unless "violent felony" or weapon involved |
| Retroactivity | middle term plus terms that could have been imposed by the judge | middle term plus what was imposed; exception for inmate with many priors, or if weapon or GBI involved |
| Judicial Council | overseer; guidance to judges | overseer; guidance to judges; advise to Legislature |
| Youthful Offender Provision - 1202 b | parole eligibility in one year | repealed |
| Good time credit loss | 30 days for assaults | 45/30/15 days for specified misconduct; detailed procedure |
| CRB composition | New board; cross-section of the community | "Grandfather" in the Adult Authority; no Women's Board |

(continued on next page

| | | |
|---|---|---|
| "use" enhancement (two years) | applies in cases of certain specified felonies | applies in all felonies |
| Enhancement for excessive loss | not in bill | 50% of base term is $100,000; 100% if $500,000 |
| GBI enhancement (three years) | accomplice could be injured | exempts accomplice; GBI defined |
| Attempt of 16 month, 2, 3 year crime | punishable in county jail for one year | punishable in state prison for ½ the term plus enhancements |

### COMMENTS:

(1)  This Committee has held previous hearings on the Indeterminate Sentence and as a Committee has concluded that major reform is necessary.  The important questions concern the nature of this reform.

(2)  The federally-sponsored Uniform Parole Reports Project has concluded that the national median time served by state prisoners outside of California for each of the years 1968-1973 was between 17 and 18 months.  For five industrial states considered comparable to California, the combined median has fallen steadily in each of those years, from a high of 24.2 months in 1968 to 18.1 months in 1973.  By contrast, the median time served in California has been approximately double the national median (generally around 36 months, with a slight drop to the low 30's in 1972 and 1973 when the Adult Authority tended to limit paroles to so-called "good risks").  Currently, the Adult Authority is setting release dates that would call for a median of around 38 months in prison.  The sentencing structure of SB 42 is based heavily on this recent past experience of the Adult Authority.

(3)  SB 42 will also affect the terms in prison for women. The Women's Board has traditionally dealt with a less violent and less dangerous inmate than has the Adult Authority.  Correspondingly, the median time served for women has always been far less than for the men.  The median time served for women between 1972 and 1975 has ranged from 10.5 months to 25 months.  Should the Legislature accept the penalties in SB 42 which have been derived from statistics concerning the terms served by men?

(4)  A major concern over the structure of SB 42 is the fixing by statute of prison terms that may entail long periods of incarceration, with no mechanism for the terms to adjust downward in the future.  History teaches us that the Legislature is reluctant to lower prison sentences and there is constant pressure to raise such sentences.  Some legislative enactments are being stricken by the courts as "cruel and unusual punishment".

(continued on next page)

An alternative to SB 42 is a structure similar to our current
system, with the Legislature fixing the range of penalties
and an administrative body determining the actual ter .  This
system allows for flexibility but has not in the past been
immune to political pressures.

(5)  Some of the criticism of the failure of the Indeterminate
Sentence Law has been placed on the Adult Authority.  Should this
body be perpetuated in the form of the Community Release Board?
Is there a reason for abolishing the Women's Board while retaining
the Adult Authority?  The bill requires the make-up of the
Community Release Board to be a cross-section of the racial,
sexual, economic, and geographic features of the population of
the state.  Does the Adult Authority represent this cross-section?

(6)  Both the Adult Authority and Women's Board employ
hearing representatives to help carry out their parole hearing
functions.  The CRB will not need many employees to help out
in its parole hearing function in that parole dates for most
prisoners will be fixed by statute.  The CRB will have the
added responsibility of reviewing Department of Corrections
decisions concerning loss of good time credit.  Possibly, the CRB
will wish to hire lawyers to help carry out its functions.  In
the bill, Section 5082(a)(page 155) says:  "Nothing shall prohibit
the Community Release Board from employing any person employed
formerly by the Adult Authority or Women's Board."  Does this
clause prevent the CRB from setting up standards for employees
that would make the former hearing representative ineligible?
Is this desirable?

(7)  SB 42 assumes that the sentencing judge will sentence
defendants to the middle term unless factors of aggravation
or mitigation of the crime are found.  Is this assumption
reasonable given that only 10 to 20% of convicted felons are
sentenced to prison?  A case that merits punishment in prison
will normally contain "factors of aggravation."  Should the
judge be instructed to select the bottom term and go to the higher
terms upon a showing of aggravating circumstances rather than
starting at the middle term as the bill now provides?

(8)  The purpose and stated legislative intent of SB 42 is for
uniformity of punishment, consistent with the seriousness of the
respective crimes.  With this purpose in mind, the following
questions are raised:

(a)  Should voluntary and involuntary manslaughter
be punished be the same crime?  In SB 42, both crimes are
punished by 2, 3, 4 years.  Current law provides for a range of
1 to 15 years for each crime.  The Adult Authority in the newly
published Parole Board Rules treats involuntary

(continued on next page)

manslaughter as a less serious crime and allows parole one
year earlier.   If the penalty of involuntary manslaughter
is changed to 16 months, 2  years, 3 years, then the following
scheme will be established for homicides:

| | |
|---|---|
| first degree murder | life imprisonment |
| second degree murder | 5, 6, 7 years |
| voluntary manslaughter | 2, 3, 4 years |
| involuntary manslaughter | 16 months, 2, 3 years |
| vehicular manslaughter | 16 months, 2, 3 year/wobbler |

It should be noted that the actual sentences will frequently
be higher for there will normally be a weapon involved.

(b)   Penal Code Section 288, lewd and lascivious acts
on a child under the age of 14 years, carries a SB 42 penalty
of 3, 4, 5 years.   This crime has been defined to cover any
touching of a child with intent to arouse.   Oral copulation and
sodomy on a child under 14 years (P.C. Sections 288a(c) and 286(c))
are 2, 3, 4 year felonies in the bill.   Shouldn't the penalties
for these more serious crimes and simple child molestation be
switched around?

(c)   Sex crimes in which the defendant "acted in concert"
with another currently carry penalties of two years in addition
to the sentence for the crime.   This allegation will add 8 months
in prison before parole eligiblity.   In SB 42, the "acting in
concert" allegation adds one year to oral copulation and sodomy
and two years to sexual intercourse.   Are these penalties con-
sistent with each other and current law?

(d)   Should pimping and pandering (P.C. Sections 266g,
266h, 266i) carry penalties of 2, 3, 4 years as indicated in
SB 42, or should they be placed in the classification of less
serious felonies with penalties of 16 months, 2, 3 years?

(9)   In light of the stated purpose and intent in SB 42,
should trainwrecking (P.C. 218, 219) and kidnapping for ransom
(Section 209) carry penalties of life imprisonment with no
parole possibility?   First degree murder has parole possibility
after seven years; second degree murder has a determinate
sentence of 5, 6, 7 years.   Are these sentences consistent,
given the relative seriousness of the crimes involved?

(10)   Should there be a limit specified in the bill on the
maximum amount of time allowed in prison for a person sentenced
for a crime that has a determinate sentence?   Is 12 years
sufficient given that persons sentenced for life imprisonment
are eligible for parole after seven years?

(continued on next page)

(11)  Does the Legislature intend to raise the possible
prison sentences for the class of felonies previously determined
by the Legislature to be the least serious felonies?  There are
at least 50 crimes on the statutes that currently carry maximum
sentences of 2 years or 3 years.  SB 42 places these crimes in
the 16 month, 2, 3 year category.  This category is also for
higher grade felonies that carry maxima of 14 years.  The
affect of combining different classes of crimes within the same
category will have the effect of possibly raising prison sentences
for the lower-grade crimes.  For example, assault on a peace
officer (P.C. Section 241), which covers situations where a
defendant swings at a peace officer but does not make contact,
currently carries an indeterminate sentence from 6 months to 2
years.  SB 42, assuming no enhancements or prior terms would
allow up to 3 years for such a crime.  If the defendant has served
a prior term in prison, another year could be added to this
sentence, which would have the effect of doubling our current
penalties.

An alternative for these felonies that currently carry
maxima of 3 years or less is to develop in SB 42 a two-tiered
approach in the sentence: 16 months and 2 years.  The presumption
will be the lower sentence unless there are circumstances in
aggravation of the crime.  This approach, although it may provide
for more incarceration in prison than the current practice, will
prevent the wholesale raising of the maximum term in prison for
these felonies as compared to the current law.

(12)  The 1976 version of SB 42 creates a new enhancement
that would add 50% to 100% of the base term for excessive
taking or damage (Section 12022.6).  Is this enhancement con-
sistent with the theory in the bill that the court is to select the
high term from the three choices for factors of aggravation
such as these?  Section 12022.6 will apply to thefts, damage
caused by arson, and damage caused by pollution.

(13)  Current law recognizes that punishment should be
enhanced when the defendant inflicts great bodily injury on the
victim during the commission of a robbery, burglary or rape.
The purpose of this concept is to deter those committing these
crimes from engaging in violent conduct in addition to the
criminal acts involved in the inherent nature of the underlying
felony.

SB 42, in Section 12022.7, expands the concept of extra
punishment for great bodily injury in two respects:  It applies
to all felonies and it covers acts not committed by the defendant.

Should crimes, in which the attempt to inflict injury is
inherent in the crime, be included in this special enhancement?
The attempt to inflict injury is an element of all felonious
assaults and batteries.  Should the success of a single criminal
act be punished by three more years in prison?  For example,

(continued on next page)

Assault with a Force Likely to Produce Great Bodily Injury
(P.C. Section 245a) is a crime that does not require injury.
In reality, no case will be prosecuted under this section
unless there are substantial injuries.  A common fact situation
under this section is a barroom brawl in which the loser is
kicked by the winner.  Under SB 42, the crime has a penalty
of 2, 3, 4 years and the GBI enhancement adds another 3 years.
This fight can lead to a penalty of 5, 6, 7 years, the same
penalty that is reserved for second-degree murder.

An alternative to applying the GBI enhancement to all felonies
is to apply it in cases where the infliction of injury is not
the purpose of the underlying felony.  Section 12022.7 should not
apply in cases where great bodily injury or assault is an element
of the crime.

Section 12022.7 also would cause the GBI enhancement to apply
when the victim or someone else engages in the act that causes the
injury.  To be consistent with current law, this enhancement
should be limited to acts committed by the defendant.

(14)  Current law provides for extra punishment for "use
of a firearm" in certain specified felonies (P.C. Section 12022.5).
Should this enhancement be expanded to apply to all felonies as
is in SB 42?

(15)  SB 42 contains a list of "violent felonies" which have
the following consequences:

(a)  Provides for three years of additional sentence
for each prior prison term served for a crime from the list if the
current crime is also on the list.

(b)  Prevents the 100% limitation on all enhancements
from applying to the sentence.

(c)  Is not included in the limitation of 5 years of
additional sentence for prior terms and consecutive sentences.

The list contains the violent crimes of murder, mayhem,
forceable rape, forceable oral copulation, forceable sodomy,
kidnap for ransom or robbery, and all felonies with great bodily
injury.  Also included on the list is Section 288, child molesting.
Should lewd and lascivious acts on a child under 14 years that
do not amount to violent conduct be included on this list?

(16)  The provisions of SB 42 are retroactive and will
apply to those persons committed to prison prior to the effective
date of the bill.  Under Section 1170.2(a), the Community Release

(continued on next page)

Board is to choose the SB 42 middle term for the crime convicted
of and enhance the sentence with the additional penalties imposed
by the judge. However, for those inmates that merit longer
periods of incarceration (due to the number of crimes convicted
of, the number of priors, or allegations of arming with a deadly
weapon, use of a firearm, or infliction of GBI), the CRB shall fix
a term and be "guided by the term which reasonably could be
imposed upon a person convicted after the effective date of this
act of a similar crime under similar circumstances." What does
this operating language mean? What does "similar crime" mean?
What does "similar circumstances" mean? Does this phrase allow
the CRB to set a term based upon allegations that were never
charged and proved at trial?

(17)  The Committee has consistently rejected legislation
that would repeal the Youthful Offender Provision, Section 1202b.
This provision currently allows the Adult Authority to consider
parole after six months of imprisonment for persons under the age
of 23 years who are committed to prison under the provisions of
this section.

SB 42 repeals this provision entirely. The concept of special
treatment for some youthful offenders that merit more lenient
consideration adapts well to the structure of SB 42. If the
court chooses to consider a defendant to be treated as a special
youthful offender, he should be able to reduce the actual sentence
to one year. Does the Legislature wish to abolish this provision?

Technical Amendments:

(1)  On page 130, line 6, strike "are" and insert "is".

(2)  On page 162, line 10, strike "criminal offense" and
insert "felony". (Otherwise, this enhancement could be construed
to cover misdemeanor malicious mischief situations).

(3)  On page 123, in the new language in the mock-up, the
list of crimes should be changed to be consistent with the list
that appears in Section 667.5(c). The latter refers to "murder
and voluntary manslaughter" while the former refers to "homocide";
"kidnapping" should be modified by "as defined in Section 209".

(4)  On page 135 (continued) in the mock-ups, Section 1170.6
of the bill, on the second line, "public session" should be "public
hearing" if the intent is to insure public input and participation.

Source:  Senate Select Committee on Corrections

EXHIBIT 2



# Murder. Penalty — Initiative Statute

## Official Title and Summary Prepared by the Attorney General

MURDER. PENALTY. INITIATIVE STATUTE.   Changes and expands categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed. Changes minimum sentence for first degree murder from life to 25 years to life. Increases penalty for second degree murder. Prohibits parole of convicted murderers before service of 25 or 15 year terms, subject to good-time credit. During punishment stage of cases in which death penalty is authorized: permits consideration of all felony convictions of defendant; requires court to impanel new jury if first jury is unable to reach a unanimous verdict on punishment. Financial impact: Indeterminable future increase in state costs.

## Analysis by Legislative Analyst

Background:

Under existing law, a person convicted of *first degree murder* can be punished in one of three ways: (1) by death, (2) by a sentence of life in prison without the possibility of parole, or (3) by a life sentence with the possibility of parole, in which case the individual would become eligible for parole after serving seven years. A person convicted of *second degree murder* can be sentenced to 5, 6, or 7 years in prison. Up to one-third of a prison sentence may be reduced through good behavior. Thus, a person sentenced to 6 years in prison may be eligible for parole after serving 4 years.

Generally speaking, the law requires a sentence of death *or* life without the possibility of parole when an individual is convicted of first degree murder under one or more of the following special circumstances: (1) the murderer was hired to commit the murder; (2) the murder was committed with explosive devices; (3) the murder involved the killing of a specified peace officer or witness; (4) the murder was committed during the commission or attempted commission of a robbery, kidnapping, forceable rape, a lewd or lascivious act with a child, or first degree burglary; (5) the murder involved the torture of the victim; or (6) the murderer has been convicted of more than one offense of murder in the first or second degree. If any of these special circumstances is found to exist, the judge or jury must "take into account and be guided by" aggravating or mitigating factors in sentencing the convicted person to either death or life in prison without the possibility of parole. "Aggravating" factors which might warrant a death sentence include brutal treatment of the murder victim. "Mitigating" factors, which might warrant life imprisonment, include extreme mental or emotional disturbance when the murder occurred.

Proposal:

This proposition would: (1) increase the penalties for first and second degree murder, (2) expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole, and (3) revise existing law relating to mitigating or aggravating circumstances.

The measure provides that individuals convicted of first degree murder and sentenced to life imprisonment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would have to serve at least 16 years and eight months. The penalty for second degree murder would be increased to 15 years to life imprisonment. A person sentenced to 15 years would have to serve at least 10 years before becoming eligible for parole.

The proposition would also expand and modify the list of special circumstances which require either the death penalty or life without the possibility of parole. As revised by the measure, the list of special circumstances would, generally speaking, include the following: (1) murder for any financial gain; (2) murder involving concealed explosives or explosives that are mailed or delivered; (3) murder committed for purposes of preventing arrest or aiding escape from custody; (4) murder of any peace officer, federal law enforcement officer, fireman, witness, prosecutor, judge, or elected or appointed official with respect to the performance of such person's duties; (5) murder involving particularly heinous, atrocious, or cruel actions; (6) killing a victim while lying in wait; (7) murder committed during or while fleeing from the commission or attempted commission of robbery, kidnapping, specified sex crimes (including those sex crimes that now represent "special circumstances"), burglary, arson, and trainwrecking; (8) murder in which the victim is tortured or poisoned; (9) murder based on the victim's race, religion, nationality, or country of origin; or (10) the murderer has been convicted of more than one offense of murder in the first or second degree.

Also, this proposition would specifically make persons involved in the crime other than the actual murderer subject to the death penalty or life imprisonment without possibility of parole under specified circumstances.

Finally, the proposition would make the death sentence *mandatory* if the judge or jury determines that the aggravating circumstances surrounding the crime *outweigh* the mitigating circumstances. If aggravating circumstances are found *not* to outweigh mitigating circumstances, the proposition would require a life sentence without the possibility of parole. Prior to weighing the aggravating and mitigating factors, the jury

32

ity of parole might at a later date be set to continue tation or modification, thereby allowing parole.

the release of persons sentenced to life without the possibility of parole.

**Fiscal Effect:**

We estimate that, over time, this measure would increase the number of persons in California prisons, and thereby increase the cost to the state of operating the prison system.

The increase in the prison population would result from:

- the longer prison sentences required for first degree murder (a minimum period of imprisonment equal to 16 years, eight months, rather than seven years);
- the longer prison sentences required for second degree murder (a minimum of ten years, rather than four years); and

There could also be an increase in the number of executions as a result of this proposition, offsetting part of the increase in the prison population. However, the number of persons executed as a result of this measure would be significantly less than the number required to serve longer terms.

The Department of Corrections states that a small number of inmates can be added to the prison system at a cost of $2,575 per inmate per year. The additional costs resulting from this measure would not begin until 1983. This is because the longer terms would only apply to crimes committed after the proposition became effective, and it would be four years before any person served the minimum period of imprisonment required of second degree murderers under existing law.

---

## Text of Proposed Law

This initiative measure proposes to repeal and add sections of the Penal Code; therefore, existing provisions proposed to be deleted are printed in strikeout type and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

Section 1. Section 190 of the Penal Code is repealed.

190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison for five, six, or seven years.

Sec. 2. Section 190 is added to the Penal Code, to read:

*190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.*

*Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life.*

*The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25 or 15 years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time.*

Sec. 3. Section 190.1 of the Penal Code is repealed.

190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:

(a) The defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2, except or a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree.

(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.

(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is found to be sane, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Sections 190.3 and 190.4.

Sec. 4. Section 190.1 is added to the Penal Code, to read:

*190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:*

*(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.*

*(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.*

*(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is*

Continued on page 41



**7** Murder. Penalty — Initiative Statute

## Argument in Favor of Proposition 7

CHARLES MANSON, SIRHAN SIRHAN, THE ZODIAC KILLER, THE SKID-ROW SLASHER, THE HILLSIDE STRANGLER.

These infamous names have become far too familiar to every Californian. They represent only a small portion of the deadly plague of violent crime which terrorizes law-abiding citizens.

Since 1972, the people have been demanding a tough, effective death penalty law to protect our families from ruthless killers. But, every effort to enact such a law has been thwarted by powerful anti-death penalty politicians in the State Legislature.

In August of 1977, when the public outcry for a capital punishment law became too loud to ignore, the anti-death penalty politicians used their influence to make sure that the death penalty law passed by the State Legislature was as weak and ineffective as possible.

That is why 470,000 concerned citizens signed petitions to give you the opportunity to vote on this new, tough death penalty law.

Even if the President of the United States were assassinated in California, his killer would not receive the death penalty in some circumstances. Why? Because the Legislature's weak death penalty law does not apply. Proposition 7 would.

If Charles Manson were to order his family of drug-crazed killers to slaughter your family, Manson would not receive the death penalty. Why? Because the Legislature's death penalty law does not apply to the master mind of a murder such as Manson. Proposition 7 would.

And, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, that criminal would not receive the death penalty. Why? Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would.

Proposition 7 would also apply to the killer of a judge, a prosecutor, or a fireman: It would apply to a killer who murders a citizen in cold blood because of his race or religion or nationality. And, it would apply to all situations which are covered by our current death penalty law.

In short, your YES vote on Proposition 7 will give every Californian the protection of the nation's toughest, most effective death penalty law.

A long and distinguished list of judges and law enforcement officials have agreed that Proposition 7 will provide them with a powerful weapon of deterrence in their war on violent crime.

Your YES vote on Proposition 7 will help law enforcement officials to stop violent crime—NOW.

JOHN V. BRIGGS
Senator, State of California
35th District

DONALD H. HELLER
Attorney at Law
Former Federal Prosecutor

DUANE LOWE
President, California Sheriffs' Association
Sheriff of Sacramento County

## Rebuttal to Argument in Favor of Proposition 7

The argument for Proposition 7 is strictly false advertising.

- It would not affect the Charles Manson and Sirhan Sirhan cases. They were sentenced under an old law, thrown out by the courts because it was improperly written.
- As for the "zodiac killer", "hillside strangler" and "skid-row slasher", *they were never caught.* Even the nation's "toughest" death penalty law cannot substitute for the law enforcement work necessary to apprehend suspects still on the loose.

But you already know that.

Regardless of the proponents' claim, no death penalty law—neither Proposition 7 nor the current California law—can guarantee the *automatic* execution of all convicted murderers, let alone suspects not yet apprehended.

California has a strong death penalty law. Two-thirds of the Legislature approved it in August, 1977, after months of careful drafting and persuasive lobbying by law enforcement officials and other death penalty advocates.

The present law is *not* "weak and ineffective" as claimed by Proposition 7 proponents. It applies to murder cases like the ones cited.

Whether or not you believe that a death penalty law is necessary to our system of justice, you should vote NO on Proposition 7. It is so confusing that the courts may well throw it out. Your vote on the murder penalty initiative will not be a vote on the death penalty; it will be a vote on a carelessly drafted, dangerously vague and possibly invalid statute.

Don't be fooled by false advertising. READ Proposition 7. VOTE NO.

MAXINE SINGER
President, California Probation, Parole
and Correctional Association

NATHANIEL S. COLLEY
Board Member, National Association for the
Advancement of Colored People

JOHN FAIRMAN BROWN
Board Member, California Church Council

Arguments printed on this page are the opinions of the authors and have not been
checked for accuracy by any official agency.

