AO 241   (Rev. 5/85)

PETITION UNDER 28 USC § 2254 FOR WRIT OF
HABEAS CORPUS BY A PERSON IN STATE CUSTODY

| **United States District Court** | District **Eastern District** | |
|---|---|---|
| Name **Kinson Her** | Prisoner No. **F-08643** | Case No. **2:09-cv-00612-JAM KJM** |

Place of Confinement                                                                 Docket No. 10

**Pelican Bay State Prison**

Name of Petitioner (include name under which convicted)        Name of Respondent (authorized person having custody of petitioner)

**Kinson Her**                              V.                    **Francisco Jacquez**

The Attorney General of the State of:        **California**

*PELICAN G.P. UNIT BAY B-7*

**PETITION**

1. Name and location of court which entered the judgment of conviction under attack _____
Sacramento Superior Court of California

2. Date of judgment of conviction ____**August 15, 2005**____

3. Length of sentence ____**Life Without Parole+ 20 years + Life with Parole**____

4. Nature of offense involved (all counts) **1.Murder 2.Attempted Murder 3. Discharged a
firearm from a motor vehicle/ with gun and gang enhancements**

_____

**FILED**

5. What was your plea? (Check one)
(a) Not guilty ☒
(b) Guilty ☐
(c) Nolo contendere ☐

DEC 17 2009

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____ DEPUTY CLERK

If you entered a guilty plea to one count or indictment, and a not guilty plea to another count or indictment, give details:

_____

6. If you pleaded not guilty, what kind of trial did you have? (Check one)
(a) Jury ☒
(b) Judge only ☐

7. Did you testify at the trial?
Yes ☐   No ☒

8. Did you appeal from the judgment of conviction?
Yes ☒   No ☐

(2)

9. If you did appeal, answer the following:

(a) Name of court _____ **3d Appellate Court of Appeal**

(b) Result **Affirm Conviction, Reduced Sentence-with draw LWOP**

(c) Date of result and citation, if known **November 30, 2007**

(d) Grounds raised _____ **see opening brief**

(e) If you sought further review of the decision on appeal by a higher state court, please answer the following:

(1) Name of court **California Supreme Court of Sacramento**

(2) Result **Denied**

(3) Date of result and citation, if known **March 12, 2008**

(4) Grounds raised _____ **see "petioner for review"**

(f) If you filed a petition for certiorari in the United States Supreme Court, please answer the following with respect to each direct appeal:

(1) Name of court **N/A**

(2) Result **N/A**

(3) Date of result and citation, if known **N/A**

(4) Grounds raised **n/A**

10. Other than a direct appeal from the judgment of conviction and sentence, have you previously filed any petitions, applications, or motions with respect to this judgment in any court, state or federal?
Yes ☒ No ☐

11. If your answer to 10 was "yes," give the following information:

(a) (1) Name of court **Sacramento Superior Court of California**

(2) Nature of proceeding **Hebeas Corpus**

(3) Grounds raised _____ **see attach grounds 1 through 11**

(4) Did you receive an evidentiary hearing on your petition, application or motion?
    Yes ☐    No ☒

(5) Result __denied__

(6) Date of result ___March 2, 2009___

(b) As to any second petition, application or motion give the same information:

(1) Name of court ___Court of Appeals, 3d District___

(2) Name of proceeding ___Habeas Corpus___

*PELICAN BAY G.P. UNIT B-7*

(3) Grounds raised ___see attach grounds 1 through 11___

(4) Did you receive an evidentiary hearing on your petition, application or motion?
    Yes ☐    No ☒

(5) Result ___denied___

(6) Date of result ___April 20, 2009___

(c) Did you appeal to the highest state court having jurisdiction the result of action taken on any petition, application or motion?
(1) First petition, etc.        Yes ☒    No ☐
(2) Second petition, etc.       Yes ☒    No ☐

(d) If you did *not* appeal from the adverse action on any petition, application or motion, explain briefly why you did not:

___N/A___

12.  State *concisely* every ground on which you claim that you are being held unlawfully. Summarize *briefly* the *facts* supporting each ground. If necessary, you may attach pages stating additional grounds and *facts* supporting same.
     CAUTION: In order to proceed in the federal court, you must ordinarily first exhaust your available state court remedies as to each ground on which you request action by the federal court. If you fail to set forth all grounds in this petition, you may be barred from presenting additional grounds at a later date.

For your information, the following is a list of the most frequently raised grounds for relief in habeas corpus proceedings. Each statement preceded by a letter constitutes a separate ground for possible relief. You may raise any grounds which you may have other than those listed if you have exhausted your state court remedies with respect to them. However, *you should raise in this petition all available grounds* (relating to this conviction) on which you base your allegations that you are being held in custody unlawfully.

Do not check any of these listed grounds. If you select one or more of these grounds for relief, you must allege facts. The petition will be returned to you if you merely check (a) through (j) or any one of these grounds.

(a) Conviction obtained by plea of guilty which was unlawfully induced or not made voluntarily with understanding of the nature of the charge and the consequences of the plea.

(b) Conviction obtained by use of coerced confession.

(c) Conviction obtained by use of evidence gained pursuant to an unconstitutional search and seizure.

(d) Conviction obtained by use of evidence obtained pursuant to an unlawful arrest.

(e) Conviction obtained by a violation of the privilege against self-incrimination.

(f) Conviction obtained by the unconstitutional failure of the prosecution to disclose to the defendant evidence favorable to the defendant.

(g) Conviction obtained by a violation of the protection against double jeopardy.

(h) Conviction obtained by action of a grand or petit jury which was unconstitutionally selected and impaneled.

(i) Denial of effective assistance of counsel.

(j) Denial of right of appeal.

A. Ground one:   **see attach brief**

Supporting FACTS (state *briefly* without citing cases or law):   **see attach brief**

PELICAN BAY
G.P. UNIT B.7

B. Ground two:   **see attach brief**

Supporting FACTS (state *briefly* without citing cases or law):   **see attach brief**

(5)

C. Ground three: __see attach brief__

Supporting FACTS (state *briefly* without citing cases or law): __see attach brief__

PELICAN BAY
G.P. UNIT B-7

D. Ground four: __see attach brief__

Supporting FACTS (state *briefly* without citing cases or law): __se attach brief__

13. If any of the grounds listed in 12A, B, C, and D were not previously presented in any other court, state or federal, state *briefly* what grounds were not so presented, and give your reasons for not presenting them: __N/A__

14. Do you have any petition or appeal now pending in any court, either state or federal, as to the judgment under attack?
Yes ☐ No ☒

15. Give the name and address, if known, of each attorney who represented you in the following stages of the judgment attacked herein:
(a) At preliminary hearing __Paul Irish__

__2001 "S" Street, Sacramento, CA. 95814__

(b) At arraignment and plea __N/A__

(c) At trial   **Paul Irish 2001 "S" Street, Sacramento, CA. 95814**

(d) At sentencing   **Paul Irish**    "         "         "

(e) On appeal   **W.L. Osterhoudt 135 Belverdere Street, San Fancisco CA. 94117**

(f) In any post-conviction proceeding   **W.L. Osterhoudt**     "     "

PELICAN BAY
G.P. UNIT B-7

(g) On appeal from any adverse ruling in a post-conviction proceeding

16. Were you sentenced on more than one count of an indictment, or on more than one indictment, in the same court and at the same time?
   Yes ☑    No ☒

17. Do you have any future sentence to serve after you complete the sentence imposed by the judgment under attack?
   Yes ☐    No   XX

    (a) If so, give name and location of court which imposed sentence to be served in the future:

      **N/A**

    (b) Give date and length of the above sentence:

      **N/A**

    (c) Have you filed, or do you contemplate filing, any petition attacking the judgment which imposed the sentence to be served in the future?
     Yes ☐    No ☐ **N/A**

Wherefore, petitioner prays that the Court grant petitioner relief to which he may be entitled in this proceeding.

_____
Signature of Attorney (if any)

I declare under penalty of perjury that the foregoing is true and correct. Executed on

**12/04/09**
_____
Date

_____
Signature of Petitioner

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

---

KINSON HER,

     PETITIONER,

VS.

FRANCISCO JACQUEZ (Warden),

       RESPONDENT,

PELICAN BAY
G.P. UNIT B-7

---

WRIT OF HABEAS CORPUS
AMENDED APPLICATION
DOCKET No. 10
CASE No. 2:09-cv-612-JAM-KJM

---

KINSON HER CECR# F-08643
PELICAN BAY STATE PRISON
P.O. BOX 7500
CRESCENT CITY,CA. 95532

# Table of Contents

2    INTRODUCTION..............................................1

3    STATEMENT OF APPEALABILITY................................2

4    STATEMENT OF CASE.........................................2

5    STATEMENT OF FACTS........................................5

6    ARGUMENT.................................................11

7   **I.**  THERE WAS INSUFFICIENT EVIDENCE OF PETITIONER KINSON HER'S

8       GUILT ON ANY OF THE CHARGES AGAINST HIM..........................11

9   A.  There Was Insufficient Evidence To Convict Petitioner Her of Murder

10      and Attempted Murder On A Direct Theory of Liability.............11

11  B.  There Was Insufficient Evidence To Convict Petitioner Her of Murder

12      and Attempted Murder As An Aider and Abettor....................12

13  C.  There Was Insufficient Evidence To Convict Petitioner of Murder and

14      Attempted Murder................................................14

15  **II.** THERE WAS INSUFFICIENT EVIDENCE SUPPORTING THE ENHANCEMENTS......16

16  A.  There Was Insufficient Evidence Supporting Enhancements Applied To

17      Counts One and Two For the Use of A Firearm During An Enumerated

18      Felony..........................................................16

19  B.  There Was Insufficient Evidence Supporting the Gang Enhancement

20      Applied To All Counts...........................................17

21  B·1 The Prosecution Failed To Prove Her's Membership In An Ongoing

22      Association of Three or More Persons.............................17

23  B·2 There Was Insufficient Evidence Presented Concerning the Primary

24      Activities of YMS, or Even MOD..................................19

25  B·3 There Was Insufficient Evidence To Show That Her Acted With the

26      Specific Intent to Promote, Further, or Assist In Any Criminal Conduct

27      by Gang Members.................................................22

28 **III.** THE PETITIONER HAD INEFFECTIVE ASSISTANCE OF COUNSEL.............23

i

1 A. The Petitioner Had Ineffective Assistance of Counsel When

2  Counsel Failed to investigate ................................. 23

3 B. Petitioner Had the ineffective Assistance of Trial Counsel

4  When Failed To Object ....................................... 24

5 B·1 The Petitioner Had the Ineffective Assistance of Trial Counsel

6  For Failing To Object To Prosecution Witness' Inflammatory

7  Characterization ........................................... 24

8 B·2 The Petitioner Had the Ineffective Assistance of Counsel When

9  Counsel Failed to Object the Gang Experts Baseless Characterization

10  of Petitioner Her As a "Hard-Core Killer" ...................... 26

11 C. Ineffective Assistance of Counsel For Giving Ineffective Example

12  In Closing Argument That Defeated the Defense Theory of Self-Defense ..27

13 D. The Petitioner Had Ineffective Assistance of Counsel When Counsel

14  Failed To Present the Petitioners Expert Witness At Trial ... 28

15 E. Trial Counsel Failed To Request Inquiry Into Prosecution Witness'

16  Detective Stigerts Prohibited Communication With the Jury(s) ..29

17 IV. THE COURT ERRED AND ABUSED ITS DISCRETION THAT VIOLATED PETITIONER'S

18  CONSTITUTIONAL RIGHTS ........................................29

19 A. The Trial Court Erred By Not Excepting Letters From Petitioner Her

20  As Motions In Regards to Personal Conflicts Between Petitioner and

21  Petitioner's Trial Counsel ..................................... 29

22 B. The Trial Court Erred By Denying Petitioner's Motion For An Interpretor ... 30

23 C. The Trial Court Erred By denying Petitioner's Motion To Exclude

24  Any Opinion of Bandanna ....................................30

25 D. The Court Erred In Allowing Inflammatory Gang Evidence To Be

26  Presented To the Jury ........................................ 31

27 D·1 The Court Erred In Denying Petitioner's Motion To Bifurcate

28  the Gang Enhancement ...........................................  31

ii

D•2    The Trial Court Erred In Allowing Gang Expert To Give Prejudicial

       Testimony About A Hypothetical Question That Misrepresented the Core

       of the Facts of the Case ..........................................,.32

D•3    The Trial Court Erred In Allowing the Gang Expert's Baseless

       Characterization of Petitioner Her As A "Hard Core Killer"......... 34

D•4    The Gang "Expert's" Testimony Violated the Confrontation Clause of

       the 6th Amendment of the U.S. Constitution.........................35

D•5    The Court Abused Its **Discretion In Considering the Gang Detective**

       **As An"Expert"**......................................................37

E.     The Trial Court Erred By Failing To Declare A Mistrial

       During Voir Dire ...................................................38

F.     The Trial Court Erred By Failing To Declare a Mistrial When Witness

       Detective Stigerts Made An Illegal and Prohibited Communication With

       the Jurors ........................................................38

G.     The Court Erred In Denying Petitioner's '995' Motion

H.     The Court Erred By Admitting Prejudicial and Inflammatory Testimony

       of a Witness that He (the witness) Believed that Threats and Reprisals

       He Had Suffered years Earlier Were Connected To His Testimony Against

       Kinson Her, When the Witness Admittedly Had No Factual Basis for

       this Belief........................................................41

I.     The Court Erred In Giving the Following Jury Instructions...........43

I•1    The Court Erred By Instructing the Jury, Over Objection, On the Theory

       of "Pretextual Self-Defense" Under CALJIC No. 5.55, When

       This Instruction Was Unsupported By the Evidence and Undermined

       Petitioner's Legitimate Self-Defense Argument......................43

I•2    The Trial Court Erred In Instructing the Jury, Over Objection,

       On the Theory of "Adoptive Admissions" (CALJIC 2.71.5), Involving

       Her's Post-Arrest Interrogation By Police .........................46

1 I·3    The Trial Court erred In Instructing CALJIC No. 2.03, 2.06, 2.51,

2       and 2.52........................................................47

3 I·4    The Trial Court Erred By Denying Petitioner's Motion To

4       Re-write CALJIC No. 2.90·.......................................48

5 I·5    The Trial Court's Instruction On CALJIC No. 5.17 On Imperfect

6       Self-Defense Is Erroneous, Placing An Improper Limitation On the

7       Defense In Circumstances In Which the Defense Should Still Be Legally

8       Applicable.....................................................49

9 V.     PROSECUTION MISCONDUCT.............................................51

10 VI.    DUE TO PETITIONER'S YOUTH, PETITIONER WAS DEPRIVED TO HAVE

11       THREE POSSIBLE TERM OF HIGH, MEDIUM, AND LOW PENALTIES................51

12 VII.   PETITIONER HER'S STATEMENT TO POLICE WAS OBTAINED IN VIOLATION

13       OF HIS CONSTITUTIONAL RIGHTS......................................52

14 A.     The Trial Court Abused Its Discretion In Admitting Petitioner's

15       Statement At Trial.......................................... 52

16 B.     Miranda Warnings Were Not Given Until Interrogation Was Well Underway...53

17 C.     Her's Repeated Invocations of His Right to Remain Silent Were Ignored

18       by the Detectives................................................57

19 VIII.   UNDER THE CIRCUMSTANCES OF THE CASE, ENHANCED SENTENCED OF 25

20       TO LIFE VIOLATES THE EIGHTH AMENDMENT AND ARE CONTRARY TO WIDELY ACCEPTED

21       INTERNATIONAL NORMS FOR THE TREATMENT OF CHILD OFFENDERS............60

22 IX.    PETITIONER'S RE-SENTENCE OF "25" YEARS TO LIFE" CONSTITUTES CRUEL

23       AND UNUSUAL PUNISHMENT............................................68

24 X.     THE 3d APPELLATE DISTRICT COURT'S DECISION NOT TO REMAND PETITIONER

25       HER TO THE SUPERIOR COURT FOR RE-SENTENCING VIOLATED PETITIONER'S

26       DUE PROCESS AND WAS PREJUDICIAL ..................................69

27 XI.    CUMMULATIVE ERRORS ARE CAUSED FOR A REVERSAL ......................70

28       CONCLUSION .......................................................71

1   PRAYER FOR RELIEF.................................................. 71

2   VERIFICATION...................................................... 71

3   APPENDIX

4   APPENDIX I.    '995 MOTION'

5   APPENDIX II.DIAGRAM AND PHYSICAL EVIDENCE SHEET

6   APPENDIX III.   INTERVIEW OF MICHEAL CAMACHO WITH INVESTIGATOR
7                   WALLY DAMERELL

8   APPENDIX IV.   LOWER COURT'S DATE OF DENIAL

9   PROOF OF SERVICE

10

11

12

13                          PELICAN BAY
14                      G.P. UNIT B-7
15

16

17

18

19

20

21

22

23

24

25

26

27

28

```
1   KINSON HER
    PELICAN BAY STATE PRISON
2   P.O. BOX 7500
    CRESCENT CITY, CA 95531
3   IN PRO PER PETITIONER

4

5

6                      IN THE UNITED STATES DISTRICT COURT

7                    FOR THE EASTERN DISTRICT OF CALIFORNIA

8
                                        )
9   KINSON HER,                         )      Case No.  2:09-cv-00612-JAM KJM
                    Petitioner,         )      Docket No. 10
10  VS.                                 )
                                        )      Amended Application
11  FRANCISCO JACQUEZ,                  )
                    Respondent.         )
12                                      )
                                        )
13  ─────────────────────────────────────

14                            -INTRODUCTION-

15          Kinson Her was convicted of murder, attempted murder, and discharge of

16  a firearm from a vehicle, and gang and firearm were applied to the first

17  two of these charges. The scant physical and circumstantial evidence

18  connecting Her to these crimes was grossly overshadowed by the deeply prejudicial

19  and entirely unscientific and unsupported testimony offered by a gang "expert,"

20  who testified that Kinson Her, who was fifteen years old at the time of

21  the crime, was the worst of the "MOD" gang members, and was a "hardcore killer."

22  Her's trial counsel was deficient for not objecting and allowing this prejudicial

23  statement to be placed before the jury, and the Court abused its discrection

24  in allowing this prejudicial statement to be placed before the jury.

25     Had the "expert testimony" and character assassination not been enough,

26  the Court abused its discretion by allowing one witness to testify at length

27  about supposed death threats, attempts on his life and acts of violence suffered

28  years earlier at the hands of unknown individuals, which he interpreted as
```

-1-

1    pressure not to testify against Kinson Her.

2        Viewed in its proper context, and without this emotionally charged
3    testimony, there was insufficient evidence connecting Kinson Her to the crimes
4    alleged. Though the evidence showed that many people witnessed the shooting
5    of Fong Vue, and that some if not all of the alleged victims in this case
6    had fired weapons at the time Vue was shot, no effort was made to collect
7    or analyze this evidence or find these witnesses. No witness testified that
8    they seen Kinson Her as being at the crime scene, or in the stolen vehicle
9    used during its commission, and no finger prints nor ballistics evidence
10   was produced to connect Her to any weapon in the case.

11       Of the scant evidence presented against Her at trial were letters found
12   in the home of his friend's father shorty after Her's arrest in Minnesota
13   in July 2002. This evidence was seized as a direct result of an unlawful
14   interrogation of Her by a police detective engaging in deceptive and inherently
15   coercive tactics, and should not have been admitted.

16       In these and other ways to be addressed herein, petitioner was deprived
17   of important constitutional and statutory rights, requiring that the judgement
18   and sentence against him be reversed by this Court.

19                    -STATEMENT OF APPEALABILITY-

20       Judgement was pronounced on December 9, 2005 (2CT:361-367).* On December
21   9,2005 appellant filed a timely Notice of Appeal (2CT:408). This appeal
22   is from a final judgement of conviction and is authorized by Penal Code Section 1237.

23                    -STATEMENT OF CASE-

24       On or about April 9,2002, the Sacramento County District Attorney filed
25   a complaint against Houa Lao, charging him with murder (count one), and assult .
26   with a firearm (count two), and with enhancements base on gang membership
27   and use of a firearm. (1 CT 15-16).

28       On April 9,2002 a preliminary examination was held in regards to Houa

   * This form of citation refers to the Clerk's Transcript on Appeal, in four
   volumes.

                              2

1 Lao(3CT 795), at the conclusion of which Lao was held to answer on Counts One and
2 Two(1CT 17;3CT 870-71). Petitioner Her was arrested in June of 2002, after
3 preliminary examination, Her was held to answer all charges(4CT 1147).

4 On December 19, 2002, an Amended Information was filed as to both defendants;
5 in Count One charged murder, Count two charged attempted murder, and Count Three
6 charged,discharged of a firearm from a vehicle, and discharge of a firearm
7 causing great bodily injury, and gang enhancement were applied to all counts.

8 Trial commenced on July 18, 2005(1CT 144). Jury deliberations began on
9 August 4, 2005(1CT 291). On August 15, 2005 the jury found both defendants guilty
10 as charged on all three counts of the information, as well as finding each of the
11 special allegations true for the purpose of enhancements.(2CT 406)* A sentencing
12 hearing was held on December 9, 2005(1RT 1357). On sentencing petitioner Her was
13 sentenced to: Count One, Life Without Parole and a consecutive 25-years to Life
14 with parole; Count Two, Life with the possibility of parole with a consecutive 20
15 years; Count Three were not being imposed, due to the Jurys finding that the
16 shooter was not made.

17 On December 9, 2005, petitioner filed a timely notice of appeal(2CT 408).

18 The appeal was denied, and petitioner's sentence of Life Without Parole was
19 reduced to 25-years to Life with possibility of parole. Decision was made on Nov.
20 30, 2007, in the Court of Appeals, 3d District-Case No. C051473.

21 Petitioner filed a "Petition For Review" in the California Supreme Court on
22 March 12, 2008- Case No. S159613.

23 Petitioner filed a writ of habeas corpus in the Superior Court of California
24 (Sacramento) on January 27, 2009 and it was denied on March 2, 2009-Case No.QF00819.

