1   ask them to amend the State Constitution to allow the legislative body to vest arbitrary discretion in Plaintiffs to allow for disparate penalties to be determined by the same branch charged with the prosecution. The voters did not approve of different penalties to be imposed on individual offenders committing the same offense; as opposed to the expressed language contained in Pen. Code §§ 1170(a)(1), 2931, & 3000, as these law's stood on November 1978.

it to the voters under the guise of an existing law, thus, making it void on its face as being repugnant to expressed provisions of the State and Federal Constitutions (See: Cal. Const. Art. 1 § 26; Art. III § 3; Art. IV §§ 9 & 16; as well as Gov. Code § 9609 see Witkin Const. Law 9ed Vol. 7 §§ 87-89, 93-94, 101-05, 109, 111, 120, 129, 497, 500, 519, & 556-57).

9-(I). As previously stated, Prop. 7 did not ask the voters to repeal any part of the D.S.L., or create a "special class" for category four and five crimes; this was done by "constructive fraud" in violation of both State and Federal Constitutions. The terms of 25 or 15 years, are exactly what the voters of Prop. 7 said they were, subject only to "good-time credits". The only way a person can be subjected to having to spend a longer term - up to "LIFE", in the case of 1st degree murder, would be if the person violated the provisions of Pen. Code § 2931, or refused to perform according to its provisions.

Prop. 7's penalties are now being implemented as penalties with no fixed terms. Under the policy of "punishment" for the crime itself; this makes Prop. 7's sentencing schemes incomplete as legislation. Furthermore, as administratively appointed officials, Plaintiffs have abused their discretion, because under State law, no Legislative agency can be vested with the power to determine a person's fundamental rights. Plaintiffs' actions violate both State and Federal Constitutions (See: e.g., Cal. Const., Art. 1 §§ 7(a)&(b); 26; Art. III § 3; Art. IV §§ 9 & 16; and U.S. Const. Art. 1 § 10(1) and the 1st, 5th, 6th, & 14th Amend.'s, supra; Exhibits 1, 2, 3, & 4, surpa.

## CONCLUSIONS

(15). As of July 1, 1977, California law no longer provided for indeterminate sentencing. And under the policy of "punishment" for the crime itself, indeterminate sentencing cannot exist, ergo, the penalty for the crime charged, must be the same - in a number of years - for each person committing the same offense, or the penalty is "uncertain" and violates, inter alia, both due process and equal protection clauses of the State and Federal Constitutions (See also: e.g., Witkin & Epstein, Crim. Law 2ed

-14-

Vol. 1 § 12, supra, Vol. 3 § 1447, supra; 13 Cal. Jur.3d §§
104-107; Cal. Const. Art. 1 § 26; Art. II § 10(c); Art. III § 3;
Art. IV. §§ 9 & 16; and the 1st, 5th, 6th, & 14th Amend.'s to the
U.S. Const.; see also: Exhibit 5 - Santa Clara Law Review).    It
has always been the law in this State that only the Legislature
has the exclusive authority to define a crime and fix the penalty
for its offense.    And, absent a constitutional amendment
authorizing the vesting of this exclusively legislative function
elsewhere, the "legislature cannot delegate this power to any
administrative agency of its own creation", ibid.    Therefore,
Prop. 7's penalties must be fixed to a "certainty" by the law
itself, and be so complete in all its terms and provisions, that
nothing is left to be decided by those who are empowered to
administer the law.    Whatever the outcome of these proceedings,
Defendant cannot be taken to trial under a suspect sentencing
structure, and the penalty to be imposed may not be conditioned
upon the will of the same branch charged with his prosecution - to
be determined by some political appointee - where the actual term
of confinement is based on the will of whomever is in power at the
time (emphasis added).

REQUEST FOR RELIEF

(16). Defendant, having acted with due diligence in trying to
resolve this matter prior to trial, request both "Declaratory and
Injunctive Relief".    Furthermore, Defendant requests this Court
grant his "Motion to Dismiss" the defective charges on the basis
that - under California law there can be no crime without a
penalty - the penalty is either "void on its face" as being in
direct conflict with both State and Federal Constitutions, or

-15-

1 "void" because the sentence cannot be constitutionally
2 administered under the Legislature's declaration contained in
3 Penal Code § 1170(a)(1), supra.

4 (17) Or, that this court declare the penalties for a
5 conviction of 1st or 2nd degree murder pursuant to Penal Code
6 Sections 187/190 are 25 or 15 year fixed terms, where defendant is
7 mandatorily paroled by the Dept. of Corrections subject to earned
8 credits, as it is expressly stated in the Title of Prop. 7, and
9 not subject to any agency's "suitability" hearing.

10 Respectfully submitted,

11 V E R I F I C A T I O N

12 FORM NO. 2

13 Verification of Pleading (CCP § 446) - Declaration Under Penalty
of Perjury (CCP § 446, 2015.5)

14 BY PARTY

15

16 Case Title:    MOTION TO DISMISS - P.C. § 995

17 Case Number:    02F01534

18 As the Defendant in this matter, I declare I have read the
19 foregoing GROUNDS FOR FILING THE ATTACHED PENAL CODE SECTION 995
20 MOTION TO DISMISS THE ABOVE ENTITLED CASE (Pleading - Complaint)
21 and know the contents thereof. The same is true of my own knowledge
22 except as to those matters which I believe to be true.

23 Executed on __Febuary__ (Month)_28__ (Day), 2009, in the City
24 of Sacramento, County of Sacramento, California.

25 I declare (or certify) under penalty of perjury that the fore-
26 going is true and correct.

27
                              Kinson Her              2/28/09
28                         Name of Defendant          Date

-16-

```
 1              P R O O F   O F   S E R V I C E   B Y   M A I L
 2    Case Name:          KINSON HER

 3                            Defendant,

 4                               vs.

 5                        State of California

 6                          Plaintiffs.

 7    Case Number:          02F01534

 8      I  Sanbeira Thlang      , declare and state as follows:   I am 18
      years or older an not a party to this action.  My address is:
 9    P.O. BOX 7500, Crescent City, CA. 95532              Pelican Bay State Prison

10      On   March       (Month)   23    (Day),  2009   I  served  the
      attached MOTION AND PLEADING FOR: NOTICE OF MOTION AND MOTION TO
11    DISMISS BASED ON A DEFECTIVE INDICTMENT GROUNDED ON CONSTRUCTIVE
      FRAUD by placing a true copy enclosed in a sealed envelope with
12    postage fully paid thereon, in the United States Mail at
                                (City), California, addressed as follows:
13

14                          PARTIES SERVED

15    NAME                    ADDRESS

16    JOHNNY JOHNSON           720 9th Street, Dep. 10
      Superior Court-Clerk     Sacramento, CA. 95814
17

18    Bill Lockyer, et al.,    Post Office Box No. 944255
      Attorney General         1300 I Street Suite 125
19                             Sacramento, CA      95814

20    _____
      District Attorney        _____
21

22    Jeanne Woodford,        P.O. Box 942883
      Dir. of Corrections     Sacramento, CA  94283-0001
23

24      I declare under penalty of perjury under the laws of the United
      States of America, that the foregoing is true and correct.
25
        Executed on   March    (Month)   23   (Day),  2009, at
26        Crescent City       (City), California.

27    Sanbeira Thlang
28    PRINT NAME                              SIGNATURE
```

# EXHIBIT 1

Bill Number __SB 42__

As Amended __April 22, 1975__**

Author __Nejedly__

Rev. & Tax __NO__

Ways & Means __YES__

Staff Member __MU__

## BILL ANALYSIS

**(as amended by Leg. Counsel Request #12986) as reflected in the mock-ups distributed on July 28, 1976)

SUBJECT:      Imprisonment:  Determinate Sentencing

NOTE:         There have been significant changes in SB 42 since it was last heard by the Criminal Justice Committee in August of 1975.  This analysis will generally describe the bill as amended by Legislative Counsel Request #12986 (or mock-ups dated July 28, 1976) (hereinafter referred to as the current version of the bill), describe the significant changes to the bill since it was last heard by the Committee (the form of the bill at the last hearing shall hereinafter be referred to as the 1975 version of the bill), and then will offer comments.

BILL DESCRIPTION:

     Under our current system of prison sentencing, the trial judge would commit a defendant to prison for the indeterminate period expressed in the statute and the respective parole board (the Adult Authority or the Women's Board of Terms and Paroles) would determine the actual term to be served and the amount of incarceration prior to being paroled.  The law does not specify when these decisions must be made.  Historically, these decisions were not made until long into the prison sentence.  Currently, both Boards attempt to make these decisions early in the term.

     SB 42 would repeal the indeterminate sentence statute (as for all crimes that do not call for life imprisonment or death) and would substitute a system of sentences that would allow the court to specify the amount of time the defendant would serve in prison. Each crime would carry three possibilities for the sentence.  The bill specifies the procedure for the judge to select one of the three choices.  To this base term, there are many enhancements that may be charged and proved that will add more time to the sentence.

(continued on next page)

SB 42 provides for credits from the sentence for good behavior and participating in programs within the prison. These credits total one-third off of the sentence. There is a specified procedure in the bill that would cover the loss of these time credits.

After the term is completed, the bill would allow for a parole period of one year for most crimes (three years for others). A violation of parole would provide for six months of further incarceration.

The bill abolishes the current parole boards and sets up a new board called the Community Release Board (CRB).

SB 42 expands the current role of the Judicial Council as the overseer of the sentencing system.

SB 42 is retroactive and a procedure is detailed as to how this new structure will apply to those sentenced to prison prior to the effective date of the Act.

Sentencing Structure:

The purpose of the sentencing structure in SB 42 is summarized by the statement of legislative purpose that appears in Section 1170 (a)(1) of this bill: The Legislature finds and declares that the purpose of imprisonment for crime is punishment. This purpose is best served by terms proportionate to the seriousness of the offense with provision for uniformity in the sentences of offenders committing the same offense under similar circumstances. The Legislature further finds and declares that the elimination of disparity and the provision of uniformity of sentences can best be achieved by determinate sentences fixed by statute in proportion to the seriousness of the offense as determined by the Legislature to be imposed by the trial court with specified discretion.

SB 42 has a three-tiered approach for all felonies that can be sentenced determinately. The bill places all of the crimes that currently carry prison sentences into the following categories: 16 months, 2, 3 years; 2, 3, 4 years; 3, 4, 5 years; 5, 6, 7 years; life imprisonment (indeterminate sentence with parole eligibility after seven years); life imprisonment without the possibility of parole; death.

(1)  16 months, 2, 3 years - this classification is to cover the least serious felonies. It contains all felonies that currently carry a maximum of two years and a maximum of three years, all felonies that carry a maximum of five years (with one exception, Penal Code Section 243, battery with serious bodily injury), all wobblers (with three exceptions:  P.C. 243, battery with bodily injury; P.C. 245a, assault with a deadly weapon or force likely to commit great bodily injury; P.C. 4532a, escape with force), some crimes with 10 year maxima, some crimes with 14 year maxima, and some others that have higher maxima such as statutory rape.

(continued on next page)

and offenses involving prisoners. This category includes most non-violent property offenses (grand theft, forgery, receiving stolen property, joy-riding, credit card offenses, second degree burglary), possession of all controlled substances (that are currently felonies), possession for sale of dangerous drugs and marijuana, and some felonious assaults (simple assault on a peace officer, assault with intent to commit a felony, shooting into a dwelling).

   (2)  2, 3, 4 years - this classification is to cover more seriol offenses. It contains only one felony that currently has a maximum of less than seven years (P.C. 243, battery with injury). Most other crimes with 10 and 14 year maxima are in this classification. It contains all wobblers that were not in the previous classification. It contains some crimes that currently carry a maximum of life imprisonment (sale of marijuana, first degree burglary, assault with a deadly weapon). Some of the felonies in this classification are: mayhem, assault with intent to commit murder, assault with a deadly weapon, voluntary manslaughter, involuntary manslaughter, bribery, perjury, possession for sale of opiates, sale of dangerous drugs and marijuana, second degree robbery, first degree burglary, arson, forceable oral copulation, forceable sodomy, oral copulation on a child under 14, sodomy on a child under 14, pimping, pandering, and assaults with intent to rape or rob.

   (3)  3, 4, 5 years - this classification covers the second most serious felonies that are to be determinately sentenced. All crimes in this group currently carry maxima of life imprisonment or a very high term. The minima currently range from six months to ten years for these crimes. Included in this classification are the following crimes: sale of opiates, kidnap, unarmed robbery of a taxi or bus driver, assault with a deadly weapon on a peace officer, forceable rape, gang sodomy and oral* copulation, child molestation, and burglary with explosives.

   (4)  5, 6, 7 years - this classification covers the most serious crimes that are to be punished with something less than life imprisonment or death. SB 42 places the following five crimes into this category: second degree murder; attempted murder; explosives with bodily injury; gang rape, and conspiracy to commit a crime on certain elected officials. All these crimes currently carry maxima of from 20 years to life imprisonment and minima ranging from five to fifteen years.

   (5)  Life imprisonment - this covers murder in the first degree, explosives with great bodily injury, kidnap for ransom, trainwrecking.

   (6)  Life with no parole - included in this classification is trainwrecking with injury, and kidnap for ransom with injury.

(continued on next page)

(7) Death - this covers special circumstance murders and kidnap with death.

Attempts are to be punished as $\frac{1}{2}$ of the term selected, plus enhancements, consecutive sentences, etc. Attempt of a crime punishable by life imprisonment is to be punished 5, 6, 7 years. Attempt of the lowest class felony can be punished with state prison (current law only allows one year in the county jail for such attempts).

## Enhancement to Sentence:

SB 42 provides for a series of factors that can cause the sentence to be enhanced if these factors are charged and proved. Some of these enhancements are applications of existing statutes; some are new concepts incorporated into the bill. The following is a summary of these enhancements:

(1) Armed with a deadly weapon (P.C. 12022) - This factor would cause one year to be imposed in addition to the base term. The "armed" allegation applies in the case of all felonies and is codification of existing law.

(2) Use of a firearm (P.C. 12022.5) - This factor would cause two years to be added to the sentence. Current law recognizes that "use of a firearm" should enhance the sentence in the following specified felonies: murder, assault with attempt to commit murder, assault with a deadly weapon, robbery, rape, burglary, kidnapping. SB 42 would expand the operation of this concept to all felonies.

(3) Great bodily injury (P.C. 12022.7) - This factor would cause three years to be added to the sentence. Current law recognizes that greater sentences are to be imposed when the defendant, during the commission of rape, burglary, and robbery, with the intent to inflict such injury, inflicted great bodily injury on the victim. SB 42 expands this concept to cover all felonies and to cover acts committed by a person other than the defendant. Great bodily injury is specifically defined in the bill.

(4) Excessive taking or damage (P.C. 12022.6) - If the victim suffers a property loss of between $100,000 and $500,000, then 50% of the term may be added to the sentence. If the loss is over $500,000, then the enhancement may be 100% of the base term. This enhancement would apply in theft and arson cases. There is no corresponding concept in the statutes currently.

(5) Prior prison terms (P.C. 667.5b) - One year may be added for each prior term spent in prison, provided that the defendant has not remained free of prison custody for five years immediately preceding the filing of an accusatory pleading that results in a felony conviction.

(continued on next page)

(6) Prior prison terms for specified felonies (P.C. 667.5a) -
Three years may be added for each prior prison term served if
the term was for a "violent felony" that includes the following:
murder or voluntary manslaughter, mayhem, forceable rape, sodomy
or oral copulation, kidnapping as defined by Section 209, lewd
acts on a child (P.C. 288), and any other felony in which great
bodily injury on a person other than the defendant or his
accomplices has been alleged and proved. This enhancement will
apply in cases where the defendant has not remained free of prison
custody and free of felony conviction for 10 years preceding the
filing of an accusatory pleading that results in a felony
conviction.

(7) Consecutive sentences - Under current law, the court
may impose sentences consecutively which would in effect raise
the minimum time in prison before parole eligibility. SB 42
would allow consecutive sentences to be imposed that would add
one-third of the middle base term to the sentence, for each
consecutive sentence. Any consecutive sentence must be free
of enhancements.

(8) Limits on enhancements - SB 42 has three sections dealing
with a limit on the amount of time that can be added to a sentence
because of enhancements and consecutive sentences:

P.C. 1170.1a(d) - Only one enhancement for arming, use,
or GBI may apply. These enhancements cannot be utilized in cases
where they are elements of the crime.

P.C. 1170.1a(e) - Prior terms that are not specified
as violent felonies and consecutive sentences cannot exceed five
years of enhancement.

P.C. 1170.1a(f) - Enhancements cannot more than double
the base term unless the defendant is convicted of a violent felony
as enumerated in Section 667.5c, or allegations of arming, use,
or GBI are found to be true.

Sentencing Procedure:

If the court decides that punishment in prison is appropriate,
it shall select the middle term from the choice of three terms
unless a motion is made to select the higher or lower based on
circumstances in aggravation or mitigation of the crime. The
court shall impose the additional sentences for enhancements
charged and proved unless the court determines that there are
circumstances in mitigation of the punishment prescribed. Reasons

(continued on next page)

for deviating from the middle term and for not imposing the
additional sentence for enhancements must be stated on the
record. The court shall follow the rules established by the
Judicial Council in exercising its decisions in sentencing
matters.

## Judicial Council:

To promote uniformity in sentencing, the Judicial Council
shall adopt rules to provide criteria to sentencing judges in
their decisions concerning sentencing. It shall quarterly
distribute information to trial judges relating to sentencing
in this state and in others. It shall conduct sentencing
institutes. It shall provide criteria to the Community Release
Board regarding parole and term setting decisions (for indeterminate
life sentences). It shall annually meet in public session to
review the sentencing structure and specific statutes. It shall
report to the Legislature regarding proposed legislation in this
area. The review will consider the nature of the offense (in
the proposed legislation) with the degree of danger it presents to
society; compare its penalty to more serious crimes, compare
its penalty to penalties in other jurisdictions and to recommenda-
tions by national commissions and other learned bodies.

## Community Release Board:

The Community Release Board will replace the existing
Adult Authority and Women's Board of Terms and Parole. It will
succeed to their same functions in indeterminate sentence cases;
it will set up parole guidelines for individual cases; and it
will be the ultimate body of review for decisions of the Depart-
ment of Corrections in the loss of good time credit. The Board
will be comprised of nine members and "shall reflect as nearly
as possible a cross-section of the racial, sexual, economic,
and geographic features of the population of the state." In
reality, the bill grandfather's in all of the existing Adult
Authority members. The Women's Board members will not be part
of this new board unless by appointment to fill a vacancy.

The Board must review all cases sentenced determinately
to see that the sentence is not disparate. If the sentence is
disparate, the Board is to move the sentencing court to recall
and resentence. This is to promote uniformity in sentencing.

## Credits for Good Behavior and Participation:

SB 42 allows for credits to be deducted from the term of
imprisonment. Three months a year are to be deducted for the fore-
bearance of specified acts (such as escape, assaultive behavior,
possession of drugs, possession of a weapon, etc.) These acts
are placed into three categories: acts which will allow the loss

(continued on next page)

of 15 days: acts which will allow the loss of 30 days: acts
which will allow the loss of 45 days. The bill provides for
some procedural safeguards for the loss of good time.

One month a year is to be deducted for participation in
work, educational, vocational, therapeutic, or other prison
programs and activities.

All prisoners will serve eight months of each one year
of the term unless good time or participation time credits are
lost. If the inmate is prosecuted by the local district attorney
for an act for which good time could be lost, then good time can
only be lost by a conviction. An acquittal is binding as a factual
determination.

Prisoners sentenced prior to the effective date of SB 42
will receive credits on their terms only after the effective
date of the Act.

Parole:

SB 42 prescribes rules and procedures for parole of persons
sentenced under this bill, including an automatic parole of no
longer than one year, or three years for "lifers", at the
expiration of the term, unless CRB for good cause waives parole
and discharges the inmate.

The bill prescribes rules and procedures for parole of
persons receiving an indeterminate (life) sentence, including
the following:

(1) Meetings between the inmate and CRB, at which a
majority of a 3 member panel of CRB will decide whether to
set or decline to set a release date. The first is within
one year of his incarceration. If no release date is set
prior to his minimum eligible parole release date, or if the
date is more than 3 years after the minimum, he can have a
re-hearing with counsel.

(2) The right of the inmate to the undivided attention
of panel members, to a transcript and to receive notice of the
panel's decision, with an explanation whenever a release date
has been denied, postponed, or rescinded.

SB 42 limits parole revocation in the following respects:

(1) Reconfinement shall not exceed 6 months.

(2) In no event shall reconfinement and re-parole extend
beyond the original one-year, or three-year maximum.

(continued on next page)

## Retroactivity:

For those prisoners already in prison but who would have been determinately sentenced under SB 42 (had it been law at the time of the sentence), the following guidelines are set up for the Community Release Board:

(a) Figure the middle term of the crime for which the prisoner has been convicted and aggregate it by any additional terms which were imposed by the trial court.

(b) The CRB should use this figure as the prisoner's term unless he already has a parole date from the Adult Authority (or Women's Board) that will let the prisoner out earlier; then the earlier date shall be selected. There shall be no good time credit for time served prior to the effective date of the Act.

(c) However, if the CRB feels that the prisoner merits more time because of the number of convictions or priors, or due to the fact that a deadly weapon was involved or that an attempt to inflict great bodily injury was involved, the Board may set a later date for release (upon a hearing with counsel for the inmate).

In fixing a term in these cases, the board "shall be guided by the term which reasonably could be imposed on a person convicted after the effective date of this act of a similar crime under similar circumstances."

## Other Incidental Changes from Current Law:

(1) Special penalties for prior convictions in narcotic cases is repealed. Only prior prison terms will enhance the sentence in the case of prior convictions.

(2) 1202b, the Youthful Offender provision is repealed.

(3) The habitual criminal statute is repealed. The enhancement for prior prison terms and for violent priors that result in prison terms is substituted for this concept.

## CHANGES IN THE BILL SINCE LAST HEARD BY THE COMMITTEE

SB 42 has had many amendments since the Committee heard the bill in August of 1975. Many of the amendments are technical and many of the ambiguities have been resolved. The following is a chart with some of the substantial changes in the bill since the printed version dated August 14, 1975.

(continued on next page)

| Subject | 1975 Version | 1976 Version |
|---|---|---|
| Life without possibility of parole | not in bill | is provided for in P.C. Sections 209, 218, 219 (trainwreck, kidnap for ransom) |
| 5 year washout for prior prison terms | not in bill | in bill |
| 3 years for "violent felony" prior term | not in bill | in bill |
| Power to recall sentence by judge | at any time | limited to 120 days after the sentence |
| Consecutive sentences | add one year | add 1/3 of middle term |
| CRB review of sentence for disparity; remand to court | for sentences of more than 10 years | for all sentences |
| Limit on enhancements | 5 years for prior terms and consecutives | 5 years for prior terms for non-"violent felonies" and consecutive; 100% limit unless "violent felony or weapon involved |
| Retroactivity | middle term plus terms that could have been imposed by the judge | middle term plus what was imposed; exception for inmate with many priors, or if weapon or GBI involved |
| Judicial Council | overseer; guidance to judges | overseer; guidance to judges; advise to Legislature |
| Youthful Offender Provision - 1202 b | parole eligibility in one year | repealed |
| Good time credit loss | 30 days for assaults | 45/30/15 days for specified misconduct; detailed procedure |
| CRB composition | New board; cross-section of the community | "Grandfather" in the Adult Authority; no Women's Board |

(continued on next page

| | | |
|---|---|---|
| "use" enhancement (two years) | applies in cases of certain specified felonies | applies in all felonies |
| Enhancement for excessive loss | not in bill | 50% of base term is $100,000; 100% if $500,000 |
| GBI enhancement (three years) | accomplice could be injured | exempts accomplice; GBI defined |
| Attempt of 16 month, 2, 3 year crime | punishable in county jail for one year | punishable in state prison for ½ the term plus enhancements |

#### COMMENTS:

(1) This Committee has held previous hearings on the Indeterminate Sentence and as a Committee has concluded that major reform is necessary. The important questions concern the nature of this reform.

