1
2
3
4
5
6
7
8           IN THE UNITED STATES DISTRICT COURT

9          FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KINSON HER,

11          Petitioner,                    2: 09 - cv - 612 - JAM TJB

12      vs.

13   FRANCISCO JACQUEZ, Warden,

14          Respondent.          ORDER, FINDINGS AND

15                               RECOMMENDATIONS

16   _____/

17                    I.  INTRODUCTION

18        Petitioner, Kinson Her, is a state prisoner proceeding *pro se* with a petition for writ of

19   habeas corpus pursuant 28 U.S.C. § 2254.  Petitioner is currently incarcerated after a jury found

20   him guilty of first-degree murder, premeditated attempted murder and discharging a firearm from

21   a vehicle.  The jury also found true that Petitioner caused great bodily injury, discharged a

22   firearm and committed the offense to benefit a criminal street gang.  In his amended federal

23   habeas petition, Petitioner raised several claims; specifically:  (1) there was insufficient evidence

24   to convict Petitioner of murder and attempted murder ("Claim I"); (2) there was insufficient

25   evidence for the jury to find that Petitioner used a firearm during an enumerated felony ("Claim

26   II"); (3) there was insufficient evidence to support the gang enhancement ("Claim III"); trial

counsel was ineffective in several respects ("Claim IV"); the trial court erred in not accepting

letters from Petitioner as motions regarding his personal conflicts with his trial counsel ("Claim

V"); (6) the trial court erred in denying Petitioner's motion for an interpreter at trial ("Claim

VI"); (7) the trial court erred in denying Petitioner's motion to exclude any opinion of a bandana

("Claim VII"); (8) the trial court erred in denying Petitioner's motion to bifurcate the gang

enhancement ("Claim VIII"); (9) the trial court erred in allowing the gang expert to give

prejudicial testimony about a hypothetical question that misrepresented the facts of the case

("Claim IX"); (10) the trial court erred in allowing the gang expert to characterize Petitioner as a

"hard core killer" ("Claim X"); (11) the gang expert's testimony violated the Confrontation

Clause ("Claim XI"); (12) the trial court abused its discretion in considering the gang detective as

an expert ("Claim XII"); (13) the trial court erred by failing to declare a mistrial during voir dire

based on prejudicial questions posed by the prosecutor to the prospective jurors ("Claim XIII");

(14) the trial court erred by failing to declare a mistrial when a prosecution witness had illegal

and prohibited communication with the jury ("Claim XIV"); (15) the trial court erred denying

Petitioner's "995" motion because Petitioner's sentence violates the Equal Protection Clause as

one person serving a life sentence can be released before another person serving a life sentence

("Claim XV"); (16) the trial court erred by admitting prejudicial and inflammatory testimony

from a witness who believed that threats and reprisals he had suffered were connected to his

testimony against Petitioner ("Claim XVI"); (17) the trial court erred instructing the jury using

CALJIC No. 5.55 ("Claim XVII"); (18) the trial court erred in instructing the jury using CALJIC

No. 2.71.5 ("Claim XVIII"); (19) the trial court erred using CALJIC Nos. 2.03, 2.06, 2.51 and

2.52 (Claim XIX"); (20) the trial court erred in failing to rewrite CALJIC No. 2.90 ("Claim

XX"); (21) the trial court erred in instructing the jury using CALJIC No. 5.17 ("Claim XXI");

(22) prosecutorial misconduct in allowing a witness to communicate with the jurors ("Claim

XXII"); (23) Petitioner was deprived of his due process right to be sentenced to a term of either a

high, medium or low penalty ("Claim XXIII"); (24) Petitioner's statement to police was obtained

2

1  in violation of his Constitutional rights ("Claim XXIV"); (25) Petitioner's sentence of twenty-

2  five years to life imprisonment violates the Eighth Amendment as it constitutes cruel and unusual

3  punishment ("Claim XXV"); (26) the Court of Appeal's decision in not remanding for re-

4  sentencing violated Petitioner's due process rights ("Claim XXVI"); and (27) cumulative error

5  ("Claim XXVII").  As explained infra, some of these Claims have been withdrawn by Petitioner

6  as stated in his traverse.  For the following reasons, Petitioner's habeas petition should be denied.

7                     II.  FACTUAL BACKGROUND[1]

8      This case arises from a drive-by shooting involving rival Hmong
       gangs.  Defendants Her and Lao were members or affiliates of the
9      gang "Masters of Destruction" or "Menace of Destruction," better
       known by the acronym MOD.
10
       On February 3, 2002, Her and Lao attended a Super Bowl party at
11     Xang Thao's home in Meadowview.  After the game, they departed
       with several MOD members in a minivan driven by Her's cousin,
12     Rindy Her (Rindy).

13     Fifteen miles away, on the north side of town, a Toyota Camry was
       stolen.  At 8:33 p.m. that same evening the stolen Camry drove
14     past an apartment building at 3212 Western Avenue in Sacramento
       (3212 Western) and fired weapons at Fong Vue, Vue Heu and Yee
15     Xiong, who were standing in front of the driveway.  Heu and
       Xiong were both affiliated with MOD's chief rival, the Hmong
16     Nation Society or HNS.  MOD claims its territory in South
       Sacramento neighborhoods such as Meadowview, Valley Hi and
17     Oak Park.  HNS claims the northern part of the city for its territory,
       including Western Avenue, where the shooting occurred.  Fong
18     Vue died a few days later as a result of shotgun wounds to the
       head.  Xiong suffered head injuries, but survived the attack.  Xiong
19     tentatively identified Lao as one of the shooters inside the Camry.
       Police found shotgun pellets around Fong Vue's body.  Bullets and
20     fragments from one or more handguns were also found around the
       driveway.  Spent .45-caliber casings were found on the grass
21     between 3212 Western and the adjacent building.

22     There was evidence that the targeted victims who were standing in
       front of 3212 Western had returned the gunfire:  Although he
23     denied shooting a firearm himself, residue tests on victim Xiong's
       hands indicated he had recently fired a gun.  The rear window of
24

25         [1] The factual background is taken from the California Court of Appeal, Third Appellate
   District opinion on direct appeal filed November 30, 2007 and filed in this court on September
26  21, 2010 by Respondent as Lodged Document 6 (hereinafter "Slip Op.").

                                          3

the Camry was shattered by a bullet that the People's forensic expert determined was likely fired from outside the vehicle and which exited through the front windshield.  There were also bullet marks in the rear bumper and spare tire.

Within minutes of the shooting, Police Officer Warren Estrada spotted the Camry making an illegal turn, near Fifth and G Streets in West Sacramento.  When he pulled the Camry over, it initially came to a stop, then led Estrada on a high-speed chase through the adjacent neighborhood.  At Second and E, three Asian males jumped out of the car and took off running in different directions. Estrada, now on foot, followed one of the fleeing suspects, who came to an embankment, leaped into the river, and began swimming.  Estrada jumped in after him, and eventually pulled Lao, who had tired in the current, out of the water.  In his wallet, Lao was carrying a piece of paper with the word "MOD" written on it.

Inside the Camry, police found 12-gauge shotgun casings as well as .32-caliber casings.  On the floorboard in the back seat was a blue bandana with a fluid stain that was matched to Her's DNA.  A blue jacket, later identified as one worn by Her, was found in the back seat of the car.  Inside the jacket was a cell phone.  The phone rang from a caller identified on the screen as "Xang."  [FN 2]  Sergeant James Duncan answered, "Where are you at?"  The caller responded that they were at the end of the bridge in Old Sacramento, that there were "hella cops around," and that he should meet them on the other side of the bridge.
[FN 2]  The telephone number displayed on the phone found in the blue jacket matched that of a cell phone belonging to Xang Thao, one of the Super Bowl party attendees.

Using this information, officers went to Old Sacramento and detained defendant Her's cousin Rindy, John Her, Xang Thao and others, who were standing around Rindy's minivan with Xang's cell phone.

Rindy testified that he and his companions were playing pool after the Super Bowl, when they received a call from Her telling Rindy to pick him up at the Money Store.  During the call, Rindy heard Lao's voice in the background, saying, "Hurry up."  The group tried to get to the Money store, but West Sacramento was inundated with police, so they drove across the bridge into Old Sacramento, where they were arrested.

At 3:00 a.m. the next morning a street sweeper working in West Sacramento recovered a .380-millimeter Beretta semiautomatic pistol and a .32-caliber Colt semiautomatic pistol lying on the side of the road north of E Street.  Officers searching the area where the police chase occurred found a 12-gauge shotgun with a pistol grip near F and Second Streets in West Sacramento.

4

Police later found three unexpended shotgun shells in Lao's closet that were of the same brand as the shells found in the Camry. Lao's fingerprint was lifted from a passenger door of the Camry. Her's girlfriend, Brenda Ly, testified that Her represented himself to be a member of MOD. Somewhere between 9:00 and 10:00 o'clock on the evening of the shooting, Ly received a call from Her, telling her to pick him up at a pay phone booth in West Sacramento. Ly complied. On the way back to her house, Ly noticed that many police cars and helicopters were in the area and asked Her if he knew anything about it. He answered, "No," but then added, "I didn't want to tell you because I [would] rather have you not know."

Ly and Her slept together that night. Between 10:48 p.m. on February 3 and 2:53 the next morning, about 60 phone calls were made from Ly's cell phone, including some to Minnesota. Ly admitted that she only made "a few" of these calls.

Shortly before 11:00 p.m. on February 3, a series of calls was made to the cell phone of Xang Thao, who was then in police custody. Officer Corey Johnson answered the phone, and a male voice with an Asian accent at the other end repeatedly asked for Xang. Johnson kept telling the caller that Xang was busy. The caller became enraged, referred to himself as "Sac High MOD," and threatened to "kick" Johnson's "f'ing ass" if he did not let him speak to Xang. While most of the calls came from blocked numbers, the last one, at 10:45 p.m., was from a caller identified on the screen as "Brenda" and in fact came from Ly's cell phone. The day after the shooting, Her traveled to Minnesota. Her, who was 15 years old, told his girlfriend he was on a "business trip." While he was in Minnesota, he asked Ly to get him the address for Lao, who was by then incarcerated. In April 2002, Ly sent $220 to Her addressed to "John" Her in Minnesota. In July 2002, Her was arrested in Minnesota and transported back to California.

Detective Aaron Lee testified as an expert on Asian gangs. MOD is the largest Hmong gang in Sacramento. MOD members commit car thefts, homicides, drive-by shootings, robberies and other violent crimes. There is a history of animosity between MOD and its northern rival, HNS. Younger brothers, cousins or relatives of MOD gang members tend to join smaller groups. One of these groups is the Youth Mafia Society, or YMS. After explaining the various factors that go into validating a youth as a gang member, Lee testified that defendant Her has been a validated member of YMS since the year 2000. Defendant Lao is a validated member of MOD, as letters he wrote from jail bear out his affiliation.

Detective Lee described several incidents exemplifying the enduring rivalry and hostility between the MOD's and HNS gang. He told the jury that a gang member who participates in a drive-by

shooting enhances his reputation within the gang and sends a
message to the community to fear and respect the gang.  Gang
members do not normally tread into the territory of their rivals.
Presented with a hypothetical drawn from the evidence in this case,
Lee opined that a drive-by shooting committed in well-known HNS
territory by three MOD members was committed for the benefit of
the MOD street gang.

(Slip Op. at p. 2-7.)

### III.  PROCEDURAL HISTORY

After Petitioner was found guilty, he was initially sentenced to life without the possibility

of parole on the murder conviction, supplemented by an indeterminate consecutive term of 25

years to life, plus 20 years.  (<u>See</u> Slip Op. at p. 2.)  On direct appeal, the California Court of

Appeal, Third Appellate District affirmed the conviction.  However, due to Petitioner's age at the

time of the offense, the Court of Appeal modified Petitioner's sentence on the murder conviction

to twenty-five years to life imprisonment with the possibility of parole.

Petitioner filed a petition for review to the California Supreme Court.  In that petition,

Petitioner raised five issues; specifically:  (1) whether the trial court erred by allowing the gang

expert (a) to give unsupported and incendiary opinions, (b) to testify in response to a faulty,

hypothetical which both denied Petitioner a fundamentally fair trial and (c) the gang expert's

testimony violated the Confrontation Clause ; (2) whether the inflammatory testimony by a

witness to the effect that he had suffered reprisals, years earlier, which he believed to be

connected to Petitioner denied him a fair trial; (3) whether the Court's instruction to the jury on

the theory of pretextual self-defense (CALJIC No. 5.55) constituted reversible error; (4) whether

the Court committed error in instructing the jury that imperfect self-defense would be unavailable

to one who by his unlawful or wrongful conduct created the circumstances legally justifying his

adversary's use of force; and (5) whether Petitioner's sentence of twenty-five years to life, under

the facts of this case, constituted cruel and unusual punishment.  The California Supreme Court

issued a summary denial on March 12, 2008.

In January 2009, Petitioner filed a state habeas petition in the Superior Court of

6

California, County of Sacramento.  Among the claims included in this state habeas petition were the following:  (1) insufficient evidence to convict Petitioner of murder and attempted murder on a direct theory of liability; (2) insufficient evidence to convict Petitioner of murder and attempted murder as an aider and abettor; (3) insufficient evidence to convict Petitioner of murder and attempted murder; (4) insufficient evidence to support the gun enhancement finding; (5) insufficient evidence with respect to the gang enhancement finding; (5) failure of the trial court to conduct a Marsden hearing when Petitioner wrote to the court expressing Petitioner's personal conflicts with trial counsel; (6) Petitioner's statement to police was obtained in violation of his Constitutional rights; (7) trial court error by denying Petitioner's motion to exclude opinion testimony of the bandana; (8) ineffective assistance of counsel through a misstatement by defense counsel during closing argument; (9) trial court error in failing to bifurcate the gang enhancement; (10) ineffective assistance of counsel for failing to investigate a witness named Vang; (11) trial court error by failing to declare a mistrial when a prosecution witness had illegal and prohibited communications with the jurors; (12) ineffective assistance of counsel when counsel failed to move for a mistrial due to a prosecution witness's prohibited conversations with the jury; (13) ineffective assistance of counsel in failing to present a defense expert on behalf of petitioner on his self-defense theory; (14) prosecutorial misconduct when the prosecutor allowed one of its witnesses to talk to the jury; (15) ineffective assistance of counsel for failing to object to the inflammatory characterization of Petitioner by the gang-expert; (16) jury instructional error through the use of CALJIC 1.00, 2.03, 2.06, 2.51, 2.52, 2.90 and 5.17; (17) trial court error in denying Petitioner's "995" motion; (18) due to Petitioner's youth, he was deprived to have three possible sentence terms of high, medium and low penalties; and (19) cumulative error.  On March 9, 2009, the Superior Court denied the state habeas petition in a written opinion.

In April 2009, Petitioner filed a petition for writ of habeas corpus in the California Court of Appeal.  (See Resp't's Lodged Doc. 12).  In that petition, Petitioner raised the issues outlined above (amongst others).  The California Court of Appeal summarily denied the petition on April

20, 2009.

In June 2009, Petitioner filed a state habeas petition in the California Supreme Court, Case No. S174121.  (See Resp't's Lodged Doc. 19.)  Among the claims that Petitioner raised in that state habeas petition were the following:  (1) there was insufficient evidence to convict Petitioner of murder and attempted murder on a direct theory of liability; (2) there was insufficient evidence to convict Petitioner of murder and attempted murder as an aider and abettor; (3) there was insufficient evidence to convict Petitioner of murder and attempted murder; (4) there was insufficient evidence supporting the use of a firearm during an enumerated felony enhancement; (5) there was insufficient evidence to support the gang enhancement because the prosecution failed to prove Petitioner's membership in an ongoing association of three of more persons; (6) there was insufficient evidence presented concerning the primary activities of YMS, or even MOD; (7) there was insufficient evidence to show that Petitioner acted with the specific intent to promote, further or assist in any criminal conduct by gang members; (8) ineffective assistance of counsel when trial counsel failed to investigate a witness named Vang; (9) ineffective assistance of counsel by failing to object to the prosecution witness' inflammatory characterization of Petitioner; (10) ineffective assistance of counsel for failing to object to the gang expert's characterization of Petitioner as a "hard core killer"; (11) ineffective assistance of counsel for giving an example during closing argument that defeated the theory of self-defense; (12) ineffective assistance of counsel for failing to present an expert witness at trial; (13) ineffective assistance of counsel for failing to request an inquiry into Detective Stigerts communications with the jury; (14) trial court error in failing to accept letters from Petitioner as a motion with respect to Petitioner's conflicts with trial counsel; (15) trial court error in denying Petitioner's request for an interpreter; (16) trial court error in denying Petitioner's motion to exclude any opinion with respect to the bandana; (17) trial court error in denying Petitioner's request to bifurcate the gang enhancement; (18) trial court error in allowing gang expert to give testimony with respect to a hypothetical that misrepresented the facts of the case; (19) trial court

8

error in allowing the gang expert to testify that Petitioner was a "hard core killer"; (20) the gang

expert's testimony violated the Confrontation Clause; (21) the trial court abused its discretion in

considering the gang detective an expert; (22) trial court error in failing to declare a mistrial

during voir dire; (23) trial court error in failing to declare a mistrial when Detective Stigerts had

communications with the jury; (24) trial court error in denying Petitioner's "995" motion; (25)

trial court error in admitting prejudicial and inflammatory testimony from a witness who believed

that threats and reprisals he had suffered years earlier were connected to his testimony against

Petitioner; (26) jury instructional error on the theory of pretextual self-defense; (27) jury

instructional error on the theory of "adoptive admissions"; (28) jury instructional error in using

CALJIC 2.03, 2.06, 2.51 and 2.52; (29) jury instructional error in denying Petitioner's motion to

re-write CALJIC 2.90; (30) jury instructional error in using CALJIC 1.00; (31) jury instructional

error using CALJIC 5.17; (32) prosecutorial misconduct; (33) due to Petitioner's youth, he was

deprived to have three possible terms of high, medium and low penalties; (34) Petitioner's

statement to police was obtained in violation of his Constitutional rights; (35) Petitioner's

sentence of twenty-five years to life violates the Eighth Amendment and is contrary to widely

accepted international norms for the treatment of child offenders; (36) cumulative error.  On

November 19, 2009, the California Supreme Court summarily denied this state habeas petition.

(See Pet'r's Am. Pet. at Appendix IV.)

As those state habeas petitions were proceding through the state courts, Petitioner also

filed a different state habeas petition in the California Court of Appeal in August 2009.  That

petition raised two claims; specifically:  (1) Petitioner's sentence of twenty-five years to life

imprisonment constituted cruel and unusual punishment; and (2) the California Court of

Appeal's decision not to remand for re-sentencing violated Petitioner's due process rights and

was prejudicial.  On August 27, 2009, the California Court of Appeal denied the state habeas

petition and stated the following:

The petition for writ of habeas corpus is denied given that

9

1    petitioner seeks to add claims that were not raised in his earlier
2    petition for writ of habeas corpus, and, assuming arguendo, such
     claims are not otherwise barred (see In re Clark (1993) 5 Cal.4th
3    750, 767-768), petitioner must first assert these claims in the
     superior court.  (In re Steele (2004) 32 Cal.4th 682, 691-692; In re
4    Hillery (1962) 202 Cal.App.2d 293, 294.)

5    (Resp't's Lodged Doc. 16.)

6         In August 2009, Petitioner filed a state habeas petition in the California Supreme Court,

7    Case No. S17956.  That state habeas petition raised the two issues that Petitioner raised in his

8    August 2009 state habeas petition to the California Court of Appeal.  The California Supreme

9    Court denied the state habeas petition on November 19, 2009 by stating that, "The petition for

10   writ of habeas corpus is denied.  (See In re Clark (1993) 5 Cal.4th 750.)" (Pet'r's Am. Pet. at

11   Appendix IV.)

12        Petitioner also filed a state habeas petition in the California Superior Court, County of

13   Sacramento in September 2009.  In that state habeas petition, Petitioner raised the same two

14   claims that he raised in his August 2009 state habeas petitions to the California Court of Appeal

15   and the California Supreme Court, specifically:   (1) Petitioner's sentence of twenty-five years to

16   life imprisonment constitutes cruel and unusual punishment; and (2) the California Court of

17   Appeal's decision not to remand for re-sentencing violated Petitioner's due process rights and

18   was prejudicial.  The Sacramento County Superior Court denied these two claims in a written

19   decision on November 9, 2009.

20        Petitioner filed a federal habeas petition on March 3, 2009.  In the area for describing his

21   claims, Petitioner stated "see motion (petition) attach."  However, no additional documents were

22   attached to this petition.  Petitioner also requested a stay of the proceedings.  On August 26,

23   2009, then Magistrate Judge Mueller denied the motion to stay without prejudice and dismissed

24   the federal habeas petition.  Petitioner was given thirty days to file an amended habeas petition.

25        Subsequently, Petitioner filed several amended habeas petitions, the last filed on

26

                                              10

1  December 17, 2009.[2]  On September 13, 2010, Respondent answered the petition.  On January

2  10, 2011, Petitioner filed a motion for leave to file an oversized traverse along with his traverse.

3  On January 25, 2011, Chief Judge Ishii reassigned this matter to the undersigned.

4            IV.  APPLICABLE LAW FOR FEDERAL HABEAS CORPUS

5            An application for writ of habeas corpus by a person in custody under judgment of a state

6  court can only be granted for violations of the Constitution or laws of the United States.  See 28

7  U.S.C. § 2254(a); see also Peltier v. Wright, 15 F.3d 860, 861 (9th Cir. 1993); Middleton v.

8  Cupp, 768 F.2d 1083, 1085 (9th Cir. 1985) (citing Engle v. Isaac, 456 U.S. 107, 119 (1982)).

9  Petitioner filed this petition for writ of habeas corpus after April 24, 1996, thus the Antiterrorism

10  and Effective Death Penalty Act of 1996 ("AEDPA") applies.  See Lindh v. Murphy, 521 U.S.