## Murder, Penalty—Initiative Statute    7

### Argument Against Proposition 7

DON'T BE FOOLED BY FALSE ADVERTISING. The question you are voting on is NOT whether California should have the death penalty. California ALREADY has the death penalty.

The question is NOT whether California should have a tough, effective death penalty. California ALREADY has the death penalty for more different kinds of crimes than any other State in the country.

The question you are voting on is whether to repeal California's present death-penalty law and replace it with a new one. Don't be fooled by false advertising. If somebody tried to sell you a new car, you'd compare it with your present automobile before paying a higher price for a worse machine.

Whether or not you agree with California's present law, it was written carefully by people who believed in the death penalty and wanted to see it used effectively. It was supported by law enforcement officials familiar with criminal law.

The new law proposed by Proposition 7 is written carelessly and creates problems instead of solving them. For example, it does not even say what happens to people charged with murder under the present law if the new one goes into effect.

As another example, it first says that "aggravating circumstances" must outweigh "mitigating circumstances" to support a death sentence. Then it says that mitigating circumstances" must outweigh "aggravating circumstances" to support a life sentence. This leaves the burden of proof unclear. As a result, court processes would become even more complicated.

Proposition 7 does allow the death penalty in more cases than present law. But what cases?

Under Proposition 7, a man or woman could be sentenced to die for lending another person a screwdriver to use in a burglary, if the other person accidentally killed someone during the burglary. Even if the man or woman was not present during the burglary, had no intention that anyone be killed or hurt, in fact urged the burglar not to take a weapon along, they could still be sentenced to die.

This is the kind of law that wastes taxpayers' money by putting counties to the expense of capital trials in many cases where the death penalty is completely inappropriate. To add to the waste, Proposition 7 requires two or more jury trials in some cases where present law requires only one.

Don't let yourself be fooled by claims that Proposition 7 will give California a more effective penalty for murder. It won't. DON'T BE FOOLED BY FALSE ADVERTISING. Vote NO on Proposition 7.

MAXINE SINGER
*President, California Probation, Parole and Correctional Association*

NATHANIEL S. COLLEY
*Board Member, National Association for the Advancement of Colored People*

JOHN PAIRMAN BROWN
*Board Member, California Church Council*

### Rebuttal to Argument Against Proposition 7

ALRIGHT, LET'S TALK ABOUT FALSE ADVERTISING.

The opposition maintains if someone were to lend a screwdriver to his neighbor and the neighbor used it to commit a murder, the poor lender could get the death penalty, even though "he had NO INTENTION" that anyone be killed."

Please turn back and read Section 6b of the Proposition 7. It says that the person must have INTENTIONALLY aided in the commission of a murder to be subject to the death penalty under this initiative.

They say that Proposition 7 doesn't specify what happens to those who have been charged with murder under the old law. Any first-year law student could have told them Proposition 7 will not be applied retroactively. Anyone arrested under an *old* law will be tried and sentenced under the *old* law.

The opposition can't understand why we included the aggravating vs. mitigating circumstances provision in Proposition 7. Well, that same first-year law student

could have told them this provision is required by the U.S. Supreme Court. The old law does not meet this requirement and might be declared unconstitutional, leaving us with no death penalty at all!

If we are to turn back the rising tide of violent crime that threatens each and every one of us, we must act NOW.

This citizen's initiative will give your family the protection of the strongest, most effective death penalty law in the nation.

JOHN V. BRIGGS
*Senator, State of California 35th District*

DONALD H. HELLER
*Attorney at Law Former Federal Prosecutor*

DUANE LOWE
*President, California Sheriffs' Association Sheriff of Sacramento County*

Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.

and by walls on all sides.

(h) "Health Facility" has the meaning set forth in Section 1250 of the Health and Safety Code, whether operated by a public or private entity.

(i) "Place of Employment" means any area under the control of a public or private employer which employees normally frequent during the course of employment but to which members of the public are not normally invited, including, but not limited to, work areas, employee lounges, restrooms, meeting rooms, and employee cafeterias. A private residence is not a "place of employment."

(j) "Polling Place" means the entire room, hall, garage, or other facility in which persons cast ballots in an election, but only during such time as election business is being conducted.

(k) "Private Hospital Room" means a room in a health facility containing one bed for patients of such facility.

(l) "Public Place" means any area to which the public is invited or in which the public is permitted or which serves as a place of volunteer service. A private residence is not a "public place." Without limiting the generality of the foregoing, "public place" includes:

(i) arenas, auditoriums, galleries, museums, and theaters;

(ii) business establishments dealing in goods or services to which the public is invited or in which the public is permitted;

(iii) instrumentalities of public transportation while operating within the boundaries of the State of California;

(iv) facilities or offices of physicians, dentists, and other persons licensed to practice any of the healing arts regulated under Division 2 of the Business and Professions Code;

(v) elevators in commercial, governmental, office, and residential buildings;

(vi) public restrooms;

(vii) polling places;

(ix) courtesy vehicles.

(m) "Restaurant" has the meaning set forth in Section 25522 of the Health and Safety Code except that the term "restaurant" does not include an employee cafeteria or a tavern or cocktail lounge if such tavern or cocktail lounge is a "bar" pursuant to Section 25939(a).

(n) "Retail Tobacco Store" means a retail store used primarily for the sale of smoking products and smoking accessories and in which the sale of other products is incidental. "Retail tobacco store" does not include a tobacco department of a retail store commonly known as a department store.

(o) "Rock Concert" means a live musical performance commonly known as a rock concert and at which the participants use sound amplifiers.

(p) "Semi-Private Hospital Room" means a room in a health facility containing two beds for patients of such facility.

(q) "Smoking" means and includes the carrying of a lighted cigarette, cigar, pipe, or any other lighted smoking equipment used for the practice commonly known as smoking, or the intentional inhalation or exhalation of smoke from any such lighted smoking equipment.

SECTION 2:  Severability

If any provision of Chapter 10.7 of the Health and Safety Code or the application thereof to any person or circumstances is held invalid, any such invalidity shall not affect other provisions or applications of said Chapter which can be given effect without the invalid provision or application, and to this end the provisions of said Chapter are severable.

SECTION 3:  Effective Date

Chapter 10.7 of the Health and Safety Code becomes effective 90 days after approval by the electorate.

---

TEXT OF PROPOSITION 6—Continued from page 29

truth of the charges upon which a finding of probable cause was based and whether such charges, if found to be true, render the employee unfit for service. This hearing shall be held in private session in accordance with Govt. Code § 54957, unless the employee requests a public hearing. The governing board's decision as to whether the employee is unfit for service shall be made within thirty (30) working days after the conclusion of this hearing. A decision that the employee is unfit for service shall be determined by not less than a simple majority vote of the entire board. The written decision shall include findings of fact and conclusions of law.

(e) Factors to be considered by the board in evaluating the charges of public homosexual activity or public homosexual conduct in question and in determining unfitness for service shall include, but not be limited to: (1) the likelihood that the activity or conduct may adversely affect students or other employees; (2) the proximity or remoteness in time or location of the conduct to the employee's responsibilities; (3) the extenuating or aggravating circumstances which in the judgment of the board, must be examined in weighing these evidence; and (4) whether the conduct included acts, words, deeds, of a continuing or comprehensive nature which would tend to encourage, promote, or dispose schoolchildren toward private or public homosexual activity or private or public homosexual conduct.

(g) If, by a preponderance of the evidence, the employee is found to have engaged in public homosexual activity or public homosexual conduct which renders the employee unfit for service, the employee shall be dismissed from employment. The decision of the governing board shall be subject to judicial review.

SECTION 4:  Severability Clause

If any provision of this enactment or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or application of this enactment which can be given effect without the invalid provision of application, and to this end the provisions of this enactment are severable.

---

TEXT OF PROPOSITION 7—Continued from page 33

found to be sane, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Section 190.3 and 190.4.

Sec. 5.   Section 190.2 of the Penal Code is repealed.

190.2.   The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found, in a proceeding under Section 190.4, to be true:

(a)   The murder was intentional and was carried out pursuant to an agreement by the person who committed the murder to accept a valuable consideration for the act of murder from any person other than the victim;

(b)   The defendant, with the intent to cause death, physi-

the murder was willful, deliberate, and ~~ meditated, and~~ was perpetrated by means of a destructive device or explosive.

(c) The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exist:

(1) The victim is a peace officer as defined in Section 830.1, subdivision (a) or (b) of Section 830.2, subdivision (a) or (b) of Section 830.3, or subdivision (b) of Section 830.5, who, while engaged in the performance of his duty was intentionally killed, and the defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties.

(2) The murder was willful, deliberate, and premeditated; the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding; and the killing was not committed during the commission or attempted commission of the crime to which he was a witness.

(3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes:

(i) Robbery in violation of Section 211.

(ii) Kidnapping in violation of Section 207 or 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute a violation of Section 209 within the meaning of this paragraph.

(iii) Rape by force or violence in violation of subdivision (2) of Section 261; or by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261.

(iv) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288.

(v) Burglary in violation of subdivision (1) of Section 460 of an inhabited dwelling house with an intent to commit grand or petit larceny or rape.

(4) The murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain.

(5) The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree, or has been convicted in a prior proceeding of the offense of murder of the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed to be murder in the first or second degree.

(d) For the purposes of subdivision (c), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.

Sec. 6. Section 190.2 is added to the Penal Code, to read:

190.2. (a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true:

(1) The murder was intentional and carried out for financial gain.

(2) The defendant was previously convicted of murder in the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed murder in the first or second degree.

(3) The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree.

(4) The murder was committed by means of a destructive device, bomb, or explosive planted, hidden or concealed in any place, area, dwelling, building or structure, and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(5) The murder was committed for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect an escape from lawful custody.

(6) The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(7) The victim was a peace officer as defined in Section 830.1, 830.2, 830.3, 830.31, 830.35, 830.36, 830.4, 830.5, 830.53, 830.6, 830.10, 830.11 or 830.12, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties; or the victim was a peace officer as defined in the above enumerated sections of the Penal Code, or a former peace officer under any of such sections, and was intentionally killed in retaliation for the performance of his official duties.

(8) The victim was a federal law enforcement officer or agent, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a federal law enforcement officer or agent, engaged in the performance of his duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his official duties.

(9) The victim was a fireman as defined in Section 245.1, who while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a fireman engaged in the performance of his duties.

(10) The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his testimony in any criminal proceeding.

(11) The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this state or any other state, or a federal prosecutor's office and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(12) The victim was a judge or former judge of any court of record in the local, state or federal system in the State of California or in any other state of the United States and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(13) The victim was an elected or appointed official or former official of the Federal Government, a local or State government of California, or of any local or state government of any other state in the United States and the killing was

intentionally ~~manifesting exceptional depravity, or the~~
performance of the victim's official du

(14) The murder was especially heinous, atrocious, or cru-
el, manifesting exceptional depravity, as utilized in this sec-
on, the phrase especially heinous, atrocious or cruel mani-
ting exceptional depravity means a conscienceless, or
pitiless crime which is unnecessarily torturous to the victim.

(15) The defendant intentionally killed the victim while
lying in wait.

(16) The victim was intentionally killed because of his race,
color, religion, nationality or country of origin.

(17) The murder was committed while the defendant was
engaged in or was an accomplice in the commission of, at-
tempted commission of, or the immediate flight after commit-
ting or attempting to commit the following felonies:

(i) Robbery in violation of Section 211.

(ii) Kidnapping in violation of Sections 207 and 209.

(iii) Rape in violation of Section 261.

(iv) Sodomy in violation of Section 286.

(v) The performance of a lewd or lascivious act upon per-
son of a child under the age of 14 in violation of Section 288.

(vi) Oral copulation in violation of Section 288a.

(vii) Burglary in the first or second degree in violation of
Section 460.

(viii) Arson in violation of Section 447.

(ix) Train wrecking in violation of Section 219.

(18) The murder was intentional and involved the inflic-
tion of torture. For the purpose of this section torture requires
proof of the infliction of extreme physical pain no matter how
long its duration.

(19) The defendant intentionally killed the victim by the
administration of poison.

(b) Every person whether or not the actual killer found
guilty of intentionally aiding, abetting, counseling, command-
ing, inducing, soliciting, requesting, or assisting any actor in
the commission of murder in the first degree shall suffer death
or confinement in state prison for a term of life without the
possibility of parole, in any case, in which one or more of the
special circumstances enumerated in paragraphs (1), (3), (4),
(5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16),
(17), (18), or (19) of subdivision (a) of this section has been
charged and specially found under Section 190.4 to be true.

The penalty shall be determined as provided in Sections
190.1, 190.2, 190.3, 190.4, and 190.5.

Sec. 7. Section 190.3 of the Penal Code is repealed.

~~190.3. If the defendant has been found guilty of murder in
the first degree, and a special circumstance has been charged
and found to be true, or if the defendant may be subject to the
death penalty after having been found guilty of violating sub-
division (a) of Section 1672 of the Military and Veterans Code,
or Section 37, 128, 219 or 4500 of this code, the trier of fact shall
determine whether the penalty shall be death or life impris-
onment without possibility of parole. In the proceedings on
the question of penalty, evidence may be presented by both
the people and the defendant as to any matter relevant to
aggravation, mitigation and sentence, including, but not lim-
ited to, the nature and circumstances of the present offense,
the presence or absence of other criminal activity by the
defendant which involved the use or attempted use of force
or violence or which involved the expressed or implied threat
to use force or violence, and the defendant's character, back-
ground, history, mental condition and physical condition.

However, no evidence shall be admitted regarding other
criminal activity by the defendant which did not involve the
use or attempted use of force or violence or which did not
involve the expressed or implied threat to use force or vio-
lence. As used in this section, criminal activity does not re-
quire a conviction.

However, in no event shall evidence of prior criminal activi~~

~~prosecuted and acquitted. The restriction on the use of
this evidence is intended to apply only to proceedings con-
ducted pursuant to this section and is not intended to affect
statutory or decisional law allowing such evidence to be used
in other proceedings.

Except for evidence in proof of the offense or special cir-
cumstances which subject a defendant to the death penalty,
no evidence may be presented by the prosecution in aggrava-
tion unless notice of the evidence to be introduced has been
given to the defendant within a reasonable period of time, as
determined by the court, prior to the trial. Evidence may be
introduced without such notice in rebuttal to evidence intro-
duced by the defendant in mitigation.

In determining the penalty the trier of fact shall take into
account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant
was convicted in the present proceeding and the existence of
any special circumstances found to be true pursuant to Sec-
tion 190.1.

(b) The presence or absence of criminal activity by the
defendant which involved the use or attempted use of force
or violence or the expressed or implied threat to use force or
violence.

(c) Whether or not the offense was committed while the
defendant was under the influence of extreme mental or
emotional disturbance.

(d) Whether or not the victim was a participant in the
defendant's homicidal conduct or consented to the homicidal
act.

(e) Whether or not the offense was committed under cir-
cumstances which the defendant reasonably believed to be a
moral justification or extenuation for his conduct.

(f) Whether or not the defendant acted under extreme
duress or under the substantial domination of another person.

(g) Whether or not at the time of the offense the capacity
of the defendant to appreciate the criminality of his conduct
or to conform his conduct to the requirements of law was
impaired as a result of mental disease or the effects of intoxica-
tion.

(h) The age of the defendant at the time of the crime.

(i) Whether or not the defendant was an accomplice to the
offense and his participation in the commission of the offense
was relatively minor.

(j) Any other circumstance which extenuates the gravity
of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, the
trier of fact shall consider, take into account and be guided by
the aggravating and mitigating circumstances referred to in
this section, and shall determine whether the penalty shall be
death or life imprisonment without the possibility of parole.~~

Sec. 8. Section 190.3 is added to the Penal Code, to read:

190.3. If the defendant has been found guilty of murder in
the first degree, and a special circumstance has been charged
and found to be true, or if the defendant may be subject to the
death penalty after having been found guilty of violating sub-
division (a) of Section 1672 of the Military and Veterans Code
or Sections 37, 128, 219, or 4500 of this code, the trier of fact
shall determine whether the penalty shall be death or con-
finement in state prison for a term of life without the possibil-
ity of parole. In the proceedings on the question of penalty,
evidence may be presented by both the people and the de-
fendant as to any matter relevant to aggravation, mitigation,
and sentence including, but not limited to, the nature and
circumstances of the present offense, any prior felony convic-
tion or convictions whether or not such conviction or convic-
tions involved a crime of violence, the presence or absence of
other criminal activity by the defendant which involved the
use or attempted use of force or violence or which involved

43

The express or implied intent to use force or violence, and the defendant's character, background and mental condition and physical condition.

However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.

However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted. The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings.

Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.

The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California.

In determining the penalty, the trier of fact shall take into account any of the following factors, if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact deter-

mines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

Sec. 9.   Section 190.4 of the Penal Code is repealed.

190.4.   (a) Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to subdivision (b) of Section 190.1.

In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Whenever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.

If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty the trier of fact shall be a jury unless a jury is waived by the defendant and by the people.

If the trier of fact finds that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, there shall be a separate penalty hearing, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prevent the holding of the separate penalty hearing.

In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury, nor shall such jury retry the issue of the truth of any of the special circumstances which were found by a unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach the unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and impose a punishment of confinement in state prison for life.

(b) If defendant was convicted by the court sitting without a jury, the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.

If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole.

(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court did charges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.

44

Case 2:09-cv-00612-JAM-TJB   Document 12   Filed 08/22/09   Page 134 of 208

~~placed upon any person who was a principal~~ ~~the commission~~ ~~of a capital offense unless he was personally present during the commission of the act or acts causing death; and intention/ally physically aided or committed such act or acts causing death.~~

~~(c) For the purposes of subdivision (b), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates, or coerces the actual killing of the victim.~~

Sec. 12. Section 190.5 is added to the Penal Code, to read:

*190.5. Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.*

Sec. 13. If any word, phrase, clause, or sentence in any section amended or added by this initiative, or any section or provision of this initiative, or application thereof to any person or circumstance, is held invalid, such invalidity shall not ...her section, ... provisions or application of this initiative, which can be given effect without the invalid word, phrase, clause, sentence, section, provision or application and to this end the provisions of this initiative are declared to be severable.

Sec. 14. If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to death under the provisions of this initiative will instead be sentenced to life imprisonment, such life imprisonment shall be without the possibility of parole.

If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to confinement in the state prison for life without the possibility of parole under the provisions of this initiative shall instead be sentenced to a term of 25 years to life in a state prison.

# EXHIBIT 3



# D E C L A R A T I O N

I, Gregory Watson, declare that I am over the age of eighteen
and not a party to this suit. My address is PO Box 409000,
Ione CA 95640.

I declare under penalty of perjury under the laws of the United
States of America that the document entitled: MORRISSEY 8, was
obtained from the Board of Prison Terms Chairman Albert Leddy.

I declare under penalty of perjury under the laws of the United
States of America that I accurately transcribed the Morrissey
8 memorandum from the original copy. If a letter or word was
indecipherable a "?" was used in its place. This was done for
ease of reading by this court as the original copy is difficult
to read due to numerous photocopying. A copy of the original
Morrissey 8 memorandum follows my transcription.

The transcription was completed on January 5, 2005, in the County
of Amador, City of Ione.


Gregory Watson



Date: August 22, 1979

File Name:

Telephone: ATSS ( )

# Memorandum

All Criminal Deputies
Office of the Attorney General

Recent (Relatively) Sentencing
Law Changes

Proposition 7 (effective 11/7/78) and SB 709 (effective 1/1/79) have worked some substantial changes in the sentencing consequences of murder convictions.

Specifically, we have taken the position that the new 15 years to life and 25 years to life sentences under the new Penal Code section 190 are "life" sentences with 15 and 25 year minimum eligible parole dates. This conclusion has side effects relating to eligibility for CYA under Welfare and Institutions Code section 173.5 and the number of peremptory challenges under Penal Code section 1070. This conclusion (as it effects CYA eligibility) is at issue in the Fifth District Court of Appeal in In re Dewester (5 Crim. 4543).

Furthermore, the venerable concept of merger of life sentences (Pen. C. section 669) passed into history, seemingly allowing for consecutive 25 to life sentences limited only by the number of victims.

The attached memo reflects the Morrissey 8's conclusions on these (and many more) topics. It has been approved by Arnie Overoye and Bob Philibosian and more fully sets out the Attorney General's position statewide.

Michael D. Wellington
Deputy Attorney General

MDW:nl
attachment



Arnold Overoye
Assistant Attorney General
Sacramento

Date:  July 26, 1979

File Name:

Telephone: ATSS (631) 7666
( )

Office of the Attorney General

Michael D. Wellington - San Diego

Morrissey 8
Meeting of July 9, 1979

On July 9, 1979, the Morrissey 8 met at our office in Sacramento. The progress of the CRB's disparate sentence review project was discussed in detail, as was People v Herrera, the CRB's first motion for recall under the disparate sentence review mandate of Penal Code section 1170, subdivision (f). The group also discussed the status of pending litigation concerning the DSL. Finally, there was an expansive discussion and analysis of the legal nature of prison sentences for first and second degree murder under Penal Code section 190 as amended by Proposition 7. A number of legal conclusions were reached on this point, which conclusions will be outlined in this memo.

### "Life" Sentences Under New
### Penal Code Section 190

Penal Code section 190 provides punishment of death, life without possibility of parole, or "confinement in the state prison for a term of 25 years to life" for first degree murder. The prescribed punishment for second degree murder is "confinement in the state prison for a term of 15 years to life." Our discussion focused only on the 15 or 25 years to life sentences. It was our conclusion that these sentences are not directly comparable to either the "indeterminate life" or "express life" sentences that existed under the Indeterminate Sentencing Law prior to July 1, 1977. Rather, we concluded that these sentences should be administered in the same fashion all "life" sentences are currently administered under the Determinate Sentencing Law except that they feature 15 or 25 year minimum eligible parole dates, instead of the general 7 year MEPD prescribed by Penal Code section 3046.

"Indeterminate Life" sentences under the old Indeterminate Sentencing Law (for example five to life for robbery) contemplated the parole board setting a "term" somewhere between five years and life. In addition, the parole board was obligated to consider a parole release date sometime prior to the expiration of the "term." The paroling decision was, by its nature, a tentative one which the prisoner subject to revocation and the service of the remainder of his term. The primary features of this whole

Arnold Overoye                    - 1 -                    July 26, 1979

scheme passed into history on July 1, 1977, with the coming of the DSL. The parole board's power to fix terms was withdrawn by the repeal of Penal Code section 2940 et seq., and nothing in the current Penal Code evidences an intent to re-establish those powers for first or second degree murder. Although the parole board currently does have the power to grant parole (Pen. C. section 3040 et seq.) that power too is substantially different since July 1, 1977. Not only is the length of parole statutorily set (Pen. Code section 3000 et seq.) but reincarceration on revocation of parole is statutorily limited to one year (Pen. C. section 3057).