25 Petitioner filed a writ of habeas corpus in the United States District Court
26 on April 6, 2009 to extend the AEDPA time limitation until all remedies are
27 fully litigated in the lower courts. Case No. 2:09-cv-0612 JAM KJM

28 Petitioner filed a writ of habeas corpus in the Court of Appeals-3d

* This form of citation refers to the Reporter's Transcript on Appeal, in six
volumes.

-3-

1 District on April 20, 2009 and it was denied on April 20, 2009.- Case No.C061573

2 On June 24, 2009, petitioner filed a writ of habeas corpus in the California

3 Supreme Court-Case No.S174141- and this petition was denied November 19,09.-

4 Case No. S174121-

5 On August 24, 2009, petitioner filed another habeas corpus in the Court of

6 Appeals-3d District to exhaust two more grounds, and it was denied on August 27,

7 2009.- Case No.C062732. Petitioner was directed to assert these claims first

8 in the lower court. (these grounds are grounds IX and X in the instant petition)-

9 On August 28, 2009, petitioner filed a writ to the California Supreme Court

10 asking that the two grounds be attached to the previous petition,Case No.S174121.-

11 The latter filed petition Case No.S175956.

12 Petitioner filed an Amended Application in response to case No.CIV S-

13 090612 JAM KJM P, in the United States Eastern District Court of California

14 on Febuary 2009. -Docket No. 10-Case No.2:09-cv-612. Petitioner previously asked

15 this Honorable Court to extend the AEDPA time limitation until petitioner

16 fully exhaust all remedies in the lower Courts. -Due to lack of knowledge and

17 lack of legal training, consistant lock downs and limited access to law library,

18 petitioner finally exhaust all remedies in the lower courts.

19 Petitioner now files a writ of Habeas Corpus under §2254 to the United Stated

20 Eastern District Court of California.

21 ///

22

23

24

25

26

27

28

4

1                          STATEMENT OF FACTS

2 Backround

3     On the evening of Febuary 3, 2002, a shooting occurred in the driveway
4 area of 3212 Western Avenue, in Sacramento California. When the police
5 arrived at the scene they found two individuals suffering from gunshot
6 wounds, Yee.Xiong and Fong Vue (1 RT 50). Yee Xiong was only grazed and
7 did not sustain life threatening injuries. Fong Vue had extensive injuries
8 to his head and upper torso. Social Worker Marcia Hager at UC. Davis stated
9 that Fong Vue was concious at the scene, but rapidly progressed to comma(see
10 p. 334 Bioethics Committee Consultation).- Officer Burke(badge #474) arrived
11 at the scene to find Vue laying next to a pool of blood. Vue advised Officer
12 Burke that Vue could not feel his legs when Officer Burke tried to get a
13 statement from Vue. (see Burke interview report). A third individual, Vue
14 Heu, claimed to have been there with Fong Vue and Yee Xiong when the shooting
15 occurred. Heu was not injured. Both Vue and Xiong were transported to UC.
16 Davis Medical Center where Vue stayed commatose. Xiong was treated and
17 released during the early morning hours after the shooting(1 RT 77). On
18 Febuary 9, 2002, Vue died after his parent decided to pull out the life
19 support plug. Officers at the scene were informed by witnesses that shots
20 came from a vehicle, identified as a dark Toyota Camry(1RT 179;236;254)-.

21     Shortly thereafter, Officer Warren Estrada observed a blue Toyota
22 Camry containing three male individuals in the area of West Sacramento
23 making an illegal turn. Believing that the car maybe stolen, Estrada attempted
24 to pull the Toyota over. The Toyota came to a stop on 2nd and F street
25 near a landmark called the "pyramid" (the Money Store) at this point the
26 officer noted that the back window had been blown out. As Estrada approach
27 the driver, however, the Toyota sped away(2RT 397-401).- A car chase ensued
28 for several blocks(2RT 402).- The Toyota eventually slowed down to a near

-5-

1     stop, whereupon three individuals exited the front and back of the car,

2     and ran toward the Sacramento river(2RT 405-406).- Estrada pursued the three

3     on foot, until two pasted the third and fled in different directions.

4     Estrada then chased one of the individual, later identified as Houa Lao.

5     Lao was apprehended by Estrada; the other suspects fled(2RT 406-409-421).-

6     It was later confirmed that the Toyota Camry had been stolen earlier that

7     evening(4RT 918-922).- Officer Estrada could not identify Kinson Her as

8     being one of the individuals who ran from the blue Toyota Camry.

9     A jacket containing a cell phone was found on the passenger-side,

10    backseat of the Toyota Camry. As officers collected evidence from the

11    car, the phone was ringing and the name "Xang" was flashing on the caller

12    I.D.. Officer Duncan answered one of these calls, and the caller either

13    stated that "he would wait on the other side of the river in Old Sacramento,"

14    as testified to by Duncan at tri of that he made it to the other side"

15    as Duncan's contemporaneous report indi

16    At about the same time that Houa Lao was being arrested, officers

17    on the far side of the river in Old Sacramento found a group of five young

18    asian male sitting in a van, A cell phone was confiscated from one member

19    of the group, Xang Thao, which corresponded to the number that was found

20    in the Toyota Camry(2RT 547).- On Febuary 4, 2002, early in the morning

21    a street sweeper found a 32 caliber and a 380 caliber on the "pursuit path."

22    Officer walked the pursuit path in the location where the Toyota had driven

23    while Officer Estrada had given chase, and found a 12-gauge shotgun(1RT 95).-

24    Houa Lao was interrogated by Detective Patrick Keller on Febuary 4,

25    2002(2RT 549-566).- Lao stated that two friends, Jasong and Jack Vang

26    had picked him up in the Toyota Camry at approximately 6-7 pm. that evening,

27    and that the three proceeded to drive around until they were pulled over

28    by Officer Estrada(2RT 554-560).- After encounting the officer, Jasong

-6-

1. told Lao, who was seated in the front passenger seat, to run.

2. Processing of the crime Scene

3. The scene at 3212 Western Ave. was described by investigating officers
4. as chaotic(1RT 78) - with as many as fifteen people assembled outside of
5. the residence while the police processed the crime scene(1RT 71).- The
6. wounds suffered by Vue and Xiong were consistant with shotgun pellets.
7. Two spent shell casings were found between 3212 and 3216 Western Ave.; from
8. two different 45 caliber weapons,and bullets were lodge into the yard of
9. the residence located at 3225 Western Ave., which is across the street from
10. 3212 Western Ave.. At least one of the bullets lodge into the yard across
11. the street from 3212 Western had knocked down a downspout from the rooftop(4RT
12. 1106).- A 38 caliber bullet was retrieved from 3225 Western Ave.. A trail
13. of blood was found, leading from the driveway are of 3212 Western Ave.,
14. ultimately ending at the door to the yard of 3210 Western Ave,, where a
15. great deal of blood was concentrated on the ground and on a blue jacket.

16. What is most notable about the processing of the crime scene is what
17. the officers failed to do. No DNA or ballistics evidence was collected
18. from the blood trail and blue jacket located between 3212 and 3206 Western
19. Ave.(the jacket having been found midway in the blood trail on the gate
20. to the rear yard of 3210 Western·1RT 135)- Detective Marnie Stigerts, who
21. was placed in charge of processing of the crime scene, testified that she
22. nor any other officer ever went into the residence or the backyard area
23. of 3212 Western, and she never returned to the scene during daylight hours
24. (1RT 124-125).- Detective Stigerts testified that she did not look north
25. of 3212 Western, and did not cross the street from this address(1RT 125).-
26. Of the fifteen (15) or so witnesses on the street when officer Micheal Boyd
27. arrived to secure the scene and collect evidence, none were interviewed(1RT
28. 73, 78) -

-7-

1    Gun residue tests were not conducted on Vue Heu, and were
2  only done on Fong Vue and Yee Xiong after many hours had elapsed.
3  Though Vue Heu testified that he and his friends never fired
4  any weapon that day(4RT 1083-84)-, gunshot residue was found
5  in the hands of Yee Xiong; the test conducted on Fong Vue
6  indicates the presence of concentrated lead(3RT 846).-   When
7  the versons of the story recounted by Vue Heu and Yee Xiong
8  substantially and materially diverged, no attempt was made
9  to probe these participant witness.  3212 Western Ave. is
10  the home of Vue Heu and Yee Xiong's friend, Vang Vang, but
11  no appearent effort was made to talk to this individual.
12  Though Vue stated that directly after the shooting, Xiong-
13  bleeding from the head-stagger to the nearby home of his
14  girlfriend, no effort was made to identify her or search
15  her residence for secreted weapons.

16    Officer Williams collected the bullets lodge in the property across
17  the street from 3212 Western Ave. only because a neighbor living in that
18  home ran out, called his attention to this evidence, and asked that he
19  do so(2RT 390-392)-  Ballistics testing confirmed that the 38 caliber
20  bullet retrieved from across the street did not emanate from any of the
21  weapons that had been found(3RT 851)-  Likewise, the 45 caliber shell
22  casings collected from the crime scene could not be connected to any
23  weapon in this case(3RT 852)-

24    Officers found expended 12-gauge and 32 caliber casings in the Toyota
25  Camry(3RT 749-813)-  This evidence was consistent with gun having been
26  fired from within the vehicle.

27    Additionally, through ballistic reconstruction, it was established
28  that the car had been fired upon from the outside(3RT 842).-  The evidence

8

1  of this fact was that there were four (4) 40 caliber bullets lodge in
2  the rear bumber of the Toyota and one of those four 40 caliber bullet
3  landed in the spair tire(3RT 827).- There is a bullet hole in the front
4  windshield, and the back windshield had been blown out, and the passenger
5  rear side window had likewise been blown out, -showing that the vehicle
6  had been attacked by a gunman who was located to the side of the car.
7  Faye Ann Springer is the District Attorney's expert who did the trajectory
8  analysis on the Toyota Camry. The expert testified that she "...saw
9  indication of one hole. Once the window breaks out, you know, you could
10  fire a second round, but it has to go some place. So it would either
11  have to exit some open portal in that vehicle."(3RT 864)-

12      A blue and white community bandanna was found on the floor of the
13  backseat. Testing of this item revealed the DNA of three individuals,
14  one of whom was Kinson Her(3RT 900)- It could not be determind, however,
15  which individual was wearing the community bandanna most recently before
16  it was found(4RT 905).- Fingerprints from the vehicle could not be matched
17  to Kinson Her or Houa Lao(3RT 649).-

18      Kinson Her was arrested in Minnesota on June 21, 2002. Detectives
19  Keller and Stigerts traveled to Minnesota on July 2, 2002, to bring
20  Her to Sacramento. Detective Keller interrogated the fifteen-year
21  old Kinson Her, while still in Minnesota without first explaining to
22  Her what was he being charged with(2RT 643 710)- It is clear from this
23  interview that Her believed that he was being arrested for leaving Sacramento
24  in violation of his probation, and not in connection with any murder(2RT 668).-
25      Before Dectives gave Miranda Warnings, Detectives recieved information
26  from Her of where his belongings might be. After interrogating Her,
27  Detective Keller went to a residence located at 1514 Irving Way, in
28  Minnesota. During his search Detective Keller found a green duffel bag

9

1 in the basement, which contains two letters. On a nearby shelf the Detective
2 found three more letters. 1514 Irving Way is the home of Her's girlfriend's
3 father.

4 Other Trial Evidence

5     Brenda Ly testified that she was Kinson Her's girlfriend for a time.
6 She attended a Super Bowl party with Her on the date of the shooting, Febuary
7 3, 2002. She testified that Lao was at this party. After the Super Bowl
8 concluded, she left. At about 9 or 10 that evening, Kinson Her called her to
9 pick him up in West Sacramento, which she did. Her stayed at Ly's house that
10 night, and the next day she returned from work he was gone.

11     Rindy Her testified that he was at the Super Bowl party on Febuary 3,
12 2002, but that niether Kinson Her nor Brenda Ly were there. He was driving his
13 fathers' minivan on that day. Rindy testified that Kinson Her belonged to the
14 "gang" called YMS.

15 //
16 //
17 //
18 //
19 //
20 //
21 //
22 //
23 //
24 //
25 //
26 //
27 //
28 //

10

**-I-**
**THERE WAS INSUFFICIENT EVIDENCE OF**
**PETITIONER KINSON HER'S GUILT ON**
**ANY OF THE CHARGES AGAINST HIM**

**A. There Was Insufficient Evidence To Convict Petitioner Her of Murder and Attempted Murder On A Direct Theory of Liability**

There was no direct nor circumstantial evidence of Her's participation in the shooting of Fong Vue and Yee Xiong. No eye witness testified that Her was at the scene of the crime. There was no confession by Her. Her's fingerprints were not found either in the Toyota Camry, nor on the weapons used in the shooting(or anywhere else connected with this investigation). Her was not seen at or near the Toyota Camry. Houa Lao did not, in any way implicate Her. There is no link between the weapons used and Kinson Her. There is no history of threats by Kinson Her to attact these individuals; indeed, Her had no history of violence.

Hence, the governments case rested on the cobbling together of circumstantial evidence. Her's DNA, along with two (2) other person, was found on a community bandanna in the vehicle. Rindy Her, a cousin of Kinson Her, testified that petitioner had borrowed his cell phone, and that cell phone was used to call Xang's cell phone. Her left Sacramento to stay with family in Minnesota, where he remain until his arrest in July of 2002.

This is the sum total of the evidence implicating Her in these crimes. Though this evidence is weak even to establish that he was in the vehicle, there was absolutely no evidence establishing Her's state of mind or alleged role in the offense. The evidence was insufficient to find petitioner guilty on a direct theory of liability. "When there is insufficient evidence to establish guilt beyond a reasonable doubt, the defendant must be found not guilty." Jackson v. Virginia,(1979) 443 U.S. 307.

1  Therefore, the petitioner's rights to a fair trial, due process, and
2  equal protection were violated and prejudice occurred against the 5th, 6th,
3  and 14th Amendments of the U.S. Constitution.

4

5  B. **There Was Insufficient Evidence To Convict Petitioner Her of**
    **Murder and Attempted Murder As An Aider and Abettor**
6

7  Petitioner Her's convictions cannot be sustained on the theory of aiding
8  and abetting. A finding of aiding and abetting requires proof that petitioner,
9  with knowledge of the unlawful purpose of the perpetrator, and with the intent
10  of committing, facilitating or encouraging the commission of the crime, by
11  act or advise, aids, promotes, encourages or instigates the commission of
12  the crime. People v. Cooper (1991) 53 Cal. 3d 1158; People v. Francisco
13  (1994) 22 Cal. App. 4th 1180.

14  In Francisco, the defendant was found guilty of first degree murder
15  on an aiding and abetting theory, based upon his involvement in a drive by
16  shooting. Francisco argued that he was simply the driver of the vehicle
17  used in the murder, and that the government failed to prove his acts were
18  deliberate or premeditated. The Court rejected this claim, finding evidence
19  that the defendant stated before the crime that he was going to get a gun
20  to shoot someone, and thereafter drove a confederate into rival gang territory,
21  where the passenger shot a rival at closed range, in retaliation for a murder
22  done to a gang member associated with the defendant and then disposed of
23  the weapon, was sufficient. These facts established that Francisco intented
24  to further the acts of the principle.

25  Her, fifteen years at the time of the offense and with no history of
26  committing violent acts- did not engage in any such conduct. There was no
27  prior declaration made about intenting to shoot someone, nor any retaliatory
28  purpose. Her was not alleged to have taken the active role of driving the

12

1 Toyota Camry, and did not have any interaction with the murder weapon. Even
2 assuming Her was in the Toyota at the time of the shooting, he may have been
3 cowering in the backseat or otherwise merely present at the time of the shooting.
4 These scenarios are as likely, based on the evidence, as any scenario implicating
5 Her in aiding and abetting a killing with malice aforethought. When evidence
6 is susceptible to two reasonable conclusions, one consistent with guilt and
7 the other consistent with innocence, the jury is required to acquit the defendant.
8 See CALJIC 2.24; See also People v. Merkouris (1956) 46 Cal. 2d 540; United
9 States v. Berger, 224 F.3d 107 (2d Cir.2000)(Evidence that is at least as
10 consistent with innocence as with guilt is insufficient to support a guilty
11 verdict.).

12      The Court has made clear that mere presence cannot give rise to liability
13 under the theory of aiding and abetting:

14      Mere presence at the scene of the crime, coupled with a failure to try
        to prevent the crime, does not justify an instruction on aiding and abetting.
15      (People v. Durham,(1969)70 Cal.2d171,180-181[74 Cal.Rptr.262,449 P.2d
        189]). A thorough review of the facts shows no knowledge by either Rose
16      or Rodriguez that the crime was to be committed. Nor was any encouragement
        shown. The fact that Rose knew of the fact, argument and the victim's
17      return to the home and had asked defendant also to return there is
        totally inadequate to support a charge of "accomplice" against her.
18      Her knowledge of the presence of the shotgun in the house is likewise
        of no aid in this respect. As to Rodriguez, he was merely a percipient
19      witness to the crime. The assistance after the fact is insufficient
        to show aiding and abetting; at worst, such assistance could lead to
20      prosecution for a different offense, namely, accessory after the murder.
        (Penal Code,§32; People v. Collum,(1898) 122 Cal.186,187[54 P.589];
21      People v. Duty,(1969) 269 Cal.App.2d 97, 100-101 [74 Cal.Rptr. 606].)

22      People v. Rutkowsky,(1975)53 Cal.App.3d 1069, 1072-73. Because the
23 evidence in the instant case showed, at most, no more than petitioner's
24 mere presence at the scene of the shooting, his convictions on Counts One
25 and Two must be reverse.

26      Therefore, petitioner Her's rights to a fair trial, due process and
27 equal protection were violated and prejudice occurred against the 5th, 6th,
28 and 14th Amendments of the U.S. Constitution.

13

1    C.   **There Was Insufficient Evidence To Convict Petitioner of Murder**
          **and Attempted Murder**
2

3         Even assuming Her was in the Toyota at the time of the shooting, the defense
4    demonstrated that the people at Western Ave. had fired shots first even before
5    the Toyota past 3212 Western(location where "victim" was), and that the people
6    inside the vehicle return shots after passing 3212. see appendix II (drawn
7    diagram I and II)- This theory of self-defense is supported by the evidence
8    the prosecutor presented at trial: There were two shots fired first followed
9    by more shots. There were two empty .45 caliber shell casings found a few
10   feet away from where the "victims" were during the shooting.(2RT 354)- There
11   were concentrated lead detected on the hands of Fong Vue, and more gunshot
12   residue were detected on the hands of Yee Xiong.(3RT 846)- The right side
13   of the rear passenger window had been blown out.(1RT 117)- As indicated by
14   the trajectory analysis, the bullet, would have to exit an open portal in the
15   vehicle(3RT 864); in which, the back windshield had also been blown out.(1RT
16   117)- This sum up that at least one of the first bullet had enter the right
17   rear passenger window and exit the back window as the Toyota was approaching
18   the "victims."

19        Apparently, there were more than one gun that was used, not including
20   the weapons from the Toyota Camry. Based on the evidence the Toyota had multiple
21   shots from a .40 caliber.(3RT 827)- A .38 caliber bullet were lodge into the
22   yard of 3225 Western Ave., which is located across the street, north of 3212
23   Western Ave.(4RT 1106)- The .45 caliber empty shell casings collected from
24   the scene could not be connected to any weapons in this case.(3RT 852)- The
25   .40 caliber bullets that were lodge into the Toyota Camry could not be connected
26   to any weapons found.(3Rt 860)- The .38 caliber bullet retreived from across
27   the street of 3212 Western was confirm that it was not emanated from any weapons
28   that had been found.(3RT 861)- At least three(3) weapons were used by the

                                          14

1 people at Western Ave.: one, the .45 caliber; two, the .40 caliber; three,
2 the .38 caliber, and not one of these weopons were found.

3     There were indications that Xiong and Vue possibly shot a gun that night
4 of the shooting.(3RT 852)- Shortly after the shooting, Social Worker at UC
5 Davis Marcia Hager stated that Vue rapidly progress to coma and only has
6 gag reflexes.(see Bioethics Committee Consultation)- At the scene Officer
7 Burke(Badge #474) was unable to obtain information from Vue, but that he
8 could not feel his legs.(see Burke interview report)- In which indicates
9 that when Vue was shot in the head, he was paralyzed and rapidly progressed
10 to coma, and only has gag reflexes; therefore, leaves Vue in a position where
11 Vue should not be capable of firing a gun after he was shot. Meaning the
12 only way Vue was to shoot a gun is before he got shot that caused him to
13 be paralyzed and rapidly progressed to coma.

14     There is no indication from the evidence that the occupants inside the
15 vehicle had fire any gunshot before they reached 3212 Western Ave..(only
16 after passing 3212)- The petitioner contends that one of the first bullet
17 the people at Western shot had enter the rear right passenger window and
18 exit the back window as the Toyota was approaching the people at Western.(see
19 Appendix II) This clearly indicates that prior to the shootout the rear passenger
20 window was up and in no position to do a premeditated drive-by shooting.
21 There is no way the occupants in the vehicle shot Vue first and Vue return
22 shots as he was progressing to coma after being shot in the head. For the
23 evidence reasonably supports that Vue had shot a gun before he was shot leads
24 only to one conclusion that the occupants in the vehicle had return shots
25 after passing 3212 Western and only after Vue had fire shots at the vehicle
26 first. Thus, the evidence was insufficient to establish guilt beyond a reasonable
27 doubt, the defendant must be found not guilty. see Jackson v. Virginia,
28 (1979) 443 307.

1    Therefore, the petitioner's rights to a fair trial, due process, and equal
2    protection were violated and prejudice occurred against the 5th, 6th, and
3    14th Amendments of the U.S. Constitution.