(2) The federally-sponsored Uniform Parole Reports Project has concluded that the national median time served by state prisoners outside of California for each of the years 1968-1973 was between 17 and 18 months. For five industrial states considered comparable to California, the combined median has fallen steadily in each of those years, from a high of 24.2 months in 1968 to 18.1 months in 1973. By contrast, the median time served in California has been approximately double the national median (generally around 36 months, with a slight drop to the low 30's in 1972 and 1973 when the Adult Authority tended to limit paroles to so-called "good risks"). Currently, the Adult Authority is setting release dates that would call for a median of around 38 months in prison. The sentencing structure of SB 42 is based heavily on this recent past experience of the Adult Authority.

(3) SB 42 will also affect the terms in prison for women. The Women's Board has traditionally dealt with a less violent and less dangerous inmate than has the Adult Authority. Correspondingly, the median time served for women has always been far less than for the men. The median time served for women between 1972 and 1975 has ranged from 10.5 months to 25 months. Should the Legislature accept the penalties in SB 42 which have been derived from statistics concerning the terms served by men?

(4) A major concern over the structure of SB 42 is the fixing by statute of prison terms that may entail long periods of incarceration, with no mechanism for the terms to adjust downward in the future. History teaches us that the Legislature is reluctant to lower prison sentences and there is constant pressure to raise such sentences. Some legislative enactments are being stricken by the courts as "cruel and unusual punishment".

(continued on next page)

An alternative to SB 42 is a structure similar to our current system, with the Legislature fixing the range of penalties and an administrative body determining the actual ter . This system allows for flexibility but has not in the past been immune to political pressures.

(5) Some of the criticism of the failure of the Indeterminate Sentence Law has been placed on the Adult Authority. Should this body be perpetuated in the form of the Community Release Board? Is there a reason for abolishing the Women's Board while retaining the Adult Authority? The bill requires the make-up of the Community Release Board to be a cross-section of the racial, sexual, economic, and geographic features of the population of the state. Does the Adult Authority represent this cross-section?

(6) Both the Adult Authority and Women's Board employ hearing representatives to help carry out their parole hearing functions. The CRB will not need many employees to help out in its parole hearing function in that parole dates for most prisoners will be fixed by statute. The CRB will have the added responsibility of reviewing Department of Corrections decisions concerning loss of good time credit. Possibly, the CRB will wish to hire lawyers to help carry out its functions. In the bill, Section 5082(a)(page 155) says: "Nothing shall prohibit the Community Release Board from employing any person employed formerly by the Adult Authority or Women's Board." Does this clause prevent the CRB from setting up standards for employees that would make the former hearing representative ineligible? Is this desirable?

(7) SB 42 assumes that the sentencing judge will sentence defendants to the middle term unless factors of aggravation or mitigation of the crime are found. Is this assumption reasonable given that only 10 to 20% of convicted felons are sentenced to prison? A case that merits punishment in prison will normally contain "factors of aggravation." Should the judge be instructed to select the bottom term and go to the higher terms upon a showing of aggravating circumstances rather than starting at the middle term as the bill now provides?

(8) The purpose and stated legislative intent of SB 42 is for uniformity of punishment, consistent with the seriousness of the respective crimes. With this purpose in mind, the following questions are raised:

(a) Should voluntary and involuntary manslaughter be punished as the same crime? In SB 42, both crimes are punished by 2, 3, 4 years. Current law provides for a range of 1 to 15 years for each crime. The Adult Authority in the newly published Parole Board Rules treats involuntary

(continued on next page)

manslaughter as a less serious crime and allows parole one
year earlier.  If the penalty of involuntary manslaughter
is changed to 16 months, 2 years, 3 years, then the following
scheme will be established for homocides:

| | |
|---|---|
| first degree murder | life imprisonment |
| second degree murder | 5, 6, 7 years |
| voluntary manslaughter | 2, 3, 4 years |
| involuntary manslaughter | 16 months, 2, 3 years |
| vehicular manslaughter | 16 months, 2, 3 year/wobbler |

It should be noted that the actual sentences will frequently
be higher for there will normally be a weapon involved.

(b)  Penal Code Section 288, lewd and lascivious acts
on a child under the age of 14 years, carries a SB 42 penalty
of 3, 4, 5 years.  This crime has been defined to cover any
touching of a child with intent to arouse.  Oral copulation and
sodomy on a child under 14 years (P.C. Sections 288a(c) and 286(c))
are 2, 3, 4 year felonies in the bill.  Shouldn't the penalties
for these more serious crimes and simple child molestation be
switched around?

(c)  Sex crimes in which the defendant "acted in concert"
with another currently carry penalties of two years in addition
to the sentence for the crime.  This allegation will add 8 months
in prison before parole eligiblity.  In SB 42, the "acting in
concert" allegation adds one year to oral copulation and sodomy
and two years to sexual intercourse.  Are these penalties con-
sistent with each other and current law?

(d)  Should pimping and pandering (P.C. Sections 266g,
266h, 266i) carry penalties of 2, 3, 4 years as indicated in
SB 42, or should they be placed in the classification of less
serious felonies with penalties of 16 months, 2, 3 years?

(9)  In light of the stated purpose and intent in SB 42,
should trainwrecking (P.C. 218, 219) and kidnapping for ransom
(Section 209) carry penalties of life imprisonment with no
parole possibility?  First degree murder has parole possibility
after seven years; second degree murder has a determinate
sentence of 5, 6, 7 years.  Are these sentences consistent,
given the relative seriousness of the crimes involved?

(10)  Should there be a limit specified in the bill on the
maximum amount of time allowed in prison for a person sentenced
for a crime that has a determinate sentence?  Is 12 years
sufficient given that persons sentenced for life imprisonment
are eligible for parole after seven years?

(continued on next page)

(11)  Does the Legislature intend to raise the possible prison sentences for the class of felonies previously determined by the Legislature to be the least serious felonies? There are at least 50 crimes on the statutes that currently carry maximum sentences of 2 years or 3 years. SB 42 places these crimes in the 16 month, 2, 3 year category. This category is also for higher grade felonies that carry maxima of 14 years. The affect of combining different classes of crimes within the same category will have the effect of possibly raising prison sentences for the lower-grade crimes. For example, assault on a peace officer (P.C. Section 241), which covers situations where a defendant swings at a peace officer but does not make contact, currently carries an indeterminate sentence from 6 months to 2 years. SB 42, assuming no enhancements or prior terms would allow up to 3 years for such a crime. If the defendant has served a prior term in prison, another year could be added to this sentence, which would have the effect of doubling our current penalties.

An alternative for these felonies that currently carry maxima of 3 years or less is to develop in SB 42 a two-tiered approach in the sentence: 16 months and 2 years. The presumption will be the lower sentence unless there are circumstances in aggravation of the crime. This approach, although it may provide for more incarceration in prison than the current practice, will prevent the wholesale raising of the maximum term in prison for these felonies as compared to the current law.

(12)  The 1976 version of SB 42 creates a new enhancement that would add 50% to 100% of the base term for excessive taking or damage (Section 12022.6). Is this enhancement consistent with the theory in the bill that the court is to select the high term from the three choices for factors of aggravation such as these? Section 12022.6 will apply to thefts, damage caused by arson, and damage caused by pollution.

(13)  Current law recognizes that punishment should be enhanced when the defendant inflicts great bodily injury on the victim during the commission of a robbery, burglary or rape. The purpose of this concept is to deter those committing these crimes from engaging in violent conduct in addition to the criminal acts involved in the inherent nature of the underlying felony.

SB 42, in Section 12022.7, expands the concept of extra punishment for great bodily injury in two respects: It applies to all felonies and it covers acts not committed by the defendant.

Should crimes, in which the attempt to inflict injury is inherent in the crime, be included in this special enhancement? The attempt to inflict injury is an element of all felonious assaults and batteries. Should the success of a single criminal act be punished by three more years in prison? For example,

(continued on next page)

Assault with a Force Likely to Produce Great Bodily Injury (P.C. Section 245a) is a crime that does not require injury. In reality, no case will be prosecuted under this section unless there are substantial injuries. A common fact situation under this section is a barroom brawl in which the loser is kicked by the winner. Under SB 42, the crime has a penalty of 2, 3, 4 years and the GBI enhancement adds another 3 years. This fight can lead to a penalty of 5, 6, 7 years, the same penalty that is reserved for second-degree murder.

An alternative to applying the GBI enhancement to all felonies is to apply it in cases where the infliction of injury is not the purpose of the underlying felony. Section 12022.7 should not apply in cases where great bodily injury or assault is an element of the crime.

Section 12022.7 also would cause the GBI enhancement to apply when the victim or someone else engages in the act that causes the injury. To be consistent with current law, this enhancement should be limited to acts committed by the defendant.

(14)   Current law provides for extra punishment for "use of a firearm" in certain specified felonies (P.C. Section 12022.5). Should this enhancement be expanded to apply to all felonies as is in SB 42?

(15)   SB 42 contains a list of "violent felonies" which have the following consequences:

(a)   Provides for three years of additional sentence for each prior prison term served for a crime from the list if the current crime is also on the list.

(b)   Prevents the 100% limitation on all enhancements from applying to the sentence.

(c)   Is not included in the limitation of 5 years of additional sentence for prior terms and consecutive sentences.

The list contains the violent crimes of murder, mayhem, forceable rape, forceable oral copulation, forceable sodomy, kidnap for ransom or robbery, and all felonies with great bodily injury. Also included on the list is Section 288, child molesting. Should lewd and lascivious acts on a child under 14 years that do not amount to violent conduct be included on this list?

(16)   The provisions of SB 42 are retroactive and will apply to those persons committed to prison prior to the effective date of the bill. Under Section 1170.2(a), the Community Release

(continued on next page)

Board is to choose the SB 42 middle term for the crime convicted of and enhance the sentence with the additional penalties imposed by the judge. However, for those inmates that merit longer periods of incarceration (due to the number of crimes convicted of, the number of priors, or allegations of arming with a deadly weapon, use of a firearm, or infliction of GBI), the CRB shall fix a term and be "guided by the term which reasonably could be imposed upon a person convicted after the effective date of this act of a similar crime under similar circumstances." What does this operating language mean? What does "similar crime" mean? What does "similar circumstances" mean? Does this phrase allow the CRB to set a term based upon allegations that were never charged and proved at trial?

(17) The Committee has consistently rejected legislation that would repeal the Youthful Offender Provision, Section 1202b. This provision currently allows the Adult Authority to consider parole after six months of imprisonment for persons under the age of 23 years who are committed to prison under the provisions of this section.

SB 42 repeals this provision entirely. The concept of special treatment for some youthful offenders that merit more lenient consideration adapts well to the structure of SB 42. If the court chooses to consider a defendant to be treated as a special youthful offender, he should be able to reduce the actual sentence to one year. Does the Legislature wish to abolish this provision?

Technical Amendments:

(1) On page 130, line 6, strike "are" and insert "is".

(2) On page 162, line 10, strike "criminal offense" and insert "felony". (Otherwise, this enhancement could be construed to cover misdemeanor malicious mischief situations).

(3) On page 123, in the new language in the mock-up, the list of crimes should be changed to be consistent with the list that appears in Section 667.5(c). The latter refers to "murder and voluntary manslaughter" while the former refers to "homocide"; "kidnapping" should be modified by "as defined in Section 209".

(4) On page 135 (continued) in the mock-ups, Section 1170.6 of the bill, on the second line, "public session" should be "public hearing" if the intent is to insure public input and participation.

Source: Senate Select Committee on Corrections

EXHIBIT 2



## Official Title and Summary Prepared by the Attorney General

MURDER. PENALTY. INITIATIVE STATUTE. Changes and expands categories of first degree murder for which penalties of death or confinement without possibility of parole may be imposed. Changes minimum sentence for first degree murder from life to 25 years to life. Increases penalty for second degree murder. Prohibits parole of convicted murderers before service of 25 or 15 year terms, subject to good-time credit. During punishment stage of cases in which death penalty is authorized: permits consideration of all felony convictions of defendant; requires court to impanel new jury if first jury is unable to reach a unanimous verdict on punishment. Financial impact: Indeterminable future increase in state costs.

## Analysis by Legislative Analyst

### Background:

Under existing law, a person convicted of *first degree murder* can be punished in one of three ways: (1) by death, (2) by a sentence of life in prison without the possibility of parole, or (3) by a life sentence with the possibility of parole, in which case the individual would become eligible for parole after serving seven years. A person convicted of *second degree murder* can be sentenced to 5, 6, or 7 years in prison. Up to one-third of a prison sentence may be reduced through good behavior. Thus, a person sentenced to 6 years in prison may be eligible for parole after serving 4 years.

Generally speaking, the law requires a sentence of death *or* life without the possibility of parole when an individual is convicted of first degree murder under one or more of the following special circumstances: (1) the murderer was hired to commit the murder; (2) the murder was committed with explosive devices; (3) the murder involved the killing of a specified peace officer or witness; (4) the murder was committed during the commission or attempted commission of a robbery, kidnapping, forceable rape, a lewd or lascivious act with a child, or first degree burglary; (5) the murder involved the torture of the victim; or (6) the murderer has been convicted of more than one offense of murder in the first or second degree. If any of these special circumstances is found to exist, the judge or jury must "take into account and be guided by" aggravating or mitigating factors in sentencing the convicted person to either death or life in prison without the possibility of parole. "Aggravating" factors which might warrant a death sentence include brutal treatment of the murder victim. "Mitigating" factors, which might warrant life imprisonment, include extreme mental or emotional disturbance when the murder occurred.

### Proposal:

This proposition would: (1) increase the penalties for first and second degree murder, (2) expand the list of special circumstances requiring a sentence of either death or life imprisonment without the possibility of parole, and (3) revise existing law relating to mitigating or aggravating circumstances.

The measure provides that individuals convicted of first degree murder and sentenced to life imprison-ment shall serve a minimum of 25 years, less whatever credit for good behavior they have earned, before they can be eligible for parole. Accordingly, anyone sentenced to life imprisonment would have to serve at least 16 years and eight months. The penalty for second degree murder would be increased to 15 years to life imprisonment. A person sentenced to 15 years would have to serve at least 10 years before becoming eligible for parole.

The proposition would also expand and modify the list of special circumstances which require either the death penalty or life without the possibility of parole. As revised by the measure, the list of special circumstances would, generally speaking, include the following: (1) murder for any financial gain; (2) murder involving concealed explosives or explosives that are mailed or delivered; (3) murder committed for purposes of preventing arrest or aiding escape from custody; (4) murder of any peace officer, federal law enforcement officer, fireman, witness, prosecutor, judge, or elected or appointed official with respect to the performance of such person's duties; (5) murder involving particularly heinous, atrocious, or cruel actions; (6) killing a victim while lying in wait; '(7) murder committed during or while fleeing from the commission or attempted commission of robbery, kidnapping, specified sex crimes (including those sex crimes that now represent "special circumstances"), burglary, arson, and trainwrecking; (8) murder in which the victim is tortured or poisoned; (9) murder based on the victim's race, religion, nationality, or country of origin; and (10) the murderer has been convicted of more than one offense of murder in the first or second degree.

Also, this proposition would specifically make persons involved in the crime other than the actual murderer subject to the death penalty or life imprisonment without possibility of parole under specified circumstances.

Finally, the proposition would make the death sentence *mandatory* if the judge or jury determines that the aggravating circumstances surrounding the crime *outweigh* the mitigating circumstances. If aggravating circumstances are found *not* to outweigh mitigating circumstances, the proposition would require a life sentence without the possibility of parole. Prior to weighing the aggravating and mitigating factors, the jury

ny of parole might at a later date be subject to commutation or modification, thereby allowing parole.

**Fiscal Effect:**

We estimate that, over time, this measure would increase the number of persons in California prisons, and thereby increase the cost to the state of operating the prison system.

The increase in the prison population would result from:

- the longer prison sentences required for first degree murder (a minimum period of imprisonment equal to 16 years, eight months, rather than seven years);
- the longer prison sentences required for second degree murder (a minimum of ten years, rather than four years); and

... these in the number of persons sentenced to life without the possibility of parole.

There could also be an increase in the number of executions as a result of this proposition, offsetting part of the increase in the prison population. However, the number of persons executed as a result of this measure would be significantly less than the number required to serve longer terms.

The Department of Corrections states that a small number of inmates can be added to the prison system at a cost of $2,575 per inmate per year. The additional costs resulting from this measure would not begin until 1983. This is because the longer terms would only apply to crimes committed after the proposition became effective, and it would be four years before any person served the minimum period of imprisonment required of second degree murderers under existing law.

## Text of Proposed Law

This initiative measure proposes to repeal and add sections of the Penal Code; therefore, existing provisions proposed to be deleted are printed in strikeout type and new provisions proposed to be added are printed in *italic type* to indicate that they are new.

### PROPOSED LAW

Section 1. Section 190 of the Penal Code is repealed.

190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole; or confinement in state prison for life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4; and 190.5. Every person guilty of murder in the second degree is punishable by imprisonment in the state prison for five, six, or seven years.

Sec. 2. Section 190 is added to the Penal Code, to read:

*190. Every person guilty of murder in the first degree shall suffer death, confinement in state prison for life without possibility of parole, or confinement in the state prison for a term of 25 years to life. The penalty to be applied shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.*

*Every person guilty of murder in the second degree shall suffer confinement in the state prison for a term of 15 years to life.*

*The provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code shall apply to reduce any minimum term of 25 or 15 years in a state prison imposed pursuant to this section, but such person shall not otherwise be released on parole prior to such time.*

Sec. 3. Section 190.1 of the Penal Code is repealed.

190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:

(a) The defendant's guilt shall first be determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2, except

or a special circumstance charged pursuant to paragraph (5) of subdivision (c) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree.

(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (5) of subdivision (c) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.

(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is found to be sane, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Section 190.3 and 190.4.

Sec. 4. Section 190.1 is added to the Penal Code, to read:

*190.1. A case in which the death penalty may be imposed pursuant to this chapter shall be tried in separate phases as follows:*

*(a) The question of the defendant's guilt shall be first determined. If the trier of fact finds the defendant guilty of first degree murder, it shall at the same time determine the truth of all special circumstances charged as enumerated in Section 190.2 except for a special circumstance charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 where it is alleged that the defendant had been convicted in a prior proceeding of the offense of murder in the first or second degree.*

*(b) If the defendant is found guilty of first degree murder and one of the special circumstances is charged pursuant to paragraph (2) of subdivision (a) of Section 190.2 which charges that the defendant had been convicted in a prior proceeding of the offense of murder of the first or second degree, there shall thereupon be further proceedings on the question of the truth of such special circumstance.*

*(c) If the defendant is found guilty of first degree murder and one or more special circumstances as enumerated in Section 190.2 has been charged and found to be true, his sanity on any plea of not guilty by reason of insanity under Section 1026 shall be determined as provided in Section 190.4. If he is*

Continued on page 44



## Argument in Favor of Proposition 7

CHARLES MANSON, SIRHAN SIRHAN, THE ZODIAC KILLER, THE SKID-ROW SLASHER, THE HILLSIDE STRANGLER.

These infamous names have become far too familiar to every Californian. They represent only a small portion of the deadly plague of violent crime which terrorizes law-abiding citizens.

Since 1972, the people have been demanding a tough, effective death penalty law to protect our families from ruthless killers. But, every effort to enact such a law has been thwarted by powerful anti-death penalty politicians in the State Legislature.

In August of 1977, when the public outcry for a capital punishment law became too loud to ignore, the anti-death penalty politicians used their influence to make sure that the death penalty law passed by the State Legislature was as weak and ineffective as possible.

That is why 470,000 concerned citizens signed petitions to give you the opportunity to vote on this new, tough death penalty law.

Even if the President of the United States were to be assassinated in California, his killer would not receive the death penalty in some circumstances. Why? Because the Legislature's weak death penalty law does not apply. Proposition 7 would.

If Charles Manson were to order his family of drug-crazed killers to slaughter your family, Manson would not receive the death penalty. Why? Because the Legislature's death penalty law does not apply to the master mind of a murder such as Manson. Proposition 7 would.

And, if you were to be killed on your way home tonight simply because the murderer was high on dope and wanted the thrill, that criminal would not receive the death penalty. Why? Because the Legislature's weak death penalty law does not apply to every murderer. Proposition 7 would.

Proposition 7 would also apply to the killer of a judge, a prosecutor, or a fireman. It would apply to a killer who murders a citizen in cold blood because of his race or religion or nationality. And, it would apply to all situations which are covered by our current death penalty law.

In short, your YES vote on Proposition 7 will give every Californian the protection of the nation's toughest, most effective death penalty law.

A long and distinguished list of judges and law enforcement officials have agreed that Proposition 7 will provide them with a powerful weapon of deterrence in their war on violent crime.

Your YES vote on Proposition 7 will help law enforcement officials to stop violent crime—NOW.

JOHN V. BRIGGS
*Senator, State of California*
*35th District*

DONALD H. HELLER
*Attorney at Law*
*Former Federal Prosecutor*

DUANE LOWE
*President, California Sheriffs' Association*
*Sheriff of Sacramento County*

## Rebuttal to Argument in Favor of Proposition 7

The argument for Proposition 7 is strictly false advertising.

• It would not affect the Charles Manson and Sirhan Sirhan cases. They were sentenced under an old law, thrown out by the courts because it was improperly written.

• As for the "zodiac killer", "hillside strangler" and "skid-row slasher", *they were never caught.* Even the nation's "toughest" death penalty law cannot substitute for the law enforcement work necessary to apprehend suspects still on the loose.

But you already know that.

Regardless of the proponents' claim, no death penalty law—neither Proposition 7 nor the current California law—can guarantee the *automatic* execution of all convicted murderers, let alone suspects not yet apprehended.

California has a strong death penalty law. Two-thirds of the Legislature approved it in August, 1977, after months of careful drafting and persuasive lobbying by law enforcement officials and other death penalty advocates.

The present law is *not* "weak and ineffective" as claimed by Proposition 7 proponents. It applies to murder cases like the ones cited.

Whether or not you believe that a death penalty law is necessary to our system of justice, you should vote NO on Proposition 7. It is so confusing that the courts may well throw it out. Your vote on the murder penalty initiative will not be a vote on the death penalty; it will be a vote on a carelessly drafted, dangerously vague and possibly invalid statute.

Don't be fooled by false advertising. READ Proposition 7. VOTE NO.

MAXINE SINGER
*President, California Probation, Parole and Correctional Association*

NATHANIEL S. COLLEY
*Board Member, National Association for the Advancement of Colored People*

JOHN PAIRMAN BROWN
*Board Member, California Church Council*

Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.