11  320, 326 (1997).  Under AEDPA, federal habeas corpus relief is not available for any claim

12  decided on the merits in the state court proceedings unless the state court's adjudication of the

13  claim: (1) resulted in a decision that was contrary to, or involved an unreasonable application of,

14  clearly established federal law, as determined by the Supreme Court of the United States; or (2)

15  resulted in a decision that was based on an unreasonable determination of the facts in light of the

16  evidence presented in state court.  See 28 U.S.C. 2254(d).  Where a state court provides no

17  reasoning to support its conclusion, a federal habeas court independently reviews the record to

18  determine whether the state court was objectively unreasonable in its application of clearly

19  established federal law.  See Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009); see also

20  Delgado v. Lewis, 223 F.3d 976, 981-82 (9th Cir. 2000), overruled on other grounds, Lockyer v.

21  Andrande, 538 U.S. 63 (2003).

22            As a threshold matter, this Court must "first decide what constitutes 'clearly established

23  Federal law, as determined by the Supreme Court of the United States.'"  Lockyer, 538 U.S. at 71

24  _____

25            [2] While Petitioner filed several amended habeas petitions, the December 17, 2009
   amended habeas petition will be referred to as "Pet'r's Am. Pet." in this findings and
26  recommendations.

1   (quoting 28 U.S.C. § 2254(d)(1)).  "'[C]learly established federal law' under § 2254(d)(1) is the

2   governing legal principle or principles set forth by the Supreme Court at the time the state court

3   renders its decision.'"  Id. (citations omitted).  Under the unreasonable application clause, a

4   federal habeas court making the unreasonable application inquiry should ask whether the state

5   court's application of clearly established federal law was "objectively unreasonable."  See

6   Williams v. Taylor, 529 U.S. 362, 409 (2000).  Thus, "a federal court may not issue the writ

7   simply because the court concludes in its independent judgment that the relevant state court

8   decision applied clearly established federal law erroneously or incorrectly.  Rather, that

9   application must also be unreasonable."  Id. at 411.  Although only Supreme Court law is binding

10  on the states, Ninth Circuit precedent remains relevant persuasive authority in determining

11  whether a state court decision is an objectively unreasonable application of clearly established

12  federal law.  See Clark v. Murphy, 331 F.3d 1062, 1070 (9th Cir. 2003) ("While only the

13  Supreme Court's precedents are binding . . . and only those precedents need be reasonably

14  applied, we may look for guidance to circuit precedents.").

15          The first step in applying AEDPA's standards is to "identify the state court decision that

16  is appropriate for our review."  See Barker v. Fleming, 423 F.3d 1085, 1091 (9th Cir. 2005).

17  When more than one court adjudicated Petitioner's claims, a federal habeas court analyzes the

18  last reasoned decision.  Id. (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).

19                          V.  ANALYSIS OF PETITIONER'S CLAIMS

20          A.  Claim I

21          In Claim I, Petitioner argues that there was insufficient evidence to support the guilty

22  findings with respect to the murder and attempted murder convictions.  In addition to arguing

23  that there was insufficient evidence to support these convictions generally, Petitioner also argues

24  that:  (1) there was insufficient evidence to convict on a direct theory of liability; and (2) there

25  was insufficient evidence to convict as an aider and abettor.  Petitioner raised this Claim on

26  direct appeal to the California Court of Appeal.  (See Resp't's Lodged Doc. 1.)  However,

                                                    12

1    Petitioner never raised this insufficiency of the evidence Claim to the California Supreme Court

2    in his petition for review on direct appeal.  (See Resp't's Lodged Doc. Ex. 7.)  Instead, these

3    arguments were next raised by Petitioner in his state habeas petition to the Sacramento County

4    Superior Court.  That Court stated the following in analyzing this Claim:

5                    Petitioner first claims that the evidence was insufficient to convict
                     him of murder and attempted murder based on a direct theory of
6                    liability or as an aider and abettor.

7                    The claim was raised and rejected on appeal, where the Third
                     District Court of Appeal found the evidence sufficient to show that
8                    petitioner participated in the drive-by shooting and that he
                     personally discharged a firearm in the commission of the offenses.
9
                     A claim is procedurally barred on state habeas corpus when the
10                   claim was raised and rejected on appeal (In re Waltreus (1965) 62
                     Cal.2d 218, reaffirmed in In re Harris (1993) 5 Cal.4th 813, 829).
11                   The only exceptions to this procedural bar are:  (1) if the claim is
                     based on constitutional error that is both clear and fundamental,
12                   and that strikes at the heart of the trial process; (2) if the claim is
                     now couched in ineffective assistance of counsel terms; (3) if the
13                   court lacked fundamental jurisdiction over the petitioner of the
                     subject matter; (4) if the court acted in excess of its jurisdiction and
14                   the issue is strictly a legal one not requiring a redetermination of
                     the facts underlying the claim; (5) there has been a change in the
15                   law affecting the petitioner (Harris, supra, 5 Cal.4th 813, 834, 834
                     fn. 8, 836, 840-841, 841); or (6) if the claim is that the sentence is
16                   unauthorized, as an unauthorized sentence may be corrected at any
                     time (People v. Welch (1993) 5 Cal.4th 228; Harris, supra, 5
17                   Cal.4th 813, 842; People v. Serrato (1973) 9 Cal.3d 753, 763,
                     overruled on other grounds in People v. Fosselman (1983) 33
18                   Cal.3d 572, 583 fn. 1).  Petitioner does not show that this claim
                     qualifies for any of these exceptions.  As such, the claim is barred.
19

20   (Resp't's Lodged Doc. 11 at p. 1-2.)

21           The California Court of Appeal and the California Supreme Court both summarily denied

22   the state habeas petitions that raised this Claim.  The Court "looks through" those silent denials

23   to the last reasoned decision which was from the Sacramento County Superior Court.  See

24   Shackleford v. Hubbard, 234 F.3d 1072, 1079 n. 2 (9th Cir. 2000).

25           The Sacramento County Superior Court denied this Claim pursuant to In re Waltreus, 62

26   Cal.2d 218, 42 Cal. Rptr. 9, 397 P.2d 1001 (1965).  California's Waltreus rule provides that

1   "'any issue that was actually raised and rejected on appeal cannot be renewed in a petition for a

2   writ of habeas corpus.'" See Forrest v. Vasquez, 75 F.3d 562, 563 (quoting In re Harris, 5 Cal.

3   4th 813, 829, 21 Cal. Rptr. 2d 373, 855 P.2d 391 (1993)). A Waltreus citation does not bar

4   federal review of a habeas claim. See Calderon v. United States District Court (Bean), 96 F.3d

5   1126, 1131 (9th Cir. 1996). In Ylst, 501 U.S. at 805, the Supreme Court concluded that a

6   Waltreus citation is neither a ruling on the merits nor a denial on procedural grounds and

7   therefore has no bearing on a California prisoner's ability to raise a claim in federal court. See

8   also Forrest, 75 F.3d at 564. A federal court instead must "look through" a denial based on

9   Waltreus to the last explained state court decision. See id.

10          In Forrest, the court looked through a Waltreus citation to the last state court decision

11  which was an order by the California Supreme Court denying the petition for review on direct

12  appeal because the petition was untimely under Rule 28(b) of the California Rules of Court.

13  However, in this case, the last clear explained decision on this Claim is from the California Court

14  of Appeal's decision on direct appeal which denied this Claim on the merits. Therefore, that

15  decision will be analyzed to determine whether it was an objectively unreasonable application of

16  clearly established federal law and/or resulted in a decision that was based on an unreasonable

17  determination of the facts in light of the evidence presented in state court. See Maravilla v.

18  Rimmer, Civ. No. 04-684, 2009 WL 1689599, at *6 (C.D. Cal. June 12, 2009) (noting that where

19  Petitioner failed to raise claim on direct appeal to the California Supreme Court, and California

20  Supreme Court denied claim on state habeas relying on Waltreus, court looks through the

21  California Supreme Court's denial based on Waltreus and analyzes whether the California Court

22  of Appeal's decision on direct appeal was contrary to 28 U.S.C. § 2254(d)); Davis v. Butler, Civ.

23  No. 03-426, 2005 WL 1490283, at *6-7 (E.D. Cal. June 15, 2005), aff'd by, 210 Fed. Appx. 584

24  (9th Cir. 2006).

25          The California Court of Appeal stated the following in analyzing this Claim on the

26  merits:

14

Her contends there was "no direct or circumstantial evidence" of his participation in the drive-by shooting at 3212 Western, and subsequent death of Fong Vue.  He argues that the evidence shows, at most, that he was present at the scene of the crime and failed to prevent it – evidence not sufficient to convict him beyond a reasonable doubt of first degree murder.  We disagree.

When confronted with a claim that the evidence is insufficient to support the verdict, the reviewing court examines the record to determine "'whether it shows evidence that is reasonable, credible and of solid value from which a rational trier of fact could find the defendant guilty beyond a reasonable doubt.'  [Citation.]  Further, 'the appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.'  [Citation.]  This standard applies whether direct or circumstantial evidence is involved."  (People v. Catlin (2001) 26 Cal.4th 81, 139.)  In reviewing the sufficiency of the evidence, the well-established test for review, "is whether there is substantial evidence to support the conclusion of the trier of facts, not whether the evidence proves guilt beyond a reasonable doubt."  (People v. Wheeler (1977) 71 Cal.App.3d 902, 906, citing People v. Reyes (1974) 12 Cal.3d 486, 497.)

Viewing the record in the light most favorable to the People, we find substantial evidence to support the jury's determination that defendant Her was one of the perpetrators of the drive-by shooting at 3212 Western.

The evidence showed that the shooting was committed by the occupants of the Camry, who stole it in the northern part of Sacramento and drove it to 3212 Western, where the shooting occurred.  The perpetrators then fled to West Sacramento, where they abandoned the Camry following a high-speed police chase.  The pursuing officer observed three Asian males exit the car, and forensic evidence showed that three different firearms (two handguns and a shotgun) were fired from the Camry.

Lao was undoubtedly one of the shooters, based on his identification by the surviving victim, his aquatic capture after fleeing from the Camry, the shotgun shells found in his closet, and his fingerprint found on the door of the Camry.

Her and Lao were both affiliated with the MOD street gang and Her was a validated member of YMS, a junior version of MOD.  Her also attended the Super Bowl party where Lao and other MOD gang members were present.  Soon after a group of them left the party, the Camry was stolen.  The drive-by shooting occurred a short time later, in the same area.

Immediately after the shooting, law enforcement personnel and police helicopters surrounded the Money Store/Tower Bridge/Old

15

Sacramento area.  During the same time frame, Her called his cousin Rindy, asking to be picked up from the Money Store.  Lao's voice could be heard in the background.  Her's jacket and a bandana with fluids containing DNA were found in the Camry. There was strong circumstantial evidence that Her used his girlfriend Brenda Ly's phone to call Xang Thao's phone, which was in possession of the police.  The caller identified himself as a MOD gang member.

When Ly picked Her up in West Sacramento around 10:30 p.m. that night, she asked him whether he had anything to do with the police cars and helicopters in the area.  His reply, that he did not want to tell her because he preferred that she not know, was a statement from which the jury could infer consciousness of guilt. Circumstantial evidence established that Her made numerous calls from Ly's cell phone in the early hours of the next morning, including some to Minnesota.  The day after the shooting, Her fled to Minnesota, where Ly eventually sent him money.

Based on the above evidence, a reasonable jury could find that Her was one of the three assailants who committed the drive-by shooting at 3212 Western that resulted in Fong Vue's death. Because the evidence was sufficient to find that Her was a direct perpetrator, we need not discuss his related contention that the evidence was insufficient to find him guilty as an accomplice.

(Slip Op. at p. 8-10.)

The Due Process Clause of the Fourteenth Amendment "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime for with which he is charged."  In re Winship, 397 U.S. 358, 364 (1970).  There is sufficient evidence to support a conviction, if "after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  "[T]he dispositive question under Jackson is 'whether the record evidence could reasonably support a finding of guilt beyond a reasonable doubt.'"  Chein v. Shumsky, 373 F.3d 978, 982 (9th Cir. 2004) (quoting Jackson, 443 U.S. at 318).  A petitioner for writ of habeas corpus "faces a heavy burden when challenging the sufficiency of the evidence used to obtain a state conviction on federal due process grounds."  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005).

A federal habeas court determines the sufficiency of the evidence in reference to the

16

1   substantive elements of the criminal offense as defined by state law.  See Jackson, 443 U.S. at

2   324 n. 16.  Murder is defined by California Law as "the unlawful killing of a human being . . .

3   with malice aforethought," see Cal. Penal Code § 187(a).  Murder in the first degree is defined as

4   follows:

5           All murder which is perpetrated by means of a destructive device
            or explosive, a weapon of mass destruction, knowing use of
6           ammunition designed to primarily penetrate metal or armor,
            poison, lying in wait, torture, or by any other kind of willful,
7           deliberate, and premeditated killing, or which is committed in the
            perpetration of, or attempt to perpetrate arson, rape, carjacking,
8           robbery, burglary, mayhem, kidnapping, train wrecking, or any
            action punishable under Section 206, 286, 288, 288a, or 289, or
9           any murder which is perpetrated by means of discharging a firearm
            from a motor vehicle, intentionally at another person outside of the
10          vehicle with the intent to inflict death, is murder of the first degree.

11  Cal. Penal Code § 189.  "Attempted murder requires the specific intent to kill and the

12  commission of a direct but ineffectual act toward accomplishing the intended killing."  People v.

13  Superior Court, 41 Cal. 4th 1, 7, 58 Cal. Rptr. 3d 421, 157 P.3d 1017 (2007).

14          Petitioner argues there was no direct or circumstantial evidence of Her's participation in

15  the shooting of Fong Vue and Yee Xiong nor evidence that he aided and abetted in their

16  shooting.  Petitioner is not entitled to federal habeas relief on this Claim.  Upon reviewing the

17  evidence in the light most favorable to the prosecution, the evidence in the record reasonably

18  supported the convictions as aptly explained and recited by the California Court of Appeal in its

19  decision on direct appeal.  The California Court of Appeal's decision was not an objectively

20  unreasonable application of clearly established federal law nor did it result in a decision that was

21  that was based on an unreasonable determination of the facts in light of the evidence presented in

22  state court.  Petitioner fails to meet his heavy burden to warrant granting federal habeas relief on

23  this insufficiency of the evidence argument.

24          B.  Claim II

25          In Claim II, Petitioner argues that there was insufficient evidence to support the finding of

26  the firearm enhancement pursuant to Cal. Penal Code § 12022.53.  With respect to the murder

1  count, the jury specifically found as true that Petitioner intentionally and personally discharged a

2  firearm thereby causing the death of Fong Vue within the meaning of Cal. Penal Code §

3  12022.53(d) and (e)(1).  (See Clerk's Tr. at p. 909.)  With respect to the attempted murder count,

4  the jury specifically found that Petitioner intentionally and personally discharged a firearm during

5  the attempted murder of Yee Xiong within the meaning of Cal. Penal Code § 12022.53(c) and

6  (e)(1).  (See Clerk's Tr. at p. 911.)  Petitioner argues that the prosecution failed to prove that he

7  had the requisite *mens rea*, or that the killing was unjustified.  (See Pet'r's Am. Pet. at p. 16.)

8       This Claim followed a similar procedural history to Claim I in that it was raised on direct

9  appeal to the California Court of Appeal which denied it on the merits but not to the California

10 Supreme Court in Petitioner's petition for review.  Petitioner then raised this Claim in his state

11 habeas petitions.  It was denied pursuant to Waltreus.  (See Resp't's Lodged Doc. 11 at p. 2

12 ("Petitioner next claims that the evidence was insufficient to support the gun enhancements on all

13 counts.  [¶]  The claim was raised and rejected on appeal, where the Third District Court of

14 Appeal found the evidence sufficient to show that petitioner participated in the drive-by shooting

15 and that he personally discharged a firearm in the commission of the offenses.  As such, it is

16 barred under Waltreus.").)  Thus, as with Claim I, the state courts' decisions on the state habeas

17 petitions will be looked through and the California Court of Appeal's decision on direct appeal

18 will be analyzed under the 28 U.S.C. § 2254(d) standard.

19      On direct appeal, the California Court of Appeal stated the following in deciding this

20 Claim:

21        For the reasons advanced in the previous argument [Petitioner's
       claim that there was insufficient evidence to support the murder
22        and attempted murder convictions], Her contends the special
       firearm findings were devoid of substantial evidence in the record
23        and should be stricken, since there was no evidence he *personally*
       discharged a firearm in the commission of the offense.
24

25        We reject the argument for the reasons we have just stated.  Two
       handguns and a shotgun were abandoned in the same area of West
26        Sacramento where the stolen Camry led Officer Estrada on a high-
       speed chase only a few hours earlier.  Hence, the trier of fact could

> find that *all three occupants* of the car personally discharged a firearm while driving past 3212 Western.

(Slip Op. at p. 11.)

The relevant standard for a sufficiency of the evidence claim was previously outlined in supra Part V.A. As previously noted, the evidence must be construed in the light most favorable to the prosecution. See Jackson, 443 U.S. at 319.

Petitioner is not entitled to federal habeas relief on this Claim. By way of example only, the evidence included Petitioner's DNA being found on a bandana inside the stolen blue Camry. Petitioner's jacket also was found within the stolen blue Camry that committed the drive-by shooting and three guns were present in the stolen blue Camry that perpetrated the drive-by shooting. Viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could have found that Petitioner intentionally and personally discharged a firearm during the commission of the murder and attempted murder of the victims. The California Court of Appeal's decision was not an objectively unreasonable application of clearly established federal law nor resulted in a decision that was based on an unreasonable determination of the facts as presented in the state court. Thus, Petitioner has failed to satisfy his heavy burden to warrant granting federal habeas relief on this Claim.

C. Claim III

In Claim III, Petitioner argues that there was insufficient evidence supporting the jury's finding of a gang enhancement pursuant to Cal. Penal Code § 186.22(b)(1). Within this Claim, Petitioner makes three distinct arguments; specifically: (1) the prosecution failed to prove Petitioner's membership in an ongoing association of three or more persons; (2) there was insufficient evidence concerning the primary activities of YMS/MOD; and (3) there was insufficient evidence to show that Petitioner acted with the specific intent to promote, further, or assist in any criminal conduct by gang members.

These arguments have a similar procedural histories as do Claims I and II. There was a

reasoned decision on the merits by the California Court of Appeal on direct appeal.  Petitioner

did not raise this Claim to the California Supreme Court in his petition for review on direct

appeal.  Petitioner then raised this Claim in his state habeas petitions which was deemed barred

by the state courts pursuant to <u>Waltreus</u>.  (<u>See</u> Resp't's Lodged Doc. 11 at p. 2 ("Petitioner next

claims that the evidence was insufficient to support the gang enhancements on all

counts.  [¶]  The claim was raised and rejected on appeal, where the Third District Court of

Appeal found the evidence sufficient to show the gang enhancements.  As such, it is barred under

<u>Waltreus</u>.").)  Thus, for the reasons previously outlined with respect to Claims I and II, the

California Court of Appeal's decision on direct appeal will be analyzed under the 28 U.S.C. §

2254(d) standard with respect to this Claim.  That court stated the following in analyzing this

Claim:

> Her contends that the evidence was insufficient to support the
> jury's finding that the shooting was committed to further criminal
> conduct by gang members within the meaning of section 186.22.
>
> Section 186.22, subdivision (b)(1) provides an enhancement
> punishment for any crime that has been committed "for the benefit
> of, at the direction of, or in association with [a] criminal street
> gang," and with specific intent "to promote, further, or assist . . .
> criminal conduct by gang members."
>
> There is no shortage of evidence that this crime was the direct
> result of hostilities between the MOD gang, to which Her
> belonged, and the HNS gang, with which two of the targeted
> victims were affiliated.
>
> There was also evidence that Her and his MOD companions stole a
> car and traveled to a known HNS neighborhood, where they
> committed the drive-by shooting targeting HNS members.  As the
> People's gang expert, Detective Lee explained, "reputation is
> everything in the gang subculture."  A drive-by shooting in the
> territory of a rival gang sends a powerful message to the
> community that MOD is composed of hard-core killers and
> therefore the community should fear and respect them.  Presented
> with a hypothetical based on the facts of the case, Lee opined that
> the shooting would "definitely benefit the MOD criminal street
> gang.  "A drive by shooting is a classic gang case.  Drive-by
> shootings are synonymous with gangs. . . . [¶]  You know, this
> drive-by, these circumstances that you have given me here, it sends
> a clear message to all of MOD's enemies that, hey, if you mess

with us, you're gonna pay the consequences."  "The use of expert testimony in the area of gang sociology and psychology is well established."  (People v. Olguin (1994) 31 Cal.App.4th 1355, 1370 (Olguin).)

We conclude that the trier of fact could reasonably find the crime was committed for the benefit of a street gang.  (See People v. Duran (2002) 97 Cal.App.4th 1448, 1465; Olguin, supra, 31 Cal.App.4th at pp. 1382-1383.)

While not contesting evidence that he was a validated member of YMS, Her claims that the gang enhancement finding was unsupported because the prosecution failed to prove that YMS was a criminal street gang within the meaning of the statute, i.e., an "ongoing organization, association, or group of three or more persons" sharing a common name or common identifying sign or symbol, that has as one of its "primary activities" the commission of specified criminal offenses; and engages through its members in a "pattern of criminal gang activity."  (§ 186.22, subd. (f); see People v. Gardeley (1996) 14 Cal.4th 605, 610 (Gardeley).)