"Expressed life" sentences under the ISL precluded the establishment of a "term" since the prisoner was never to be discharged. Although such prisoners could be paroled, they could at any time be retaken to serve the remainder of their life sentences. Under the DSL however, all life prisoners discharge automatically within a few years of their release on parole no matter what their conduct during the parole. (Pen. Code section 3000 et seq.) As indicated above, any confinement on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying the old concepts of "indeterminate life" and "express life" have been abolished, it was concluded that the new prison sentences under Proposition 7 were not intended to fit either of these old models. The language of the new Penal Code section 190 (15 years to life, 25 years to life) implies that someone must make a choice where the prisoner falls between the two ends of the spectrum. Since the sentence is clearly one under Penal Code section 1168, subdivision (b), the trial judge cannot make the choice. This leaves the Community Release Board. Since the Community Release Board's only remaining power in this regard is the power to grant parole (Pen. Code section 3040) it was concluded that the new sentences require the CRB to fix a parole date somewhere within the appropriate range. As a result, the new sentences appear to be "life" sentences which are analogous to all other "life" sentences under the DSL except that Penal Code section 190 provides specific (15 or 25 years) minimum eligible parole dates which prevail over the general "life" MEPD of seven years found in Penal Code section 3046. The "life" sentences of Penal Code section 190 appear slightly different from other life sentences under the DSL in the additional respect that good time credits (Pen. Code section 2930 et seq.) are made expressly applicable to the MEPD. Such credits are not otherwise applicable to anyone sentenced under Penal Code section 1168, subdivision (b). (Pen. Code section 2930, subd. (a).)

Two consequences of characterizing section 190 sentences as "life" sentences are both significant and consistent with the thrust of Proposition 7. First, "life" cases entitle both parties to the trial to 25 preemptory challenges. (Pen. Code section 1070.) Second, a "life" sentence precludes commitment to the Youth Authority following a superior court trial.

Arnold Overoye                    - 2 -                    July 26, 1979

In re Rodriquez

In re Rodriquez (1975) 14 Cal.3d 639, also appears to have been rendered obsolete by the changed structure of life sentences. In Rodriquez, the California Supreme Court placed the burden on the parole board to set a prisoner's "primary term" quickly and without regard to any post-conviction behavior. This "primary term" established the outer limit of the prison system's jurisdiction over the prisoner. The basis for the Rodriquez decision lay in the judicial branch's obligation to examine terms, as fixed by the parole board to determine whether they were cruel or unusual. In light of the fact the CRB has no term fixing power, it was the unanimous conclusion of all members present that Rodriquez is no longer applicable.

Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting. Penal Code section 669 and 3046 were both amended as of January 1, 1979, to expressly provide that determinate enhancements may run consecutively to life sentences, and that multiple life sentences can run consecutively to each other. In the case of consecutive life sentences, section 3046 requires the defendant be imprisoned "until he has served at least seven calendar years on each of the life sentences . . ." The question was raised whether the apparent 15 to 25 year MEPDs under Penal Code section 190 is inconsistent with the language of section 3046. The conclusion was that there is no inconsistencies. It was noted that section 3046 is a generalized section providing MEPDs for all life terms, while section 190 is a much more specific section which applies directly to first and second degree murders. Furthermore, section 3046 merely requires the service of "at least" seven years for each sentence. Thus, the 15 and the 25 year designation in section 190 are not at all inconsistent with the specific language of section 3046. It was noted that Penal Code section 4500 has for years provided just such a specific exception to section 3046 by providing a nine year MEPD for certain kinds of assaults by life prisoners. Finally, it should be noted that SB 709 which effectuated the amendment to sections 669 and 3046 was filed September 6, 1978, while the ??re specific language of Penal Code section 190 was added ?? initiative on November 7, 1978. Thus, the specific MEPDs in section 190 appear to be the latest expression of the sovereign.

Another merger problem revolves around the fact that although SB 709 was filed in September 1978, it did not become effective until January 1, 1979. Thus, its abolition of the merger doctrine did not go into effect until approximately seven weeks after the November 7, 1978, effective date of Proposition 7. (Pen. Code Section 190 et seq.) In light of this, the group concluded that any first or second degree murders committed between November 7, 1978, and January 1, 1979 would be subject to the 15 or 25 yearr MEPDs but that no consecutive sentencing would be possible. The abolishing of the merger doctrine clearly works to increase

punishment.   ??????????, imposition of consecutive life sentences for crimes committed before January 1, 1979, would seem to be unavoidably ex post facto.

Retroactive Calculation of ISL<br>Second Degree Murder Cases

The final question addressed was what term the CRB is to be guided by when retroactively calculating an ISL prisoner's second degree murder sentence under Penal Code section 1170.2. Subdivision (a) of that section requires the CRB to determine whether a prisoner would have been sentenced under Penal Code section 1170 had his crime been committed after July 1, 1977, and if so, what his sentence would have been. The difficulty is that for second degree murder the sentence has seemed to be many things at many different times after July 1, 1977. The initial DSL "price tag" for second degree murder was five, six or seven years. In September of 1978, the Legislature passed SB 709 which (effective January 1, 1979) changed this to five, seven or eleven years. However, before that could ever take effect, on November 7, 1978, Proposition 7 was passed, changing second degree murder from a determinate term (to be sentenced under Penal Code section 1170) to a "life" term (to be sentenced under Penal Code section 1168, subdivision (b)). We concluded that SB 709 need not be considered since its second degree penalty was superseded before it ever went to effect by Proposition 7. The CRB could not retroactively apply Proposition 7's 15 to life for two reasons. First, it would be an ex post facto increase from the five to life sentence in effect before July 1, 1977. Second, since we have concluded that the new sentence is a "life" sentence, it would have been sentenced under Penal Code section 1168, subdivision (b), and thus would not be subject to retroactive calculation under the express language of section 1170.2. This leaves the theoretical possibility that there is no legislative authority whatsoever for the CRB to recalculate an ISL second degree murder conviction. No one believed that this was the Legislature's intent when it drafted section 1170.2. It was the group's opinion that when the Legislature referred to a felon "who should have been sentenced under section 1170 if he had committed (his crime) after July 1, 1977, . . ." the phrase "after July 1, 1977." means immediately after July 1, and invites reference to the DSL sentence lengths which became effective contemporaneously with section 1170.2. This seems the most likely legislative intent, and avoids a world of conceptual trouble.

Michael D. Wellington<br>Deputy Attorney General

MDW:nl

All Criminal Deputies

Date  August 22, 1979

File No.

Telephone: ATSS (    )
            (    )

Office of the Attorney General

Recent (Relatively) Sentencing
Law Changes

Proposition 7 (effective 11/7/78) and SB 709 (effective
1/1/79) have worked some substantial changes in the sentenc-
ing consequences of murder convictions.

Specifically, we have taken the position that the new 15
years to life and 25 years to life sentences under new
Penal Code section 190 are "life" sentences with 15 and 25
year minimum eligible parole dates. This conclusion has
side effects relating to eligibility for CYA under Welfare
and Institutions Code section 1731.5 and the number of
peremptory challenges under Penal Code section 1070. This
conclusion (as it effects CYA eligibility) is at issue in
the Fifth District Court of Appeal in In re Demester
(5 Crim 4543).

Furthermore, the venerable concept of merger of life
sentences (Pen. Code, § 669) passed into history, seemingly
allowing for consecutive 25 to life sentences limited only
by the number of victims.

The attached memo reflects the Morrissey 8's conclusions
on these (and many more) topics. It has been approved by
Ernie Overoye and Bob Philibosian and more fully sets out the
Attorney General's position statewide.

Michael D. Wellington
Deputy Attorney General

MDW:nl
Attachment

Assistant Attorney General                                    July 26, 1979
Sacramento                                           File No:

                                          Telephone ATSS (631) 7666
                                                    (    )

Office of the Attorney General

Michael D. Wellington - San Diego

Morrissey 8
Meeting of July 9, 1979

On July 9, 1979, the Morrissey 8 met at our office in
Sacramento. The progress of the CRB's disparate sentence
review project was discussed in detail, as was People v
Herrera, the CRB's first motion for recall under the dis-
parate sentence review mandate of Penal Code section 1170,
subdivision (f). The group also discussed the status of
pending litigation concerning the DSL. Finally, there was
an extensive discussion and analysis of the legal nature of
prison sentences for first and second degree murder under
Penal Code section 190 as amended by Proposition 7. A number
of legal conclusions were reached on this point, which conclu-
sions will be outlined in this memo.

               "Life" Sentences Under New
                Penal Code Section 190

Penal Code section 190 provides punishment of death, life
without possibility of parole, or "confinement in the state
prison for a term of 25 years to life" for first degree
murder. The prescribed punishment for second degree murder
is "confinement in the state prison for a term of 15 years
to life." Our discussion focused only on the 15 or 25
years to life sentences. It was our conclusion that these
sentences are not directly comparable to either the "indeter-
minate life" or "express life" sentences that existed under
the Indeterminate Sentence Law prior to July 1, 1977.
Rather, we concluded that these sentences should be administered
in the same fashion all "life" sentences are currently admin-
istered under the Determinate Sentence Law except that they
feature 15 or 25 year minimum eligible parole dates, instead
of the general 7 year MEPD prescribed by Penal Code section
1045.

Indeterminate Life" sentences under the old Indeterminate
Sentence Law (for example five to life for robbery) contemplated

Arnold Overoye                    -2-                    July 26, 1979

the parole board setting a "term" somewhere between five
years and life.  In addition, the parole board was obligated
to consider a parole release date sometime prior to the
expiration of the "term."  The paroling decision was, by its
nature, a tentative one with the prisoner subject to revoca-
tion and the service of the remainder of his term.  The
primary features of this whole scheme passed into history
on July 1, 1977, with the coming of DSL.  The parole board's
power to fix terms was withdrawn by the repeal of Penal Code
section 2940 et seq., and nothing in the current Penal Code
evidences an intent to reestablish those powers for first
or second degree murder.  Although the parole board currently
does have the power to grant parole (Pen. Code, § 3040 et
seq.) that power too is substantially different since July 1,
1977.  Not only is the length of parole statutorily set
(Pen. Code, § 3000 et seq.) but reincarceration on revocation
of parole is statutorily limited to one year (Pen. Code
3057).

"Express life" sentences under the ISL precluded the
establishment of a "term" since the prisoner was never to
be discharged.  Although such prisoners could be paroled, they
could at any time be retaken to serve the remainder of their
life sentences.  Under the DSL however, all life prisoners
discharge automatically within a few years of their release
on parole no matter what their conduct during the parole.
(Pen. Code, § 3000 et seq.)  As indicated above, any confine-
ment on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying
the old concepts of "indeterminate life" and "express life"
have been abolished, it was concluded that the new prison
sentences under Proposition 7 were not intended to fit
either of these old models.  The language of new Penal Code
section 190 (15 years to life, 25 years to life) implies
that someone must make a choice where the prisoner falls
between the two ends of the spectrum.  Since the sentence
is clearly one under Penal Code section 1168, subdivision
(b), the trial judge cannot make the choice.  This leaves
the Community Release Board.  Since the Community Release
Board's only remaining power in this regard is the power to
grant parole (Pen. Code, § 3040) it was concluded that the
new sentences require the CRB to fix a parole date somewhere
within the appropriate range.  As a result, the new sentences
appear to be "life" sentences which are analogous to all other
"life" sentences under the DSL except that Penal Code section
190 provides specific (15 or 25 years) minimum eligible
parole dates which prevail over the general "life" MEPD of
seven years found in Penal Code section 3046.  The "life"
sentences of Penal Code section 190 appear slightly different

 

from other life sentences under the ISL in the additional
respect that good time credits (Pen. Code, § 2930 et seq.)
are made expressly applicable to the MEPD.  Such credits
are not otherwise applicable to any other sentence under
Penal Code section 1168, subdivision (b).  (Pen. Code, §
2930, subd. (n).)

Two consequences of characterizing section 190 sentences as
"life" sentences are both significant and consistent with
the thrust of Proposition 7.  First, "life" cases entitle
both parties to the trial to 26 peremptory challenges.
(Pen. Code, § 1070.)  Second, a "life" sentence precludes
commitment to the Youth Authority following a superior court
trial.

## In re Rodriguez

In re Rodriguez (1975) 14 Cal.3d 639, also appears to have
been rendered obsolete by the changed structure of life
sentences.  In Rodriguez, the California Supreme Court
placed the burden on the parole board to set a prisoner's
"primary term" quickly and without regard to any post-
conviction behavior.  This "primary term" established
the outer limit of the prison system's jurisdiction over the
prisoner.  The basis for the Rodriguez decision lay in the
judicial branch's obligation to examine terms, as fixed by
the parole board, to determine whether they were cruel
or unusual.  In light of the fact the CRB has no term fixing
power, it was the unanimous conclusion of all members present
that Rodriguez is no longer applicable.

## Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting.
Penal Code sections 669 and 3046 were both amended as of
January 1, 1979, to expressly provide that determinate enhance-
ments may run consecutively to life sentences and that multiple
life sentences can run consecutively to each other.  In the
case of consecutive life sentences, section 3046 requires
the defendant be imprisoned "until he has served at least seven
calendar years on each of the life sentences . . . ."  The
question was raised whether the apparent 15 to 25 year MEPDs
under Penal Code section 190 is inconsistent with the language
of section 3046.  The conclusion was that there is no inconsistency.
It was noted that section 3046 is a generalized section provid-
ing MEPDs for all life terms, while section 190 is a much
more specific section which applies directly to first and
second degree murders.  Furthermore, section 3046 merely
requires the service of "at least" seven years for each
sentence.  Thus, the 15 and the 25 year designation in section
190 are not at all inconsistent with the specific language
of section 3046.  It was noted that Penal Code section
4500 has for years provided just such a specific exception
to section 3046 by providing a nine year MEPD for certain
kinds of assaults by life prisoners.  Finally, it was noted



noted that SB 709 which effectuated the amendment to
ctions 669 and 3046 was filed September 6, 1978, while the
re specific language of Penal Code section 190 was added
inicitive on November 7, 1978. Thus, the specific
PDs in section 190 appear to be the latest expression of
e sovereign.

other merger problem revolves around the fact that although
709 was filed in September 1978, it did not become
fective until January 1, 1979. Thus, its abolition of the
rger doctrine did not go into effect until approximately
ven weeks after the November 7, 1978, effective date of
oposition 7. (Pen. Code, § 190 et seq.) In light of this,
e group concluded that any first or second degree murders
mitted between November 7, 1978, and January 1, 1979
uld be subject to the 15 or 25 year MEPDs but that no
nsecutive sentencing would be possible. The abolishing of
e merger doctrine clearly works to increase punishment.
erefore, imposition of consecutive life sentences for
imes committed before January 1, 1979, would seem to be
avoidably ex post facto.

Retroactive Calculation of ISL
Second Degree Murder Cases

e final question addressed was what term the CRB is to be
ided by when retroactively calculating an ISL prisoner's
cond degree murder sentence under Penal Code section 1170.2
bdivision (a) of that section requires the CRB to determine
ether a prisoner would have been sentenced under Penal
de section 1170 had his crime been committed after July 1,
77, and if so, what his sentence would have been. The
fficulty is that for second degree murder the sentence has
ated to be many things at many different times after
ly 1, 1977. The initial ISL range that for second degree
rder was five, six or seven years. In September of 1978,
e Legislature passed SB 709 which (effective January 1, 1979)
anged this to five, seven or eleven years. However, before
at could ever take effect, on November 7, 1978, Proposition 7
s passed changing second degree murder from a determinate
rm (to be sentenced under Penal Code section 1170) to a
ife" term (to be sentenced under Penal Code section 1168
bdivision (b)). We concluded that SB 709 need not be
nsidered since its second degree murder penalty was
perseded before it ever went to effect by Proposition 7.
e CRB could not retroactively apply Proposition 7's 15
 life for two reasons. First, it would be an ex post
cto increase from the five to life sentence in effect

— 16 —

476

Institution for Women, the court in imposing the
sentence shall not fix the term or duration of the period
of imprisonment.

969c. Whenever a defendant uses a weapon under such
circumstances as to bring such defendant within the
operation of Section 1202 the fact that the defendant so
used a weapon may be charged in the accusatory
pleading. This charge, if made, shall be added to and be
a part of the count or each of the counts of the accusatory
pleading which charge the offense at the time of the
commission of which the defendant used a weapon. That
portion of any count which charges that the defendant
used a weapon shall be sufficient if it can be understood
therefrom that at the time of his commission of the
offense set forth in the count, the defendant used a
weapon. The nature of the weapon must be set forth. One
such charge may name more than one weapon. If the
defendant pleads not guilty of the offense charged in any
count which alleges that the defendant used a weapon,
the question whether or not he used a weapon as alleged
must be tried by the court or jury which tries the issue
upon the plea of not guilty. If the defendant pleads guilty
of the offense charge the question whether or not he used
a weapon as alleged must be determined by the court
before pronouncing judgment.

SEC. 13.5. Section 969d of the Penal Code is amended
to read:

969d. Whenever a defendant used or was armed with
a firearm as recited in Section 12022.5, the fact that the
defendant used or was armed with a firearm may be
charged in the accusatory pleading. This charge, if made,
shall be added to and be a part of the count or each of the
counts of the accusatory pleading which charged the
offense. That portion of any count which charges that the
defendant used or was armed with a firearm shall be
sufficient if it can be understood therefrom that at the
time of his commission of the offense set forth in the
count the defendant used or was armed with a firearm.
The nature of the firearm must be set forth. One such
charge may name more than one firearm. If the

— 17 —

AB 476

1  defendant pleads not guilty to the offense charged in any
2  count which alleges that the defendant used or was
3  armed with a firearm, the question whether or not he
4  used or was armed with a firearm as alleged must be
5  determined by the court before pronouncing judgment.
6  SEC. 14. Section 1169 of the Penal Code is amended to
7  read:
8  1168. (a) Every person who commits a public offense,
9  for which any specification of three time periods of
10  imprisonment in any state prison is now prescribed by
11  law shall, unless such convicted person be placed on
12  probation, a new trial granted, or the imposing of
13  sentence suspended, be sentenced pursuant to Chapter
14  4.5 (commencing with Section 1170) of Title 7 of Part 2.
15  (b) For any person not sentenced under such
16  provision, but who is sentenced to be imprisoned in the
17  state prison, including imprisonment not exceeding one
18  year and one day, the court imposing the sentence shall
19  not fix the term or duration of the period of
20  imprisonment.
21  SEC. 15. Section 1170 of the Penal Code is amended to
22  read:
23  1170. (a) (1) The Legislature finds and declares that
24  the purpose of imprisonment in state prison for crime is
25  punishment. This purpose is best served by terms
26  proportionate to the seriousness of the offense with
27  provision for uniformity in the sentences of offenders
28  committing the same offense under similar
29  circumstances. The Legislature further finds and declares
30  that the elimination of disparity and the provision of
31  uniformity of sentences can best be achieved by
32  determinate sentences fixed by statute in proportion to
33  the seriousness of the offense as determined by the
34  Legislature to be imposed by the court with specified
35  discretion. This declaration applies to persons sentenced
36  under this section or Section 1168.
37  (2) In any case in which the punishment prescribed by
38  statute for a person convicted of a public offense is a term
39  of imprisonment in the state prison of 16 months, two or
40  three years, two ... of ...

— 20 —

the sentence he may be on parole for a period as provided in Section 3000.

(b) When a judgment of imprisonment is to be imposed and the statute specifies three possible terms, the court shall order imposition of the middle term, unless there are circumstances in aggravation or mitigation of the crime. Upon denial of probation, either party may move that the upper or lower term be imposed by the court. The motion shall specify the circumstances which justify imposition of the upper or lower term. Imposition of the upper or lower term shall be based on circumstances alleged. Either party may request a hearing to prove or rebut the circumstances alleged. In determining whether there are circumstances that justify imposition of the upper or lower term, the court may consider the motion, the record in the case, the probation officer's report, other reports including reports received pursuant to Section 1203.03 and presentence reports submitted by the prosecution or the defendant, the sentencing rules of the Judicial Council, and any evidence introduced at the sentencing hearing. The court shall set forth on the record the facts and reasons for imposing the upper or lower term. The court may not impose an upper term by using the same fact used to enhance the sentence under Section 667.5, 1170.1, 12022, 12022.5, 12022.6, or 12022.7. A term of imprisonment shall be specified in every case unless imposition of sentence is suspended.

( ) The court shall state the reasons for its sentence choice on the record at the time of sentencing. The court must also inform the defendant that as part of the sentence after expiration of the term he may be on parole for a period as provided in Section 3000.

( ) When a defendant subject to this section or subdivision (b) of Section 1168 has been sentenced to be imprisoned in the state prison and has been committed to the custody of the Director of Corrections, the court may within 120 days of the date of commitment on its own motion, or at any time upon the recommendation of the Director of Corrections or the Community Release...

— 21 —

AB 476

1 Board, recall the sentence and commitment previously
2 ordered and resentence the defendant in the same
3 manner as if he had not previously been sentenced,
4 provided the new sentence, if any, is no greater than the
5 initial sentence. The resentence under this subdivision
6 shall apply the sentencing rules of the Judicial Council so
7 as to eliminate disparity of sentences and to promote
8 uniformity of sentencing. Credit shall be given for time
9 served.
10   (e) Any sentence imposed under this article shall be
11 subject to the provisions of Sections 3000 and 3057 and
12 any other applicable provisions of law.
13   (f) In all cases the Community Release Board shall, not
14 later than one year after the commencement of the term
15 of imprisonment, review the sentence and shall by
16 motion recommend that the court recall the sentence
17 and commitment previously ordered and resentence the
18 defendant in the same manner as if he had not been
19 previously sentenced if the board determines the
20 sentence is disparate. The review under this section shall
21 apply the sentencing rules of the Judicial Council and the
22 information regarding the sentences in this state of other
23 persons convicted of similar crimes so as to eliminate
24 disparity of sentences and to promote uniformity of
25 sentencing.
26   SEC. 16. Section 1170.1 of the Penal Code is repealed.
27   1170.1. The trial judge shall state the reasons for his
28 sentence choice on the record at the time of sentencing.
29 The trial judge shall also inform the defendant that after
30 the expiration of his sentence he shall be on parole for a
31 period of up to one year unless for good cause parole is
32 waived as provided in Section 3000.
33   SEC. 17. Section 1170.1a of the Penal Code is amended
34 and renumbered to read:
35   1170.1. (a) Except as provided in subdivisions (b) and
36 (c) and subject to Section 654, when any person is
37 convicted of two or more felonies, whether in the same
38 proceeding or court or in different proceedings or courts,
39 and whether by judgment rendered by the same or...