4

5                              **-II-**
                   **THERE WAS INSUFFICIENT EVIDENCE**
6                  **SUPPORTING THE ENHANCEMENTS**

7

8    **A. There Was Insufficient Evidence Supporting Enhancements Applied to
        Counts One and Two for the Use of A Firearm During An Enumerated**
9       **Felony**

10   The Jury found true an enhancement on Counts One and Two, pursuant to
11   Cal.P.C. 12022.53, for the use of a firearm during the commission of an
12   enumerated felony. The enhancement under 12022.53 for Count One required
13   a finding by the trier of fact that (1) during the commission of an enumerated
14   felony; (2) a principal personally and intentionally; (3) discharged a firearm;
15   (4) proximately causing death; (5) and that the murder was committed for
16   the benefit of, at the direction of, or in association with a criminal street
17   gang; (6) with the specific intent to promote, further or assist in any criminal
18   conduct by gang members.
19      The crimes alleged in Counts One and Two, murder and attempted murder,
20   are enumerated felonies. However, for the reasons stated above in grounds
21   1(see pages **11-16** ), the prosecution failed to prove that petitioner Her had
22   the requisite mens rea, or that the killing was "unjustified." Therefore,
23   the first element of these enhancements is not satisfied. Hence, there is
24   insufficient evidence to establish guilt beyond a reasonable doubt, the defendant must
25   be found not guilty. see Jackson v. Virginia,(1979) 443 U.S. 307.

26   Thus, the petitioner's rights to a fair trial, due process and equal
27   protection were violated and prejudice occurred against the 5th, 6th, and
28   14th Amendments of the U.S. Consitution.

**16**

1    B.  There Was Insufficient Evidence Supporting The Gang Enhancement
         Applied to All Counts
2

3       The element "that the murder was committed for the benefit of, at the

4   direction of, in association with a criminal street gang" lacks evidentiary

5   support.  Central to these enhancements is the definition of criminal street

6   gang as:

7       (1) an ongoing association of three or more persons with a common name
        or common identifying sign or symbol; (2) which has as one of its primary
8       activitites the commission of one or more of the criminal acts enumerated
        in the statue; and (3) includes members who either individually or collect-
9       ively have engaged in a 'pattern of criminal gang activity' by committing,
        attempting to commit, or soliciting two or more of the enumerated offenses
10      (the so-called "predicate offense") during the statutorily defined period.

11      See People v. Gardeley,(1996) 14 Cal. 4th 605, 617. The prosecutor failed

12  to prove that petitioner Her was a member of a gang possessing these attributes.

13

14      B·1  The Prosecution Failed to Prove Her's Membership In An Ongoing
             Association of Three or More Persons
15

16      An alleged gang expert, Kinson Lee, testified that Her had been validated

17  as a member of the Young Mafia Society(YMS) in the year 2000 (4RT 972).-

18  Lee testified that at some point two other individuals, Ceng Vang and Laksu

19  Cha had been validated as YMS members(4RT 971), though both had since moved

20  on to become members of MOD (4RT 971).- Appellant Lao was not shown to have

21  any affiliation with YMS, and was not a validated member of any gang.  Kinson

22  Her's alleged stint in YMS was not shown to have coincided with that of Vang

23  and Cha.  Therefore, the prosecution failed to prove the existence of an

24  ongoing association of three or more persons.

25      The People attempted to abscure the insubstantial nature of "YMS" by

26  claiming that it was a junior subset of MOD, and that MOD is an "umbrella

27  group."(4RT 949)- Lee explained that each group has its own identity, but

28  they all have the same enemies as MOD- and fall under the heading "MOD."

1   (Id.;4RT 949;972)- such a claim must failed, however because whatever "YMS"

2   may have been, the prosecution failed to show that this chimerical "subset"

3   consisted of anyone but Her at the time of the shooting.*  Petitioner Her

4   was never validated as a member of MOD, perhaps because his extreme youth

5   precluded such membership.

6        In this respect the present case is similar to People v. Perez (2004)

7   118 Cal.App.4th 151.  In Perez, the basis of a criminal street gang enhancement

8   was that the defendant was a member of a group calling itself "Crazy Latin

9   Boys"(CLB), which harbored racial animus torward African Americans and Asians.

10  The shooting in question, in which an Asian boy was targeted, was supposedly

11  committed for the purpose of avenging a fallen comrade, who was believed

12  to have been killed by members of an Asian gang. 118 Cal.App. 4th at 156-

13  157.

14       On review, the Court reversed the criminal street gang allegation,

15  holding that the evidence failed to establish the necessary element that

16  the gang's primary activities were the commission of enumerated crimes. (Id.

17  118 Cal.App 4th at 159)- Importantly, the Court looked soley to the documented

18  behavior of CLB, which at the time of the offense had somewhere between

19  10 and 20 members, and not its "umbrella organization" the East Side Longos,

20  a gang professing membership of over 300 members.  The Court did not even

21  consider actions taken or documented in relation to the East Side Longos,

22  because though there might be affiliation between that gang and Perez' group,

23  the relevant issue was the primary activities of CLB.

24       As in Perez, the relevant question in relation to petitioner Her is

25  whether there was sufficient evidence that the group of which he was a

26  validated member, the YMS, can meet the definition of a street gang as set

27  forth in the statute.  Because the government failed to prove that the

28  necessary criteria existed in this case, the enhancement applied to all

* Her's former girlfriend thought he was a member of MOD, and one of Her's letter
bore numbers supposedly signifying MOD affiliation. But no one testified to Her's
validation as a MOD, a group apparently consisting of people considerably older
than Her

18

1 Counts must be reversed. There is no way the jury could reasonably find
2 that petitioner Her is a validated gang member, nor that the petitioner
3 was a membership in an ongoing association of three or more persons. "When
4 there is insufficient evidence to establish guilt beyond a reasonable doubt,
5 the defendant must be found not guilty." Jackson v. Virginia, (1979) 443
6 U.S. 307.

7    Therefore, the petitioner's rights to a fair trial, due process and
8 equal protection were violated and prejudice occurred against the 5th, 6th,
9 and 14th Amendment as guaranteed by the U.S. Constitution.

10

11    **B·2  There Was Insufficient Evidence Presented Concerning the
        Primary Activities of YMS, or Even MOD**
12

13    After stating that Kinson Her was a member of YMS, gang expert Lee
14 never returned to detail the actions, history of crime, avowed purpose or
15 any other relevant data about this so-call gang. Instead, he made a bald
16 statement that YMS consists of younger brothers and cousins of original
17 MOD members - and then detailed actions taken by MOD members in association
18 with gang.(4RT 949;953). In this regard, Lee stated that the primary activit-
19 ies of MOD are doing acts of violence. With the prosecutor's prodding,
20 he added robbery and theft offenses.(4RT 951)- He based this description
21 of MODs primary activities by describing a number of violent episodes occurring
22 within the preceding decade, which MOD members were suspected of, arrested
23 for, or convicted of.(4RT 953-957)-

24    This evidence failed to establish the necessary element of the group's
25 "primary activities," and was thus insufficient to support the enhancement
26 applied to Petitioner's sentence. In Perez, supra, the Court explained:

27    "The phrase 'primary activities,' as used in the gang statute, implied
      that the commission of one or more of the statutorily enumerated crimes
28    is one of thee group's 'chief' or 'principal' occupations.[Citaion.]

**19**

1  That definition would necessarily exclude the occasional commission
   of those crimes by the group's members."(Id. at p.323.)"Sufficient proof
2  of the gang's primary activities might consist of evidence that the
   group's members consistenly and repeatedly have committed criminal activity
3  listed in the gang statute.  Also sufficient might be expert testimony,
   as occurred in People v. Gardeley [(1966)] 14 Cal. 4th 605,[620][59
4  Cal. Rptr. 2d 356, 927 P.2d 713].  There, a police gang expert testified
   that the gang of which defendant Gardeley had for nine years been a member
5  was primary engaged in the sale of narcotics and witness intimidation,
   both statutorily enumerated felonies.[Citation.]"(Sengpadychith, supra,
6  at p.324

7  18 Cal.App. 4th at 159-160 (emphasis in original).  Utilizing this standard,

8  the Perez Court found that a rash of shootings over the course of a week,

9  coupled with the beating of an individual six years prior, and the alleged

10  shooting at issue in the case were legally insufficient to establish that

11  the gang's primary activities, i.e. activities which the  gang consistently

12  and repeatedly committed, consisted of murder and attempted murder. Id.

13  Accordingly, the Court ordered that the true finding on the criminal street

14  gang allegation be stricken. Id.

15      In the instant case, there was no testimony from which to glean the

16  primary activities of YMS. As for ??, Officer Lee testified that he believes

17  the group's primary activities to be violence (homicide and drive-by shooting)

18  and theft.  Later in his testimony Lee detailed a number of incidents. occurring

19  between members of MOD and HNS.  Of the offenses claimed to be perpetrated

20  by MOD members, the officer only identifies three incidents resulting in

21  convictions.  The first of these occurred in January 1995 - and the person

22  convicted was from a supposed junior subset called TLR (4Rt 954); the second

23  and third incidents occurred in Febuary and July 2001 in which MOD members

24  were convicted of robbing and beating rival gang members. (4RT 956-957).

25  All other crimes discussed by Lee failed to specify who was involved and

26  how the cases were resolved.  This evidence was plainly insufficient to show

27  that the primary activities of MOD were violence and theft offenses.  See

28  In re Leland D.(1990) 223 Cal.App.3d 251; and In re Nathaniel C.,(1991) 228

1 Cal.App. 3d 990.

2     In Leland D., a California Court of Appeal reversed the finding on the
3 gang enhancement under Section 186.22 explaining "[a]though the statute does
4 not require proof of convictions, it does require proof that the offenses
5 were committed. Evidence that an individual has been arrested for an offense,
6 without more is not sufficient to establish either that a crime has been
7 committed or that any particular individual is guilty of its commission."
8 223 Cal.App 3d at 258. Applying this rule to the facts of Leland D., the
9 Court concluded that "[c]learly Officer Freeman's "expert testimony" based
10 on nonspecific hearsay and arrest information does not constitute substantal
11 evidence that the Fink White Deuces are a criminal street gang as defined
12 by statute." Id., 223 Cal.App. 3d at 259.

13     In the present case, Officer Lee's testimony did not reflect who was
14 arrested for the crimes which were alleged to have been committed, nor the
15 outcome of those arrests. The information presented by Lee was based on
16 nonspecific hearsay and did not provide substantial evidence that the MOD
17 is a gang, cognizable under the statute. Therefore, there's no way the
18 jury could reasonably find that the petitioner is a validated gang member,
19 nor could the jury reasonably find that YMS or MOD's primary activities are
20 violence, robbery, and theft. Thus, the gang enhancement should be reversed.
21 "When there is insufficient evidence to establish guilt beyond a reasonable
22 doubt, the defendant must be found not guilty." Jackson v. Virginia,(1979)
23 443 U.S. 307.

24     Therefore, petitioner's rights to a fair trial, due process, and equal
25 protection were violated and prejudice occurred against the 5th, 6th, and
26 14th Amendments as guaranteed by the U.S. Constitution.

27 ///

28 ///

**21**

1    **B·3  There Was Insufficient Evidence To Show That Her Acted With the**
     **Specific Intent to Promote, Further, or Assist In Any Criminal**
2    **Conduct by Gang Members**

3    There was no evidence from which a rational jury could have concluded that

4    Her acted with the specific intent to promote, further, or assist gang members.

5    see Peopl v. Killibrew,(2002) 103 Cal. App. 4th 664; see also People v. Frank

6    S.,(2006) 141 Cal.App. 4th 1129.

7    In Killibrew, the defendant was convicted of conspiring to posses a handgun.

8    Though Killibrew did not have a handgun in his possession, a gang expert testified

9    that Killibrew was a member of a criminal street gang, and thereby had the

10   requisite subjective knowledge and intent to possess the gun. Id.,103 Cal.App.

11   4th at 647;652.  Specifically he testified that "when one gang member in a

12   car possesses a gun, every other gang member in the car knows of the gun and

13   will constructively possess the gun." Id., 103 Cal.App. 4th at 652.  The

14   California Court of Appeals reversed this conviction, upon a finding that

15   the testimony about Killibrew's subjective knowledge and intent was inadmissible,

16   and the evidence was insufficient to establish Killibrew's guilt. Id. 103

17   Cal. App. 4th at 648.

18   Similarly, in In re Frank S.,(2006) 141 Cal.App.4th 1192,1196, the Court

19   reversed the lower court's finding on a gang allegation, because there was

20   no substantial evidence that the defendant had the specific intent to promote,

21   further or assist in criminal conduct by gang members, aside from a gang expert's

22   statement that the defendant's possession of the knife would benefit the

23   Nortenos by providing the gang with protection. Id. 141 Cal.App.4th 1199.

24   In the instant case, there was absolutely no evidence presented that

25   Petitioner Her had the specific intent to promote, further or assist in criminal

26   conduct by gang member's at the time of the shooting on Western Ave..  The

27   gang expert spoke generally, stating that drive-by shootings promote gangs,

28   such as MOD, by installing fear in rivals.(4RT 961).  This general supposition

**22**

1 by the gang expert, however, was plainly insufficient to establish, beyond
2 a reasonable doubt that Kinson Her harbored the necessary specific intent
3 required for the gang enhancement. Accordingly, there was a failure of proof
4 on this element as well. Thus, the gang enhancement applied to petitioner Her
5 should be reversed. "When there is insufficient evidence to establish guilt
6 beyond a reasonable doubt, the defendant must be found not guilty." Jackson
7 v. Virginia(1979) 443 U.S. 307.

8 Therefore, petitioner Her's rights to a fair trial, due process, and
9 equal protection were violated and prejudice occurred against the 5th, 6th,
10 and 14th Amendments of the U.S. Constitution.

11

12                              -III-
                    THE PETITIONER HAD INEFFECTIVE ASSISTANCE
13                  OF COUNSEL

14

15  A.  The Petitioner Had Ineffective Assistance of Counsel When
         Counsel Failed to Investigate
16

17 The petitioner's Investigator Wally Demerell investigated and found
18 a witness who could possibly identify petitioner Her in a white vehicle,
19 and **not** in a dark colored vehicle as alleged in this case.  Investigator
20 Wally Damerell interviewed Micheal Camacho on May 3, 2004.  Camacho stated
21 that he and his cousin Angel Camacho were at the Sacramento County Court-
22 House with someone named Vang.  Vang stated to Angel Camacho that Vang witness
23 the shooting in this instant case.  Vang also stated the Vang was at the
24 scene on Western Ave. at the time of the shooting, and Vang identified petitioner
25 Her as being in a white vehicle, not the Blue Toyota Camry as alleged in
26 this case. (see interview - appendix III.)-

27 During Micheal Camacho's interview with Investigator Demerall on May
28 3, 2004, Micheal stated that witness Vang was the only one with that last

23

1  name in J-1 Juvenile Facility; however, the Defense Counsel and defense invest-
2  igator Demerell did not make any attempts to find out what Vang really witness
3  before abandoning this possible defense. -see Eugene Rios v. Teresa Rocha,
4  (2002) No.01-12835 D.C. No.-CV-94 00209 U.S. Court of Appeals, 9th Circuit-
5  This information may have been helpful to the petitioner at trial to demonstrate
6  that infact petitioner was not in the Blue Toyota Camry when the shooting
7  occurred,but Counsel and Investigator Demerell failed to investigate.-see
8  Wiggins v. Smith, 123 S.Ct 2527 (2003)- Although it is not clear what witness
9  Vang witness due to the fact that Trial Counsel and Investigator never investigat-
10 ed Vang for possibly useful information that may help the petitioner.-see
11 Taylor v. Singletary,(1997) 123 F.2d 350,"Defendant have 5th and 6th Amendment
12 rights to present witness that are both material and favorable." The petitioners
13 Counsel's representation of the petitioner clearly fail way below an objective
14 standard of reasonableness under prevailing professional norms and a reasonable
15 probability existed that, but for counsel's failings, defendant would have
16 received a more favorable result. - see Strickland v. Washington, (1984)
17 446 U.S. 668,688.-

18      Therefore, the petitioner's rights to effective assistance of counsel,
19 due process, and equal protection were violated, and prejudice occurred against
20 the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

21 **B. Petitioner Had Ineffective Assistance of Trial Counsel When Failed To Object**

22 **B-1  The Petitioner Had the Ineffective Assistance of Trial Counsel**
     **For Failing To Object To Prosecution Witness' Inflammatory**
23   **Characterization**

24      The petitioner's Counsel failed to lodge an objection to prosecutions
25 hypothetical question, and therefore allowed gang expert's prejudicial statement
26 to be presented in front of the juries.

27      The prosecutor gave gang 'expert' Lee a situation supposedly mirroring
28 that in this case - Herein three people, associated with MOD gang, were

24

1 in a car with three weapons, one a sawed off shotgun, the car is stolen, and
2 they go to Western Avenue, approach a house, and fire the weapons. Lee is asked
3 whether that would be for the benefit of MOD (4RT 962), and unsuprisingly
4 responded "definitely - a drive by shooting is a classic gang crime."(Id.)-

5 This hypothethical, however, included crucial "facts" not supported by the
6 evidence. First, for the reason stated in the proceding section, the description
7 of the three vehicle occupants as MOD members was not proven. The government
8 does not even offer a guess as to who the third person might have been, and the
9 prosecution's own witness identified Her as a member of YMS, not MOD, and could
10 not assign Lao to any gang.(4RT 972)-

11 Second, there was no sawed off shotgun in this case. Defendant Lao objected
12 to this mischaracterization of the gun, and the court simply instructed the pro-
13 secutor to call it a "shorten" shotgun instead. (4RT 962)- This "fact" should
14 not have been introduce into a case wherein no weapons were sawed off.

15 Third, the evidence does not support the assumption that the occupants
16 in the vehicle went to a nieghborhood and shot weapons without provocation.
17 The undeniable facts are that a gun battle took place between individuals on the
18 street and the individuals in the vehicle, and it could not be assertain that
19 the occupants in the vehicle fired first. Therefore, taken as a whole, the
20 hypothetical question - which served as the basis for the expert to offer
21 ultimate opinion testimony on the question of the enhancements, grossly mistated
22 the facts of the case, and resulted in undue prejudice.

23 The testimony of the gang 'expert' Lee was flawed because the form of the
24 hypothetical question put to the expert was devoid of factual support and was
25 unduly prejudice. A valid hypothetical question "must be rooted in the facts
26 shown by the evidence." see People v. Gardeley,(1996) 14 Cal.4th 605, 619.-
27 Thus, the petitioners trial Counsels legal representation failed way below an
28 objective standard of reasonableness, and the petitioner would have been able

**25**

1  to strike the prejudicial statements of the presecution witness if petitioners

2  trial counsel was effective in representing the petitioner. - see Strickland

3  v. Washington, (1984) 446 U.S. 668, 688.

4       Therefore, petitioner Her's rights to effective assistance of Counsel,

5  fair trial, due process, and equal protection were violated and prejudice occurred

6  against the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

7

8       **B·2  The Petitioner Had the Ineffective Assistance of Counsel When**
        **Counsel Failed to Object the Gang Experts Baseless Characterization**
9       **of Petitioner Her As a "Hard-Core Killer."**

10      The gang expert Lee was asked by the prosecutor for his opinion of Kinson

11  Her's level of participation and activity as a gang member, and he responded:

12  "I put him right up there at the top--- of being a **hard core killer.**" (4RT

13  937)- Lee went on, "[Her] had progressed from his previous times he was arrested,

14  from steeling a vehicle to illegal gun possession in a vehicle,now to homicide."(Id.)

15  This  "opinion" was not based on training and experience, or on any real expertise,

16  but rather was foundationless, conclusory and completely prejudice.  The expert

17  assumed petitioner Her's guilt in this case at bar, and then argue that his

18  participation in this murder put him at the forefront of homicide gangsters.

19  The opinion could not assist the trier of fact in any way other than giving

20  them a basis to prejudge the defendant, outside of the evidence.  The Killibrew

21  Court explained:

22      Otherwise admissible expert opinion testimony which embraces the ultimate
        issue to be decided by the trier of fact is admissible.(Evid. Code .805)-
23      This rule, however does not permit the expert to express any opinion he
        or she may have.(Citation).  'Undoubtedly there is a kind of statement
24      by the witness which amounts to no more than an expression of his general
        belief as to how the case should be decided... There is no necessity for
25      this kind of evidence; to receive would tend to suggest that the judge
        and the jury may shift responsibility for decision to the witness; and
26      in any event it is wholly without value to the trier of fact in reaching
        a decision.' Killibrew, 103 Cal. App. 4th at 651.
27

28  The type of opinion offered by Officer Lee is especially egregious, because

**26**

1 it invited the jury to base its complex determination of guilt or innocence
2 on generalized fear and unsupported hypothesis. He based his characterization
3 of the petitioner as the worst member of the "largest Hmong gang in Sacramento"
4 on his assumption that petition was guilty of the crime. The expert was
5 charged with assisting tyhe jury to decipher, and then attacted petitioner's
6 character in crude, manufestly unscientific terms. Thus, the petitioner's
7 trial counsels legal representation fail below an objective standard by not
8 objecting to this highly prejudicial statement, and thus, allowing this undue
9 prejudicial statement to be presented to the juries.

10    Therefore, this caused prejudice and violated petitioner's rights to
11 effective assistance of counsel, fair trial, due process, and equal protection
12 as guaranteed by the 5th, 6th, and 14th Amendments of the U.S. Constitution.

13    C.  Ineffective Assistance of Counsel For Giving Ineffective Example
      In Closing Argument That Defeated the Defense Theory of Self-Defense
14

15    Trial Counsel said in closing argument that "We all know from the evidence
16 that there was a projectile fired through as I just went over, the rear passeng-
17 er window. That projectile was never fired---"(paused for a moment then continue)
18 "---recovered." Petitioner Her's counsel is referring to the first
19 projectile that the people at Western Ave. had fired. According to the
20 Reporter's Transcripts (5RT 1228) trial counsel let the word "never fired"
21 sink in the jury's head, and then corrected himself by saying "recovered."
22 This is clearly ineffective assistance of counsel and this simply defeats
23 the petitioner's theory of self-defense, since the defense was relying on
24 the first bullet that penetrated and blew out the right rear passenger window,
25 in which exit the back window.