## Argument Against Proposition 7

DON'T BE FOOLED BY FALSE ADVERTISING. The question you are voting on is NOT whether California should have the death penalty. California AL-READY has the death penalty.

The question is NOT whether California should have a tough, effective death penalty. California ALREADY has the death penalty for more different kinds of crimes than any other State in the country.

The question you are voting on is whether to repeal California's present death-penalty law and replace it with a new one. Don't be fooled by false advertising. If somebody tried to sell you a new car, you'd compare it with your present automobile before paying a higher price for a worse machine.

Whether or not you agree with California's present law, it was written carefully by people who believed in the death penalty and wanted to see it used effectively. It was supported by law enforcement officials familiar with criminal law.

The new law proposed by Proposition 7 is written carelessly and creates problems instead of solving them. For example, it does not even say what happens to people charged with murder under the present law if the new one goes into effect.

As another example, it first says that "aggravating circumstances" must outweigh "mitigating circumstances" to support a death sentence. Then it says that mitigating circumstances" must outweigh "aggravating circumstances" to support a life sentence. This leaves the burden of proof unclear. As a result, court processes would become even more complicated.

Proposition 7 does allow the death penalty in more cases than present law. But what cases?

Under Proposition 7, a man or woman could be sentenced to die for lending another person a screwdriver to use in a burglary, if the other person accidentally killed someone during the burglary. Even if the man or woman was not present during the burglary, had no intention that anyone be killed or hurt, in fact urged the burglar not to take a weapon along, they could still be sentenced to die.

This is the kind of law that wastes taxpayers' money by putting counties to the expense of capital trials in many cases where the death penalty is completely inappropriate. To add to the waste, Proposition 7 requires two or more jury trials in some cases where present law requires only one.

Don't let yourself be fooled by claims that Proposition 7 will give California a more effective penalty for murder. It won't. DON'T BE FOOLED BY FALSE AD-VERTISING. Vote NO on Proposition 7.

MAXINE SINGER
President, California Probation, Parole and Correctional Association

NATHANIEL S. COLLEY
Board Member, National Association for the Advancement of Colored People

JOHN FAIRMAN BROWN
Board Member, California Church Council

## Rebuttal to Argument Against Proposition 7

ALRIGHT, LET'S TALK ABOUT FALSE ADVERTISING.

The opposition maintains if someone were to lend a screwdriver to his neighbor and the neighbor used it to commit a murder, the poor lender could get the death penalty, even though "he had NO INTENTION that anyone be killed."

Please turn back and read Section 6b of the Proposition 7. It says that the person must have INTENTION-ALLY aided in the commission of a murder to be subject to the death penalty under this initiative.

They say that Proposition 7 doesn't specify what happens to those who have been charged with murder under the old law. Any first-year law student could have told them Proposition 7 will not be applied retroactively. Anyone arrested under an *old* law will be tried and sentenced under the *old* law.

The opposition can't understand why we included the aggravating vs. mitigating circumstances provision in Proposition 7. Well, that same first-year law student could have told them this provision is required by the U.S. Supreme Court. The old law does not meet this requirement and might be declared unconstitutional, leaving us with no death penalty at all!

If we are to turn back the rising tide of violent crime that threatens each and every one of us, we must act NOW.

This citizen's initiative will give your family the protection of the strongest, most effective death penalty law in the nation.

JOHN V. BRIGGS
Senator, State of California
35th District

DONALD H. HELLER
Attorney at Law
Former Federal Prosecutor

DUANE LOWE
President, California Sheriffs' Association
Sheriff of Sacramento County

Arguments printed on this page are the opinions of the authors and have not been checked for accuracy by any official agency.

35

and by walls on all sides.

(h) "Health Facility" has the meaning set forth in Section 1250 of the Health and Safety Code, whether operated by a public or private entity.

(i) "Place of Employment" means any area under the control of a public or private employer which employees normally frequent during the course of employment but to which members of the public are not normally invited, including, but not limited to, work areas, employee lounges, restrooms, meeting rooms, and employee cafeterias. A private residence is not a "place of employment."

(j) "Polling Place" means the entire room, hall, garage, or other facility in which persons cast ballots in an election, but only during such time as election business is being conducted.

(k) "Private Hospital Room" means a room in a health facility containing one bed for patients of such facility.

(l) "Public Place" means any area to which the public is invited or in which the public is permitted or which serves as a place of volunteer service. A private residence is not a "public place." Without limiting the generality of the foregoing, "public place" includes:

(i) arenas, auditoriums, galleries, museums, and theaters;

(ii) business establishments dealing in goods or services to which the public is invited or in which the public is permitted;

(iii) instrumentalities of public transportation while operating within the boundaries of the State of California;

(iv) facilities or offices of physicians, dentists, and other persons licensed to practice any of the healing arts regulated under Division 2 of the Business and Professions Code;

(v) elevators in commercial, governmental, office, and residential buildings;

(vi) public restrooms;

(vii) jury rooms and juror waiting rooms;

(viii) polling places;

(ix) courtesy vehicles;

(m) "Restaurant" has the meaning set forth in Section 25522 of the Health and Safety Code except that the term "restaurant" does not include an employee cafeteria or a tavern or cocktail lounge if such tavern or cocktail lounge is a "bar" pursuant to Section 25939(a).

(n) "Retail Tobacco Store" means a retail store used primarily for the sale of smoking products and smoking accessories and in which the sale of other products is incidental. "Retail tobacco store" does not include a tobacco department of a retail store commonly known as a department store.

(o) "Rock Concert" means a live musical performance commonly known as a rock concert and at which the musicians use sound amplifiers.

(p) "Semi-Private Hospital Room" means a room in a health facility containing two beds for patients of such facility.

(q) "Smoking" means and includes the carrying or holding of a lighted cigarette, cigar, pipe, or any other lighted smoking equipment used for the practice commonly known as smoking, or the intentional inhalation or exhalation of smoke from any such lighted smoking equipment.

SECTION 2. Severability

If any provision of Chapter 10.7 of the Health and Safety Code or the application thereof to any person or circumstance is held invalid, any such invalidity shall not affect other provisions or applications of said Chapter which can be given effect without the invalid provision or application, and to this end the provisions of said Chapter are severable.

SECTION 3. Effective Date

Chapter 10.7 of the Health and Safety Code becomes effective 90 days after approval by the electorate.

navigation
TEXT OF PROPOSITION 6—Continued from page 29

truth of the charges upon which a finding of probable cause was based and whether such charges, if found to be true, render the employee unfit for service. This hearing shall be held in private session in accordance with Govt. Code § 54957, unless the employee requests a public hearing. The governing board's decision as to whether the employee is unfit for service shall be made within thirty (30) working days after the conclusion of this hearing. A decision that the employee is unfit for service shall be determined by not less than a simple majority vote of the entire board. The written decision shall include findings of fact and conclusions of law.

(f) Factors to be considered by the board in evaluating the charges of public homosexual activity or public homosexual conduct in question and in determining fitness for service shall include, but not be limited to: (1) the likelihood that the activity or conduct may adversely affect students or other employees; (2) the proximity or remoteness in time or location of the conduct to the employee's responsibilities; (3) the extenuating or aggravating circumstances which in the judg-

ment of the board, must be examined in weighing the evidence; and (4) whether the conduct included acts, words, deeds of a continuing or comprehensive nature which would tend to encourage, promote, or dispose schoolchildren toward private or public homosexual activity or private or other homosexual conduct.

(g) If, by a preponderance of the evidence, the employee is found to have engaged in public homosexual activity or public homosexual conduct which renders the employee unfit for service, the employee shall be dismissed from employment. The decision of the governing board shall be subject to judicial review.

SECTION 4. Severability Clause

If any provision of this enactment or the application thereof to any person or circumstances is held invalid, such invalidity shall not affect other provisions or application of this enactment which can be given effect without the invalid provision or application, and to this end the provisions of this enactment are severable.

TEXT OF PROPOSITION 7—Continued from page 33

found to be same, there shall thereupon be further proceedings on the question of the penalty to be imposed. Such proceedings shall be conducted in accordance with the provisions of Section 190.3 and 190.4.

Sec. 5. Section 190.2 of the Penal Code is repealed.

190.2. The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in the state prison for life without possibility of parole in any case in which

one or more of the following special circumstances has been charged and specially found, in a proceeding under Section 190.4, to be true:

(a) The murder was intentional and was carried out pursuant to an agreement by the person who committed the murder to accept a valuable consideration for the act of murder from any person other than the victim;

(b) The defendant, with the intent to cause death, personally

~~..... .... ... ..... of committed such act or acts causing death, and the murder was willful, deliberate, and ; meditated, and was perpetrated by means of a destructive device or explosives;~~

~~(e) The defendant was personally present during the commission of the act or acts causing death, and with intent to cause death physically aided or committed such act or acts causing death and any of the following additional circumstances exists:~~

~~(1) The victim is a peace officer as defined in Section 830.1, subdivision (a) or (b) of Section 830.2, subdivision (a) or (b) of Section 830.3, or subdivision (b) of Section 830.5, who, while engaged in the performance of his duty was intentionally killed; and the defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties.~~

~~(2) The murder was willful, deliberate, and premeditated; the victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission or attempted commission of the crime to which he was a witness.~~

~~(3) The murder was willful, deliberate, and premeditated and was committed during the commission or attempted commission of any of the following crimes:~~

~~(i) Robbery in violation of Section 211;~~

~~(ii) Kidnapping in violation of Section 207 or 209. Brief movements of a victim which are merely incidental to the commission of another offense and which do not substantially increase the victim's risk of harm over that necessarily inherent in the other offense do not constitute a violation of Section 209 within the meaning of this paragraph.~~

~~(iii) Rape by force or violence in violation of subdivision (2) of Section 261; or by threat of great and immediate bodily harm in violation of subdivision (3) of Section 261;~~

~~(iv) The performance of a lewd or lascivious act upon the person of a child under the age of 14 years in violation of Section 288;~~

~~(v) Burglary in violation of subdivision (1) of Section 460 or an inhabited dwelling house with an intent to commit grand or petit larceny or rape.~~

~~(4) The murder was willful, deliberate, and premeditated, and involved the infliction of torture. For purposes of this section, torture requires proof of an intent to inflict extreme and prolonged pain.~~

~~(5) The defendant has in this proceeding been convicted of more than one offense of murder of the first or second degree; or has been convicted in a prior proceeding of the offense of murder of the first or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed to be murder in the first or second degree.~~

~~(6) For the purposes of subdivision (e), the defendant shall be deemed to have physically aided in the act or acts causing death only if it is proved beyond a reasonable doubt that his conduct constitutes an assault or a battery upon the victim or if by word or conduct he orders, initiates or coerces the actual killing of the victim.~~

Sec. 6. Section 190.2 is added to the Penal Code, to read:

190.2. (a) The penalty for a defendant found guilty of murder in the first degree shall be death or confinement in state prison for a term of life without the possibility of parole in any case in which one or more of the following special circumstances has been charged and specially found under Section 190.4, to be true:

(1) The murder was intentional and carried out for financial gain.

(2) The defendant was previously convicted of murder in the first degree or second degree. For the purpose of this paragraph an offense committed in another jurisdiction which if committed in California would be punishable as first or second degree murder shall be deemed murder in the first or second degree.

(3) The defendant has in this proceeding been convicted of more than one offense of murder in the first or second degree.

(4) The murder was committed by means of a destructive device, bomb, or explosive planted, hidden or concealed in any place, area, dwelling, building or structure, and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(5) The murder was committed for the purpose of avoiding or preventing a lawful arrest or to perfect, or attempt to perfect an escape from lawful custody.

(6) The murder was committed by means of a destructive device, bomb, or explosive that the defendant mailed or delivered, attempted to mail or deliver, or cause to be mailed or delivered and the defendant knew or reasonably should have known that his act or acts would create a great risk of death to a human being or human beings.

(7) The victim was a peace officer as defined in Section 830.1, 830.2, 830.3, 830.31, 830.35, 830.36, 830.4, 830.5, 830.5i, 830.6, 830.10, 830.11 or 830.12, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a peace officer engaged in the performance of his duties; or the victim was a peace officer as defined in the above enumerated sections of the Penal Code, or a former peace officer under any of such sections, and was intentionally killed in retaliation for the performance of his official duties.

(8) The victim was a federal law enforcement officer or agent, who, while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a federal law enforcement officer or agent, engaged in the performance of his duties; or the victim was a federal law enforcement officer or agent, and was intentionally killed in retaliation for the performance of his official duties.

(9) The victim was a fireman as defined in Section 245.1, who while engaged in the course of the performance of his duties was intentionally killed, and such defendant knew or reasonably should have known that such victim was a fireman engaged in the performance of his duties.

(10) The victim was a witness to a crime who was intentionally killed for the purpose of preventing his testimony in any criminal proceeding, and the killing was not committed during the commission, or attempted commission of the crime to which he was a witness; or the victim was a witness to a crime and was intentionally killed in retaliation for his testimony in any criminal proceeding.

(11) The victim was a prosecutor or assistant prosecutor or a former prosecutor or assistant prosecutor of any local or state prosecutor's office in this state or any other state, or a federal prosecutor's office and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(12) The victim was a judge or former judge of any court of record in the local, state or federal system in the State of California or in any other state of the United States and the murder was carried out in retaliation for or to prevent the performance of the victim's official duties.

(13) The victim was an elected or appointed official or former official of the Federal Government, a local or State government of California, or of any local or state government of any other state in the United States and the killing was

intentionally carried out in retaliation for or to prevent the performance of the victim's official du

• (14) The murder was especially heinous, atrocious, or cruel, manifesting exceptional depravity, as utilized in this section, the phrase especially heinous, atrocious or cruel manifesting exceptional depravity means a conscienceless, or pitiless crime which is unnecessarily torturous to the victim.

(15) The defendant intentionally killed the victim while lying in wait.

(16) The victim was intentionally killed because of his race, color, religion, nationality or country of origin.

(17) The murder was committed while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit the following felonies:

(i) Robbery in violation of Section 211.

(ii) Kidnapping in violation of Sections 207 and 209.

(iii) Rape in violation of Section 261.

(iv) Sodomy in violation of Section 286.

(v) The performance of a lewd or lascivious act upon person of a child under the age of 14 in violation of Section 288.

(vi) Oral copulation in violation of Section 288a.

(vii) Burglary in the first or second degree in violation of Section 460.

(viii) Arson in violation of Section 447.

(ix) Train wrecking in violation of Section 219.

(18) The murder was intentional and involved the infliction of torture. For the purpose of this section torture requires proof of the infliction of extreme physical pain no matter how long its duration.

(19) The defendant intentionally killed the victim by the administration of poison.

(b) Every person whether or not the actual killer found guilty of intentionally aiding, abetting, counseling, commanding, inducing, soliciting, requesting, or assisting any actor in the commission of murder in the first degree shall suffer death or confinement in state prison for a term of life without the possibility of parole, in any case, in which one or more of the special circumstances enumerated in paragraphs (1), (3), (4), (5), (6), (7), (8), (9), (10), (11), (12), (13), (14), (15), (16), (17), (18), or (19) of subdivision (a) of this section has been charged and specially found under Section 190.4 to be true.

The penalty shall be determined as provided in Sections 190.1, 190.2, 190.3, 190.4, and 190.5.

Sec. 7.   Section 190.3 of the Penal Code is repealed.

190.3.   If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true; or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code, or Section 37, 128, 219 or 4500 of this code; the trier of fact shall determine whether the penalty shall be death or life imprisonment without possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence, including, but not limited to, the nature and circumstances of the present offense, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved the expressed or implied threat to use force or violence; and the defendant's character, background, history, mental condition and physical condition.

However; no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the expressed or implied threat to use force or violence. As used in this section; criminal activity does not require a conviction.

However, in no event shall evidence of prior criminal activity

ty be admitted for an offense for which the defendant was prosecuted and was acquitted. The restriction on the use of this evidence is intended to apply only to proceedings conducted pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in other proceedings.

Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty; no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time; as determined by the court, prior to the trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.

In determining the penalty the trier of fact shall take into account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to section 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence.

(c) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(d) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(e) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(f) Whether or not the defendant acted under extreme duress or under the substantial domination of another person.

(g) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or the affects of intoxication.

(h) The age of the defendant at the time of the crime.

(i) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(j) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall determine whether the penalty shall be death or life imprisonment without the possibility of parole.

Sec. 8.   Section 190.3 is added to the Penal Code, to read:

190.3.   If the defendant has been found guilty of murder in the first degree, and a special circumstance has been charged and found to be true, or if the defendant may be subject to the death penalty after having been found guilty of violating subdivision (a) of Section 1672 of the Military and Veterans Code or Sections 37, 128, 219, or 4500 of this code, the trier of fact shall determine whether the penalty shall be death or confinement in state prison for a term of life without the possibility of parole. In the proceedings on the question of penalty, evidence may be presented by both the people and the defendant as to any matter relevant to aggravation, mitigation, and sentence including, but not limited to, the nature and circumstances of the present offense, any prior felony conviction or convictions whether or not such conviction or convictions involved a crime of violence, the presence or absence of other criminal activity by the defendant which involved the use or attempted use of force or violence or which involved

the express or implied threat to use force or violence, and the defendant's character, background, his . . . mental condition and physical condition.

However, no evidence shall be admitted regarding other criminal activity by the defendant which did not involve the use or attempted use of force or violence or which did not involve the express or implied threat to use force or violence. As used in this section, criminal activity does not require a conviction.

However, in no event shall evidence of prior criminal activity be admitted for an offense for which the defendant was prosecuted and acquitted. The restriction on the use of this evidence is intended to apply only to proceedings pursuant to this section and is not intended to affect statutory or decisional law allowing such evidence to be used in any other proceedings.

Except for evidence in proof of the offense or special circumstances which subject a defendant to the death penalty, no evidence may be presented by the prosecution in aggravation unless notice of the evidence to be introduced has been given to the defendant within a reasonable period of time as determined by the court, prior to trial. Evidence may be introduced without such notice in rebuttal to evidence introduced by the defendant in mitigation.

The trier of fact shall be instructed that a sentence of confinement to state prison for a term of life without the possibility of parole may in future after sentence is imposed, be commuted or modified to a sentence that includes the possibility of parole by the Governor of the State of California.

In determining the penalty, the trier of fact shall take into account any of the following factors if relevant:

(a) The circumstances of the crime of which the defendant was convicted in the present proceeding and the existence of any special circumstances found to be true pursuant to Section 190.1.

(b) The presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence.

(c) The presence or absence of any prior felony conviction.

(d) Whether or not the offense was committed while the defendant was under the influence of extreme mental or emotional disturbance.

(e) Whether or not the victim was a participant in the defendant's homicidal conduct or consented to the homicidal act.

(f) Whether or not the offense was committed under circumstances which the defendant reasonably believed to be a moral justification or extenuation for his conduct.

(g) Whether or not defendant acted under extreme duress or under the substantial domination of another person.

(h) Whether or not at the time of the offense the capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was impaired as a result of mental disease or defect, or the effects of intoxication.

(i) The age of the defendant at the time of the crime.

(j) Whether or not the defendant was an accomplice to the offense and his participation in the commission of the offense was relatively minor.

(k) Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime.

After having heard and received all of the evidence, and after having heard and considered the arguments of counsel, the trier of fact shall consider, take into account and be guided by the aggravating and mitigating circumstances referred to in this section, and shall impose a sentence of death if the trier of fact concludes that the aggravating circumstances outweigh the mitigating circumstances. If the trier of fact determines that the mitigating circumstances outweigh the aggravating circumstances the trier of fact shall impose a sentence of confinement in state prison for a term of life without the possibility of parole.

Sec. 9. Section 190.4 of the Penal Code is repealed.

~~190.4. (a) Whenever special circumstances as enumerated in Section 190.2 are alleged and the trier of fact finds the defendant guilty of first degree murder, the trier of fact shall also make a special finding on the truth of each alleged special circumstance. The determination of the truth of any or all of the special circumstances shall be made by the trier of fact on the evidence presented at the trial or at the hearing held pursuant to subdivision (b) of Section 190.1.~~

~~In case of a reasonable doubt as to whether a special circumstance is true, the defendant is entitled to a finding that it is not true. The trier of fact shall make a special finding that each special circumstance charged is either true or not true. Wherever a special circumstance requires proof of the commission or attempted commission of a crime, such crime shall be charged and proved pursuant to the general law applying to the trial and conviction of the crime.~~

~~If the defendant was convicted by the court sitting without a jury, the trier of fact shall be a jury unless a jury is waived by the defendant and by the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty the trier of fact shall be a jury unless a jury is waived by the defendant and by the people.~~

~~If the trier of fact finds that any one or more of the special circumstances enumerated in Section 190.2 as charged is true, there shall be a separate penalty hearing, and neither the finding that any of the remaining special circumstances charged is not true, nor if the trier of fact is a jury, the inability of the jury to agree on the issue of the truth or untruth of any of the remaining special circumstances charged, shall prevent the holding of the separate penalty hearing.~~

~~In any case in which the defendant has been found guilty by a jury, and the jury has been unable to reach a unanimous verdict that one or more of the special circumstances charged are true, and does not reach a unanimous verdict that all the special circumstances charged are not true, the court shall dismiss the jury and shall order a new jury impaneled to try the issues, but the issue of guilt shall not be tried by such jury, nor shall such jury retry the issue of the truth of any of the special circumstances which were found by a unanimous verdict of the previous jury to be untrue. If such new jury is unable to reach the unanimous verdict that one or more of the special circumstances it is trying are true, the court shall dismiss the jury and impose a punishment of confinement in state prison for life.~~

~~(b) If defendant was convicted by the court sitting without a jury, the trier of fact at the penalty hearing shall be a jury unless a jury is waived by the defendant and the people, in which case the trier of fact shall be the court. If the defendant was convicted by a plea of guilty, the trier of fact shall be a jury unless a jury is waived by the defendant and the people.~~

~~If the trier of fact is a jury and has been unable to reach a unanimous verdict as to what the penalty shall be, the court shall dismiss the jury and impose a punishment of confinement in state prison for life without possibility of parole.~~

~~(c) If the trier of fact which convicted the defendant of a crime for which he may be subjected to the death penalty was a jury, the same jury shall consider any plea of not guilty by reason of insanity pursuant to Section 1026, the truth of any special circumstances which may be alleged, and the penalty to be applied, unless for good cause shown the court discharges that jury in which case a new jury shall be drawn. The court shall state facts in support of the finding of good cause upon the record and cause them to be entered into the minutes.~~

~~be such would of this code, the death pend~~ ~~shall not be im~~
~~posed upon any person who was a principl~~ ~~the commission~~
~~of a capital offense unless he was personally present during~~
~~the commission of the act or acts causing death, and intention/~~
~~ally physically aided or committed such act or acts causing~~
~~death.~~

~~(c) For the purposes of subdivision (b), the defendant shall~~
~~be deemed to have physically aided in the act or acts causing~~
~~death only if it is proved beyond a reasonable doubt that his~~
~~conduct constitutes an assault or a battery upon the victim or~~
~~if by word or conduct he orders, initiates, or coerces the actual~~
~~killing of the victim.~~

Sec. 12. Section 190.5 is added to the Penal Code, to read:

*190.5. Notwithstanding any other provision of law, the death penalty shall not be imposed upon any person who is under the age of 18 at the time of the commission of the crime. The burden of proof as to the age of such person shall be upon the defendant.*

Sec. 13. If any word, phrase, clause, or sentence in any section amended or added by this initiative, or any section or provision of this initiative, or application thereof to any person or circumstance, is held invalid, such invalidity shall not

non amended or added by this initiative, or any other section,
provisions or applica of this initiative, which can be given
effect without the invalid word, phrase, clause, sentence, section, provision or application and to this end the provisions
this initiative are declared to be severable.