Her's argument reads the enhancement statute too narrowly.  The enhancement is triggered when the crime is "committed for the *benefit of*, at the direction of, or *in association with* any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members."  (§ 186.22, subd. (b)(1), italics added).  YMS was a junior "wannabe" gang, populated by younger relatives and friends of the MOD's.  Detective Lee described a long record of homicides and other violent crimes engaged in by the MOD gang.  Since YMS was a junior street gang operating under the MOD umbrella and Her called himself a MOD, the jury would find that the crime was committed for the benefit of and to promote the criminal activities of the MOD gang, regardless of whether Her himself was a validated member.

Her's argument that there was insufficient evidence to show that crimes of violence and theft were MOD's "primary activities" borders on frivolous.  Detective Lee testified extensively as to numerous street crimes engaged in by MOD since extensively as to numerous street crimes engaged in by MOD since the 1990's, including beatings, stabbings, drive-by shootings and car-thefts.  [FN 3]  The jury was also entitled to consider the *present* drive-by shooting as evidence of the group's primary activities.  (People v. Sengpadychith (2001) 26 Cal.4th 316, 323.)  Incontrovertibly, there was substantial evidence that one of MOD's primary activities was the commission of gang crimes enumerated within the statute.  (§ 186.22, subd. (e); see Sengpadychith, supra, at pp. 323-324; Gardeley, supra, 14 Cal.4th at p. 620.)

[FN 3]  Her's claim that Detective Lee's testimony was based on nothing more than "nonspecific hearsay" is without merit.  First, the point was forfeited because Her's trial attorney never lodged a

1   hearsay objective in the trial court.  (Evid. Code, § 353.)
    Moreover, the fact that a gang expert bases his opinion on hearsay
2   does not render per se such testimony objectionable.  (Olguin,
    supra, 31 Cal.App.4th at p. 1385.)
3
    Finally, we reject the argument that the prosecution failed to show
4   that Her harbored a specific intent to promote criminal activity by
    gang members.  As stated in People v. Morales (2003) 112
5   Cal.App.4th 1176, "specific intent to *benefit the gang* is not
    required.  What is required is the 'specific intent to promote,
6   further, or assist in any criminal conduct by gang members.'" (Id.
    at p. 1198, italics added.)  The evidence we have recited, that Her
7   knowingly aided members of MOD in committing the drive-by
    shooting, was sufficient of itself to satisfy the specific intent
8   requirement.  (Ibid.)

9   (Slip Op. at p. 11-14.)

10      The standard for a sufficiency of the evidence claim has previously been articulated.

11  See supra Part V.A.  The substantive elements of the gang enhancement as defined under state

12  law must be analyzed in determining whether Petitioner should be granted habeas relief on this

13  insufficiency of the evidence claim.  See Jackson, 443 U.S. at 324 n.16.

14      California Penal Code § 186.22(b)(1) states that "any person who is convicted of a felony

15  committed for the benefit of, at the direction of, or in association with any criminal street gang,

16  with the specific intent to promote, further, or assist in any criminal conduct by gang members,

17  shall, upon conviction of that felony, in addition and consecutive to the punishment prescribed

18  for the felony or attempted felony of which he or she has been convicted . . . ."  The statute then

19  outlines the relevant punishments depending upon the nature of the felony.  See id.

20      Petitioner's first two arguments within this Claim argue that the prosecutor failed to show

21  sufficient evidence that YMS or even MOD satisfies the definition of a criminal street gang

22  under the statute.  California Penal Code § 186.22(f) defines a "criminal street gang" as "any

23  ongoing organization, association, or group of three or more persons, whether formal or informal,

24  having one of its primary activities the commission of one or more of the criminal acts

25  enumerated [in subdivsiion (e) of the statute, the 'predicate offenses'] . . . and whose members

26  individually or collectively engage in or have engaged in a pattern of criminal activity."  See also

1   People v. Gardeley, 14 Cal. 4th 605, 617, 59 Cal. Rptr. 2d 356, 927 P.2d 713 (1996) ("[T]he

2   prosecution must prove that the gang (1) is an ongoing association of three or more persons with

3   a common name or common identifying symbol; (2) has as one of its primary activities the

4   commission of one or more of the criminal acts enumerated in the statute; and (3) includes

5   members who either individually or collectively have engaged in a 'pattern of criminal gang

6   activity' by committing, attempting to commit, or soliciting *two or more* of the enumerated

7   offenses (the so-called 'predicate offenses') during the statutorily defined period.").

8          Petitioner first argues that the prosecution failed to show that YMS was an ongoing

9   association of three or more persons at the time of the shooting.  Detective Lee (the gang expert)

10  testified that Petitioner was a gang member.  (See id. at 974.)  Lee testified that Petitioner was a

11  validated member of YMS.  (See Reporter's Tr. at p. 972.)  He stated that YMS is a subgroup of

12  MOD.  (See id. at 949.)  The following colloquy took place between the prosecutor and Detective

13  Lee during the trial:

14          Q:  You believe Kinson Her, as you testified, it's your opinion that
            he is a gang member?
15          A:  Oh, yes.
            Q:  What do you base that opinion on?
16          A:  Well, obviously he was validated from – by Officer Gin back
            on December 13th of 2000 [as YMS].  [¶]  During his previous
17          crimes, he had been arrested with other known TLR, YMS, MOD
            gang members.  [¶]  He obviously has an association with
18          individuals such as Xang Tao, Laksu Chau, Peter Lor, and, of
            course, his brother Xiong Her.
19

20  (Reporter's Tr. at p. 974.)  Detective Lee further stated that "Steve Thang, Ceng Vang, Xang

21  Tao, Kinson Her, Kong Vang, and Woodrow Tao" were all members of MOD.  (See id. at p.

22  976.)  He also stated that he believed that co-defendant Lao was a MOD member.  (See id. at p.

23  977.)  Thus, there were more than three members of the criminal street gang that Petitioner was

24  affiliated with (i.e. YMS/MOD).  (See id. at p. 969-72 (detailing several individuals that are

25  members of YMS/MOD).)  As previously stated, the evidence in a sufficiency of the evidence

26  claim must be viewed in the light most favorable to the prosecution.  See Jackson, 443 U.S. at

1   319. Petitioner failed to establish that there was insufficient evidence in the record that there was

2   an ongoing association of three or more persons that Petitioner was associated with at the time of

3   the shooting.

4          Next, Petitioner argues that there was insufficient evidence that one of the primary

5   activities of YMS/MOD was one of the criminal acts enunciated in the gang enhancement statute.

6   In support of this argument, Petitioner relies on People v. Perez, 118 Cal. App. 4th 151, 12 Cal.

7   Rptr. 3d 821 (2004).  In Perez, the California Court of Appeal determined that there was

8   insufficient evidence to support the gang enhancement as the prosecution failed to show that the

9   gang's primary activities were the commission of enumerated crimes.  In that case, the evidence

10  produced at trial was deemed insufficient because, as stated by the California Court of Appeal:

11              Even if we assume that the CLB gang was responsible for the
               shootings of Asians on February 16 and 18, as well as the shooting
12              of Siuva C., such evidence of the retaliatory shootings of a few
               individuals over a period of less than a week, together with a
13              beating six years earlier, was insufficient to establish that the
               group's members *consistently and repeatedly* have committed
14              criminal activity listed in the gang statute.

15  Id. at 160, 12 Cal. Rptr. 3d 821 (emphasis in original and internal quotation marks and citation

16  omitted).  Unlike Perez, there was substantial testimony from the gang expert regarding the fact

17  that one of the primary activities of MOD was engaging in the criminal acts enunciated in the

18  criminal gang enhancement statute.  The gang expert testified that MOD is involved in

19  homicides, drive-by shootings and many violent crimes.  (See Reporter's Tr. at p. 951.)  More

20  specifically, Detective Lee testified to several crimes related to MOD criminal activities in the

21  1990's through 2001.  (See id. at 953-57.)  When viewing this evidence in the light most

22  favorable to the prosecution, it was sufficient to find that one of the primary activities of

23  YMS/MOD was committing crimes enumerated in the gang enhancement statute.

24          Finally, Petitioner argues that there was insufficient evidence to show that Petitioner

25  acted with the specific intent to promote, further, or assist in any criminal conduct by gang

26  members.  Up until recently, there was a divergence of opinion between the California state

1   courts and the federal courts in determining what is the proper inquiry in deciding this type of

2   claim.  The Ninth Circuit set forth the a standard for federal habeas courts to use in analyzing

3   such a sufficiency of the evidence claim in Garcia v. Carey, 395 F.1099 (9th Cir. 2005) and

4   Briceno v. Scribner, 555 F.3d 1069 (9th Cir. 2009).  Under Garcia/Briceno, a prosecutor had to

5   satisfy two prongs for there to be sufficient evidence to warrant a finding of a gang enhancement

6   pursuant to § 186.22(b)(1).  First, the evidence must have showed that the defendant committed

7   the felony "for the benefit of, at the discretion of, or in association with [a] criminal street gang."

8   Briceno, 555 F.3d at 1078 (quoting Cal. Penal Code § 186.22(b)(1)).  Second, the evidence must

9   have showed that the defendant committed the crime "with the specific intent to promote, further,

10  or assist in any criminal conduct by gang members."  Id. (quoting Cal. Penal Code §

11  186.22(b)(1)).  As noted by the Ninth Circuit, it was important that these two requirements were

12  kept separate and not merged.  Furthermore, the second prong inquiry was not satisfied by

13  evidence of mere membership in a criminal street gang alone.  See id. (citing Garcia, 395 F.3d at

14  1102-03 & n.5).

15          In Garcia, the court found that:

16              There is nothing in this record, however, that would support an
                inference that Garcia robbed Bojorquez with the specific intent to
17              facilitate other criminal conduct by the E.M.F.  The evidence
                indicates that Garcia was a gang member and that he robbed
18              Bojorquez in an area known to be in the heart of the gang's "turf."
                Detective Hernandez, the gang expert, testified that the gang was
19              "turf oriented," and he described three robberies committed by
                E.M.F. members in El Monte during the few months prior to
20              Garcia's offense.  But there is no evidence indicating that this
                robbery was committed with the specific purpose of furthering
21              other gang criminal activity, and there is nothing inherent in the
                robbery that would indicate that it furthers some other crime.
22              There is nothing on the record that connects the "turf-orientated"
                nature of the gang with the commission of robberies generally, or
23              more importantly, with the commission of this robbery in
                particular.   There is no testimony that protection of turf enables
24              any other kind of criminal activity of the gang.  The expert's
                testimony is singularly silent on what criminal activity of the gang
25              was furthered or intended to be furthered by the robbery of
                Bojorquez.

26

Id. at 1103.  Thus, the Ninth Circuit found that there was a lack of evidentiary support for the specific intent to further other gang criminal activity.  See id. at 1004.

In Briceno, the Ninth Circuit reaffirmed Garcia despite the fact that the California Appellate Court had held that Garcia misinterpreted California law.  See Lopez v. Walker, Civ. No. 08-0598, 2010 WL 1558953, at *12 n. 49 (E.D. Cal. April 19, 2010) ("[E]very California Court of Appeal decision since Briceno has agreed that Briceno and Garcia misinterpreted California law with respect to whether the crime must be committed in furtherance of some other criminal activity, and declined to follow them.").

Conversely, California state courts had interpreted § 186.22(b)(1) differently than the Ninth Circuit.  In People v. Vazquez, 178 Cal. App. 4th 347, 353-54, 100 Cal. Rptr. 3d 351 (2009), the California Court of Appeal explained the divergent opinions between the Ninth Circuit and the California state courts on this issue:

> In Briceno, supra, and Garcia, supra, the Ninth Circuit held that the specific intent requirement of section 186.22, subdivision (b) is not satisfied by evidence of a defendant's gang membership alone, and instead requires some evidence, aside from a gang expert's "generic testimony," that supports an inference that the defendant committed the crime "'with the specific intent to facilitate other criminal conduct by the [gang].'" (Briceno, supra, 555 F.3d at p. 1079, quoting Garcia, supra, 395 F.3d at p. 1103.)  Among other things, according to the Ninth Circuit, the statute requires evidence describing "'what criminal activity of the gang was . . . intended to be furthered'" by the crime.  (Id., quoting Garcia, supra, at p. 1103.)

> While our Supreme Court has not yet reached this issue, numerous California courts of appeal have rejected the Ninth Circuit's reasoning.  As our colleagues noted in People v. Romero (2006) 140 Cal.App.4th 15, 19, 43 Cal.Rptr.3d 862: "By its plain language, the statute requires a showing of specific intent to promote, further, or assist in 'any other criminal conduct (§ 186.22, subd. (b)(1), italics added.)"  Thus, if substantial evidence establishes that the defendant is a gang member who intended to commit the charged felony in association with other gang members, the jury may fairly infer that the defendant also intended for his crime to promote, further or assist criminal conduct by those gang members.  (Id. at pp. 19-20, 43 Cal.Rptr.3d 862.)

1       In May 2010, the Ninth Circuit requested that the California Supreme Court answer

2  several questions in <u>Emery v. Clark</u>, 604 F.3d 1102 (9th Cir. 2010) in light of the conflicting

3  interpretations of the California gang enhancement statute in the federal and state courts.  Among

4  the questions that the Ninth Circuit requested that the California Supreme Court answer was

5  whether "California's street gang enhancement statute, in particular the element of 'specific

6  intent to promote, further, or assist in any criminal conduct by gang members' in California Penal

7  Code section 186.22(b)(1), require proof that the defendant specifically intended to promote,

8  further, or assist in *other* criminal gang activity, apart from the offense of conviction?"  <u>Id.</u> at

9  1103 (footnote and citations omitted).

10       On June 23, 2010, the California Supreme Court granted the request for certification but

11  deferred further action in the <u>Emery</u> matter pending consideration of related issues in another

12  case, specifically <u>People v. Albillar</u>, No. S163905.  On December 20, 2010, the California

13  Supreme Court decided <u>People v. Albillar</u>, 51 Cal. 4th 47, 119 Cal.Rptr. 3d 415, 244 P.3d 1062

14  (2010).  In <u>Albillar</u>, the California Supreme Court noted the conflict between the California state

15  and federal courts with respect to the interpretation of section 186.22.(b)(1).  <u>See id.</u> at 66.  The

16  court expressly rejected the Ninth Circuit's interpretation of the statute by stating that:

17             we reject the Ninth Circuit's attempt to write additional
requirements into the statute.  It provides an enhanced penalty
18            where the defendant specifically intends to 'promote, further, or
assist in any criminal conduct by gang members.'  (§ 186.22, subd.
19            (b)(1).)  There is no statutory requirement that this 'criminal
conduct by gang members' be distinct from the charged offense, or
20            that the evidence establish specific crimes the defendant intended
to assist his fellow gang members in committing.

21

22  <u>Id.</u>  Ultimately, the California Supreme Court held that:

23             We . . . find that the scienter requirement in section 186.22(b)(1)-
i.e., "the specific intent to promote, further or assist in any criminal
24            conduct by gang members" - is unambiguous and applies to *any*
criminal conduct, without a further requirement that the conduct be
25            "apart from" the criminal conduct underlying the offense of
conviction sought to be enhanced.

26

1
2
3
4
5
6

> A similar analysis disposes of the related argument, advanced by all three defendants, that section 186.22(b)(1) requires the specific intent to promote, further, or assist a *gang-related* crime. The enhancement already requires proof that the defendant commit a gang-related crime in the first prong-i.e., that the defendant be convicted of a felony for the benefit of, at the direction of, or in association with a criminal street gang . . . There is no further requirement that the defendant act with the specific intent to promote, further, or assist a *gang*; the statute requires only the specific intent to promote, further, or assist criminal conduct by gang members.

7   Id. at 66-67. The court concluded by stating that, "[i]n sum, if substantial evidence establishes

8   that the defendant intended to and did commit the charged felony with known members of a

9   gang, the jury may fairly infer that the defendant had the specific intent to promote, further or

10  assist criminal conduct by those gang members." Id. at 68. The court did note however that not

11  every crime that is committed by gang members is related to a gang. See id. at 60.

12      A federal court interpreting state law is bound by the decisions of the highest state court.

13  See Vernon v. City of Los Angeles, 27 F.3d 1385, 1391 (9th Cir. 1994). As the California

14  Supreme Court has now spoken on what constitutes sufficient evidence under section

15  186.22(b)(1), the standard set forth in Albillar applies in this case rather than the standard set

16  forth by the Ninth Circuit in Garcia and Briceno. See Bonilla v. Adams, No. 07-55626, 2011

17  WL 1058181, at *1 (9th Cir. Mar. 24, 2011).

18      In this case, the gang expert testified that:

19
20
21
22
23
24
25

> reputation is everything in the gang subculture. You want to – you want to have that reputation. You want to build yourself up as being hard core. If you can do a drive by shooting and get away with it, then that's another notch on your belt, but that type of reputation to them translates into that respect and that's ultimately what they are trying to achieve, is that respect, that notoriety within the gang . . . . when you commit a drive-by shooting or 187, that earns that street credibility within the gang. It is sending a clear message that MOD, we're hard core killers. We have this – obviously this infamous history already and we are continuing this legacy. [¶] And ultimately that's what they want. That's what they want to be known as. They want their rivals to fear them. They want people in the community to fear them, and to them, that fear equals respect.

26

28

(Reporter's Tr. at p. 960-61.)  The prosecutor then asked the gang expert the following

hypothetical:

> Q:  I want you to assume for a moment that there are at least three individuals in a car that associate themselves with MOD, that the car is stolen recently, that they drive to Western Avenue and go to a house, with a boat, that they are in possession of a pistol grip shotgun, it's a pump action, that they are in possession of a loaded .32-caliber handgun and a .380 semiautomatic handgun, that they approach the house with the boat, that they fire at least two rounds with the shotgun, several rounds with the .32 and at least one round with the .380.  [¶]  Do you have an opinion as to whether that particular crime would be for the benefit of the MOD or benefit of the criminal street gang?
>
> A:  Definitely.  A drive-by shooting is a classic gang case.  Drive-by shootings are synonymous with gangs.  I can't think of one drive-by shooting that I have investigated that is not somehow gang-related.  [¶]  You know, this drive-by shooting, these circumstances which you have given me here, it sends a clear message to all of MOD's enemies that, hey, if you mess with us, you're gonna pay the consequences.

(Id. at p. 962.)  The evidence indicated that Petitioner committed the drive-by shooting with

known members of a gang, MOD.  As Albillar made clear, where substantial evidence

established that the defendant intended to and did commit a charged felony with known gang

members, the jury may fairly infer that defendant had the specific intent to promote, further or

assist criminal conduct by those gang members.  See Albillar, 51 Cal. 4th at 66, 119 Cal. Rptr. 3d

415, 244 P.3d 1062 ("There is no further requirement that the defendant act with the specific into

to promote, further, or assist a gang; the statute requires only the specific intent to promote,

further, or assist criminal conduct by gang members.")  In this case, there was evidence that

Petitioner along with Lao intended to commit the drive-by shooting together as the evidence

indicated that they were in the stolen Camry together that committed the drive-by shooting.  They

were each members of the same criminal street gang, namely MOD.  The gang expert testified

during trial that he believed that Lao was a member of MOD.  (See Reporter's Tr. at p. 977.)  The

gang expert further testified that a drive-by shooting tells the gang's rivals not to mess with that

gang.  (See id. at p. 962.)  Viewing the evidence in the record in the light most favorable to the

1    prosecution, Petitioner's assertions that there was insufficient evidence to support the gang

2    enhancements do not warrant granting federal habeas relief on Claim III.

3        D.  Claim IV

4        Petitioner raises several ineffective assistance of counsel arguments within Claim IV;

5    specifically Petitioner asserted in his amended federal habeas petition that trial counsel was

6    ineffective by:  (1) failing to investigate a witness named Vang; (2) failing to object to a

7    hypothetical question asked of the gang expert which mischaracterized the evidence; (3) failing

8    to object when the gang expert characterized Petitioner as a "hard core killer"; (4) erring in

9    giving an ineffective example during closing argument; (5) failing to present an expert witness at

10   trial; and (6) failing to request an inquiry into Detective Stigerts' purported prohibited

11   communication with the jury.

12            i.  Applicable Law

13       The Sixth Amendment guarantees effective assistance of counsel.  In <u>Strickland v.</u>

14   <u>Washington</u>, 466 U.S. 668 (1984), the Supreme Court articulated the test for demonstrating

15   ineffective assistance of counsel.  First, the petitioner must show that considering all the

16   circumstances, counsel's performance fell below an objective standard of reasonableness.  <u>See id.</u>

17   at 688.  Petitioner must identify the acts or omissions that are alleged not to have been the result

18   of reasonable professional judgment.  <u>See id.</u> at 690.  The federal court must then determine

19   whether in light of all the circumstances, the identified acts or omissions were outside the range

20   of professional competent assistance.  <u>See id.</u>

21       Second, a petitioner must affirmatively prove prejudice.  <u>See id.</u> at 693.  Prejudice is

22   found where "there is a reasonable probability that, but for counsel's unprofessional errors, the

23   result of the proceeding would have been different."  <u>Id.</u> at 694.  A reasonable probability is "a

24   probability sufficient to undermine the confidence in the outcome."  <u>Id.</u>  A reviewing court "need

25   not determine whether counsel's performance was deficient before examining the prejudice

26   suffered by defendant as a result of the alleged deficiencies . . . [i]f it is easier to dispose of an

1   ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be

2   followed." Pizzuto v. Arave, 280 F.3d 949, 955 (9th Cir. 2002) (citing Strickland, 466 U.S. at

3   597).

4                ii.  Failing to investigate witness Vang

5           Petitioner argued in his amended habeas petition that trial counsel was ineffective for

6   failing to investigate a witness named "Vang."  However, Petitioner withdrew this argument as

7   stated in his traverse.