# ENROLLED BILL REPORT

| | |
|---|---|
| AGENCY | HEALTH AND WELFARE |
| DEPARTMENT, BOARD OR COMMISSION | CORRECTIONS |

| BILL NUMBER |
|---|
| AB 476 |
| AUTHOR |
| Boatwright |

## SUMMARY

Allows the Community Release Board to hear 4,000 cases or more for possible extended terms rather than 500; retains thousands of persons under parole supervision; permits good time for periods of time less than eight months; makes numerous other changes and appropriates $9.6 million. An urgency measure.

## HISTORY, SPONSORSHIP, AND RELATED BILLS

An administration bill which grew out of the study and deliberations of a committee chaired by Secretary Obledo to implement the Determinate Sentence Act.

Opponents included State Public Defender, Public Defenders Association, Attorneys for Criminal Justice, National Lawyers Guild, Prisoners' Union, Friends Committee on Legislation, American Civil Liberties Union, San Francisco Bar Association, Committee for Prisoner Humanity and Justice, Women for Peace, and Friends Outside.

A coalition of district attorneys headed by those of San Diego and Los Angeles spearheaded an effort to make the penalties and enhancements stronger. They were joined from time to time by the Attorney General and the Peace Officers Association.

The District Attorneys Association consistently supported the bill. Ultimately the Peace Officers and the Coalition DA's were in support and the Attorney General was, at least, no longer in opposition.

## VOTE

Assembly Criminal Justice Committee approved the bill 7-2 (Alatorre, Hannai). With the author resisting all amendments, Ways and Means tabled five proposed amendments to "strengthen" the bill by votes of 12 or 14 to 6. It then adopted the bill 17-2 (Torres, Vasconcellos). The Assembly approved 66-6 beating back a series of amendments similar to those offered in Ways and Means. Senate Judiciary first adopted and then rescinded major amendments finally adopting a modestly amended bill 5-2 (Carpenter and Sieroty). Senate Finance approved 8-3 (Carpenter, Stull and Cusanovich) with little discussion and without an actual appropriation before it. Again on the Senate floor amendments were beaten and the measure was passed 30-2 (Sieroty and Dunlap). The bill was returned to the Criminal Justice Committee which recommended non-concurrence. The conference committee report was accepted 59-1 (Vasconcellos) in the Assembly without debate. The Senate approved 37-0.

| RECOMMENDATION | | | | |
|---|---|---|---|---|
| SIGN | | | | |
| DEPARTMENT HEAD | | DATE JUN 2 3 1977 | AGENCY HEAD | DATE JUN 3 1977 |

## SPECIFIC FINDINGS

### Retroactivity

Existing law (SB 42) requires the Community Release Board (CRB) to apply the determinate sentence to persons sentenced to state prison prior to July 1, 1977, for crimes that have the new three-tier sentences. The board must use the middle term of the offense bearing the longest term of imprisonment aggregated by any additional terms imposed by the court at the time of sentence. No good behavior or participation credit is granted.

In situations where the calculated time appears inadequate to a majority of the members of the CRB because of the number of crimes of which the prisoner was convicted, or because he was armed or used a deadly weapon or inflicted great bodily injury, a three-member panel may hold a hearing under specified procedures. A release date must be set within 90 days. In setting the date the panel is to be guided by the sentence which could have been imposed for the act had the prisoner been sentenced after the new law was in effect.

As changed by the bill, terms for any enhancements are specified. The sentence calculation need only be reviewed by two members of the board to schedule the prisoner for a hearing for a longer term set. The hearing panel requires only two members. The board need only notify the inmate in 90 days that he will have a hearing. The hearing, itself, must be held by April 1, 1978 or within 120 days of receipt of the prisoner, whichever is later. This time period may be extended an additional 90 days by the board by resolution unless the resolution is vetoed by either house of the legislature. Legislative intent is expressed that the hearings be accomplished in the most expeditious manner possible.

In setting the sentence the board is guided by, but not limited to, the term that could reasonably have been set had the crime occurred after July 1. The board is also to be guided by a legislative declaration that the paramount consideration is to protect the public from repetition of extraordinary crimes of violence.

The effect of the amendments is to permit the CRB to hear four or five thousand cases for possible extension of the calculated term in constrast to the 500 that could be heard under existing law. Further it is not required to limit the term to that which could be given under the new law.

### Good Time

Good time procedures are simplified. Under SB 42 the inmate is given good time in eight month blocks and the Department must recompute his sentence and notify the prisoner of the redetermined release date each time.

## Good Time - continued .

The bill provides that good time is based on eight month periods but that credit may also be given on a proportional basis for lesser periods. <u>Within 30 days of his reception in prison, the prisoner would be informed of his anticipated good time release date.</u> He is notified only if there is any change.

Under existing law persons who are confined either by choice or because of behavioral problems may not be denied credit because of inability to participate. Under the bill, they shall be given specified activities commensurate with their custodial status. This will prevent the worst inmates from receiving credit for doing nothing.

No more than 90 days of good time credit or 30 days of participation credit may be lost during any eight-month period in which the misbehavior or failure to participate took place. A current provision which forbids denial if proceedings are not begun within 90 days of the misbehavior is deleted.

Now, if the misbehavior constitutes a crime and the case is referred to the district attorney, the department may not hold a hearing unless the DA certifies in writing that no prosecution will be taken. But if there is to be a hearing, it must be held in 30 days. The idea was to force the DA to act promptly. Under the bill, if the DA has not filed within 60 days the inmate may request a hearing and the department must comply within 15 days.

Under existing law the evaluation of a prisoner's appeal of good time denial takes a full hearing of the CRB with the prisoner present, permitted to speak and cross examine, request a stenographic transcript, etc. The bill permits the board to affirm, reverse or modify the department's good time decision or to grant a hearing with all the rights above.

## Parole

The Determinate Sentence Act is silent as to the purpose of parole. It provides that determinately sentenced prisoners may have a period of parole not exceeding a year and that those with life sentences may have up to three years of parole. Parole time runs even if the prisoner's parole has been revoked and he has been returned to prison. Time is stopped only if the parolee absconds. Return to prison without a new commitment is limited to six months. The section is retroactive so the time limits begin to run from the initial date of parole. The Department of Corrections specifies the conditions and length of parole for determinate prisoners. The prisoner may appeal to the CRB.

Under AB 476, the legislature finds that it is in the interest of public safety to provide supervision and assistance to parolees since the period immediately following incarceration is critical to successful reintegration of the offender into society and to positive citizenship. Statements emphasizing public

EER

## Parole - continued

protection and requiring the director to insure against reversion to criminal-
ity were eliminated by the conference committee. The retroactivity of parole
is eliminated.

Under the provisions of existing law, thousands of parolees and hundreds of
parole violators would have been discharged from parole July 1. The change
made by AB 476 retaining these persons has a profound effect on the parole
population.

Time during which the parolee is in custody does not count. While the year
and three year limits are retained, a new top of 18 months and four years
respectively is established for those persons who have a combination of parole
and custody. Those who abscond are not affected by these limits. Parole
conditions for those determinately sentenced are provided by the department
under guidelines specified by the Community Release Board. The board has the
power to establish and enforce regulations under which prisoners may be
allowed to go on parole.

### CRB Hearings

The CRB is authorized to parole prisoners sentenced indeterminatively. It is
also required to review annually each prisoner sentenced under prior indeter-
minate sentence law to make sure that the prisoner has the benefits of both
systems.

Current law would require sending notice to a variety of persons when the CRB
determines the length of time any prisoner is confined. The bill limits this
requirement to those prisoners serving life sentences. This eliminates the
need to send notices re each of the prisoners whose term is subject to the
retroactive provisions or who is reviewed annually on a sentence of less than
life.

Current law requires one of the three board members at a parole hearing to
have been at the previous hearing. The bill leaves an "out" when this is not
feasible.

Disparate sentence review is defined to include the decision to deny probation
and the imposition of the lower or upper prison term, concurrent or consecu-
ive sentences, or the imposition of enhancements. This limits board review
to cases sent to prison.

### Salary

The bill provides a salary for the chairman and members of the Community
Release Board -- a matter overlooked in SB 42.

#### Enhancements

Existing law provides an additional term for prior prison sentences -- three
years for specified violent crimes and one year for others. The bill extends
the list of violent crimes to include any felony in which the offender
personally uses a firearm. The bill also counts a prior commitment to the
Department of Health as a mentally disordered sex offender after conviction
of a felony as a prior prison term if the commitment exceeded a year.
Existing law provides an enhancement for the taking or damaging of property
of value exceeding $100,000 and $500,000. The bill reduces these limits to
$25,000 and $100,000. Now some crimes are exempt from this enhancement. The
bill would make the enhancement apply to any felony.

Existing law provides an enhancement for great bodily injury except where it
is an element of the crime or homicide and defines great bodily injury. The
bill changes the definition to significant or substantial physical injury
and extends the exemptions to assault with a deadly weapon and assault with
force likely to produce great bodily injury.

Existing law provides enhancements for the use of a firearm or the commission
of a felony while personally armed with a deadly weapon (which includes a
firearm). The bill changes this so that a one year enhancement applies to
any person armed with a firearm, or is a principal in a crime where any
principal is armed or who personally uses a deadly or dangerous weapon. If
the defendant personally uses a firearm he is subject to a two year enhancement

#### Ex Post Facto

Numerous sections are changed to insure that persons who commit their crime
prior to July 1, 1977 are sentenced under prior law.

#### Other Changes

Overlooked penalty provisions are made determinate; names of boards are
changed and numerous obsolete sections are repealed.

The conference report added a section making it a felony to possess piperidin
and cyclohexanone at the same time with intent to manufacture phencyclidine
unless authorized by the Board of Pharmacy. This addition was said to be from
a bill by Assemblywoman Egeland which was inadvertantly chaptered out.

The conference report also added a death penalty section from the Military
and Veterans Code to become effective only if SB 155 is chaptered.

#### FISCAL FINDINGS:  $9,583,200

The bill appropriates $9,583,200 from the General Fund to be allocated by the
Director of Finance for implementation of the Determinate Sentence Act as
amended by this bill.

## FISCAL FINDINGS - continued

Of the total $7,014,600 is for the Department of Corrections and $2,568,600
to the Community Release Board. Both allocations are for the 1977-78 Fiscal
Year. Major costs to the department are anticipated increases in the prison
average daily population of 1,410 and 4,450 in the parole population.

## RECOMMENDATION: SIGN

Provisions of the bill are necessary to insure adequate review of persons
sentenced retroactively. The bill provides a desirable statement of the
purpose of parole and eliminates the running of the parole period while the
person is locked up for violation. It improves the procedures for adminis-
tering good time and simplifies denial. It makes numerous other changes
necessary for the implementation of the Determinate Sentence Act and provides
needed funding.

#

| | BILL NUMBER |
|---|---|
| HEALTH AND WELFARE | AB 476 |
| DEPARTMENT, BOARD OR COMMISSION CORRECTIONS | AUTHOR Boatwright |

## SUMMARY

Allows the Community Release Board to hear 4,000 cases or more for possible
extended terms rather than 500; retains thousands of persons under parole
supervision; permits good time for periods of time less than eight months;
makes numerous other changes and appropriates $9.6 million. An urgency
measure.

## HISTORY, SPONSORSHIP, AND RELATED BILLS

An administration bill which grew out of the study and deliberations of a
committee chaired by Secretary Obledo to implement the Determinate Sentence
Act.

Opponents included State Public Defender, Public Defenders Association, Attor-
neys for Criminal Justice, National Lawyers Guild, Prisoners' Union, Friends
Committee on Legislation, American Civil Liberties Union, San Francisco Bar
Association, Committee for Prisoner Humanity and Justice, Women for Peace, and
Friends Outside.

A coalition of district attorneys headed by those of San Diego and Los Angeles
spearheaded an effort to make the penalties and enhancements stronger. They
were joined from time to time by the Attorney General and the Peace Officers
Association.

The District Attorneys Association consistently supported the bill. Ultimate-
ly the Peace Officers and the Coalition DA's were in support and the Attorney
General was, at least, no longer in opposition.

## VOTE

Assembly Criminal Justice Committee approved the bill 7-2 (Alatorra, Hannai).
With the author resisting all amendments, Ways and Means tabled five proposed
amendments to "strengthen" the bill by votes of 12 or 14 to 6. It then adopted
the bill 17-2 (Torres, Vasconcellos). The Assembly approved 66-6 beating back
a series of amendments similar to those offered in Ways and Means. Senate
Judiciary first adopted and then rescinded major amendments finally adopting
a modestly amended bill 5-2 (Carpenter and Sieroty). Senate Finance approved
8-3 (Carpenter, Stull and Cusanovich) with little discussion and without an
actual appropriation before it. Again on the Senate floor amendments were
beaten and the measure was passed 30-2 (Sieroty and Dunlap). The bill was
returned to the Criminal Justice Committee which recommended non-concurrence.
The conference committee report was accepted 59-1 (Vasconcellos) in the
Assembly without debate. The Senate approved 27-6.

RECOMMENDATION

| | SIGN | DATE | AGENCY HEAD | DATE |
|---|---|---|---|---|
| DEPARTMENT HEAD | | JUN 2 9 1977 | Cpal Dulley | JUN 3 - 1977 |

## SPECIFIC FINDINGS

### Retroactivity

Existing law (SB 42) requires the Community Release Board (CRB) to apply the determinate sentence to persons sentenced to state prison prior to July 1, 1977, for crimes that have the new three-tier sentences. The board must use the middle term of the offense bearing the longest term of imprisonment aggregated by any additional terms imposed by the court at the time of sentence. No good behavior or participation credit is granted.

In situations where the calculated time appears inadequate to a majority of the members of the CRB because of the number of crimes of which the prisoner was convicted, or because he was armed or used a deadly weapon or inflicted great bodily injury, a three-member panel may hold a hearing under specified procedures. A release date must be set within 90 days. In setting the date the panel is to be guided by the sentence which could have been imposed for the act had the prisoner been sentenced after the new law was in effect.

As changed by the bill, terms for any enhancements are specified. The sentence calculation need only be reviewed by two members of the board to schedule the prisoner for a hearing for a longer term set. The hearing panel requires only two members. The board need only notify the inmate in 90 days that he will have a hearing. The hearing, itself, must be held by April 1, 1978 or within 120 days of receipt of the prisoner, Whichever is later. This time period may be extended an additional 90 days by the board by resolution unless the resolution is vetoed by either house of the legislature. Legislative intent is expressed that the hearings be accomplished in the most expeditious manner possible.

In setting the sentence the board is guided by, but not limited to, the term that could reasonably have been set had the crime occurred after July 1. The board is also to be guided by a legislative declaration that the paramount consideration is to protect the public from repetition of extraordinary crimes of violence.

The effect of the amendments is to permit the CRB to hear four or five thousand cases for possible extension of the calculated term in constrast to the 500 that could be heard under existing law. Further it is not required to limit the term to that which could be given under the new law.

### Good Time

Good time procedures are simplified. Under SB 42 the inmate is given good time in eight month blocks and the Department must recompute his sentence and notify the prisoner of the redetermined release date each time.

# EXHIBIT 5

# COMMENTS

## SENATE BILL 42—THE END OF THE INDETERMINATE SENTENCE

For more than fifty-nine years California had a system of indeterminate sentences for felony convictions.[1] The indeterminate sentence system prohibited the sentencing judge from specifying a designated term of imprisonment for each convicted felon, and required the felon to be sentenced for "the term prescribed by law."[2] As a result, each felon was sent to prison for a term having a statutory minimum and maximum length, without any indication of the length of term that that specific prisoner would serve. Each individual's term was set after incarceration by the "governing authority of the prison,"[3] based on that individual's conduct in prison.[4] In theory, the indeterminate sentencing system would allow each prisoner's sentence to be tailored to his rehabilitative efforts in prison, enabling each individual to be released as soon as he was capable of living in society without resorting to crime.

A number of different criticisms[5] were leveled at the administration of the law—the uncertain date of release, the varying sentence lengths for prisoners committed on similar offenses, the broad discretion of the Adult Authority, the Au-

---

The author would like to thank Judge Donald Chapman of the Santa Clara County Municipal Court, Joseph A Spangler, Supervising Investigator of the California Adult Authority, and Mary Lou Fenili.

1. The original indeterminate sentencing provision, Penal Code section 1168, was enacted on May 18, 1917, and became effective on July 27 of the same year. 1917 Cal. Stats., ch. 526, § 1, at 665 (a lengthy historical note is included after the section).

2. The term prescribed by law was a statutory minimum and maximum term for the offense for which the defendant was convicted. A recital of the offense of which the defendant was convicted and a designation of the state prison to which he was committed was upheld as a proper sentencing in People v. Mendosa, 178 Cal. 509, 173 P. 998 (1918).

3. 1917 Cal. Stat., ch. 526, § 1, at 665. The governing authority of the prison was orginally called the State Board of Prison Directors. In 1941 it became the Board of Prison Terms and Parole and in 1944, the Adult Authority.

4. See notes 41-61 and accompanying text infra for a discussion of the Adult Authority's method of determining sentences.

5. See, e.g., J. MITFORD, KIND AND USUAL PUNISHMENT: THE PRISON BUSINESS 81 (1973) [hereinafter cited as MITFORD]; Sacramento Bee, Feb. 28, 1975, at B1, col. 3; Transcript of the Hearing on the Indeterminate Sentence Law, Sen. Select Comm. on Penal Institutions, Dec. 5-6, 1974 [hereinafter cited as Transcript]. See also M. FRANKEL, CRIMINAL SENTENCES 88 (1973) [hereinafter cited as FRANKEL].

thority's relative immunity from effective review, and the lack of effective evaluation of available sentencing materials by the Adult Authority.[6]

These criticisms, however, were only symptoms of the real problem, which was that the fundamental premise upon which the system was based, that is, the *ability* to rehabilitate was not a viable concept.[7] The criticisms generated an Adult Authority attempt to promote uniformity and order within the law[8] which was ultimately invalidated by the courts as beyond the Adult Authority's power.[9]

Increasing criticism motivated the legislature to re-examine the law and numerous alternatives were proposed.[10] From among the alternatives Senate Bill 42 was enacted as the favored remedy. It was passed by the legislature on September

---

6.    There was much criticism of the legislature's grant of total power for sentencing decisions to the Adult Authority without meaningful direction. Some of the criticism came from members of the legislature themselves: "For years the Legislature has neglected its responsibility of providing guidelines for boards charged with parole decision making. . . . The Parol Board [the Adult Authority] is one of the last bastions of unchecked and arbitrary power in America." ASSEM. SELECT COMM. ON ADMIN. OF JUSTICE, PAROLE BOARD REFORM IN CALIFORNIA: ORDER OUT OF CHAOS 16 (1970). *See also* FRANKEL, *supra* note 5, at 88-89; MITFORD, *supra* note 5, at 86; Goldfarb & Singer, *Problems in the Administration of Justice in California*, ASSEM. J. (Supp. App.), Reg. Sess. 41 (1969) (criticism of the absence of procedural due process safeguards at Adult Authority proceedings).

    General criticism of indeterminate sentencing was raised at the hearings of the Senate Select Committee on Penal Institutions on Senate Bill 42. *Transcript, supra* note 5.

7.    *See, e.g.,* ASSEM. COMM. ON CRIM. PROC., CRIME AND PENALTIES IN CALIFORNIA 25 (1968); CAL. ST. BAR COMM. ON CRIM. JUSTICE, REP. AND RECOMMENDATIONS ON SENTENCING AND PRISON REFORM 1-4, 34-35 (1975); FRANKEL, *supra* note 5, at 90-92; Glueck, *Predictive Devices and the Individualization of Justice*, 44 LAW & Contemp. Prob. 461-62 (1958) [hereinafter cited as Glueck].

8.    The major Adult Authority attempts to provide uniform procedures were Chairman's Directives 75/20 and 75/30. Adult Authority Chairman's Directive 75/20 (April 15, 1975) [hereinafter cited as C.D. 75/20]; Adult Authority Chairman's Directive 75/30 (September 2, 1975) [hereinafter cited as C.D. 75/30]. *See* notes 41-61 and accompanying text *infra* for a description of C.D. 76/20 procedures. C.D. 75/20 involved the procedure for determining parole release dates, while C.D. 75/30 paralleled those procedures for setting an individual maximum term proportionate to the seriousness of an individual's offense as required by *In re* Rodriquez, 14 Cal. 3d 639, 652, 653, 537 P.2d 384, 393, 394, 122 Cal. Rptr. 552, 561, 562 (1975).

9.    *In re* Stanley, 54 Cal. App. 3d 238, 126 Cal. Rptr. 524 (1976).

10.    *See* 1976 Cal. Legis. Serv., ch. 1139, at 4752 (formerly Senate Bill 42) (abolishing most indeterminate sentences and the Adult Authority); A.B. 1440, Reg. Sess. (1975) (requiring that sentences within the maximum length set by the trial judge, be imposed by a panel of superior court judges or hearing officers shortly after incarceration); A.B. 2311, Reg. Sess. (1975) (establishing a Commission on Criminal Sanctions to set fixed, determinate terms for all noncapital felony offenses at some point between zero and the median national time served for similar crimes).

1, 1976, and signed into law by Governor Brown on September 20, 1976.[11] The bill eliminates the Adult Authority and returns California to a determinate sentencing system.[12]

This comment will examine the indeterminate sentencing system and its administration. Senate Bill 42 will be outlined, and the new sentencing system will be evaluated for its ability to alleviate the difficulties of indeterminate sentencing.