26    Furthermore, it is clear in the reocord that trial counsel is saying
27 that it is difficult for the defense to prove self-defense; for the defense
28 is in the "negative." In closing argument, trial counsel said,"...if the

1 burden was on lets say, Kinson Her to prove it, which is true in some other

2 countries, that it's very difficult for somebody on the other side to prove

3 a negative, as we all know. The negative being, well we didn't shoot first.

4 It's very difficult if the burden was on him to prove that." (4RT 1195)-

5 · The petitioner's trial counsel defeated the self-defense argument by

6 giving these prejudicial statements to the Jury. Petitioner's trial counsel

7 fell way below an objective standard. see Strickland v. Washington, 446 U.S.

8 668. Therefore, it caused prejudice against petitioner and violated petitioner's

9 rights to effective assistance of counsel, fair trial, due process and equal

10 protection as guaranteed by the 5th, 6th, and 14th Amendments of the U.S.

11 Constitution.

12 **D. The Petitioner Had Ineffective Assistance of Counsel When Counsel**
     **Failed To Present the Petitioners Expert Witness At Trial**
13

14 The petitioner was told verbally by his trial counsel that there was

15 an expert witness who was willing to testify on the petitioner's behalf;

16 however, when trial began, defense counsel failed to locate and have expert

17 witness attend the trial in order to testify for the defense.

18 The expert was willing to testify that the people at Western Ave. had

19 fired shot first based on the evidence. This expert witness would have been

20 helpful to the petitioner had the counsel located the expert. The expert

21 would have had a major influence on the jurors to have a more favorable result

22 to the petitioner. "Defendant's 5th and 6th Amendment rights to present

23 witness that are both material and favorable." Taylor v. Singletary,

24 (1997) 123 F.3d 350. Therefore, the petitioner's rights to an effective

25 counsel, rights to present witness, rights to a fair trial, and rights to

26 equal protection were violated and prejudice occurred against the 5th, 6th,

27 and 14th Amendments of the U.S. Constitution.

28 ///                              **28**

1    **E.   Trial Counsel Failed To Request Inquiry Into Prosecution Witness'**
         **Detective Stigerts Prohibited Communication With the Jury(s)**
2

3       On July 20, 2005 at the petitioner's trial, one of the prosecution

4    witness, Detective Stigerts made an illegal and prohibited communication

5    with the jurors by talking to the jurors; however, when this matter was

6    brought to the attention of the petitioner's trial counsel,petitioner's

7    counsel failed to request inquiry into the  prohibited communication that

8    may have infected the jurors and caused prejudice. (2RT 510)- The petitioner's

9    counsel fail below an objective standard of reasonableness under prevailing

10   professional norms and a reasonable probability existed that, but for counsel's

11   failings, defendant would have received a more favorable result. see

12   Strickland v. Washington, (1984) 446 U.S. 668, 688.

13      This was ineffective assistance of petitioner's trial counsel and the

14   petitioner's rights to effective assistance of counsel, fair and impartial

15   jury, due process, and equal protection were violated and prejudice occurred

16   against the 5th, 6th, and 14th   Amendments guaranteed by the U.S.

17   Constitution.

18

19                          -IV-
                **THE COURT ERRED AND ABUSED ITS**
20              **DISCRETION THAT VIOLATED PETITIONER'S**
                **CONSTITUTIONAL RIGHTS**
21

22   **A.   The Trial Court Erred By Not Excepting Letters From Petitioner**
           **Her As Motions  In Regards to Personal Conflicts Between Petitioner**
23         **and Petitioner's Trial Counsel**

24      The Petitioner was having a personal conflict with his defense attorney

25   and attempt to notify the Court verbally, but the Court stated that the

26   petitioner would have to go through his counsel. (1RT 19)- The petitioner

27   also wrote two letters to the court asking the Court to settle this personal

28   conflict and to place a "995" motion in the court file. (1RT 25-line 13)-

                                29

1  (1RT 26 line 1)- "When a trial judge is on notive that a personal conflict
2  of interest exists, the judge must make inquiry into the conflict. If not,
3  the defendant's conviction is reversed automatically." Holoway v. Arkansas,
4  (1976) 435 U.S. 475.

5  Therefore, the petitioner's rights to effective assistance of counsel,
6  fair trial, due process, and equal protection were violated and prejudice occurred
7  against the 5th, 6th, and 14th Amendments of the U.S. Constitution.

8

9  B.  The Trial Court Erred By denying Petitioner's Motion
         For An Interpreter
10

11  On July 11, 2005, at the beginning of the petitioner's trial, the petitioner
12  motion for the court to provide an interpreter for the petitioner because the
13  petitioner did not fully understand the english language and was not able to
14  proceed to trial with an understanding of what was being said within his own
15  trial; however, the court denied the motion and allowed the petitioner to be
16  unaware of what was being said at his own trial. (1RT 5)-

17  The english language is not the petitioner's primary language and speaking
18  english fluently can be quite fast and difficult to comprehend for a person
19  who does not fully understand the english language. Thus, this was a denial
20  of the petitioner's rights to a meaningful access to the court when the
21  petitioner could not fully understand what was being said or done at his own
22  trial.

23  Therefore, the petitioner's rights to freedom of speech, fair trial, due
24  process and equal protection were violated and prejudice occurred against the
25  1st, 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

26

27  C.  The Trial Court Erred By Denying Petitioner's Motion To Exclude
         Any Opinion of Bandanna
28  ///

1    On July, 11, 2005, during motion of limine, the petitioner motion to exclude
2 any lay opinion that the community bandanna was used in a fashion to cover
3 someone's face or any nature thereof. (1RT 13)- The Court denied this motion.
4 (1 RT 13)- The Trial Court abused its discretion in denying this motion and
5 allowing the prosecution to introduce the theory that the community bandanna
6 was used in a fashion to cover one's face or head.

7    Witness Detective Stigerts testified on direct examination that the
8 community bandanna was tied like it would go around your head and made a
9 motion with both of her hands to the back of her head. (1RT 122)- The prosecution's
10 intention that the community bandanna was to 'cover ones head' was not rooted
11 from the facts or evidence in this case. There was no witness who seen
12 the suspects wearing a blue bandanna on ones face or head. Not a single
13 witness mention the color blue or the community bandanna. "It is abuse of
14 discretion to admit evidence if there is even the modest likelihood of unfair
15 prejudice or small risk of misleading the jury." see U.S. v. Hitt, (1992)
16 981 F.2d 422.

17    This is clear error and abuse from the court for allowing the prosecution's
18 witness Detective Stigerts to testify in a manner of how the community bandanna
19 was used to 'cover ones head'; for no eve witness seen the occupants in the vehicle
20 wearing a bandanna or anything to do with the color blue on ones head.

21    Therefore, the petitioner's rights to a fair trial, due process, and equal
22 protection were violated and prejudice occurred against the 5th, 6th, and 14th
23 Amendments as guaranteed by the U.S. Constitution.

24

25    **D.  The Court Erred In Allowing Inflamatory Gang Evidence To Be**
           **Presented To the Jury**
26

27    **D·1  The Court Erred In Denying Petitioner's Motion To Bifurcate**
           **the Gang Enhancement**
28 ///

1    The petitioner filed a written motion to bifurcate the gang enhancement
2  during motion of limine, on grounds that the other crime evidence is highly
3  inflammatory and irrelevant to the substantive charges, which will create
4  prejudice and violate the petitioner's rights to receive a fair trial.

5    The Court denied the motion and allowed prejudicial evidence to be presented
6  within the trial; therefore, causing prejudice in the petitioner's trial.
7  The court abuse its discretion in allowing this.  "Enhancements can be
8  bifurcated from the substantial charges." see People v. Caleron, (1994) 9
9  Cal.4th 69; People v. Bracamonte, (1981) 119 Cal. App.3d 664; and People v.
10 Weathington(1991) 231 Cal.App.3d 69).-

11   The detrimental impact of gang evidence is further compounded when it
12 involves violent acts of third parties because it imposes upon the accused
13 the impossible task of dissuading a jury from concluding guilt by association.
14 A conviction based on guilt by association has long been recognized as a heinous
15 error."People v. Chambers,(1964) 231 Cal.App. 2d 23.

16   Therefore, the petitioner's rights to a fair trial, due process, and
17 equal protection were violated and prejudice occurred against the 5th, 6th,
18 and 14th Amendments as guaranteed by the U.S. Constitution.

19

20   **D·2  The Trial Court Erred In Allowing Gang Expert To Give Prejudicial**
21   **Testimony About A Hypothetical Question That Misrepresented the**
     **Core of the Facts of the Case**

22   The Trial Court erred in denying petitioner's motion to bifurcate the
23 gang enhancement; therefore, allowing the gang expert to give inflammatory
24 testimony.  The testimony of Officer Lee was flawed because the form of the
25 hypothetical question put to the expert was devoid of factual support and
26 was unduly prejudicial.  A valid hypothetical question "must be rooted from
27 the facts shown by the evidence."  see People v. Gardeley,(1996) 14 Cal.4th
28 605, 618. ("Like a house built on sand, the expert's opinion is no better

1 than the facts on which it is based." Id., qouting Kennemur v. State of
2 California,(1982) 113 Cal. App.3d 907). Here, the prosecutor gave expert
3 Lee a fatual situation supposedly mirroring that in this case - wherein three
4 people, associated with the MOD gang, were in a car with three weapons, one
5 a sawed off shotgun, the car is stolen, and they go to Western Ave., approach
6 a house, and fire the weapons. Lee was asked to opine whether that would
7 be for the benefit of MOD,(4RT 962)- and unsupprisingly responded "definitely
8 - a drive by shooting is a classic gang crime."(Id.)-

9    This, hypothetical, however, included crucial "facts" not supported
10 by the evidence. First, the description of the three vehicle occupants as
11 MOD members was not proven. The government does not even offer a guess as
12 to who the third person might have been, and the prosecution's own witness
13 could not assign Lao to any gang. Second, there was no sawed off shotgun
14 in this case. Defendand Lao objected to the mischaracterization of the gun,
15 and the court simply instructed the prosecutor to call it a "shorten" shotgun
16 instead. (4RT 961)- This "fact" should not have been introduced into a case
17 wherein no weapons were "sawed-off." Third, the evidence does not support
18 the assumption that the vehicle's occupants went into a neighborhood and
19 shot weapons without provation. The undeniable facts are that a gun battle
20 took place between individuals on the street and individual in the vehicle,
21 and it could not be assertain that the occupants in the vehicle fired shot
22 first, or what event precipitated the battle. Therefore, taken as a whole,
23 the hypothetical question - which served as the basis for the expert to offer
24 ultimate opinion testimony on the question of the enhancement, grossly misstated
25 the facts of the case, and resulted in undue prejudice.

26    Not had the Court abused its discretion in denying the petitioner's
27 motion to bifurcate the gang enhancement, this prejudicial testimony from
28 the gang expert wouldn't been presented so early to the jury along with the

**33**

1  substantial charges. Therefore, the court erred in allowing inflammatory
2  testimony from the gang expert to be presented on the substantial charges.
3  Thus, the petitioner's rights to a fair trial, due process, and equal protection
4  were violated and prejudice occurred against the 5th, 6th, and 14th Amendment
5  of the U.S. Constitution.

6

7      D·3  The Trial Court Erred In Allowing the Gang Expert's Baseless
8           Characterization of Petitioner Her As A "Hard Core Killer"

9      The trial court erred in denying petitioner's motion to bifurcate the
10 gang enhancement; therefore, allowing the gang expert to give inflammatory
11 testimony. At trial Officer Lee was asked by the prosecutor for his opinion
12 of Kinson Her's level of participation and activity as a gang member, and he
13 responded:"I put him right up there at the top - of being a hard core kill."
14 (4RT 973)- Lee went on."[Her] had progressed from his previous times he
15 was arrested, from stealing a vehicle to illegal gun possession in a vehicle,
16 now to homicide."(Id.) This "opinion" was not based on training and experience,
17 or on any real sort of expertise, but rather was foundationless, conclusory
18 and completely prejudicial. The expert assumed petitioner's guilt in the case
19 at bar, and then argued that his participation in this murder put him at the
20 forefront of homicide gangsters. Because this could not assist the trier of
21 fact in any ligitimate way, the trial court erred by allowing the tesimony
22 to stand. The decision to do so was at odds with the California law.  In
23 People v. Killibrew,(2002) 103 Cal. App.664, the California Court of Appeal
24 explained:

25      Otherwise admissible opinion testimony which embraces the ultimate issue
        to be decided by the trier of fact is admissible(Evid.Code 805). - This
26      rule, however, does not permit the expert to express any opinion he or
        she may have.(citation)-'Undoubtedly there is a kind of statement by the
27      witness which amounts to no more than an expression of his general belief
        as to how the case should be decided....There is no necessity for this
28      kind of evidence; to receive it would tend to suggest that the judge ....

1    and jury may shift responsibility for decision to the witness; and in
     any event it is wholly without value to the trier of fact in reaching
2    a decision.'

3 Killibrew, 103 Cal. App.4th at 651.(internal citations omitted).  Because
4 there was no evidence of petitioner Her's active participation in this crime,
5 the officer's assessment of Her's guilt, offered pursuant to his designation
6 as an "expert," and with the authority of the State behind him, was unduly
7 prejudicial.  Officer Lee acted as an adjunct of the prosecution, using
8 the seemingly impenetrable cloak of gang expertise to promote the views of
9 the prosecution.  This is precisely the type of testimony that the Killibrew
10 court cautioned against.  The Officer's crude attack on this child, who had
11 absolutely no record of violent behavior, was unprofessional, unscientific,
12 and must be rectified by this court; for this violated the petitioner's rights
13 to fair trial, due process, and equal protection as guaranteed by the U.S.
14 Constitution.

15

16    D-4  The Gang "Expert's" Testimony Violated the Confrontation Clause
            of the 6th Amendment of the U.S. Constitution
17

18    Though petitioner understands that expert opinion, in the abstract,
19 may be based on outside sourses, not produced for cross-examination, that
20 principle does not justify what was done here, which was entirely lawless.
21 While Lee was presented as an "expert" in gang-related matters, there was
22 nothing or analytical about his opinions.  Lee's testimony about specific
23 gangs, their activities and membership was based almost entirely on information
24 imparted to him by others - police officers, alleged gang affiliates, and
25 informers.  Thus, Lee was simply conveying, in the guise of expert opinion,
26 the out-of-court factual assertions of individuals who were not called to
27 testify and were thus not subject to cross-examination.

28    In Crawford v. Washington, 541 U.S. 36, 124 S Ct. 1354(2004), the Supreme

**35**

1 Court reinvigorated the historical Sixth Amendment right of confrontation,

2 by holding that out of court statements that are testimonial in nature must

3 be excluded in criminal trials. We acknowledge that the California Court of

4 Appeal, Fourth Appellate District, has recently upheld gang expert testimony

5 in the face of a Crawford challenges in People v. Thomas(2005) 130 Cal.App.

6 4th 1202 and People v. Fulcher (2006) 136 Cal. App 4th 41, 56. Nevertheless

7 we respectfully submit that the circumstances of Lee's testimony required that

8 it be excluded on Sixth Amendment grounds.

9     Lee's opinions about MOD, YMS, and the defendants below were cobbled together

10 from statments made be people - both in law enforcement and in the criminal

11 underworld - who knew Lee's purpose and were aware of the likely import of

12 these statements. Thus, these out-of-court, uncross-examined declarations were

13 made by people who knew that their utterances to Lee, a reputed gang "expert,"

14 were "testimonial" in nature, forming the probable basis for "testimonial" utterances

15 set forth in Crawford and its progeny. The Crawford Court explained:

16     Various formulations of the core class of "testimonial" statements exist:
       "ex parte in-court testimony or its functional equivalent--that is, material
17     such as affidavits, custodial examinations, prior testimony that the defendant
       was unable to cross-examine, or similar pretrial statements that declarants
18     would reasonably expect to be used prosecutorially," Brief for petitioner
       23;"extrajudicial statements...contained in formalized testimonial materials,
19     such as affidavits, depositions, prior testimony, or confessions,"
       White v. Illinois, 502 U.S. 346,365,116 L. Ed 2d 848,112 S.Ct. 736
20     (1992)(Thomas, J., joined by Scalia, J., concerning in part and concurring
       in judgement); "statements that were made under circumstances which would
21     lead an objective witness reasonably to believe that the statement would
       be available for use at a later trial," Brief for National Association
22     of Criminal Defense Lawyers et al. as Amici Curiae 3. These formulations
       all share a common nucleus and then define the Clause's coverage at
23     various levels of abstraction around it. Regardless of the precise
       articulation, some statements qualify under any definition--for example,
24     ex parte testimony at a preliminary hearing.

25 541 U.S. at 40-41 [emphasis supplied]. The Court concluded "[w]here testimonial

26 statements are at issue, the only indicium of reliability sufficient to

27 satisfy constitutional demands is the one the Constitution actually prescribes:

28 confrontation." Id.

1    The People cannot overcome this constitutional violation by

2    invoking the canard independently in evidence.  Lee's "opinion" about Her,

3    his gang affiliation and his character as "a hard core killer" are clearly

4    not scientific or analytical conclusions drawn from a careful examination

5    of available data; they are mere expressions of things Lee had been told.

6    Lee is, in short, a mouth piece for all manner of out-of-court assertions made

7    under circumstances making it clear to the declarants that their claims would

8    be used testimonially.  The prosecutor should not have been able to avoid

9    the crucial confrontation guaranteed of the Sixth Amendments in this way.

10    Lee's asserted "expert"opinion should not have been received.

11        Therefore, the petitioner's rights to a fair trial, due process, and

12    equal protection were violated and prejudice occurred against the 5th, 6th,

13    and 14th Amendments to the U.S. Constitution.

14

15        D·5  **The Court Abused Its Discretion In Considering the Gang Detective
          As An "Expert"**

16

17        As describe in Rule 702 of the state rule of evidence, the trial court

18    must also consider the experts qualifications and the "straight forward connection

19    between the experts knowledge and the basis for the opinion such that no

20    analytical gap exists between the data and the opinion.

21        In the instant case, though its at the courts discretion, the court abused

22    its discretion for not considering the experts qualifications as to the

23    "straight forward connection between the experts knowledge and the basis for

24    the opinion such that no analytical gap exists between the data and the opinion

25    offered."  In the instant case, the gang 'expert Lee's accuracy rate did not

26    show that the analysis was sufficiently trustworthy to be reliable; for the gang

27    expert was a police detective for a period of time does not necessarily make

28    the detective a qualified expert.

<center>37</center>

1    The gang expert Lee's opinion that petitioner Her was a "hardcore
2 killer" and the crime was committed for the benefit of the MOD gang was
3 foundationless, unscientific, and an analytical gap existed. The analytical
4 gap existed as argued in grounds II section B1, B2, B3, and ground IV
5 section D1, D2, D3, D4.

6    Therefore, the petitioner's rights to a fair trial, due process, and
7 equal protection were violated and prejudice occurred against the 5th, 6th,
8 and the 14th Amendments to the U.S. Constitution.

9

10    E.  The Trial Court Erred By Failing To Declare A Mistrial
       During Voir Dire
11

12    On July 12, 2005 at the petitioner's trial, petitioner's trial counsel
13 motioned for a mistrial(1RT 38)- based on prejudicial questions posed by
14 the prosecuting attorney within voir dire of the prospective jurors, and
15 the court erroneously denied the motion and failed to declare a mistrial.
16    The prosecutor's statement that both the defense counsel are in the
17 job of hiding the truth, and that the truth is not a good thing for the
18 defendant(1RT 39) is highly prejudice.  It is prejudicial and irrelevant
19 to pose such question during voir dire.  This prejudicial questions were
20 intentionally posed to the prospective jurors. see Irwin v. Dowd, (1961)
21 366 U.S. 717.-

22    Therefore, the petitioner's rights to a fair and impartial jury, due
23 process, and equal protection were violated and prejudice occurred against
24 the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.
25

26    F.  The Trial Court Erred By Failing To Declare a Mistrial When
       Witness Detective Stigerts Made An Illegal and Prohibited
27       Communication With the Jurors

28 ///

38

1    On July 20, 2005, at the petitioner's trial, one of the prosecution
2  witness Detective Stigerts made an illegal and prohibited communication
3  with the jurors by talking to the jurors, but when this matter was brought
4  to the attention of the court, the court failed to declare a mistrial.(2RT 510)-

5    The petitioner's co-defendants trial counsel brought the attention up so
6  the record can reflect that the court had to admonish Detective Stigerts -who
7  had been present as the prosecutions investigating Officer- because she had
8  approached the jury and made some comments to the jurors(1RT 510).- Without any
9  questions being asked, the court assumes the conversation between the witness
10  Detective Stigerts and the jury were about a coffee spillage, and the Court
11  found that Detective Stigerts did not in any way intended to ingratiate herself
12  with the jurors or did anything that would amount to a mistrial.  In Caliendo
13  v. Warden of Cal. Men's Colony-C.A.P.S/(2004) 365 F.3d 691.- "Any unathorized
14  communication between [a] juror and witness or interest party is presumptively
15  prejudice." Thus, the court erred in her foundationless opinion and abused
16  its discretion by presuming communication between witness Detective Stigerts
17  and the jurors harmless and being not prejudice.

18    The petitioner has a right to a fair and impartial jury, but the illegal
19  and prohibited communications infected the jurors and caused prejudice within
20  the petitioner's trial. Therefore, the petitioner's rights to a fair and
21  impartial jury, due process and equal protection were violated and prejudice
22  occurred against the 5th, 6th, and 14th Amendments as guaranteed by the U.S.
23  Constitution.

24

25    G.  The Court Erred In Denying Petitioner's '995' Motion

26    On August 4, 2005, petitioner Her filed a '995' motion and the court
27  erred in not accepting the motion; for it was not filed by the petitioner's
28  counsel.

1    According to the '995' motion, as it pertains to the Indeterminate
2 Sentencing Law, the Senate Bill 42 was ratified on July 1, 1977, and it states
3 as follow:

4    "S.B. 42 would repeal the indetermine sentencing statute and would substitute
     a system of sentences that would allow the court to specify the amount
5    of time the defendant should serve in prison. Each crime would carry
     three possibilities for the sentences. The Bill specifies the procedures
6    for the judge to select one of the three choices."