Sec. 14. If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to death under the provisions of this initiative will instead be sentenced to life imprisonment, such life imprisonment shall be without the possibility of parole.

If any word, phrase, clause, or sentence in any section amended or added by this initiative or any section or provision of this initiative, or application thereof to any person or circumstance is held invalid, and a result thereof, a defendant who has been sentenced to confinement in the state prison for life without the possibility of parole under the provisions of this initiative shall instead be sentenced to a term of 25 years to life in a state prison.

EXHIBIT 3

## D E C L A R A T I O N

I, Gregory Watson, declare that I am over the age of eighteen
and not a party to this suit. My address is PO Box 409000,
Ione CA 95640.

I declare under penalty of perjury under the laws of the United
States of America that the document entitled: MORRISSEY 8, was
obtained from the Board of Prison Terms Chairman Albert Leddy.

I declare under penalty of perjury under the laws of the United
States of America that I accurately transcribed the Morrissey
8 memorandum from the original copy. If a letter or word was
indecipherable a "?" was used in its place. This was done for
ease of reading by this court as the original copy is difficult
to read due to numerous photocopying. A copy of the original
Morrissey 8 memorandum follows my transcription.

The transcription was completed on January 5, 2005, in the County
of Amador, City of Ione.


Gregory Watson




# Memorandum

All Criminal Deputies
Office of the Attorney General


Recent (Relatively) Sentencing
Law Changes


Proposition 7 (effective 11/7/78) and SB 709 (effective 1/1/79) have worked some substantial changes in the sentencing consequences of murder convictions.

Specifically, we have taken the position that the new 15 years to life and 25 years to life sentences under the new Penal Code section 190 are "life" sentences with 15 and 25 year minimum eligible parole dates. This conclusion has side effects relating to eligibility for CYA under Welfare and Institutions Code section 173.5 and the number of peremptory challenges under Penal Code section 1070. This conclusion (as it effects CYA eligibility) is at issue in the Fifth District Court of Appeal in In re Dewester (5 Crim. 4543).

Furthermore, the venerable concept of merger of life sentences (Pen. C. section 669) passed into history, seemingly allowing for consecutive 25 to life sentences limited only by the number of victims.

The attached memo reflects the Morrissey 8's conclusions on these (and many more) topics. It has been approved by Arnie Overoye and Bob Philibosian and more fully sets out the Attorney General's position statewide.


                                        Michael D. Wellington
                                        Deputy Attorney General


MDW:nl
attachment



Arnold Overoye                              Date:  July 26, 1979
Assistant Attorney General
Sacramento                                  File Name:

                                            Telephone: ATSS (631) 7666
                                                         (     )


Office of the Attorney General

Michael D. Wellington - San Diego

Morrissey 8
Meeting of July 9, 1979

On July 9, 1979, the Morrissey 8 met at our office in Sacramento.
The progress of the CRB's disparate sentence review project was
discussed in detail, as was People v Herrera, the CRB's first
motion for recall under the disparate sentence review mandate
of Penal Code section 1170, subdivision (f). The group also
discussed the status of pending litigation concerning the DSL.
Finally, there was an expansive discussion and analysis of the
legal nature of prison sentences for first and second degree
murder under Penal Code section 190 as amended by Proposition
7. A number of legal conclusions were reached on this point,
which conclusions will be outlined in this memo.

                    "Life" Sentences Under New
                    Penal Code Section 190

Penal Code section 190 provides punishment of death, life without
possibility of parole, or "confinement in the state prison for
a term of 25 years to life" for first degree murder. The
prescribed punishment for second degree murder is "confinement
in the state prison for a term of 15 years to life." Our
discussion focused only on the 15 or 25 years to life sentences.
It was our conclusion that these sentences are not directly
comparable to either the "indeterminate life" or "express life"
sentences that existed under the Indeterminate Sentencing Law
prior to July 1, 1977. Rather, we concluded that these sentences
should be administered in the same fashion all "life" sentences
are currently administered under the Determinate Sentencing Law
except that they feature 15 or 25 year minimum eligible parole
dates, instead of the general 7 year MEPD prescribed by Penal
Code section 3046.

"Indeterminate Life" sentences under the old Indeterminate
Sentencing Law (for example five to life for robbery) contemplated
the parole board setting a "term" somewhere between five years
and life. In addition, the parole board was obligated to consider
a parole release date sometime prior to the expiration of the
"term." The paroling decision was, by its nature, a tentative
one which the prisoner subject to revocation and the service
of the remainder of his term. The primary features of this whole

Arnold Overoye              - 1 -              July 26, 1979

scheme passed into history on July 1, 1977, with the coming of the DSL. The parole board's power to fix terms was withdrawn by the repeal of Penal Code section 2940 et seq., and nothing in the current Penal Code evidences an intent to re-establish those powers for first or second degree murder. Although the parole board currently does have the power to grant parole (Pen. C. section 3040 et seq.) that power too is substantially different since July 1, 1977. Not only is the length of parole statutorily set (Pen. Code section 3000 et seq.) but reincarceration on revocation of parole is statutorily limited to one year (Pen. C. section 3057).

"Expressed life" sentences under the ISL precluded the establishment of a "term" since the prisoner was never to be discharged. Although such prisoners could be paroled, they could at any time be retaken to serve the remainder of their life sentences. Under the DSL however, all life prisoners discharge automatically within a few years of their release on parole no matter what their conduct during the parole. (Pen. Code section 3000 et seq.) As indicated above, any confinement on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying the old concepts of "indeterminate life" and "express life" have been abolished, it was concluded that the new prison sentences under Proposition 7 were not intended to fit either of these old models. The language of the new Penal Code section 190 (15 years to life, 25 years to life) implies that someone must make a choice where the prisoner falls between the two ends of the spectrum. Since the sentence is clearly one under Penal Code section 1168, subdivision (b), the trial judge cannot make the choice. This leaves the Community Release Board. Since the Community Release Board's only remaining power in this regard is the power to grant parole (Pen. Code section 3040) it was concluded that the new sentences require the CRB to fix a parole date somewhere within the appropriate range. As a result, the new sentences appear to be "life" sentences which are analogous to all other "life" sentences under the DSL except that Penal Code section 190 provides specific (15 or 25 years) minimum eligible parole dates which prevail over the general "life" MEPD of seven years found in Penal Code section 3046. The "life" sentences of Penal Code section 190 appear slightly different from other life sentences under the DSL in the additional respect that good time credits (Pen. Code section 2930 et seq.) are made expressly applicable to the MEPD. Such credits are not otherwise applicable to anyone sentenced under Penal Code section 1168, subdivision (b). (Pen. Code section 2930, subd. (a).)

Two consequences of characterizing section 190 sentences as "life" sentences are both significant and consistent with the thrust of Proposition 7. First, "life" cases entitle both parties to the trial to 25 preemptory challenges. (Pen. Code section 1070.) Second, a "life" sentence precludes commitment to the Youth Authority following a superior court trial.


In re Rodriquez (1975) 14 Cal.3d 639, also appears to have been rendered obsolete by the changed structure of life sentences. In Rodriquez, the California Supreme Court placed the burden on the parole board to set a prisoner's "primary term" quickly and without regard to any post-conviction behavior. This "primary term" established the outer limit of the prison system's jurisdiction over the prisoner. The basis for the Rodriquez decision lay in the judicial branch's obligation to examine terms, as fixed by the parole board to determine whether they were cruel or unusual. In light of the fact that the CRB has no term fixing power, it was the unanimous conclusion of all members present that Rodriquez is no longer applicable.

## Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting. Penal Code section 669 and 3046 were both amended as of January 1, 1979, to expressly provide that determinate enhancements may run consecutively to life sentences, and that multiple life sentences can run consecutively to each other. In the case of consecutive life sentences, section 3046 requires the defendant be imprisoned "until he has served at least seven calendar years on each of the life sentences . . . ." The question was raised whether the apparent 15 to 25 year MEPDs under Penal Code section 190 is inconsistent with the language of section 3046. The conclusion was that there is no inconsistencies. It was noted that section 3046 is a generalized section providing MEPDs for all life terms, while section 190 is a much more specific section which applies directly to first and second degree murders. Furthermore, section 3046 merely requires the service of "at least" seven years for each sentence. Thus, the 15 and the 25 year designation in section 190 are not at all inconsistent with the specific language of section 3046. It was noted that Penal Code section 4500 has for years provided just such a specific exception to section 3046 by providing a nine year MEPD for certain kinds of assaults by life prisoners. Finally, it should be noted that SB 709 which effectuated the amendment to sections 669 and 3046 was filed September 6, 1978, while the ??re specific language of Penal Code section 190 was added ?? initiative on November 7, 1978. Thus, the specific MEPDs in section 190 appear to be the latest expression of the sovereign.

Another merger problem revolves around the fact that although SB 709 was filed in September 1978, it did not become effective until January 1, 1979. Thus, its abolition of the merger doctrine did not go into effect until approximately seven weeks after the November 7, 1978, effective date of Proposition 7. (Pen. Code Section 190 et seq.) In light of this, the group concluded that any first or second degree murders committed between November 7, 1978, and January 1, 1979 would be subject to the 15 or 25 yearr MEPDs but that no consecutive sentencing would be possible. The abolishing of the merger doctrine clearly works to increase

punishment. ???????????, imposition of consecutive life sentences for crimes committed before January 1, 1979, would seem to be unavoidably ex post facto.

### Retroactive Calculation of ISL Second Degree Murder Cases

The final question addressed was what term the CRB is to be guided by when retroactively calculating an ISL prisoner's second degree murder sentence under Penal Code section 1170.2. Subdivision (a) of that section requires the CRB to determine whether a prisoner would have been sentenced under Penal Code section 1170 had his crime been committed after July 1, 1977, and if so, what his sentence would have been. The difficulty is that for second degree murder the sentence has seemed to be many things at many different times after July 1, 1977. The initial DSL "price tag" for second degree murder was five, six or seven years. In September of 1978, the Legislature passed SB 709 which (effective January 1, 1979) changed this to five, seven or eleven years. However, before that could ever take effect, on November 7, 1978, Proposition 7 was passed changing second degree murder from a determinate term (to be sentenced under Penal Code section 1170) to a "life" term (to be sentenced under Penal Code section 1168, subdivision (b)). We concluded that SB 709 need not be considered since its second degree penalty was superseded before it ever went to effect by Proposition 7. The CRB could not retroactively apply Proposition 7's 15 to life for two reasons. First, it would be an ex post facto increase from the five to life sentence in effect before July 1, 1977. Second, since we have concluded that the new sentence is a "life" sentence, it would have been sentenced under Penal Code section 1168, subdivision (b), and thus would not be subject to retroactive calculation under the express language of section 1170.2. This leaves the theoretical possibility that there is no legislative authority whatsoever for the CRB to recalculate an ISL second degree murder conviction. No one believed that this was the Legislature's intent when it drafted section 1170.2. It was the group's opinion that when the Legislature referred to a felon "who should have been sentenced under section 1170 if he had committed (his crime) after July 1, 1977, . . ." the phrase "after July 1, 1977." means immediately after July 1, and invites reference to the DSL sentence lengths which became effective contemporaneously with section 1170.2. This seems the most likely legislative intent, and avoids a world of conceptual trouble.

Michael D. Wellington<br>
Deputy Attorney General

MDW:nl

Office of the Attorney General

Recent (Relatively) Sentencing
Law Changes

Proposition 7 (effective 11/7/78) and SB 709 (effective
7/1/79) have worked some substantial changes in the sentenc-
ing consequences of murder convictions.

Specifically, we have taken the position that the new 15
years to life and 25 years to life sentences under new
Penal Code section 190 are "life" sentences with 15 and 25
year minimum eligible parole dates. This conclusion has
side effects relating to eligibility for CYA under Welfare
and Institutions Code section 1731.5 and the number of
peremptory challenges under Penal Code section 1070. This
conclusion (as it effects CYA eligibility) is at issue in
the Fifth District Court of Appeal in In re Dewester,
5 Crim. 4543.

Furthermore, the venerable concept of merger of life
sentences (Pen. Code, § 669) passed into history, seemingly
allowing for consecutive 25 to life sentences limited only
the number of victims.

The attached memo reflects the Morrissey 8's conclusions
these (and many more) topics. It has been approved by
nie Overoye and Bob Philibosian and more fully sets out the
torney General's position statewide.

Michael D. Wellington
Deputy Attorney General

MDW:
Attachment

fice of the Attorney General

ichael D. Wellington - San Diego

orrissey &
eeting of July 9, 1979

n July 9, 1979, the Morrissey 8 met at our office in
acramento. The progress of the CRB's disparate sentence
eview project was discussed in detail, as was People v
errera, the CRB's first motion for recall under the dis-
arate sentence review mandate of Penal Code section 1170,
ubdivision (f). The group also discussed the status of
ending litigation concerning the DSL. Finally, there was
n expensive discussion and analysis of the legal nature of
rison sentences for first and second degree murder under
enal Code section 190 as amended by Proposition 7. A number
f legal conclusions were reached on this point, which conclu-
ions will be outlined in this memo.

### "Life" Sentences Under New
### Penal Code Section 190

enal Code section 190 provides punishment of death, life
ithout possibility of parole, or "confinement in the state
rison for a term of 25 years to life" for first degree
urder. The prescribed punishment for second degree murder
s "confinement in the state prison for a term of 15 years
o life." Our discussion focused only on the 15 or 25
ears to life sentences. It was our conclusion that these
entences are not directly comparable to either the "indeter-
inate life" or "express life" sentences that existed under
he Indeterminate Sentence Law prior to July 1, 1977.
ather, we concluded that these sentences should be administered
n the same fashion all "life" sentences are currently admin-
stered under the Determinate Sentence Law except that they
eature 15 or 25 year minimum eligible parole dates, instead
f the general 7 year MEPD prescribed by Penal Code section
145.

Indeterminate Life" sentences under the old Indeterminate
entence Law (for example five to life for robbery) contemplated



the parole board setting a "term" somewhere between five years and life. In addition, the parole board was obligated to consider a parole release date sometime prior to the expiration of the "term." The paroling decision was, by its nature, a tentative one with the prisoner subject to revocation and the service of the remainder of his term. The primary features of this whole scheme passed into history on July 1, 1977, with the coming of DSL. The parole board's power to fix terms was withdrawn by the repeal of Penal Code section 2940 et seq., and nothing in the current Penal Code evidences an intent to reestablish those powers for first or second degree murder. Although the parole board currently does have the power to grant parole (Pen. Code, § 3040 et seq.) that power too is substantially different since July 1, 1977. Not only is the length of parole statutorily set (Pen. Code, § 3000 et seq.) but reincarceration on revocation of parole is statutorily limited to one year (Pen. Code 3057).

"Express life" sentences under the ISL precluded the establishment of a "term" since the prisoner was never to be discharged. Although such prisoners could be paroled, they could at any time be retaken to serve the remainder of their life sentences. Under the DSL however, all life prisoners discharge automatically within a few years of their release on parole no matter what their conduct during the parole. (Pen. Code, § 3000 et seq.) As indicated above, any confinement on revocation of parole is limited to one year.

Thus, since much of the administrative power underlying the old concepts of "indeterminate life" and "express life" have been abolished, it was concluded that the new prison sentences under Proposition 7 were not intended to fit either of these old models. The language of new Penal Code section 190 (15 years to life, 25 years to life) implies that someone must make a choice where the prisoner falls between the two ends of the spectrum. Since the sentence is clearly one under Penal Code section 1168, subdivision (b), the trial judge cannot make the choice. This leaves the Community Release Board. Since the Community Release Board's only remaining power in this regard is the power to grant parole (Pen. Code, § 3040) it was concluded that the new sentences require the CRB to fix a parole date somewhere within the appropriate range. As a result, the new sentences appear to be "life" sentences which are analogous to all other "life" sentences under the DSL except that Penal Code section 190 provides specific (15 or 25 years) minimum eligible parole dates which prevail over the general "life" MEPD of seven years found in Penal Code section 3046. The "life" sentences of Penal Code section 190 appear slightly different

from other life sentences under the UDL for the additional
respect that good time credits (Pen. Code, § 2930 et seq.)
are made expressly applicable to the HEPD. Such credits
are not otherwise applicable to anyone sentenced under
Penal Code section 1168, subdivision (b). (Pen. Code, §
2930, subd. (a).)

Two consequences of characterizing section 190 sentences as
"life" sentences are both significant and consistent with
the thrust of Proposition 7. First, "life" cases entitle
both parties to the trial to 26 peremptory challenges.
(Pen. Code, § 1070.) Second, a "life" sentence precludes
commitment to the Youth Authority following a superior court
trial.

## In re Rodriguez

In re Rodriguez (1975) 14 Cal.3d 639, also appears to have
been rendered obsolete by the changed structure of life
sentences. In Rodriguez, the California Supreme Court
placed the burden on the parole board to set a prisoner's
"primary term" quickly and without regard to any post-
conviction behavior. This "primary term" established
the outer limit of the prison system's jurisdiction over the
prisoner. The basis for the Rodriguez decision lay in the
judicial branch's obligation to examine terms, as fixed by
the parole board, to determine whether they were cruel
or unusual. In light of the fact the CRB has no term fixing
power, it was the unanimous conclusion of all members present
that Rodriguez is no longer applicable.

## Merger of New Life Sentences

Merger of life sentences was also discussed at the meeting.
Penal Code sections 669 and 3046 were both amended as of
January 1, 1979, to expressly provide that determinate enhance-
ments may run consecutively to life sentences, and that multiple
life sentences can run consecutively to each other. In the
case of consecutive life sentences, section 3046 requires
the defendant be imprisoned "until he has served at least seven
calendar years on each of the life sentences . . . ." The
question was raised whether the apparent 15 to 25 year MEPDs
under Penal Code section 190 is inconsistent with the language
of section 3046. The conclusion was that there is no inconsistency.
It was noted that section 3046 is a generalized section provid-
ing MEPDs for all life terms, while section 190 is a much
more specific section which applies directly to first and
second degree murders; Furthermore, section 3046 merely
requires the service of "at least" seven years for each
sentence. Thus, the 15 and the 25 year designation in section
190 are not at all inconsistent with the specific language
of section 3046. It was noted that Penal Code section
4500 has for years provided just such a specific exception
to section 3046 by providing a nine year MEPD for certain
kinds of assaults by life prisoners. Finally, it should

noted that SB 709 which effectuated the amendment to
tions 669 and 3046 was filed September 6, 1978, while the
e specific language of Penal Code section 190 was added
initiative on November 7, 1978. Thus the specific
ns in section 190 appear to be the latest expression of
sovereign.

ther merger problem revolves around the fact that although
709 was filed in September 1978, it did not become
fective until January 1, 1979. Thus, its abolition of the
ger doctrine did not go into effect until approximately
ven weeks after the November 7, 1978, effective date of
pposition 7. (Pen. Code, § 190 et seq.) In light of this,
group concluded that any first or second degree murders
mitted between November 7, 1978, and January 1, 1979
ld be subject to the 15 or 25 year MEPDs but that no
secutive sentencing would be possible. The abolishing of
merger doctrine clearly works to increase punishment.
refore, imposition of consecutive life sentences for
mes committed before January 1, 1979, would seem to be
avoidably ex post facto.

### Retroactive Calculation of ISL
### Second Degree Murder Cases

final question addressed was what term the CRB is to be
ided by when retroactively calculating an ISL prisoner's
cond degree murder sentence under Penal Code section 1170.2
bdivision (a) of that section requires the CRB to determine
ether a prisoner would have been sentenced under Penal
de section 1170 had his crime been committed after July 1,
77, and if so, what his sentence would have been. The
fficulty is that for second degree murder the sentence has
ered to be many things at many different times after
ly 1, 1977. The initial DSL "prison term" for second degree
rder was five, six or seven years. In September of 1978,
e Legislature passed SB 709 which (effective January 1, 1979)
anged this to five, seven or eleven years. However, before
at could ever take effect, on November 7, 1978, Proposition 7
s passed changing second degree murder from a determinate
rm (to be sentenced under Penal Code section 1170) to a
ife' term (to be sentenced under Penal Code section 1168,
bdivision (b)). We concluded that SB 709 need not be
nsidered since its second degree murder penalty was
perseded before it ever went to effect by Proposition 7.
e CRB could not retroactively apply Proposition 7's 15
life for two reasons. First, it would be an ex post
cto increase from the five to life sentence in effect

~~Institution for Women, the court in imposing the sentence shall not fix the term or duration of the period of imprisonment~~

969c. Whenever a defendant uses a weapon under such circumstances as to bring such defendant within the operation of Section 12022 the fact that the defendant so used a weapon may be charged in the accusatory pleading. This charge, if made, shall be added to and be a part of the count or each of the counts of the accusatory pleading which charge the offense at the time of the commission of which the defendant used a weapon. That portion of any count which charges that the defendant used a weapon shall be sufficient if it can be understood therefrom that at the time of his commission of the offense set forth in the count, the defendant used a weapon. The nature of the weapon must be set forth. One such charge may name more than one weapon. If the defendant pleads not guilty of the offense charged in any count which alleges that the defendant used a weapon, the question whether or not he used a weapon as alleged must be tried by the court or jury which tries the issue upon the plea of not guilty. If the defendant pleads guilty of the offense charge the question whether or not he used a weapon as alleged must be determined by the court before pronouncing judgment.

SEC. 13.5. Section 969d of the Penal Code is amended to read:

969d. Whenever a defendant used or was armed with a firearm as recited in Section 12022.5, the fact that the defendant used or was armed with a firearm may be charged in the accusatory pleading. This charge, if made, shall be added to and be a part of the count or each of the counts of the accusatory pleading which charged the offense. That portion of any count which charges that the defendant used or was-armed-with-a firearm shall be sufficient if it can be understood therefrom that at the time of his commission of the offense set forth in the count the defendant used or was armed with a firearm. One such charge may name more than one firearm. If the

1 defendant pleads not guilty to the offense charged in any
2 count which alleges that the defendant used or was
3 armed with a firearm, the question whether or not he
4 used or was armed with a firearm as alleged must be
5 determined by the court before pronouncing judgment.
6 SEC. 14. Section 1168 of the Penal Code is amended to
7 read:
8 1168. (a) Every person who commits a public offense,
9 for which any specification of three time periods of
10 imprisonment in any state prison is now prescribed by
11 law shall, unless such convicted person be placed on
12 probation, a new trial granted, or the imposing of
13 sentence suspended, be sentenced pursuant to Chapter
14 4.5 (commencing with Section 1170) of Title 7 of Part 2.
15 (b) For any person not sentenced under such
16 provision, but who is sentenced to be imprisoned in the
17 state prison, including imprisonment not exceeding one
18 year and one day, the court imposing the sentence shall
19 not fix the term or duration of the period of
20 imprisonment.
21 SEC. 15. Section 1170 of the Penal Code is amended to
22 read:
23 1170. (a) (1) The Legislature finds and declares that
24 the purpose of imprisonment in ~~state~~ prison for crime is
25 punishment. This purpose is best served by terms
26 proportionate to the seriousness of the offense with
27 provision for uniformity in the sentences of offenders
28 committing the same offense under similar
29 circumstances. The Legislature further finds and declares
30 that the elimination of disparity and the provision of
31 uniformity of sentences can best be achieved by
32 determinate sentences fixed by statute in proportion to
33 the seriousness of the offense as determined by the
34 Legislature to be imposed by the court with specified
35 discretion. This declaration applies to persons sentenced
36 under this section or Section 1168.
37 (2) In any case in which the punishment prescribed by
38 statute for a person convicted of a public offense is a term
39 of imprisonment in the state prison of 16 months, two or
40 three years two th...

the sentence he may be on parole for a period as evided in Section 3000.