8                iii.  Failing to object to the prosecution witness' inflammatory characterization

9           Next, Petitioner argues that trial counsel was ineffective in failing to object to a

10  hypothetical question posed by the prosecutor to the gang expert.  The hypothetical question that

11  was asked of the expert was the following:

12          Q:  I want you to assume for a moment that there are at least three
            individuals in a car that associate themselves with MOD, that the
13          car is stolen recently, that they drive to Western Avenue and go to
            a house, with a boat, that they are in possession of a pistol grip
14          shotgun, it's a pump action, that they are in possession of a loaded
            .32-caliber handgun and a .380 semiautomatic handgun, that they
15          approach the house with the boat, that they fire at least two rounds
            withe the shotgun, several rounds with the .32 and at least one
16          round with the .380. [¶]  Do you have an opinion as to whether that
            particular crime would be for the benefit of the MOD or benefit of
17          the criminal street gang?

18  (Reporter's Tr. at p. 962.)  Petitioner argues that the proposed hypothetical should have been

19  objected to because it misconstrued the evidence in three respects:  (1) the description of the

20  three vehicle occupants as MOD members was not proven; (2) there was no sawed-off shotgun in

21  this case; and (3) the hypothetical assumes that the occupants of the vehicle fired first.  (See

22  Pet'r's Am. Pet. at p. 24-25.)

23          The last reasoned decision on these arguments came from the Sacramento County

24  Superior Court which stated the following in denying this ineffective assistance of counsel claim:

25          Petitioner next claims that defense counsel was ineffective in
            failing to object to gang expert Lee's opinion that the drive-by
26          shooting was committed for the benefit of the gang, because the

                                        31

hypothetical question was not rooted from the facts shown by the evidence. Petitioner notes that defense trial counsel's failure resulted in a waiver of the issue on appeal, as determined by the Third District in the appeal.

Petitioner fails to note, however, that petitioner's girlfriend Ly testified at trial that petitioner represented himself to be a member of the MOD gang, that the expert testified that petitioner had been a validated member of a subset of that gang since 2000, and that other evidence showed that the victims were members of a rival gang and that petitioner and his accomplices had driven into territory well know to be that of the rival gang and committed the drive-by shooting. These were sufficient facts upon which to base the opinion that the shooting was for the benefit of the gang. As such, any objection to the opinion would have been denied, had one been made, and defense trial counsel was not ineffective in failing to make the objection (see Strickland v. Washington (1984) 466 U.S. 668).

(Resp't's Lodged Doc. 11 at p. 5.)

An attorney's failure to make a meritless objection does not constitute ineffective assistance of counsel. See Matylinsky v. Budge, 577 F.3d 1083, 1094 (9th Cir. 2009) (concluding counsel's failure to object to testimony on hearsay grounds not ineffective where objection would have been properly overruled); Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) ("[T]he failure to take a futile action can never be deficient performance . . . ."). There was evidence in the record that the occupants of the stolen Camry which performed the drive-by shooting were members of MOD. The gang expert testified that both Petitioner and Lao were YMS/MOD members and evidence in the record linked both of them as occupants of the vehicle. With respect to Petitioner's second argument, defense counsel did object to the prosecutor's use of the term "sawed off shotgun" and the trial judge suggested that the prosecutor rephrase it as a "shortened shotgun." (See Reporter's Tr. at p. 962.) Thus, Petitioner's claim that trial counsel was ineffective for failing to object is contrary to the record. Finally, evidence in the record included testimony regarding who fired the first shots. (See, e.g., Reporter's Tr. at 174, 178-79). Therefore, Petitioner fails to show that counsel's performance was objectively unreasonable in failing to object to this proposed hypothetical question by the prosecutor to the gang expert.

Petitioner is not entitled to federal habeas relief on this argument.

                    iv.  Failure to object to gang expert's characterization of Petitioner as a "hard core killer"

Next, Petitioner argues that trial counsel was ineffective in failing to object when the gang expert referred to Petitioner as a "hard core killer."  This argument was raised by Petitioner in his state habeas petitions.  However, no court provided a reasoned decision of this Claim. Therefore, the California Supreme Court's summary denial of Petitioner's state habeas petition is applicable.  As that was a summary denial, the record will be independently reviewed to analyze whether the California Supreme Court's denial of this argument was an objectively unreasonable application of clearly established federal law or was based on an unreasonable determination of the facts in light of the record.  See Musladin, 555 F.3d at 835; see also Harrington v. Richter, 131 S.Ct. 770, 784-85 (2011) (stating that a summary denial constitutes a decision on the merits).

The following colloquy took place between the prosecutor and the gang expert during trial:

> Q:  Now let's talk about Kinson Her.  [¶]  With respect to Kinson Her, do you believe him – where do you believe he falls in terms of his level of participation and activity as a gang member?
> A:  I put him right up there at the top –
> Q:  Explain why.
> A:  – of being a hard core killer.  [¶]  He had progressed from his previous times he was arrested, from stealing a vehicle to illegal gun possession in a vehicle, now to a homicide.

(Reporter's Tr. at p. 973.)  However, on cross-examination, the gang expert qualified his statement in the following colloquy with Petitioner's trial counsel:

> Q:  [Y]ou were asked questions about levels of participation, people being at certain levels, other levels, and your characterization of him being, quote, at the top, according to your words --
> A:  Okay.
> Q:  – is based on your assumption that he is guilty of the crimes he is charged with in this case; isn't that true?
> A:  Well, I believe – yes, that is true, and if you're going to participate in a drive-by shooting which ultimately leads to a homicide, he would be at the – I would consider a hard core gang member.

1
Q:  Okay.  And that's based on your – again, your assumption that he is guilty of the crimes in this case?

2
A:  Yes.

Q:  So, in other words, you're utilizing this case as a basis for your

3
opinion about his level of participation in a particular gang?

A:  Well, if we didn't have this case, I wouldn't be here right now.

4
So . . .

Q:  If we didn't have this case, you wouldn't put him as a top level

5
MOD participant, would you?

A:  That's correct

6

7   (Reporter's Tr. at 993-94.)

8        Petitioner failed to show to a reasonable probability that the outcome of the proceeding

9   would have been different had trial counsel made this objection.  The evidence giving rise to

10  Petitioner's conviction and enhancements was strong.  To reiterate, and by way of example only,

11  it included Petitioner's DNA on the bandana found within the stolen Camry which committed the

12  drive-by shooting.  Another MOD gang member was identified in the stolen Camry which

13  committed the crime.  Evidence produced at trial indicated that drive-by shootings was one of the

14  primary activities of MOD and that HNS was a rival gang to MOD and the shooting occurred in

15  or near HNS territory.  The failure of Petitioner's trial counsel to object to the gang expert's

16  characterization as a "hard core killer" did not prejudice Petitioner under the requisite Strickland

17  standard.

18                v.  Trial counsel's errors in closing argument

19       Petitioner next argued that trial counsel was ineffective during closing argument when he

20  misspoke.  However, Petitioner withdrew this argument as stated in his traverse.

21                vi.  Failure to present an expert witness at trial

22       Petitioner next argues that trial counsel was ineffective for failing to present an expert

23  witness at trial.  More specifically, Petitioner states that his trial counsel told him that there was

24  an expert witness willing to testify on his behalf that the people at 3212 Western Avenue fired

25  first.  (See Pet'r's Am. Pet. at p. 28.)  Petitioner raised this issue in his state habeas petitions.  As

26  both the California Supreme Court and the California Court of Appeal issued summary denials,

34

1  those decisions will be "looked through" to the last reasoned decision which was from

2  Sacramento County Superior Court.  That court stated the following in analyzing this claim:

3              Petitioner next claims that defense trial counsel was ineffective in
            failing to present an expert witness to testify on his
4            behalf.  [¶]  Petitioner fails to attach reasonably available
            documentary evidence such as an affidavit from an expert setting
5            forth what testimony the expert would have given at trial that
            would have been reasonably likely to have made a difference in the
6            outcome of the trial.  As such, the claim fails under Swain and
            Harris.
7

8  (Resp't's Lodged Doc. 11 at p. 5.)  As outlined above, the state courts denied this argument due

9  to Petitioner's failure to attach relevant documentary evidence in support.

10          In his answer, Respondent argues that this claim is unexhausted.  (See Resp't's Answer at

11  p. 26.)  A state prisoner must exhaust state court remedies before petitioning for a writ of habeas

12  corpus in federal court.  See 28 U.S.C. § 2254(b); Duncan v. Henry, 513 U.S. 364, 365 (1995)

13  (per curiam).  To exhaust state remedies, the prisoner must "fairly present" both operative facts

14  and federal legal theory supporting his federal claim to the state's highest court, "thereby alerting

15  that court to the federal nature of the claim."  Baldwin v. Reese, 541 U.S. 27, 29 (2004).

16          The Ninth Circuit has held that where a state court holds that a petitioner has not pled

17  facts with sufficient particularity, that it is equivalent to the grant of a demurrer.  See Gaston v.

18  Palmer, 417 F.3d 1030, 1039 (9th Cir. 2006), modified on other grounds, 447 F.3d 1165 (9th Cir.

19  2006).  "That deficiency, when it exists, can be cured in a renewed petition" and constitutes a

20  denial of the petition on procedural grounds.  See Kim v. Villalbos, 799 F.2d 1317, 1319 (9th

21  Cir. 1986).  However, a citation to Swain does not per se indicate that the a claim is unexhausted.

22  See id. at 1319-20.  Rather, the federal court is required to determine whether petitioner "fairly

23  presented" his claim to the California Supreme Court.  See id.

24          Under Kim, the state habeas petition must be independently examined to determine

25  whether this argument was capable of being alleged with greater particularity and is therefore

26  unexhausted.  See id. at 1320.  As previously stated, Petitioner must show two things to be

35

1  entitled to habeas relief for ineffective assistance of counsel.  First, he must show that trial

2  counsel's performance feel below an objective standard of reasonableness.  See Strickland, 466

3  U.S 687-88.  Second, he must show that he suffered prejudice, in that there is a reasonable

4  probability that but for counsel's unprofessional errors, Petitioner would have prevailed.  See id.

5  at 694.  Petitioner was required to allege specific facts that, if proven, would establish that trial

6  counsel's conduct fell below that of a reasonable attorney and that the outcome of the proceeding

7  would have been different.  In his state habeas petition, Petitioner provides only generalities

8  regarding the alleged expert witness.  He provides no documentary evidence indicating who this

9  expert was nor does he provide any information in the form of an affidavit or similar document

10  indicating what this unnamed expert would have stated if he testified at trial.  The state court's

11  denial of this argument for failing to state the claim with sufficient particularity was appropriate

12  under these circumstances.  Therefore, the argument is deemed unexhausted.

13       Nevertheless, even though the argument is deemed unexhausted, an unexhausted claim

14  can still be denied on the merits where the claim is deemed to be not "colorable."  See Cassett v.

15  Stewart, 406 F.3d 614, 624 (9th Cir. 2005).  Under these circumstances it is easier to analyze this

16  argument under the Strickland prejudice prong.  To establish prejudice caused by the failure to

17  call a witness, Petitioner must show that the witness was likely to have been available to testify,

18  that the witness would have given the proffered testimony and that the witness would have

19  created a reasonable probability that the jury would have reached a verdict more favorable to

20  Petitioner.  See Grisby v. Blodgett, 130 F.3d 365, 373 (9th Cir. 1997) (speculating as to what a

21  proposed witness would say is not enough to establish prejudice); United States v. Harden, 846

22  F.2d 1229, 1231-32 (9th Cir. 1988) (no ineffective assistance because of counsel's failure to call

23  a witness where, among other things, there was no evidence in the record that the witness would

24  testify).  Petitioner fails to present any type of documentation, such as an affidavit that this

25  unnamed expert would have been available to testify.  Furthermore, Petitioner presents no

26  evidence indicating that the unnamed expert would have given the proffered testimony, namely

1   that the people at Western Avenue fired first.  Therefore, Petitioner failed to present a colorable

2   ineffective assistance of counsel claim with respect to this argument.

3              vii.  Failure to request inquiry into Detective Stigerts communication with the jury

4          Next, Petitioner argues that trial counsel failed to inquire into possible prohibited

5   communications that Detective Stigerts, a prosecution witness, had with the jury.  Petitioner

6   argues that counsel's conduct fell below an objective standard of reasonableness and that the

7   result of his proceeding would have been more favorable had trial counsel made this inquiry.

8   Petitioner raised this claim in his state habeas petitions.  The last reasoned decision on this claim

9   was from the Sacramento County Superior Court which denied the claim due to Petitioner's

10   failure to attach the reporters transcript and failure to set forth the claim with sufficient

11   particularity  The Superior Court relied on <u>Swain</u> and <u>Harris</u> in denying this claim.

12          Even though the state court's denial of this claim for Petitioner's failure to plead with

13   sufficient particularity may deem this claim unexhausted under these circumstances, the

14   unexhausted argument can still be denied on the merits if it is deemed not "colorable."  <u>See</u>

15   <u>Cassett</u>, 406 F.3d at 624.

16          In the middle of the trial, Defendant Lao's counsel (Ms. Rogers) stated to the trial court

17   the following:

18          Your Honor, at this time I would just like the record to reflect that
           earlier in the morning the court had to admonish Detective Stigerts,
19          who has been present as the DA's investigative officer, because she
           had approached the jury and made some comments to the
20          jury.  [¶]  And, also, there was some conversation about – between
           the prosecutor and Detective Stigerts about pulling pictures, which
21          the court also admonished the detective about.

22   (Reporter's Tr. at p. 510.)  The trial judge responded that:

23          All right.  I will indicate for the record that one of the jurors spilled
           a large cup of coffee.  And we had that wiped up, and I think the
24          detective said something to the juror about the coffee.  I
           admonished her that – just to not have any contact with the jurors
25          even though it was unrelated to the case.

26          I think it was just a mistake on her part.  I do not find that she in

1
2
3
>any way intended to ingratiate herself with the jurors or did anything that would amount to a mistrial.  She was admonished to not have any contact.  Again, it was an incidental comment about a spill of coffee.

4
5
>And I did just caution the DA and the detective to be careful when they're conferring just because we're in a crowded courtroom and to make sure that they either communicate by notes or that she whisper directly in his ear so nothing could possibly be overheard.

6
(Id. at 510-11.)

7   Here, the trial court was put on notice (by Lao's counsel) about the purported

8  communication between Detective Stigerts and the jury.  The mere fact that Petitioner's counsel

9  did not put this on the record did not fall below an objective standard of reasonableness in that

10  the issue was presented to the trial court by co-defendant's counsel.  Therefore, Petitioner cannot

11  meet the first prong of the Strickland test with respect to this argument as the issue was in fact

12  raised in the trial court.

13   Petitioner also fails to satisfy the second prong of the Strickland test; namely that but for

14  counsel's purported ineffectiveness, the result of the proceeding would have been different.

15  Unless it is de minimus, an unauthorized communication between a juror and a witness or

16  interested party is presumptively prejudicial.  See Caliendo v. Warden Cal. Men's Colony, 365

17  F.3d 691, 696 (9th Cir. 2004).  "A communication is possibly prejudicial, not de minimus, if it

18  raises a risk of influencing the verdict."  Id. at 697.  "[I]f an unauthorized communication with a

19  juror is de minimus, the defendant must show that the communication could have influenced the

20  verdict before the burden of proof shifts to the prosecution."  Id. at 696.  The defendant must

21  offer sufficient evidence to trigger the presumption of prejudice.  See id. at 696.  Factors relevant

22  to this inquiry include "the length and nature of the contact, the identity and role at trial of the

23  parties involved, evidence of actual impact on the juror, and the possibility of eliminating

24  prejudice through a limiting instruction."  Id. at 697-98.

25   The state court made a factual finding that the communication between Stigerts and the

26  jury concerned the spillage of a cup of coffee.  Petitioner fails to rebut this factual finding by

1   clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an

2   application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State

3   court, a determination of a factual issue made by a State court shall be presumed to be correct.

4   The applicant shall have the burden of rebutting the presumption of correctness by clear and

5   convincing evidence.").  Detective Stigerts' reference to the jury regarding the spillage of coffee

6   was *de minimus* and innocuous in nature and content.  Petitioner failed to show that the

7   communication was anything beyond *de minimus* such that the communication is not deemed

8   presumptively prejudicial.  Petitioner is not entitled to federal habeas relief on this ineffective

9   assistance of counsel argument as he failed to satisfy either prong of the Strickland test.  Thus,

10  Petitioner failed to show that this argument is "colorable" to warrant granting federal habeas

11  relief.

12          E.  Claim V

13          In Claim V, Petitioner argued that the trial court erred in not construing letters from

14  Petitioner as motions regarding the personal conflicts Petitioner was having with trial counsel.

15  However, Petitioner withdrew this Claim as stated in his traverse.

16          F.  Claim VI

17          In Claim VI, Petitioner argued that the trial court erred in failing to provide Petitioner

18  with an interpreter during trial.  However, Petitioner withdrew this Claim as stated in his

19  traverse.

20          G.  Claim VII

21          In Claim VII, Petitioner argues that the trial court erred in denying Petitioner's motion "to

22  exclude any opinion of the bandanna."  (Pet'r's Am. Pet. at p. 30-31.)  He asserts that the trial

23  court erred because no witness saw any occupant of the vehicle wearing a blue bandana to cover

24  one's head.  (See id. at p. 31.)  Before trial, Petitioner's trial counsel made a motion in limine

25  regarding certain matters concerning any possible testimony concerning the bandana that was

26  found in the stolen Toyota Camry.  The following colloquy took place between counsel and the

court on this motion before trial:

>MR. IRISH:  I'd also indicated as a motion in limine off the record, and would make, that there's – in the discovery there is indications of a bandanna being found in the rear of the vehicle that was detained by law enforcement on the subsequent – subsequent to the shooting that's the subject of this incident, and there was reference in one of the officer's reports that the bandanna was tied in a fashion consistent with wearing it to cover one's face.  [¶]  And I would move to exclude any opinion evidence of that nature, in that I think the jury can make that determination itself by looking at the bandanna, and that, subject, really is argument by the counsel, whether, in fact, it is or is not tied in that manner that's consistent with covering somebody's face.
>THE COURT:  Mr. McCormick?
>MR. McCORMICK:  I think that's an appropriate thing for – if nothing else, a descriptive nature to the record as to what the condition of the bandanna is, because certainly, it's different if the bandanna has that knot tied in the middle versus at the end, which is consistent with being worn over one's head or one's face to conceal their identity.
>THE COURT:  I am going to deny that motion.  I think that the witness can testify the manner in which the bandanna was tied and could be asked the different ways it can be worn.  That is certainly subject to cross-examination.

(Reporter's Tr. at p. 13-14.)

>During trial, the following colloquy took place between the prosecutor and Detective

Stigerts with respect to the bandana:

>Q:  Was there anything unusual about – or that you found to be significant as a homicide investigator about the condition of the bandanna?
>A:  Yeah.  It was tied as you would if you would tie it and, basically, fold one flap down and then take the other two corners and tie it around and tie it around like it would go over your head.
>MR. IRISH:  For the record, when she indicated tie it, she made a motion with both her hands to the back portion of her head.

(Id. at p. 122.)  During cross-examination by Petitioner's trial counsel, the following colloquy

occurred between Petitioner's counsel and Detective Stigerts:

>Q:  When you rendered the opinion that that was tied in a manner as if it would go over the head, you're talking about tying in the back and put over the top of somebody's head?
>A:  Yes.

1   (Id. at p. 144.)

2        In his state habeas petitions, Petitioner argued that the trial court erred denying his motion

3   in limine on allowing this testimony regarding the bandana.  The Sacramento County Superior

4   Court was the last reasoned decision on this Claim and stated the following:

5              Petitioner next claims that the trial court erred in denying his
              motion to exclude any opinion that the bandana was used in a
6              fashion to cover someone's face or any nature thereof . . .
              Petitioner fails to attach reporter's transcript of the court's denial of
7              the motion, thus the court cannot assess the claim.  Nor does
              petitioner make a prima facie showing that the ruling was
8              erroneous, or that the admission of the opinion was prejudicial.  As
              such, the claim fails under Swain, Harris, and In re Bower (1985)
9              38 Cal.3d 865.

10   (Resp't's Lodged Doc. 11 at p. 3.)

11        Respondent argues that this Claim is unexhausted as the Sacramento Superior Court

12   relied on Swain and Harris to deny this Claim.  However, the Sacramento Superior Court also

13   denied this Claim on the merits.  Furthermore, the subsequent summary denials by the California

14   Court of Appeal and the California Supreme Court are construed as denials on the merits.  See

15   Harrington, 131 S.Ct. at 784.  Therefore, this Claim is deemed exhausted and will be analyzed on

16   the merits pursuant to the standard enunciated in 28 U.S.C. § 2254(d).

17        First, to the extent that this Claim is asserting an error of state law upon the admission of

18   Detective Stigerts' testimony regarding the bandanna, Petitioner's claim is not cognizable on

19   federal habeas review and must be denied.  See Estelle v. McGuire, 502 U.S. 62, 71-72 (1991).

20   Second, "[a] habeas petitioner bears a heavy burdern in showing a due process violation based on

21   an evidentiary decision."  Boyde v. Brown, 404 F.3d 1159, 1172 (9th Cir. 2005), amended on

22   reh'g by, 421 F.3d 1154 (9th Cir. 2005).  The admission of evidence violates due process only if

23   there are no permissible inferences the jury may draw from it.  See id. at 1172.  Even where a

24   trial court errs in admitting the evidence at issue, such error is deemed harmless unless it had a

25   substantial and injurious effect or influence in determining the fact finder's verdict.  See Gill v.

26   Ayers, 342 F.3d 911, 921 (9th Cir. 2003) (citing Brecht v. Abrahamson, 507 U.S. 619, 637

41

1  (1993)).

2  In this case, Detective Stigerts' testimony regarding how the bandana was worn was a

3  permissible inference in light of how it was tied.  Thus, the admission of this evidence did not

4  violate Petitioner's due process rights.  Furthermore, even if allowing this type of testimony was

5  in error, it did not have a substantial and injurious effect or influence in the verdict as it only

6  related to how the bandana was worn which was a tangential issue to Petitioner's conviction.