## A History of Indeterminate Sentencing and the Adult Authority

### *The Indeterminate Sentence Law*

The indeterminate sentence law was enacted May 18, 1917, and became effective July 27 of the same year.[13] In its original form, California Penal Code section 1168(a) provided:

> Every person convicted of a public offense, for which pub-
> lic offense punishment by imprisonment in any reforma-
> tory or the state prison is not prescribed by law, if such
> convicted person shall not be placed on probation, a new
> trial granted, or imposing of sentence suspended, shall be
> sentenced to be confined in the state prison, but the court
> in imposing such sentence shall not fix the term or dura-
> tion of the period of imprisonment.[14]

The indeterminate sentence was a statutorily defined mini-mum and maximum term for each felony. Within that statu-tory term each prisoner's sentence was set *after* his incarcera-tion by the governing authority of the prison.

The statute also provided that "the governing authority of the reformatory or prison" or "any board or commission that may be hereafter given authority so to do"[15] had responsibility for determining what amount of time, if any, greater than the minimum the prisoner would be confined.

Although the indeterminate sentence law also consisted of hundreds of provisions of the Penal Code and other codes defin-ing minimum and maximum terms for each felony, this single short section[16] was the backbone of the system. Other sections

---

11.  Senate Weekly History, Reg. Sess. (1976).

12.  1976 Cal. Legis. Serv., ch. 1139, at 4752 (legislative counsel's digest). *See* notes 66-143 and accompanying text *infra.*

13.  1917 Cal. Stats., ch. 526, § 1, at 665.

14.  *Id.* at 665-66.

15.  *Id.* at 666.

16.  Cal. Penal Code § 1168 (West 1970).

136            *SANTA CLARA LAW REVIEW*            [Vol. 17

established the "governing authority of the prison," but none provided direction for the administration of the law.[17] The administrative board determining sentences was given total control over the process of indeterminate sentencing.

Immediately after its enactment, the constitutional validity of indeterminate sentencing was unsuccessfully challenged in *In re Lee*.[18] This challenge went to the core of indeterminate sentencing—that is, to the right to make a sentence indeterminate.

The contention that an indeterminate sentence was void for uncertainty and indefiniteness was not accepted in *Lee*. The court held that the sentence was in legal effect a sentence for the maximum term, and thus, both certain and definite.[19] In this holding the court relied on the experience of other jurisdictions already possessing some form of indeterminate sentence.[20]

*Lee* also established the validity of giving sentencing discretion to an administrative body. It was alleged that the law violated the constitutional doctrine of separation of powers.[21] The court replied by stating that the legislative function, to provide the sentence to be imposed, was completed with the enactment of the indeterminate sentence law and the minimum and maximum terms for each felony. The judicial function, to determine guilt and impose sentence, was completed at trial.[22] The actual execution of the sentence was seen as a purely administrative task.

Again, the court relied on precedents from other jurisdic-

---

17.  *See* CAL. PENAL CODE § 5075 *et seq.* (West 1970).

18.  177 Cal. 690, 171 P. 958 (1918).

19.  *Id.* at 693, 171 P. at 959.

20.  Because the question was not raised, the *Lee* court did not go further and examine whether the maximum sentence, often a life sentence, was cruel or unusual punishment. Challenges to indeterminate sentencing on cruel or unusual punishment grounds were not raised until very recently. *See In re Rodriquez*, 14 Cal. 3d 639, 537 P.2d 384, 122 Cal. Rptr. 552 (1975) (prison term disproportionate to inmate's particular offense constituted cruel and unusual punishment and indicated that the Adult Authority was not administering the law in a constitutional manner); *People v. Wingo*, 14 Cal. 3d 169, 534 P.2d 1001, 121 Cal. Rptr. 97 (1975) (a term within the statutory limits that is disproportionate to individual culpability is unconstitutional); *In re Foss*, 10 Cal. 3d 910, 519 P.2d 1073, 112 Cal. Rptr. 649 (1974) (a statutory minimum unconstituional); *In re Lynch*, 8 Cal. 3d 410, 503 P.2d 921, 105 Cal. Rptr. 217 (1972) (a statutory maximum unconstitutional). The invalidation of sentences on this ground fostered many changes in Adult Authority procedures. *See, e.g.,* C.D. 75/30, *supra* note 8. It also pushed the Authority to repudiate rehabilitation as a sentencing criterion.

21.  177 Cal. at 692, 171 P. at 959. *See* CAL. CONST. art. III, § 3 (constitutional doctrine of separation of powers).

22.  177 Cal. at 693, 171 P. at 959.

tions having indeterminate sentences.[23] It cited with approval the Tennessee Supreme Court statement that "the act does not attempt to confer on the board the power to fix the punishment that any given crime shall bear."[24] Such a statement is belied by the fact that the Adult Authority was given extremely wide latitude in setting sentences. For example, the sentence for a felony conviction of assault with a deadly weapon was six months to life.[25] At the time *Lee* was decided, the governing authority of the prison had complete freedom to set an inmate's sentence anywhere within those bounds.[26]

As a result of *Lee* and its progeny,[27] the validity of indeterminate sentencing per se was solidly established and criticism was restricted to the governing body and its administration of the law.

## The Adult Authority

In 1944 the Board of Prison Terms and Paroles was abolished and the Adult Authority was created as the agency to administer the indeterminate sentence law.[28] Originally, the Adult Authority had three members. It later was expanded to nine members who were appointed by the Governor and confirmed by the Senate.[29] Section 5075 of the Penal Code directed

23. *Id.* at 693-94, 171 P. at 959.

24. *Id.* at 694, 171 P. at 960, *quoting* Woods v. State, 130 Tenn. 100, 113, 169 S.W. 558, 561 (1914). .

25. CAL. PENAL CODE § 245 (West 1970) (felony penalty). Under S.B. 42 assault with a deadly weapon carries a sentence of 2, 3 or 4 years. 1976 Cal. Legis. Serv., ch. 1139, § 152, at 4790 (to be codified as CAL. PENAL CODE § 245).

26. Prior to the decision in *In re Rodriguez*, the general rule was that a prisoner had no vested right to a term fixed at less than the maximum sentence. *In re* Schoengarth, 66 Cal. 2d 295, 302, 425 P.2d 200, 204, 57 Cal. Rptr. 600, 603 (1967). As a result terms were set and reset anywhere within the statutory bounds, if the prisoner violated any Department of Corrections rules. *Rodriguez* limited this rule by requiring that the maximum for each prisoner must not be disproportionate to the seriousness of the prisoner's offense. 14 Cal. 3d at 652, 537 P.2d at 393, 122 Cal. Rptr. at 516. This compulsion of proportionality was derived from United States and California constitutional provisions against cruel and/or unusual punishment. *See* U.S. CONST. amend. VIII; CAL. CONST. art. I, § 17.

27. *See, e.g.,* Bennett v. People, 406 F.2d 36 (9th Cir. 1969); *In re* Larsen, 44 Cal. 2d 642, 283 P.2d 1043, *appeal dismissed,* 350 U.S. 928 (1955); Fleischer v. Adult Authority, 202 Cal. App. 2d 44, 20 Cal. Rptr. 603 (1962); People v. Kostal, 159 Cal. App. 2d 444, 323 P.2d 1020 (1958).

28. CAL. PENAL CODE §3000 (West 1970). Jessica Mitford described the Adult Authority in this manner: "This board wields total, arbitrary despotic power over the destinies and liberties of California's state prison population, not only while they are in custody but also after they have been released on parole." MITFORD, *supra* note 5, at 86.

29. CAL. PENAL CODE §5075 (West 1970).

that, to the extent possible, the members selected should be experienced in the fields of corrections, sociology, law, law enforcement, and education.[30]

Statutes provided very little guidance for the Authority in its administration of indeterminate sentencing. Penal Code section 5076.1 directed the Authority to hold hearings at the prisons *as often as necessary* to allow a full and complete examination of each inmate's file.[31] As the size of the prison population increased, the section was amended to give the Adult Authority the power to employ hearing representatives to assist the Authority in its time-consuming tasks of examining each inmate's file, setting terms and making parole decisions.[32]

Most of the direction for the operation of the indeterminate sentence law was provided by the Adult Authority itself.[33] In the absence of statutory direction, the Adult Authority regularly issued policy statements, resolutions and chairman's directives which specified exactly how the indeterminate sentence law would be administered.[34]

---

30. *Id.* Supposedly these special areas of knowledge would assist the Adult Authority members in their task of determining sentence lengths. The former occupations of the 1976 Adult Authority members included: Raymond Procunier, director of the Department of Corrections; Raymond Brown, Oakland deputy chief of police; Manuel Quevedo, Jr., San Bernardino police officer and member of the Alcoholic Beverage Control Board; Robert Wood, state assemblyman and farmer; Rudy Garcia, community director of the state health and welfare agency, and Lt. Commander in the United States Navy in charge of special court martials; Henry Kerr, Assistant Commander, Los Angeles Police Department, Detective Division; Curtis Lynum, San Francisco District Director, FBI; Ruth Rushen, Los Angeles County Probation Department, Probation Officer. Telephone conversation with Adult Authority personnel (March, 1976).

Marvin Frankel has spoken of these "experts" running our sentencing system as follows: "In our easy adoration of expertise we have given over power to people of dubious qualifications, subjected to little or no control." FRANKEL, *supra* note 5, at 88-89.

31. CAL. PENAL CODE § 5076.1 (West Supp. 1975) (emphasis added).

32. *Id.* In 1976 the Adult Authority employed about 29 hearing representatives to assist the nine Adult Authority members. These 38 people were responsible for hearing the cases of over 40,000 inmates in the custody of the Department of Corrections. Telephone conversation with Adult Authority personnel (March, 1976).

33. For criticisms of the Adult Authority's operation of the indeterminate sentence law see authorities listed in note 5 *supra*.

34. The distinctions among these documents is not clear. Both policy statements and resolutions appear to be general declarations of Adult Authority decisions on various topics. Chairman's Directives, on the other hand, are much more specific and deal with detailed procedural matters. *See, e.g.,* C.D. 75/30, *supra* note 8. The relative importance of these statements, resolutions and directives in Adult Authority operations is not clear. Apparently, they differ only in the depth to which they cover the subject matter.

*Rehabilitative Foundations of Indeterminate Sentencing*

Indeterminate sentencing in the United States grew out of notions of preventive confinement.[35] Though early statements of the rationale for indeterminacy were based upon a desire to isolate the criminal from society,[36] very shortly the purpose of indeterminancy was subtly shifted from confining a prisoner until he had reformed to the actual reformation itself.[37] Shortly after the enactment of California's indeterminate sentence law, the California Supreme Court wrote: "The purpose of the indeterminate sentence law . . . is to *mitigate* the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime."[38]

The difficulty with attempting to make the punishment fit the criminal rather than the crime lay in the limited ability of the criminal justice system to identify and treat the cause of crime. For years the administrators of the indeterminate sentence law attempted to individualize rehabilitation through sentencing while lacking the expertise and methods necessary for treatment. The result was that sentencing was open to criticism as arbitrary, excessive and unfair.[39]

In early 1975 when Raymond Procunier became chairman of the Adult Authority, he recognized that rehabilitation could not be achieved within the indeterminate sentencing system.[40]

---

35. *See* Dershowitz, *Indeterminate Confinement: Letting the Therapy Fit the Harm*, 123 U. PA. L. REV. 297, 304-15 (1974) [hereinafter cited as Dershowitz].

36. Zebulon Brockway, the long time superintendant of Elmaira Reformatory in New York and an early proponent of indeterminate sentencing in the United States, rejected both punishment and deterrence as rationales for sentencing and instead proposed that all persons convicted of crimes should be confined to prison until they could safely be returned to society. Z. BROCKWAY, FIFTY YEARS OF PRISON SERVICE 401 (1912).

37. *See* Dershowitz, *supra* note 35.

38. *In re* Lee, 177 Cal. 690, 692, 171 P. 958, 959 (1918).

39. *See* K. DAVIS, DISCRETIONARY JUSTICE: A PRELIMINARY INQUIRY 133-34 (1973); FRANKEL, *supra* note 5.

40. Sacramento Bee, Feb. 28, 1975, at B1, col. 3. There seems to be a general consensus that rehabilitation, making a criminal into a law abiding citizen, is an impossible task. *See, e.g.*, FRANKEL, *supra* note 5, at 93; Friedman, *The Dilemmas of Sentencing*, 44 CAL. ST. BAR J. 372, 377 (1969); Sacramento Bee, Feb. 28, 1975, at B1, col. 3. Punishment, deterrence and protection decisions are really policy decisions which demand less qualification than a rehabilitation decision. Senate Bill 42 recognizes that these policy decisions are best made by a legislative body which is answerable to the people rather than by an administrative board which is not.

As a result, he attempted to remove rehabilitation from sentencing decisions. Chairman's Directive 75/20 was the result.

## CHAIRMAN'S DIRECTIVE 75/20—AN ADMINISTRATIVE ATTEMPT TO MAKE SENTENCING DECISIONS MORE UNIFORM

As a major step in administrative reform, Raymond Procunier, the Adult Authority Chairman, issued Chairman's Directive 75/20 (C.D. 75/20),[41] which established a procedure for setting parole release and discharge dates for each prisoner. The parole release date was the length of time an inmate would serve in prison before being released on parole. In a sense, it was the inmate's individualized minimum term.[42] The date was tentative. If for any reason the inmate was found unfit to be released, the date could be revoked.

The parole discharge date was the date on which the inmate would be released from the Department of Corrections' control and supervision after a successful period of parole. It also was a tentative date because the individual's actions while on parole could cause parole to be revoked or the time under supervision to be lengthened.

The major purpose of C.D. 75/20 was to establish procedures for evaluating information and guidelines for release decisions. It was intended that these dates would be set at an inmate's first regularly scheduled parole consideration meeting.[43]

The first section of C.D. 75/20 was administrative. It specified what information could be considered in making parole release and discharge decisions, as well as what situations would allow a postponement of decision or a denial of parole.[44] Postponement could be ordered only if the information at the hearing was incomplete. The reason for postponement had to

---

41. C.D. 75/20, *supra* note 8.

42. Prior to the decision of *In re* Rodriguez, 14 Cal. 3d 639, 537 P.2d 384, 122 Cal. Rptr. 552 (1975), a parole release date was only tentative. It could be revoked and the sentence returned to the statutory maximum for any breach of prison discipline. After *Rodriguez* the date could not be raised above the "primary term" which was a maximum proportionate to the individual's offense. *See* note 26 *supra* ; C.D. 75/30, *supra* note 8 (establishing Adult Authority procedures for setting a proportionate maximum).

43. Such a meeting includes two Adult Authority members or hearing representatives and the inmate. The purpose is to review his file and make recommendations that will speed his release. The first scheduled meeting is six months before the inmate's minimum eligible parole release date. Adult Authority Policy Statement No. 15 [on file at SANTA CLARA L. REV.].

44. C.D. 72/20, *supra* note 8, at § A.1.

be noted on a standardized form in the inmate's file[45] and the Department of Corrections' staff had to be instructed to obtain the necessary information. In no situation could a case be postponed longer than ninety days.

## C.D. 75/20 Procedures

The body of C.D. 75/20 was concerned with the procedure to establish a parole release date—a procedure that involved a number of different steps.

*The "base offense."* The "base offense" was the most serious offense for which the inmate had been sentenced.[46] This was determined by examining the statutory minimum and maximum sentences for each offense for which the inmate had been sentenced, selecting the most severe as the "base offense," and listing that offense on the Adult Authority Parole Decision form 279. If the inmate was committed for multiple offenses, all offenses other than the base offense had to be listed as running either concurrently or consecutively with that offense.

*The typical or aggravated range.* The "base offense" was then characterized as "typical" or "aggravated" for that type of offense.[47] To do this, the facts of the crime were evaluated for their "relative seriousness" with respect to other crimes of the same type. The directive listed several factors to be considered in making this determination, including the seriousness of any personal injury to the victim of the crime, the number of victims, the degree to which the inmate was involved in inflicting such personal injury, the extent of damage to or loss of property, the professionalism with which the crime was carried out, the possession or use of weapons, and the quantities of contraband possessed or sold.

No relative weights for each of these factors were supplied, nor was there an instruction to disregard or alter factors which were integral parts of the definition of an offense. Thus, in effect, some factors were weighed twice—once as a definition of the offense and again as a factor in determining the seriousness of the offense.

*The base period of confinement.* The base period of con-

---

45.  California Department of Corrections form 279 [on file at SANTA CLARA L. REV.].

46.  C.D. 75/20, *supra* note 8, at § A.2.a.

47.  *Id.* at § A.2.b.

finement[48] was established by referring to the table of suggested base ranges attached to the directive.[49] The base offense and the typical or aggravated character of that offense were used to determine which average sentence range would be applied to a particular prisoner. By evaluating the facts of a crime, a specific period within that range was selected as the "base period" of confinement for that inmate. The primary factor in this determination was the seriousness of the offense, apparently determined by using the same factors which allowed the offense to be characterized as typical or aggravated. If there were "unusual" factors in a particular case, the base period could be set above or below the chosen range.[50]

*Adjusting the base period.* The Adult Authority then adjusted the base period[51] for prior prison terms, concurrent or consecutive sentences, prior felony convictions plead and proven in court which had not resulted in a prison sentence, and weapons charges.[52] Periods of time were to be deducted from the base period for an individual whose minimum term had been reduced under Penal Code section 1202b, the Youthful Offender Statute.[53] The directive defined each of these "mitigating" or "aggravating" situations, defined ranges to be used to select the adjustment period for each,[54] and cautioned that the categories were mutually exclusive and that the same felony convictions should not result in two additional periods being added to the base. The directive also warned that dismissed charges were not to be considered in adjusting the base range.

This last manipulation resulted in a specific period of months. When added to the date on which the inmate was

---

48. *Id.* at § A.2.c.

49. For a table of suggested base ranges see app. A *infra*.

50. These factors include the individual's age; the individual's pattern of criminality (whether the individual is a professional, systematic criminal or an amateur, occasional offender); serious or major disciplinary offenses in prison; a lengthy period of incarceration prior to actual reception by the Department of Corrections, etc. C.D. 75/20, *supra* note 8, at § A.2.c.

51. *Id.* at § A.3.

52. Weapons charges include commission of a felony while armed with a deadly weapon and use of a firearm in the commission of certain specified felonies. CAL. PENAL CODE §§ 12022, 12022.5 (West 1970).

53. The Youthful Offender Statute allows the sentencing court to reduce to six months the minimum term of a defendant who was convicted of a felony, other than a felony punishable by death, committed while he was under the age of 23 years. CAL. PENAL CODE § 12026 (West 1970).

54. For a table of suggested adjustment ranges see app. A *infra*.

bilitation" to justify a resetting of his release and discharge dates. This procedure did not allow Board error to be a factor in a review of the dates. In addition, it establsihed rehabilitation as *the* criterion for change when the procedures for setting the dates initially did not even include rehabilitiation as a factor.[61]

### Invalidation of C.D. 75/20

The procedural inadequacies of C.D. 75/20 and the possibilities of prejudice involved therein were overshadowed by the glaring fact that the directive allowed for absolutely no consideration of rehabilitation in the original sentence setting decision. The directive marked the Adult Authority's recognition that rehabilitation was not a reasonable standard for determining sentences.

Unfortunately, the indeterminate sentence law required individual sentences to be at least partially based on consideration of factors of "individual reclamation and post-release expectations."[62] In other words, rehabilitation and the prediction of recidivism were mandatory factors to consider under the indeterminate sentence law.

In January, 1976, the California Court of Appeal for the Third District decided the case of *In re Stanley.*[63] This case invalidated C.D. 75/20 procedures on the ground that rehabilitation was not considered. Since the indeterminate sentence law required consideration of rehabilitation in term setting, and since the Adult Authority had admitted it could neither rehabilitate nor evaluate efforts at rehabilitation, *Stanley* seemed conclusively to establish that the goal of the indeterminate sentence was beyond reach.

The dilemma of indeterminate sentencing has been stated succinctly:

> [I]t is time . . . that reformers of the criminal law face the fact that the feasibility of a reliable technique of individualization is crucial to the entire program of scientific and humane criminal justice. If, in fact, a reasonably

---

61. *Id.*

62. *In re Stanley,* 54 Cal. App. 3d 236, 248, 126 Cal. Rptr. 524, 531 (1976). The invalidation of C.D. 75/20 was predicted months before *Stanley* was decided. *See* letter from G. Murphy, California Legislative Counsel, by B. Dale, Deputy Counsel, to Sen. J. Nejedly (Mar. 18, 1975) [on file at SANTA CLARA L. REV.].

63. 54 Cal. App. 3d 236, 126 Cal. Rptr. 524.

mitigated, typical and aggravated offenses at that level of seriousness. For example, the middle level of seriousness is assigned terms of three, four and five years.[69] One offense with this degree of punishment is rape.[70] A rape conviction would normally result in a sentence for the middle term, but if the sentencing judge finds that there were mitigating or aggravating factors involved, the lowest or highest term, respectively, might be selected.[71]

The major portion of Senate Bill 42 consists of statutes defining the terms for each offense.[72] Almost all of the new sentences represent substantial reductions in sentence length from the minimum and maximum statutory terms for the same offense under the indeterminate sentence law.[73] This change to much shorter sentences was urged by proponents of the Bill for two reasons—first, California had the longest average sentences in the United States, and perhaps in the world,[74] and second, sentences over about five years in length could not be justified because there appears to be no significant "improvement" in prisoners after that period.[75]

---

69. For a table of selected offenses with determinate and indeterminate penalties see app. B *infra.*

70. CAL. PENAL CODE § 264 (West 1970). *See* 1976 Cal. Legis. Serv., ch. 1139, § 154, at 4791 (to be codified as CAL. PENAL CODE § 264).

71. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170(b)). *See* notes 78-121 and accompanying text *infra* (trial court sentencing).

72. For a comparison of the penalties for various offenses see app. B *infra.*

73. Senate Bill 42 was severely criticized by Judge Bruce Allen, presiding judge in the criminal division of Santa Clara County Superior Court, primarily because of the extremely short sentences which it provides compared to those provided under the indeterminate sentence law. San Jose Post-Record, Sept. 20, 1976, at 1, col. 1. This is not necessarily accurate. Given the suggested base ranges which the Adult Authority used for sentencing prior to the passage of Senate Bill 42, the new sentences should be very close to the sentences actually served under the prior law. *Compare* app. A *with* app. B *infra.*

74. *See Transcript, supra* note 5, at 20 (remarks of Peter Sheehan, American Civil Liberties Union, San Francisco); MITFORD, *supra* note 5, at 86. Mitford commented that "[u]nder cover of the indeterminate sentence, the median term served by California's 'felony first releases' had risen from 24 months in 1960 to 36 months in 1970, highest in the nation and probably the world." *Id.*

75. To urge that sentences be reduced because rehabilitation is ineffective for prisoners confined more than five years doesn't seem very persuasive since the basis of S.B. 42 was punishment, not rehabilitation. It is likely, given the fact that Senate Bill 42 seeks to establish sentences that are similar to those served for similar crimes in other jurisdictions, that the first rationale urged for shorter sentences (that California's sentences were substantially longer than those in other jurisdictions) was given much more weight by the legislature than the rehabilitation rationale.