7    The S.B. 42 repealed and eliminated all life with the possibility of      •
8 parole from the California statutes, laws, and codes on July 1, 1977. Under
9 the law of case, there can be no crime without a penalty, and if the penalty
10 is "indeterminate" under the Legislature's declared policy of "punishment"
11 for the crime itself, it is "void on its face" as being uncertain, and against
12 the law, because it cannot be constitutionally administered. (P.C. §1170(a)(1)
13 Stats 1977 C 165 §15)- the penalty inflicted must be the same for each offender
14 committing the same offense, therefore, it must be a penalty fixed in a number
15 of years by the Legistature. Without an expressed re-enactment of the repealed
16 "I.S.L." and its supporting statutes, some of which call for purpose and
17 policy, the penalty cannot be legally enforced. The voters did not confer
18 discretion on any agency to determine any indeterminate sentence after July
19 1, 1977. Also, the "I.S.L." re-enactment was not a subject that was ever
20 submitted for voters approval. Schnitz v. Younger, 21 Cal. 3d. 90,93,145
21 CR 517 (1978): Scott v. Superior Court, 27 Cal. App.3d 292, 295, 103 CR 683
22 (1972) ["... a statue may not be amended by reference to its title. A section
23 of a statue may not be amended unless the section is re-enacted as amended."].

24    On July 1, 1977, California no longer provided for indeterminate sentencing.
25 And under the policy of "punishment" for the crime itself, indeterminate sentenc-
26 ing cannot exist, therefore, the penalty for the crime charged, must be the
27 same in a number of years for each person committing the same offense, or
28 the penalty is "uncertain" and violates, inter alia, both due process and

1 and equal protection clauses of the State and Federal Constitution. * (see

2 appendix I)- The Indeterminate Sentencing Law violates the equal protection

3 rights as guaranteed by the 14th Amendment of the U.S. Constitution since

4 one person serving Life can be released before another person serving life

5 when the two committed the same offensee. This is clearly unconstitutional

6 and the petitioner's 52 years to life with the possibility of parole must

7 be eliminated and correctly re-sentence.

8    Therefore, the court erred in not accepting the petitioner's motion;

9 for the petitioner's rights to due process and equal protection were violated

10 and prejudice occurred against the 5th and 14th Amendments as guaranteed by

11 the U.S. Constitution.

12

13    **H. The Court Erred By Admitting Prejudicial and Inflammatory Testimony**
14    **of a Witness that He (the witness) Believed that Threats and Reprisals**
     **He Had Suffered Years Earlier Were Connected To His Testimony Against**
15    **Kinson Her, When the Witness Admittedly Had No Factual Basis for**
     **this Belief**

16    Midway through the direct examinations of witness Rindy Her, the prosecutor

17 asked for a hearing outside the presence of the jury(3RT 673).- Apparently,

18 Rindy Her's demeanor was thought unsatisfactory, and the prosecutor endeavored

19 to prove, by questioning Mr. Her, that his poor performance was a product

20 of intimidation he suffered as a result of testifing - stating that his house

21 had been shot at, he had been physically attacted, and he had received death

22 threats, which he connected to being a witness against petitioner Her.

23    Her made clear, however, that he did not know who shot at his house three

24 years before, and no warning was issued to him by the shooter(3RT 678-681);

25 He stated that he likewise had never seen the people who attacted him on

26 the street three years before, though they could have been friends of persons

27 who were friends of Kinson Her.(3RT 690-691)- Again, the attackers said nothing

28 to Rindy Her about testifying and Her did not report the attacks to police;

* please notice that appendix I is only a copy and the original is still in
Sacramento Superior Court file-

1 Finally, Rindy Her stated that unknown persons called his house three years

2 before, on two occasions - and during one of these calls he was told that

3 he would be killed if he testified.(3RT 681-684)-

4 Petitioner objected to allowing Rindy Her to testify about these events,

5 arguing that, under Califonia Evi. Code § 352, any probative value to be

6 gained from the testimony was clearly and substantially outwieghed by its

7 prejudicial effect(3RT 695-696); and that the testimony would violate petitoiner's

8 rights to due process.  The court ultimately allowed this highly prejudicial

9 material to be presented to the jury with the following instruction:

10    You are about to hear testimony concerning threats and acts of violence
      directed toward this witness.  This evidence is only to be considered
11    in evaluating Mr. Her's attitude and demeanor torwards testifying.
      The evidence is not to be considered against Houa Lao or Kinson Her.
12    There's no evidence connecting Houa Lao or Kinson Her to these acts.
      (3RT 697)-
13

14 The trial court's rulings on evidentiary questions are reviewed for

15 an abuse of discretion.  Inflammatory evidence is admissible only where its

16 probative value outwieghs its prejudicial effect.  People v. Durham(1969)

17 70 Cal. 2d 171.

18 In refining this rule, the California Court of Appeals has explained

19 that evidence should be excluded where there is good reason to believe that

20 the real object for presenting the evidence is not that for which it is

21 ostensibly offered,but rather is to affect the jury's determination on issues

22 for which the evidence could not be rightly admitted under the Califonia

23 Rules of Evidence.  People v. McGee(2002) 104 Cal. App. 4th 559.

24 There is no question that this testimony, which bore no relevance to

25 the issue of the trial, painted Kinson Her in the minds of the jurors as

26 a gang member and a violent individual with violent associates.  The court

27 had strong reason to believe that this was the real purpose for which Rindy

28 Her's testimony was elicited.  Clearly the evidence of uncharged threats,

42

1 violence and witness intimidation was not admissible to establish either

2 Kinson's Her's gang connections nor his participation in the charged offenses.

3     Nor was this evidence fairly relevant to Rindy Her's credibility. Rindy

4 Her had not been cross-examined or impeached at the time that the court allowed

5 this testimony about his fear or reprisals from persons associated with

· 6 Petitioner Her. This violation was magnified by the fact that, as we know,

7 Rindy Her did not know the identity of his attacters, had never seen them

8 before, and could not connect them to Kinson Her - though he thought it was

9 possible that they might know people who Kinson Her also knew. This evidence

10 was irrelevant to the establishment of any material fact in this case, and

11 created a substantial likelihood of undue prejudice and confusion in the

12 jury.

13     Therefore, the court's admission of this evidence deprived petitioner

14 Her of a fair trial, due process, and equal protection. This violation occurred

15 against the 5th, 6th, and 14th Amendments as guaranteed by the U.S. Constitution.

16

17 **I. The Court Erred In Giving the Following Jury Instructions**

18    **I·1 The Court Erred By Instructing the Jury, Over Objection, On the**
       **Theory of "Pretextual Self Defense" Under CALJIC No. 5.55, When**
19        **This Instruction Was Unsupported By the Evidence and Undermined**
       **Petitioner's Legitimate Self-Defense Argument**
20

21     **The** Court below instructed the jury, over objection by Her(4RT 1096),

22 that"the right to self-defense is not available to a person who seeks a quarel

23 with the intent to create a real or apparent necessity of exercising self

24 defense" pursuant to CALJIC 5.55.(4RT 1134)- Because this instruction was

25 not supported by the evidence, its inclusion in the jury's instructions constitu-

26 ted error under state law and federal constitution law. People v. Crandell,

27 (1988) 46 Cal.3d 833.

28     **The error** was exacerbated by the People's reliance on CALJIC 5.55,

1   to undercut the defendants claim of self-defense, during closing argument,

2   the prosecutor told the jury that "[t]hat instruction would eliminate any

3   possibility of self-defense," and stated "this is not a case of self-defense.

4   And even if it were self-defense, it wouldn't be appropriate for these two

5   defendants, but its not a case of self-defense." (4RT 1172-1173)- Again in

6   closing, after defense counsel had argued self-defense, the prosecutor qouted

7   the CALJIC 5.55 instruction, and argued that it precluded self-defense.(5RT 1296)-

8       Use of this erroneous instruction to undermine petitioner's viable claim

9   of self-defense was damaging, because the defense was very strong. The vehicle

10  allegedly, with Lao and Her, drove past a house where gang members were colleted,

11  and gunfire was exchange. Forensic evidence establish that the rear right

12  passenger side window was closed at the time of the shooting, and thus was

13  blown out by the persons who fire upon the vehicle, before the vehicle past

14  3212 Western. The fact that the side portion of the Toyota was hit by the

15  assailants gathered in front of 3212 Western and that bullet holes were also

16  found at the residence across the street from 3212 Western is strong evidence

17  that these individuals were the initial aggressors in the shootout, and that

18  the vehicle occupants return fire, in the belief that self-defense was warranted.

19       The evidence did not show, as claimed by Yee Xiong and Vue Heu, that

20  these individuals were innocently collected at the Western address when they

21  were fired upon. Rather, it is beyond dispute that notwithstanding the perjury

22  of these key witnesses, a gun battle occurred - with assailants firing weapons

23  at the vehicle, and guns being fired from the vehicle torward the individuals

24  on the street. Gunshot residue found on the hands of Yee Xiong and the noted

25  concentration of lead on the hands of Fong Vue makes it clear that these

26  individuals fired weapons. Since no weapons were found corresponding to the

27  bullet holes found in the Toyota, the bullet hole across the street, nor

28  the .45 empty shell casings found next the victims, individuals associated with

1   the "victims" on Western at the time of the incident clearly took and hid the
2   weapons used to shoot at the vehicle, following the exchange of gunfire.

3       The only persons who admitted to being present, Yee Xiong and Vue Heu,
4   lied about almost every detail of this event on the witness stand, and their
5   testimony was internally inconsistent, inconsistent with each other, and lacked
6   even the most rudimentary credibility. (1) Vue Heu stated that neither he nor
7   any of his friends had any guns.(1RT 192)- He stated that he did not see any
8   of his friends with a weapon (Yee,Fong,Vang, or himself) and he does not know
9   if any of them own weapons.(1RT 227)- Yee Xiong, likewise was adamant that
10  he did not shoot at the car, nor handle any weapon on the day of the shooting.
11  (2RT 311-313)- The results of gun residue test undeniably show that both Heu
12  and Xiong lied about this fact. (2) Vue Heu testified that he was outside with
13  Yee Xiong and Fong Vue, and that no one else was present (Vang having gone
14  inside prior to Fong's arrival)(1RT 172-173;187)-

15      Further, Heu stated that Fong had only been there for approximately one
16  minute when he was shot.(1RT 174;214) Yee Xiong testified, however, that there
17  were at least four people outside, though he doesn't remember who, whether
18  these individual were male or female, young or old, or any other details.(2RT
19  333-335); Xiong further stated that he never saw Vang that night, and was not
20  talking to Vue Heu at all.(2RT 336). (3) Vue Heu testified that he had been
21  with his friends in the driveway of 3212 Western Ave. for about 1 to 2 hours(though
22  he acknowledged telling police that they were outside for approximately 4 hours.)
23  (1RT 172;214); Yee Xiong stated, by contrast, that he had just arrived moments
24  before the shooting (rather than being there for a period of hours).(2RT 313)-
25  (4) Heu said he is not associated with a gang, but that he heard that Yee Xiong
26  was a part of RBG (ruthless Boy Gangster)-(1RT 182;198).- Yee Xiong confirmed
27  this affiliation. By contrast, the People's gang expert testified that Xiong
28  was a member of the gang "Little Leprechaun Krew"(4RT 968), and that Heu was

45

1 associated with HNS.(4RT 989)-

2     Based on the evidence, the defendant relied heavily on their claims that
3 the People had failed to prove the shootings were not justified by self-defense.
4 There was no evidence that the petitioner went to 3212 Western, looking to
5 court a fight, planning to "create" a spurious claim of self-defense. As
6 a review of the evidence shows, such a theory is preposterous under the facts
7 of this case. The giving of CALJIC 5.55 and the prosecutor's argument to
8 the jury that this instruction eliminated the possibility of a finding that
9 petitioner acted in self-defense; therefore, the petitioner's rights to a
10 fair trial, due process, and equal protection were violated and prejudice
11 occurred against the 5th, 6th, and 14th Amendments to the U.S. Constituion.

12

13    **I•2 The Trial Court Erred In Instructing the Jury, Over Objection,**
       **On the Theory of "Adoptive Admissions" (CALJIC 2.71.5), Involving**
14        **Her's Post-Arrest Interrogation By Police**

15     The court below also instructed the jury on the theory of adoptive admissions,
16 codified in CALJIC 2.71.5, regarding petitioner Her's silence in the face
17 of accusation. Since petitioner's silence came during a police interrogation,
18 and after petitioner Her had finally been apprised of his constitutional right
19 to remain silent, the Court erred in allowing the ensuing silence to be treated
20 as an admission. The Court's instruction was as follow:

21     "If you should find from the evidence that there was an occasion when
      defendant Kinson Her(1) under conditions which reasonably afforded him
22     an opportunity to reply; (2) failed to make a denial or made an envasive
      statement in the face of an accusation expressed directly to him or in
23     his presence, tending to connect him with the commission of the crime
      for which the defendant is now on trial; and (3) that he had heard the
24     accusation and understood its nature, then the circumstance of his response
      on that occasion may be considered against him as indicating an admission
25     that the accusation is true..." 94RT 1122-1123)-

26     A review of California case law discussing "adoptive admissions" makes
27 **clear that** this instruction is not intended to be used to undermine a criminal
28 defendant's constitutional right to silence during custodial interrogation.

1  See People v. Cockrell (1965) 63 Cal. 3d 659, 670-671. Rather, the jury instruction

2  has been upheld as properly given, only after the threshold inquiry is satisfied

3  that the accused's silence was not the product of an exercise of his rights.

4  As the Court observed in People v. Edmondson (1976) 62 Cal.App.3d 677, "[i]f a

5  person is accused of having committed a crime, under circumstances which do not

6  lend themselves to an inference that he was relying on the right of silence

7  guaranteed by the Fifth Amendment to the United States Constitution, and

8  he fails to speak... the accusatory statement and the fact of silence may

9  be offered as implied adoptive admission of guilt.

10  Here, because petitioner Her was communicating with a law enforcement

11  agent, following arrest and during custodial interrogation, he had the right

12  to rely on the constitutional Right to silence which had been belatedly offered

13  to him by Detective Keller. In light of the lack of evidence presented against

14  petitioner Her in connection with the crimes alleged, the Court committed harmful

15  error by allowing the jury to infer petitioner's culpability from his non-

16  responsiveness during interrogation.

17  Therefore, the petitioner's rights to a fair trial, due process, and equal

18  protection were violated and prejudice occurred against the 5th, 6th, and 14th

19  Amendments to the U.S. Constitution.

20

21  **I-3  The Trial Court Erred In Instructing CALJIC No. 2.03, 2.06, 2.51**
             **and 2.52**
22

23  The Court allowed jury instruction CALJIC No. 2.03, 2.06, 2.51, and 2.52

24  to be given to the jury during the petitioner's trial. These were argumentative,

25  pinpoint instructions, that rendered the instant case fundamentally unfair in

26  violation of the Due Process Clause of the 14th Amendment to the U.S. Constitution.

27  What rendered the instructions fundamentally unfair in this case is that

28  a neutrally formulated version of these instructions had the effect of throwing

47

1 or appearing to throw, the prestige and weight of the court itself behind the
2 theory of the prosecuting party. A fair and reliable determination in a criminal
3 case requires of course a fair and impartial trier of fact. The instructions
4 at issue here violated due process against the fifth and fourthteenth Amendments,
5 and in a case in which the question of self-defense was close factually, there
6 is at least a reasonable doubt that these instructions affected the outcome
7 of the case, and the petitioner's conviction must be reversed.

8    Therefore, the petitioner's rights to a fair trial, due process, and equal
9 protection were violated and prejudice occurred against the 5th, 6th, and 14th
10 Amendments to the U.S. Constitution.

11

12    I•4  The Trial Court Erred By Denying Petitioner's Motion To
            Re-write CALJIC No. 2.90
13

14    On July 11, 2005, at the beginning of the petitioner's trial, the petitioner
15 motioned to re-write Jury Instruction CALJIC No. 2.90 due to the reduced
16 requirement of the burden of proof for the prosecution(1RT 7); however, the
17 court denied the motion and allowed the instruction to be presented to the jury
18 without re-writing; therefore, causing prejudice.

19    The reasonable doubt instruction's burden of proof to something less than
20 the required "guilt beyond a reasonable doubt." The phrase "abiding conviction"
21 in that instruction fails to convey to the jury the degree of certainy to establish
22 proof beyond a reasonable doubt. The notion of "abiding conviction" is too
23 easily confused with "clear and convincing" evidentiary standard. "Clear and
24 convincing" evidence can never be the basis of a criminal conviction.

25    CALJIC No. 2.90 sanctions application of a constitutionally deficient
26 "degree of proof." (Cage v. Louisiana,((1990) 498 U.S. 39, 40, 41)- Such
27 instructional error is structural and requires automatic, per se reversal.
28 (Sullivan v. Louisiana,supra, 508 U.S. at p. 227-280; Jackson v. Virginia,

48

1  (1979) 443 U.S. 307, 320, fn 14 ["failure to instruct the jury on th necessity

2  of proof beyond a reasonable doubt can never be harmless error"]).  The incom-

3  plete abiding conviction language set forth in CALJIC 2.90 constitutes

4  reversible per se structural error by conveying an insufficient standard of

5  proof akin to clear and convincing evidence and going only to jurors' duration

6  of belief in guilt, not their degree of certainty(In re Winship supra. 397

7  U.S. at p. 364; Cal.Const. art. I §§7, 15; U.S. Const. Amendments V, VI, XIV.

8  see also Arizona v. Fulminate (1991) 449 U.S. 279, 309; This instructional error

9  causes a reversal because they resulted in a total or near-total deprivation

10  of jury determination on all issues beyond a reasonable doubt. Therefore, the

11  petitioner's rights to a fair trial, due process, and equal protection were

12  violated and prejudice occurred against the 5th, 6th, and 14th Amendments

13  to the U.S. Constitution.

14

15  I·5  The Trial Court's Instruction On CALJIC No. 5.17 On Imperfect Self-
        Defense Is Erroneous, Placing An Improper Limitation On the Defense
16      In Circumstances In Which the Defense Should Still Be Legally
        Applicable

17  The court allowed jury instruction CALJIC No. 5.17 to be given to the

18  Jury during the petitioner's trial. The revised language in CALJIC No. 5.17

19  which is cast in objective terms and takes no account of the petitioner's

20  subjective belief as to the situation, purports to disqualify imperfect self-

21  defense for the petitioner who makes a mistake of fact as well as for the

22  petitioner who either violates the law knowingly or who makes a mistake of

23  the law unknowingly.  The revised language is therefore erroneous.

24  Thus, the limiting language in CALJIC No. 5.17 was erroneous and created

25  a bar to a finding of voluntary manslaughter if petitioner was found to have

26  objectively been the aggressor regardless of his subjective state of mind.

27  Also, if the gang evidence in this case were accepted to one degree or another

28  by the jurors as showing an aggression by MOD, this should not have precluded

49

1  a finding of imperfect self-defense except for the erroneous language of

2  CALJIC No. 5.17. The evidence that clearly established that the Toyota

3  Camry was fired on was also a basis for this finding of lesser culpability,

4  and the case would have resulted more favorably for the petitioner absent

5  the instruction error. People v. Watson, (1956) 46 Cal. 2d 818, 836-837.

6  The improper language of CALJIC No. 5.17 also interferes with and deprive

7  petitioner of his 6th and 14th Amendment rights to present a defense. This

8  caused prejudice and violated petitioner's 6th, and 14th Amendments to the

9  U.S. Constitution. Since the respondents cannot show beyond a reasonable

10  doubt that the improper portion of CALJIC No. 5.17 was harmless, petitioner's

11  conviction must be reversed. Chapman v. California, (1967) 386 U.S. 18,

12  23-24.

13  ///

14  ///

15

16

17

18

19

20

21

22

23.

24

25

26

27

28

1
                              -V-
                    **PROSECUTION MISCONDUCT**
2

3

4        The prosecution allowed the prosecution's main witness, who

5    was put in charge to collect evidence at the scene at Western

6    Ave., to talk to the jury during trial.(2RT 510)-  The prosecution's

7    witness, Detective Stigerts, illegally communicated with the jurors

8    on July 20, 2005, during trial and may have influenced on the

9    Jury's guilty verdict and caused prejudice.  "Any unathorized

10   communication between [a] juror and a witness or interest party

11   is presumptively prejudice. see Caliendo v. Warden of Cali.

12   Mens colony C.A. 9(2004) 365 CAN 6BAY  The burden to prove harmless

13   rely's heavily on the prosecutor. However, the prosecutor failed

14   to prove the communication was harmless; therefore, the conversation is presume

15   harmful and it caused prejudice that invalids the guilty verdict.

16       Therefore, the petitioner's rights to a fair trial and impartial jury,

17   due process, and equal protection were violated and prejudice occurred against

18   the 5th, 6th, and 14th Amendments to the U.S. Constitution.

19

20

21                              -VI-
                    **DUE TO PETITIONER'S YOUTH, PETITIONER WAS**
22                  **DEPRIVED TO HAVE THREE POSSIBLE TERM OF**
                    **HIGH, MEDIUM, AND LOW PENALTIES**
23

24       Petitioner Her was 15 years-old at the time of the offense and thus,

25   was unable to receive Life Without Parole and Death Penalty. see Penal Code 190.-

26   Therefore, leaves petitioner with only one option of life with the possibility

27   of parole. -Anyone sentenced before July 1, 1977 can be an indeterminate

28   term(see Penal Code §1168) and anyone sentenced after July 1, 1977, are setenced

                              51

1  to a determinate term (P.C. §1170)(also see appendix 1)- The petitioner's alleged

2  offense was committed in 2002 way after 1977. The petitioner not only has a

3  right to know the certainty of the penalty, but also the right to know the three

4  precise term he could possibly face, if convicted. A crime that does not have

5  three precise term of punishment of high, medium, and low must be striken out

6  of the statute; for every crime has a punishment of three precise term, and

7  without punishment there is no crime. Therefore, petitioner Her should be precluded

8  as to Murder and Attempted Murder since P.C. 187 (murder) and P.C. 664/187 (attempt

9  murder) does not provide three precise term of high, medium, and low for youthful

10  offender such as 15 years old. Thus, petitioner Her should be precluded as

11  to those charges and petitioner's conviction must be vacated for petitioner

12  was 15 years-old during the alleged offense in 2002.