(b) When a judgment of imprisonment is to be posed and the statute specifies three possible terms, e court shall order imposition of the middle term, less there are circumstances in aggravation or tigation of the crime. Upon denial of probation, either rty may move that the upper or lower term be imposed the court. The motion shall specify the circumstances uch justify imposition of the upper or lower term. position of the upper or lower term shall be based on e circumstances alleged. Either party may request a ring to prove or rebut the circumstances alleged. In ermining whether there are circumstances that justify position of the upper or lower term, the court may sider the motion, the record in the case, the probation icer's report, other reports including reports received rsuant to Section 1203.03 and presentence reports mitted by the prosecution or the defendant, the tencing rules of the Judicial Council, and any dence introduced at the sentencing hearing. The rt shall set forth on the record the facts and reasons imposing the upper or lower term. The court may not rose an upper term by using the same fact used to ance the sentence under Section 667.5, 1170.1, 12022, 22.5, 12022.6, or 12022.7. A term of imprisonment shall specified in every case unless imposition of sentence uspended.

c) The court shall state the reasons for its sentence ice on the record at the time of sentencing. The court ll also inform the defendant that as part of the tence after expiration of the term he may be on parole a period as provided in Section 3000.

d) When a defendant subject to this section or division (b) of Section 1168 has been sentenced to be risoned in the state prison and has been committed he custody of the Director of Corrections, the court within 120 days of the date of commitment on its motion, or at any time upon the recommendation of Director of Corrections or the Community Release—

1 Board, recall the sentence and commitment previously
2 ordered and resentence the defendant in the same
3 manner as if he had not previously been sentenced,
4 provided the new sentence, if any, is no greater than the
5 initial sentence. The resentence under this subdivision
6 shall apply the sentencing rules of the Judicial Council so
7 as to eliminate disparity of sentences and to promote
8 uniformity of sentencing. Credit shall be given for time
9 served.
10 (e) Any sentence imposed under this article shall be
11 subject to the provisions of Sections 3000 and 3057 and
12 any other applicable provisions of law.
13 (f) In all cases the Community Release Board shall, not
14 later than one year after the commencement of the term
15 of imprisonment, review the sentence and shall by
16 motion recommend that the court recall the sentence
17 and commitment previously ordered and resentence the
18 defendant in the same manner as if he had not been
19 previously sentenced if the board determines the
20 sentence is disparate. The review under this section shall
21 apply the sentencing rules of the Judicial Council and the
22 information regarding the sentences in this state of other
23 persons convicted of similar crimes so as to eliminate
24 disparity of sentences and to promote uniformity of
25 sentencing.
26 SEC. 16. Section 1170.1 of the Penal Code is repealed.
27 1170.1. The trial judge shall state the reasons for his
28 sentence choice on the record at the time of sentencing.
29 The trial judge shall also inform the defendant that after
30 the expiration of his sentence he shall be on parole for a
31 period of up to one year unless for good cause parole is
32 waived as provided in Section 3000.
33 SEC. 17. Section 1170.1a of the Penal Code is amended
34 and renumbered to read:
35 1170.1. (a) Except as provided in subdivisions (b) and
36 (c) and subject to Section 654, when any person is
37 convicted of two or more felonies, whether in the same
38 proceeding or court or in different proceedings or courts,
39 and whether by judgment rendered by the same—

EXHIBIT 4

| | BILL NUMBER |
| --- | --- |
| HEALTH AND WELFARE | AB 476 |
| DEPARTMENT, BOARD OR COMMISSION | AUTHOR |
| CORRECTIONS | Boatwright |

## SUMMARY

Allows the Community Release Board to hear 4,000 cases or more for possible extended terms rather than 500; retains thousands of persons under parole supervision; permits good time for periods of time less than eight months; makes numerous other changes and appropriates $9.6 million.  An urgency measure.

## HISTORY, SPONSORSHIP, AND RELATED BILLS

An administration bill which grew out of the study and deliberations of a committee chaired by Secretary Obledo to implement the Determinate Sentence Act.

Opponents included State Public Defender, Public Defenders Association, Attorneys for Criminal Justice, National Lawyers Guild, Prisoners' Union, Friends Committee on Legislation, American Civil Liberties Union, San Francisco Bar Association, Committee for Prisoner Humanity and Justice, Women for Peace, and Friends Outside.

A coalition of district attorneys headed by those of San Diego and Los Angeles spearheaded an effort to make the penalties and enhancements stronger.  They were joined from time to time by the Attorney General and the Peace Officers Association.

The District Attorneys Association consistently supported the bill.  Ultimately the Peace Officers and the Coalition DA's were in support and the Attorney General was, at least, no longer in opposition.

## VOTE

Assembly Criminal Justice Committee approved the bill 7-2 (Alatorre, Barnai). With the author resisting all amendments, Ways and Means tabled five proposed amendments to "strengthen" the bill by votes of 12 or 14 to 6.  It then adopted the bill 17-2 (Torres, Vasconcellos).  The Assembly approved 66-6 beating back a series of amendments similar to those offered in Ways and Means.  Senate Judiciary first adopted and then rescinded major amendments finally adopting a modestly amended bill 5-2 (Carpenter and Sieroty).  Senate Finance approved 8-3 (Carpenter, Stull and Cusanovich) with little discussion and without an actual appropriation before it.  Again on the Senate floor amendments were beaten and the measure was passed 30-2 (Sieroty and Dunlap).  The bill was returned to the Criminal Justice Committee which recommended non-concurrence. The conference committee report was accepted 59-1 (Vasconcellos) in the Assembly without debate.  The Senate approved 27-6.

| RECOMMENDATION | | | | |
| --- | --- | --- | --- | --- |
| SIGN | | | | |
| DEPARTMENT HEAD | DATE | AGENCY HEAD | | DATE |
| | JUN 2 3 1977 | Cal Halley | JUN 3 - 1977 | |

## SPECIFIC FINDINGS

### Retroactivity

Existing law (SB 42) requires the Community Release Board (CRB) to apply the determinate sentence to persons sentenced to state prison prior to July 1, 1977, for crimes that have the new three-tier sentences. The board must use the middle term of the offense bearing the longest term of imprisonment aggregated by any additional terms imposed by the court at the time of sentence. No good behavior or participation credit is granted.

In situations where the calculated time appears inadequate to a majority of the members of the CRB because of the number of crimes of which the prisoner was convicted, or because he was armed or used a deadly weapon or inflicted great bodily injury, a three-member panel may hold a hearing under specified procedures. A release date must be set within 90 days. In setting the date the panel is to be guided by the sentence which could have been imposed for the act had the prisoner been sentenced after the new law was in effect.

As changed by the bill, terms for any enhancements are specified. The sentence calculation need only be reviewed by two members of the board to schedule the prisoner for a hearing for a longer term set. The hearing panel requires only two members. The board need only notify the inmate in 90 days that he will have a hearing. The hearing, itself, must be held by April 1, 1978 or within 120 days of receipt of the prisoner, whichever is later. This time period may be extended an additional 90 days by the board by resolution unless the resolution is vetoed by either house of the legislature. Legislative intent is expressed that the hearings be accomplished in the most expeditious manner possible.

In setting the sentence the board is guided by, but not limited to, the term that could reasonably have been set had the crime occurred after July 1. The board is also to be guided by a legislative declaration that the paramount consideration is to protect the public from repetition of extraordinary crimes of violence.

The effect of the amendments is to permit the CRB to hear four or five thousand cases for possible extension of the calculated term in contrast to the 500 that could be heard under existing law. Further it is not required to limit the term to that which could be given under the new law.

### Good Time

Good time procedures are simplified. Under SB 42 the inmate is given good time in eight month blocks and the Department must recompute his sentence and notify the prisoner of the redetermined release date each time.

## Good Time - continued

The bill provides that good time is based on eight month periods but that credit may also be given on a proportional basis for lesser periods. <u>Within 30 days of his reception in prison, the prisoner would be informed of his anticipated good time release date.</u> He is notified only if there is any change.

Under existing law persons who are confined either by choice or because of behavioral problems may not be denied credit because of inability to participate. Under the bill, they shall be given specified activities commensurate with their custodial status. This will prevent the worst inmates from receiving credit for doing nothing.

No more than 90 days of good time credit or 30 days of participation credit may be lost during any eight-month period in which the misbehavior or failure to participate took place. A current provision which forbids denial if proceedings are not begun within 90 days of the misbehavior is deleted.

Now, if the misbehavior constitutes a crime and the case is referred to the district attorney, the department may not hold a hearing unless the DA certifies in writing that no prosecution will be taken. But if there is to be a hearing, it must be held in 30 days. The idea was to force the DA to act promptly. Under the bill, if the DA has not filed within 60 days the inmate may request a hearing and the department must comply within 15 days.

Under existing law the evaluation of a prisoner's appeal of good time denial takes a full hearing of the CRB with the prisoner present, permitted to speak and cross examine, request a stenographic transcript, etc. The bill permits the board to affirm, reverse or modify the department's good time decision or to grant a hearing with all the rights above.

### Parole

The Determinate Sentence Act is silent as to the purpose of parole. It provide that determinately sentenced prisoners may have a period of parole not exceeding a year and that those with life sentences may have up to three years of parole. Parole time runs even if the prisoner's parole has been revoked and he has been returned to prison. Time is stopped only if the parolee absconds. Return to prison without a new commitment is limited to six months. The section is retroactive so the time limits begin to run from the initial date of parole. The Department of Corrections specifies the conditions and length of parole for determinate prisoners. The prisoner may appeal to the CRB.

Under AB 476, the legislature finds that it is in the interest of public safe to provide supervision and assistance to parolees since the period immediately following incarceration is critical to successful reintegration of the offend into society and to positive citizenship. Statements emphasizing public

## Parole - continued

protection and requiring the director to insure against reversion to criminality were eliminated by the conference committee. The retroactivity of parole is eliminated.

Under the provisions of existing law, thousands of parolees and hundreds of parole violators would have been discharged from parole July 1. The change made by AB 476 retaining these persons has a profound effect on the parole population.

Time during which the parolee is in custody does not count. While the year and three year limits are retained, a new top of 18 months and four years respectively is established for those persons who have a combination of parole and custody. Those who abscond are not affected by these limits. Parole conditions for those determinately sentenced are provided by the department under guidelines specified by the Community Release Board. The board has the power to establish and enforce regulations under which prisoners may be allowed to go on parole.

### CRB Hearings

The CRB is authorized to parole prisoners sentenced indeterminatively. It is also required to review annually each prisoner sentenced under prior indeterminate sentence law to make sure that the prisoner has the benefits of both systems.

Current law would require sending notice to a variety of persons when the CRB etermines the length of time any prisoner is confined. The bill limits this requirement to those prisoners serving life sentences. This eliminates the need to send notices re each of the prisoners whose term is subject to the retroactive provisions or who is reviewed annually on a sentence of less than life.

Current law requires one of the three board members at a parole hearing to have been at the previous hearing. The bill leaves an "out" when this is not feasible.

Disparate sentence review is defined to include the decision to deny probation and the imposition of the lower or upper prison term, concurrent or consecutive sentences, or the imposition of enhancements. This limits board review to cases sent to prison.

### Salary

The bill provides a salary for the chairman and members of the Community Release Board -- a matter overlooked in SB 42.

## Enhancements

Existing law provides an additional term for prior prison sentences -- three years for specified violent crimes and one year for others. The bill extends the list of violent crimes to include any felony in which the offender personally uses a firearm. The bill also counts a prior commitment to the Department of Health as a mentally disordered sex offender after conviction of a felony as a prior prison term if the commitment exceeded a year. Existing law provides an enhancement for the taking or damaging of property of value exceeding $100,000 and $500,000. The bill reduces these limits to $25,000 and $100,000. Now some crimes are exempt from this enhancement. The bill would make the enhancement apply to any felony.

Existing law provides an enhancement for great bodily injury except where it is an element of the crime or homicide and defines great bodily injury. The bill changes the definition to significant or substantial physical injury and extends the exemptions to assault with a deadly weapon and assault with force likely to produce great bodily injury.

Existing law provides enhancements for the use of a firearm or the commission of a felony while personally armed with a deadly weapon (which includes a firearm). The bill changes this so that a one year enhancement applies to any person armed with a firearm, or is a principal in a crime where any principal is armed or who personally uses a deadly or dangerous weapon. If the defendant personally uses a firearm he is subject to a two year enhancement

### Ex Post Facto

Numerous sections are changed to insure that persons who commit their crime prior to July 1, 1977 are sentenced under prior law.

### Other Changes

Overlooked penalty provisions are made determinate; names of boards are changed and numerous obsolete sections are repealed.

The conference report added a section making it a felony to possess piperidine and cyclohexanone at the same time with intent to manufacture phencyclidine unless authorized by the Board of Pharmacy. This addition was said to be from a bill by Assemblywoman Egeland which was inadvertently chaptered out.

The conference report also added a death penalty section from the Military and Veterans Code to become effective only if SB 155 is chaptered.

FISCAL FINDINGS:   $9,583,200

The bill appropriates $9,583,200 from the General Fund to be allocated by the Director of Finance for implementation of the Determinate Sentence Act as amended by this bill.

FISCAL FINDINGS - continued

Of the total $7,014,600 is for the Department of Corrections and $2,968,600
to the Community Release Board.  Both allocations are for the 1977-78 Fiscal
Year.  Major costs to the department are anticipated increases in the prison
average daily population of 1,410  and 4,450 in the parole population.

RECOMMENDATION:  SIGN

Provisions of the bill are necessary to insure adequate review of persons
sentenced retroactively.  The bill provides a desirable statement of the
purpose of parole and eliminates the running of the parole period while the
person is locked up for violation.  It improves the procedures for adminis-
tering good time and simplifies denial.  It makes numerous other changes
necessary for the implementation of the Determinate Sentence Act and provides
needed funding.

#

# ENROLLED BILL REPORT

| | | BILL NUMBER |
| --- | --- | --- |
| AGENCY | HEALTH AND WELFARE | AB 476 |
| DEPARTMENT, BOARD OR COMMISSION | CORRECTIONS | AUTHOR |
| | | Boatwright |

## SUMMARY

Allows the Community Release Board to hear 4,000 cases or more for possible extended terms rather than 500; retains thousands of persons under parole supervision; permits good time for periods of time less than eight months; makes numerous other changes and appropriates $9.6 million. An urgency measure.

## HISTORY, SPONSORSHIP, AND RELATED BILLS

An administration bill which grew out of the study and deliberations of a committee chaired by Secretary Obledo to implement the Determinate Sentence Act.

Opponents included State Public Defender, Public Defenders Association, Attorneys for Criminal Justice, National Lawyers Guild, Prisoners' Union, Friends Committee on Legislation, American Civil Liberties Union, San Francisco Bar Association, Committee for Prisoner Humanity and Justice, Women for Peace, and Friends Outside.

A coalition of district attorneys headed by those of San Diego and Los Angeles spearheaded an effort to make the penalties and enhancements stronger. They were joined from time to time by the Attorney General and the Peace Officers Association.

The District Attorneys Association consistently supported the bill. Ultimately the Peace Officers and the Coalition DA's were in support and the Attorney General was, at least, no longer in opposition.

## VOTE

Assembly Criminal Justice Committee approved the bill 7-2 (Alatorre, Hannai). With the author resisting all amendments, Ways and Means tabled five proposed amendments to "strengthen" the bill by votes of 12 or 14 to 6. It then adopted the bill 17-2 (Torres, Vasconcellos). The Assembly approved 66-6 beating back a series of amendments similar to those offered in Ways and Means. Senate Judiciary first adopted and then rescinded major amendments finally adopting a modestly amended bill 5-2 (Carpenter and Sieroty). Senate Finance approved 8-3 (Carpenter, Stull and Cusanovich) with little discussion and without an actual appropriation before it. Again on the Senate floor amendments were beaten and the measure was passed 30-2 (Sieroty and Dunlap). The bill was returned to the Criminal Justice Committee which recommended non-concurrence. The conference committee report was accepted 59-1 (Vasconcellos) in the Assembly without debate. The Senate approved 27-6.

| RECOMMENDATION | | |
| --- | --- | --- |
| SIGN | | |
| DEPARTMENT HEAD | DATE JUN 3 0 1977 | AGENCY HEAD *Pat Halley* DATE JUN 3 0 1977 |

## SPECIFIC FINDINGS

### Retroactivity

Existing law (SB 42) requires the Community Release Board (CRB) to apply the determinate sentence to persons sentenced to state prison prior to July 1, 1977, for crimes that have the new three-tier sentences. The board must use the middle term of the offense bearing the longest term of imprisonment aggregated by any additional terms imposed by the court at the time of sentence. No good behavior or participation credit is granted.

In situations where the calculated time appears inadequate to a majority of the members of the CRB because of the number of crimes of which the prisoner was convicted, or because he was armed or used a deadly weapon or inflicted great bodily injury, a three-member panel may hold a hearing under specified procedures. A release date must be set within 90 days. In setting the date the panel is to be guided by the sentence which could have been imposed for the act had the prisoner been sentenced after the new law was in effect.

As changed by the bill, terms for any enhancements are specified. The sentence calculation need only be reviewed by two members of the board to schedule the prisoner for a hearing for a longer term set. The hearing panel requires only two members. The board need only notify the inmate in 90 days that he will have a hearing. The hearing, itself, must be held by April 1, 1978 or within 120 days of receipt of the prisoner, whichever is later. This time period may be extended an additional 90 days by the board by resolution unless the resolution is vetoed by either house of the legislature. Legislative intent is expressed that the hearings be accomplished in the most expeditious manner possible.

In setting the sentence the board is guided by, but not limited to, the term that could reasonably have been set had the crime occurred after July 1. The board is also to be guided by a legislative declaration that the paramount consideration is to protect the public from repetition of extraordinary crimes of violence.

The effect of the amendments is to permit the CRB to hear four or five thousand cases for possible extension of the calculated term in constrast to the 500 that could be heard under existing law. Further it is not required to limit the term to that which could be given under the new law.

### Good Time

Good time procedures are simplified. Under SB 42 the inmate is given good time in eight month blocks and the Department must recompute his sentence and notify the prisoner of the redetermined release date each time.

# EXHIBIT 5

# SENATE BILL 42—THE END OF THE INDETERMINATE SENTENCE

For more than fifty-nine years California had a system of indeterminate sentences for felony convictions.[1] The indeterminate sentence system prohibited the sentencing judge from specifying a designated term of imprisonment for each convicted felon, and required the felon to be sentenced for "the term prescribed by law."[2] As a result, each felon was sent to prison for a term having a statutory minimum and maximum length, without any indication of the length of term that that specific prisoner would serve. Each individual's term was set after incarceration by the "governing authority of the prison,"[3] based on that individual's conduct in prison.[4] In theory, the indeterminate sentencing system would allow each prisoner's sentence to be tailored to his rehabilitative efforts in prison, enabling each individual to be released as soon as he was capable of living in society without resorting to crime.

A number of different criticisms[5] were leveled at the administration of the law—the uncertain date of release, the varying sentence lengths for prisoners committed on similar offenses, the broad discretion of the Adult Authority, the Au-

---

The author would like to thank Judge Donald Chapman of the Santa Clara County Municipal Court, Joseph A Spangler, Supervising Investigator of the California Adult Authority, and Mary Lou Fenili.

1. The original indeterminate sentencing provision, Penal Code section 1168, was enacted on May 18, 1917, and became effective on July 27 of the same year. 1917 Cal. Stats., ch. 526, § 1, at 665 (a lengthy historical note is included after the section).

2. The term prescribed by law was a statutory minimum and maximum term for the offense for which the defendant was convicted. A recital of the offense of which the defendant was convicted and a designation of the state prison to which he was committed was upheld as a proper sentencing in People v. Mendosa, 178 Cal. 509, 173 P. 998 (1918).

3. 1917 Cal. Stat., ch. 526, § 1, at 665. The governing authority of the prison was orginally called the State Board of Prison Directors. In 1941 it became the Board of Prison Terms and Parole and in 1944, the Adult Authority.

4. *See* notes 41-61 and accompanying text *infra* for a discussion of the Adult Authority's method of determining sentences.

5. *See, e.g.,* J. MITFORD, KIND AND USUAL PUNISHMENT: THE PRISON BUSINESS 81 (1973) [hereinafter cited as MITFORD]; Sacramento Bee, Feb. 28, 1975, at B1, col. 3; *Transcript of the Hearing on the Indeterminate Sentence Law,* Sen. Select Comm. on Penal Institutions, Dec. 5-6, 1974 [hereinafter cited as *Transcript*]. *See also* M. FRANKEL, CRIMINAL SENTENCES 88 (1973) [hereinafter cited as FRANKEL].

thority's relative immunity from effective review, and the lack of effective evaluation of available sentencing materials by the Adult Authority.⁶

These criticisms, however, were only symptoms of the real problem, which was that the fundamental premise upon which the system was based, that is, the *ability* to rehabilitate was not a viable concept.⁷ The criticisms generated an Adult Authority attempt to promote uniformity and order within the law⁸ which was ultimately invalidated by the courts as beyond the Adult Authority's power.⁹

Increasing criticism motivated the legislature to re-examine the law and numerous alternatives were proposed.¹⁰ From among the alternatives Senate Bill 42 was enacted as the favored remedy. It was passed by the legislature on September

---

6. There was much criticism of the legislature's grant of total power for sentencing decisions to the Adult Authority without meaningful direction. Some of the criticism came from members of the legislature themselves: "For years the Legislature has neglected its responsibility of providing guidelines for boards charged with parole decision making. . . . The Parol Board [the Adult Authority] is one of the last bastions of unchecked and arbitrary power in America." ASSEM. SELECT COMM. ON ADMIN. OF JUSTICE, PAROLE BOARD REFORM IN CALIFORNIA: ORDER OUT OF CHAOS 15 (1970). *See also* FRANKEL, *supra* note 5, at 88-89; MITFORD, *supra* note 5, at 86; Goldfarb & Singer, *Problems in the Administration of Justice in California,* ASSEM. J. (Supp. App.), Reg. Sess. 41 (1969) (criticism of the absence of procedural due process safeguards at Adult Authority proceedings).

General criticism of indeterminate sentencing was raised at the hearings of the Senate Select Committee on Penal Institutions on Senate Bill 42. *Transcript, supra* note 5.

7. *See, e.g.,* ASSEM. COMM. ON CRIM. PROC., CRIME AND PENALTIES IN CALIFORNIA 25 (1968); CAL. ST. BAR COMM. ON CRIM. JUSTICE, REP. AND RECOMMENDATIONS ON SENT-ENCING AND PRISON REFORM 1-4, 34-35 (1975); FRANKEL, *supra* note 5, at 90-92; Glueck, *Predictive Devices and the Individualization of Justice,* 44 LAW & Contemp. Prob. 461-62 (1958) [hereinafter cited as Glueck].