7  The case against Petitioner included a great deal of evidence implicating Petitioner as described

8  in supra Part V.A.  Therefore, Petitioner is not entitled to federal habeas relief on this Claim.

9  H.  Claim VIII

10  Next, Petitioner argues that the trial court erred in denying Petitioner's motion to

11  bifurcate the gang enhancement issue.  Before trial, the trial judge denied the motion to bifurcate

12  and stated the following:

13      The court has read and considered the defense motions to bifurcate
the gang enhancement, as well as the People's opposition.  The
14  court has conducted a weighing process pursuant to Evidence Code
Section 352 and considered the applicable case law.  The court
15  finds the probative value of this evidence substantially outweighs
the prejudicial effect.

16

17      The defendants are charged with first degree murder with a gang
enhancement pursuant to Penal Code Section 186.22(b)(1).  The
issue of intent in the murder allegation is inextricably tied to the
18  gang evidence.

19      Based on all the case authority in this area, as well as the facts
alleged to have occurred in this case, the motion to bifurcate is
20  denied.

21  (Reporter's Tr. at p. 8.)

22  Petitioner raised this Claim in his state habeas petitions.  The last reasoned decision on

23  this Claim was from the Sacramento County Superior Court which stated the following:

24      Petitioner next claims that the trial court erred in denying
petitioner's motion to bifurcate the gang enhancements . . .
25  [¶]  Petitioner fails to attach the reporter's transcript of the court
denying the motion.  Regardless, the claims fails, as the crimes
26  were clearly gang-related and gang evidence was going to be

1    admitted on the substantive charges regardless of whether the gang
     enhancements were bifucated.  As such, the claim fails under
2    Harris and Bower.

3    (Resp't's Lodged Doc. 11 at p. 4.)

4           Respondent argues that this Claim is procedurally barred.  (See Resp't's Answer at p. 51.)

5    A state court's refusal to hear the merits of a claim because of the petitioner's failure to follow a

6    state procedural rule is considered a denial of relief on an independent and adequate state ground.

7    See Harris v. Reed, 489 U.S. 255, 260-61 (1989).  The state rule for these purposes is only

8    "adequate" if it is "firmly established and regularly followed."  See Bennett v. Mueller, 322 F.3d

9    573, 583 (9th Cir. 2003) ("[t]o be deemed adequate, the state law ground for decision must be

10   well-established and consistently applied.").  The state rule must also be "independent" in that it

11   is not "interwoven with the federal law."  Park v. California, 202 F.3d 1146, 1152 (9th Cir. 2000)

12   (citing Michigan v. Long, 463 U.S. 1032, 1040-41 (1983)).  Furthermore, procedural default can

13   only block a claim in federal court if the state court, "clearly and expressly states that its

14   judgment rests on a state procedural bar."  Harris, 489 U.S. at 263.

15          When the state court discusses a procedural default but also reaches the merits of a claim,

16   a denial of the claim cannot necessarily be said to have relied on the on the procedural default.

17   See Thomas v. Hubbard, 273 F.3d 1164, 1176 (9th Cir. 2001), overruled on other grounds,

18   Payton v. Woodford, 346 F.3d 1204 (9th Cir. 2003) (citing Harris, 489 U.S. at 263); see also

19   Panther v. Hames, 991 F.2d 576, 580 (9th Cir. 1993).  As the Ninth Circuit stated in Panther,

20   "because the Alaska Court of Appeals considered Panther's claims on the merits . . . so can we."

21   991 F.2d at 580.  In Thomas, the Ninth Circuit noted that the state court discussed the issue of

22   procedural default but then went on to deny the claim because any error was harmless.  See 273

23   F.3d at 1176.  The Ninth Circuit held: "[i]n so doing, the [state] court left the resolution of the

24   procedural default issue uncertain rather than making a clear and express statement that its

25   decision was based on procedural default."  Id.

26          In this case, the Sacramento County Superior Court discussed the procedural issue but

43

also denied the Claim on the merits.  The California Court of Appeal and the California Supreme

Court issued summary denials.  Under these circumstances, the Claim is not procedurally barred

and will be analyzed using the 28 U.S.C. § 2254(d) standard.

In analyzing this Claim, the relevant inquiry is whether the petitioner's right to a fair trial

was violated in that the denial of the motion to bifurcate resulted in prejudice great enough to

render the trial fundamentally unfair.  See Grisby v. Blodgett, 130 F.3d 365, 370 (9th Cir. 1997).

Additionally, he purported impermissible joinder must have had a substantial and injurious effect

or influence in determining the jury's verdict.  See Sandoval v. Calderon, 241 F.3d 765, 772 (9th

Cir. 2000).  The focus is "particularly on cross-admissibility of evidence and the danger of

'spillover' from one charge to another, especially where one charge or set of charges is weaker

than another."  Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004); see also Sandoval, 241

F.3d at 772-73 (9th Cir. 2000) (cross-admissibility "dispels the prejudicial impact of joining all

counts in the same trial").

In this case, the Superior Court determined that the gang related evidence was going to be

admitted on the substantive charges.  The gang related evidence went to Petitioner's intent and

motive to commit the charged crimes against a rival gang.  Additionally, the trial court gave the

jury the following limiting instruction with respect to the gang evidence:

> Evidence has been introduced for the purpose of showing criminal
> street gang activities and of criminal acts by gang members, other
> than the crimes for which defendants are on trial.

> This evidence, if believed, may not be considered by you to prove
> that Defendant is a person of bad character or that he has a
> disposition to commit crimes.  It may be considered by you only
> for the limited purpose of determining if it tends to show that the
> crime or crimes charged were committed for the benefit of, at the
> direction of or in association with a criminal street gang, with the
> specific intent to promote, further or assist in any criminal conduct
> by gang members.

> For the limited purpose for which you may consider this evidence,
> you must weigh it in the same manner as you do all other evidence
> in the case.

> You are not permitted to consider such evidence for any other
> purpose.

(Reporter's Tr. at p. 1150.)  The jury is presumed to have followed this instruction.  See Weeks v. Angelone, 528 U.S. 225, 234 (2000).  In light of the cross-admissibility of the gang evidence in this case and the limiting instruction given to the jury, Petitioner failed to show that the denial of the motion to bifurcate rendered his trial fundamentally unfair so as to violate his due process rights.  Petitioner is not entitled to federal habeas relief on this Claim.

I. Claim IX, X, XI

In Claim IX, Petitioner argues that the trial court erred in allowing the gang expert to testify to an improper hypothetical question posed by the prosecutor.  In Claim X, Petitioner argues that the trial court erred in allowing the gang expert to testify that Petitioner was a "hard core killer."  In Claim XI, Petitioner argues that the expert's testimony violated the Confrontation Clause.  Petitioner raised these arguments on direct appeal and the California Court of Appeal stated the following:

> In response to a hypothetical question from the prosecutor, Detective Lee opined that a drive-by shooting committed in well-known HNS territory by three MOD members was committed for the benefit of the MOD street gang.  Her launches a three-pronged attack on the admission of this testimony:  (1) Lee's opinion was inadmissible because the hypothetical question was not "rooted in the facts shown by the evidence (citing Gardeley, supra, 14 Cal.4th at p. 618); (2) Lee's characterization of him as a "hard-core killer" was inflammatory and highly prejudicial; and (3) the opinion violated the confrontation clause of the United States Constitution because it was based on the "factual assertions of individuals who were not called to testify and were thus not subject to cross-examination."

> None of these arguments has been preserved for appeal because Her's trial attorney failed to make any objection to Detective Lee's opinion testimony when it was given.  (Evid. Code, § 353; People v. Kipp (2001) 26 Cal.4th 1100, 1124; People v. Garceau (1993) 6 Cal.4th 140, 179.)  And the failure to raise a constitutional challenge to Lee's testimony in the trial court means that his Sixth Amendment argument as been forfeited as well.  (People v. Benson (1990) 52 Cal.3d 754, 788.)  "[T]he rule that a challenge to the admission of evidence is not preserved for appeal unless a specific

1    and timely objection was made below stems from long-standing
     statutory and common law principles."  (People v. Anderson
2    (2001) 25 Cal.4th 543, 586.)

3    No cognizable challenge to Detective Lee's testimony is raised on
     appeal.
4

5    (Slip Op. at p. 14-15.)  Petitioner raised these Claims in his petition for review on direct appeal to

6    the California Supreme Court which issued a summary denial.

7         Petitioner did not raise Claims IX or X to the Sacramento County Superior Court in his

8    state habeas petition.  Instead, in that court he only argued that the trial court erred in denying the

9    motion to bifurcate (i.e. Claim VIII) and that the gang expert's testimony violated the

10   Confrontation Clause, (i.e. Claim XI).  (See Resp't's Lodged Doc. at 10 at p. 23-24.)  The

11   Sacramento County Superior Court did not discuss Petitioner's Confrontation Clause argument

12   in its March 2, 2009 opinion.  Petitioner did not raise Claims IX and X in his state habeas

13   petition to the California Court of Appeal but did raise Claim XI.  As previously stated, the Court

14   of Appeal summarily denied the state habeas petition.

15        In his state habeas petition to the California Supreme Court, Petitioner raised Claims IX,

16   X and XI.  (See Resp't's Lodged Doc. 19 at p. 34-38.)  That court issued a summary denial

17   without comment or citation on these Claims.

18        Respondent argues that these three Claims are procedurally barred in light of the

19   reasoning of the California Court of Appeal's decision on direct appeal.  However, in the

20   interests of judicial economy, and because these three Claims are clearly without merit for the

21   reasons described infra, the procedural default argument will not be addressed.  See Lambrix v.

22   Singletary, 520 U.S. 518, 525 (1997); Franklin v. Johnson, 290 F.3d 1223, 1232 (9th Cir. 2002)

23   ("Procedural bar issues are not infrequently more complex than the merits issues presented by the

24   appeal, so it may well make sense in some instances to proceed to the merits if the result will be

25   the same.").

26   //

46

1          i.  Claim IX

2          As previously stated, in Claim IX Petitioner argues that the trial court erred in allowing

3  the gang expert to respond to a hypothetical posed by the prosecutor during direct testimony that,

4  according to Petitioner, was not based on facts that was supported in the record.  However, for

5  the reasons discussed in supra Part V.D.iii, the proposed hypothetical was based on the facts in

6  evidence.  Petitioner failed to show that the gang expert's response to a hypothetical based on

7  facts in the evidence violated his due process rights.  See, e.g., Granberry v. Haws, Civ. No. 07-

8  6365, 2008 WL 3876884, at *11 (C.D. Cal. Aug. 18, 2008) (explaining that gang expert was

9  presented with a hypothetical fact pattern that the shooter believed the victims were members of

10  a rival gang and that the gang expert's response to the hypothetical was based on facts

11  established by evidence such that counsel was not ineffective for failing to object to it);

12  Vang v. Runnels, Civ. No. 03-5528, 2008 WL 324101, at *11 (E.D. Cal. Feb. 5, 2008) (noting

13  that the state court found that the proposed hypothetical question was rooted in facts shown by

14  the evidence such that Petitioner failed to demonstrate that a hypothetical question infected the

15  trial with unfairness and that absent the hypothetical, the verdict would have been different).

16  Claim IX should therefore be denied.

17          ii.  Claim X

18          In Claim X, Petitioner argues that the trial court erred in allowing the gang expert to

19  characterize Petitioner as a "hard core killer."  This Claim is similar to Petitioner's argument that

20  trial counsel was ineffective for failing to object to this characterization by the gang expert.  In

21  supra Part V.D.iv, it was determined that Petitioner failed to show to a reasonable probability that

22  the outcome of the proceeding would have been different had trial counsel objected to this

23  characterization of Petitioner by the gang expert.  In light of the strong evidence implicating

24  Petitioner to these crimes as previously described, Petitioner fails to show that this statement

25  rendered his trial fundamentally unfair.  During cross-examination, Petitioner's trial counsel

26  elicited from the gang expert that this statement was based only on his assumption that Petitioner

1   was guilty in this case.  (See Reporter's Tr. at p. 993.)  Thus, its admission did not have a

2   substantial and injurious effect on the jury's verdict.  Under these circumstances, Claim X should

3   be denied.

4                        iii.  Claim XI

5           In Claim XI, Petitioner argues that the gang expert's testimony violated the Confrontation

6   Clause.  He states that:

7                  Lee's testimony about specific gangs, their activities and
                    membership was based almost entirely on information imparted to
8                  him by others - police officers, alleged gang affiliates, and
                    informers.  Thus, Lee was simply conveying, in the guise of expert
9                  opinion, the out-of court factual assertions of individuals who were
                    not called to testify and were thus not subject to cross-examination.
10
    (Pet'r's Am. Pet. at p. 35.)

11
            The Confrontation Clause of the Sixth Amendment specifically provides that "[i]n all
12
    criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses
13
    against him."  U.S. Const., amend VI.  In Crawford v. Washington, 541 U.S. 36, 59 (2004), the
14
    United States Supreme Court held that the Confrontation Clause bars the state from introducing
15
    out-of-court statements which are testimonial in nature, unless "the declarant is unavailable, and
16
    only where the defendant has had a prior opportunity to cross-examine."  The Confrontation
17
    Clause does not, however, bar the use of testimonial statements for purposes other than
18
    establishing the truth of the matter asserted.  See Crawford, 541 U.S. at 59 n. 9.  "Thus, Crawford
19
    does not undermine the established rule that experts can testify to their opinions on relevant
20
    matters and, may relate the information and sources upon which they rely in forming those
21
    opinions."  Lopez v. Horel, Civ. No. 07-4169, 2011 WL 940054, at *11 (C.D. Cal. Jan. 19, 2011)
22
    (citing Ortiz v. Tilton, Civ. No. 06-1752, 2008 WL 2543440, at *14, 16 (S.D. Cal. May 5, 2008),
23
    report and recommendation adopted by, 2009 WL 1796537 (S.D. Cal. Jun. 23, 2009)).
24
            Numerous courts have held since Crawford that "the introduction of otherwise
25
    inadmissible evidence in support of a gang expert witness' testimony does not violate the
26

1  Confrontation Clause."  Id.; see also Lopez v. Jacquez, Civ. No. 09-1451, 2010 WL 2650695, at

2  *6 (E.D. Cal. July 1, 2010) ("[T]he Court does not find that an objective application of Crawford

3  would result in a finding that the gang expert's reliance on hearsay testimony to explain his

4  opinion that Petitioner was a member of the West Fresno Nortenos, and that the West Fresno

5  Nortenos area criminal street gang, to be in violation of Petitoner's Confrontation Clause rights),

6  report and recommendation adopted by, 2010 WL 3384691 (E.D. Cal. Aug. 26, 2010); Walker v.

7  Clark, Civ. No. 08-5587, 2010 WL 1643580, at *15 n. 8 (C.D. Cal. Feb. 18, 2010) ("Cason v.

8  Hedgpeth, Civ. No. 08-4576, 2009 WL 1096209, at *13-14 (C.D. Cal. Apr. 22, 2009) (hearsay

9  evidence regarding witness's gang membership did not violate Crawford because it was admitted

10  not for the truth of the matter asserted but to support detective's opinion that witness was a gang

11  member); Thomas v. Chromes, Civ. No. 06-787, 2008 WL 4597214, at *7 (C.D. Cal. Oct. 10,

12  2008) (gang expert's reliance on gang members' statements as basis for opinion that petitioner

13  was a gang member did not violate Crawford); Ortiz, 2008 WL 2543440, at *16 (gang expert's

14  reliance on field investigation reports, defendants' admissions as to gang member status, and

15  other hearsay as basis for opinion did not violate Crawford because materials were not admitted

16  for truth of the matter asserted and his reliance on them was subject to cross-examination);

17  Nguyen v. Evans, Civ. No. 06-4630, 2008 WL 1994902, at *5 (N.D. Cal. May 5, 2008) (gang

18  expert's testimony regarding information he received from other gang members and victims,

19  which he used as a basis for his opinion, did not violate Crawford); Eddington v. Adams, Civ.

20  No. 06-1770, 2008 WL 397290, at *10 (E.D. Cal. Feb. 8, 2008) (gang expert's reliance on gang

21  member's statement as part of basis for opinion did not violate Crawford).") , report and

22  recommendation adopted by, 2010 WL 1641372 (C.D. Cal. Ap. 20, 2010)

23      Similar to the cases listed above, the gang expert's testimony in this case did not result in

24  a violation of Petitioner's Confrontation Clause rights and Crawford.  Therefore, Petitioner is not

25  entitled to federal habeas relief on Claim XI.

26  //

1    J.  Claim XII

2        In Claim XII, Petitioner argues that the trial court abused its discretion in considering

3    Detective Lee as a gang expert.  Petitioner did not raise this Claim on direct appeal nor in his

4    state habeas petitions in the Superior Court or the Court of Appeal.  Petitioner did raise this

5    Claim in his state habeas petition to the California Supreme Court.  (See Resp't's Lodged Doc.

6    No. 19 at p. 38-39.)  The California Supreme Court's summary denial of that petition is

7    considered a decision on the merits with respect to this particular Claim.  See Harrington, 131

8    S.Ct. at 784.

9        The determination that Detective Lee was a gang expert did not violate Petitioner's due

10   process rights in that it did not make his trial fundamentally unfair.  See, e.g., United States v.

11   Hankey, 203 F.3d 1160, 1169 (9th Cir. 2000) (holding that police officers with years of

12   experience and special knowledge of gangs may qualify as expert witnesses).  At trial, Detective

13   Lee outlined his relevant experience and stated the following:

14           Well, actually, starting back to the academy, we had eight hours of
             gang awareness training.  Three of those hours were solely
15           dedicated to Asian gangs.

16           The first two and a half years of my career, I was a patrol officer
             primarily in south Sacramento, east Sacramento areas.  I dealt with
17           gang members all the time, involved of all different ethnicities.

18           The next two and a half years I worked Problem Oriented Policing.
             As a Problem Oriented Police Officer, I was assigned to specific
19           neighborhoods in the south area and east areas of Sacramento.  The
             majority of the complaints were narcotic related and gang related.
20
             The past – little over four years now, I have been investigating
21           Asian gangs.  I investigate everything from homicides to drive-by
             shootings home invasions, basically anything our Asian gangsters
22           are involved in.

23   (Reporter's Tr. at p. 943.)  As illustrated above, Detective Lee had years of experience in dealing

24   with gangs, and in particular, Asian gangs.  The summary denial by the California Supreme

25   Court of this Claim was not an unreasonable application of clearly established federal law nor did

26   it result in a decision that was from an unreasonable determination of the facts in light of the

record.  See Hankey, 203 F.3d at 1169.  Petitioner is not entitled to federal habeas relief on Claim XII.

### K.  Claim XIII

In Claim XIII, Petitioner argued that the trial court erred in denying Petitioner's motion for a mistrial due to prejudicial questions the prosecutor asked of the prospective jurors during the voir dire proceedings.  However, Petitioner withdrew this Claim as stated in his traverse.

### L. Claim XIV

Next, Petitioner argues that the trial court erred in failing to declare a mistrial due to Detective Stigerts communication with the jury.  Petitioner raised a similar claim as described previously when he argued that trial counsel was ineffective in failing to make further inquiry into this matter as discussed in supra Part V.D.vii.  Respondent argues that this Claim is unexhausted.  Even if this Claim is deemed unexhausted, it can still be denied on the merits so long as it is not "colorable."  See Cassett, 406 F.3d at 624.

As outlined in supra Part V.D.vii, the state court made a factual finding that the communication between Stigerts and the jury concerned the spillage of a cup of coffee.  Petitioner fails to rebut this factual finding by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  Detective Stigerts' communication to the jury regarding the spillage of coffee was *de minimus* and innocuous in nature and content.  Petitioner failed to show that the communication was anything beyond *de minimus* such that the communication is not deemed presumptively prejudicial.  Therefore, Petitioner fails to show that his due process rights were violated and that his trial was rendered fundamentally unfair by this communication.  Claim XIV should be denied.

### M.  Claim XV

In Claim XV, Petitioner argues that indeterminate sentencing cannot exist and that the penalty for the crime charged must be the same number of years for each person committing the same offense.  (See Pet'r's Am. Pet. at p. 40-41.)  However, Petitioner withdrew this Claim as

1    stated in his traverse.

2        N.  Claim XVI

3        Next, Petitioner argues that the trial court erred "by admitting prejudicial and

4    inflammatory testimony of a witness that he (the witness) believed that threats and reprisals he

5    had suffered years earlier were connected to his testimony against Kinson Her, when the witness

6    admittedly had no factual basis for this belief."  (Pet'r's Am. Pet. at p. 41.)  During trial, Rindy

7    Her testified that he had received two telephone calls threatening to kill him if he testified.  (See

8    Reporter's Tr. at p. 698.)  He also testified that his house was shot up and that he was jumped by

9    members of a gang that were associated with Petitioner.  (See id. at 698-99.)  Petitioner raised

10   this issue on direct appeal, and the Court of Appeal stated the following:

11           In the middle of prosecution witness Rindy Her's testimony, the
             court held an in-chambers hearing, during which Rindy disclosed
12           he had been assaulted, his house had been fired upon, and he had
             received anonymous calls threatening to kill him if he testified.
13           (Rindy stated that he was worried about testifying, because there
             were a lot of Kinson Her's friends out there, making him feel
14           unsafe.