The American Bar Association has noted that "[t]here is general agreement among most who have recently studied the pattern of sentencing in this country that

no more than *one* of these enhancements shall apply to the sentence for any single offense. Here again, Senate Bill 42 very clearly seeks to avoid double or excessive punishment as well as to clarify the application of these enhancement provisions. The indeterminate sentence law did not contain similar rules of application and, as a result, sentences varied widely because enhancement provisions were applied differently.

Enhancement for prior terms and consecutive sentences is limited to five years[81] and the total term of imprisonment is limited to twice the number of years imposed as the "base term,"[82] unless the defendant is convicted of a violent felony,[83] being armed with a deadly weapon, the use of a firearm, or the infliction of great bodily harm.[84] If the conviction falls into one of these exceptions, it appears that there is no limit on the total term of imprisonment except for the limitation provided by the number of enhancements which can be imposed by law.

*Sentencing Procedure*

*Trial court sentencing.* Section 1170 (a)(2) provides the basic outline of sentencing procedure.[85] The trial court is required to sentence an individual convicted of an offense to one of the three specified terms unless the defendant is given some other disposition provided by law.[86] At all times the court must consider the sentencing rules prescribed by the Judicial Council as authorized in section 1170.3,[87] and it is required to impose appropriate enhancements unless it finds mitigating circumstances.[88]

---

81. *Id.* § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1 (a(e)).

82. The base term is the unenhanced term selected by the trial judge from among the three choices for any determinate offense.

83. 1976 Cal. Legis. Serv., ch. 1139, § 268, at 4817 (to be codified as CAL. PENAL CODE § 667.5(c)) (definition of violent felonies).

84. *Id.* at 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1a(f)).

85. *Id.* at 4818 (to be codified as CAL. PENAL CODE § 1170(a)(2)).

86. Other dispositions include a fine, jail, probation or the suspension or imposition or execution of sentence. *Id.*

87. *Id.* at 4822 (to be codified as CAL. PENAL CODE § 1170.3). The rules, which the Judicial Council is required to develop, are to be designed to promote uniformity. They must provide guidance for the court's decision to:
   (a) Grant or deny probation.
   (b) Impose the lower or upper prison term.
   (c) Impose concurrent or consecutive sentences.
   (d) Consider an additional sentence for prior prison terms.
   (e) Impose an additional sentence for being armed with a deadly weapon, using a firearm, an excessive taking or damage [to property], or the infliction of great bodily injury.

88. Additional punishment due to aggravating circumstances can be avoided by

When sentencing for an offense having three specified terms, the court must order the middle of the three possible terms, unless circumstances in mitigation or aggravation, of the crime are presented by motion and found to be true at a hearing on that motion.[89] A warning is given that no facts used to enhance a sentence, such as prior prison terms for violent crimes,[90] consecutive sentences,[91] or use of a firearm,[92] shall justify imposition of the aggravated (or upper) term, and that no fact should be used twice to determine, aggravate or enhance a sentence. This warning is a substantial change from the procedures under the indeterminate sentence law where the facts which define an offense could also be considered as aggravating circumstances as well as conditions for enhancement.[93]

---

establishing circumstances in mitigation of the punishment. 1976 Cal. Legis. Serv., ch. 1139, §§ 304-06, at 4835 (to be codified as CAL. PENAL CODE §§ 12022, 12022.5, 12022.6, 12022.7).

Penal Code section 12022.6 provides a punishment enhancement for excessive taking of or damage to property

where the elements of the offense involve [the] criminal taking of funds or property from or property damage to any individual, organization, group or the community in general and [the offense does] not specify a minimum value of the taking or damage, or [specifies] a minimum of less than $100,000.

This enhancement has two levels depending on the magnitude of the taking or damage. For a taking or damage greater than $100,000 but less than $500,000, the enhancement is for an additional term equal to one-half of the base term selected by the judge. If the taking or damage is equal to or greater than $500,000 then the enhancement is for a term equal to the base term selected by the judge. This new section represents a recognition by the legislature that a serious property crime can be as damaging to individuals and the community as a violent crime involving bodily harm or a threat of bodily harm.

89.   1976 Cal. Legis. Serv., ch. 1139, § 173, at 4819 (to be codified as CAL. PENAL CODE § 1170(b)).

90.   *Id.* § 268, at 4816 (to be codified as CAL. PENAL CODE § 667.5). New Penal Code section 667.5(a) provides enhancement only if the commitment offense is one of several defined "violent felonies" or a felony in which great bodily injury to a person other than the defendant or his accomplices has been pled and proven *and* the prior separate prison term also involved a "violent felony." The enhancement imposed is an additional three year term for each such prior felony unless the felon was free of prison custody and felony conviction for ten years immediately preceding the filing of the accusatory pleading that resulted in the present felony conviction. In this section the legislature specifically declares that these "violent felonies" merit special consideration when imposing a sentence to display society's condemnation for such extraordinary crimes of violence against the person.

Section 667.5(b) provides for one year enhancement for other prior prison terms for any felony.

91.   *Id.* § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170.1a).

92.   *Id.* § 305, at 4836 (to be codified as CAL. PENAL CODE § 12022.5).

93.   *See* notes 41-61 and accompanying text *supra* (discussion of C.D. 75/20 procedures).

Whenever a mitigated or aggravated term is selected, the facts relied upon must be set forth on the record. In fact, the record must include all facts supporting the choice of sentence, whether the mitigated, typical or aggravated term is chosen. This requirement provides a more complete record, thereby aiding appellate review of sentencing decisions.

A provision for resentencing within one hundred and twenty days of commitment is retained from the prior law.[94] There are no significant changes in this provision, except for the proviso that the trial judge in resentencing should apply the rules and information provided by the Judicial Council regarding sentences of other prisoners convicted of similar crimes.

To promote uniformity of sentencing, the Community Release Board, which is the successor to the Adult Authority and the California Women's Board of Terms and Paroles,[95] must review all sentences within one year after commencement of the terms thereof and recommend recall of the present sentence and resentencing of the defendant if a sentence is found to be disparate.[96]

The California Judicial Council[97] has the responsibility for establishing rules and procedures designed to foster the aims of determinate sentencing—uniformity of sentencing and sentencing proportionate to the seriousness of the offense committed.[98] Accordingly, it is directed to establish criteria to aid the

---

94.   *Compare* 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170(c)) *with* CAL. PENAL CODE § 1168 (West 1970).

95.   The composition of Community Release Board is similar to that of the Adult Authority. The Board includes nine members, each serving a four year term. 1976 Cal. Legis. Serv., ch. 1139, § 294, at 4832 (to be codified as CAL. PENAL CODE § 5075). Board membership is required to reflect "as nearly as possible a cross-section of the racial, sexual, economic and geographic features or the population of the state." *Id.* The Board is responsible for reviewing all prisoner's requests for reconsideration of denial of good time credit, and for setting parole length and conditions. In addition, it has the authority to modify decisions of the Department of Corrections in these matters. *Id.* § 297, at 4833 (to be codified as CAL. PENAL CODE § 5077). In contrast to the Adult Authority, the Community Release Board is authorized to do business in panels of three rather than two. *Compare id.* § 296, at 4833 (to be codified as CAL. PENAL CODE § 5076.1) *with* CAL. PENAL CODE § 5076.1 (West Supp. 1976). Since panels will probably be conducted in groups of the lowest allowable number, the addition of one member to the panel will prevent deadlocks.

96.   1976 Cal. Legis. Serv., ch. 1139, § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1b). This is another one of many provisions in the Bill designed to promote uniformity of sentence.

97.   The Judicial Council is established by the California Constitution. CAL. CONST. art. VI, § 6.

98.   *See* 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4822 (to be codified as CAL. PENAL CODE § 1170.3 *et seq.*) (defining the duties of the Judicial Council under the Bill).

trial judge in his sentencing decisions,[99] to collect, analyze and distribute information on sentencing in California and other jurisdictions;[100] to conduct annual sentencing institutes;[101] and to review present sentencing statutes and procedures and recommend changes to the legislature.[102] The main objectives of the Council in this review are to strive to maintain sentences proportionate to the seriousness of the offense, and to assure that California lawmakers remain abreast of current sentencing trends by comparing sentences in other jurisdictions and sentencing procedures recommended by national commissions and other learned bodies.[103]

*Multiple convictions.* Multiple convictions under Senate Bill 42 are dealt with by a formula.[104] The aggregate term for all convictions is the greatest term imposed for any *one* of the offenses for which the individual is convicted, including any enhancement imposed for that offense, *plus* one-third of the middle term of imprisonment for each other felony conviction for which a consecutive sentence was imposed without any enhancement for those additional offenses.[105]

Since no mention is made of concurrent sentences, it may be presumed, from the failure to provide an aggravating term for those sentences, that the terms are in fact to run concurrently. This is a distinct change from prior Adult Authority policy which added time to the "base term" for concurrent as well as consecutive sentences.[106] The Adult Authority procedures considered additional convictions in establishing the seriousness of a commitment. They also added time to that sentence as a penalty for sentences whose terms were, by definition to run at the same time as the commitment offense. Senate Bill 42 clarifies the roles of concurrent and consecutive sentences by allowing an extension of the sentence only in the case of convic-

---

99.   *See* note 87 *supra.*

100.   1976 Cal. Legis. Serv., ch. 1139, § 273, at 4822 (to be codified as CAL. PENAL CODE § 1170.4).

101.   *Id.* (to be codified as CAL. PENAL CODE § 1170.5).

102.   *Id.* (to be codified as CAL. PENAL CODE § 1170.6).

103.   *Id.* (listing of considerations).

104.   *Id.* at 4819 (to be codified as CAL. PENAL CODE § 1170.1a).

105.   For example, a conviction for robbery with proof of great bodily harm and an additional conviction for first degree burglary to run consecutively might be treated as follows: 3 years (the middle term for robbery) plus 3 years (the enhancement for great bodily harm, plus 1 year (one third of the middle term for burglary), for a total sentence of seven years.

106.   C.D. 75/20, *supra* note 8, at § A.3.b. *See* notes 51-54 and accompanying text *supra.*

tions intended to be served consecutively.

When an individual is convicted of a felony committed while in prison, and his sentence is to run consecutively with his present prison term, his term is calculated in the same manner as for multiple convictions.[107] His term is the remainder of time to be served on the original offense(s) plus the greatest term imposed for any felony committed while serving the original term plus one-third of the middle term for each other felony conviction.

*Sentences imposed prior to Senate Bill 42.* All inmates sentenced before the effective date of Senate Bill 42, who would have been sentenced to a determinate term under the applicable provisions of the new bill, will have their terms recalculated by the Community Release Board. This will be done by utilizing the middle term of the most serious offense for which the prisoner was convicted, aggregated by any additional terms imposed at the time of sentencing.[108] If this calculation results in a term which would end before the parole release date already set by the Adult Authority,[109] then the inmate's parole date must be reset at the shorter term. Resetting is mandatory unless a majority of the Community Release Board determines that a longer term is warranted due to the number of present or prior convictions, or due to the presence of facts justifying an *arming, use* or *great bodily harm* enhancement.

When a longer term is believed justified, the prisoner is entitled to a hearing at which he may be represented by counsel and in which the setting of his term and parole date will be reviewed.[110] All inmates who have not had a parole date set by the Adult Authority prior to the effective date of Senate Bill 42 shall have their terms calculated and parole dates set in the same manner as that described above.[111] They also are entitled to a review hearing if the Board decides that they should serve a longer sentence than that calculated.

Inmates sentenced prior to the effective date of Senate Bill 42 who still have indeterminate sentences under the Bill will have their release dates set by the Community Release Board

---

107. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1a(b)).

108. *Id.* at 4821 (to be codified as CAL. PENAL CODE § 1170.2(a)).

109. *See* notes 41-61 and accompanying text *supra* (C.D. 75/20, Adult Authority procedures for setting parole release dates).

110. The procedural guidelines for such a review are established by 1976 Cal. Legis. Serv., ch. 1139, § 281.8, at 4827 (to be codified as CAL. PENAL CODE § 3041.5).

111. *Id.* § 273, at 4821 (to be codified as CAL. PENAL CODE § 1170.2(c)).

Case 2:09-cv-00612-JAM-TJB   Document 12   Filed 09/22/09   Page 176 of 208

in the manner established by prior law.[112] Nothing in Senate
Bill 42 will require an inmate, sentenced before the effective
date of the Bill, to remain in prison longer than he would have
been kept in custody under the indeterminate sentence law.
Though the indeterminate sentence law is retained only in a
few provisions, mainly those providing terms of life imprison-
ment,[113] its procedure will continue to be relevant in setting
the terms of prisoners sentenced before the passage of Senate
Bill 42.

### Good Time Credit

The second major procedural section of Senate Bill 42
deals with provisions for granting "good time" credit for time
served in prison.[114] Every prisoner with a determinate term
must be advised within fourteen days of the commencement of
his term of all applicable prison rules and available institu-
tional programs, including the possibility of receiving a reduc-
tion of up to one-third of his sentence for good time and partici-
pation.[115] All prisoners sentenced prior to the effective date of
Senate Bill 42 who will have determinate sentences must be
advised of the rules and programs within ninety days of the
Bill's effective date.[116] In all cases, the inmate's file must reflect
compliance with this provision.

At the time the prisoner is informed of the availability of
"good time," he must be shown a document, which both he and
a Department of Corrections official will sign, which outlines
the conditions for obtaining good time credit.[117] These condi-
tions may be modified by the mutual consent of the Depart-
ment and the prisoner, by transfer of the inmate to another
institution, or by the Department's determination of the pris-
oner's lack of adaptability and success in a specific program or
assignment. If lack of adaptability is claimed, the inmate is
entitled to a hearing on that decision.[118]

112.  *Id.* at 4822 (to be codified as CAL. PENAL CODE § 1170.2(e)).

113.  *See, e.g., id.* § 271, at 4818 (to be codified as CAL. PENAL CODE § 1168).

114.  *Id.* § 276, at 4823 (to be codified as CAL. PENAL CODE §§ 2930-32). Good time
credits apply to all prisoners. *Id.* § 273, at 4822 (to be codified as CAL. PENAL CODE §
1170.2(d)). However, prisoners sentenced prior to the effective date of the bill can
receive credit only from the effective date of the bill. *Id.*

115.  *Id.* § 276, at 4823 (to be codified as CAL. PENAL CODE § 2930(a)).

116.  *Id.* (to be codified s CAL. PENAL CODE § 2930(b)).

117.  *Id.* (to be codified as CAL. PENAL CODE § 2931(a)).

118.  *Id.* at 4824 (to be codified as CAL. PENAL CODE § 2931(a)(3)).

The documentation requirement in this section is un
doubtedly an effort to avoid the criticism that was directed at
the Adult Authority that each time a prisoner appeared before
the Board he was told to do something different in order to
obtain an early release.[119] Although the Department can
unilaterally change the credit requirements for lack of adapta-
bility, the hearing requirement should prevent abuses.

The maximum possible good time credit will result in a
four month reduction in sentence for every eight monthy
served.[120] Three months of each four month reduction are based
upon forebearance from illegal activities or prison disciplinary
infractions. These forbidden activities range from assault with
a weapon and escape to manufacture or sale of intoxicants.
Penalties for participation in these activities range from a
forty-five day reduction in credit for the most serious to a fif-
teen day reduction for the least serious.

In any case the Department may seek a criminal prosecu-
tion for violations of law. If the prisoner is prosecuted, he may
not be denied credit if found not guilty and he may be denied
credit at the specified rates if found guilty.[121] One month of
good time credit can be awarded for participation in prison
activities.[122] Success in the activity is not required for credit, if
a reasonable effort is made. However, failure to participate,
unless confined by choice or due to behavior problems, will
result in a maximum loss of thirty days credit for every eight
month period actually served.

The Bill's credit provisions provide some incentive to pris-
oners to better themselves and to reduce their sentences by not
committing additional crimes in prison.[123] Even if the inmate

---

119.  *See Transcript, supra* note 5.

120.  1976 Cal. Legis. Serv., ch. 1139, § 276, at 4824 (to be codified as CAL. PENAL
CODE § 2931(b)).

121.  *Id.* at 4825 (to be codified as CAL. PENAL CODE § 2932 (d)).

122.  *Id.* at 4824 (to be codified as CAL. PENAL CODE § 2931(c)).

123.  Almost all prohibited activities are at least misdemeanors. The activities
prohibited by the bill and their penalties are as follows:

(1)  Assault with a weapon; or escape.

(2)  Physically assaultive behavior; possession of a weapon without per-
mission; attempt to escape; or urging others, with the intent to cause a
riot, to commit acts of force or violence, at a time and place under circum-
stances which produce a clear and present and immediate danger of a riot
which results in acts of force or violence.

(3)  Intentional destruction of state property valued in excess of fifty
dollars ($50); falsification of a significant record or document; possession
of escape tools without permission; or manufacture or sale of intoxicants.
Activities specified in paragraph (1) may result in a maximum denial of

refuses to participate in prison activities and does all the forbidden activities, nothing except another felony conviction will lengthen his term.[124]

Denial of good time credit is possible only if certain time limitations and procedures are observed.[125] First, credit can be denied only within the eight month credit review period in which the misbehavior takes place. Second, the Department must follow a strict timetable for notifying the inmate of its intent to deny credit and for proceeding with the denial hearing. The Department must also meet specific notice requirements.[126] Third, the inmate must be granted certain procedural assistance and safeguards, including the right to request the attendance of witnesses and to question all witnesses at the hearing and the right to assistance by Department employees in gathering facts and presenting the prisoner's defense.[127] Finally, the inmate must be notified within ten days of the hearing of the results and reasons therefor, and he must be granted not only Department, but also Community Release Board review upon request.[128]

Although the inmate does not have the full panoply of procedural safeguards, substantial safeguards are provided, and the proceeding to deny credit can not result in additional criminal penalties to the inmate.[129]

---

good behavior credit of 45 days for each such prohibited activity. Activities specified in paragraph (2) may result in a maximum denial of good behavior credit of 30 days for each such prohibited activity. Activities specified in paragraph (3) may result in a maximum denial of good behavior credit of 15 days for each such prohibited activity. Nothing in this section shall prevent the Department of Corrections from seeking criminal prosecution for violations of law.
*Id.* (to be codified as CAL. PENAL CODE § 2931(b)).

124. Such a system seems the best way to encourage efforts at "rehabilitation," even if they have no actual beneficial effect, without getting enmeshed in measuring rehabilitation. Also, the provisions of the Bill do not completely shut the door on rehabilitation. In the future if rehabilitation becomes understood, its effects can be built into the sentencing system.

125. 1976 Cal. Legis. Serv., ch. 1139, § 276, at 4824 (to be codified as CAL. PENAL CODE § 2932).

126. *Id.* (to be codified as CAL. PENAL CODE § 2932(a)(1)).

127. *Id.* at 4825 (to be codified as CAL. PENAL CODE § 2932(a)(2)-(6)).

128. *Id.* (to be codified as CAL. PENAL CODE § 2932(a)(7)).

129. It is possible that an inmate's right to credit could be considered so closely related to his liberty that even more procedural safeguards may be necessary to meet the requirements of due process. *See, e.g.,* CAL. CONST. art. I, §§ 14-15 (specific constitutional due process protections for criminal trials). Since a person's freedom is restricted by a denial of good time almost as much as it is by a criminal conviction, full criminal trial protections may be required. However, since the procedures provided for

Every eight months the Department must recompute prison time to be served on the basis of good time earned and must notify each prisoner of his new release date. If credit denial proceedings or criminal prosecutions prevent release of a prisoner who otherwise would have been released, and he is subsequently found not guilty, the time spent incarcerated beyond the scheduled release date will be deducted from the prisoner's parole period.[130]

There were no good time provisions in the indeterminate sentence law. Each sentence could vary anywhere within the statutory minimum and maximum bounds. Procedural safeguards were not provided by law and were developed only on a case by case basis.[131]

Although the new determinate sentence law will probably be challenged in the courts on many procedural grounds, the safeguards that are built into the law will prevent serious abuses before the procedures can be tested. Moreover, the substantial documentation requirements will make review of any case much more complete and accurate.

## Parole

The last major procedural section of Senate Bill 42 deals with parole.[132] Parole is a required period of Department of Corrections supervision of an inmate after he is released from prison.[133] For all inmates serving determinate sentences and

---

the Bill are already quite detailed and protective of a prisoner's rights, additional safeguards should be imposed only if the courts find present procedures do not adequately protect those rights.

130.  *See* notes 133-43 and accompanying text *infra* (explanation of parole procedure under the Bill).

131.  The protections that were developed in the courts were often limited to very narrow facts, leaving other areas unprotected until the appropriate case reached the courts. For example, parole revocation and parole rescission procedures both involved the withdrawing of liberty, but due process procedures were extended to one proceeding long before they were extended to the other. Gee v. Brown, 14 Cal. 3d 571, 534 P.2d 716, 120 Cal. Rptr. 876 (1975); *In re* Prewith, 8 Cal. 3d 470, 503 P.2d 1326, 105 Cal. Rptr. 318 (1972). Also, the documentation required by Adult Authority procedures was inadequate, often limiting review to only the most glaring cases of abuse.

132.  1976 Cal. Legis. Serv., ch. 1139, § 278 *et seq.*, at 4826 (to be codified as CAL. PENAL CODE §§ 3000-65).

133.  To anyone familiar with present concepts of parole, the parole period provided by the Bill looks like an additional period of supervision, and possibly of incarceration if parole is revoked, after an individual's determinate sentence has been served. Such an additional penalty could present constitutional due process problems if viewed as an additional period of supervision and control without a trial and a conviction. However, since all determinate sentences have a one year parole provision

those serving indeterminate sentences less than life imprison-
ment, parole will be a period up to one year. Prisoners serving
indeterminate sentences with a life maximum will serve a pa-
role period up to three years. This parole can be waived by the
Community Release Board for good cause, and the inmate can
be released from custody immediately.