13  For the stated reasons above, petitioner has been deprived of having three

14  precise term of possible punishments and therefore, violated petitioner's rights

15  to a fair trial, due process, and equal protection as guaranteed by the U.S.

16  Constitution.

17

18                                   -VII-
                      PETITIONER HER'S STATEMENT TO POLICE
19                    WAS OBTAINED IN VIOLATION OF HIS CONSTITUTIONAL
                      RIGHTS
20

21

22    A.  The Trial Court Abused Its Discretion In Admitting Petitioner's
           Statement At Trial
23

24  Police Detective John Keller and Detective Stigerts interviewed petitioner

25  Her after Her's arrest, and Detective Keller elicited statements from Her.

26  The petitioner was 15 years-old, did not have any adult present during questioning,

27  had minimal contact with the justice system, had not finish his junior year

28  in high school and was of limited education and mental compacity. Petitioner

52

1 also asserted that there was "pre-Miranda custodial interrogation" and that
2 Det. Keller engaged in subterfuge and deceit. The Court abused its discretion
3 in denying petitioner Her's motion to **suppress** Her's interrogation statement.
4 (4 RT 1025)- The U.S. Supreme Court has long recognized that"admission and
5 confession of juveniles requires special caution," In re Gault, 387 U.S. 145
6 (1987)-

7      The admission of the petitioner's statements to Detective Keller were
8 prejudicial when presented at trial and the jury's verdict was influenced
9 by the statements. Therefore, the petitioner's rights to a fair trial, due
10 process and equal protection were violated and prejudice occurred against the
11 5th, 6th, and 14th Amendments to the U.S. Constitution.

12

13

14 **B. Miranda Warnings Were Not Given Until Interrogation Was Well**
**Underway**
15

16      In Miranda v. Arizona the Supreme Court held that "the Fifth and Fourteenth
17 Amendments' proscription against compelled self-incrimination required that
18 any interrogation of a suspect in custody must be preceded by specific warnings."
19 See Miranda v. Arizona, 384 U.S. 436, 479(1966)- Miranda refers to police
20 interrogation, whether by word or action, which "the police would know is
21 reasonably likely to elicit an incriminating response from the defendant."
22 See Rhodes v. Innis, 446 U.S. 291,301(1980)-

23      Miranda warnings were not offered to Kinson Her until interrogation by
24 Detective Keller was well under way, and only after the youthful petitioner
25 had already committed himself to a course of unprotected discussion with the
26 detective. This, of course, was by design, and not a product of an oversight
27 by the detective. Petitioner Her never explicitly waived his Miranda rights,
28 and any impicit waiver claimed by the government was not the result of a knowing

53

1    and intelligent decision by the young petitioner. Prior to any Miranda warn**ings,**
2    Det. Keller elicited from Her where he was staying and where his clothing
3    and possession could be found (3 CT 651-658, 659-660); a shooting involving
4    petitioner's aunt(3 CT 661); and other personal details (3 CT 665-557)- Keller
5    mislead Her as to his status, telling Her that he is being arrested on a pro-
6    bation violation, rather than **a** homicide warrant.(3 CT 668)-

7    Det. Keller questioned Her about being the victim in a shooting - having
8    been in a vehicle which people shot at (3 CT 661)- Keller asked what communication
9    Her had with his parents since arriving in Minnesota, who Her lives with in
10   Sacramento, and about the ages, names and characteristics of his brothers
11   and sisters. (3 CT 663-664)- Keller asked Her where he was born, in what
12   hospital, and whether he has a Hmong name in addition to his American name.
13   (3 CT 665-667)-

14   After all of this far ranging discussion (comprising fourteen pages of
15   transcript), Detective Keller decided to Mirandize the fifteen year old suspect.
16   (2 CT 669)- By that time the detective and the petitioner had entered into
17   a full course of communication, wherein Detective Keller was able to ascertain
18   who petitioner Her was spending time with in Minnesota, the name of his girlfriends,
19   the location of his clothes and possessions, personal details about the composition
20   of Her's family, about a shooting in which Her was a victim and his family
21   member was shot. All of this time was spent developing a rapport with Her,
22   so that once Miranda warnings were given, they would no longer be effective.
23   Det. Keller convinced Her that they were there to pick him up for probation
24   violation right before the Miranda warnings.(see interview)-  citing Doody v.
25   Arizona, Case No. 06-17161---D.C. No. CV-98-00528-EHC 9th Circuit, U.S. Court
26   of Appeals (2008)- It held that ...."the excessively casual delivery of Miranda
27   warnings to a juvenile, seemingly designed to ensure that he would ignore
28   the warnings and waive his rights, gives little comfort that **Doo**dy commenced the

1    interrogation with an understanding of what was at stake." In Doody, it further
2    states that..."although the state court's conclusion that there was no Miranda
3    violation reasonable, the safety net that proper, serious Miranda warnings
4    provide- that of informing a suspect of his rights and of the gravity of the
5    situation - was quite weak in this case, prone to give way as a protection
6    against an involuntary confession if conditions were otherwise conducive to
7    such a confession." Plus it also states that..."A juvenile was given Miranda
8    warnings in a downplay manner that ensure he would not take them seriously
9    and would waive his rights."

10      In the instant case, Det. Keller convinced Her that he was being arrested
11    for probation violation for going out of state (interrogation interview
12    transcript)- Det. Keller used the Miranda warnings in a downplay manner and
13    the way in which, petitioner Her did not take the Miranda seriously.

14      In Missouri v. Seibert, 542 U.S. 600, 124 S.Ct.2601(2004), the United
15    States Supreme Court held that the giving of such mid-stream warnings could
16    neither cure the constitutional violation which had already occurred, nor
17    provide adequate protection of the right against self-incrimination during
18    the remainder of the interrogation. The Supreme Court explained:

19      The threshold issue when interrogators question first and warn later
      is thus whether it would be reasonable to find that in these circumstances
20      the warnings could function "effectively" as Miranda requires. Could
      warninings effectively advise the suspect that he had a real choice about
21      giving an admissible statement at that juncture? Could they reasonably
      convey that he could choose to stop talking even if he had talked ealier?
22      For unless the warnings could place a suspect who has just been interrogated
      in a position to make such an informed warnings as compliance as distinct
23      from the first, unwarned and inadmissible segment.

24               \*   \*   \*

25      Upon hearing warnings only in the aftermath of interrogation and just
      after making confession, a suspect would hardly think he had a genuine
26      right remain silent, let alone persist in so believing more likely reaction
      on the suspect's part would be perplexity about the reason for discussing
27      rights at that point, bewilderment being an unpromising frame of mind
      for knowledgeable decision. What is worse, telling a suspect that "anything
28      you say can and will be used against you." Without expressly excepting

1        the statement just given, could lead to an entirely **reasonable** inference
         that what he has just said will be used, with subsequent silence being
2        of no avail. Thus, when Miranda warnings are inserted in the midst of
         coordinated and continuing interrogation, they are likely to mislead
3        and "deprive a defendant of knowledge essential to his ability to understand
         the nature of his rights and the consequences of abandoning them."
4

5  See Seibert, 542 U.S. at 655-656.

6     Although petitioner Her did not make a confession, either in the unwarned

7  or warned segments of the interrogation, he did provide answers to Detective

8  Keller's questions which were used to produce further evidence against him,

9  and used at trial. Of particular note, petitioner Her responded to Detective

10  Keller's investigatory questions about about of his possessions by pointing

11  the officer in the direction of the home of his friend, Lise Vang. He

12  explained to Keller, in fact, where to find Vang's address and phone number,

13  and told that officer her name, age, and that she lived with her parents.

14  These pre-Miranda statements led the detectives to a search of the family

15  home of Lisa Vang, wherein petitioner Her's duffel bag and a series of letters

16  written from and to him were seized and enter into evidence, as proof of gang

17  affiliation, and association with codefendant Lao.

18     The post-Miranda interrogation was put before the jury, and was used

19  by the prosecution to establish that petitioner was untruthful in claiming

20  to not know co-defendant Lao - evidencing his consciousness of guilt. As

21  in Seibert, both the warned and unwarned segments of this interrogation occurred

22  in the station house, far from petitioner's home and family. The 15-year old

23  Her was not offered assistance of any sort as he was held in detention and

24  in isolation, to face the gaunlet of accusations of the two detectives alone.

25  Petitioner Her was arrested and placed in Hennepin County Juvenile Center

26  in a single cell for 12 days before Detectives interrogated petitioner Her,

27  and he certainly did not have any friendly adult present during questioning.

28     **Hence, the petitioner's rights to a fair trial, due process,**

1 and equal protection were violated and prejudice occurred against the
2 5th, 6th, and 14th Amendments to the U.S. Constitution.

3

4     C. Her's Repeated Invocations of His Right to Remain Silent Were Ignored
        by the Detectives
5

6    In People v. Burton (1971) 6 Cal.3d 357, the California Supreme Court
7 reversed the appellant's convictions for murder and assault, based upon a finding
8 that his statement was obtained in violation of his constitutional rights.
9 Burton, who was sixteen years old at the time of the incidents, confessed
10 during police interrogation to shooting three people. He had been advised
11 of his Miranda rights prior to these confessions. Though he never directly
12 invoked his right to counsel, on several occasions Burton requested to speak
13 with his parents. These requests were ignored by his interrogator.

14    The Court held that the defendant's request to see his parents was an
15 invocation of his Fifth Amendment rights under Miranda v. Arizona, 384 U.S.
16 436 (1966)- In so holding, the California Supreme Court explained:"[t]the
17 United States Supreme Court in Miranda, noting that incommunicado interrogation
18 is at odds with an individual's right not to be compelled to incriminate himself
19 stated:"Unless adequate protective devices are employed to dispel the compulsion
20 inherent in custodial surroundings, no statement obtained from the defendant
21 can truly be the product of his free choice"..."To strictly limit the manner
22 in which a suspect may assert the privilege, or to demand that it be invoked
23 with unmistakable clarity (resolving any ambiguity against the defendant)
24 would subvert Miranda's prophylactic intent." 6 Cal.3d at 383.

25    During the course of petitioner Her's interrogation, Her attempted to
26 invoke his right to remain silent on several occasions. First Her states"I
27 don't- okay, so what, I can just be quiet until like uh, court?" Detective
28 Keller did not miss a beat, responding to this request: "Well, yeah, you could.

1 But Ricky's in jail, right now on a murder, okay? And he's trying to implicate

2 you as being involved." Detective Keller and Her than proceeded to talk

3 about how Her is being implicated in a shooting. *

4     In the second invocation of his right to remain silent petitioner Her

5 states "So I could just wait until my court date to say anything?" the Detective

6 again sidestepped Her's clear intent to find help before proceeding with

7 the interrogation, by stating:

8     "If that's what you choose....Well, you're the one who is gonna be looking
      at getting charged with murder, okay? And if your not a shooter or
9     you not the one that did it, this is the time - **this is gonna be the
      only time we talk to you, okay?"** (3 CT 710-711)(emphasis added)
10

11 as the interrogation continued, Her yet again attempted to assert his rights:

12 DET KELLER:  Well, then be honest about what happened down there.  Tell me
             about it.
13 HER:        What, I can't wait 'til, um, court?
   DET KELLER: You can.
14 HER:        Well, that's what I want to do.
   DET KELLER: Okay.  All right.  Well when we get back we are going to write
15             up a warrant requesting you be charged with murder on a drive-
             by shooting.
16 HER:        So if ---
   DET KELLER: Gang related.
17

18 (See 3 CT 711-712)- The detective concludes this threat with an invitation

19 to Her that he can think about it, and if he decides he wants to be honest

20 about this before its too late, then they can talk about it during the plane

21 ride home.

22     These tactics undermined any protection the belated giving of Miranda

23 warnings could have afforded.  **Accordingly, the interrogation violated petition**er's

24 Constitutional rights, and the court abused its discretion in admitting it

25 at trial for the jury's consideration.  Petitioner's statement in response

26 to Keller's interrogation should not have been admitted, and all fruits thereof,

27 including items seized for use against Her at trial, should be suppressed.

28     Therefore, the court's admission of this evidence deprived petitioner

\* The statements of the detective were false.  Keller well knew that no one had directly
implicated Her as being involved in the Sacramento shooting.

**58**

1   Her of a fair trial, due process, and equal protection that caused prejudice

2   against petitioner and thus, violated petitioner's rights as guaranteed by the

3   5th, 6th, and 14th Amendments to the U.S. Constitution.

4   //

5   //

6   //

7   //

8   //

9   //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

PELICAN BAY
G.P. UNIT B-7

See People v. Ahluwalia, 2005 WL 1560465(Cal.App.3Dist.),an unpublish case decided by the Appellate Court on July 5, 2005. In that case, as in this, Detective Keller interrogated the defendant at length before finally giving him Miranda warnings. Though the Court found in that case that there was no evidence that Detective Keller's actions undermined the defendant's Constitutional rights, the record in the instant case shows that the detective's actions were by design and part of a pattern. The interrogation of Houa Lao in the instant case, likewise displays an attempt by this same detective to coerce youthful or otherwise vulnerable suspects into unprotected discussion through subterfuge, badgering and overreaching. We cite Ahluwalia not as authority for any legal argument, but merely to demonstrate Keller's pattern of abusive, improper interrogation, which should not be encouraged or rewarded.

59

1

2

3

4

5

UNDER THE CIRCUMSTANCES OF THE CASE, EHANCED
SENTENCES OF 25 TO LIFE VIOLATES THE EIGHTH
AMENDMENT AND ARE CONTRARY TO WIDELY ACCEPTED
INTERNATIONAL NORMS FOR THE TREATMENT OF CHILD
OFFENDERS

6 Petitioner urges that his federal and state constitutional rights to be
7 free from cruel and unsual punishment are implicated in this case, because though
8 just fifteen years old at the time of the offense, an offense for which there
9 was little if any evidence that he took any role aside from being present, the
10 Court of Appeal ordered this case for the limited purpose of correcting
11 his sentence from life without the possibility of parole to one of 25 years to
12 life. This "corrected" sentence, although consistent with the letter of California
13 law is deeply at odds with emerging Supreme Court precedent regarding the treatment
14 of juveniles in the criminal justice system, and is entirely inconsistent with
15 international precepts on the treatment of juveniles. The appellate court's
16 holding that "[a] life sentence with the possibility of parole for a criminally
17 sophisticated 15 year old convicted of a special-circumstance murder to promote
18 the objectives of a criminal street gang violates neither Eighth Amendment nor
19 article 1, section 17 of the California Constitution," (Exhibit A, p.32), is
20 deeply flawed, for it embraced assumptions about Her, such as his supposed "sophi-
21 stication" and his gang-related mental state, that are unsupported by the evidence.
22 In this same section, the Court of Appeals also explicitly refused to give any
23 consideration to the maxims of international law cited by the Petitioner.

24 The Eighth Amendment to the United States Constitution prohibits the imposition
25 of cruel and unusual punishment on a criminal defendant. The California Supreme
26 Court has held that "a punishment may violate article I, section 17, of the [Cal-
27 ifornia] Constitution if, although not cruel or unusual in its method, it is so
28 disproportionate to the crime for which it is inflicted that it shocks the conscience

1 and offends fundamental notions of human dignity." In re Lynch, (1972) 8 Cal.

2 3d 410, 424. In Lynch, the court delineated several "techiques" employed by

3 courts to determine proportionality:

4    (1)examination of the nature of the offense and/or the offender, with
     particular regard to the degree of danger present to society,(2)comparison
5    between the challenged penalty with the punishments prescribed in the same
     jurisdiction for different offenses which, by the same test, must be deemed
6    more serious, and(3)comparison between the challenged penalty with the pun-
     ishments for the same offense in other jurisdictions having an identical or
7    similar constitution provision. In re Lynch, 8 Cal.3d 410, 425-29.

8 "the importance of each prong depends on the specific facts of each case and

9 application of the first prong alone may suffice in determining whether a

10 punishment is cruel and unusual.[Citation.]" In re DeBeque,(1989) 212 Cal.App.3d

11 241, 249.

12    Moreover, the U.S. Supreme Court death penalty cases provide an analytical

13 framework from which to approach the issue of whether a punishment runs afoul

14 of the Eighth Amendment prohibition on cruel and unusaul punishment when applied

15 to juvenile offenders. The Court's reliance on international norms on the

16 treatment of child offenders forms the basis of these recent decisions and

17 indicates a trend toward juvenile sentencing that is in line with humanitarian

18 priciples and standards.

19 A. Lynch and its progeny

20    The cases since Lynch demonstrate that a punishment which is not

21 disproprtionate in the abstract is nevertheless constitutionally impermissible

22 if it is disproportionate to the defendant's individual culpability. See

23 People v. Dillon(1983) 34 Cal.3d 441, 480. These cases compel a finding that

24 petitioner Her's sentence was disproportionate in light of the nature of the

25 offense and his personal characteristics.

26    In Dillon, several boys plotted to rob some marijuana plants from a marijuana

27 farm. They armed themselves with guns, knowing that the farm was guarded by armed

28 men. Defendant Dillon, 17 years-old at the time of the offense, shot and killed

1  a guard in the course of the attempted robbery. Dillon testified that he was
2  acting under the belief that the guard had shot one of his cohorts. As the armed
3  man approached him, Dillon shot at him, testifying that he was in fear of his
4  life. That defendant was convicted, and received a sentence of life in prison. *
5  On review, the California Supreme Court addressed the proportionality of a
6  defendant's sentence, relying on Lynch, by establishing a two-part analysis:

7  "[f]irst, the crime itself must be reviewed, both in the abstract and in
   view of the totality of the circumstances surrounding its commission,
8  'including such factors as its motive, the way it was committed, the extent
   of defendant's involvement, and the consequences of his acts ...,'
9  to determine whether a particular punishment is grossly disproportionate
   to the crime for which it is inflicted.[citations ommitted]. Secondly, the
10 court must consider 'the nature of the offender' and inquire 'whether the
   punishment is grossly disproportionate to the defendant's individual
11 culpability as shown by such factors as his age, prior criminality, personal
   characteristics, and state of mind."
12

13 Applying this framework, the Dillon Court concluded that a sentence of life
14 imprisonment for first-degree murder was grossly disproportionate in relation
15 to the defendant's true culpability, and thus violated the State Constitution.
16 34 Cal. at 448. By contrast, in Prople v. Demirdjian, (2006) 144 Cal.App. 4th
17 10, the court held that the imposition of two consecutive terms of 25 years to
18 life with possibility of parole for a defendant who was 15 years old at the time
19 of the crime did not violate the state or federal constitutional prohibitions
20 against excessive punishment. The Court again looked to the unique facts and
21 circumstances underlying the crime and the defendant's role in it. The court
22 held the circumstances of the crime were so barbarous as to support a finding
23 of premeditation:

24 "[t]he circumstances of this case are particularly horrendous. The bodies
   of the two boys, aged 13 and 14, were found at the playground of their
25 school... there was a 16-pound rock next to Blaine's head and a 3-pound
   rock a few yards away. Both boys had head injuries and there was blood
26 all over the school yard - on fences, rails, playground equipment and in
   two outdoor sinks. There was a broken bottle with a red stain on it.
27 A 60-pound, 12-foot bench was lying across Chris' chest and neck. A trail

* Noting the youth and immaturity of the defendant, and that the muder at issue appeared
to be completely out of character and a product of the sfress of the moment, the court
below, following the lead of the jury, concluded that the defendant should be sentenced to
the youth authority rather than to prison. The People successfully appealed this ruling,
and the court was ultimately force to re-sentence the defendant to life without the

1    of blöody footprints led from the bodies to the sinks...[¶]. Autopsies
     of the boys showed that they died of multiple blunt force trauma to their
2    heads and bodies. The rocks were identified as potential weapons. Chris'
     neck and chest were compressed and his liver was torn apart."
3

4 144 Cal.App. 4th 10, 15. Applying the Dillon factors, the court found that the
5 killings were "savage and apparently unprovoked", that appellant "attempted to
6 dispose of the evidence and denied wrongdoing when questioned." The punishment
7 was not held to be disportionate because of the horrendous nature of the crime,
8 and the relative maturity of the defendant - evidenced by his involvement in
9 narcotics sales and possession of firearms. The court concluded that the
10 circumstances of the crimes and of defendant himself justified imposition of
11 the 25 year to life sentences.

12    The facts of the instant case can be readily distinguished from Demirdjian.
13 Petitioner Her may have been a passenger in the rear of an automobile that
14 was involved in a shooting but there no evidence that he was in control
15 of the situation. Petitioner Her was only fifteen at the time of the incident
16 and had no record of violent crime. Perhaps most importantly, the instant
17 case involved a shootout between two sets of armed individuals. There is
18 no proof that Her was a participant in the shooting, or, if a participant,
19 that he did not act in self-defense. Clearly, under the facts of the instant
20 case Her's punishment is so disproportionate in light of his individual culpability
21 that it violates the prohibitions against cruel and unusual punishment contained
22 in the Eighth Amenendment and should be vacated.

23    B. International Law on the Rights of the Child

24    Article 37 of the Convention on the Rights of the Child ("CRC")prohibits
25 the imposition of the death penalty or life without the possibility of parole
26 on anyone under the age of 18. UNITED NATIONS CONVENTION ON THE RIGHTS OF
27 THE CHILD, Art.37, Nov. 20 1989, 15577 U.N.T.S. 3, 28 I.L.M. 1448, 1468-70
28 (entered into force Sept. 2, 1990). The CRC explicitly addresses the contradiction
possibility of parole. See Dillon, 34 Cal.3d 441.

1 between the particular rights and needs of children and unduly harsh adult
2 sentencing. Underlying several of the Treaty's provisions is the fundamental
3 recognition of the child's potential for rehabilitation.