8. The major Adult Authority attempts to provide uniform procedures were Chairman's Directives 75/20 and 75/30. Adult Authority Chairman's Directive 75/20 (April 15, 1975) [hereinafter cited as C.D. 75/20]; Adult Authority Chairman's Directive 75/30 (September 2, 1975) [hereinafter cited as C.D. 75/30]. *See* notes 41-61 and accompanying text *infra* for a description of C.D. 75/20 procedures. C.D. 75/20 involved the procedure for determining parole release dates, while C.D. 75/30 paralleled those procedures for setting an individual maximum term proportionate to the seriousness of an individual's offense as required by *In re* Rodriquez, 14 Cal. 3d 639, 652, 653, 537 P.2d 384, 393, 394, 122 Cal. Rptr. 552, 561, 562 (1975).

9. *In re* Stanley, 54 Cal. App. 3d 238, 126 Cal. Rptr. 524 (1976).

10. *See* 1976 Cal. Legis. Serv., ch. 1139, at 4752 (formerly Senate Bill 42) (abolishing most indeterminate sentences and the Adult Authority); A.B. 1440, Reg. Sess. (1975) (requiring that sentences within the maximum length set by the trial judge, be imposed by a panel of superior court judges or hearing officers shortly after incarceration); A.B. 2311, Reg. Sess. (1975) (establishing a Commission on Criminal Sanctions to set fixed, determinate terms for all noncapital felony offenses at some point between zero and the median national time served for similar crimes).

1, 1976, and signed into law by Governor Brown on September 20, 1976.[11] The bill eliminates the Adult Authority and returns California to a determinate sentencing system.[12]

This comment will examine the indeterminate sentencing system and its administration. Senate Bill 42 will be outlined, and the new sentencing system will be evaluated for its ability to alleviate the difficulties of indeterminate sentencing.

## A HISTORY OF INDETERMINATE SENTENCING AND THE ADULT AUTHORITY

### *The Indeterminate Sentence Law*

The indeterminate sentence law was enacted May 18, 1917, and became effective July 27 of the same year.[13] In its original form, California Penal Code section 1168(a) provided:

> Every person convicted of a public offense, for which public offense punishment by imprisonment in any reformatory or the state prison is not prescribed by law, if such convicted person shall not be placed on probation, a new trial granted, or imposing of sentence suspended, shall be sentenced to be confined in the state prison, but the court in imposing such sentence shall not fix the term or duration of the period of imprisonment.[14]

The indeterminate sentence was a statutorily defined minimum and maximum term for each felony. Within that statutory term each prisoner's sentence was set *after* his incarceration by the governing authority of the prison.

The statute also provided that "the governing authority of the reformatory or prison" or "any board or commission that may be hereafter given authority so to do"[15] had responsibility for determining what amount of time, if any, greater than the minimum the prisoner would be confined.

Although the indeterminate sentence law also consisted of hundreds of provisions of the Penal Code and other codes defining minimum and maximum terms for each felony, this single short section[16] was the backbone of the system. Other sections

---

11. Senate Weekly History, Reg. Sess. (1976).

12. 1976 Cal. Legis. Serv., ch. 1139, at 4752 (legislative counsel's digest). *See* notes 66-143 and accompanying text *infra*.

13. 1917 Cal. Stats., ch. 526, § 1, at 665.

14. *Id.* at 665-66.

15. *Id.* at 666.

16. CAL. PENAL CODE § 1168 (West 1970).

established the "governing authority of the prison," but none provided direction for the administration of the law.[17] The administrative board determining sentences was given total control over the process of indeterminate sentencing.

Immediately after its enactment, the constitutional validity of indeterminate sentencing was unsuccessfully challenged in *In re Lee*.[18] This challenge went to the core of indeterminate sentencing—that is, to the right to make a sentence indeterminate.

The contention that an indeterminate sentence was void for uncertainty and indefiniteness was not accepted in *Lee*. The court held that the sentence was in legal effect a sentence for the maximum term, and thus, both certain and definite.[19] In this holding the court relied on the experience of other jurisdictions already possessing some form of indeterminate sentence.[20]

*Lee* also established the validity of giving sentencing discretion to an administrative body. It was alleged that the law violated the constitutional doctrine of separation of powers.[21] The court replied by stating that the legislative function, to provide the sentence to be imposed, was completed with the enactment of the indeterminate sentence law and the minimum and maximum terms for each felony. The judicial function, to determine guilt and impose sentence, was completed at trial.[22] The actual execution of the sentence was seen as a purely administrative task.

Again, the court relied on precedents from other jurisdic-

---

17. *See* CAL. PENAL CODE § 5075 *et seq.* (West 1970).

18. 177 Cal. 690, 171 P. 958 (1918).

19. *Id.* at 693, 171 P. at 959.

20. Because the question was not raised, the *Lee* court did not go further and examine whether the maximum sentence, often a life sentence, was cruel or unusual punishment. Challenges to indeterminate sentencing on cruel or unusual punishment grounds were not raised until very recently. *See In re* Rodriquez, 14 Cal. 3d 639, 537 P.2d 384, 122 Cal. Rptr. 552 (1975) (prison term disproportionate to inmate's particular offense constituted cruel and unusual punishment and indicated that the Adult Authority was not administering the law in a constitutional manner); People v. Wingo, 14 Cal. 3d 169, 534 P.2d 1001, 121 Cal. Rptr. 97 (1975) (a term within the statutory limits that is disproportionate to individual culpability is unconstitutional); *In re* Foss, 10 Cal. 3d 910, 519 P.2d 1073, 112 Cal. Rptr. 649 (1974) (a statutory minimum unconstitutional); *In re* Lynch, 8 Cal. 3d 410, 503 P.2d 921, 105 Cal. Rptr. 217 (1972) (a statutory maximum unconstitutional). The invalidation of sentences on this ground fostered many changes in Adult Authority procedures. *See, e.g.,* C.D. 75/30, *supra* note 8. It also pushed the Authority to repudiate rehabilitation as a sentencing criterion.

21. 177 Cal. at 692, 171 P. at 959. *See* CAL. CONST. art. III, § 3 (constitutional doctrine of separation of powers).

22. 177 Cal. at 693, 171 P. at 959.

tions having indeterminate sentences.[23] It cited with approval the Tennessee Supreme Court statement that "the act does not attempt to confer on the board the power to fix the punishment that any given crime shall bear."[24] Such a statement is belied by the fact that the Adult Authority was given extremely wide latitude in setting sentences. For example, the sentence for a felony conviction of assault with a deadly weapon was six months to life.[25] At the time *Lee* was decided, the governing authority of the prison had complete freedom to set an inmate's sentence anywhere within those bounds.[26]

As a result of *Lee* and its progeny,[27] the validity of indeterminate sentencing per se was solidly established and criticism was restricted to the governing body and its administration of the law.

### The Adult Authority

In 1944 the Board of Prison Terms and Paroles was abolished and the Adult Authority was created as the agency to administer the indeterminate sentence law.[28] Originally, the Adult Authority had three members. It later was expanded to nine members who were appointed by the Governor and confirmed by the Senate.[29] Section 5075 of the Penal Code directed

---

23.  *Id.* at 693-94, 171 P. at 959.

24.  *Id.* at 694, 171 P. at 960, *quoting* Woods v. State, 130 Tenn. 100, 113, 169 S.W. 558, 561 (1914). .

25.  CAL. PENAL CODE § 245 (West 1970) (felony penalty). Under S.B. 42 assault with a deadly weapon carries a sentence of 2, 3 or 4 years. 1976 Cal. Legis. Serv., ch. 1139, § 152, at 4790 (to be codified as CAL. PENAL CODE § 245).

26.  Prior to the decision in *In re Rodriguez,* the general rule was that a prisoner had no vested right to a term fixed at less than the maximum sentence. *In re* Schoengarth, 66 Cal. 2d 295, 302, 425 P.2d 200, 204, 57 Cal. Rptr. 600, 603 (1967). As a result terms were set and reset anywhere within the statutory bounds, if the prisoner violated any Department of Corrections rules. *Rodriguez* limited this rule by requiring that the maximum for each prisoner must not be disproportionate to the seriousness of the prisoner's offense. 14 Cal. 3d at 652, 537 P.2d at 393, 122 Cal. Rptr. at 516. This compulsion of proportionality was derived from United States and California constitutional provisions against cruel and/or unusual punishment. *See* U.S. CONST. amend. VIII; CAL. CONST. art. I, § 17.

27.  *See, e.g.,* Bennett v. People, 406 F.2d 36 (9th Cir. 1969); *In re* Larsen, 44 Cal. 2d 642, 283 P.2d 1043, *appeal dismissed,* 350 U.S. 928 (1955); Fleischer v. Adult Authority, 202 Cal. App. 2d 44, 20 Cal. Rptr. 603 (1962); People v. Kostal, 159 Cal. App. 2d 444, 323 P.2d 1020 (1958).

28.  CAL. PENAL CODE § 3000 (West 1970). Jessica Mitford described the Adult Authority in this manner: "This board wields total, arbitrary power over the destinies and liberties of California's state prison population, not only while they are in custody but also after they have been released on parole." MITFORD, *supra* note 5, at 86.

29.  CAL. PENAL CODE § 5075 (West 1970).

that, to the extent possible, the members selected should be experienced in the fields of corrections, sociology, law, law enforcement, and education.[30]

Statutes provided very little guidance for the Authority in its administration of indeterminate sentencing. Penal Code section 5076.1 directed the Authority to hold hearings at the prisons *as often as necessary* to allow a full and complete examination of each inmate's file.[31] As the size of the prison population increased, the section was amended to give the Adult Authority the power to employ hearing representatives to assist the Authority in its time-consuming tasks of examining each inmate's file, setting terms and making parole decisions.[32]

Most of the direction for the operation of the indeterminate sentence law was provided by the Adult Authority itself.[33] In the absence of statutory direction, the Adult Authority regularly issued policy statements, resolutions and chairman's directives which specified exactly how the indeterminate sentence law would be administered.[34]

---

30. *Id.* Supposedly these special areas of knowledge would assist the Adult Authority members in their task of determining sentence lengths. The former occupations of the 1976 Adult Authority members included: Raymond Procunier, director of the Department of Corrections; Raymond Brown, Oakland deputy chief of police; Manuel Quevedo, Jr., San Bernardino police officer and member of the Alcoholic Beverage Control Board; Robert Wood, state assemblyman and farmer; Rudy Garcia, community director of the state health and welfare agency, and Lt. Commander in the United States Navy in charge of special court martials; Henry Kerr, Assistant Commander, Los Angeles Police Department, Detective Division; Curtis Lynum, San Francisco District Director, FBI; Ruth Rushen, Los Angeles County Probation Department, Probation Officer. Telephone conversation with Adult Authority personnel (March, 1976).

Marvin Frankel has spoken of these "experts" running our sentencing system as follows: "In our easy adoration of expertise we have given over power to people of dubious qualifications, subjected to little or no control." FRANKEL, *supra* note 5, at 88-89.

31. CAL. PENAL CODE § 5076.1 (West Supp. 1975) (emphasis added).

32. *Id.* In 1976 the Adult Authority employed about 29 hearing representatives to assist the nine Adult Authority members. These 38 people were responsible for hearing the cases of over 40,000 inmates in the custody of the Department of Corrections. Telephone conversation with Adult Authority personnel (March, 1976).

33. For criticisms of the Adult Authority's operation of the indeterminate sentence law see authorities listed in note 5 *supra*.

34. The distinctions among these documents is not clear. Both policy statements and resolutions appear to be general declarations of Adult Authority decisions on various topics. Chairman's Directives, on the other hand, are much more specific and deal with detailed procedural matters. *See, e.g.,* C.D. 76/30, *supra* note 8. The relative importance of these statements, resolutions and directives in Adult Authority operations is not clear. Apparently, they differ only in the depth to which they cover the subject matter.

## Rehabilitative Foundations of Indeterminate Sentencing

Indeterminate sentencing in the United States grew out of notions of preventive confinement.[35] Though early statements of the rationale for indeterminacy were based upon a desire to isolate the criminal from society,[36] very shortly the purpose of indeterminancy was subtly shifted from confining a prisoner until he had reformed to the actual reformation itself.[37] Shortly after the enactment of California's indeterminate sentence law, the California Supreme Court wrote: "The purpose of the indeterminate sentence law . . . is to *mitigate* the punishment which would otherwise be imposed upon the offender. These laws place emphasis upon the reformation of the offender. They seek to make the punishment fit the criminal rather than the crime."[38]

The difficulty with attempting to make the punishment fit the criminal rather than the crime lay in the limited ability of the criminal justice system to identify and treat the cause of crime. For years the administrators of the indeterminate sentence law attempted to individualize rehabilitation through sentencing while lacking the expertise and methods necessary for treatment. The result was that sentencing was open to criticism as arbitrary, excessive and unfair.[39]

In early 1975 when Raymond Procunier became chairman of the Adult Authority, he recognized that rehabilitation could not be achieved within the indeterminate sentencing system.[40]

---

35. *See* Dershowitz, *Indeterminate Confinement: Letting the Therapy Fit the Harm,* 123 U. PA. L. REV. 297, 304-15 (1974) [hereinafter cited as Dershowitz].

36. Zebulon Brockway, the long time superintendant of Elmaira Reformatory in New York and an early proponent of indeterminate sentencing in the United States, rejected both punishment and deterrence as rationales for sentencing and instead proposed that all persons convicted of crimes should be confined to prison until they could safely be returned to society. Z. BROCKWAY, FIFTY YEARS OF PRISON SERVICE 401 (1912).

37. *See* Dershowitz, *supra* note 35.

38. *In re* Lee, 177 Cal. 690, 692, 171 P. 958, 959 (1918).

39. *See* K. DAVIS, DISCRETIONARY JUSTICE: A PRELIMINARY INQUIRY 133-34 (1973); FRANKEL, *supra* note 5.

40. Sacramento Bee, Feb. 28, 1975, at B1, col. 3. There seems to be a general consensus that rehabilitation, making a criminal into a law abiding citizen, is an impossible task. *See, e.g.,* FRANKEL, *supra* note 5, at 93; Friedman, *The Dilemmas of Sentencing,* 44 CAL. ST. BAR J. 372, 377 (1969); Sacramento Bee, Feb. 28, 1975, at B1, col. 3. Punishment, deterrence and protection decisions are really policy decisions which demand less qualification than a rehabilitation decision. Senate Bill 42 recognizes that these policy decisions are best made by a legislative body which is answerable to the people rather than by an administrative board which is not.

As a result, he attempted to remove rehabilitation from sentencing decisions. Chairman's Directive 75/20 was the result.

## CHAIRMAN'S DIRECTIVE 75/20—AN ADMINISTRATIVE ATTEMPT TO MAKE SENTENCING DECISIONS MORE UNIFORM

As a major step in administrative reform, Raymond Procunier, the Adult Authority Chairman, issued Chairman's Directive 75/20 (C.D. 75/20),[41] which established a procedure for setting parole release and discharge dates for each prisoner. The parole release date was the length of time an inmate would serve in prison before being released on parole. In a sense, it was the inmate's individualized minimum term.[42] The date was tentative. If for any reason the inmate was found unfit to be released, the date could be revoked.

The parole discharge date was the date on which the inmate would be released from the Department of Corrections' control and supervision after a successful period of parole. It also was a tentative date because the individual's actions while on parole could cause parole to be revoked or the time under supervision to be lengthened.

The major purpose of C.D. 75/20 was to establish procedures for evaluating information and guidelines for release decisions. It was intended that these dates would be set at an inmate's first regularly scheduled parole consideration meeting.[43]

The first section of C.D. 75/20 was administrative. It specified what information could be considered in making parole release and discharge decisions, as well as what situations would allow a postponement of decision or a denial of parole.[44] Postponement could be ordered only if the information at the hearing was incomplete. The reason for postponement had to

41.  C.D. 75/20, *supra* note 8.

42.  Prior to the decision of *In re* Rodriguez, 14 Cal. 3d 639, 537 P.2d 384, 122 Cal. Rptr. 552 (1975), a parole release date was only tentative. It could be revoked and the sentence returned to the statutory maximum for any breach of prison discipline. After *Rodriguez* the date could not be raised above the "primary term" which was a maximum proportionate to the individual's offense. *See* note 26 *supra* ; C.D. 75/30, *supra* note 8 (establishing Adult Authority procedures for setting a proportionate maximum).

43.  Such a meeting includes two Adult Authority members or hearing representatives and the inmate. The purpose is to review his file and make recommendations that will speed his release. The first scheduled meeting is six months before the inmate's minimum eligible parole release date. Adult Authority Policy Statement No. 15 [on file at SANTA CLARA L. REV.].

44.  C.D. 72/20, *supra* note 8, at § A.1.

1977] *SENATE BILL 42* 141

be noted on a standardized form in the inmate's file[45] and the Department of Corrections' staff had to be instructed to obtain the necessary information. In no situation could a case be postponed longer than ninety days.

## *C.D. 75/20 Procedures*

The body of C.D. 75/20 was concerned with the procedure to establish a parole release date—a procedure that involved a number of different steps.

*The "base offense."* The "base offense" was the most serious offense for which the inmate had been sentenced.[46] This was determined by examining the statutory minimum and maximum sentences for each offense for which the inmate had been sentenced, selecting the most severe as the "base offense," and listing that offense on the Adult Authority Parole Decision form 279. If the inmate was committed for multiple offenses, all offenses other than the base offense had to be listed as running either concurrently or consecutively with that offense.

*The typical or aggravated range.* The "base offense" was then characterized as "typical" or "aggravated" for that type of offense.[47] To do this, the facts of the crime were evaluated for their "relative seriousness" with respect to other crimes of the same type. The directive listed several factors to be considered in making this determination, including the seriousness of any personal injury to the victim of the crime, the number of victims, the degree to which the inmate was involved in inflicting such personal injury, the extent of damage to or loss of property, the professionalism with which the crime was carried out, the possession or use of weapons, and the quantities of contraband possessed or sold.

No relative weights for each of these factors were supplied, nor was there an instruction to disregard or alter factors which were integral parts of the definition of an offense. Thus, in effect, some factors were weighed twice—once as a definition of the offense and again as a factor in determining the seriousness of the offense.

*The base period of confinement.* The base period of con-

---

45. California Department of Corrections form 279 [on file at SANTA CLARA L. REV.].

46. C.D. 75/20, *supra* note 8, at § A.2.a.

47. *Id.* at § A.2.b.

finement[48] was established by referring to the table of suggested base ranges attached to the directive.[49] The base offense and the typical or aggravated character of that offense were used to determine which average sentence range would be applied to a particular prisoner. By evaluating the facts of a crime, a specific period within that range was selected as the "base period" of confinement for that inmate. The primary factor in this determination was the seriousness of the offense, apparently determined by using the same factors which allowed the offense to be characterized as typical or aggravated. If there were "unusual" factors in a particular case, the base period could be set above or below the chosen range.[50]

*Adjusting the base period.* The Adult Authority then adjusted the base period[51] for prior prison terms, concurrent or consecutive sentences, prior felony convictions plead and proven in court which had not resulted in a prison sentence, and weapons charges.[52] Periods of time were to be deducted from the base period for an individual whose minimum term had been reduced under Penal Code section 1202b, the Youthful Offender Statute.[53] The directive defined each of these "mitigating" or "aggravating" situations, defined ranges to be used to select the adjustment period for each,[54] and cautioned that the categories were mutually exclusive and that the same felony convictions should not result in two additional periods being added to the base. The directive also warned that dismissed charges were not to be considered in adjusting the base range.

This last manipulation resulted in a specific period of months. When added to the date on which the inmate was

48. *Id.* at § A.2.c.

49. For a table of suggested base ranges see app. A *infra.*

50. These factors include the individual's age; the individual's pattern of criminality (whether the individual is a professional, systematic criminal or an amateur, occasional offender); serious or major disciplinary offenses in prison; a lengthy period of incarceration prior to actual reception by the Department of Corrections, etc. C.D. 75/20, *supra* note 8, at § A.2.c.

51. *Id.* at § A.3.

52. Weapons charges include commission of a felony while armed with a deadly weapon and use of a firearm in the commission of certain specified felonies. CAL. PENAL CODE §§ 12022, 12022.5 (West 1970).

53. The Youthful Offender Statute allows the sentencing court to reduce to six months the minimum term of a defendant who was convicted of a felony, other than a felony punishable by death, committed while he was under the age of 23 years. CAL. PENAL CODE § 12026 (West 1970).

54. For a table of suggested adjustment ranges see app. A *infra.*

bilitation" to justify a resetting of his release and discharge dates. This procedure did not allow Board error to be a factor in a review of the dates. In addition, it establsihed rehabilitation as *the* criterion for change when the procedures for setting the dates initially did not even include rehabilitiation as a factor.[61]

## *Invalidation of C.D. 75/20*

The procedural inadequacies of C.D. 75/20 and the possibilities of prejudice involved therein were overshadowed by the glaring fact that the directive allowed for absolutely no consideration of rehabilitation in the original sentence setting decision. The directive marked the Adult Authority's recognition that rehabilitation was not a reasonable standard for determining sentences.

Unfortunately, the indeterminate sentence law required individual sentences to be at least partially based on consideration of factors of "individual reclamation and post-release expectations."[62] In other words, rehabilitation and the prediction of recidivism were mandatory factors to consider under the indeterminate sentence law.

In January, 1976, the California Court of Appeal for the Third District decided the case of *In re Stanley*.[63] This case invalidated C.D. 75/20 procedures on the ground that rehabilitation was not considered. Since the indeterminate sentence law required consideration of rehabilitation in term setting, and since the Adult Authority had admitted it could neither rehabilitate nor evaluate efforts at rehabilitation, *Stanley* seemed conclusively to establish that the goal of the indeterminate sentence was beyond reach.

The dilemma of indeterminate sentencing has been stated succinctly:

[I]t is time . . . that reformers of the criminal law face the fact that the feasibility of a reliable technique of individualization is crucial to the entire program of scientific and humane criminal justice. If, in fact, a reasonably

61. *Id.*

62. *In re* Stanley, 54 Cal. App. 3d 238, 248, 126 Cal. Rptr. 524, 531 (1976). The invalidation of C.D. 75/20 was predicted months before *Stanley* was decided. *See* letter from G. Murphy, California Legislative Counsel, by B. Dale, Deputy Counsel, to Sen. J. Nejedly (Mar. 18, 1975) [on file at SANTA CLARA L. REV.].

63. 54 Cal. App. 3d 238, 126 Cal. Rptr. 524.

mitigated, typical and aggravated offenses at that level of seriousness. For example, the middle level of seriousness is assigned terms of three, four and five years.[69] One offense with this degree of punishment is rape.[70] A rape conviction would normally result in a sentence for the middle term, but if the sentencing judge finds that there were mitigating or aggravating factors involved, the lowest or highest term, respectively, might be selected.[71]

The major portion of Senate Bill 42 consists of statutes defining the terms for each offense.[72] Almost all of the new sentences represent substantial reductions in sentence length from the minimum and maximum statutory terms for the same offense under the indeterminate sentence law.[73] This change to much shorter sentences was urged by proponents of the Bill for two reasons—first, California had the longest average sentences in the United States, and perhaps in the world,[74] and second, sentences over about five years in length could not be justified because there appears to be no significant "improvement" in prisoners after that period.[75]

---

69. For a table of selected offenses with determinate and indeterminate penalties see app. B *infra.*

70. CAL. PENAL CODE § 264 (West 1970). *See* 1976 Cal. Legis. Serv., ch. 1139, § 154, at 4791 (to be codified as CAL PENAL CODE § 264).

71. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170(b)). *See* notes 78-121 and accompanying text *infra* (trial court sentencing).

72. For a comparison of the penalties for various offenses see app. B *infra.*

73. Senate Bill 42 was severely criticized by Judge Bruce Allen, presiding judge in the criminal division of Santa Clara County Superior Court, primarily because of the extremely short sentences which it provides compared to those provided under the indeterminate sentence law. San Jose Post-Record, Sept. 20, 1976, at 1, col. 1. This is not necessarily accurate. Given the suggested base ranges which the Adult Authority used for sentencing prior to the passage of Senate Bill 42, the new sentences should be very close to the sentences actually served under the prior law. *Compare* app. A *with* app. B *infra.*

74. *See Transcript, supra* note 5, at 20 (remarks of Peter Sheehan, American Civil Liberties Union, San Francisco); MITFORD, *supra* note 5, at 86. Mitford commented that "[u]nder cover of the indeterminate sentence, the median term served by California's 'felony first releases' had risen from 24 months in 1960 to 36 months in 1970, highest in the nation and probably the world." *Id.*

75. To urge that sentences be reduced because rehabilitation is ineffective for prisoners confined more than five years doesn't seem very persuasive since the basis of S.B. 42 was punishment, not rehabilitation. It is likely, given the fact that Senate Bill 42 seeks to establish sentences that are similar to those served for similar crimes in other jurisdictions, that the first rationale urged for shorter sentences (that California's sentences were substantially longer than those in other jurisdictions) was given much more weight by the legislature than the rehabilitation rationale.

The American Bar Association has noted that "[t]here is general agreement among most who have recently studied the pattern of sentencing in this country that

no more than *one* of these enhancements shall apply to the sentence for any single offense. Here again, Senate Bill 42 very clearly seeks to avoid double or excessive punishment as well as to clarify the application of these enhancement provisions. The indeterminate sentence law did not contain similar rules of application and, as a result, sentences varied widely because enhancement provisions were applied differently.

Enhancement for prior terms and consecutive sentences is limited to five years[81] and the total term of imprisonment is limited to twice the number of years imposed as the "base· term,"[82] unless the defendant is convicted of a violent felony,[83] being armed with a deadly weapon, the use of a firearm, or the infliction of great bodily harm.[84] If the conviction falls into one of these exceptions, it appears that there is no limit on the total term of imprisonment except for the limitation provided by the number of enhancements which can be imposed by law.

## *Sentencing Procedure*

*Trial court sentencing.* Section 1170 (a)(2) provides the basic outline of sentencing procedure.[84] The trial court is required to sentence an individual convicted of an offense to one of the three specified terms unless the defendant is given some other disposition provided by law.[86] At all times the court must consider the sentencing rules prescribed by the Judicial Council as authorized in section 1170.3,[87] and it is required to impose appropriate enhancements unless it finds mitigating circumstances.[88]

---

81. *Id.* § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1 (a(e)).

82. The base term is the unenhanced term selected by the trial judge from among the three choices for any determinate offense.

83. 1976 Cal. Legis. Serv., ch. 1139, § 268, at 4817 (to be codified as CAL. PENAL CODE § 667.5(c)) (definition of violent felonies).

84. *Id.* at 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1a(f)).

85. *Id.* at 4818 (to be codified as CAL. PENAL CODE § 1170(a)(2)).

86. Other dispositions include a fine, jail, probation or the suspension or imposition or execution of sentence. *Id.*

87. *Id.* at 4822 (to be codified as CAL. PENAL CODE § 1170.3). The rules, which the Judicial Council is required to develop, are to be designed to promote uniformity. They must provide guidance for the court's decision to:

(a) Grant or deny probation.

(b) Impose the lower or upper prison term.

(c) Impose concurrent or consecutive sentences.

(d) Consider an additional sentence for prior prison terms.

(e) Impose an additional sentence for being armed with a deadly weapon, using a firearm, an excessive taking or damage [to property], or the infliction of great bodily injury.

88. Additional punishment due to aggravating circumstances can be avoided by

When sentencing for an offense having three specified terms, the court must order the middle of the three possible terms, unless circumstances in mitigation or aggravation, of the crime are presented by motion and found to be true at a hearing on that motion.[89] A warning is given that no facts used to enhance a sentence, such as prior prison terms for violent crimes,[90] consecutive sentences,[91] or use of a firearm,[92] shall justify imposition of the aggravated (or upper) term, and that no fact should be used twice to determine, aggravate or enhance a sentence. This warning is a substantial change from the procedures under the indeterminate sentence law where the facts which define an offense could also be considered as aggravating circumstances as well as conditions for enhancement.[93]

---

establishing circumstances in mitigation of the punishment. 1976 Cal. Legis. Serv., ch. 1139, §§ 304-06, at 4835 (to be codified as CAL. PENAL CODE §§ 12022, 12022.5, 12022.6, 12022.7).

Penal Code section 12022.6 provides a punishment enhancement for excessive taking of or damage to property

where the elements of the offense involve [the] criminal taking of funds or property from or property damage to any individual, organization, group or the community in general and [the offense does] not specify a minimum value of the taking or damage, or [specifies] a minimum of less than $100,000.

This enhancement has two levels depending on the magnitude of the taking or damage. For a taking or damage greater than $100,000 but less than $500,000, the enhancement is for an additional term equal to one-half of the base term selected by the judge. If the taking or damage is equal to or greater than $500,000 then the enhancement is for a term equal to the base term selected by the judge. This new section represents a recognition by the legislature that a serious property crime can be as damaging to individuals and the community as a violent crime involving bodily harm or a threat of bodily harm.

89. 1976 Cal. Legis. Serv., ch. 1139, § 173, at 4819 (to be codified as CAL. PENAL CODE § 1170(b)).

90. *Id.* § 268, at 4816 (to be codified as CAL. PENAL CODE § 667.5). New Penal Code section 667.5(a) provides enhancement only if the commitment offense is one of several defined "violent felonies" or a felony in which great bodily injury to a person other than the defendant or his accomplices has been pled and proven *and* the prior separate prison term also involved a "violent felony." The enhancement imposed is an additional three year term for each such prior felony unless the felon was free of prison custody and felony conviction for ten years immediately preceding the filing of the present felony conviction. In this section the legislature specifically declares that these "violent felonies" merit special consideration when imposing a sentence to display society's condemnation for such extraordinary crimes of violence against the person.

Section 667.5(b) provides for one year enhancement for other prior prison terms for any felony.

91. *Id.* § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170.1a).

92. *Id.* § 305, at 4836 (to be codified as CAL. PENAL CODE § 12022.5).

93. *See* notes 41-61 and accompanying text *supra* (discussion of C.D. 75/20 procedures).

Whenever a mitigated or aggravated term is selected, the facts relied upon must be set forth on the record. In fact, the record must include all facts supporting the choice of sentence, whether the mitigated, typical or aggravated term is chosen. This requirement provides a more complete record, thereby aiding appellate review of sentencing decisions.

A provision for resentencing within one hundred and twenty days of commitment is retained from the prior law.[94] There are no significant changes in this provision, except for the proviso that the trial judge in resentencing should apply the rules and information provided by the Judicial Council regarding sentences of other prisoners convicted of similar crimes.

To promote uniformity of sentencing, the Community Release Board, which is the successor to the Adult Authority and the California Women's Board of Terms and Paroles,[95] must review all sentences within one year after commencement of the terms thereof and recommend recall of the present sentence and resentencing of the defendant if a sentence is found to be disparate.[96]

The California Judicial Council[97] has the responsibility for establishing rules and procedures designed to foster the aims of determinate sentencing—uniformity of sentencing and sentencing proportionate to the seriousness of the offense committed.[98] Accordingly, it is directed to establish criteria to aid the

---

94. *Compare* 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170(c)) *with* CAL. PENAL CODE § 1168 (West 1970).

95. The composition of Community Release Board is similar to that of the Adult Authority. The Board includes nine members, each serving a four year term. 1976 Cal. Legis. Serv., ch. 1139, § 294, at 4832 (to be codified as CAL. PENAL CODE § 5075). Board membership is required to reflect "as nearly as possible a cross-section of the racial, sexual, economic and geographic features or the population of the state." *Id.* The Board is responsible for reviewing all prisoner's requests for reconsideration of denial of good time credit, and for setting parole length and conditions. In addition, it has the authority to modify decisions of the Department of Corrections in these matters. *Id.* § 297, at 4833 (to be codified as CAL. PENAL CODE § 5077). In contrast to the Adult Authority, the Community Release Board is authorized to do business in panels of three rather than two. *Compare id.* § 296, at 4833 (to be codified as CAL. PENAL CODE § 5076.1) *with* CAL. PENAL CODE § 5076.1 (West Supp. 1976). Since panels will probably be conducted in groups of the lowest allowable number, the addition of one member to the panel will prevent deadlocks.

96. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1b). This is another one of many provisions in the Bill designed to promote uniformity of sentence.

97. The Judicial Council is established by the California Constitution. CAL. CONST. art. VI, § 6.

98. *See* 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4822 (to be codified as CAL. PENAL CODE § 1170.3 *et seq.)* (defining the duties of the Judicial Council under the Bill).

trial judge in his sentencing decisions,[99] to collect, analyze and distribute information on sentencing in California and other jurisdictions;[100] to conduct annual sentencing institutes;[101] and to review present sentencing statutes and procedures and recommend changes to the legislature.[102] The main objectives of the Council in this review are to strive to maintain sentences proportionate to the seriousness of the offense, and to assure that California lawmakers remain abreast of current sentencing trends by comparing sentences in other jurisdictions and sentencing procedures recommended by national commissions and other learned bodies.[103]

*Multiple convictions.* Multiple convictions under Senate Bill 42 are dealt with by a formula.[104] The aggregate term for all convictions is the greatest term imposed for any *one* of the offenses for which the individual is convicted, including any enhancement imposed for that offense, *plus* one-third of the middle term of imprisonment for each other felony conviction for which a consecutive sentence was imposed without any enhancement for those additional offenses.[105]

Since no mention is made of concurrent sentences, it may be presumed, from the failure to provide an aggravating term for those sentences, that the terms are in fact to run concurrently. This is a distinct change from prior Adult Authority policy which added time to the "base term" for concurrent as well as consecutive sentences.[106] The Adult Authority procedures considered additional convictions in establishing the seriousness of a commitment. They also added time to that sentence as a penalty for sentences whose terms were, by definition to run at the same time as the commitment offense. Senate Bill 42 clarifies the roles of concurrent and consecutive sentences by allowing an extension of the sentence only in the case of convic-

---

99. *See* note 87 *supra.*

100. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4822 (to be codified as CAL. PENAL CODE § 1170.4).

101. *Id.* (to be codified as CAL. PENAL CODE § 1170.5).

102. *Id.* (to be codified as CAL. PENAL CODE § 1170.6).

103. *Id.* (listing of considerations).

104. *Id.* at 4819 (to be codified as CAL. PENAL CODE § 1170.1a).

105. For example, a conviction for robbery with proof of great bodily harm and an additional conviction for first degree burglary to run consecutively might be treated as follows: 3 years (the middle term for robbery) plus 3 years (the enhancement for great bodily harm, plus 1 year (one third of the middle term for burglary), for a total sentence of seven years.

106. C.D. 75/20, *supra* note 8, at § A.3.b. *See* notes 51-54 and accompanying text *supra.*

tions intended to be served consecutively.

When an individual is convicted of a felony committed while in prison, and his sentence is to run consecutively with his present prison term, his term is calculated in the same manner as for multiple convictions.[107] His term is the remainder of time to be served on the original offense(s) plus the greatest term imposed for any felony committed while serving the original term plus one-third of the middle term for each other felony conviction.

*Sentences imposed prior to Senate Bill 42.* All inmates sentenced before the effective date of Senate Bill 42, who would have been sentenced to a determinate term under the applicable provisions of the new bill, will have their terms recalculated by the Community Release Board. This will be done by utilizing the middle term of the most serious offense for which the prisoner was convicted, aggregated by any additional terms imposed at the time of sentencing.[108] If this calculation results in a term which would end before the parole release date already set by the Adult Authority,[109] then the inmate's parole date must be reset at the shorter term. Resetting is mandatory unless a majority of the Community Release Board determines that a longer term is warranted due to the number of present or prior convictions, or due to the presence of facts justifying an *arming, use* or *great bodily harm* enhancement.

When a longer term is believed justified, the prisoner is entitled to a hearing at which he may be represented by counsel and in which the setting of his term and parole date will be reviewed.[110] All inmates who have not had a parole date set by the Adult Authority prior to the effective date of Senate Bill 42 shall have their terms calculated and parole dates set in the same manner as that described above.[111] They also are entitled to a review hearing if the Board decides that they should serve a longer sentence than that calculated.

Inmates sentenced prior to the effective date of Senate Bill 42 who still have indeterminate sentences under the Bill will have their release dates set by the Community Release Board

---

107. 1976 Cal. Legis. Serv., ch. 1139, § 273, at 4820 (to be codified as CAL. PENAL CODE § 1170.1a(b)).

108. *Id.* at 4821 (to be codified as CAL. PENAL CODE § 1170.2(a)).

109. *See* notes 41-61 and accompanying text *supra* (C.D. 75/20, Adult Authority procedures for setting parole release dates).

110. The procedural guidelines for such a review are established by 1976 Cal. Legis. Serv., ch. 1139, § 281.8, at 4827 (to be codified as CAL. PENAL CODE § 3041.5).

111. *Id.* § 273, at 4821 (to be codified as CAL. PENAL CODE § 1170.2(c)).

in the manner established by prior law.[112] Nothing in Senate
Bill 42 will require an inmate, sentenced before the effective
date of the Bill, to remain in prison longer than he would have
been kept in custody under the indeterminate sentence law.
Though the indeterminate sentence law is retained only in a
few provisions, mainly those providing terms of life imprison-
ment,[113] its procedure will continue to be relevant in setting
the terms of prisoners sentenced before the passage of Senate
Bill 42.

## *Good Time Credit*

The second major procedural section of Senate Bill 42
deals with provisions for granting "good time" credit for time
served in prison.[114] Every prisoner with a determinate term
must be advised within fourteen days of the commencement of
his term of all applicable prison rules and available institu-
tional programs, including the possibility of receiving a reduc-
tion of up to one-third of his sentence for good time and partici-
pation.[115] All prisoners sentenced prior to the effective date of
Senate Bill 42 who will have determinate sentences must be
advised of the rules and programs within ninety days of the
Bill's effective date.[116] In all cases, the inmate's file must reflect
compliance with this provision.

At the time the prisoner is informed of the availability of
"good time," he must be shown a document, which both he and
a Department of Corrections official will sign, which outlines
the conditions for obtaining good time credit.[117] These condi-
tions may be modified by the mutual consent of the Depart-
ment and the prisoner, by transfer of the inmate to another
institution, or by the Department's determination of the pris-
oner's lack of adaptability and success in a specific program or
assignment. If lack of adaptability is claimed, the inmate is
entitled to a hearing on that decision.[118]

---

112. *Id.* at 4822 (to be codified as CAL. PENAL CODE § 1170.2(e)).

113. *See, e.g., id.* § 271, at 4818 (to be codified as CAL. PENAL CODE § 1168).

114. *Id.* § 276, at 4823 (to be codified as CAL. PENAL CODE §§ 2930-32). Good time
credits apply to all prisoners. *Id.* § 273, at 4822 (to be codified as CAL. PENAL CODE §
1170.2(d)). However, prisoners sentenced prior to the effective date of the bill can
receive credit only from the effective date of the bill. *Id.*

115. *Id.* § 276, at 4823 (to be codified as CAL. PENAL CODE § 2930(a)).

116. *Id.* (to be codified s CAL. PENAL CODE § 2930(b)).

117. *Id.* (to be codified as CAL. PENAL CODE § 2931(a)).

118. *Id.* at 4824 (to be codified as CAL. PENAL CODE § 2931(a)(3)).

The documentation requirement in this section is un doubtedly an effort to avoid the criticism that was directed at the Adult Authority that each time a prisoner appeared before the Board he was told to do something different in order to obtain an early release.[119] Although the Department can unilaterally change the credit requirements for lack of adapta bility, the hearing requirement should prevent abuses.

The maximum possible good time credit will result in a four month reduction in sentence for every eight monthy served.[120] Three months of each four month reduction are based upon forebearance from illegal activities or prison disciplinary infractions. These forbidden activities range from assault with a weapon and escape to manufacture or sale of intoxicants. Penalties for participation in these activities range from a forty-five day reduction in credit for the most serious to a fif teen day reduction for the least serious.

In any case the Department may seek a criminal prosecu tion for violations of law. If the prisoner is prosecuted, he may not be denied credit if found not guilty and he may be denied credit at the specified rates if found guilty.[121] One month of good time credit can be awarded for participation in prison activities.[122] Success in the activity is not required for credit, if a reasonable effort is made. However, failure to participate, unless confined by choice or due to behavior problems, will result in a maximum loss of thirty days credit for every eight month period actually served.

The Bill's credit provisions provide some incentive to pris oners to better themselves and to reduce their sentences by not committing additional crimes in prison.[123] Even if the inmate

119. *See Transcript, supra* note 5.

120. 1976 Cal. Legis. Serv., ch. 1139, § 276, at 4824 (to be codified as CAL. PENAL CODE § 2931(b)).

121. *Id.* at 4825 (to be codified as CAL. PENAL CODE § 2932 (d)).

122. *Id.* at 4824 (to be codified as CAL. PENAL CODE § 2931(c)).

123. Almost all prohibited activities are at least misdemeanors. The activities prohibited by the bill and their penalties are as follows:

(1) Assault with a weapon; or escape.

(2) Physically assaultive behavior; possession of a weapon without per mission; attempt to escape; or urging others, with the intent to cause a riot, to commit acts of force or violence, at a time and place under circum stances which produce a clear and present and immediate danger of a riot which results in acts of force or violence.

(3) Intentional destruction of state property valued in excess of fifty dollars ($50); falsification of a significant record or document; possession of escape tools without permission; or manufacture or sale of intoxicants. Activities specified in paragraph (1) may result in a maximum denial of

refuses to participate in prison activities and does all the forbidden activities, nothing except another felony conviction will lengthen his term.[124]

Denial of good time credit is possible only if certain time limitations and procedures are observed.[125] First, credit can be denied only within the eight month credit review period in which the misbehavior takes place. Second, the Department must follow a strict timetable for notifying the inmate of its intent to deny credit and for proceeding with the denial hearing. The Department must also meet specific notice requirements.[126] Third, the inmate must be granted certain procedural assistance and safeguards, including the right to request the attendance of witnesses and to question all witnesses at the hearing and the right to assistance by Department employees in gathering facts and presenting the prisoner's defense.[127] Finally, the inmate must be notified within ten days of the hearing of the results and reasons therefor, and he must be granted not only Department, but also Community Release Board review upon request.[128]

Although the inmate does not have the full panoply of procedural safeguards, substantial safeguards are provided, and the proceeding to deny credit can not result in additional criminal penalties to the inmate.[129]

---

good behavior credit of 45 days for each such prohibited activity. Activities specified in paragraph (2) may result in a maximum denial of good behavior credit of 30 days for each such prohibited activity. Activities specified in paragraph (3) may result in a maximum denial of good behavior credit of 15 days for each such prohibited activity. Nothing in this section shall prevent the Department of Corrections from seeking criminal prosecution for violations of law.

*Id.* (to be codified as CAL. PENAL CODE § 2931(b)).

124. Such a system seems the best way to encourage efforts at "rehabilitation," even if they have no actual beneficial effect, without getting enmeshed in measuring rehabilitation. Also, the provisions of the Bill do not completely shut the door on rehabilitation. In the future if rehabilitation becomes understood, its effects can be built into the sentencing system.

125. 1976 Cal. Legis. Serv., ch. 1139, § 276, at 4824 (to be codified as CAL. PENAL CODE § 2932).

126. *Id.* (to be codified as CAL. PENAL CODE § 2932(a)(1)).

127. *Id.* at 4825 (to be codified as CAL. PENAL CODE § 2932(a)(2)-(6)).

128. *Id.* (to be codified as CAL. PENAL CODE § 2932(a)(7)).

129. It is possible that an inmate's right to credit could be considered so closely related to his liberty that even more procedural safeguards may be necessary to meet the requirements of due process. *See, e.g.,* CAL. CONST. art. I, §§ 14-15 (specific constitutional due process protections for criminal trials). Since a person's freedom is restricted by a denial of good time almost as much as it is by a criminal conviction, full criminal trial protections may be required. However, since the procedures provided for

Every eight months the Department must recompute prison time to be served on the basis of good time earned and must notify each prisoner of his new release date. If credit denial proceedings or criminal prosecutions prevent release of a prisoner who otherwise would have been released, and he is subsequently found not guilty, the time spent incarcerated beyond the scheduled release date will be deducted from the prisoner's parole period.[130]

There were no good time provisions in the indeterminate sentence law. Each sentence could vary anywhere within the statutory minimum and maximum bounds. Procedural safeguards were not provided by law and were developed only on a case by case basis.[131]

Although the new determinate sentence law will probably be challenged in the courts on many procedural grounds, the safeguards that are built into the law will prevent serious abuses before the procedures can be tested. Moreover, the substantial documentation requirements will make review of any case much more complete and accurate.

## Parole

The last major procedural section of Senate Bill 42 deals with parole.[132] Parole is a required period of Department of Corrections supervision of an inmate after he is released from prison.[133] For all inmates serving determinate sentences and

---

the Bill are already quite detailed and protective of a prisoner's rights, additional safeguards should be imposed only if the courts find present procedures do not adequately protect those rights.

130. *See* notes 133-43 and accompanying text *infra* (explanation of parole procedure under the Bill).

131. The protections that were developed in the courts were often limited to very narrow facts, leaving other areas unprotected until the appropriate case reached the courts. For example, parole revocation and parole rescission procedures both involved the withdrawing of liberty, but due process procedures were extended to one proceeding long before they were extended to the other. Gee v. Brown, 14 Cal. 3d 571, 534 P.2d 716, 120 Cal. Rptr. 876 (1975); *In re* Prewith, 8 Cal. 3d 470, 503 P.2d 1326, 105 Cal. Rptr. 318 (1972). Also, the documentation required by Adult Authority procedures was inadequate, often limiting review to only the most glaring cases of abuse.

132. 1976 Cal. Legis. Serv., ch. 1139, § 278 *et seq.*, at 4826 (to be codified as CAL. PENAL CODE §§ 3000-65).

133. To anyone familiar with present concepts of parole, the parole period provided by the Bill looks like an additional period of supervision, and possibly of incarceration if parole is revoked, after an individual's determinate sentence has been served. Such an additional penalty could present constitutional due process problems if viewed as an additional period of supervision and control without a trial and a conviction. However, since all determinate sentences have a one year parole provision

those serving indeterminate sentences less than life imprisonment, parole will be a period up to one year. Prisoners serving indeterminate sentences with a life maximum will serve a parole period up to three years. This parole can be waived by the Community Release Board for good cause, and the inmate can be released from custody immediately.