15           Over defendant's objection that the prejudicial effect of the
             evidence outweighed its probative value (Evid. Code § 352), the
16           trial judge allowed Rindy to describe these acts in front of the jury,
             for the sole purpose of evaluating his demeanor.  Prior to admitting
17           this evidence, the judge gave the following instruction:

18           "Ladies and gentlemen, at this time I am going to give you a
             limiting instruction.  You must follow this instruction.  [¶]  You
19           are about to hear testimony concerning some threats and acts of
             violence directed towards this witness.  This evidence is only to be
20           considered in evaluating [Rindy] Her's attitude and demeanor
             towards testifying.  The evidence is not to be considered against
21           Houa Lao and Kinson Her.  There's no evidence connecting
             [codefendants] Houa Lao and Kinson Her to these acts."
22
             Rindy thereupon recounted the acts of witness intimidation and
23           stated his belief that they were committed by gang members
             associated with his cousin, defendant Her.
24
             Her now claims that the admission of this evidence was prejudicial
25           error, because it "painted [him] in the minds of the jurors as a gang
             member and a violent individual with violent associates," and was
26           not "fairly relevant" to Rindy's credibility.  The argument lacks

                                        52

1   merit.

2   "'Evidence a witness is afraid to testify is relevant to the credibility
    of that witness and is therefore admissible. [Citations.]  Testimony
3   a witness is fearful of retaliation similarly relates to that witness's
    credibility and is also admissible. [Citation.]  It is not necessary to
4   show threats against the witness were made by the defendant
    personally, or the witness's fear of retaliation is directly linked to
5   the defendant for the evidence to be admissible.'"  (Olguin, supra,
    31 Cal.App.4th at p. 1368, quoting People v. Gutierrez (1994) 23
6   Cal.App.4th 1576, 1587-1588.)  As the court noted in Olguin:  "A
    witness who testifies despite fear of recrimination of any kind by
7   anyone is more credible because of his or her personal stake in the
    testimony.  Just as the fact a witness expects to receive something
8   in exchange for testimony may be considered in evaluating his or
    her credibility [citation], the fact a witness is testifying despite fear
9   of recrimination is important [in] fully evaluating his or her
    credibility.  For this purpose, it matters not the source of the threat.
10  It could come from a friend of the defendant, or it could come from
    a stranger who merely approves of the defendant's conduct or
11  disapproves of the victim. . . . [¶]  Regardless of its source, the jury
    would be entitled to evaluate the witness's testimony knowing it
12  was given under such circumstances."  (Olguin, supra, at pp. 1368-
    1369.)

13

14  "We will not overturn or disturb a trial court's exercise of its
    discretion under [Evidence Code] section 352 in the absence of
15  manifest abuse, upon a finding that its decision was palpably
    arbitrary, capricious and patently absurd."  (People v. Jennings
16  (2000) 81 Cal.App.4th 1301, 1314.)  Here, the evidence was
    admitted with a proper cautionary admonition that it was to be
17  considered solely for purposes of its effect on Rindy's demeanor
    and attitude toward testifying.  The jury was also reminded there
18  was no evidence connecting defendants to the acts described.  We
    find no error, prejudicial or otherwise, in the admission of the
    intimidation testimony.

19

20  (Slip. Op. at p. 16-18.)

21          Respondent argues that this Claim should be deemed unexhausted because his federal

22  habeas petition marks the first time that Petitioner has raised this Claim as an issue of federal

23  law.  This argument is incorrect.  Petitioner argued on direct appeal that the admission of this

24  testimony violated due process of law.  (See Resp't's Lodged Doc. 1 at p. 37.)  Petitioner raised

25  this issue citing a deprivation of due process to the California Supreme Court on direct appeal

26  (see Resp't's Lodged Doc. 7 at p. 14.) and in his state habeas petition.  (See Resp't's Lodged

53

1    Doc. 19 at p. 45.)  The California Supreme Court summarily denied each of these petitions.

2          In Ortiz-Sandoval v. Gomez, 81 F.3d 891, 897 (9th Cir. 1996), the Ninth Circuit analyzed

3    whether the trial court's admission of a threat he made against two witnesses rendered his trial

4    fundamentally unfair such that it violated his due process rights.  The court noted that "[w]hile a

5    petitioner for federal habeas relief may not challenge the application of state evidentiary rules, he

6    is entitled to relief if the evidentiary decision created an absence of fundamental fairness that

7    "'fatally infected the trial.'"  Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463, 1465 (9th

8    Cir. 1986)).  The court noted that the petitioner "had something to gain by threatening the

9    witnesses:  the possible prevention of testimony showing his premeditation and lack of honest

10   belief in self-defense."  Id. at 898.  Ultimately, the court determined that while there was some

11   danger of prejudice, "the record does not permit a conclusion that the trial court abused its

12   discretion or that the introduction of the evidence rendered the trial fundamentally unfair."  Id.

13   (citation omitted).  The court noted that the threat was not particularly inflammatory and that the

14   trial court gave a limiting instruction.  See id.

15         This case is even one step removed from the situation in Ortiz-Sandoval (in which the

16   Ninth Circuit found no due process violation as outlined above) in that the purported threats that

17   were admitted into evidence against Rindy Her did not involve threats from Petitioner.  In that

18   sense, this case is more similar to United States v. Pierson, 121 F.3d 560 (9th Cir. 1997).  In

19   Pierson, the threats were anonymous.  Thus, the Ninth Circuit distinguished Ortiz-Sandoval and

20   determined that the district court had not abused its discretion in allowing the witness to testify to

21   the threats.  See id. at 563.

22         Petitioner has failed to show that the admission of the threats against Rindy Her rendered

23   his trial fundamentally unfair so as to violate his due process rights.  First, the threats were not

24   made by the Petitioner.  Second, the jury was given a limiting instruction immediately prior to

25   Rindy Her's testimony concerning the threats.  Under these circumstances, Petitioner's due

26   process rights were not violated.  See, e.g., Trejo v. Harrinton, Civ. No. 09-1113, 2010 WL

935744, at *1 (C.D. Cal. Mar. 9, 2010) ("Here, the government did not imply that Petitioner had anything to do with witness Rosales' fear . . . Rosales' fear was relevant to his credibility, and the jury could have permissibly inferred that he was in fear because of other members of Petitioner's gang or some other legitimate reason . . . . Therefore, Petitioner's trial was not fundamentally unfair.") (internal citation omitted).  For the foregoing reasons, this Claim for habeas relief should be denied.

O.  Claim XVII

In Claim XVII, Petitioner argues that "the court erred by instructing the jury, over objection, on the theory of "pretextual self-defense" under CALJIC No. 5.55, when this instruction was unsupported by the evidence and undermined Petitioner's legitimate self-defense argument." (Pet.'r's Am. Pet. at p. 43.)  Petitioner raised this Claim on direct appeal and the California Court of Appeal stated the following:

> Her and Lao each assign error to the giving of CALJIC No. 5.55. The instruction, which was given over defense objection, told the jury that the right of self-defense is not available to a person who seeks a quarrel with the intent to create a real or apparent need for exercising the right of self-defense.  The prosecutor used the instruction in closing argument to argue that defendants could not rely on the right of self-defense if the evidence showed they deliberately drove into the territory of their HNS rivals with the intent to foment a quarrel.
>
> Defendants claim the instruction should not have been given because there was no evidence that they drove by 3212 Western with the *specific intent* to create a pretext for self-defense.
>
> We find no reversible error.  First, the instruction was simply part of a packet of self-defense instructions requested by defense, all of which the court decided to give and some of which conflicted with others.  As the court stated in <u>Olguin</u>: "It was obvious to everyone that not all of those instructions could apply to the case, and the jurors were specifically instructed they were to 'Disregard any instruction which applies to facts determined by you not to exist.' (CALJIC No. 17.31.)"  (<u>Olguin</u>, <u>supra</u>, 31 Cal.App.4th at p. 1381.)  We presume the jury follows the instructions given.  (<u>Ibid.</u>) The California Supreme Court has also observed that an instruction correctly stating a principle of law but not applicable to the facts of the case is usually harmless, having little or no effect "'other than to add to the bulk of the charge.'"  (<u>People v. Rollo</u> (1977) 20

55

Cal.3d 109, 123, quoting People v. Sanchez (1947) 30 Cal.2d 560, 573.)

Second, while there was credible evidence that HNS gang members *returned the fire* of the drive-by shooters, the notion that defendants were exercising their right of self-defense when they drove by the apartment building and riddled it with bullets, is nothing short of fanciful.  For the jurors to have accepted this theory, they would have had to conclude that defendants and a third companion drove a stolen car into the heart of enemy gang territory and, while armed to the teeth, were fired upon by HNS members who, serendipitously, happened to be standing outside.  Aside from the fact that, as Detective Lee pointed out, a shotgun is not a useful weapon to carry around for self-defense, such a scenario defies both logic and common sense.  We conclude there was no substantial evidence to support a jury finding that the occupants of the Camry were exercising their right of self-defense.  (See People v. Shelmire (2005) 130 Cal.App.4th 1044, 1054-1055.)  [FN 7]
[FN 7]  When asked at oral argument what evidence in the record showed that the victims fired first, counsel for Lao cited only the fact that one bullet entered the side passenger window of the Camry and exited the "back windshield" (*sic*), and expert testimony that one gang feels "disrespected" when a rival gang enters its territory.  We find this far too flimsy and speculative as basis to support a viable claim of perfect self-defense.

Because there was no substantial evidence of self-defense, the jury could not have been misled by the giving of CALJIC No. 5.55 and the alleged instructional error was harmless.  (People v. Flood (1998) 18 Cal.4th 470, 491, Cal. Const., art. VI, § 13.)

(Slip. Op. at p. 22-24.)

A challenge to a jury instruction solely as an error of state law does not state a claim cognizable in a federal habeas corpus action.  See Estelle, 502 U.S. at 71-72.  To obtain federal collateral relief for errors in the jury charge, a petitioner must show that the ailing instruction by itself so infected the entire trial that the resulting conviction violates due process.  See id. at 72.  Additionally, the instruction may not be judged in artificial isolation, but must be considered in the context of the instructions as a whole and the trial record.  See id.  The court must evaluate jury instructions in the context of the overall charge to the jury as a component of the entire trial process.  See United States v. Frady, 456 U.S 152, 169 (1982).  Furthermore, even if it is determined that the instruction violated the petitioner's right to due process, a petitioner can only

1    obtain relief if the unconstitutional instruction had a substantial influence on the conviction and

2    thereby resulted in actual prejudice under <u>Brecht</u>, 507 U.S. at 637, which is whether the error had

3    substantial and injurious effect or influence in determining the jury's verdict.  <u>See, e.g.</u>, <u>Hedgpeth</u>

4    <u>v. Pulido</u>, 555 U.S. 57, 129 S.Ct. 530, 532 (2008) (per curiam).

5           As noted by the California Court of Appeal on direct appeal, the pretextual self-defense

6    instruction was part of a larger jury instruction detailing the theory of self-defense.  Taken as a

7    whole, the instruction did not so infect the trial so as to violate Petitioner's due process rights.  It

8    is also worth noting that the gang expert testified as to the rival gangs purported territory, thereby

9    supporting giving this instruction.  Furthermore, as noted by the California Court of Appeal, the

10   jury was specifically instructed that to "disregard any instruction which applies to the facts

11   determined by you not to exist."  (Reporter's Tr. at p. 1297.)  A jury is presumed to have

12   followed its instructions.  <u>See</u> <u>Weeks</u>, 528 U.S. at 234.  If the jury did not believe that Petitioner

13   was seeking a quarrel, this instruction would not have been considered by the jury in determining

14   its verdict.  This instruction did not infect the trial so as to violate Petitioner's due process rights.

15   Petitioner is not entitled to federal habeas relief on this Claim.

16         P.  Claim XVIII

17         In Claim XVIII, Petitioner argued that "[t]he trial court erred in instructing the jury, over

18   objection, on the theory of 'adoptive admissions' (CALJIC 2.71.5), involving Her's post-arrest

19   interrogation by police."  (Pet'r's Am. Pet. at p. 46.)  However, Petitioner withdrew this Claim as

20   stated in his traverse.

21         Q.  Claim XIX

22         Next, Petitioner argues that the trial court erred in instructing the jury using CALJIC 2.03,

23   2.06, 2.51 and 2.52.  However, Petitioner withdrew this Claim as stated in his traverse.

24         R.  Claim XX

25         In Claim XX, Petitioner argues that the trial court erred in failing to rewrite CALJIC 2.90.

26   However, Petitioner withdrew this Claim as stated in his traverse.

S.  Claim XXI

In Claim XXI, Petitioner argues that "[t]he trial court's instruction on CALJIC No. 5.17 on imperfect self-defense is erroneous, placing an improper limitation on the defense in circumstances in which the defense should still be legally applicable."  (Pet'r's Am. Pet. at p. 49.)  At trial, the jury was instructed that:

> A person who kills another person in the actual but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury kills unlawfully but does not harbor malice aforethought and is not guilty of murder.  This would be so event though a reasonable person in the same situation, seeing and knowing the same facts, would not have had the same belief.  Such an actual but unreasonable belief is not a defense to the crime of voluntary manslaughter.
>
> As used in this instruction, an "imminent" peril or danger means one that is apparent, present, immediate and must be instantly dealt with or must so appear at the time to the slayer.
>
> However, this principle is not available and malice aforethought is not negated if the Defendant by his unlawful or wrongful conduct created the circumstances which legally justified his adversary's use of force, attack or pursuit.
>
> This principle applies equally to a person who kills in purported self-defense or purported defense of another person.

(Reporter's Tr. at p. 1132-33.)

Petitioner argues that this instruction was improper because it takes no account of Petitioner's subjective belief as to the situation.  Petitioner raised this Claim on both direct appeal and in his state habeas petitions.  The last reasoned decision on this Claim was from the Sacramento Superior Court on state habeas review.  That court stated the following with respect to this Claim:

> Petitioner next claims that it was error to give CALJIC No. 5.17, because the revised language in that instruction is case in objective terms and takes no account of petitioner's subjective belief . . .
> [¶]  CALJIC No. 5.17, however, is not cast in objective terms.  Rather, the revised instruction as given at trial instructed on "the actual but unreasonable belief in the necessity to defend against imminent peril," "even though a reasonable person in the same

58

> situation seeing and knowing the same facts would not have had the same belief," when the peril is one that "is apparent, present, immediate and must be instantly dealt with, or must so appear at the time to the slayer." That is subjective, not objective, thus the claim is denied.

(Resp't's Lodged Doc. 11 at p. 5-6.)

As stated by the Sacramento County Superior Court, CALJIC 5.17 is subjective rather than objective. Thus, it is contrary to Petitioner's assertion that it fails to take into account Petitioner's subjective beliefs. Petitioner fails to show that the state courts' denial of this Claim was contrary to or an unreasonable application of clearly established federal law or resulted in a decision that was based on an unreasonable determination of the facts in the record. Petitioner is not entitled to federal habeas relief on Claim XXI.

T.  Claim XXII

In Claim XXII, Petitioner argues that the prosecutor committed misconduct when he "allowed the prosecution's main witness [Detective Stigerts] . . . to talk to the jury during trial." (Pet'r's Am. Pet. at p. 51.) Petitioner raised similar claims when he argued that trial counsel was ineffective in failing to make further inquiry into this matter as discussed in supra Part V.D.viii and that the trial court erred in failing to declare a mistrial due to this communication. See supra Part V.L.

Respondent argues that this Claim is unexhausted. (See Resp't's Answer at p. 40.) Assuming arguendo that this Claim is unexhausted, the Claim could still be denied on the merits if it is deemed not "colorable." See Cassett, 406 F.3d at 624.

A criminal defendant's due process rights are violated if prosecutorial misconduct renders a trial "fundamentally unfair." Drayden v. White, 232 F.3d 704, 713 (9th Cir. 2000) (citing Darden v. Wainright, 477 U.S. 168, 183 (1986)). A habeas petition will be granted for prosecutorial misconduct only when the misconduct "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden, 477 U.S. at 181 (internal quotation marks and citation omitted). A claim of prosecutorial misconduct is analyzed under the

prejudice standard set forth in Brecht 507 U.S. 619.  See Karis v. Calderon, 283 F.3d 1117, 1128 (stating that a claim of prosecutorial misconduct is analyzed under the standard set forth in Brecht).  Specifically, the inquiry is whether the prosecutorial misconduct had a substantial and injurious effect on the jury's verdict.  See Johnson v. Sublett, 63 F.3d 926, 930 (9th Cir. 1995) (finding no prejudice from prosecutorial misconduct because it could not have had a substantial impact on the verdict under Brecht).

As stated in supra Part V.D.vii, the state court made a factual finding that the communication between Stigerts and the jury concerned the spillage of a cup of coffee. Petitioner fails to rebut this factual finding by clear and convincing evidence.  See 28 U.S.C. § 2254(e)(1).  Detective Stigerts' reference to the jury regarding the spillage of coffee was *de minimus* and innocuous in nature and content.  Petitioner failed to show that the communication was anything beyond *de minimus* such that the communication is not deemed presumptively prejudicial.  Petitioner fails to show that his due process rights were violated and that his trial was rendered fundamentally unfair by this communication and/or that any purported misconduct had a substantial and injurious effect on the jury's verdict.  Therefore, Petitioner fails to establish even a "colorable" claim for relief in Claim XXII.  This Claim should be denied.

U.  Claim XXIII

In Claim XXII, Petitioner argues that he should be subject to a high, medium or low penalty for the murder and attempted murder convictions.  Petitioner raised this issue in his state habeas petitions.  The last reasoned decision was from the Sacramento County Superior Court which stated the following:

> Petitioner, in a related claim, claims he should be subject to a determinate sentencing triad for murder.  [¶]  This is an incorrect statement of the law.  Non-capital murder, at the time of the commission of the crimes as well as before and after that time, is punishable under Penal Code § 190 by a life sentence.

(Resp't's Lodged Doc. 11 at p. 6.)

Respondent argues that this Claim is unexhausted.  (See Resp't's Answer at p. 61.)

However, Petitioner raised this Claim in his state habeas petitions and it was denied on the merits.  Therefore, the Claim is deemed exhausted.

At the outset, to the extent that Petitioner argues that his sentence violated state law, that issue is not cognizable on federal habeas review.  See Estelle, 502 U.S. at 71-72.  Furthermore, to the extent this Claim raises a federal dimension, Petitioner fails to show that the state court's denial of this Claim was an unreasonable application of clearly established federal law or resulted in a decision that was based upon an unreasonable determination of the facts in the record in light of the reasoning of the Sacramento County Superior Court denying this Claim.  Accordingly, this Claim should be denied.

V.  Claim XXIV

In Claim XXIV, Petitioner argues that his statement to police (which was admitted into evidence) was obtained in violation of his constitutional rights.  Petitioner argues that the trial court erred in admitting his statement:  (1) because of his age, limited education and mental capacity; (2) because the Miranda warnings were not given until the interrogation was well underway; and (3) because Petitioner's right to remain silent were ignored by the police.

Petitioner raised these issues on direct appeal to the California Court of Appeal which stated the following:

> On July 2, 2002, Detective John Keller traveled to Minnesota,
> where he interviewed Her.  During trial, Her's counsel made an
> amorphous [FN 4] oral motion in limine, in which he claimed that
> Her's statements to Keller were elicited in violation of his rights
> under Miranda v. Arizona (1966) 384 U.S. 436 [16 L.Ed.2d 694].
> Counsel argued that his client's waiver was not free and voluntary,
> because he was only 15 years old, had "minimal contact with the
> justice system" and did not have an adult present during
> questioning.  He also asserted that there was "pre-Miranda
> custodial interrogation" and that Detective Keller engaged in
> subterfuge and deceit.  The trial court denied the motion, finding
> that Her had previous contact with the criminal justice system, had
> previously been advised of his Miranda rights, and that his waiver
> was knowing, intelligent and voluntary.  Echoing trial counsel's
> arguments, Her claims the trial court's ruling was incorrect.
> [FN 4]  There is no written motion in the record and counsel never
> described the remedy he sought.  Consequently, we are unable to

ascertain from the record exactly what evidence Her was seeking to exclude from the trial.  The trial court characterized the motion as one to suppress Her's statement to Detective Keller.

We need not reach the merits of the ruling, because Her has totally failed to demonstrate that the admission of his statements to Detective Keller was *prejudicial*.

Admission of statements obtained in violation of Miranda are subject to review under the harmless error standard of Chapman v. California (1967) 386 U.S. 18, 24 [17 L.Ed.2d 705, 710-711] (Chapman), under which we inquire whether the error may be deemed harmless beyond a reasonable doubt.  (See Arizona v. Fulminante (1991) 499 U.S. 279, 310 [113 L.Ed.2d 302, 331-332]; People v. Cunningham (2001) 25 Cal.4th 926, 994.)

In the interview, Her steadfastly denied knowing Lao or anything about the shooting.  In his brief, Her makes no attempt to demonstrate that the admission of his statements influenced the jury verdict or significantly affected the outcome of the trial. Prejudice is never presumed; it must be affirmatively demonstrated.  "Anyone who seeks on appeal to predicate a reversal of conviction on error must show that it was prejudicial." (People v. Archerd (1970) 3 Cal.3d 615, 643; People v. Bell (1998) 61 Cal.App.4th 282, 291.)  Because Her makes no such showing, we must conclude "that the error complained of did not contribute to the verdict obtained" (Chapman, supra, 386 U.S. at p. 24 [17 L.Ed.2d at p. 710]) and therefore any error was harmless beyond a reasonable doubt.  [FN 5]
[FN 5]  In his factual recitation, Her claims that his statements to Detective Keller were used to search a residence where police discovered letters indicative of gang affiliation and that his denial that he knew defendant Lao was used to show consciousness of guilt.  However, since this passage (1) does not appear under a separately headed argument; (2) does not address the issue of prejudice; and (3) is unaccompanied by a single citation to the record, it does not qualify as a cognizable legal argument.  (People v. Freeman (1994) 8 Cal.4th 450, 482, fn. 2; People v. California Horse Racing Bd. (1995) 34 Cal.App.4th 1826, 1830.)

(Slip Op. at p. 18-20.)