Major provisions of the Bill include specific guidelines for
every decision which must be made and procedural safeguards
to assure that each individual is treated fairly and equally and
has a right to some form of review.[134] The primary exception is
the parole waiver decision; no definition of good cause or fac-
tors to be considered are provided, nor is any procedure set up
for making and reviewing that decision.[135] The absence of
guidelines for this decision allows for disparity in its applica-
tion and will certainly lead to litigation even if the Community
Release Board adopts procedures paralleling other notice and
hearing procedures in the Bill.[136] The legislature should remedy
this defect by providing standards for making the parole waiver
decision, by requiring documentation of the reasons for the
decision, and by providing a review procedure.

The remainder of the parole provisions deal with the pa-
role release decisions for inmates still serving indeterminate
sentences under Senate Bill 42. Within the first year of incar-
ceration of such an inmate, a Community Release Board
panel[137] must meet with the inmate to review his file and make
recommendations.[138] Presumably these recommendations will
deal with the activities the inmate should engage in to assure

---

and since the defendant is warned at the sentencing hearing of the parole requirement
(*id.* § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170.1)), each term should be
viewed as the determinate sentence plus one year of parole. Since the parole period
cannot exceed the one year maximum (*id.* § 278, at 4826 (to be codified as CAL. PENAL
CODE § 3000(d)), even if there is a subsequent conviction for a felony committed while
on parole, courts will probably interpret this period simply as part of each sentence,
thereby avoiding due process problems.

134.  *See, e.g., id.* § 281.8, at 4827 (to be codified as CAL. PENAL CODE § 3041.5)
(procedural requirements for hearings to review parole eligibility or the setting, post-
poning or rescinding of parole dates or the evaluation of a prisoner's appeal of good
time denial).

135.  *See id.* § 278, at 4826 (to be codified as CAL. PENAL CODE § 3000).

136.  *See* note 130 *supra.* Some cases have already held that parole is a substan-
tial liberty. *See, e.g.,* Gagnon v. Scarpelli, 411 U.S. 778 (1973); Preston v. Piggman,
496 F.2d 270 (1974). If parole is a substantial liberty requiring due process protections,
surely the right to be free without parole is an even greater liberty entitled to at least
as much protection.

137.  1976 Cal. Legis. Serv., ch. 1139, § 296, at 4833 (to be codified as CAL. PENAL
CODE § 5076.1) (provides for doing business in panels).

138.  *Id.* § 281, at 4827 (to be codified as CAL. PENAL CODE § 3041(a)).

early release, similar to the conditions for granting good time credit for a prisoner with a determinate sentence.[139]

One year prior to the inmate's minimum eligible parole release date,[140] a Community Release Board panel will meet with the inmate and will set his parole release date. These dates must be set in a manner that will provide uniform sentences for similar offenses.[141] The Judicial Council is authorized to provide rules for the Board which will help promote uniformity.

Subdivision (b) of section 3041 gives the Community Release Board authority to consider the protection of society by refusing to set a parole release date if public safety so requires. That subdivision makes reference to the "timing" of current or past offenses as a factor which makes a more lengthy period of incarceration necessary. Timing is not defined.[142]

## Conclusions

Senate Bill 42 eliminates most of the problems of the indeterminate sentence while creating few of its own. It clearly defines the purpose of sentencing and imposes numerous requirements to assure that that purpose is met. Although the resulting sentences can be questioned as too short for the adequate protection of society,[143] the scheme of varied levels of

---

139. *See* notes 118-20 and accompanying text *supra.* For the information of the Community Release Board and the protecton of the inmate, these recommendations should be carefully documented and included in the inmate's file. Though these recommendations will be more easily modified than conditions for granting good time credit because of the indeterminate features of the inmate's term, careful documentation will prevent the Board from making contradictory recommendations each time it meets with the inmate and will allow the inmate to question changes in recommendations.

140. *See* notes 41-42 and accompanying text *supra* (definition of parole release date).

141. Uniformity was not a primary goal of the indeterminate sentence procedures. *See* C.D. 75/20, *supra* note 8.

142. The only interpretation this author can imagine for the use of that word is that the Community Release Board may consider whether there has been a rash of crimes similar to the inmate's immediately prior to his release and whether the public outcry at the release of such a prisoner would be too great to allow release. It does not seem rational to postpone an individual's release because of the crimes of others. If this interpretation of timing is correct, its use is certainly subject to challenge on due process grounds.

143. Such a decision is purely a policy decision and should be made by the legislature and not an administrative board. Under the indeterminate sentence system this decision was made on a case-by-case basis and the result was disparity. The Adult Authority's approach to the protection of society was expressed in a policy statement:

Felons committed to prison should be kept until there is reasonable cause to believe they can lead crime-free lives in society. Doubt should be

Case 2:09-cv-00612-JAM-TJB   Document 12   Filed 09/22/09   Page 182 of 208

seriousness and proportionate levels of sentencing is consistent with the punishment rationale. If additional punishment or greater protection of society is deemed necessary, individual sentences or the entire system can be skewed upward by adding years or months to the sentences without increasing the disparity of the system or upsetting the goal of proportionality.

Determinate sentencing, when combined with the goal of uniformity in sentencing crimes of similar gravity, eliminates the disparity of sentences under an indeterminate sentencing system. Merely having punishment as a purpose, a goal which can be achieved, goes a long way toward improving the sentencing system. The procedural safeguards of careful documentation, and adequate notice, hearing and review for every major decision involving the inmate, erase the additional problems of arbitrariness and insulation from review with which the indeterminate sentencing system was plagued. Finally, this determinate sentencing system provides short enough sentences so that even a supposedly rehabilitated individual who cannot be detected need not serve very long.

The frustration of the indeterminate sentence system has been eloquently expressed by Judge Marvin Frankel:

> The sentence purportedly tailored to the cherished needs of the individual turns out to be a crude order for simple warehousing. . . .
>
> . . . In a host of cases, then, when somebody says a prisoner must stay locked up because he is not "ready" for release, the ultimate Kafkaism is the lack of any definition of "ready."[144]

With a determinate sentencing system that frustration should be at an end.

*Paula A. Johnson*

---

resolved in favor of public protection. Prisoners who make a career of criminal behavior forfeit their right to be treated leniently.

. . . .

Violent, dangerous criminals and those who make a career of stealing other persons' property will be confined until there is adequate assurance they have been reformed.

Adult Authority Policy Statement No. 24 [on file at Santa Clara L. Rev.].

144.  Frankel, *supra* note 5, at 93.

*Appendix A*

SUGGESTED BASE RANGES FOR SENTENCES*

| Offense | Typical (in months) | Aggravated (in months) |
|---|---|---|
| Murder 1st | 96-156 | |
| Murder 2nd | 42-66 | |
| Manslaughter | | |
|   Voluntary | 36-46 | |
|   Involuntary | 24-32 | |
|   Vehicle | 18-24 | |
| Robbery 1st | 30-38 | 36-44 |
| Robbery 2nd | 22-30 | 28-36 |
| Arson | 18-30 | 30-42 |
| Assault | 24-32 | 30-38 |
| Burglary 1st | 24-30 | 28-34 |
| Burglary 2nd | 16-22 | 20-29 |
| Theft | 16-22 | 20-28 |
| Grand theft | 22-28 | 26-34 |
| Sexual crimes | 30-60 | |
| Unlawful sexual intercourse | 12-30 | |
| Controlled substances (heroin; opium and its derivatives; hallucinogens) | | |
|   Possession | 26-36 | |
|   Possession for sale | 34-42 | |
|   Sale | 38-48 | |
| Controlled substances (marijuana and dangerous drugs) | | |
|   Possession | 18-32 | |
|   Possession for sale | 28-38 | |
|   Sale | 36-44 | |
| Bribery | 12-24 | |
| Prisoner with weapon | 9-18 | 18-36 |
| Escape | 6-18 | 16-22 |
| Ex-felon in possession weapon | 9-18 | 18-30 |
|   Sale or mfg. weapon | 9-18 | 18-36 |
| Parole violation | 0-9 | 9-18 |

SUGGESTED ADJUSTMENT RANGES*

| Prior Prison Terms | Sentencing Status | Subsequent Offenses |
|---|---|---|
| Less serious (each) + (3-9) mos. | Youthful Offender – (6-18) mos. | Court convictions (each) + (12-24) mos. |
| More serious (each) + (9-24) mos. | Concurrent sentence (each) + (3-12) mos. | Disciplinary |
| | |   Less serious + (3-9) mos. |
| | Consecutive sentence (each) + (12-24) mos. |   More serious + (9-18) mos. |
| | Prior felony convictions pled and proven (each) + (0-9) mos. | |

*Derived from tables in C.D. 75/20, *supra* note 8.

*Appendix B*

COMPARATIVE SENTENCES FOR SELECTED OFFENSES UNDER S.B. 42
AND INDETERMINATE SENTENCING SYSTEMS

| Penalty Under S.B. 42 | Offense | Penalty Under Indeterminate Sentencing |
|---|---|---|
| 16 months, 2 years or 3 years | Accessory | 6 months to 5 years |
| | Misprison of treason | 6 months to 5 years |
| | Threatening public official to deter from duties | 6 months to 5 years |
| | Defrauding government | 6 months to 5 years |
| | Corrupt influencing of jurors | 6 months to 5 years |
| | Escape from reformatory | 6 months to 10 years |
| | False report of secretion of explosive | 6 months to 3 years |
| | Assault by public officer | 6 months to 5 years |
| | Assault with attempt to commit felony except murder | 6 months to 15 years |
| | Child/wife beating | 6 months to 10 years |
| | Bigamy | 6 months to 10 years |
| | Indecent exposure, 2d conviction | 1 year to life |
| | Burglary 2d | 1 year to 15 years |
| | Forgery | 1 year to 14 years |
| | Receiving stolen property | 6 months to 10 years |
| | Wiretapping | 6 months to 3 years |
| 2, 3 or 4 years | Bribing executive officer | 1 year to 14 years |
| | Perjury | 1 year to 14 years |
| | Manslaughter | 6 months to 15 years |
| | Mayhem | 6 months to 14 years |
| | Robbery 1st | 5 years to life |
| | Robbery 2nd | 1 year to life |
| | Poisoning with intent to kill | 10 years to life |
| | Assault with intent to murder | 1 year to 14 years |
| | Assault with intent to commit rape, sodomy, mayhem, robbery, grand larceny | 1 year to 20 years |
| | Dueling resulting in death | 1 year to 7 years |
| | Battery with serious bodily injury | 6 months to 5 years |
| | Assault with caustic chemical | 1 year to 14 years |
| | Assault with deadly weapon | 6 months to life |
| | Pimping | 1 year to 10 years |
| | Child stealing | 6 months to 20 years |
| | Sodomy with force | 6 months to 5 years |
| | Lynching | 6 months to 20 years |
| | Arson, not dwelling house | 2 years to 20 years |
| | Burglary 1st | 5 years to life |
| | Counterfeiting | 1 year to 14 years |
| | Grand theft | 6 months to 10 years |
| | Extortion | 1 year to 10 years |

| 3, 4 or 5 years | Kidnapping | 1 year to 25 years |
| | Robbery of transportation operator | 5 years to life |
| | Attempt to kill President | 10 years to life |
| | Assault with a deadly weapon on a peace officer | 6 months to 15 years |
| | Rape | 3 years to life |
| | Sodomy against will of victim | 5 years to life |
| | Child molesting | 1 year to life |
| | Arson during emergency | 5 years to life |
| | Burglary with explosive | 10 years to 40 years |
| | Prisoner holding hostage in prison | 5 years to life |
| 5, 6 or 7 years | Murder 2d | 5 years to life |
| | Rape with force or violence | 5 years to life |
| life imprisonment—no special circumstances | Murder 1st | life, special circumstances |
| | Kidnapping resulting in death of victim | capital punishment life with or without possibility of parole |

**EQUAL I**
**DIMENS**
**THE RIG**

The pu
tal right to
participatio
that right m
work of equ
ment will ex
dimensions
equal prote
suggest a th
flexible and

*The Two Tie*

The Cou
apply to a le
mum scrutin
Court that t
"fundamenta
struck down,
test. Otherwi
test which r
some legitim
lative schem
Under t

1. The Cou
constitutionally p
to participate in
State has adopted
of the state's popu
1, 35 n.78 (1973).
The Court's
does not review r
ment will use the
to express the Co
2. Mr. Jus
fourteenth amend
fundamental rig
voided only if it
under the due pr
381 U.S. 479, 500

APPENDIX II

APPENDIX II

APPENDIX II

APPENDIX II

APPENDIX II

APPENDIX II

# DIAGRAM AND PHYSICAL EVIDENCE SHEET

| | REPORT NUMBER |
|---|---|
| | 02-10546 |

CLASS. 245 PC

IM VUE, FONG          LOCATION 3212 WESTERN AV

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = N/A )



DIAGRAM 6

LOCATION
OF
EVIDENCE ITEMS
#1 THRU #20

LEGEND

1) CLOTHING WITH POSSIBLE BLOOD
2) POSSIBLE BLOOD SAMPLE
3) SHOTGUN PELLETS IN THE GARAGE DOOR (NOT MEASURED)
4) WAD FROM EXPENDED SHOTGUN SHELL (UNDER VEHICLE)
5) POSSIBLE BLOOD SAMPLE FROM CORNER OF VEHICLE (NOT MEASURED)
6) PLASTIC SODA BOTTLE ON TOP OF VEHICLE (NOT MEASURED)
7) CLOTHING
8) KNIT HAT
9) WAD FROM EXPENDED SHOTGUN SHELL
10) SHOTGUN PELLETS ON THE GARAGE FLOOR (NOT MEASURED)
11) POSSIBLE BLOOD SAMPLE
12) LATEX GLOVES WITH POSSIBLE BLOOD (IN TRASH CAN)
13) JACKET WITH POSSIBLE BLOOD
14) FLASHLIGHT
15) POSSIBLE BLOOD SAMPLE
16) COPPER COLORED EXPENDED BULLET JACKET FRAGMENT
17) PAPER TOWEL WITH POSSIBLE BLOOD
18) POSSIBLE BLOOD SAMPLE
19) COPPER COLORED EXPENDED BULLET
20) PIECE OF GLASS (UNDER THE BOAT/TRAILER)

| PREPARED BY | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
|---|---|---|---|---|---|---|
| DO. | 6382 | CSI | 97 | 3 | 02/04/02 | |
| ASSISTING OFFICER | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| V. CIARNELLI | 8374 | CSI | 97 | 1 | 02/04/02 | |
| RECEIVED BY | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| | 6763 | CSI | 97 | 11 | | |

SACRAMENTO POLICE DEPARTMENT
## DIAGRAM AND PHYSICAL EVIDENCE SHEET

| REPORT NUMBER |
| --- |
| 02-10546 |

CLASS  245 PC

VICTIM  VUE, FONG        LOCATION  3212 WESTERN AV

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED  (SCALE = N/A  )



DIAGRAM 7

MEASUREMENTS
OF EVIDENCE ITEMS
#1 THRU #13 AND #19,#20
SOUTH OF THE NORTH
LAMP POST

LEGEND

1) CLOTHING WITH POSSIBLE BLOOD
2) POSSIBLE BLOOD SAMPLE
3) SHOTGUN PELLETS IN THE GARAGE DOOR (NOT MEASURED)
4) WAD FROM EXPENDED SHOTGUN SHELL (UNDER VEHICLE)
5) POSSIBLE BLOOD SAMPLE FROM CORNER OF VEHICLE (NOT MEASURED)
6) PLASTIC SODA BOTTLE ON TOP OF VEHICLE (NOT MEASURED)
7) CLOTHING
8) KNIT HAT
9) WAD FROM EXPENDED SHOTGUN SHELL
10) SHOTGUN PELLETS ON THE GARAGE FLOOR (NOT MEASURED)
11) POSSIBLE BLOOD SAMPLE
12) LATEX GLOVES WITH POSSIBLE BLOOD (IN TRASH CAN)
13) JACKET WITH POSSIBLE BLOOD
19) COPPER COLORED EXPENDED BULLET
20) PIECE OF GLASS (UNDER THE BOAT/TRAILER)

| PREPARED BY | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| --- | --- | --- | --- | --- | --- | --- |
| WOO | 6382 | CSI | 97 | 3 | 02/04/02 | |
| ASSISTING OFFICER | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| V. CIARNELLI | 6374 | CSI | 97 | 1 | 02/04/02 | |
| RECEIVED BY  A. Schick | BADGE #  6363 | UNIT | DIV | YRS OF SERVICE  11 | DATE  2-21-02 | TIME |

SPD 141 (REV 8/00)

-PETITIONER'S DRAWN DIAGRAM #2
OF THE SCENE AT WESTERN AVENUE-



North

West          •          East

South

W
E
S
T
E
R
N

A
V
E
•

A= park vehicle
B= Park vehicle
C= park vehicle
D= park boat
E= park vehicle
F= park vehicle
G= park vehicle
I= Toyota Camry(SUSPECT VEHICLE)
J= approximately the location
   where "victim" was
K= location where pellets
   lodged into garage

I

A

B

D

E

F

J
g
a
r
a
g
e
J

K

3212

g
a
r
a
g
e

3210

g
a
r
a
g
e

3208

S
I
D
E
W
A
L
K

C

3206

The evidence indicate that there was a .38 caliber weapon being fired;in which
lodged into the residence of 3225, located north across the street from 3212 Western.
(4 RT 1106)- There was shotgun pellets inside the garage in the sheetrock located on
the south-east garage of 3212.(2 RT 354)- The location of the pellets in the garage
of 3212 is consistent with shotgun being fired within the vehicle after vehicle passes
3212. Please note that it is impossible for the right rear passenger window to have
been hit with a bullet after it past 3212; for the driver and left passenger window
was up and there was no indication of any bullet entering the vehicle from the
right side at this point.- This diagram #2 depicts the location where the Toyota
Camry was when gun fire was exchange according to the evidence just mention above.

-PETITIONER'S DRAWN DIAGRAM- #1
OF THE SCENE AT WESTERN AVENUE-



A= park vehicle
B= park vehicle
C= park vehicle
D= park boat
E= park vehicle
F= park vehicle
G= park vehicle
I= Toyota Camry
   (SUSPECT VEHICLE)
J= approximately the location
   where "victim" was -

This diagram #1 depicts the first shot fired by the people outside that penetrated the rear right passenger window and exit the back window. At this point there is no evidence of occupants in the vehicle returning gunshot. Please note that Detective did not cross the street of 3212 to investigate.(1 RT 125)-

**APPENDIX III**

**APPENDIX III**

**APPENDIX III**

**APPENDIX III**

**APPENDIX III**

**APPENDIX III**

Ct the Copy

(er X-ref -3670886
Jail 651 J street
814   5E-210





Paul R. Irish
2001 S Street
Sac. Ca. 95814

95814+6815   |..|...|.|.||..||.|.|.||..||.|.|.|.|....|||.|.||....|||.|.|

Paul Irish:                                          April 7, 2005

I just wrote you a letter before this one,
but this time I am asking you to raise my speedy
trial Right. That is I want a Speedy Trial. And
would like to go to trial as soon as possible.
                            Thank You!!

P. S. Could you also send me
a copy of this with something
to verify that you've Received          Sincerely,
My  Request.                                    Kinson Her

**APPENDIX IV**

**APPENDIX IV**

**APPENDIX IV**

**APPENDIX IV**

**APPENDIX IV**

...LDO H. "Wally" DAMERELL
P.O. Box 733
Rancho Murieta, CA 95683

DATE  :  May 3, 2004       CASE  :  People vs
                                                          Kinson HER

FOR    :  Paul Irish, Attorney at Law

FROM  :  Wally Damerell, Investigator .  CASE # :  02F01534

INTERVIEW/STATEMENT OF MICHAEL CAMACHO ON MAY 3, 2004

CONTACT  :  Michael CAMACHO
                          Sacramento County Juvenile Hall
                          Unit J-2

This witness had been identified by the defendant as one who could testify that he had been privy to a conversation between juvenile hall residents at the Sacramento County Courthouse in which one had told of being present at the murder site on Western Avenue when the fatal shooting occurred which resulted in the defendant's subsequent arrest. He indicated the witness could testify that he was not present and that the car involved in the shooting was not the dark colored one as alleged in the official reports.

The witness was interviewed this date at the Juvenile Hall. He is seventeen years old and can be identified by his birth date of July 27, 1986. He has been convicted of ADW and, following the California Youth Authority's refusal to accept him as a Ward, has been committed to the State Department of Corrections. He stated that he is currently waiting to be transfered to the Tehachipi Prison's (California Correctional Institution) Reception Center.

He stated that he and his cousin, Angel CAMACHO were at the Sacramento County Courthouse earlier this year and he had been present when a resident of Unit J-1 at the Juvenile Hall named VANG, first name not recalled, were conversing. VANG had stated that he was present the night of the shooting incident on Western Avenue in 2002 when the murder occurred that the defendant is charged with, and then described what had happened.

VANG reportedly told Angel CAMACHO that the shooters had been in a white car, not the dark car alleged in this case. It had cruised down Western Avenue past the shooting site, and then turned around and drove back.

Page Two      People vs Kinson HER      Michael Camacho Statement

The witness told of VANG's description of the white car, stating that he was not able to recall whether it had been described as a car or as a truck, but that he now assumes it had been a car because he could not imagine a truck being used for a drive by shooting.

In any case, the white vehicle, according the witness's description of what VANG had said, drove back to the shooting site and shooter(s) inside the car opened fire, and then continued to drive on.

VANG's description followed by his telling of the gunfire that was returned by those that had been shot at, with shots fired at the white vehicle by the time it had reached the stop sign further up the street from where the victims had been shot.

He was asked if VANG had said anything about recognizing any of the occupants inside the white vehicle. The witness responded by saying that our defendant, Kinson HER, had been the only passenger he recognized inside the vehicle. He had not said anything about seeing the defendant doing the actual firing, nor had he identified anyone else.

With respect to the common name of VANG and attempts to better identify that Juvenile Hall resident, the witness stated that he did not know what type of crime VANG was in custody for, but noted that to his knowledge he was the only resident in J-1 with that last name.

The witness was thanked for his willingness to speak with the undersigned, and for his willingness to reveal the information that he had. With that the interview was concluded and the witness was returned to his housing unit.