4     Recognizing the unacceptability of sentences that negate the potential
5 of children to make changes for the better over time, the CRC flatly prohibits
6 sentencing children to life sentences without parole or to the death penalty.
7 It is a universal precept of international law, that the child, by reason of
8 his physical and mental immaturity, needs special safeguards and care, including
9 appropriate legal protection. By this model, Courts are urged to place an
10 emphasis on rehabilitation and reintegration of the child into society, rather
11 than on punishment alone.

12     The Supreme Court has relied upon the consensus of the international
13 community in holding that the Eighth and Fourteenth Amendments bar capital
14 punishment for juvenile offenders. U.S. v. Roper, 543 U.S. 551,561 (2005)
15 citing Thompson v. Oklahoma (1988) 487 U.S. 815, 830. In Roper, the court
16 stated "it is proper that we acknowledge the overwhelming weight of international
17 opinion against the juvenile death penalty, resting in large part of the
18 understanding that the instability and emotional embalance of young people
19 may often be a factor of the crime." Indeed, the Supreme Court has repeatedly
20 cited the penacological questions of retribution and deterrence when determining
21 the adequacy of punishment imposed on juveniles.

22     In Thompson v. Oklahoma, the Supreme Court held that to permit the execution
23 of any offender under the age of 16 would offend civilized standards of decency.
24 Thompson, supra, 487 U.S. at 919. The plurality observed that this position
25 was consistent with the views that have been expressed by "other nations that
26 share our Anglo-American heritage and by the leading members of the Western
27 European Community." Id. at 830. To impose a sentence on a juvenile that

²⸍   In discounting the imposition of capital punishment upon juvenile offenders, the
Court in Roper cited three general differences between juveniles and adults:(1) a
lack of maturity and an underdeveloped senses of responsibility found in youth
more often than in adults;(2)the susceptibility of juvenile influences and outside
pressures, including peer pressure; and(3)the transitory personality traits

1 effectively forecloses the possibility forever realizing the youths rehabilitation,
2 and which will not serve society's interest in retribution, is contrary the
3 purpose imposing punishment.

4     The logic applied in Thompson and Roper should be applied to prohibit the
5 imposition of enhanced sentences of twenty-five years to life on juvenile offenders.
6 Although the California courts have deferred to the legislature in enacting
7 provisions that allow such sentences on juveniles, there is consensus that the
8 punishment is indeed severe. See People v. Guinn(1994)28 Cal. App. 4th 1130,
9 1147. The Court is urged to reevaluate the appropriateness of meeting out
10 such severe punishment, especially, where, as here, the result is a life sentence
11 imposed on a juvenile, with no history of violence, and for whom there is no
12 reason to believe that he cannot be redeemed.

13     Implicit in the imposition of severe statutory sentencing schemes, after
14 all, is the conclusion that the young person cannot be rehabilitated. Petitioner
15 submits that this position is entirely at odds with widely accepted international
16 norms on the treatment of juvenile offenders. It is simple untenable that a
17 momentary lapse of judgement can result in a child being incarcerated for the
18 remainder of their natural life. As the Supreme Court stated in Roper the differe-
19 nces between youths and adults "render suspect any conclusion that a juvenile
20 falls among the worst offenders." Roper, 543 U.S. 551, 553(2005). The Court
21 went on to say "the reality that juveniles still struggle to define their indentity
22 means it is less supportable to conclude that even a heinous crime committed
23 by a juvenile is evidence of an irretrievably depraved character." Id.*

24     Petitioner's trial counsel argued persuasively to the court that:

25     [J]ust from a psychological standpoint a fifteen year old kid is a lot
    different from an adult. Their inability to make judgements, their impulsivity.
26     Their emotions are different. In fact, there is I think studies about
    their brain development not actually having totally developed at that point.
27     And it does affect their ability to make decisions and, more significantly,
    get involved in - with the wrong type of people and get involved in the
28     wrong type of situations.

of a juvenile when compared to that of an adult. Roper at 569.
* Petitioner's trial counsel argued these matters to the court at sentencing.(5
RT 1378) **65**

1  (5 RT 1378-1379)- Counsel was correct that studies have shown a marked difference

2  in the brain development of young adolescents as compared to adults. Among these

3  was a study by the Juvenile Justice Center of the American Bar Association,

4  prepared in January 2004. While developed to address the subject of the juvenile

5  death penalty, the conclusions of this study are highly relevant to the imposition

6  of adult penalties on juveniles in general:

7    Adolescence is a transitional period during which a child is becoming, but
     is not yet, an adult. An adolescent is a crossroads of changes where, emotions,
8    hormones, judgement, identity and the physical body are so in flux that
     parents and even experts struggle to fully understand.
9
     As a society, we recognize the limitations of adolescents and, therefore,
10   restrict their privileges to vote, serve on a jury, consume alcohol, marry,
     enter into contracts, and even watch movies with mature content.  Each year
11   the United States spends billion of dollars to promote drug use prevention
     and sex education to protect youth at this vulnerable stage of life.  When
12   it comes to the death penalty, however, we treat them as full functioning
     adults.

13  Cruel and Unusual Punishment: The Juvenile Death Penalty, ABA Juvenile Justice

14  Center, January 2004 edition.

15  This anomalous treatment of children as fully functioning adults holds equally

16  true where life sentences are concerned. Yet, as researchers have discovered,

17  the human brain undergoes significant structural changes over the period between

18  childhood and adulthood that tends to discredit this treatment. see Elkhonon

19  Goldberg, The Executive Brain: Frontal Lobes and the Civilized Mind, Oxford Univer-

20  sity Press (2001). The behaviors associated with this process of development

21  include self-absorption, a need for privacy, mood swings, unique dress, and escapism,

22  such as video games, music, and talking on the phone as well as riskier behaviors,

23  such as drug use and sexual activity.

24  Of central importance to this process is childhood trauma of various kinds,

25  including social dislocation, poverty, social and emotional disfunction and violence.

26  These factors act upon the biological changes already occurring in the adolescent

27  brain to produce behaviors that can be destructive and dangerous. As one research

28  had put it, "part of the brain that is helping organization, planning and strategizing

1 is not done being built yet . . . .its sort of unfair to expect [adolescents]
2 to have adult levels of organizational skills or decision making before their
3 brain is finished being built."

4   At Kinson Her's sentencing proceeding, members of petitioner's family testified
5 eloquently about his background and upbringing. His sisters, Mary and Donna,
6 testified about his childhood, his brightness, his promise, and his kindness.(5
7 RT 1367-1373)- As he entered early adolescent, a person of modest means in
8 an immigrant family struggling to understand a new culture ran into trouble.
9 As Donna Her put it: "I know that for many of male adolescents there are a lot
10 of negative influences in low income families and low income communities like
11 ours." In a civilized system of justice it is incumbent upon the Court to explore
12 this youth's backround, his capabilities, his rehabilitative potential, his
13 future dangerousness or lack thereof, before effectively throwing the key away
14 and concluding that he must serve his life or the greater portion thereof in
15 an adult prison.

16   In sum, we submit that sentences passed on child offenders such as Kinson
17 Her must reflect not only the gravity of the crimes they have committed, but
18 acknowledge that they do not possess the maturity and judgement necessary to
19 justify a punishment that brands them permanently unredeemable. Because petitioner
20 has been so branded, we respectfully urge that his "corrected" sentence of 25
21 years to life is unlawful, and violates petitioner's 6th, 8th, and 14th
22 Amendments of the U.S. Constitution, thus should be reverse.

23 //
24 //
25 //
26 //
27 //
28 //

1
2
3

4    On November 30, 2007, the California Third Appellate District modified

5 petitioner Her's sentence from "Life Without Parole" to"25-years to Life"

6 on count one(Cal.P.C.187); for the Life Without Parole is forbidden and

7 cannot be imposed on someone who was only 15 years-old at the time of the

8 offense, such as petitioner.(see Cal.P.C. 109.5 and also see 3d Appellate

9 Court decision(transcripts p.28))-

10    California Penal Code prescribes the maximum punishment for juvenile

11 defendants who have been found guilty of special circumstance findings.

12 Subdivision (b) specifies that the maximum punishment for a juvenile who

13 was at least 16 and under 18 at the time of the offense may be sentenced

14 to either Life Without Parole or 25 years to Life, at the court's discretion.

15    However, in the instant case, the Appellate Court applied the Demirdjian

16 case(People v. Demirdjian (2006) 144 Cal.App.4th 10, 17)- "For juveniles

17 under 16 who were 14 or 15 when the crime was committed, a life term without

18 possibility of parole is not permitted, leaving a term of 25 years to life

19 with possibility of parole." Accordingly, the Appellate Court re-sentenced

20 petitioner to"25 years to Life with possibility of parole" on count one.

21    The re-sentence of 25-years to Life on count one (Cal.P.C. 187), plus 20

22 years and 7 years to Life on count two(Cal.P.C.664/187) totaled to 52-years

23 and two Life sentences with the possibility of parole. Making the minimum

24 earliest parole date in the year 2057; which is indistinguishable from a

25 sentence of "Life Without Parole" for all intensive purposes in the real world.

26 Thus, there is no difference between "52-years to Life" and "Life Without

27 Parole." Accordingly, the re-sentence totaling to 52-years to Life is unlawful

28 along with Life Without Parole for someone who was 15-years-old at the time

68

1 of the offense, such as petitioner.

2    Based on the foregoing, it is inhumane and unlawful to sentence petitioner
3 Her to serve the greater portion of his life in prison starting at age (15)
4 fifteen; seeking his very first parole hearing from the parole board at age
5 (70) seventy. Therefore, the petitioner's re-sentence totaling to 52-years
6 to Life constitutes cruel and unusual punishment and such sentence on a 15 year-
7 old minor should be eliminated and/or reduced. This clearly violates petitioner's
8 8th and 14th Amendments as guaranteed by the U.S. Constitution.

9

10                          -X-
                 THE 3d APPELLATE DISTRICT COURT'S DECISION
11               NOT TO REMAND PETITIONER HER TO THE SUPERIOR
                 COURT FOR RE-SENTENCING VIOLATED PETITIONER'S
12               DUE PROCESS AND WAS PREJUDICIAL

13    The Appellate Court(3d District) simply modified petitioner Her's Life
14 Without Parole to 25-years to Life with parole without remanding petitioner
15 to the trial court or give petitioner a re-sentencing hearing; which deprived
16 petitioner an opportunity to receive a more reasonable sentence from the trial
17 court. Perhaps petitioner would have been succussful at convincing the trial
18 court to stay more of petitioner's counts and/or run both counts concurrent.

19    Therefore, the Appellate Court did not remand petitioner to the trial
20 court or give petitioner a re-sentencing hearing deprived and violated petitioner's
21 Due Process under the 6th and 14th Amendments of the U.S. Constitution.

22 ///

23 ///

24

25

26

27

28

**-XI-**
      **CUMULATIVE ERRORS ARE**
**CAUSED FOR A REVERSAL**

3.    The combined and cummulative errors of insufficient evidence, Ineffective

4   Assistance of Counsel, Trial Court errors, Jury Instructional errors,

5   Prosecutor misconduct, and sentencing errors have compounded the prejudice

6   caused by the other, to the petitioner's detriment and are caused for a

7   reversal of the petitioner's case.  see Harrington v. California,(1968)

8   395 U.S. 250, 255; United States v. Frederick (9th Cir. 1996) 78 F. 1370,

9   1381; People v. Buffum, (1953) 40 Cal. 2d 709 726; People v. Zerillo, (1950)

10  36 Ca;. 2d 222, 133; People v. Cruz (1978) 83 Cal. App. 3d 308, 334; People

11  v. Ramos, (1982) 30 Cal. 3d 553, 581; Cal. Const. Art. IV, §13.

12    The petitioner did not forfeit any of these claims.  However, the forfeit

13  rule is not automatic. see People v. Allen (1974) 41 Cal. App. 3d 196; see

14  also People v. Norwood (1972) 26 Cal. App. 3d 148; Hale v. Morgan, (1978)

15  22 Cal. 3d 388.

16    Therefore, the petitioner's rights to freedom of speech, fair and impartial

17  jury, due process, free from fruel and unsual punishment, effective assistance

18  of counsel, and equal protection were violated and prejudice occurred.

19  against the 1st, 5th, 6th, 8th, and 14th Amendments as guaranteed by the

20  U.S. Constitution.

21

22

23

24

25

26

27

28                                70

1          -CONCLUSION-

2     Based on the foregoing, there are numerous, multiple and highly

3 constitutional errors that have occurred in the petitioner's pre-trial, trial,

4 and post-trial proceedings, and the claimed errors are harmful.

5     Wherefore, the petitioner respectfully ask this Honorable Court to

6 grant his prayer for relief.-

7

8                    -Prayer for Relief-

9     1.  Grant petition and issue a writ granting a reversal of the petitioner's

10 conviction, based on the absence of evidence of guilt.

11    2.  In the alternative, petitioner respectfully ask this Honorable Court

12 to vacate and reverse his conviction and sentence, and to remand the case

13 to the Superior Court with appropriate directions or modify petitioner's

14 conviction and/ or sentence.

15    3.  Appoint petitioner counsel to assist in the litigation necessary

16 to remedy the subject or award reasonable attorney fee's.

17    4.  Order an evidentiary hearing and appoint counsel for petitioner;

18    5.  Grant all other appropriate relief.

19

20. Dated: December 4, 2009                    Respectfully Submitted,

21

22                                              Kinson Her
                                                In Pro Per Petitioner
23

24                        VERIFICATION

25

26    I declare under penalty of perjury that the foregoing is true and correct.

27 Dated: December 4, 2009

28                                              Kinson Her
                                                Declarant

                            71

## APPENDIX

PELICAN BAY
G.P. UNIT B-7

APPENDIX I

APPENDIX I

PELICAN BAY
G.P. UNIT B-7

APPENDIX I

APPENDIX I

APPENDIX I

APPENDIX I



CASE NO. 02F01534

I N   T H E   S U P E R I O R   C O U R T

O F   T H E   S T A T E   O F   C A L I F O R N I A

IN AND FOR THE

COUNTY OF SACRAMENTO

Kinson Her

Defendant,

vs.

THE STATE OF CALIFORNIA

Plaintiffs, et al.

District Attorney,
Kevin McCormick

MOTION TO DISMISS
PURSUANT TO PENAL CODE SECTION 995

GROUNDS FOR MOTION TO DISMISS (Note: References to "Exhibits" are those obtained from State Archives, except # 3 which was obtained from B.P.T. Chairman Albert Leddy)

(1). That effective July 1, 1977, California repealed its 60-year-old Indeterminate Sentencing Law (I.S.L.) and replaced it with the Determinate Sentencing Law (D.S.L.), so that all those whose crimes were committed after 7/1/77, would know the "certainty" of the penalty to be inflicted see: SB-42, Stats 1976 C 1139 § 273. Effective 7/1/77, AB-476 went into effect. This amendment to SB-42 made the D.S.L. retroactive so that all persons - whether their crime was committed as a felony or a misdemeanor, under the I.S.L. or the D.S.L. - would be vested by the Legislature with the right to know the certainty of the penalty as determined by the Legislature and imposed by a court of law see e.g., P.C. § 1170(a)(1), AB-476, Stats 1977 C 165 § 15.

(2). In repealing the I.S.L., and enacting the D.S.L., - in order to effect the "certainty of the term" - California repealed the statutes necessary for the I.S.L.'s continued existence; this included the Adult Authority's "term fixing" and "parole granting" functions over persons whose crime was committed after 7/1/77. The only discretion retained by this agency, was the power to fix the conditions of performance while released on parole, and the parole of those persons sentenced "FOR LIFE" with the possibility of parole (See: Pen. Code §§ 671, 2920, 2940, 3020-3025, & 5077 (repealed), see now: Pen. Code §§ 1170, 2931, & 3000(f), see also: §§ 3052 & 5076, Stats 1977 C 165). In repealing the I.S.L., the Legislature made the policy decision to repeal Plaintiffs' statutory authorization to fix terms, supra, and replaced the Adult Authority with the Community Release Board (C.R.B.) with specified ministerial duties see Defendant's Exhibits 1 and 4.

(3). In repealing the I.S.L., the Legislature changed from its purpose and policy for imprisonment for crime from: "Mitigation and Rehabilitation", to the certainty of the term, and "punishment" for the crime itself; "as determined by the Legislature, to be imposed by a court of law with specified discretion" (See: AB-476, supra and Pen. Code §§ 12 & 13). In SB-42, the Legislature declared the repeal of the I.S.L., as its "number one priority", and by law and fact acted by repealing the WAYS, MEANS, STANDARDS, SAFEGUARDS, PURPOSE, and POLICY, necessary for the I.S.L.'s existence.

(4). The C.R.B.'s discretion under Pen. Code §§ 3041, and 1170.2 - to fix terms for persons whose crime was committed prior to 7/1/77 - expired on October 1, 1978 prior to the voters ratification of the 1978 Prop. 7 Initiative Statute on November 8, 1978 (See: Pen. Code § 1170.2(b), Stats 1977 C 165 § 18; Stats 1978 C 329 §§ 4, 5, & 6; Stats 1979 C 255 § 9). Accordingly, ipso jure, Plaintiffs, were never given jurisdiction over those whose crime was committed after 7/1/77, and not sentenced "FOR LIFE", which, as a penalty, has always been held as an exception to the I.S.L. Consistent with Art. IV § 9 of California's Constitution, Prop. 7 failed to ask the voters to approve the re-enactment of any part of the repealed I.S.L., or re-vest discretion in any agency (Note: The C.R.B. was replaced by the B.P.T., without term fixing authority or judicial discretion; both which would have been necessary to impose a final judgment and to fix terms under the repealed purpose and policy of the I.S.L. see also: Stats 1979 C 255 p. 568 § 53).

(5). As of July 1, 1977, California law no longer provided for indeterminate sentences, and there was no discretion vested for its administration for persons whose crime was committed after that date. Moreover, under the policy of "punishment" for the crime itself, no state-wide agency can be vested with power to determine the "punishment" any given crime shall bear, absent a constitutional amendment authorizing the legislature to vest its exclusive powers elsewhere.

# T A B L E   O F   E X H I B I T S

(1). SENATE BILL NO. 42 (1976): Showing California's repeal o
its 60-year-old Indeterminate Sentencing Law, and creatio.
of a seven (7) category classification system, making al:
crimes for which imprisonment in a state prison i:
specified - in order to effect the "certainty" of the term,
as "DETERMINATE SENTENCES".

(2). 1978 PROPOSITION 7 INITIATIVE: Obtained from the State
Archives. Proving that the voters were not asked to: (a)
re-enact the repealed I.S.L.; (b) change the policy for
imprisonment from "punishment" for the crime itself
(emphasis added), back to "rehabilitation" of the
individual offender, as the purpose for release on parole;
(c) vest any agency with the power to determine the term to
be served for each offender committing the same offense.

(3). MORRISSEY 8 MEMORANDUM: Showing how a group of state
officials - hired and paid for by the Attorney General's
Office - changed and enlarged Prop. 7 in order to vest
discretion back  in the same branch agency who just had
its power repealed; for the expressed purpose of vesting
authority to determine "punishment" for crime, without the
approval of the voters, or a constitutional amendment
authorizing the Legislature to vest its discretion
elsewhere.

(4). ASSEMBLY BILL NO. 476 (1977): Making "substantive" changes
to SB-42, including: (a) the making of the Determinate
Sentencing Law retroactive; (b) changing the policy to
include all penalties for crime, whether calling for
imprisonment specified to be served in county jail or state
prison would have a determinate penalty fixed by the
legislature and imposed by a court of law; (c) restatement
of the Legislative declaration that Determinate Sentencing
applies after July 1, 1977, equally to all persons
sentenced under Penal Code Sections 1170, or prior to July
1, 1977, under Penal Code Section 1168, would be entitled
by law, to know the "certainty" of the penalty to be
inflicted; as determined by the Legislature and imposed by
a court of law.

(5). SANTA CLARA LAW REVIEW: The legal history of Indeterminate
Sentencing in California. Gives the Legislature's reasons
for repealing the I.S.L., and as to why it was deemed a
"failed experiment" - due to administrative abuse - during
over 60 years in operation.

-ii-

I N   T H E   S U P E R I O R   C O U R T

F O R   T H E   S T A T E   O F   C A L I F O R N I A

IN AND FOR THE

COUNTY OF SACRAMENTO

KINSON HER,

CASE NO. **02F01534**

    Defendant,

**MOTION**

    vs.

PURSUANT TO: P.C. § 995

The State of California,

    Plaintiffs, et al.

DISTRICT ATTORNEY _____/

NOTICE AND MOTION FOR:

MANDATORY AND PROHIBITORY RELIEF

TO THE HONORABLE PRESIDING JUDGE OF THE SUPERIOR COURT OF
THE STATE OF CALIFORNIA IN AND FOR SACRAMENTO COUNTY, AND TO
THE HONORABLE ASSOCIATE JUSTICES OF THE COURT.

AND TO THE PLAINTIFFS AND ATTORNEY OF RECORD:

(1). PLEASE TAKE NOTICE THAT at the time set by the above
named Court, or as thereafter set by the Court's clerk for the
matter to be heard, Defendant will move for a "MANDATORY" and
"PROHIBITORY" order to dismiss the above entitled action pursuant
to Section 995 of the California Penal Code.  Said order is

-1-

1  necessary for restraining, enjoining, and ordering you, your
2  officers, agents, servants, employees, and attorney, and all those
3  in active concert or participation with you or them, from further
4  proceedings in the prosecution of the matter of the charge of
5  murder under Penal Code Section 187 against Defendant.