Major provisions of the Bill include specific guidelines for every decision which must be made and procedural safeguards to assure that each individual is treated fairly and equally and has a right to some form of review.[134] The primary exception is the parole waiver decision; no definition of good cause or factors to be considered are provided, nor is any procedure set up for making and reviewing that decision.[135] The absence of guidelines for this decision allows for disparity in its application and will certainly lead to litigation even if the Community Release Board adopts procedures paralleling other notice and hearing procedures in the Bill.[136] The legislature should remedy this defect by providing standards for making the parole waiver decision, by requiring documentation of the reasons for the decision, and by providing a review procedure.

The remainder of the parole provisions deal with the parole release decisions for inmates still serving indeterminate sentences under Senate Bill 42. Within the first year of incarceration of such an inmate, a Community Release Board panel[137] must meet with the inmate to review his file and make recommendations.[138] Presumably these recommendations will deal with the activities the inmate should engage in to assure

---

and since the defendant is warned at the sentencing hearing of the parole requirement (*id.* § 273, at 4819 (to be codified as CAL. PENAL CODE § 1170.1)), each term should be viewed as the determinate sentence plus one year of parole. Since the parole period cannot exceed the one year maximum (*id.* § 278, at 4826 (to be codified as CAL. PENAL CODE § 3000(d)), even if there is a subsequent conviction for a felony committed while on parole, courts will probably interpret this period simply as part of each sentence, thereby avoiding due process problems.

134. *See, e.g., id.* § 281.8, at 4827 (to be codified as CAL. PENAL CODE § 3041.5) (procedural requirements for hearings to review parole eligibility or the setting, postponing or rescinding of parole dates or the evaluation of a prisoner's appeal of good time denial).

135. *See id.* § 278, at 4826 (to be codified as CAL. PENAL CODE § 3000).

136. *See* note 130 *supra.* Some cases have already held that parole is a substantial liberty. *See, e.g.,* Gagnon v. Scarpelli, 411 U.S. 778 (1973); Preston v. Piggman, 496 F.2d 270 (1974). If parole is a substantial liberty requiring due process protections, surely the right to be free without parole is an even greater liberty entitled to at least as much protection.

137. 1976 Cal. Legis. Serv., ch. 1139, § 296, at 4833 (to be codified as CAL. PENAL CODE § 5076.1) (provides for doing business in panels).

138. *Id.* § 281, at 4827 (to be codified as CAL. PENAL CODE § 3041(a)).

early release, similar to the conditions for granting good time credit for a prisoner with a determinate sentence.[139]

One year prior to the inmate's minimum eligible parole release date,[140] a Community Release Board panel will meet with the inmate and will set his parole release date. These dates must be set in a manner that will provide uniform sentences for similar offenses.[141] The Judicial Council is authorized to provide rules for the Board which will help promote uniformity.

Subdivision (b) of section 3041 gives the Community Release Board authority to consider the protection of society by refusing to set a parole release date if public safety so requires. That subdivision makes reference to the "timing" of current or past offenses as a factor which makes a more lengthy period of incarceration necessary. Timing is not defined.[142]

## CONCLUSIONS

Senate Bill 42 eliminates most of the problems of the indeterminate sentence while creating few of its own. It clearly defines the purpose of sentencing and imposes numerous requirements to assure that that purpose is met. Although the resulting sentences can be questioned as too short for the adequate protection of society,[143] the scheme of varied levels of

---

139. *See* notes 118-20 and accompanying text *supra.* For the information of the Community Release Board and the protection of the inmate, these recommendations should be carefully documented and included in the inmate's file. Though these recommendations will be more easily modified than conditions for granting good time credit because of the indeterminate features of the inmate's term, careful documentation will prevent the Board from making contradictory recommendations each time it meets with the inmate and will allow the inmate to question changes in recommendations.

140. *See* notes 41-42 and accompanying text *supra* (definition of parole release date).

141. Uniformity was not a primary goal of the indeterminate sentence procedures. *See* C.D. 75/20, *supra* note 8.

142. The only interpretation this author can imagine for the use of that word is that the Community Release Board may consider whether there has been a rash of crimes similar to the inmate's immediately prior to his release and whether the public outcry at the release of such a prisoner would be too great to allow release. It does not seem rational to postpone an individual's release because of the crimes of others. If this interpretation of timing is correct, its use is certainly subject to challenge on due process grounds.

143. Such a decision is purely a policy decision and should be made by the legislature and not an administrative board. Under the indeterminate sentence system this decision was made on a case-by-case basis and the result was disparity. The Adult Authority's approach to the protection of society was expressed in a policy statement:

> Felons committed to prison should be kept until there is reasonable cause
> to believe they can lead crime-free lives in society. Doubt should be

seriousness and proportionate levels of sentencing is consistent with the punishment rationale. If additional punishment or greater protection of society is deemed necessary, individual sentences or the entire system can be skewed upward by adding years or months to the sentences without increasing the disparity of the system or upsetting the goal of proportionality.

Determinate sentencing, when combined with the goal of uniformity in sentencing crimes of similar gravity, eliminates the disparity of sentences under an indeterminate sentencing system. Merely having punishment as a purpose, a goal which can be achieved, goes a long way toward improving the sentencing system. The procedural safeguards of careful documentation, and adequate notice, hearing and review for every major decision involving the inmate, erase the additional problems of arbitrariness and insulation from review with which the indeterminate sentencing system was plagued. Finally, this determinate sentencing system provides short enough sentences so that even a supposedly rehabilitated individual who cannot be detected need not serve very long.

The frustration of the indeterminate sentence system has been eloquently expressed by Judge Marvin Frankel:

> The sentence purportedly tailored to the cherished needs of the individual turns out to be a crude order for simple warehousing. . . .
>
> . . . In a host of cases, then, when somebody says a prisoner must stay locked up because he is not "ready" for release, the ultimate Kafkaism is the lack of any definition of "ready."[144]

With a determinate sentencing system that frustration should be at an end.

*Paula A. Johnson*

---

resolved in favor of public protection. Prisoners who make a career of criminal behavior forfeit their right to be treated leniently.

. . . .

Violent, dangerous criminals and those who make a career of stealing other persons' property will be confined until there is adequate assurance they have been reformed.

Adult Authority Policy Statement No. 24 [on file at Santa Clara L. Rev.].

144. Frankel, *supra* note 5, at 93.

*Appendix A*

SUGGESTED BASE RANGES FOR SENTENCES*

| Offense | Typical (in months) | Aggravated (in months) |
|---|---|---|
| Murder 1st | 96-156 | |
| Murder 2nd | 42-66 | |
| Manslaughter | | |
|   Voluntary | 36-46 | |
|   Involuntary | 24-32 | |
|   Vehicle | 18-24 | |
| Robbery 1st | 30-38 | 36-44 |
| Robbery 2nd | 22-30 | 28-36 |
| Arson | 18-30 | 30-42 |
| Assault | 24-32 | 30-38 |
| Burglary 1st | 24-30 | 28-34 |
| Burglary 2nd | 16-22 | 20-29 |
| Theft | 16-22 | 20-28 |
| Grand theft | 22-28 | 26-34 |
| Sexual crimes | 30-60 | |
| Unlawful sexual intercourse | 12-30 | |
| Controlled substances (heroin; opium and its derivatives; hallucinogens) | | |
|   Possession | 26-36 | |
|   Possession for sale | 34-42 | |
|   Sale | 38-48 | |
| Controlled substances (marijuana and dangerous drugs) | | |
|   Possession | 18-32 | |
|   Possession for sale | 28-38 | |
|   Sale | 36-44 | |
| Bribery | 12-24 | |
| Prisoner with weapon | 9-18 | 18-36 |
| Escape | 6-18 | 16-22 |
| Ex-felon in possession | | |
|   weapon | 9-18 | 18-30 |
|   Sale or mfg. weapon | 9-18 | 18-36 |
| Parole violation | 0-9 | 9-18 |

SUGGESTED ADJUSTMENT RANGES*

| Prior Prison Terms | Sentencing Status | Subsequent Offenses |
|---|---|---|
| Less serious (each) + (3-9) mos. | Youthful Offender − (6-18) mos. | Court convictions (each) + (12-24) mos. |
| More serious (each) + (9-24) mos. | Concurrent sentence (each) + (3-12) mos. | Disciplinary Less serious + (3-9) mos. |
| | Consecutive sentence (each) + (12-24) mos. | More serious + (9-18) mos. |
| | Prior felony convictions pled and proven (each) + (0-9) mos. | |

*Derived from tables in C.D. 75/20, *supra* note 8.

*Appendix B*

COMPARATIVE SENTENCES FOR SELECTED OFFENSES UNDER S.B. 42
AND INDETERMINATE SENTENCING SYSTEMS

| Penalty Under S.B. 42 | Offense | Penalty Under Indeterminate Sentencing |
|---|---|---|
| 16 months, 2 years or 3 years | Accessory | 6 months to 5 years |
| | Misprison of treason | 6 months to 5 years |
| | Threatening public official to deter from duties | 6 months to 5 years |
| | Defrauding government | 6 months to 5 years |
| | Corrupt influencing of jurors | 6 months to 5 years |
| | Escape from reformatory | 6 months to 10 years |
| | False report of secretion of explosive | 6 months to 3 years |
| | Assault by public officer | 6 months to 5 years |
| | Assault with attempt to commit felony except murder | 6 months to 15 years |
| | Child/wife beating | 6 months to 10 years |
| | Bigamy | 6 months to 10 years |
| | Indecent exposure, 2d conviction | 1 year to life |
| | Burglary 2d | 1 year to 15 years |
| | Forgery | 1 year to 14 years |
| | Receiving stolen property | 6 months to 10 years |
| | Wiretapping | 6 months to 3 years |
| 2, 3 or 4 years | Bribing executive officer | 1 year to 14 years |
| | Perjury | 1 year to 14 years |
| | Manslaughter | 6 months to 15 years |
| | Mayhem | 6 months to 14 years |
| | Robbery 1st | 5 years to life |
| | Robbery 2nd | 1 year to life |
| | Poisoning with intent to kill | 10 years to life |
| | Assault with intent to murder | 1 year to 14 years |
| | Assault with intent to commit rape, sodomy, mayhem, robbery, grand larceny | 1 year to 20 years |
| | Dueling resulting in death | 1 year to 7 years |
| | Battery with serious bodily injury | 6 months to 5 years |
| | Assault with caustic chemical | 1 year to 14 years |
| | Assault with deadly weapon | 6 months to life |
| | Pimping | 1 year to 10 years |
| | Child stealing | 6 months to 20 years |
| | Sodomy with force | 6 months to 5 years |
| | Lynching | 6 months to 20 years |
| | Arson, not dwelling house | 2 years to 20 years |
| | Burglary 1st | 5 years to life |
| | Counterfeiting | 1 year to 14 years |
| | Grand theft | 6 months to 10 years |
| | Extortion | 1 year to 10 years |

| | | |
|---|---|---|
| 3, 4 or 5 years | Kidnapping | 1 year to 25 years |
| | Robbery of transportation operator | 5 years to life |
| | Attempt to kill President | 10 years to life |
| | Assault with a deadly weapon on a peace officer | 6 months to 15 years |
| | Rape | 3 years to life |
| | Sodomy against will of victim | 5 years to life |
| | Child molesting | 1 year to life |
| | Arson during emergency | 5 years to life |
| | Burglary with explosive | 10 years to 40 years |
| | Prisoner holding hostage in prison | 5 years to life |
| 5, 6 or 7 years | Murder 2d | 5 years to life |
| | Rape with force or violence | 5 years to life |
| life imprisonment—no special circumstances | Murder 1st | life, special circumstances |
| | Kidnapping resulting in death of victim | capital punishment |
| | | life with or without possibility of parole |

The pu
tal right to
participatio
that right m
work of equ
ment will ex
dimensions
equal prote(
suggest a th
flexible and

*The Two Tie*

The Cou
apply to a le
mum scrutin
Court that t
"fundament
struck down,
test. Otherwi
test which r
some legitim
lative schem
Under t

1. The Cou
constitutionally p
to participate in
State has adopted
of the state's popu
1, 35 n.78 (1973).
The Court's
does not review r
ment will use the
to express the Co
2. Mr. Just
fourteenth amen(
fundamental rig
voided only if it
under the due pr
381 U.S. 479, 500

APPENDIX II

APPENDIX II

PELICAN BAY
G.P. UNIT B-7

APPENDIX II

APPENDIX II

APPENDIX II

APPENDIX II

# SACRAMENTO POLICE DEPARTMENT
## DIAGRAM AND PHYSICAL EVIDENCE SHEET

REPORT NUMBER
02-10546

CLASS. 245 PC

IM VUE, FONG                    LOCATION 3212 WESTERN AV

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = N/A )

## DIAGRAM 6
### LOCATION OF EVIDENCE ITEMS #1 THRU #20





3212

3210

3208

3206

GARAGE

TRASH CAN
GATE


PELICAN BAY
G.P. UNIT B-7

W E S T E R N   A V

S I D E W A L K

### LEGEND

1) CLOTHING WITH POSSIBLE BLOOD
2) POSSIBLE BLOOD SAMPLE
3) SHOTGUN PELLETS IN THE GARAGE DOOR (NOT MEASURED)
4) WAD FROM EXPENDED SHOTGUN SHELL (UNDER VEHICLE)
5) POSSIBLE BLOOD SAMPLE FROM CORNER OF VEHICLE (NOT MEASURED)
6) PLASTIC SODA BOTTLE ON TOP OF VEHICLE (NOT MEASURED)
7) CLOTHING
8) KNIT HAT
9) WAD FROM EXPENDED SHOTGUN SHELL
10) SHOTGUN PELLETS ON THE GARAGE FLOOR (NOT MEASURED)
11) POSSIBLE BLOOD SAMPLE
12) LATEX GLOVES WITH POSSIBLE BLOOD (IN TRASH CAN)
13) JACKET WITH POSSIBLE BLOOD
14) FLASHLIGHT
15) POSSIBLE BLOOD SAMPLE
16) COPPER COLORED EXPENDED BULLET JACKET FRAGMENT
17) PAPER TOWEL WITH POSSIBLE BLOOD
18) POSSIBLE BLOOD SAMPLE
19) COPPER COLORED EXPENDED BULLET
20) PIECE OF GLASS (UNDER THE BOAT/TRAILER)

| | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
|---|---|---|---|---|---|---|
| PREPARED BY  JO, | 6382 | CSI | 97 | 3 | 02/04/02 | |
| ASSISTING OFFICER  V CIARNELLI | 6374 | CSI | 97 | 1 | 02/04/02 | |
| RECEIVED BY | | | | | | |

SACRAMENTO POLICE DEPARTMENT
# DIAGRAM AND PHYSICAL EVIDENCE SHEET

REPORT NUMBER
02-10546

CLASS. 245 PC

CTIM   VUE, FONG          LOCATION  3212 WESTERN AV

ALL MEASUREMENTS ARE APPROXIMATE AND NOT TO SCALE UNLESS STATED (SCALE = N/A  )

DIAGRAM 7

MEASUREMENTS
OF EVIDENCE ITEMS
#1 THRU #13 AND #19,#20
SOUTH OF THE NORTH
LAMP POST



LEGEND

1) CLOTHING WITH POSSIBLE BLOOD
2) POSSIBLE BLOOD SAMPLE
3) SHOTGUN PELLETS IN THE GARAGE DOOR (NOT MEASURED)
4) WAD FROM EXPENDED SHOTGUN SHELL (UNDER VEHICLE)
5) POSSIBLE BLOOD SAMPLE FROM CORNER OF VEHICLE (NOT MEASURED)
6) PLASTIC SODA BOTTLE ON TOP OF VEHICLE (NOT MEASURED)
7) CLOTHING
8) KNIT HAT
9) WAD FROM EXPENDED SHOTGUN SHELL
10) SHOTGUN PELLETS ON THE GARAGE FLOOR (NOT MEASURED)
11) POSSIBLE BLOOD SAMPLE
12) LATEX GLOVES WITH POSSIBLE BLOOD (IN TRASH CAN)
13) JACKET WITH POSSIBLE BLOOD
19) COPPER COLORED EXPENDED BULLET
20) PIECE OF GLASS (UNDER THE BOAT/TRAILER)

| PREPARED BY | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
|---|---|---|---|---|---|---|
| WOO | 6382 | CSI | 97 | 3 | 02/04/02 | |
| ISTING OFFICER | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| V. CIARNELLI | 6374 | CSI | 97 | 1 | 02/04/02 | |
| RECEIVED BY | BADGE # | UNIT | DIV | YRS OF SERVICE | DATE | TIME |
| | 6363 | | | 11 | | |



A= park vehicle
B= park vehicle
C= park vehicle
D= park boat
E= park vehicle
F= park vehicle
G= park vehicle
I= Toyota Camry
   (SUSPECT VEHICLE)
J= approximately the location
   where "victim" was -

This diagram #1 depicts the first shot fired by the people outside that penetrated
the rear right passenger window and exit the back window. At this point there is no
evidence of occupants in the vehicle returning gunshot. Please note that Detective
did not cross the street of 3212 Western to investigate (1RT 125)-



The evidence indicate that there was a .38 caliber weapons being fired; in which
lodged into the residence of 3225, located north across the street from 3212 Western.
(4RT 1106)-There was shotgun pellets inside the garage in the sheetrock located on
the south-east garage of 3212.(2RT 354)-The location of the pellets in the garage
of 3212 is consistent with shotgun being fired within the vehicle after vehicle
passes 3212. Please note that it is impossible for the right rear passenger window to
have been hit with a bullet after it past 3212; for the driver and left passenger
window was up and there was no indication of any bullet entering the vehicle from
the right side at this point.-This diagram #2 depicts the location where the
Toyota Camry was when the gun fire was exchange according to the evidence just
mention above.

APPENDIX III

APPENDIX III

APPENDIX III

PELICAN BAY
G.P. UNIT B-7

APPENDIX III

APPENDIX III

APPENDIX III

...LDO H. "Wally" DAMERELL
P.O. Box 733
Rancho Murieta, CA 95683

DATE : May 3, 2004     CASE : People vs
                                                  Kinson HER

FOR : Paul Irish, Attorney at Law

FROM : Wally Damerell, Investigator   CASE # : 02F01534

INTERVIEW/STATEMENT OF MICHAEL CAMACHO ON MAY 3, 2004

         CONTACT : Michael CAMACHO
                            Sacramento County Juvenile Hall
                            Unit J-2

This witness had been identified by the defendant as one who could testify that he had been privy to a conversation between juvenile hall residents at the Sacramento County Courthouse in which one had told of being present at the murder site on Western Avenue when the fatal shooting occurred which resulted in the defendant's subsequent arrest. He indicated the witness could testify that he was not present and that the car involved in the shooting was not the dark colored one as alleged in the official reports.

The witness was interviewed this date at the Juvenile Hall. He is seventeen years old and can be identified by his birth date of July 27, 1986. He has been convicted of ADW and, following the California Youth Authority's refusal to accept him as a Ward, has been committed to the State Department of Corrections. He stated that he is currently waiting to be transfered to the Tehachipi Prison's (California Correctional Institution) Reception Center.

He stated that he and his cousin, Angel CAMACHO were at the Sacramento County Courthouse earlier this year and he had been present when a resident of Unit J-1 at the Juvenile Hall named VANG, first name not recalled, were conversing. VANG had stated that he was present the night of the shooting incident on Western Avenue in 2002 when the murder occurred that the defendant is charged with, and then described what had happened.

VANG reportedly told Angel CAMACHO that the shooters had been in a white car, not the dark car alleged in this case. It had cruised down Western Avenue past the shooting site, and then turned around and drove back.

The witness told of VANG's description of the white car, stating that he was not able to recall whether it had been described as a car or as a truck, but that he now assumes it had been a car because he could not imagine a truck being used for a drive by shooting.

In any case, the white vehicle, according the witness's description of what VANG had said, drove back to the shooting site and shooter(s) inside the car opened fire, and then continued to drive on.

VANG's description followed by his telling of the gunfire that was returned by those that had been shot at, with shots fired at the white vehicle by the time it had reached the stop sign further up the street from where the victims had been shot.

He was asked if VANG had said anything about recognizing any of the occupants inside the white vehicle. The witness responded by saying that our defendant, Kinson HER, had been the only passenger he recognized inside the vehicle. He had not said anything about seeing the defendant doing the actual firing, nor had he identified anyone else.

With respect to the common name of VANG and attempts to better identify that Juvenile Hall resident, the witness stated that he did not know what type of crime VANG was in custody for, but noted that to his knowledge he was the only resident in J-1 with that last name.

The witness was thanked for his willingness to speak with the undersigned, and for his willingness to reveal the information that he had. With that the interview was concluded and the witness was returned to his housing unit.

Respectfully submitted,

Waldo H. Damerell
Defense Investigator

APPENDIX IV

APPENDIX IV

PELICAN BAY
G.P. UNIT B-7

APPENDIX IV

APPENDIX IV

APPENDIX IV

Court of Appeal, Third Appellate District - No. C051473
S159613

# IN THE SUPREME COURT OF CALIFORNIA

En Banc

THE PEOPLE, Plaintiff and Respondent,

KINSON HER, et al., Defendants and Appellants.

The petitions for review are denied.

SUPREME COURT
**FILED**

MAR 1 2 2008

Moreno, J., was absent and did not participate.

Frederick K. Ohlrich Clerk

Deputy

GEORGE

Chief Justice

IN THE
# Court of Appeal of the State of California
IN AND FOR THE
## THIRD APPELLATE DISTRICT

# FILED

APR 2 0 2009

COURT OF APPEAL - THIRD DISTRICT
DEENA C. FAWCETT

BY_____ Deputy

In re KINSON HER on Habeas Corpus.

C061573
County No.

BY THE COURT:

The petition for writ of habeas corpus is denied.

Dated: April 20, 2009

RAYE, Acting P.J.

---

cc: See Mailing List

S175956

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

---

In re KINSON HER on Habeas Corpus.

---

The petition for writ of habeas corpus is denied.   (See *In re Clark* (1993) 5 Cal.4th 750.)

SUPREME COURT
**FILED**

NOV 1 9 2009

Frederick K. Ohlrich Clerk

Deputy

**GEORGE**

*Chief Justice*

S174121

# IN THE SUPREME COURT OF CALIFORNIA

**En Banc**

In re KINSON HER on Habeas Corpus.

The petition for writ of habeas corpus is denied.

PELICAN BAY
G.P. UNIT B. 7

SUPREME COURT
FILED

NOV 1 9 2009

Frederick K. Ohlrich Clerk

_____
Deputy

**GEORGE**
_____
*Chief Justice*

## PROOF OF SERVICE BY MAIL

## BY PERSON IN STATE CUSTUODY

I, Kinson Her, declare: I am over 18 years of age and a party to this action. I am a resident at Pelican Bay State Prison, in the county of Del Norte, State of California. My prison address is: P.O. BOX 7500 Crescent City, CA. 95532.

On December 4, 2009, I served the attached: Petition for Writ of Hebeas Corpus, on the parties here by placing true and correct copies thereof, enclosed in a sealed envelope, with postage thereon fully paid, in the United States Mail in a deposit box so provided at the above-named correctional institution in which I am presently confined. The envelope was addressed as follows:

1) Clerk of: United States District Court    2) Attorney General
    Eastern District of California    1300 "I" Street
    501 "I" Street, Suite 4-200    Sacramento CA. 95814
    Sacramento, CA. 95814-2322

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed on:December 4, 2009

Kinson Her
Declarant Signature