Petitioner did not raise these arguments in his petition for review to the California

Supreme Court on direct appeal.  Petitioner next raised these arguments in his state habeas

petitions.  The Sacramento County Superior Court stated the following with respect to these

arguments, "Petitioner next claims that the trial court abused its discretion in admitting at trial

petitioner's statement given to Detective Keller.  [¶]  The claim was raised and rejected on

1   appeal, and Petitioner fails to show any exception to the Waltreus bar to the claim." (Resp't's

2   Lodged Doc. 11 at p. 3.)  The California Court of Appeal and the California Supreme Court

3   issued summary denials on Petitioner's state habeas petition.

4        Petitioner argues that this Claim is unexhausted.  However, for similar reasons as

5   described with respect to Claim I, see supra Part V.A., this Court will look through the state

6   habeas decision which relied on Waltreus to the last reasoned decision which was from the

7   California Court of Appeal on direct appeal which denied this Claim on the merits.

8        First, Petitioner argues that the trial court erred in admitting his statement.  He states that

9   he was only "15 years-old, did not have any adult present during questioning, had minimal

10  contact with the justice system, had not finish [sic] his junior year in high school and was of

11  limited education and mental compacity [sic]."  (Pet'r's Am. Pet. at p. 52.)

12       In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the United States Supreme Court

13  declared that a person questioned by law enforcement officers after being "taken into custody or

14  otherwise deprived of his freedom of action in any significant way" must first be warned that he

15  has the right to remain silent, that any statements he does make me be used against him, and that

16  he has a right to the presence of an attorney, either retained or appointed.  An officer's duty to

17  administer Miranda warnings arises only where there has been such a restriction on a person's

18  freedom as to render him 'in custody.' Oregon v. Mathiason, 429 U.S. 492, 495 (1977) (per

19  curiam).  When a suspect is subjected to a custodial interrogation and not warned of the above

20  rights, the ensuing statements elicited may not be admitted for certain purposes in a criminal trial.

21  See Stansbury v. California, 511 U.S. 318, 322 (1994) (per curiam).

22       A defendant may waive his Miranda rights, provide the waiver is "voluntary in the sense

23  that it was the product of a free and deliberate choice rather than intimidation, coercion, or

24  deception," and "made with a full awareness of both the nature of the right being abandoned and

25  the consequences of the decision to abandon it."  Moran v. Burbine, 475 U.S. 412, 421 (1986).

26  However, an express waiver of Miranda rights is not necessary.  See Berghuis v. Thompkins, 130

1  S.Ct. 2250, 2261 (2010); North Carolina v. Butler, 441 U.S. 369, 373 (1973); United States v.

2  Younger, 398 F.3d 1179, 1185 (9th Cir. 2005) ("In soliciting a waiver of Miranda rights, police

3  officers need not use a waiver form nor ask explicitly whether a defendant intends to waive his or

4  her rights."). A valid waiver of rights may be implied under the circumstances presented in the

5  particular case. Specifically, "a suspect may impliedly waive the rights by answering an officer's

6  questions after receiving Miranda warnings." United States v. Rodriguez, 518 F.3d 1072, 1080

7  (9th Cir. 2008). However, even if there is a Miranda violation, the erroneous admission of

8  statements taken in violation of Miranda is subject to harmless error analysis under the Brecht

9  standard. See Ghent v. Woodward, 279 F.3d 1121, 1126 (9th Cir. 2002).

10      At the outset, Petitioner waived his Miranda rights during the interrogation with the

11  detectives. (See Clerk's Tr. at p. 669.) After receiving the appropriate warnings, Petitioner

12  responded to and answered the detective's questions. See Berghuis, 130 S.Ct. at 2261 (noting

13  that a waiver of Miranda rights may be implied through the defendant's silence, along with an

14  understanding of those rights and a course of conduct indicating waiver). When Petitioner was

15  asked if he understood his rights, Petitioner responded that he did. (See Clerk's Tr. at p. 669.)

16  Petitioner also had experience with being given his Miranda rights. (See id. at p. 668.) In Fare v.

17  Michael C., 442 U.S. 707, 725 (1979), the United States Supreme Court stated that the totality of

18  the circumstances approach is adequate to determine whether a juvenile waived his Miranda

19  rights. This approach includes the juvenile's age, experience, education, background, and

20  intelligence, and into whether he has the capacity to understand the warning given him, the

21  nature of his Fifth Amendment rights, and the consequences of waiving those rights. See id.

22      In this case, the state court did not determine whether Petitioner had waived his Miranda

23  rights as it determined that even if there was a Miranda violation, any error was harmless. As

24  outlined above, the Court of Appeal decided this argument under the stricter Chapman standard

25  as opposed to the standard enunciated in Brecht. Recently, the United States Supreme Court

26  stated that:

> [I]n § 2254 proceedings a court must assess the prejudicial impact
> of constitutional error in a state-court criminal trial under the
> "substantial and injurious effect" standard set forth in <u>Brecht</u>, 507
> U.S. 619, whether or not the state appellate court recognized the
> error and reviewed it for harmlessness under the "harmless beyond
> a reasonable doubt standard set forth in <u>Chapman</u>, 386 U.S. 18.

<u>Fry v. Pliler</u>, 551 U.S. 112, 121-22 (2007).  Thus, the <u>Brecht</u> harmless error standard will be

analyzed in reviewing whether any purported <u>Miranda</u> violation warrants federal habeas relief.

As noted by the California Court of Appeal, Petitioner never made any confession in his

interview with Detective Keller.  He steadfastly denied anything to do with the shooting at 3212

Western.  There was strong evidence linking Petitioner to this crime and his gang activity.  This

included, but was not limited to the physical evidence including Petitioner's DNA being found

on the bandana in the stolen Toyota Camry which committed the drive-by shooting, the three

guns that were found that were involved in the shooting, the gang expert's testimony and

Petitioner's girlfriend Ly's testimony.  Thus, assuming *arguendo* that any <u>Miranda</u> violation

occurred by admitting Petitioner's statement due to his age and youth, any error would be

deemed harmless under <u>Brecht</u>.  The evidence from the interrogation did not have had a

substantial and injurious effect on the jury's verdict.  There was little evidence that Petitioner

stated during his interrogation that implicated him in these crimes.

Petitioner also argues that the <u>Miranda</u> warnings were not given until the interrogation

between Detective Keller and Petitioner had already begun.  The transcript of the interview was

admitted into evidence and the tape of the interview was played to the jury.  Before the <u>Miranda</u>

warnings were given to Petitioner, the following colloquy took place:

          UNKNOWN:  This is Kinson.
          DET. KELLER:  Kinson, how are you?
          K. HER:  All right.
          DET. KELLER:  Pat Keller from Sacramento.
          K. HER:  Hi.
          DET. KELLER:  How are you?  You'll be going home with us.
          DET. FESMIRE:  Marnie Fesmire, from Sacramento, as well.
          DET. KELLER:  Detective Fesmire.
          DET. FESMIRE:  (Unintelligible)

1  DET. KELLER:  Okay.  Have a seat in the back there.
   DET. FESMIRE:  That'd be good.
2  UNKNOWN:  Okay.  (Unintelligible)
   DET. KELLER:  Yeah.
3  UNKNOWN:  (Unintelligible).
   DET. KELLER:  Okay.  I'll – I'll meet you back (unintelligible).
4  UNKNOWN:  Okay.
   K. HER:  (Unintelligible)
5  DET. FESMIRE:  It's just your picture that we have of you.
   DET. KELLER:  Hopefully we can get out of here when the time
6  comes.
   K. HER:  So what you mean about –
7  DET. FESMIRE:  That's you.
   K. HER:  What about driving back or –
8  DET. KELLER:  Drive?
   K. HER:  Or fly?
9  DET. FESMIRE:  You're high if you think we're driving.
   DET. KELLER:  We'll fly back.
10 K. HER:  It's free for me, right?
   DET. KELLER:  Huh?
11 K. HER:  Is it free for me or (unintelligible)?
   DET. KELLER:  Yeah, we're paying – we're paying your way.
12 K. HER:  All right.
   DET. KELLER:  All right?
13 K. HER:  I just want to ask cuz I don't – I don't – I want to know if
   I'm going to pay after or anything.
14 DET. KELLER:  Pay what?
   K. HER:  Pay after.
15 DET. KELLER:  To come back?
   K. HER:  No, to go back.  Pay after the flight.
16 DET. KELLER:  No, we're paying.
   K. HER:  I know.
17 DET. KELLER:  You –
   K. HER:  I was just asking.
18 DET. KELLER: You don't have to pay.
   DET. FESMIRE:  And –
19 DET. KELLER:  Um, --
   DET. FESMIRE:  You wouldn't get a choice, really, cuz it's a
20 warrant.  So – unfortunately.
   DET. KELLER:  Kinson, where you been staying out here?
21 (Unintelligible)
   K. HER:  Oh, it's – I think it's 30 – either 1316 or 1613.
22 DET. KELLER:  What?
   K. HER:  4th Ave.
23 DET. KELLER:  4th Ave.?
   K. HER:  Yeah.
24 DET. KELLER:  Is that here in Minneapolis?
   K. HER:  Uh-huh.
25 DET. KELLER:  And whose place is that?
   K. HER:  Oh, um Tom.  I was staying with – I don't know if
26 (unintelligible) name, but I was staying with him for like two

66

1   weeks or two months.
    DET. KELLER:  Okay.  Tom what?
2   K. HER:  Tom Baker.
    DET. KELLER:  Is that a relative or just a friend?
3   K. HER:  He's like my in-law.  He's like my brother-in-law.
    DET. KELLER:  Oh, brother-in-law?
4   K. HER:  Like – he's like my auntie's – he's like my auntie's
    husband.
5   DET. KELLER:  So by marriage he is related?
    K. HER:  Yeah.
6   DET. KELLER:  Okay.  How old is Tom?
    K. HER:  He's like twenty.
7   DET. KELLER:  Is there a phone number out there?
    K. HER:  No.
8   DET. KELLER:  How far away is that from, uh, where we're at
    right now?
9   K. HER:  I'm not even sure.
    DET. KELLER:  Oh, really?
10  K. HER:  I don't even know where we're at right now.
    DET. KELLER:  Okay.  Okay.
11  K. HER:  I don't know my way around.
    DET. KELLER: You know more than we do.  So that's where
12  you've been staying since you came back here?
    K. HER:  Yeah.
13  DET. KELLER:  Do you have any clothes and stuff like that there?
    K. HER:  Um, nope.  Not right now.
14  DET. KELLER:  Where are all your clothes and all that stuff?
    K. HER:  At my – oh, at my girlfriend's house.
15  DET. KELLER:  Okay.  Who's that?
    K. HER:  Lisa.
16  DET. KELLER:  Lisa what?
    K. HER:  Lisa Vang.
17  DET. KELLER:  Vang?
    K. HER:  Yeah.
18  DET. KELLER:  And how old is she?
    K. HER:  She's eighteen.
19  DET. KELLER:  And what's her address?
    K. HER:  I don't know her address.
20  DET. KELLER:  What street?
    K. HER:  Uh, I'm not sure.  I got it in the room.
21  DET. KELLER:  Okay, how about a phone for Lisa?
    K. HER:  Yeah, I (unintelligible) in the room.  I don't –
22  DET. KELLER:  Okay.  You don't have it?  All right.  How long
    you been – has she had your stuff?  You don't stay with her?
23  K. HER:  Uh, she was – she was with me for a while
    (unintelligible).
24  DET. KELLER:  She was staying at, uh, Tom's house?
    K. HER:  Yeah, for a while.
25  DET. KELLER:  Uh, when did she pick all your stuff up?
    K. HER:  Uh, I'm not sure.  She's – I'm not sure.  She wrote to me.
26  She's like – she's – she's like she got my clothes.  She gonna send

67

1    it to (unintelligible).  I'm not sure.
DET. KELLER:  So basically after you got rolled up she went and
2    got your stuff –
K. HER:  Yeah.
3    DET. KELLER:  – from Tom's house and took it back to her
house?
4    K. HER:  Yeah, that's what she said.  Yes, sir.
DET. KELLER:  Okay.  Who's Lisa live with?
5    K. HER:  Uh, her parents.
DET. KELLER:  Her mom and dad or –
6    K. HER:  Yeah.
DET. KELLER:  And you don't know either of the phone
7    numbers?  Both Tom and (unintelligible) --
K. HER:  He don't have no phone.
8    DET. KELLER:  Do you have family back here?  Other than like
brother-in-law and stuff?  I mean, immediate family?
9    K. HER:  Yeah, like my brother cousins.
DET. KELLER:   Cousins?
10    K. HER:  Yeah.
DET. KELLER:  Who – who are they?
11    K. HER:  My cousins.  But then I – I – I haven't seen them ever
since I got here.  I haven't talked to them.
12    DET. KELLER:  Okay.  So that's not why you came out here, then,
to – to be with them or –
13    K. HER:  (No audible response.)
DET. KELLER:  Okay.  You know, I'm not sure.  I guess you got
14    rolled up because you were the victim in the shooting?  Is that what
–
15    K. HER:  Yeah.
DET. KELLER:  You guys were in a car that got shot up or –
16    K. HER:  Yeah.
DET. KELLER:  – somebody got –
17    K. HER:  Yeah.
DET. KELLER:  Some girl got shot?
18    K. HER:  Yeah.
DET. KELLER:  And that was Lisa's sister that got shot?
19    K. HER:  No, that was Tom's wife.
DET. KELLER:  Tom's wife?  So your aunt?
20    K. HER:  Yeah.
DET. KELLER:  Okay.  What's her name?
21    K. HER:  Mee.
DET. KELLER:  M-E-E?
22    K. HER:  Yeah.
DET. KELLER:  And that's your aunt?
23    K. HER:  Yeah.
DET. KELLER:  What's her last name?
24    K. HER:  Her.
DET. KELLER:  Baker or –
25    K. HER:  Her.
DET. KELLER:  Her?  She's the one that got shot in the arm or
26    something?

1   K. HER:  Yeah.
DET. KELLER:  She gonna be okay?
2   K. HER:  I don't know.  I haven't talked to her.
DET. KELLER:  You haven't heard from her?
3   K. HER:  No.  Cuz they don't let me call no one.  Only my parents.
DET. KELLER:  And you've talked to Mom and Dad back in
4   Sacramento?
K. HER:  Um, yeah.
5   DET. KELLER:  Cuz they reported you as a –
K. HER:  Yeah.
6   DET. KELLER:  – missing person a while back.
K. HER:  I called them – I called them – they – they actually knew
7   I was up here, but I don't know, I guess (unintelligible).  But I told
them when I was up here.
8   DET. KELLER:  I don't blame them for worrying.
K. HER:  Yeah.
9   DET. KELLER:  Uh, like I say, they reported you missing, but they
do know you – you're in custody and all that?
10   K. HER:  Yeah.
DET. KELLER:  People out here called and –
11   K. HER:  No.
DET. KELLER:  – talked to them?
12   K. HER:  I don't think they did.  I did.
DET. KELLER:  What's your home address?
13   K. HER:  3585 Sandy – uh 18th Street.
DET. KELLER: Uh, and the phone?
14   K. HER:  [redacted].
DET. KELLER:  What's Mom's name?
15   K. HER:  Mee.
DET. KELLER:  Her?
16   K. HER:  For.
DET. KELLER:  T-H-O-R?
17   K. HER:  F-O-R.
DET. KELLER:  And Dad?
18   K. HER:  Wayne (unintelligible) Her.
DET. KELLER:  Wayne?
19   K. HER:  Yeah.
DET. KELLER:  For?  Or –
20   K. HER:  Her.
DET. KELLER:  – Her, you said?  And who else lives there at, uh,
21   18th Street?
K. HER:  Uh, on 18th Street?
22   DET. KELLER:  Yeah, at Mom and Dad's?
K. HER:  My brothers and sisters.
23   DET. KELLER:  How many brothers?
K. HER:  Like my brother lives next door and my – one – him and
24   my brother own it, two of my brothers.  But there's like two
different – it's like a duplex.
25   DET. KELLER:  Okay.  So you guys are in both houses in the du –
duplex?  (Unintelligible)
26   K. HER:  It's like next to each other.

1    DET. KELLER:  Okay.
K. HER:  Yeah, I live with – I got two brothers that live with me
2    and three sisters.
DET. KELLER:  But some of them live in the du –
3    K. HER:  Uh-huh.
DET. KELLER:  – duplex next door, right?
4    K. HER:  Yeah.
DET. KELLER:  Which – what are the names of the brothers?
5    K. HER:  John. And X-A, Xa.
DET. KELLER:  X-A?
6    K. HER: Yeah.  That's – they live – actually, I just live with like
one of my brothers.
7    DET. KELLER:  Okay.  Which one?
K. HER:  John.
8    DET. KELLER:  How old is John?
K. HER:  Like seventeen.
9    DET. KELLER:  How old is X-A?
K. HER:  Like – he's like a – like an older dude.  Like thirty.
10    Thirty (unintelligible) --
DET. KELLER:  That ain't that old, dude.  Come on.
11    K. HER:  (Unintelligible)
DET. KELLER:  Don't insult me.
12    K. HER:  Compared to me.  I mean, yeah.
DET. KELLER:  Um, which – what are your sisters' names?
13    K. HER:  Julie, Donna and Laura.
DET. KELLER:  Donna and what?
14    K. HER:  Laura.
DET. KELLER:  Laura?  Those are American names or those are
15    birth names?
K. HER:  Yeah, they're birth names.
16    DET. KELLER:  Okay.  How old is Julie?
K. HER:  She's, I think, twenty-one.  I think Donna – I don't know.
17    She probably like around twenty.
DET. KELLER:  And Laura?
18    K. HER:  Thirteen.
DET. KELLER:  So Laura's the youngest?
19    K. HER:  Yeah.
K. HER:  And then you?
20    K. HER:  Uh-huh.
DET. KELLER:  And then it looks like John?
21    K. HER:  Yeah.
DET. KELLER:  Now what is your real name?
22    K. HER:  Kinson.
DET. KELLER:  Now is that your American name?
23    K. HER:  Yeah, you could say.
DET. KELLER:  Okay.  What's your, uh – you're Hmong?
24    K. HER:  Yeah.
DET. KELLER:  Okay.  What's your Hmong name?
25    K. HER:  I don't got no Hmong name.  I don't know if – I don't
know if – because they're (unintelligible) all name was American
26    name.  But that's the only name I have.  I don't have no American

70

1  name.
DET. KELLER:  Okay.  That's Her, right?

2  K. HER:  Yeah.
DET. KELLER:  And what's your real birth date?

3  K. HER:  September 20th.
DET. KELLER:  September 20th?

4  K. HER:  '86.
DET. KELLER:  And you're fifteen?

5  K. HER:  Yeah.
DET. KELLER:  Were you born here in the U.S. or –

6  K. HER:  Yeah.
DET. KELLER:  Where at?

7  K. HER:  Sacramento.
DET. KELLER:  In Sac?

8  DET. FESMIRE:  Do you know where at?  What hospital in
(unintelligible)?

9  K. HER:  Nope.  I don't know.
DET. KELLER:  Uh, does your dad work?

10  K. HER:  Uh, nope, not that I know of.
DET. KELLER:  No?  What about Mom?

11  K. HER:  No.
DET. KELLER:  What do they do for money?

12  K. HER:  I don't know.
DET. KELLER:  They get some kind of –

13  K. HER:  Welfare.
DET. KELLER:  – assistance?  Uh, you got any idea why we're

14  back here, Kinson?
K. HER:  No.  To come pick me up, that's what they said.  And

15  what was the warrant for, anyway?
DET. KELLER:  Probation.

16  K. HER:  Violation?
DET. KELLER:  Yeah.  Who's your P.O.?  Is it Montana?

17  K. HER:  Yeah.  I think –
DET. KELLER:  Or somebody else?

18  K. HER:  I'm not sure.  I think it's John Montana.
DET. KELLER:  It was Montana and then somebody else took it, I

19  think?
K. HER:  I'm not sure but – I'm not sure myself.  The last time it

20  was like Montana.
DET. KELLER:  Okay.  Yeah, I think – cuz when I talked to John I

21  think he submitted – you're actually on somebody else's caseload
now.

22  K. HER:  So is this a probation violation?
DET. KELLER:  Yeah.

23  K. HER:  For going out of state?
DET. KELLER:  Yeah, for not being where you're supposed to be.

24  That's part of your probation.  And Mom and Dad reported you as
a runaway or missing person or something.  So (unintelligible)

25  been trying to figure out where you're at.  So – and there's some
things that we need to talk about, okay?

26  K. HER:  Yeah.

71

1   DET. KELLER:  Has anybody read your rights since you got rolled
    up on this thing?
2   K. HER:  Nope.
    DET. KELLER:  Okay.  Have you had them read before?
3   K. HER:  Um, yeah.
    DET. KELLER:  Okay.  What kind of –
4   K. HER:  (Unintelligible).  I don't remember.
    DET. KELLER:  On some kind of case?
5   K. HER:  Yeah.
    DET. KELLER:  What are you on probation for, uh, Kinson?
6   K. HER:  For GTA, grand theft auto.
    DET. KELLER:  You and a million other kids, huh?
7   K. HER:  Like, yeah, (unintelligible).

8   (Clerk's Tr. at p. 655-669.)  Whereupon, Petitioner was read and waived his <u>Miranda</u> rights.

9       Petitioner argues that giving the <u>Miranda</u> warnings "mid-stream" violated <u>Missouri v.

10  Seibert</u>, 542 U.S. 600 (2004).  He states in his amended federal habeas petition that his pre-

11  <u>Miranda</u> statements led detectives to search Lisa Vang's family home where Petitioner's duffel

12  bag and a series of letters were found which were used as proof of gang affiliation and

13  association with co-defendant Lao.  (<u>See</u> Pet'r's Am. Pet. at p. 56.)  Additionally, the Petitioner

14  argues that the admission of the post-<u>Miranda</u> interrogation was impermissible because it was

15  used to establish that Petitioner was untruthful in claiming not to know co-defendant Lao.