Respectfully submitted,

Waldo H. Damerell
Defense Investigator

APPENDIX V

APPENDIX V

APPENDIX V

APPENDIX V

APPENDIX V

APPENDIX V

## SUPERIOR COURT OF CALIFORNIA
## COUNTY OF SACRAMENTO

| | | | |
|---|---|---|---|
| DATE/TIME | : March 2, 2009 | DEPT. NO | : 10 |
| JUDGE | : GRETA C. FALL | CLERK | : R. ZAWODNY |
| REPORTER | : NONE | BAILIFF | : NONE |

PEOPLE OF THE STATE OF CALFORNIA,
     Plaintiff,

VS.          Case No.: 09F00819 & 09F00415

KINSON HER,
     Defendant.

**Nature of Proceedings:**      **PETITION FOR WRIT OF HABEAS CORPUS - ORDER**

The petitions for writ of habeas corpus have been filed and considered.

IT IS ORDERED that the petitions for writ of habeas corpus are **DENIED**.

Petitioner, incarcerated at Pelican Bay State Prison·in Crescent City, California, for a judgment of conviction from Sacramento County Superior Court Case No. 02F01534, has filed two habeas corpus petitions concerning that judgment.

The first petition filed, Case No. 09F00415, is actually a request for exhibits and transcripts from the case, which did not need to be requested via habeas corpus. As such, the second petition, Case No. 09F00819, which attacks the judgment in Case No. 02F01534, will not be deemed to be successive.

In the petition filed in Case No. 09F00819, petitioner seeks habeas corpus relief from the judgment in Case No. 02F01534.

Petitioner first claims that the evidence was insufficient to convict him of murder and attempted murder based on a direct theory of liability or as an aider and abettor.

The claim was raised and rejected on appeal, where the Third District Court of Appeal found the evidence sufficient to show that petitioner participated in the drive-by shooting and that he personally discharged a firearm in the commission of the offenses.

A claim is procedurally barred on state habeas corpus when the claim was raised and rejected on appeal (In re Waltreus (1965) 62 Cal.2d 218, reaffirmed in In re Harris (1993) 5 Cal.4th 813, 829). The only exceptions to this procedural bar are: (1) if the claim is based on constitutional error that is both clear and fundamental, and that strikes at the heart of the trial process; (2) if the claim is now couched in ineffective

| | | |
|---|---|---|
| BOOK | : 10 | **Superior Court of California,** |
| DATE | : MARCH 2, 2009 | **County of Sacramento** |
| CASE NO. | : 09F00819 & 09F00415 | |
| CASE TITLE | : PEOPLE v. KINSON HER | BY:   R. ZAWODNY, |
| | | Deputy Clerk |

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                                      **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
**PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER**

assistance of counsel terms; (3) if the court lacked fundamental jurisdiction over the petitioner or the subject matter; (4) if the court acted in excess of its jurisdiction and the issue is strictly a legal one not requiring a redetermination of the facts underlying the claim; (5) there has been a change in the law affecting the petitioner (Harris, supra, 5 Cal.4th 813, 834, 834 fn. 8, 836, 840-841, 841); or (6) if the claim is that the sentence is unauthorized, as an unauthorized sentence may be corrected at any time (People v. Welch (1993) 5 Cal.4th 228; Harris, supra, 5 Cal.4th 813, 842; People v. Serrato (1973) 9 Cal.3d 753, 763, overruled on other grounds in People v. Fosselman (1983) 33 Cal.3d 572, 583 fn. 1). Petitioner does not show that this claim qualifies for any of these exceptions. As such, the claim is barred.

Petitioner next claims that the evidence was insufficient to support the gun enhancements on all counts.

The claim was raised and rejected on appeal, where the Third District Court of Appeal found the evidence sufficient to show that petitioner participated in the drive-by shooting and that he personally discharged a firearm in the commission of the offenses. As such, it is barred under Waltreus.

Petitioner next claims that the evidence was insufficient to support the gang enhancements on all counts.

The claim was raised and rejected on appeal, where the Third District Court of Appeal found the evidence sufficient to show the gang enhancements. As such, it is barred under Waltreus.

Petitioner next claims that the trial court erred in failing to order a competency hearing under Penal Code § 1368, and that appellate counsel was ineffective in failing to raise the issue on appeal. He claims that because he did not finish junior or senior high school and was only 15 years old at the time of the crime that he was mentally retarded and incompetent to stand trial.

Not finishing school does not evidence mental retardation. Nor does mental retardation, standing alone, necessarily mean that a defendant is incompetent to stand trial. Rather, to be incompetent to stand trial, it must be shown that a criminal defendant, as a result of mental disorder or developmental disability, is unable to understand the nature of the criminal proceedings or to assist counsel in the conduct of a defense in a rational manner (Penal Code § 1367).

Petitioner fails to make such an allegation, nor does he show that he was in fact incompetent to stand trial by reasonably available documentary evidence or affidavits, requiring denial of the claim (In re Swain (1949) 34 Cal.2d 300; In re Harris (1993) 5 Cal.4th 813, 827 fn. 5).

Petitioner next claims that on July 11, 2005, he was having a personal conflict with his defense counsel and wrote the court a letter asking for a hearing on the conflict, but that the court would not accept or construe the letter as a motion under People v. Marsden (1970) 2 Cal.3d 118. He claims error under Marsden, and that appellate counsel was ineffective in failing to raise the issue on appeal.

| BOOK | : 10 |
| DATE | : MARCH 2, 2009 |
| CASE NO. | : 09F00819 & 09F00415 |
| CASE TITLE | : PEOPLE v. KINSON HER |

**Superior Court of California,**
**County of Sacramento**

BY:    **R. ZAWODNY,**
          **Deputy Clerk**

**Page 2 of 8**

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                                                        **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
**PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER**

Petitioner, however, fails to attach a copy of the letter to the instant petition, or of any relevant reporter's transcript on the matter. The court's underlying file for Case No. 02F01534 does not appear to contain the letter nor does it contain a transcript, although it contains a brief minute order entry for July 11, 2005 that "[o]utside the presence of the jury and the other parties, the Court heard from [defense counsel] and [petitioner] regarding a letter written to the Court. [Petitioner] wrote a letter to the Court regarding motions and his relationship with [defense counsel.] The Court indicated that it would not accept motions that were not filed by the attorneys and that [defense counsel] would be representing [petitioner.]" The court's underlying file also contains a sealed envelope in which petitioner's motion to dismiss, that the court declined to file on August 4, 2005; that motion, discussed more fully below regarding another claim, did not include any Marsden request, nor is there any letter attached to the motion to dismiss.

Without a copy of the actual letter, the claim cannot be assessed by this court to determine whether the letter or the discussion of it in court gave rise to any Marsden motion that was not considered. What is contained in the sealed envelope, as noted above, contains no Marsden mention. As such, the claim is denied (Harris, supra).

Petitioner next claims that the trial court erred in denying his motion for an interpreter at trial, and that appellate counsel was ineffective in failing to raise the issue on appeal.

Again, however, petitioner fails to attach any reasonably available documentary evidence to show that he did not fully understand English at the time of trial. Nor does he attach a copy of the reporter's transcript of the court's denial of the motion for an interpreter. As such, the claim fails under Swain and Harris.

Petitioner next claims that the trial court abused its discretion in admitting at trial petitioner's statement given to Detective Keller.

The claim was raised and rejected on appeal, and petitioner fails to show any exception to the Waltreus bar to the claim.

Petitioner next claims that the trial court erred in denying his motion to exclude any opinion that the bandana was used in a fashion to cover someone's face or any nature thereof, and that appellate counsel was ineffective in failing to raise the issue on appeal.

Petitioner fails to attach reporter's transcript of the court's denial of the motion, thus the court cannot assess the claim. Nor does petitioner make a prima facie showing that the ruling was erroneous, or that the admission of the opinion was prejudicial. As such, the claim fails under Swain, Harris, and In re Bower (1985) 38 Cal.3d 865.

Petitioner next claims that defense counsel was ineffective in misspeaking during closing argument that the projectile was never "fired," which counsel after a moment corrected as being "recovered," and that appellate counsel was ineffective in failing to raise the issue on appeal.

| | | |
|---|---|---|
| **BOOK** | **: 10** | **Superior Court of California,** |
| **DATE** | **: MARCH 2, 2009** | **County of Sacramento** |
| **CASE NO.** | **: 09F00819 & 09F00415** | |
| **CASE TITLE** | **: PEOPLE v. KINSON HER** | **BY:   R. ZAWODNY,** |
| | | **Deputy Clerk** |

**Page 3 of 8**

**CASE NUMBER: 09F00819**                                   **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
**PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER**

Petitioner fails to attach the reporter's transcript evidencing the matter.  Regardless, it is clear that counsel misspoke and immediately corrected himself, thereby dissipating any prejudice. The claim simply fails as it had no possibility of being prejudicial and was clearly a harmless mistake.

Petitioner next claims that the trial court erred in denying petitioner's motion to bifurcate the gang enhancements, and that appellate counsel was ineffective in failing to raise the issue on appeal.

Petitioner fails to attach the reporter's transcript of the court denying the motion. Regardless, the claims fails, as the crimes were clearly gang-related and gang evidence was going to be admitted on the substantive charges regardless of whether the gang enhancements were bifurcated.  As such, the claim fails under Harris and Bower.

Petitioner next claims that defense trial counsel was ineffective in fully investigating a witness named Vang who purportedly had told a cousin of Michael Camacho that Vang had witnessed the shooting and had seen petitioner in a white vehicle and not in the blue Toyota Camry.

Petitioner, however, fails to now present Vang as a witness and show through affidavit that Vang would have testified, had he been called, that petitioner was not in the car involved in the drive-by shooting.  Without such an affidavit, petitioner's claim, based on multiple levels of hearsay only, fails.  Nor does petitioner show that the error was prejudicial, as the evidence against him and that he was in fact present in the car from which the shots were fired was strong.

Petitioner next claims that the trial court erred in denying petitioner's motion for mistrial made on July 12, 2005, based on questions posed during voir dire by the prosecutor, and that appellate counsel was ineffective in failing to raise the issue on appeal.

Petitioner fails to attach reporter's transcript of the denial of the motion, nor does petitioner set forth the claim with sufficient particularity.  As such, the court cannot assess the claim and denial is required under Swain and Harris.

Petitioner next claims that the trial court erred in failing to claim a mistrial on July 20, 2005, after prosecution witness Detective Stigerts communicated to a juror, that defense trial counsel was ineffective in failing to move for a mistrial, that the prosecution committed misconduct in allowing Stigerts to communicate with the jurors, and that appellate counsel was ineffective in failing to raise these issues on appeal.

Petitioner fails to attach reporter's transcript of the matter, nor does petitioner set forth the claim with sufficient particularity.  As such, the court cannot assess these claims and denial is required under Swain and Harris.

Petitioner next claims that defense trial counsel was ineffective in failing to present an expert witness to testify on his behalf.

| | | |
|---|---|---|
| **BOOK** | **: 10** | **Superior Court of California,** |
| **DATE** | **: MARCH 2, 2009** | **County of Sacramento** |
| **CASE NO.** | **: 09F00819 & 09F00415** | |
| **CASE TITLE** | **: PEOPLE v. KINSON HER** | **BY:   R. ZAWODNY,** |
| | | **Deputy Clerk** |

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                                              **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
PROCEEDINGS:  PETITION FOR WRIT OF HABEAS CORPUS – ORDER

Petitioner fails to attach reasonably available documentary evidence such as an affidavit from an expert setting forth what testimony the expert would have given at trial that would have been reasonably likely to have made a difference in the outcome of the trial.  As such, the claim fails under Swain and Harris.

Petitioner next claims that defense trial counsel was ineffective in failing to object to gang expert Lee's opinion that the drive-by shooting was committed for the benefit of the gang, because the hypothetical question was not rooted from the facts shown by the evidence.  Petitioner notes that defense trial counsel's failure resulted in a waiver of the issue on appeal, as determined by the Third District in the appeal.

Petitioner fails to note, however, that petitioner's girlfriend Ly testified at trial that petitioner represented himself to be a member of the MOD gang, that the expert testified that petitioner had been a validated member of a subset of that gang since 2000, and that other evidence showed that the victims were members of a rival gang and that petitioner and his accomplices had driven into territory well known to be that of the rival gang and committed the drive-by shooting.  These were sufficient facts upon which to base the opinion that the shooting was for the benefit of the gang.  As such, any objection to the opinion would have been denied, had one been made, and defense trial counsel was not ineffective in failing to make the objection (see Strickland v. Washington (1984) 466 U.S. 668).

Petitioner next claims that it was error to instruct with CALJIC No. 1.00 and its "more likely to be guilty than not guilty" language, which he claims lessened the prosecutor's burden of proof, and that appellate counsel was ineffective in failing to raise the issue on appeal.

A similar argument was recently rejected in People v. Brasure (2008) 42 Cal.4th 1037, 1059, as courts also instruct with the reasonable doubt instruction, which in petitioner's case was CALJIC No. 2.90, and jurors are not reasonably likely to draw a conclusion, from the bits of CALJIC No. 1.00 or other instructions, that overrides the direction in that reasonable doubt instruction.  As such, the claim fails.

Petitioner next claims that it was error to deny petitioner's motion to rewrite CALJIC No. 2.90 to delete the "abiding conviction" language, and that appellate counsel was ineffective in failing to raise the issue on appeal.

The use of the "abiding conviction" language in the reasonable doubt instruction has long been upheld by the courts, including the United States Supreme Court (see Victor v. Nebraska (1994) 511 U.S. 1; People v. Campos (2007) 156 Cal.App.4th 1228).  The claim therefore fails.

Petitioner next claims that it was error to give CALJIC No. 5.17, because the revised language in that instruction is cast in objective terms and takes no account of petitioner's subjective belief, and that appellate counsel was ineffective in failing to raise the issue on appeal.

CALJIC No. 5.17, however, is not cast in objective terms.  Rather, the revised instruction as given at trial instructed on "the actual but unreasonable belief in the necessity to defend against imminent peril," "even though a reasonable person in the same situation seeing and knowing the same facts would not have had the

| | | |
|---|---|---|
| **BOOK** | **: 10** | **Superior Court of California,** |
| **DATE** | **: MARCH 2, 2009** | **County of Sacramento** |
| **CASE NO.** | **: 09F00819 & 09F00415** | |
| **CASE TITLE** | **: PEOPLE v. KINSON HER** | **BY:   R. ZAWODNY,** |
| | | **Deputy Clerk** |

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                                    **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
**PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER**

same belief," when the peril is one that "is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer." That is subjective, not objective, thus the claim is denied.

Petitioner next claims that it was error to give CALJIC Nos. 2.03, 2.06, 2.51, and 2.52 on consciousness of guilt and motive, as these instructions were argumentative and rendered the trial fundamentally unfair.

Petitioner cites no case law that has disapproved of these instructions, nor does petitioner state with particularity how any of these instructions is erroneous. As such, petitioner fails to set forth a prima facie case for relief, requiring denial under Bower.

Petitioner next claims that on August 4, 2005, he "filed" a "995" motion and the court "erred in denying" it. He attaches a copy of a part of the motion, and has changed the dates of its signing to 2009 instead of 2005 in the copy attached to the petition; this part, contained with the remainder of the motion in a sealed envelope in the court's underlying file, as noted above, claims that he cannot be prosecuted for murder because the punishment for murder cannot be a life sentence since the passage of the Determinate Sentencing Law. Petitioner attempts to repeat only this part of the motion, in this habeas petition.

The motion was never accepted for filing by the court. Petitioner does not show that was error, as petitioner was represented by counsel at the time, and only his counsel could make a motion on his behalf at that time (see McGee v. Superior Court (1973) 34 Cal.App.3d 201, 213, disapproved on other grounds in People v. Norris (1985) 40 Cal.3d 51, 56).

Nor would this part of the motion have been granted if it had been entertained, as the motion is completely baseless. Petitioner was not charged with a murder committed before 1978; rather, petitioner was charged with and convicted of crimes committed in 2002, long after the Determinate Sentencing Law was enacted. Regardless, at all times, both before and after the Determinate Sentencing Law was enacted, murder continued to punishable by 25-years-to-life. The Determinate Sentencing Law had no effect on punishment for murder, and had no effect on Penal Code §§ 187, 189, or 190.

Petitioner, in a related claim, claims that he should be subject to a determinate sentencing triad for murder.

This is an incorrect statement of the law. Non-capital murder, at the time of the commission of the crimes as well as before and after that time, is punishable under Penal Code § 190 by a life sentence.

Finally, petitioner claims that the cumulative errors are prejudicial and require reversal of the judgment.

Petitioner has shown no error, and reversal is not required.

The petition in Case No. 09F00819, therefore, is **denied**.

| | | |
|---|---|---|
| **BOOK** | : **10** | **Superior Court of California,** |
| **DATE** | : **MARCH 2, 2009** | **County of Sacramento** |
| **CASE NO.** | : **09F00819 & 09F00415** | |
| **CASE TITLE** | : **PEOPLE v. KINSON HER** | **BY:   R. ZAWODNY,** |
| | | **Deputy Clerk** |

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                                           **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
<u>PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER</u>

In Case No. 09F00415, petitioner requests release of the trial exhibit evidence pursuant to Penal Code § 1417.5, and a copy of his sealed Penal Code § 995 motion.

Petitioner claims that he needs these items for purposes of his federal habeas corpus petition that he intends to file in the United States District Court, Eastern District of California. He fails to state, however, the relevancy of these items to the claims he intends to bring in that habeas petition.

Regardless, the exhibits are no longer in this court's possession. Rather, on August 29, 2008, petitioner's trial counsel authorized destruction of the exhibits. Then, on September 19, 2008, the court ordered that all exhibits in the case be transferred to the Sacramento City Police Department, and the exhibits were so transferred on October 28, 2008. As such, there are no exhibits in this court's possession that the court could allow access to.

As for the sealed Penal Code § 995 motion, petitioner fails to show a need for it. As a general matter, an indigent defendant is constitutionally entitled to a free transcript of a prior criminal case only when the transcript is needed for an effective defense or appeal (<u>Britt v. North Carolina</u> (1971) 404 U.S. 226, 227), which has been concluded for petitioner, or when the transcript is needed for a habeas corpus action to challenge a conviction when a specific need is affirmatively shown (<u>Miller v. Hamm</u> (1970) 9 Cal.App.3d 860, 871; <u>McGarry v. Fogliani</u> (9th Cir. 1966) 370 F.2d 42, 44). Petitioner, however, does not explain how anything in his Penal Code § 995 motion, that was not accepted for filing at the time of trial, relates to any claim he intends to raise in his federal habeas corpus petition.

Nor is it clear that petitioner in fact is missing a copy of the motion. He attached a copy of the vast majority of the motion to his petition in Case No. 09F00829, giving rise to the reasonable inference that he indeed has a copy of the entire motion in his possession and does not need a copy from the court at this time.

For these reasons, the petition in Case No. 09F00415 is **denied**.

DATED: _3- 2-09_

_Greta Fall_

GRETA C. FALL
Judge of the Superior Court of California
County of Sacramento

BOOK      : 10                                    **Superior Court of California,**
DATE      : **MARCH 2, 2009**                     **County of Sacramento**
CASE NO.  : **09F00819 & 09F00415**
CASE TITLE : **PEOPLE v. KINSON HER**             BY:   R. ZAWODNY,
                                                        **Deputy Clerk**

**Page 7 of 8**

Z1.doc--0819 HER WHC ORDER.doc

**CASE NUMBER: 09F00819**                          **DEPARTMENT: 10**
**CASE TITLE: PEOPLE v. KINSON HER**
**PROCEEDINGS: PETITION FOR WRIT OF HABEAS CORPUS – ORDER**

### CERTIFICATE OF SERVICE BY MAILING
C.C.P. Sec. 1013a(3))

I, the undersigned deputy clerk of the Superior Court of California, County of Sacramento, do declare under penalty of perjury that I did this date place a copy of the above entitled **PETITION FOR WRIT OF HABEAS CORPUS – ORDER** in envelopes addressed to each of the parties, or their counsel of record as stated below, with sufficient postage affixed thereto and deposited the same in the United States Post Office at Sacramento, California.

KINSON HER
PELICAN BAY STATE PRISON
P. O. BOX 7500
CRESENT CITY, CA 95532

Dated: _____                Superior Court of California,
                                      County of Sacramento

                                      By:    _R. Zawodny_
                                             Deputy Clerk

**BOOK**        **: 10**                           **Superior Court of California,**
**DATE**        **: MARCH 2, 2009**                **County of Sacramento**
**CASE NO.**    **: 09F00819 & 09F00415**
**CASE TITLE**  **: PEOPLE v. KINSON HER**         **BY:    R. ZAWODNY,**
                                                   **Deputy Clerk**

**Page 8 of 8**

Z1.doc--0819 HER WHC ORDER.doc

Court of Appeal, Third Appellate District - No. C051473
S159613

# IN THE SUPREME COURT OF CALIFORNIA

## En Banc

THE PEOPLE, Plaintiff and Respondent,

v.

KINSON HER, et al., Defendants and Appellants.

The petitions for review are denied.

Moreno, J., was absent and did not participate.

SUPREME COURT
**FILED**

MAR 1 2 2008

Frederick K. Ohlrich Clerk

———————————
Deputy

GEORGE
———————————
Chief Justice

IN THE
# Court of Appeal of the State of California
IN AND FOR THE
## THIRD APPELLATE DISTRICT

# FILED

APR 2 0 2009

COURT OF APPEAL · THIRD DISTRICT
DEENA C. FAWCETT

BY_____ _____ Deputy

In re KINSON HER on Habeas Corpus.

C061573
County No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated:  April 20, 2009

RAYE, Acting P.J.

-----------------------------------

cc: See Mailing List

## PROOF OF SERVICE BY MAIL

### BY PERSON IN STATE CUSTODY

I, Kinson Her, declare:  I am over 18 years of age and a party to
this action.  I am a resident at Pelican Bay State Prison,  in the county
of Del Norte, State of California.  My prison address is:  P.O. Box 7500
Crescent City, CA. 95532.

On September 8, 2009,  I served the attached: Petition for Writ
of Habeas Corpus, on the parties herein by placing true and correct copies
thereof, enclosed in a sealed envelope, with postage thereon fully paid,
in the United States Mail in a deposit box so provided at the above-named
correctional institution in which I am presently confined.  The envelope
was addressed as follows:

1)  Clerk of:United States District Court
          Eastern District of California
          501 "I" Street, Suite 4-200
          Sacramento, CA. 95814-2322

I declare under penalty of perjury under the laws of the United
States of America that the foregoing is true and correct.

Executed on September 11, 2009

Declarant Signature