6  ## OPENING STATEMENT

7  (2). PLEASE TAKE NOTICE THAT,  Kinson Her  , hereinafter
8  Defendant in the above entitled action, respectfully motions this
9  Court to set aside the indictment on the grounds that this Court
10  has no jurisdiction to allow the prosecution of Defendant where
11  the "penalty" for the offense of murder in the 1st or 2nd degree —
12  enacted by the 1978 Proposition 7 Murder Penalty Initiative
13  Statute — is challenged as being either: (A) "VOID ON ITS FACE" in
14  violation of expressed provisions of the State and Federal
15  Constitutions, infra. (B) Where these penalties, supra, cannot be
16  lawfully administered as being repugnant to numerous provisions of
17  the State Constitution as well as the due process and equal
18  protection clauses of both State and Federal Constitutions, infra.
19  (3). PLEASE TAKE NOTICE THAT, in these proceedings, Defendant
20  will prove that the drafter of Prop. 7 adopted the sentencing
21  scheme from a repealed law, and submitted it to the voters under
22  the guise of an existing sentencing structure, in violation of
23  lawful provisions for the making of a law, and expressed
24  Constitutional mandates (See: e.g., Government Code § 9609;
25  California Constitution Article 1 §§ 7(a)&(b), 9, 24, & 26;
26  Article III § 3; and Article IV §§ 9 & 16; and the 1st, 5th, &
27  14th Amendments, & Article 10(1) of the United States
28  Constitution). Additionally, the drafter misused the People's

-2-

1 initiative power to unconstitutionally repeal and re-enact Penal
2 Code Section 190 to change the penalties from "Determinate"
3 penalties fixed by the Legislature, back to "Indeterminate"
4 penalties without approval of the voters, and without the **WAYS,**
5 **MEANS, STANDARDS, SAFEGUARDS, PURPOSE,** and POLICY, necessary for
6 the administration of the penalty to be inflicted (See: Exhibit 1
7 - SB-42 Ways & Means Analysis). In short, the statutes used to
8 vest discretion in the State's parole agency, as it existed during
9 the time the agency was vested with discretion to fix penalties,
10 were expressly repealed, along with the "I.S.L.'s" purpose -
11 mitigation of the penalty the offender would ordinarily serve for
12 the offense, and the policy of fixing the terms based on the
13 determination of the offender's "rehabilitation" (See: e.g., 18a,
14 18b, 671, 2920, 2940, 3020-3025, and 5077; see: SB-42, Stats 1976
15 C 1139; AB-476, Stats 1977 C 165).

16    (4). PLEASE TAKE NOTICE THAT, the repeal and re-enactment of
17 Penal Code § 190, to "change" the penalty in the case of 1st
18 degree murder, and to "increase" the penalty in the case of 2nd
19 degree murder, did not contain the subject of changing the
20 sentencing law from "Determinate" terms fixed by the Legislature,
21 to be determined by a jury, and imposed by a court of law, to
22 "Indeterminate" penalties, to be fixed by some agency not
23 mentioned anywhere in the initiative. This could not be lawfully
24 accomplished by will of Prop. 7's drafter alone, and without the
25 subjects presented within the initiative for approval of the
26 California voters. This denies Defendant a "final judgment" and
27 from knowing the "certainty" of the penalty to be inflicted the
28 same as all others for which the "Determinate Sentencing Law"

-3-

1 (D.S.L.) was created. Therefore, unless this Court enters a
2 declaratory judgment to the effect that Prop. 7's penalties are
3 "Determinate" penalties of 25 or 15 year terms, whereby the final
4 judgment as to the "certainty" of the penalty is fixed by the
5 Legislature, determined by a jury, and imposed by a court of law,
6 and not conditioned upon the will of the same branch charged with
7 Defendant's prosecution, Defendant is denied his constitutionally
8 vested rights.

9 (5). **PLEASE TAKE NOTICE THAT**, pursuant to Penal Code Sections
10 12 & 13, the only way Defendant can be taken to trial under the
11 current sentencing structure, based on the policy of "punishment"
12 for the crime itself, is for the charge of voluntary manslaughter.
13 Under the law of the case, there can be no crime without a
14 penalty, and if the penalty is "indeterminate" - under the
15 Legislature's declared policy of "punishment" for the crime itself
16 - it is "void on it face" as being uncertain, and against the law,
17 because it cannot be constitutionally administered (See: P.C. §
18 1170(a)(1), Stats 1977 C 165 § 15). As this case indisputably
19 shows, the "Indeterminate Sentencing Law" (I.S.L.) was repealed
20 effective July 1, 1977. Therefore the penalty to be inflicted
21 must be the same for each offender committing the same offense,
22 ergo, it must be a penalty fixed in a number of years by the
23 Legislature. Without an expressed re-enactment of the repealed
24 "I.S.L." and its supporting statutes, some of which call for a
25 purpose and policy, the penalty cannot be legally enforced. The
26 voters did not confer discretion on any agency to determine the
27 amount of time within Prop. 7's sentencing structure. Without
28 these subjects having been presented within the initiative, by

law, they are expressly excluded, and as shown by the law itself, the "I.S.L.'s" re-enactment, was not a subject submitted for voter approval (See: Exhibits 1, SB-42 supra, and 2 - 1978 Proposition 7 Murder Penalty Initiative Statute, obtained from the State's Archives; Cal. Const. Art. 1 §§ 7(a)&(b), 9, 24, & 26; Art. II §§ 8(d) & 10(c); Art. III § 3, Art. IV §§ 9 & 16; and Art. 1 § 10(1) & the 1st, 5th, & 14th Amendments to the U.S. Const., supra; see also: Schmitz v. Younger, 21 C.3d 90, 93 [145 C.R. 517] (1978); Scott A. v. Superior Court, 27 C.A.3d 292, 295 [103 C.R. 683] (1972) ["...a statute may not be amended by reference to its title. A section of a statute may not be amended unless the section is re-enacted as amended."]; Clark v. Jordan, 7 C.2d 248, 60 P.2d 457 (1936) [short title in initiative measure held misleading]; Ex parte Haskell, 112 C. 412, 421 [44 P. 725] (1896) [former Art. IV § 24, now Art. IV § 9] [Holding: "A statute shall embrace but one subject, which shall be expressed in its title. If a statute embraces a subject not expressed in its title, only the part not expressed is void."]).

(6). **PLEASE TAKE NOTICE THAT**, the indictment must be set aside because it charges a crime without a constitutionally correct penalty, and was issued without notice to Defendant that "state actors" hereinafter referred to as the "MORRISSEY 8", have "changed" the penalty for the crime charged in order to vest themselves discretion where none was conferred. By their own admissions, the officials acting as the "MORRISSEY 8" have committed "constructive fraud" upon this Court, and Defendant in the name of the People of the State of California (See: Exhibit 3, "MORRISSEY 8 MEMORANDUM"). This "Memorandum" provides this Court

-5-

with indisputable evidence that state actors have changed Prop.
2 7's penalties from "25 or 15 year terms, subject to good-time
3 credits", to "straight life" penalties with 25 and 15 year minimum
4 terms, subject to some kind of "suitability hearing" process to
5 determine a person's rights to liberty, that was not in affect for
6 any application of law to persons whose crime was committed after
7 July 1, 1977, and not sentenced to "straight life" (See: Pen. Code
8 §§ 1170 (a)(1); 2931, 3000(f), Stats 1977 C 165 §§ 15, 38, & 42;
9 Defendant's Exhibit 4 - AB-476, obtained from the State Archives).
10 (7). **PLEASE TAKE NOTICE THAT**, Defendant's direct attack upon
11 the sentencing schemes adopted by the 1978 Prop. 7 Initiative
12 Statute, should in no way be construed as an admission of guilt on
13 the part of Defendant. The issues presented are a result of a
14 fraud upon the People of California, preventing Defendant from
15 protecting his liberty interests in a matter that could cause this
16 Court to issue an invalid judgment as to the penalty to be
17 inflicted for the crime charged (See: e.g., Witkin & Epstein,
18 Crim. Law 2ed Vol. 1 § 12 & 13; see also: People v. Butterfield 37
19 C.A.2d 140, 143 [99 P.2d 310] [holding: "...motion made 10 months
20 after discovery of fraud; held not barred]; 62 A.L.R.2d 432). If
21 Defendant were to find himself convicted in a trial by judge,
22 jury, or plea, and failed to attack Prop. 7's unlawful adoption of
23 a repealed laws sentencing structure prior to trial - see Gov.
24 Code § 9609, supra, he will have invited a substantial error to
25 have been committed that could cause him irreparable injury (See:
26 Cal. Const. Art. 1 § 26 and Art. IV §§ 9 & 16).

27 (8). **PLEASE TAKE NOTICE THAT**, if this Court were to impose any
28 of Prop. 7's penalties upon Defendant, there is no way to know to

-6-

MOTION TO DICMICC

1 | a "certainty" the will of the voters the exact amount of penalty
2 | to be imposed for the offense charged, based on a verdict by
3 | judge, jury, or plea, against Defendant pursuant to Penal Code §
4 | 187/190. And if Defendant failed to make this attack upon Prop.
5 | 7's sentencing schemes, the result might be attributable to
6 | Defendant's lack of due diligence; regardless of the institutional
7 | failures of the D.O.C., B.P.T., and the Court. Thus a "reversible
8 | error" would have been committed, and these proceedings would be a
9 | meaningless waste of the People's taxes, as well as the fair and
10 | impartial administration of justice. In this case, Penal Code §
11 | 995 allows for a Motion to dismiss and operates at times in a
12 | manner similar to that of an extraordinary writ (See: s/n #1:)

13 | (9). PLEASE TAKE NOTICE THAT, due to the repeal of the I.S.L.,
14 | supra, no discretion was vested in the Executive Branch to
15 | determine facts or evidence as to the vested rights of persons
16 | whose crime was committed after July 1, 1977. The only function
17 | remaining with the C.R.B., was for parole considerations of those
18 | persons whose sentence is determined by a jury and imposed by a
19 | court "FOR LIFE" (See: Pen. Code § 190; Stats 1977 C 316, Stats
20 | 1978 C 579; Pen. Code § 5076 et seq.).

21 | (10). PLEASE TAKE NOTICE THAT, under the laws of this case,

22 | s/n #1: For example see: People v. Superior Court 33 C.3d 754, 762 [191 C.R. 1] (1983); Domino v.
Superior Court, 129 C.A.3d 1000, 1006, 1012 [181 C.R. 486] (1982) [given the state of evidence, the
23 | superior court should have granted the motion to dismiss]; People v. Swinney, 46 C.A.3d 332, 340,
344 [120 C.R. 148] (1975) ["discovery" refers to discovery of criminal agency, not merely discovery
24 | of loss, and requires exercise of "reasonable diligence"]; People v. Witt, 53 C.A.3rd 154, 162 [125
C.R. 653] (1975) [when information shows on its face that prosecution is barred by statute of
25 | limitations, defense may be raised at any time before or after judgment — crime or penalty];
Anderson v. Superior Court, 66 C.2d 863, 866-67 [59 C.R. 426] (1967) [995 motion dismissing murder
26 | charge granted]; In re Henderson, 61 C.2d 541, 544 [39 C.R. 373] (1964); In re Razutis, 35 C2d 532,
534 [219 P.2d 15] [legality of commitment at preliminary examination; waiver of objections unless
27 | raised by motion under P.C. 995]; see also: In re Sandel, 64 C.2d 412, 415-19 [50 C.R. 462] (1966);
Gray v. Hall, 203 Cal. 306, 316, 322 [265 P.246] (1928); Norton v. Shelby County, 118 U.S. 425, 6
28 | S.Ct. 1121, 1125, 30 L.Ed. 178, 186 (1886)).

1 Defendant does not claim a statute of limitations defense to the
2 prosecution for the crime of murder, but he is claiming, inter
3 alia, that those acting on the part of Plaintiffs knew, or should
4 have known that California repealed its "I.S.L.", along with the
5 Executive Branch's discretion to fix terms of imprisonment between
6 a minimum and maximum penalty structure (See: e.g., Exhibits: 1,
7 3, & 4, supra; see also: 3 Cal. Proc., 3d Actions § 544; 1 Cal.
8 Crimes, § 35; Planned Parenthood Affiliates v. Swoap, 173 C.A.3d
9 1187, 1201 [219 C.R. 664] (1985); cf. Association for Retarded
10 Citizens v. Department of Developmental Services, 38 C.3d 384, 394
11 [211 C.R. 758] (1985) cf. Morris v. Williams, 67 C.2d 733, 748 [63
12 C.R. 689] (1967); Drummey v. State Bd. of Funeral Directors, 13
13 C.2d 75, 84-85 [87 P.2d 848] (1939); Cal. Const. Art. III § 3).

14                **EVIDENCE IN SUPPORT OF MOTION TO DISMISS**

15 Supporting Statement:

16     (11). PLEASE TAKE NOTICE THAT, having presented a case in
17 controversy, and a showing of indisputable evidence that
18 regardless of the circumstances, and/or opposition offered by
19 Plaintiffs, under the law of the case, Defendant cannot be taken
20 to trial where the penalty for the offense is in violation of
21 expressed provisions to both State and Federal Constitutions.
22 Furthermore, if Defendant where to be found guilty of the crime of
23 murder in the 1st or 2nd degree, the State's Constitution mandates
24 that Defendant is entitled to have the penalty fixed to a
25 "certainty" by the Legislature in a number of years, and that the
26 penalty be a "final judgment", imposed by a court of law; not
27 conditioned upon the will of any other branch or agency (See e.g.,
28 Art. 1 §§ 7(a)&(b), 26; Art III § 3 of Cal. Const.; and the 1st,

MOTION TO DISMISS -

1  5th, and 14th Amend. to the U.S. Const.).

2  (12). PLEASE TAKE NOTICE THAT, according to California
3  Constitution Article II § 10(c), Defendant is entitled by law to
4  have a penalty determined according to the expressed language used
5  in the Title of Prop. 7, and administrated by the laws adopted for
6  the implementation of the penalty - Penal Code § 2931 et seq.,
7  Stats 1977 C 165 § 38 - as these laws, supra, stood in effect as
8  of November 8, 1978, based on the following:

9  (13). Effective November 8, 1978, the voters ratified the 1978
10  Prop. 7 Initiative Statute into law. The language used in Prop.
11  7's Title by its Drafter stated, inter alia, that:

12      "Changes minimum sentence for first degree murder from
        life to 25 years to life. Increases penalty for second
13      degree murder. Prohibits parole of convicted murderers
        before service of 25 or 15 year terms, subject to
14      good-time credits". (See: Exhibit 2, supra).

15  (14). The 1978 Prop. 7 Initiative Statute did not contain the
16  following subjects, nor did it ask the voters permission to:

17  (A). Change Prop. 7's penalties of 25 or 15 years, to penalties
18      "FOR LIFE" with mimimums of 25 or 15 years, subject to some
19      kind of "suitability hearing process" whereby a person's
20      liberty would be conditioned upon the will of the same
21      branch charged with Defendant's prosecution. The voters
22      were not asked to vest discretion in the "MORRISSEY 8" or
23      any other agency granting them the power to amend Prop. 7,
24      or that could be construed as "notice" other than what was
25      specified by the expressed language used in Prop. 7's
26      Title, supra;

27  (B). re-enact the I.S.L., under the Legislature's declared
28      policy of "punishment" for 1st and 2nd degree murder

-9-

1 offenses;

2 (C). change the purpose for imprisonment from "punishment" for

3 the crime itself, back to "mitigation" of the penalty,

4 based on "rehabilitation" of the individual offender;

5 (D). repeal the authority to reduce Defendant's penalty,

6 "subject to good-time credits", and re-vest it back with

7 the same agency who just had its powers to fix terms and

8 administer earned credits - under the repealed I.S.L. Pen.

9 Code § 2920, Stats 1977 C 165 § 36 - taken away less than

10 16 months earlier for abuse;

11 (E). create a separate and "special class" of prisoner to be

12 excluded from the D.S.L.; granting the Community Release

13 Board (C.R.B.) - now known as the Board of Prison Terms

14 (B.P.T.) - the power to deny those who stand within the

15 same relationship to the law, the same rights and

16 privileges as all others for the D.S.L. was created, the

17 "certainty" of the penalty to be inflicted, sine qua non,

18 there can be no penalty;

19 (F). repeal or amend the law vesting the rights created, as

20 decreed by the Legislature, so that all those who commit a

21 crime, as well as the victims and the offender's family

22 members - would know the "certainty" of the penalty to be

23 inflicted as declared by the law itself;

24 (G). ask the voters to amend Penal Code Sections 1170, 2931,

25 and 3000, et seq., adopted as the means for implementing

26 the D.S.L., as well as Prop. 7's sentencing structure;

27 (H). nor did Prop. 7 ask the voters to amend the D.S.L., or to

28 amend the State Constitution in order to permit the

-10-

. vesting of legislative discretion in Plaintiffs to

2    determine Defendant's fundamental rights under the newly

3    declared policy of "punishment" for Prop. 7's penalties;

4    (I). Prop. 7 did not repeal the D.S.L. nor create a "special

5    class" within the D.S.L. for category four and five crimes

6    (See: Exhibit 1, supra, id at p. 3).

7    ## INDISPUTABLE ISSUES OF FACT AND LAW

8    ### Indisputable Material Facts:     ### Supporting Evidence:

9    1-(A) During its 1976 session, California's Legislature made the policy decision to repeal the sentencing law with no fixed penalties as its purpose for imprisonment for crime. In repealing the I.S.L., California changed from the policy for imprisonment from mitigation and rehabilitation to the "punishment" for the crime itself. The purpose for the new Determinate Sentencing Law was so that all those convicted of crime, would know the "certainty" of the penalty to be imposed by a court of law. This law took effect on July 1, 1977. Prop. 7 did not contain notice of the "MORRISSEY 8 MEMORANDUM" where they changed Prop. 7's penalties of 25 and 15 year terms to penalties "FOR LIFE" with 25 and 15 year minimum terms, subject to a so-called "suitability hearing process".

As shown, Prop. 7's Title asked the voter to "CHANGE" the penalty for 1st degree murder from life. In the case of 2nd degree murder, the subject of "LIFE" was specifically omitted (See: Cal. Const. Art. 1 § 26; Art. II § 8(d); Art. IV §§ 9 & 16). When Plaintiffs made the decision to treat Prop. 7's terms the same as all other penalties "FOR LIFE", they violated expressed provisions of both State and Federal Constitutions (See: e.g., Witkin Const. Law 9ed Vol. 7 §§ 101-105; 444-47; 481; 497; and 500 (1988); Cal. Const. Art. 1 §§ 1, 3, 7(a)&(b), 15, 24, & 26, Art. II § 10(c); & the 1st, 5th, 6th, and 14th U.S. Const. Amend.'s; Exhibit 3, supra).

2-(B). Prop. 7 did not re-enact the I.S.L., which cannot exist under the policy of "punishment" for these offenses. In the case of Prop. 7's 1st and 2nd degree murder penalties, neither the C.R.B., or any other agency was delegated with legislative discretion to determine the penalties of Prop. 7's adopted sentencing schemes. According to Prop. 7's Title, the voters were told the offenders would be paroled from the 25 or 15 year terms "subject to good-time credits", and nothing more.

Under California law, no state-wide agency can be vested with this exclusively Legislative power, and any attempt to so construe Prop. 7's penalties would violate State & Federal Constitutions (See: Cal. Const. Art. 1 § 26; Art. II § 8(d); Art. III § 3; & Art. IV §§ 9 & 16; see also: Witkin & Epstein Crim. Law Vol. 1 § 12; Vol. 3 § 1447; & Witkin Const. Law 9ed Vol. 7 §§ 93, 101-05, 107-11, 113-14, 120, 129, 481-87, 497, 556-57, & 591 et seq; and the 1st, 5th, 6th, & 14th Amend.'s to the U.S. Const.; see

-11-

3-(C). Prop. 7 did not change the purpose for imprisonment from: "punishment" for the crime itself, back to "mitigation" of the penalty, based on "rehabilitation" of the offender as these were not subjects contained in the 1978 Prop. 7 Initiative Statute. The Legislature did not state its purpose for retaining indeterminate sentencing, which cannot exist under the policy of "punishment" for the crime itself. Note: Prop. 7's Title did not contained the subject of 15 years to life.

4-(D). Prop. 7 did not ask the voters to take the power to fix terms and grant parole away from the D.O.C. - pursuant to Pen. Code §§ 2930 thru 2932 & 3000(f) - and re-vest it back with the C.R.B. so that those effected by Prop. 7 would be subjected to some kind of "suitability hearing process" not contained within the bill. By law, offenders are entitled to four months off their sentences for each eight months served. The B.P.T.'s so-called "suitability hearings", interfere with this vested right.

5-(E). Prop. 7's sentencing structure is a pure question of law where fundamental rights are at stake. There is no question that the D.S.L. was created so that all those within the "SB-42 class" would be entitled to know the "certainty" of the penalty to be inflicted as determined by the Legislature and imposed by a court of law. The charge against Defendant were part of the "class" for which the D.S.L. was created. Prop. 7 did not ask the voters to create a "special class" of offender. Nor did it ask the voters to grant

At the time Prop. 7 was submitted to the voters, the Adult Authority had already had its term fixing authority repealed. The C.R.B. succeeded the Adult Authority with only specified duties (See Exhibit 1 SB-42, supra). State law prohibits any state-wide agency from possessing the power to determine the penalty any given crime shall bear, absent an amendment to the Constitution authorizing it (See: Cal. Const., Art. 1 §§ 7(a)&(b), 9, & 26; Art. III § 3; Art. IV §§ 1, 9 & 16; & the 14th Amend. to the U.S. Const., supra; see Exhibit 3, supra).

Under California law, once the Legislature vested the power to administer penalties for crimes committed after 7/1/77, with the D.O.C., this function became a matter of public trust, and could not be given away, or usurped by another agency - acting outside the law - who just had its discretion repealed. The voters ratified Prop. 7's sentencing provisions according to what they were told by its title, and according to the laws in existence at the time of its enactment (See: Cal. Const., Art. 1 § 26; Art. II § 10(c); Art. IV §§ 9 & 16; and U.S. Const.'s 1st, 5th, 6th, & 14th Amend.'s, supra).

California's Constitution prohibits discrimination in the application of the law in any form. It also prohibits "class" discrimination, whenever a general law can be made applicable. If the Author of Prop. 7 intended to create a "special class", and disadvantage Prop. 7 prisoners by reviving "uncertainty" in their penalties, he failed to mention it to the voters. Any attempt to deny those within Prop. 7, the same rights and privileges as those for which the D.S.L. was created, violates the due process

-12-