16  (<u>See</u> <u>id.</u>)

17      In <u>Seibert</u>, 542 U.S. at 604, the United States Supreme Court held that the "midstream

18  recitation of warnings after interrogation and unwarned confession could not effectively comply

19  with <u>Miranda's</u> constitutional requirement [such that] a statement repeated after a warning in

20  such circumstances is inadmissible."  An impermissible two-step interrogation process is one

21  where "a confession [is] obtained after a <u>Miranda</u> warning but preceded by the suspect's earlier,

22  unwarned incriminating statements."  <u>United States v. Williams</u>, 435 F.3d 1148, 1152 (9th Cir.

23  2006).  It is impermissible to employ this technique if the midstream <u>Miranda</u> warnings do not

24  effectively appraise the defendant of his constitutional rights.  <u>See</u> <u>id.</u> at p. 1157-58.  The test

25  used to determine this is whether (1) the use of the interrogation technique by officers was

26  deliberate, <u>see</u> <u>id.</u> at 1159, and (2) the midstream <u>Miranda</u> warnings "adequately and effectively

1    apprised the suspect that he had a 'genuine choice whether to follow up on [his] earlier

2    admission.'" Id. at 1160 (quoting Seibert, 542 U.S. at 615).

3           At the outset, Petitioner provides no indication that the use of the interrogation technique

4    in waiting to give Petitioner his Miranda rights after some preliminary questions were asked was

5    deliberately done by the detectives.  Furthermore, as noted by the California Court of Appeal,

6    Petitioner never made any confession in his interview with Detective Keller.  He steadfastly

7    denied anything to do with the shooting at 3212 Western.  There was strong evidence linking

8    Petitioner to this crime and his gang activity and there was little to no evidence that was gleaned

9    from the interrogation as Petitioner was steadfast in his denials.  This included the physical DNA

10   evidence, the gang expert's testimony and his girlfriend Ly's testimony.  Thus, assuming

11   *arguendo* that any Miranda violation occurred by admitting the pre and post-Miranda statements,

12   any error would be deemed harmless under Brecht.  The evidence from the interrogation (both

13   pre and post-warnings) did not have had a substantial and injurious effect on the jury's verdict.

14          Next, Petitioner argues that his repeated invocations of his right to remain silent were

15   ignored by the detectives after he was given his Miranda warnings.  The following colloquies

16   took place between Detective Keller and Petitioner during the interrogation:

17               K. HER:  You need to get on your thing.  I don't – I don't even – I
                 don't even know who he is.  I don't – okay, so what, I can just be
18               [quiet until like, uh court].
                 DET. KELLER:  Well, yeah, you could.  But Ricky's in jail right
19               now on a murder, okay?  And he's trying to implicate you as being
                 involved.
20               K. HER:  Involved with him (unintelligible)?

21   (Clerk's Tr. at p. 705-06; see also Resp't's Lodged Doc. 1 at p. 42-43.)

22               K. HER:  So I could just wait until my court date to say anything?
                 DET. KELLER:  If that's what you choose.
23               K. HER:  (Inaudible).
                 DET. KELLER:  Well, you're the one that's gonna be looking at
24               getting charged with murder, okay?  And if you're not a shooter or
                 you're not the one that did it, this is the time – this is gonna be the
25               only time we talk to you, okay?
                 K. HER:  Uh-huh.
26               DET. KELLER:  We're gonna go back and we're gonna write up a

1     warrant requesting you be charged with murder and submit it to the
      district attorney and the judge.  And this is your only opportunity –
2     I mean, if you're not involved you need to tell me because
      otherwise it's gonna be too late.  And once you catch a murder on
3     your record it stays for good.
      K. HER:  So, what, we're gonna go back tomorrow?
4     DET. KELLER:  Uh-huh.  Why don't you want to be honest about
      this?  Or are you just a cold-blooded killer?  Is that the real deal?
5     K. HER:  I ain't no killer.  I ain't no cold-blooded killer.
      DET. KELLER:  Well, then be honest about what happened down
6     there.  Tell me about it.
      K. HER:  What, I can't wait 'til, um, court?
7     DET. KELLER:  You can.
      K. HER:  Well, that's what I want to do.
8     DET. KELLER:  Okay.  All right.  Well, when we get back we're
      gonna write up a warrant requesting you be charged with murder
9     on a drive-by shooting.
      K. HER:  So if –
10    DET. KELLER:  Gang-related.
      K. HER:  If I go to court could like my sister – could my sister go?
11    DET. KELLER:  Court's open to the public.  Okay?
      K. HER:  Okay.
12    DET. KELLER:  And after you think about this tonight and
      whatever, you know, if you decide tomorrow that you want to be
13    honest about this before it's too late, you tell me and we'll talk
      about it on the plane or whatever.  Okay?
14    K. HER:  Uh-huh.
      DET. KELLER:  Get you back to your cell and figure out where
15    you need to go from there.
      (End of Interview)

16

17    (Clerk's Tr. at p. 710-12.)

18         Petitioner argues that the above colloquies indicate that he subsequently withdrew his

19    Miranda waiver by invoking his right to remain silent.  In order to invoke one's Fifth

20    Amendment right to silence, a suspect must do so unambiguously.  See Berghuis, 130 S.Ct. at

21    2260 ("Thompkins did not say that he wanted to remain silent or that he did not want to talk with

22    the police.  Had he made either of these simple, unambiguous statements, he would have invoked

23    his right to cut off questioning.  Here he did neither, so he did not invoke his right to remain

24    silent.") (internal quotation marks and citations omitted).  In this case, Petitioner did not

25    unambiguously invoke his right to remain silent until he told Detective Keller that he wanted to

26    wait until he was in court to make a statement.  Petitioner comments leading up to that statement

74

1   were in question form to Detective Keller regarding the invocation of his right to remain silent.

2   As such, Petitioner fails to show that the admission of his statement violated his right to remain

3   silent as the interrogation ceased after Petitioner unambiguously asserted that right.

4       Even assuming *arguendo* that there was a <u>Miranda</u> violation with respect to Detective

5   Keller's failure to allow Petitioner to remain silent, any error was harmless.  The admission of

6   Petitioner's statement did not have a substantial or injurious effect on the jury's verdict.  The

7   admission of the interrogation into evidence, in which Petitioner denied knowing his co-

8   defendant and denied any wrongdoing with respect to the drive-by shooting did not have a

9   substantial and injurious effect on the jury's verdict.  Thus, for the foregoing reasons, Petitioner

10  is not entitled to federal habeas relief on his <u>Miranda</u> violation arguments.

11      W.  Claim XXV

12      In Claim XXV, Petitioner argues that his sentence of twenty-five years to life

13  imprisonment violated the Eighth Amendment's protection against cruel and unusual

14  punishment.  The last reasoned decision on this Claim was from the California Court of Appeal

15  on direct appeal which stated the following[3]:

16          Her claims that a state prison sentence of 25 years to life violates
            both the state and federal prohibitions against cruel and unusual
17          punishment.

18          Preliminary, we note the issue has not been preserved for review,
            since Her's counsel did not challenge the constitutionality of his
19          sentence below.  (<u>People v. Norman</u> (2003) 109 Cal.App.4th 221,
            229 (<u>Norman</u>); <u>People v. DeJesus</u> (1995) 38 Cal.App.4th 1, 27.)
20

21          However, we shall reach the merits of the claim in the interest of
            judicial economy and to forestall the "inevitable ineffectiveness-of-
22          counsel claim."  (<u>Norman</u>, <u>supra</u>, 109 Cal.App.4th at p. 230.)

23          The Eighth Amendment to the United States Constitution
            proscribes "cruel and unusual punishment" and "contains a 'narrow
24          proportionality principle' that 'applies to noncapital sentences.'"
            (<u>Ewing v. California</u> (2003) 538 U.S. 11, 20 [155 L.Ed.2d 108,

25

26     [3] Petitioner raised this Claim to the California Supreme Court on direct appeal in his
    petition for review which was summarily denied.

75

117], quoting <u>Harmelin v. Michigan</u> (1991) 501 U.S. 957, 996-997 [115 L.Ed.2d 836, 866] (conc. opn. of Kennedy, J., joined by O'Connor & Souter, JJ.)  That principle prohibits "'imposition of a sentence that is grossly disproportionate to the severity of the crime.'"  (<u>Ewing</u>, <u>supra</u>, 538 U.S. at p. 21 [155 L.Ed.2d at p. 117], quoting <u>Rummel v. Estelle</u> (1980) 445 U.S. 263, 271 [63 L.Ed.2d 382, 389]), although in a noncapital case, successful proportionality challenges are "'exceedingly rare.'" (<u>Ibid.</u>)

Her relies primarily on <u>People v. Dillon</u> (1983) 34 Cal.3d 441, 479 (<u>Dillon</u>) to advance his disproportionality argument.  We are not persuaded.  In <u>Dillon</u>, a 17-year-old boy was convicted of first degree felony murder and sentenced to life imprisonment for shooting an *armed man who approached him* during the defendant's attempted robbery of a marijuana farm.  (<u>Id</u>. at pp. 451-452.)  Both the judge and jury believed the defendant should be committed to the California Youth Authority, but since he was ineligible, the court had no alternative but to sentence him to life imprisonment.  (<u>Id</u>. at pp. 485-487.)  Noting that the other participants in the robbery received relatively "petty chastisements" (<u>id</u>. at p. 488), as well as the harshness of the felony-murder rule, the state Supreme Court concluded the defendant's punishment was cruel and unusual within the meaning of article I, section 17 of the California Constitution (<u>id</u>. at pp. 486-489).

By contrast, the jury here found that Her committed a *premeditated* murder to promote the activities of a criminal street gang.  Unlike the youth in <u>Dillon</u> who had no prior trouble with the law, Her was a documented gang member who was on probation when he committed the murder and fled the jurisdiction the next day.

In <u>Demirdjian</u>, <u>supra</u> 144 Cal.App.4th 10, the Court of Appeal for the Second Appellate District, Division Four, upheld the constitutionality of a 25-year-to-life sentence for a defendant who committed two unprovoked murders at the age of 15.  (<u>Id</u>. at p. 16.)  The court quoted from <u>People v. Guinn</u> (1994) 28 Cal.App.4th 1130, which upheld a sentence of life *without parole* in the case of a defendant who committed an unprovoked murder at age 17:  "[W]hile that punishment is very severe, 'the People of the State of California in enacting the provision [authorizing this punishment] . . . made a legislative choice that some 16- and 17-year olds, who are tried as adults, and who commit the adult crime of special circumstance murder, are presumptively to be punished with LWOP.  We are unwilling to hold that such a legislative choice is necessarily too extreme, given the social reality of the many horrendous crimes, committed by increasingly vicious youthful offenders, which undoubtedly spurred the enactment.'" (<u>Demirdjian</u>, <u>supra</u>, 144 Cal.App.4th at p. 16, quoting <u>Guinn</u>, <u>supra</u> 28 Cal.App.4th at p. 1147.)

The logic of <u>Guinn</u> and <u>Demirdjian</u> applies here.  Unlike the

76

youthful offender in <u>Guinn</u> whose sentence totally precludes his release, Her's immediate sentence means that he stands a reasonable chance of leaving the prison walls before he reaches old age.  There is nothing shocking or unconscionable about such a disposition. [FN 8]

[FN 8]  Her also cites the United Nations Convention on the Rights of the Child and the United States Supreme Court case of <u>Roper v. Simmons</u> (2005) 543 U.S. 551, 575 [161 L.Ed.2d 1, 25], which found that imposition of the death penalty for juvenile offenders constituted cruel or unusual punishment.  These authorities are so far removed from the present circumstances that the argument built around them requires no separate reply.

We conclude that a life sentence with the possibility of parole for a criminally sophisticated 15 year old convicted of a special-circumstance murder to promote the objectives of a criminal street gang violates neither the Eighth Amendment nor article 1, section 17 of the California Constitution.

(Slip Op. at p. 29-32.)

At the outset to the extent that Petitioner based this Claim on the California Constitution, it is not cognizable on federal habeas review.  <u>See</u> <u>Estelle</u>, 502 U.S. at 67-68 ("In conducing habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States.").

A criminal sentence that is not proportionate to the crime of conviction may indeed violate the Eighth Amendment to the United States Constitution.  Outside of the capital punishment context, however, the Eighth Amendment "'forbids only extreme sentences that are grossly disproportionate to the crime.'"  <u>United States v. Bland</u>, 961 F.2d 123, 129 (9th Cir. 1992) (quoting <u>Harmelin v. Michigan</u>, 501 U.S. 957, 1010 (1991) (Kennedy, J., concurring)). The threshold for an inference of gross disproportionality is high.  So long as the sentence does not exceed statutory maximums, it will not be considered cruel and unusual punishment under the Eighth Amendment.  <u>See</u> <u>United States v. Mejia-Mesa</u>, 153 F.3d 925, 930 (9th Cir. 1998); <u>United States v. McDougherty</u>, 920 F.2d 569, 576 (9th Cir. 1990).  The Ninth Circuit has observed that "[u]nder <u>Harmelin</u>, it is clear that a mandatory life sentence for murder does not constitute cruel and unusual punishment."  <u>United States v. LaFleur</u>, 971 F.2d 200, 211 (9th Cir.

1991).  The Supreme Court has noted that "[o]utside of the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." Rummel v. Estelle, 445 U.S. 263, 272 (1980).  Furthermore, the Ninth Circuit has explained that "while capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences.  Like any other prison sentence, it raises no inference of disproportionality when imposed on a murderer."  See Harris v. Wright, 93 F.3d 581, 585 (9th Cir. 1996) (internal citation omitted).

Petitioner points to no case from the United States Supreme Court holding that juveniles cannot be sentenced to life imprisonment with the possibility of parole for homicide. See Graham v. Florida, 130 S.Ct. 2011, 2043 (2010) (opinion of Thomas, J., dissenting) ("The Court holds today that it is 'grossly disproportionate' and hence unconstitutional for any judge or jury to impose a sentence of life without parole on an offender less than 18 years old, unless he has committed a homicide.").  The Supreme Court in Graham noted that "[j]uvenile offenders who committed both homicide and nonhomicide crimes present a different situation for a sentencing judge than juvenile offenders who committed no homicide.  It is difficult to say that a defendant who receives a life sentence on a nonhomicide offense but who was at the same time convicted of homicide is not in some sense being punished in part for the homicide when the judge makes the sentencing determination."  130 S.Ct. at 2023.  Thus, it appears as if the Supreme Court has at least tacitly recognized that life without parole for a juvenile who has committed homicide does not violate the Eighth Amendment.  See also Harris, 93 F.3d 581, 585 (9th Cir. 1996) ("[C]apital punishment aside, there's no constitutional (or rational) basis for classifying punishment in distinct, ordinal categories.  As the Supreme Court noted in Harmelin, 501 U.S. at 996, 111 S.Ct. 2702, if we put mandatory life imprisonment without parole into a unique constitutional category, we'll be hard pressed to distinguish mandatory life with parole; the latter is nearly indistinguishable from a very long, mandatory term of years; and that, in turn,

78

is hard to distinguish from shorter terms.  Youth has no obvious bearing on this problem: If we can discern no clear line for adults, neither can we for youths.  Accordingly, while capital punishment is unique and must be treated specially, mandatory life imprisonment without parole is, for young and old alike, only an outlying point on the continuum of prison sentences.  See id. at 995-96, 111 S.Ct. at 2701-02.  Like any other prison sentence, it raises no inference of disproportionality when imposed on a murderer.");  Williams v. Ryan, Civ. No. 05-737, 2010 WL 3768151, at *30 (S.D. Cal. Sept. 21, 2010).  Petitioner's reliance on things such as the Convention of the Rights of the Child and cases such as Roper v. Simmons, 543 U.S. 551 (2005) are unavailing and distinguishable as Petitioner did not receive a death sentence.

In this case, Petitioner was not even sentenced to life without the possibility of parole.  In light of the fact that Petitioner relies on no Supreme Court case that shows that life with the possibility of parole violates the Eighth Amendment's protection from cruel and unusual punishment, and that the Ninth Circuit has held that life without parole for juveniles raises no inference of disproportionality, the California Court of Appeal's decision denying this Claim was not an unreasonable application of clearly established federal law.  Petitioner is not entitled to federal habeas relief on Claim XXV.

X.  Claim XXVI

In Claim XXVI, Petitioner argued that the California Court of Appeal erred in modifying Petitioner's sentence of life without the possibility of parole without remanding the matter to the trial court for re-sentencing.  However, Petitioner withdrew this argument as stated in his traverse.

Y.  Claim XXVII

In Petitioner's final Claim, he argues that "[t]he combined errors of insufficient evidence, ineffective assistance of counsel, trial court errors, jury instructional errors, prosecutor misconduct, and sentencing errors have compounded the prejudice caused by the other, to the petitioner's detriment and are caused for a reversal of the petitioner's case."  (Pet'r's Am. Pet. at

p. 70.)  Petitioner raised this Claim in his state habeas petitions.  The last reasoned decision was from the Sacramento County Superior Court which stated that, "[f]inally petitioner claims that the cumulative errors are prejudicial and require reversal of the judgment.  [¶]  Petitioner has shown no error, and reversal is not required."  (Resp't's Lodged Doc. 11 at p. 6.)

The Supreme Court has clearly established that the combined effect of multiple errors violates due process where it renders the resulting criminal trial fundamentally unfair.  See Chambers v. Mississippi, 410 U.S. 284, 298, 302-03 (1973).  "The cumulative effect of multiple errors can violate due process even where no single error rises to the level of a constitutional violation or would independently warrant reversal."  Parle v. Runnels, 505 F.3d 922, 927 (9th Cir. 2007) (citing Chambers, 410 U.S. at 290 n.3).  "[C]umulative error warrants habeas relief only where the errors have 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'"  Id. (quoting Donnelly v. DeChristoforo, 416 U.S. 637, 643 (1974).  "Such 'infection' occurs where the combined effect of the errors had a 'substantial and injurious effect or influence on the jury's verdict.'"  Id. (quoting Brecht, 507 U.S. at 637).  Thus, "where the combined effect of individually harmless errors renders a criminal defense 'far less persuasive than it might [otherwise] have been,' the resulting conviction violates due process." Id. (quoting Chambers, 410 U.S. at 294).  However, if evidence of guilt is overwhelming, errors are considered "harmless" and the conviction will generally be affirmed.  See Parle, 505 F.3d at 928.

In this case, the evidence of Petitioner's guilt was strong as previously described.  Therefore, any alleged "errors" did not have had a substantial and injurious effect or influence on the jury's verdict and would be considered harmless.  Petitioner is not entitled to federal habeas relief on his cumulative error argument.

## VI.  PETITIONER'S REQUESTS

A.  Motion for Leave to File Oversized Brief

On January 10, 2011, Petitioner filed a motion to file an oversized traverse along with a

80

1  copy of his traverse.  This motion will be granted and the traverse is deemed properly filed.

2       B.  Request for the Appointment of Counsel

3       Petitioner requests the appointment of counsel.  (See Pet'r's Am. Pet. at p. 71.)  There

4  currently exists no absolute right to the appointment of counsel in habeas proceedings.  See, e.g.,

5  Nevius v. Sumner, 105 F.3d 453, 460 (9th Cir. 1996).  However, 18 U.S.C. § 3006A authorizes

6  the appointment of counsel at any stage of the case "if the interests of justice so require."  In the

7  present case, the interests of justice do not so require to warrant the appointment of counsel.

8  Accordingly, Petitioner's request for the appointment of counsel is denied.

9       C.  Request for an Evidentiary Hearing

10       Finally, Petitioner requests an evidentiary hearing.  (See Pet'r's Am. Pet. at p. 71.)  A

11  court presented with a request for an evidentiary hearing must first determine whether a factual

12  basis exists in the record to support petitioner's claims, and if not, whether an evidentiary hearing

13  "might be appropriate."  Baja v. Ducharme, 187 F.3d 1075, 1078 (9th Cir. 1999); see also Earp v.

14  Ornoski, 431 F.3d 1158, 1166 (9th Cir. 2005).  A petitioner requesting an evidentiary hearing

15  must also demonstrate that he has presented a "colorable claim for relief."  Earp, 431 F.3d at

16  1167 (citations omitted).  To show that a claim is "colorable," a petitioner is "required to allege

17  specific facts which, if true, would entitle him to relief."  Ortiz v. Stewart, 149 F.3d 923, 934 (9th

18  Cir. 1998) (internal quotation marks and citation omitted).  In this case, an evidentiary hearing is

19  not warranted for the reasons stated in supra Part V.  Petitioner failed to demonstrate that he has

20  a colorable claim for federal habeas relief.  Thus, his request will be denied.

21                 VII.  CONCLUSION

22       Accordingly, IT IS HEREBY ORDERED that:

23       1.     Petitioner's motion to file an oversized brief filed January 10, 2011 is

24            GRANTED, and Petitioner's traverse is deemed properly filed;

25       2.     Petitioner's request for the appointment of counsel is DENIED; and

26       3.     Petitioner's request for an evidentiary hearing is DENIED.

1       For all of the foregoing reasons, IT IS RECOMMENDED that the petition for writ of

2  habeas corpus be DENIED.

3       These findings and recommendations are submitted to the United States District Judge

4  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one days

5  after being served with these findings and recommendations, any party may file written

6  objections with the court and serve a copy on all parties.  Such a document should be captioned

7  "Objections to Magistrate Judge's Findings and Recommendations."  Any reply to the objections

8  shall be served and filed within seven days after service of the objections.  The parties are

9  advised that failure to file objections within the specified time may waive the right to appeal the

10  District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).  In any objections he

11  elects to file, Petitioner may address whether a certificate of appealability should issue in the

12  event he elects to file an appeal from the judgment in this case.  See Rule 11, Federal Rules

13  Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability

14  when it enters a final order adverse to the applicant).

15  DATED:  April 15, 2011

19               TIMOTHY J BOMMER
                  UNITED STATES MAGISTRATE JUDGE